IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| Smokecraft Clarendon, LLC | * | Case No: 24-13609 |
| | | (Chapter 11) |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**CAPITAL BANK NATIONAL ASSOCIATION'S OBJECTION TO
DEBTOR'S FIRST AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**

Capital Bank, National Association ("Capital Bank"), by counsel, files this Objection (the "Objection") to Debtor's First Amended Subchapter V Plan of Reorganization (the "Plan"), because it fails to comply with the obligations imposed by the United States Bankruptcy Code. In support of this Objection, Capital Bank states as follows:

**I.   INTRODUCTION**

The Court should deny confirmation of the Plan because it fails to comply with the obligations imposed by Sections 1191 and 1129[1], including that (i) it dramatically undervalues Capital Bank's collateral, which Capital Bank has appraised and which appraisal is significantly higher than the proposed Plan distributions to Capital Bank; and (ii) as pointed out by the objection filed by the Office of the United States Trustee [Dkt. 81], the proposed Plan is neither feasible, nor fair and equitable.

The Court should deny confirmation of the Plan.

**II.   BACKGROUND**

1. On April 29, 2024 (the "Petition Date"), the Debtor commenced this Chapter 11 proceeding under Subchapter V of Title 11 of the United States Code.

2. As further described hereinafter, Capital Bank is a first-priority secured creditor of the Debtor with a blanket lien on all of Debtor's assets.

3. In January 2020, Capital Bank, the Debtor, and the Debtor's majority owner Smokecraft Holdings, LLC ("Holdings") entered into various agreements to fund the Debtor's

---
[1] All Section references are to the United States Bankruptcy Code.

renovation and construction on existing improvements in its leased space in Arlington County, VA. Particularly, Capital Bank, the Debtor, and Holdings (as applicable with respect to each agreement) entered into the following (collectively, and together with all other related documents executed in connection therewith, the "Funding Agreements"):

a. Construction Loan Agreement (the "Loan"), dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings;

b. Security Agreement, dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings;

c. Credit Agreement, dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings, and Andrew C. Darneille (as guarantor);

d. Copyright Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

e. Patent Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

f. Trademark Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

g. Assignment of Contracts, dated as of January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

h. Subordination of Lien Agreement, dated as of July 2019, by and between, KBSIII 3003 Washington, LLC, the Debtor's landlord, the Debtor, and Capital Bank [date not completed in original];

i. U.S. Small Business Administration ("SBA") Authorization issued in connection with the Loan, having an SBA Loan No. of 36035970-10 and an approval date of March 15, 2019, as amended from time to time;

j. SBA Note, dated January 31, 2020, executed by Smokecraft Clarendon, LLC and Smokecraft Holdings, LLC as borrowers; and

k. SBA Unconditional Guarantee, dated January 31, 2020, executed by Andrew C. Darneille as guarantor.

4. The Funding Agreements granted Capital Bank a lien on all assets of the Debtor (the "Collateral") to secure the obligations created by the Funding Agreements and owed by the Debtor. Debtor does not contest that it executed each of the Funding Agreements and that they are enforceable, and the Court has granted orders authorizing the use of Capital Bank's cash collateral.

4935-9202-9448, v. 1

5. Capital Bank's blanket lien is perfected and as evidenced by, among other things, a UCC-1 financing statement filed on January 31, 2020, with the Virginia State Corporation Commission at File No.: 202001310319956.

6. Capital Bank asserts that pursuant to UCC § 9-204, the relevant Funding Agreements bear appropriate and necessary "after-acquired" and prospective indebtedness language and, thus, the UCC-1 financing statement properly perfected the lien securing the obligations created by the Funding Agreements.

7. Accordingly, Capital Bank holds a first-priority blanket lien on all of the Debtor's assets including, but not limited to, the Debtor's equipment, fixtures, and inventory; intellectual property; accounts; and improvements to its restaurant premises. Debtor disputes that Capital Bank has a lien on all fixtures.

8. On July 8, 2024, Capital Bank filed a proof of claim asserting a total claim of $917,126.61 (the "Claim"), of which $515,268.11 of the claim is secured, and $401,858.50 is unsecured. Since the filing of the Claim, Capital Bank obtained an appraisal of its collateral.

9. On July 31, 2024, AAA Certified Appraisers, LLC (the "Appraiser") issued a report (the "Appraisal") indicating that the appraised value of certain machinery and equipment items owned by the Debtor and located on the Debtor's premises (the "Appraised Collateral"), had a fair market value of $158,420.00 as of July 18, 2024. (See **Exhibit 1**, attached.)

