**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

In re                                                        Case No. 24-13609-MCR

Smokecraft Clarendon, LLC                         Chapter 11

       Debtor.

_____/

**REPLY TO OBJECTIONS OF CAPITAL BANK**
**NATIONAL ASSOCIATION AND UNITED STATES TRUSTEE**

      Comes now Smokecraft Clarendon, LLC ("Smokecraft" or the "Debtor"), by and through

undersigned counsel, in reply to (i) Capital Bank National Association's Objection to Debtor's

First Amended Subchapter V Plan of Reorganization (the "Capital Bank Objection," as found at

DE #84, with the proponent thereof being known as "Capital Bank") and (ii) the United States

Trustee's Objection to Debtor's Chapter 11, Subchapter V Plan (the "US Trustee Objection," as

found at DE #81, with the proponent thereof being known as the "US Trustee" or "UST"), and

states as follows:

## I.      Introduction

      Restaurant equipment—somewhat notoriously—depreciates more expediently and

dramatically than a new car. Yet Capital Bank looks past this core—and relatively

uncontroversial—premise in objecting to confirmation of Smokecraft Clarendon, LLC's First

Amended Subchapter V Plan of Reorganization (the "Plan," as found at DE #72), urging that

restaurant equipment ought to be valued at (or sometimes even above) replacement value.

      As noted *infra*, myriad showings are required to confirm the Plan. Many of those legal

prerequisites are not controverted *sub judice*; no one questions the proper identification of the

Debtor's directors and officers, 11 U.S.C. § 1129(a)(5)(A); no one suggests the price charged for

a plate of ribs to be subject to government oversight, 11 U.S.C. § 1129(a)(6); no one urges any fees to be due and owing to this Honorable Court or the US Trustee, 11 U.S.C. § 1129(a)(12); there is no contention that retirement benefits are even vaguely implicated by the Plan, 11 U.S.C. § 1129(a)(13); and no one is alleging Smokecraft to owe child support or alimony, 11 U.S.C. § 1129(a)(14).

Capital Bank does, however, vociferously protest that it ought to be paid more under the Plan. Yet the financial institution relies, almost *en toto*, on an appraisal obtained early in this case, punctuated by clearly erroneous valuations and untethered to any cognizable resale market. In so doing, Capital Bank also overlooks that it does *not* have a lien on any fixtures, nor are any fixtures assets of the Debtor; pursuant to a Subordination of Lien Agreement (the "Subordination Agreement," a copy of which is attached hereto as Exhibit A), Capital Bank relinquished its lien on all such fixtures in favor of the Debtor's landlord. And lest the titular designation of that agreement appear misleading, the document itself is not a traditional intercreditor agreement through which two parties simply reshuffle their respective lien priorities; the document is, rather, a *carte blanche* release of all liens against fixtures, with Smokecraft itself being a party and signatory to the agreement. Plainly stated, the restaurant's fixtures are assets of the landlord and the landlord is assuredly not a debtor in bankruptcy.

The US Trustee's objection is more narrow in scope, being moored to a contention that critical vendors ought not receive preferential treatment in a plan of reorganization where general unsecured creditors take nothing. The US Trustee contends, equally, that confirmation is improper absent some distribution to general unsecured creditors. While Smokecraft respectfully disagrees with these assertions, the Debtor is also keen to relegate these concerns to the realm of mootness. As such, concurrent with the docketing of this brief, the Debtor is filing a second amended plan of

reorganization that eliminates the class of critical vendors and replaces such with a convenience class comprised of all general unsecured creditors holding claims of $25,000.00 or less. The Debtor is also extending the duration of the plan, through this amendment, to provide for the payment *in full* of this convenience class—a sum in excess of $99,000.00.[1]

There are other eccentricates attendant to the Capital Bank Objection, discussed in more detail below. A $65,000.00 certificate of deposit, securing a standby letter of credit that, in turn, is serving as a security deposit on a lease, appears to be misconstrued. So, too, does there appear to be some factual discrepancy as to the facts underlying a payment to insiders and why the subject payment assuredly would not give rise a good faith preference claim capable of satisfying the rigors of Rule 9011.