10. The Appraiser categorized the Appraised Collateral into two groups. The first group, known as "Capital Equipment," includes high-value kitchen equipment such as ovens, ice makers, mixer, fryers, and smokers. Each piece of Capital Equipment was individually evaluated by the Appraiser. The second group, termed "Support and Ancillary Items," encompasses a range of supporting items such as shelving, pots, pans, skillets, carts, heat lamps, kitchen utensils, blenders, mixers, microwaves, processors, racks, customer utensils, plates, cups, bowls, bar and restaurant glasses, mugs, caddies, and other miscellaneous restaurant items.

11. The Appraised Collateral is exclusive of inventory; intellectual property; cash; accounts receivable; and other general intangibles, all of which constitute other collateral of

4935-9202-9448, v. 1

Capital bank. It is also exclusive of any items that constitute Capital Bank's collateral that were documented as being purchased by the Debtor with Capital Bank's loan, but not located on the Debtor's premises at the time of the appraisal. Accordingly, the value of the Appraised Collateral does not represent the full value of Capital Bank's allowed secured claim.

12. On August 9, 2024, the Debtor filed a Subchapter V Plan of Reorganization [Dkt. 49] (the "Subchapter V Plan"), wherein Debtor stated that the liquidation value of the Debtor's entire estate, including presumably the Appraised Collateral but also property that Debtor contends is not subject to Capital Bank's lien, is $108,247.53. (*See* Subchapter V Plan at page 3.)

13. On September 18, 2024, Capital Bank filed its Objection to Debtor's Chapter 11, Subchapter V Plan [Dkt. 60].

14. On October 2, 2024, Motleys Industrial (the "Debtor's Appraiser") issued a Liquidation Value Appraisal Report (the "Liquidation Appraisal") indicating that the appraised value of certain machinery and equipment items owned by the Debtor, had a value of $49,135.00 as of September 3, 2024. This is apparently the figure that the Debtor used in formulating its plan. (Plan, Dkt. 72, at pp. 3)

15. On November 8, 2024, Capital Bank served requests for production of documents on the Debtor. The Debtor responded to these requests but the documents provided create as many questions as they answer. For example, the trademark information for the Debtor's name indicates that it was initially filed by the Debtor but later transferred to the Debtor's non-debtor affiliate, Smokecraft Holdings, LLC. See, Trademark Log attached as **Exhibit 2.**

16. The Debtor also listed on its Statement of Financial Affairs a payment of $65,628.50 to Diane and Hopewell Darnielle on August 8, 2023. (SOFA, Dkt. 1, §4.2) This is listed as a loan repayment; however, the Debtor produced no loan documents or other evidence that the Darnielles made a loan to the Debtor rather than a capital contribution. Both Diane and Hopewell Darnielle as listed as equity interest holders. (List of Equity Security Holders, Dkt. 1).

17. On November 19, 2024, the Debtor filed its First Amended Subchapter V Plan of Reorganization [Dkt. 72], wherein Debtor stated that the liquidation value of the Debtor's estate, including presumably the Appraised Collateral, is $103,811.03. (*See* Plan at page 4.)

18. On December 11, 2024, the United States Trustee filed its Objection to Debtor's Chapter 11, Subchapter V Plan [Dkt. 81].

**III.  THE PLAN IS NOT CONFIRMABLE UNDER THE U.S. BANKRUPTCY CODE**

**A.  Debtor Fails to Meet its Burden Under 11 U.S.C. § 1129(a).**

19. To confirm a plan of reorganization, a plan proponent must demonstrate that the proposed plan satisfies each of the requirements of Section 1129(a) of the Bankruptcy Code.

20. The plan proponent bears the burden of proof on each element of Section 1129. *E.g.*, *In re Mullins*, 435 B.R. 352, 357 (Bankr. W.D. Va. 2010) ("The burden of proof to establish that a chapter 11 plan satisfies the statutory requirements for confirmation falls on the plan's proponent."); *In re Byrd Foods, Inc.*, 253 B.R. 196, 199 (Bankr. E.D. Va. 2000) ("It is well established that it is the debtor's burden to show that the plan meets the statutory criteria.").