At bottom, though, this case is—and always has been—about saving a local restaurant. The Plan represents the best possible outcome for creditors, employees, and patrons. The Plan, by marked contrast, does *not* represent the best possible outcome for equity; the entity's principal would assuredly be better compensated drawing a W-2 salary at the Olive Garden. But Smokecraft entered this case with an enduring commitment to maximize returns for creditors, to keep its staff gainfully employed during difficult economic times, and to continue to provide a much-loved communal gathering spot for the local citizenry. The Plan accomplishes these ends. And the Plan is thusly well meritorious of confirmation.

---

[1] Insofar as the amended plan does not "adversely change the treatment" of any creditor's claims herein, Fed. R. Bankr. P. 3019(a), neither new notice nor new balloting is required.

## II.      Standard: Confirmation of a Subchapter V Plan of Reorganization

In cases arising under Subchapter V, "[t]he court shall confirm a plan . . . only if all of the requirements of section 1129(a), other than paragraph (15) of that section, . . . are met." 11 U.S.C. § 1191(a).

The foregoing notwithstanding, confirmation is still permissible, if a "plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan," 11 U.S.C. § 1129(b), even if subsections (8), (10), and (15) of Section 1129 are not otherwise satisfied, *id.*.

Accordingly, to confirm a plan—either compulsory or discretionarily—a court must find that (i) the plan is compliant with Title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. § 1129(a)(1); (ii) the plan's proponent is compliant with the Bankruptcy Code, 11 U.S.C. § 1129(a)(2); (iii) "[t]he plan has been proposed in good faith and not by any means forbidden by law," 11 U.S.C. § 1129(a)(3); (iv) professional fees correlative to the case's administrative are to be subject to judicial approval, 11 U.S.C. § 1129(a)(4); (v) the plan proponent has disclosed its forward-looking officers and directors, with such being generally consistent with the interests of creditors and equity holders, 11 U.S.C. § 1129(a)(5); (vi) the plan not provide for the imposition of rates at odds with governmental oversight, 11 U.S.C. § 1129(a)(6); (vii) each impaired class has either accepted the plan or will take as much under the plan as it would in a chapter 7 liquidation, 11 U.S.C. § 1129(a)(7); (viii) administrative expense obligations of the debtor will be paid through the life of the plan, 11 U.S.C. 1191(e); (ix) taxes due to governmental units will be paid within five years of the petition date, 11 U.S.C. § 1129(a)(9); (x) confirmation is not likely to be followed by liquidation, 11 U.S.C. § 1129(a)(11); (xi) filing fees and US Trustee fees are to be paid on or before the plan's effective date, 11 U.S.C. § 1129(a)(12); (xii) retirement benefits are not

4

diminished by the plan, 11 U.S.C. § 1129(a)(13); (xiii) the plan provide for payment of domestic support obligations, 11 U.S.C. § 1129(a)(14); and (xiv) property transfers be in accord with applicable nonbankruptcy law, 11 U.S.C. § 1129(a)(16).

For confirmation to be compulsory, the Debtor must also show that (a) each class is either unimpaired or has voted to accept the plan, 11 U.S.C. § 1129(a)(8); and (b) at least one impaired class has voted to accept the plan, 11 U.S.C. § 1129(a)(10).

In establishing the foregoing, "[t]he plan proponent bears the burden of establishing that each requirement set forth in §1129 has been met by a preponderance of the evidence." *In re Neogenix Oncology, Inc.*, 508 B.R. 345, 353 n.9 (Bankr. D. Md. 2014) (citing *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993)).

### III.  Argument: The Capital Bank Objection Should be Overruled

The Capital Bank Objection posits confirmation of the Plan ought to be denied because (i) Capital Bank receives thereunder less than the value of the collateral securing the entity's claim in this case, Capital Bank Objection, DE #84, at § III(B), and less than what the bank would receive in a chapter 7 liquidation, *id.* at § III(C); (ii) confirmation is likely to be followed by liquidation, *id.* at § III(D); and (iii) the Plan is not proposed in good faith, *id.* at § III(E). Each of these assertions is errant in light of the facts of this case—Capital Bank is grossly overvaluing the equipment that acts as collateral and the Plan is readily feasible in nature. Equally troublingly, however, parts of the Capital Bank Objection appear to be propagated in bad faith, being tethered to contentions the financial institutions eithers knows—or should know—to be demonstrably counterfactual in nature.