21. Even absent the filing of an objection to a Chapter 11 plan, the plan proponent must affirmatively demonstrate that the plan is confirmable, and the Court must determine whether the requirements of § 1129(a), and if applicable § 1129(b), have been met. *See, e.g. In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 475 (Bankr. S.D. Ohio 1994). At this juncture, Debtor has not proposed a confirmable plan under 11 U.S.C. § 1129(a) for the reasons that follow.

**B.  The Plan is Not Confirmable Pursuant to 11 U.S.C. § 1129(b)(2)(A)(i)(II) Because the Plan Does Not Include Payments to Capital Bank Totaling the Value of Its Secured Claim.**

22. Section 1129(b)(2)(A)(i)(II) makes clear that in order for a plan to be considered fair and equitable the plan must provide for holders of secured claims to receive payments totaling "at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;"

23. The Plan is not confirmable in that it does not provide to Capital Bank cash payment equaling at least the value of the secured portion of Capital Bank's claim.

24. The Plan's proposed payments to Capital Bank are based on a valuation of the Debtor's assets that significantly undervalues them. As outlined below, the Debtor's assertion that Capital Bank's secured interest amounts to only $38,811.03 is significantly lower than the value of the Appraised Collateral pursuant to the Appraisal obtained by Capital Bank. The proposed plan distributions on account of Capital Bank's secured claim are only approximately twenty-four percent (24%) of the appraised value of the personal property constituting Capital Bank's collateral; and, other general intangibles, cash and other collateral are not included in the Appraisal, thus making clear that the proposed plan distributions run afoul of §1129(b)(2)(A).

25. The fact that the Debtor's appraisal also excludes a significant number of items for which Capital Bank has documentation confirming that the Debtor purchased the items using Capital Bank's loan proceeds, and yet there is no record of the items being located on the premises much less included in the Debtor's appraisal.

26. Furthermore, the Debtor has not provided sufficient explanation as to why the intellectual property that the Debtor owned was transferred to its affiliate; and why the Debtor ascribes no value to the intellectual property.

27. The Debtor also fails to include in the proposed Plan any attempt to recover the payment to insiders exceeding $65,000, which payment was given by the Debtor to two equity interest holders (Hopewell and Diane Darnielle) within one year prior of the bankruptcy filing.

28. The Plan's contemplated payments to Capital Bank are not sufficient under §1129(b)(2)(A)(i)(II) and thus, the Plan is not confirmable.

C. **The Plan is Not Confirmable Pursuant to 11 U.S.C. § 1129(a)(7) Because Creditors are Projected to Receive Less Then They Would Upon the Liquidation of the Debtor.**

29. The Plan describes Capital Bank as the sole member of Class 2. Capital Bank's claim as a member of Class 2 is impaired. (*See* Plan at page 8). Class 2 represents the portion of the Capital Bank's claim that is secured. Per the Plan the remainder of the debt would be

- 6 -

considered part of Class 5 – General unsecured creditors. Under the Plan, Class 5 claims total $1,076,459.25 [Plan at page 6] and disbursements to the Class 5 creditors total $0 [*See* Plan at page 9].

30. The Plan proposes that Capital Bank will receive payment, in total, of $38,811.03 plus 8% interest for Capital Bank's secured portion of its claim, which is categorized as a Class 2 claim but will receive payment equaling $0 of its claim to the extent that it is categorized as being part of Class 5. Based on the Appraisal of the collateral obtained by Capital Bank, the projected Plan payments are less than what Capital Bank and other creditors would receive if the Debtor liquidated all of its assets. This is true, without even including intellectual property, avoidance action recoveries, and missing equipment/tangible property that Capital Bank knows was purchased; all of which would increase the amount of distributions required to be paid to Capital Bank under a confirmable plan.

31. The devaluation of Debtor assets, and the failure to include and account for all of the Debtor's assets as described further below, has the effect of reducing the amount that Capital Bank would receive under the Plan to an amount that is less than the total that Capital Bank would receive under a Chapter 7 liquidation of the Debtor. As this violates § 1129(a)(7)(A)(ii) of the Bankruptcy Code, the Court should not confirm the Plan.

**D. The Plan is Not Confirmable Under 11 U.S.C. § 1129(a)(11) Because Confirmation of the Plan is Likely to be Followed by a Liquidation.**

32. The Court should not confirm the Plan because it is not a feasible reorganization plan and Debtor has not met its burden to show that the Debtor is unlikely to require a liquidation of its assets post-confirmation.

33. Pursuant to § 1129(a)(11), the Court must find that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor [. . .]." 11 U.S.C. § 1129(a)(11).