5

### a.  The Capital Bank Objection is Factually Amiss

Capital Bank underwrote a loan to Smokecraft, caused myriad documents in support thereof to be drafted and executed, has actively participated in this case from the outset, and—as acknowledged in the institution's objection—has had occasion to take thorough discovery in this case. So it comes as deeply concerning to see the Capital Bank Objection, on more than one occasion, be premised upon factually unmoored allegations. The bank's filing evinces a lack of fidelity to certain objective facts, necessarily calling into question the good faith of an objection that seemingly takes aim at euthanizing a small business and casting a loyal workforce unto the local unemployment rolls.

In a broadside against Smokecraft, Capital Bank alleges, *inter alia*, "the Debtor has not provided sufficient explanation as to why the intellectual property that the Debtor owned was transferred to its affiliate. . ." *Id.* at ¶ 26. And there is thusly created at least the appearance of improper activity being afoot, with the Debtor transferring intellectual property assets to an insider, pre-petition, in a seeming effort to keep such at bay from the lien of Capital Bank. Yet what the financial institution neglects to mention is that no such transfer has ever occurred; the at-issue intellectual property was always owned by the Debtor's primary equity holder. And, equally, even if such a transfer had occurred (which did not happen), such could not be to the detriment of Capital Bank since the institution holds a lien on all assets of the at-issue equity holder. Indeed, as reflected on a Trademark Security Agreement dated January 31, 2020, both Smokecraft *and* Smokecraft Holdings LLC ("SHL"), assigned a lien on all trademarks to Capital Bank. *See* Trademark Security Agreement, attached hereto as Exhibit B. A similar agreement granting a lien in any patents was executed of even date therewith. *See* Patent Security Agreement, attached hereto as Exhibit C.

Similarly, Capital Bank protests that the Debtor does not account for a "[p]otential recovery for creditors from a bond posted in litigation with a mechanics lien claimant in the amount of $65,000." Capital Bank Objection, DE #84, at ¶ 44(b). In support of this proposition, the bank cited to "Schedule D [Dkt. 1]." *Id.* Yet no such bond exists as of present, no such bond existed as of the petition date, and there is no reference—whatsoever—to a bond anywhere on Schedule D. Worsening matters, the only reference to a bond, *anywhere* in docket entry #1, is on the Statement of Financial Affairs, where the disposition of the bond is explained.

As a starting point, there was never a $65,000 bond—there was a $64,000 bond. More importantly, though, there is no bond to be recovered since it has long-since been released. And Capital Bank knows this because it received in discovery, before filing an objection, (i) documents evidencing the payment of the bond; (ii) a consent motion in a related lawsuit whereby a mechanic's lien was discharged through the posting of the bond; (iii) the order stemming from that consent motion; (iv) deposit records whereby the Debtor borrowed the money, to post the bond, from two insiders (clearly denoting the transactions to be loans); (v) the cashier's check with which the bond was posted; (vi) the checks with which the insiders were repaid when the bond was released; and (vii) the transaction ledger showing the loans from the insiders and the repayment thereupon. *See* Smokecraft0006-Smokecraft0015, attached hereto as Exhibit D.[2]

That last document—the transaction ledger—is also of some import. Capital Bank alleges there to exist a "[p]otential $65,628 avoidance action against the Debtor's owner's parents who appear to have been repaid $65,628 within the year prior to the case," further alleging, *inter alia*, "[t]he Debtor has not produced any loan documents regarding this amount." Capital Bank

---

[2] The documents produced to Capital Bank were unredacted in nature. Certain redactions of account numbers are made on the copies attached to this filing, for self-evident reasons.

Objection, DE #84, at ¶ 44(a). Yet neither of these contentions are accurate. The transaction ledger for the loans, alongside the slips showing deposit of the loaned monies, were produced to Capital Bank, as were copies of the checks with which the loan was repaid (clearly denoting "Loan Return" and the applicable interest rates on the memo lines). *See* Smokecraft0010-Smokecraft0015, attached hereto as Exhibit D. And there is no avoidance action to be had since the monies, upon being repaid to the insiders, were promptly tendered back to the Debtor—in even greater sums— as new loans. *Id.* at Smokecraft0015.