34. In the Plan, Debtor has not provided any evidence that would tend to show that liquidation is not a likely outcome following the confirmation of the Plan. To the contrary, the

Debtor explicitly acknowledges the difficulty of success in the restaurant industry and the uncertainty that the Debtor faces:

> [T]he restaurant business is notoriously difficult, compounded here by rising labor and product costs, and a general decline in consumer "eat-out" spending habits. The projections attached to this Plan are made in good faith and rooted in empirical, historical data points. But these are not guarantees and, even more so than with most businesses, are speculative to a necessary degree. The Debtor is resolved to make best efforts toward a successful reorganization, and believes creditors are uniformly aided—not hampered—through such efforts. But the Debtor is also acutely aware that a further spike in costs, or a failure of sales to rise in accord with inflationary measures, could change ink from black to red and invite a return to this Honorable Court.

[Plan at page 5].

35. The Debtor has provided no reason for the court to believe that liquidation will not be an inevitable consequence of the confirmation of the plan.

> [I]n determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable. However, when long term payments are contemplated stricter proof of feasibility is required. The Court in scrutinizing the plan should consider (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management. Other factors include the prospective availability of credit and whether the debtor will have the ability to meet its requirements for capital expenditures.

*In re Agawam Creative Mktg. Assocs., Inc.*, 63 B.R. 612, 619-620 (Bankr. D. Mass. 1986) (internal citations omitted).

36. As set forth in the Office of the United States Trustee's (the "UST") objection to the Debtor's Plan [Dkt. 81], there are feasibility concerns "if the administrative creditors demand to be paid as of the Effective Date" as required by Section 1129(a)(9). The UST continues to note that given the Debtor's "lackluster financial performance while in bankruptcy, there is no assurance that the Subchapter V Trustee" will even be paid over time (if she agrees to such treatment) and warns that if the Subchapter V Trustee waits to be paid, "she will most likely suffer the same fate as the Class 5 claimants." Capital Bank adopts the United States Trustee's

objection in this respect. The Debtor has failed to provide evidence to support a finding that the Plan is feasible.

37. Thus, the Plan is not feasible and is likely to result in a liquidation of the Debtor post-confirmation. The Plan violates § 1129(a)(11) and should not be confirmed.

**E. The Plan is Not Confirmable Because It Was Not Proposed in Good Faith Pursuant to 11 U.S.C. § 1129(a)(3).**

38. To confirm a plan of reorganization, a plan proponent must demonstrate that the proposed plan satisfies each of the requirements of Section 1129(a) of the Bankruptcy Code.

39. The Plan violates § 1129(a)(3) because it was not proposed in good faith. One requirement for confirmation of a plan is that the "plan has been proposed in good faith [. . .]." 11 U.S.C. § 1129(a)(3). "Since the Bankruptcy Code does not define the concept of good faith, the bankruptcy court must inquire into the [plan proponent's] conduct as a whole in determining whether the plan was filed in good faith." *In re Sherwood Square Assocs.*, 107 B.R. 872, 875–76 (Bankr. D. Md. 1989) (Internal citations and quotations omitted). In determining "good faith," courts view the totality of the circumstances regarding the plan. *See id*.

40. The Plan was not proposed in good faith but was rather filed in order to minimize Capital Bank's secured collateral in order to disadvantage Capital Bank.

41. As discussed above, Capital Bank possesses a lien on all of the Debtor's assets including, but not limited to, the Debtor's equipment, fixtures, inventory, all assets of the Debtor post-petition, any cash from pre-petition credit card receipts or other accounts receivable post-petition any cash from pre-petition credit card receipts or other accounts receivable. This collateral includes the entirety of machinery and equipment owned by the Debtor.

42. As described above, the Appraiser issued to Capital Bank a valuation of the physical personal property constituting the Appraised Collateral that is owned by the Debtor and located on the premises. The appraised fair market value of the Appraised Collateral is $158,420.00 as of July 18, 2024. Thus, the amount proposed to be paid to Capital Bank is roughly **twenty-four percent of the appraised value of the personal property alone**, and not

including inventory, cash, general intangibles, and other collateral securing Capital Bank's claim.

43. Upon review, it appears the Liquidation Appraisal failed to consider and value additional Debtor assets that Capital Bank has evidence showing the Debtor both purchased and received. These unscheduled and unaccounted for physical assets add up to approximately $250,000 in value. The Debtor should have accounted for and valued all of the assets it owns in order to obtain a complete and accurate valuation.