To be sure, giving subsequent new value to a debtor is an absolute defense to a preference claim. 11 U.S.C. § 547(c)(4). *See also Field v. Md. Motor Truck Ass'n (In re George Transfer, Inc.)*, 259 B.R. 89, 94 (Bankr. D. Md. 2001) ("Specifically, Code § 547(c)(4) provides that a transfer is not avoidable to the extent that the creditor subsequently gave new, unsecured value to or for the value of the debtor. Although there is no requirement that the subsequent advance be extended as a result of the previously received preference, the rationale of this section treats the advance as if it were in effect a return of the preference, restoring the previous depletion of the estate.") (quoting William L. Norton, Jr., Bankruptcy Law and Practice 2d § 57:20 (2000)).

Here, the monies repaid to the two insiders were then loaned again, in a greater sum, back to the Debtor. If Smokecraft tried to bring a preference action against the two insiders, the suit would be likely to give rise to little more than a dispute as to whether or not the insiders are entitled to sanctions under Rule 9011. And Capital Bank presumably knows this, just as do all other parties in interest, since the Debtor's very own case-initiating filing discloses the loan repayments and describes them as follows: "Repayment of monies loaned to pay for lien bond. Shortly after these funds were repaid to Diane and Hopewell Darnielle, the same monies were then loaned - again -

to the debtor, in a greater sum spread over two deposits, to be applied to other purposes." Statement of Financial Affairs, DE #1, at § 4.2, p. 59.

To be sure, issues abound as well, including Capital Bank alleging there to be "missing equipment/tangible property," Capital Bank Objection, DE #84, at ¶ 30, without ever delineating just what assets are supposedly missing. This particular assertion is deeply troubling, as it essentially amounts to a broadside on the ethos of integrity of the Debtor. Yet Capital Bank furnishes no anecdotes in support of this contention, instead just asserting assets to be missing and then moving on without any care to delineate that which has supposedly been lost. If the contention is that forks and knives periodically walk out of a restaurant, such is assuredly true but also far from grounds upon which to deny confirmation; if the contention is that the Debtor has fenced a refrigerator, assuredly some greater detail is warranted as Smokecraft, quite genuinely, has not the slightest clue as to what is Capital Bank is alluding.

Moreover, as discussed below, it appears Capital Bank has procured an appraisal that not only values assets in the wrong manner and at values seemingly at odd with those that could be fetched in any cognizable marketplace but, on some occasions, somehow values assets at sums *in excess* of their replacement costs.

While many of these other issues are addressed below, the foregoing problems bear emphasis for the simple reason that they are demonstrative of the manner with which Capital Bank is approaching this case. The bank feigns outrage that intellectual property assets were assigned to a holding company, whilst conveniently failing to mention that no such assignment ever occurred and the bank procured a lien against those very assets from the holding company. The bank suggests a bond to be recoverable, while strategically overlooking that (i) the bond has long-since been released; (ii) the bank was given paperwork evidencing the placement and release of the

bond; and (iii) the Debtor's own Statement of Financial Affairs explains the disposition of the bond. The bank urges a preference action to be maintainable against insiders, while ignoring that such insiders would have the most clear-cut subsequent new value defense to cross the docket of this Honorable Court in a long while, and while equally ignoring that the bank—again—was given access to documents showing such even after the information was readily disclosed on the Statement of Financial Affairs.

In short, it is difficult to accept the Capital Bank Objection as a good faith filing. No doubt, Capital Bank is displeased—as are too many creditors in too many cases—that a bankruptcy has been filed. And, no doubt, Capital Bank is displeased that scant collateral exists to secure repayment of a restaurant loan. But such is not cause to make allegations unmoored to fact and law alike. And Capital Bank's election to do so is perhaps ultimately revealing of the ethos, *vel non*, with which the entity's objection ought to be regarded.