44. In addition to the unaccounted for physical assets, there are several additional assets or potential assets that the Debtor has not sufficiently accounted for or provided accurate and complete information concerning, which include:

   a. Potential $65,628 avoidance action against the Debtor's owner's parents who appear to have been repaid $65,628 within the year prior to the case. The Debtor has not produced any loan documents regarding this amount. Rather, both of the Debtor's owner's parents are equity interest owners as reported on the Statement of Financial Affairs.

   b. Potential recovery for creditors from a bond posted in litigation with a mechanics lien claimant in the amount of $65,000. *See* Schedule D [Dkt. 1]. Capital Bank has not been provided complete and accurate information regarding the nature of this potential asset. However, based on a review of documents that have been produced, this appears to be an amount paid to a court registry to be held pending final judgment on a mechanic's lien lawsuit such that the $65,000 should be released to the Debtor because the mechanic's lien was released by operation of Virginia law, and therefore, there is no secured claim on account of the plaintiff in the lawsuit.

45. In the Liquidation Appraisal, the Debtor's Appraiser determined that the Debtor's assets had a liquidation value of $49,135.00. Even setting aside the property that has not been

included in the Liquidation Appraisal, the Liquidation Appraisal is substantially lower than the Appraisal obtained by Capital Bank; indeed, the Liquidation Appraisal is $109,285 lower.

46. While the Debtor will likely argue that Capital Bank's Appraisal considered a fair market value, the Debtor is a reorganizing business that sought protection under Chapter 11. The Debtor did not file a case under Chapter 7 seeking to liquidate. As such, the more appropriate value for consideration under the Debtor's choice of proceeding and plan to reorganize its business, is a fair market value. Even if the Court were to apply a liquidation discount to Capital Bank's Appraisal, it would still greatly exceed the amount of distributions the Debtor proposes to make to Capital Bank.

47. Given that Capital Bank provided the Debtor with a copy of the Appraisal, which includes a fair market value applicable to the Debtor's path of reorganization in this case, and yet the Debtor seeks confirmation of a Plan that undervalues its own property in line with a liquidation approach that it is not pursuing in the case, the Court should find that the Debtor filed the Plan with an ulterior motive to unfairly devalue Capital Bank's secured collateral and to deny creditors of their protections under §1129 and 1123. This behavior is prohibited by § 1129(a)(3) of the Bankruptcy Code, and accordingly the Court should not confirm the Plan.

### IV. CONCLUSION

48. For the foregoing reasons, Capital Bank respectfully requests that the Court deny confirmation of the Debtor's Plan and grant such other and further relief as the Court deems just and appropriate.

        /s/ Catherine K. Hopkin
Catherine Keller Hopkin, 28257
Corinne D. Adams, 18768
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland 21401
(443) 569-0788
chopkin@yvslaw.com; cadams@yvslaw.com

Counsel for Capital Bank N.A.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of December 2024, notice of filing Capital Bank's Objection to Debtor's First Amended Subchapter V Plan of Reorganization was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list; and a copy of the Objection was mailed first class, postage prepaid to the parties identified on the attached service list.

*/s/ Catherine Keller Hopkin*
Catherine Keller Hopkin

**The following parties received**
**CM/ECF notice of the filing:**

Catherine Keller Hopkin, Esquire
(chopkin@yvslaw.com)
Counsel for Capital Bank N.A.
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401

Corinne Donohue Adams, Esquire
(cadams@yvslaw.com)
Counsel for Capital Bank N.A.
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401

Lynn A. Kohen, Esquire
(lynn.a.kohen@usdoj.gov)
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770

L. Jeanette Rice, Esquire
(jeanette.rice@usdoj.gov)
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770

Angela L. Shortall, Subchapter V Trustee
(ashortall@3cubed-as.com)
111 South Calvert Street, Suite 1400
Baltimore, Maryland  21202

U.S. Trustee – Greenbelt
(ustpregion04.gb.ecf@usdoj.gov)
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770

Maurice Belmont VerStandig, Esquire
(mac@mbvesq.com)
Counsel for Debtor
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland  20854

**The following parties received notice**
**of the filing by first-class mail:**

Uline
12575 Uline Drive
Pleasant Prairie, WI 53158

Smokecraft Clarendon, LLC
7104 Loch Lomond Drive
Bethesda, MD 20817