### b.  Evidence Will Show Payments Under the Plan, to Capital Bank, Equal the Value of Capital Bank's Secured Claim and Exceed Liquidation Value

The Capital Bank Objection is partially reliant upon an appraisal, obtained by the bank during the course of this case, showing the fair market value of the Debtor's assets to equal $151,570.00, without any discussion of costs of disposition. It is somewhat strange that the bank is using a fair market value appraisal to argue, *inter alia*, ". . . the projected Plan payments are less than what Capital Bank and other creditors would receive if the Debtor liquidated all of its assets," Capital Bank Objection, DE #84, at ¶ 30, since a fair market valuation is assuredly not a liquidation valuation. Yet significantly larger issues abound with the appraisal (the "Capital Bank Appraisal," as found at DE #84-1, pp. 2-32). The bank has somehow obtained an appraisal that, on at least one significant occasion, values a used asset at a sum in excess of replacement cost (ie, the monies

10

requisite to buy a brand new asset in unused condition).[3] And the bank has, too, elected to include fixtures in its appraisal, even though such are not assets of the Debtor or items upon which the bank has a lien.

The fixtures are a significant issue in this case. Under Virginia law, a three prong test is utilized to determine whether or not a chattel constitutes a fixture:

> (1) annexation of the chattel to the realty, actual or constructive; (2) its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) the intention of the owner of the chattel to make it a permanent addition to the freehold.

*In re Alterman*, 127 B.R. 356, 361 (Bankr. E.D. Va. 1991) (citing *Danville Holding Corp. v. Clement*, 16 S.E.2d 345, 349 (Va. 1941)). Critically, however, "[a]lthough it is ostensibly a three-part or three-step test, in essence the test applied by most courts, including the Supreme Court of Virginia, is whether the party annexing the chattel to the realty intended to permanently improve such realty." *In re Shelton*, 35 B.R. 505, 509 (Bankr. E.D. Va. 1983). And, "[i]n the law relating to fixtures, actual annexation includes every movement by which a chattel is joined or united to the property; constructive annexation is the union of such things as have been holden parcel of the realty, but which are not actually annexed, fixed, or fastened to the property." *Id.* (quoting Black's Law Dictionary, 81 (5th ed. 1979)).

Capital Bank has included, in its appraisal, "Exhaust/Hoods," a "Beer Tap System (12 lines)," a "Walkin Cooler," a "Walkin Freezer," and "Camera, Sound, TV, Rack, DJ Systems." *See* Capital Bank Appraisal, DE #84-1, pp. 31-32. These items, alone, add up to $34,280.00 of the appraisal value used by Capital Bank. *Id.* Yet none of these items are assets of the Debtor.

---

[3] Without exhausting the issues with the Capital Bank Appraisal, it bears notation that a freezer is valued in excess of replacement cost.

To be sure, every one of the foregoing items is actually annexed to the premises being leased by Smokecraft. And myriad other items on Capital Bank's appraisal are constructively annexed to the premises being leased by Smokecraft. So, under the first prong of the *Danville Holding* test, all of these putative assets—alongside others that are constructively annexed to the premises—are fixtures.

Consideration of the second prong fetches a similar result: these items—along myriad others—have been adapted to the use and purpose of the realty in question: a restaurant. While Smokecraft is loath to contemplate a universe in which the Debtor ceases operations, there can be little question but that, should such an eventuality come to pass, the landlord will re-let the premises as a restaurant. The space has been built out as a restaurant. The space is in a retail district for which there exists demand for a restaurant. There is no readily-ascertainable alternative use for the space, in its built-out condition; this is not realty than can be easily altered to serve as a different purpose.

Vis a vis the intention of the owner, which is both the third prong and the most important under *Shelton*, such is abundantly clear for reasons that Capital Bank has tellingly omitted from its objection. The Subordination Agreement was notably entered into in July 2019, *before* the build-out of Smokecraft began. The landlord was so concerned about retaining ownership of fixtures in the premises that it not only conditioned build-out on Capital Bank executing the Subordination Agreement but, too, required the Debtor to be a party thereto. And the document is express in providing, *inter alia*:

> Notwithstanding anything herein to the contrary, in no event shall the following be deemed part of the Collateral: (a) property attached to or built into the Premises so as to become a fixture under applicable Jaw or a part of the Premises, (b) any Tenant Improvements or Alterations, and (c) any personal property owned by Landlord and located in the Premises.

Subordination Agreement, attached hereto as Exhibit A, at § 2.

Stated otherwise, Capital Bank knew that much of what was going into Smokecraft's leased space would constitute fixtures. Capital Bank knew the landlord would regard these items as fixtures. Capital Bank knew Smokecraft agreed these items would be regarded as fixtures. Capital Bank signed an agreement acknowledging these items would be construed as fixtures and not capable of serving as collateral for Capital Bank's loan. And yet Capital Bank has now filed its objection, premised in large part upon the idea that fixtures are an asset of the Debtor and ought to be included when assessing the value of the bank's lien and when computing the liquidation value of the Debtor's estate.

To be sure, numerous other issues engulf the appraisal obtained by Capital Bank. Various other line items are constructively or actually affixed to the premises and thusly constitute fixtures. At least one notable item is appraised at a sum in excess of the price of a new item. *See supra*, n. 1. And by seeking an appraisal at "fair market value," in lieu of liquidation value, Capital Bank appears to be propagating a fictitious universe in which there exists a market—other than one facilitated by the liquidation industry—for heavily used restaurant equipment that has been literally smoked and charred for several years.

Smokecraft has obtained its own appraisal, which is attached hereto as Exhibit E. This appraisal recognizes the extant market, *vel non*, for heavily used restaurant equipment. This appraisal is tethered to actual conditions of asset sales in the industry. And this appraisal places the liquidation value of the Debtor's assets at $29,435.00. *See* Appraisal, attached hereto as Exhibit E.

Yet it does bear acknowledgement that even the Debtor's appraisal may be partially errant. In reviewing the document, the appraiser has faithfully observed that various items are leasehold improvements and, as such, not to be valued. Yet the appraiser does appear to have nonetheless

valued at least one fixture. So, while the error is economically *de minimis*, it actually appears the appraisal places the value of Capital Bank's collateral at a sum greater than what it ought to be.

### c.  The Plan is Not Likely to be Followed by Liquidation

Capital Bank next insist the Plan is likely to be followed by liquidation and, as such, non-feasible in nature. Capital Bank Objection, DE #84, at § III(D). In support of this, the bank quotes from cautionary language in the Plan, noting that the restaurant business—as with just about every business—does not come with forward-looking guarantees of economic performance, and that restaurants are famously finicky businesses to operate. *Id.* at ¶ 34. The bank also relies on the US Trustee Objection, in noting there to be concerns about what would happen if administrative creditors demanded payment on the effective date of the Plan. *Id.* at ¶ 36.

The latter concern—which, as noted by Capital Bank, is shared by the US Trustee—is disposed of with ease. While there normally exists an obligation to pay administrative claims in full on the effective date of a plan, 11 U.S.C. § 1129(a)(9), such an obligation is not extant in cases brought under Subchapter V. The Bankruptcy Code, as part of the small business reorganization provisions of chapter 11, expressly provides, *inter alia*: "Notwithstanding section 1129(a)(9)(A) of this title, a plan that provides for the payment through the plan of a claim of a kind specified in paragraph (2) or (3) of section 507(a) of this title may be confirmed under subsection (b) of this section." 11 U.S.C. § 1191(e).

So while a provision requiring administrative creditors to be paid during the life of a plan, absent their consent (and both counsel and the subchapter V trustee have indicated informal agreement to payment under the Plan), does militate against confirmation under Section 1191(a), such a provision is nonetheless openly contemplated by the Bankruptcy Code where a confirmation comes under Section 1191(b). And, given Capital Bank's objection, it may be safely surmised that

14

the Plan is almost assuredly not otherwise eligible for confirmation under Section 1191(a) in any event. So this is a moot issue.

In terms of Capital Bank's parroting of cautionary language in the Plan in furtherance of an argument against feasibility: of course projections are speculative. Projections are speculative in every chapter 11 case, whether the debtor be an investment fund focused on arbitraging a unique blend of off-shore penny stocks and thinly-traded cryptocurrencies or whether the debtor be a single asset real estate entity. The law does not demand certainty accompany objections; the law seeks only good faith derivative of objective data points.

In this case, the Debtor's monthly budgets have proven uncannily precise during the life of this case. The projections appended to the Plan are based on empirical data points, derived from historic operations, inflationary trends, and experiential year-over-year cost and pricing adjustments. And while much of this issue will, unfortunately, need to be addressed through evidence at a hearing on confirmation, suffice it to posit that the Debtor's principal has a master of business administration degree; the projections in this case are not the byproduct of a Ouija Board or Magic Eight Ball.

### d. The Plan is Proposed in Good Faith

The final contention is Capital Bank is that the Plan is not proposed in good faith. Capital Bank Objection, DE #84, at § III(E). This is, to some degree, an *ipso facto* contention—the bank essentially posits that for all of the reasons discussed above, there is an absence of good faith. But, for those very same reasons discussed above, the bank is errant in so contending.

Good faith ought to play a role in the dialogue surrounding confirmation, however. While there is an abiding respect for the US Trustee and an absence of any such concerns in the prism of that office's objection, it is difficult to credit the objection docketed by Capital Bank is meeting

the rigors of good faith. This is not a Rule 9011 motion and no such motion will follow this filing. But it is hard to look at a bank that agreed to waive any lien on fixtures as a condition of a restaurant being built, that signed a document memorializing that agreement, and that then endeavors to enforce a lien on fixtures, as acting in good faith. It is, too, difficult to see a financial institution that is given extensive documentation of a bond being released, and of the transactions associated therewith, before protesting that a plan does not account for what is to come of the bond, as proceeding in good faith. And it is, too, onerous to view an objection that decries the bad faith of an intellectual property transfer as being lodged in good faith when, in reality, no such transfer ever occurred and the objecting party secured a lien against the assets in any event.

## IV.    Argument: The US Trustee Objection Should be Overruled

The US Trustee Objection appears to be markedly more reasoned than that of Capital Bank. While the Debtor nonetheless takes issue with the two core contentions set forth therein, it does bear recognition that the US Trustee is, rather plainly, advocating on behalf of unsecured creditors who otherwise have elected to not expend the time and monies requisite to engage counsel in this case. And Smokecraft both appreciates and respects such effort.

The two inter-related contentions championed by the US Trustee are that (i) critical vendors ought not be separated from ordinary trade creditors; and (ii) it is not fair and equitable for a plan to pay nothing to unsecured creditors. Though Smokecraft believes these contentions to be ultimately at odds with prevailing precedent, the Debtor equally believes the spirit of the concerns to be meaningful and well-headed. As such, contemporaneously herewith, Smokecraft is docketing an amended plan that eschews a critical vendor class in favor of a statutorily-contemplated convenience class, paying 100 cents on the dollar to all general unsecured creditors holding claims of $25,000.00 or less.

## V.      Conclusion

WHEREFORE, Smokecraft respectfully prays this Honorable Court (i) overrule the Capital Bank Objection; (ii) overrule the US Trustee Objection; (iii) confirm the Plan; and (iv) afford such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. 18071
THE BELMONT FIRM
1050 Connecticut Avenue NW,
Suite 500
Washington, DC 20036
Phone: (301) 444-4600
E-mail: mac@dcbankruptcy.com
*Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of January, 2025, a copy of the foregoing was served electronically upon filing via the ECF system on all counsel who have entered an appearance herein, including:

- Corinne Donohue Adams     cadams@yvslaw.com, cadams@yvslaw.com;jbeckman@yvslaw.com;pgomez@yvslaw.com;vmichaelides@yvslaw.com;yvslawcmecf@gmail.com;r39990@notify.bestcase.com
- Catherine Keller Hopkin     chopkin@yvslaw.com, pgomez@yvslaw.com;kreese@yvslaw.com;vmichaelides@yvslaw.com;yvslawcmecf@gmail.com;hopkincr39990@notify.bestcase.com
- Lynn A. Kohen     lynn.a.kohen@usdoj.gov
- L. Jeanette Rice     Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- Angela L. Shortall     ashortall@3cubed-as.com, md70@ecfcbis.com
- US Trustee - Greenbelt     USTPRegion04.GB.ECF@USDOJ.GOV
- Maurice Belmont VerStandig     mac@mbvesq.com, lisa@mbvesq.com;mahlon@dcbankruptcy.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.

17