IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

In re                                              Case No. 24-13609-MCR

Smokecraft Clarendon, LLC                          Chapter 11

    Debtor.
_____/

**SMOKECRAFT CLARENDON, LLC'S FIRSTSECOND
AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**

    Comes now Smokecraft Clarendon, LLC ("Smokecraft" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A, and provides the following plan of reorganization (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

**a. Description and History of the Debtor's Business**

    Any sensible examination of the hallmarks of American culture assuredly starts with baseball, fireworks, and barbecue. The sporting pastime is, in some regards, difficult to explain to the uninitiated—people take turns swinging a thin, circular plank of wood at a stitched orb, as other people stand idly by, donning mitts with very different stitching; a series of short-distance sprints ensue should the wood and the orb somehow connect in mid-air. Fireworks are, to a degree, equally odd; people draw near to watch a series of explosions so loud as to summon thoughts of Francis Scott Key's lyrical observation of rockets' red glare and bombs bursting in air.

    Barbecue is easier to both explain and understand. Carnivorous society has permeated since neanderthal ages, with the artful preparation of food giving rise to social gatherings for millennia. Communal dining is integral to religious rites across a broad spectrum of faiths; Leonardo da Vinci and Edward Hopper have both furnished immortalized depictions of people drawn to a dining table. And, over time, the traditions of food preparation have been passed from one generation to the next, gradually refined and improved.

    Smokecraft is the preeminent purveyor of barbecue in the Washington, DC area. The Debtor boasts of more awards than can easily be recounted, with oversized trophies festooning the premises and one particularly large prize standing amongst bottles of booze in the bar area. The ribs, brisket, pork, and poultry are truly phenomenal; the side dishes are no less stunning. Smokecraft is a pitch-perfect exemplar of American cuisine sitting in the suburbs of the American capital. And this Plan is designed to ensure the Debtor persists longs into the future.

    Formed on May 22, 2018 as a Virginia limited liability company largely owned—and overseen—from Maryland, Smokecraft entered into a lease agreement on May 22, 2019 and obtained an SBA loan on January 31, 2020. The intent was to build a shrine to barbecue in Clarendon, enticing locals and drawing crowds from across the bridge, with topnotch food, a vibrant bar, and a chic space adorned with the very wood used to smoke meats. Helmed by Andrew

1

Darneille—an award-winning pitmaster with an MBA—the restaurant showed every promise of success.

Yet January 31, 2020 did, of course, prove a disastrous time for a new business to borrow money to build a vibrant dining and bar space. It is hard to build a new brand when society is locked down and craving food from the pre-pandemic institutions already known and loved. It is even harder to make a lively bar part and parcel of people's evening gathering habits when social distancing becomes a new part of the prevailing vernacular. Throw in a rapid escalation in the price of meat and one can easily see how opening a new restaurant—a notoriously-difficult business in the best of times—can be downright perilous in the throes of a global pandemic.

On April 29, 2024, Smokecraft filed a voluntary petition for Chapter 11 relief and, in so doing, commenced this case. The Debtor had not missed a rent payment and was current on its obligations to Capital Bank, the conduit that facilitated the SBA loan. But trade debts were beginning to amass and, more importantly, cash was perilously tight; but for the bankruptcy filing, the next payroll would have been jeopardized.

While the absence of significant pre-petition defaults may have rendered this case a surprise to creditors, the bankruptcy has proceeded smoothly since filing. The Debtor obtained "first day" relief to pay pre-petition wages and to continue operating its gift card program. Industry-typical hiccups have manifested from time to time—certain vendors cut off Smokecraft in narrow-minded disdain for the Chapter 11 process, while one utility company applied post-petition payments to a pre-petition claim and used the resulting shortfall as grounds to threaten a shut-off of services—but the case has otherwise proceeded uneventfully. Meaningful communications have been had with the most significant secured creditor, through counsel, throughout the bankruptcy process; the Subchapter V trustee has proven instrumental in offering insights, aiding in the facilitation of communications, and helping move this matter along.

In the spirit of small business reorganizations, this is a relatively simple Plan, drafted in accord with the rigors of Official Form 425A. The Debtor proposes to pay all administrative and priority claims, as well as the secured claim of Capital Bank, over a four-and-a-half-year time horizon.[1] To accommodate the seasonality of Smokecraft's business, these payments will be in uneven installments, crafted to match the Debtor's projected disposable income. Unfortunately, while some monies will be available for disbursement to general unsecured creditors, the distribution will be far from 100%. Still, this Plan leaves *all* creditors in markedly better position than they would be in the event of a Chapter 7 liquidation. And, of primary importance, this Plan allows a vibrant local business to remain open, a loyal workforce to remain employed, and local citizens an opportunity to enjoy spectacular barbecue whilst watching baseball and taking in displays of fireworks.

b.  **Liquidation Analysis & Secured Claim Valuation**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest

---

[1] Smokecraft is cognizant that priority tax claims need to be paid within five years of the petition date, as opposed to during the four-and-a-half-year plan period. There do not appear, however, to be any priority tax claims.

holders would receive in a Chapter 7 liquidation. The Debtor entered bankruptcy with $129,456.85 in assets, the whole of which serve as security for two creditors' claims.[2] In a Chapter 7 liquidation, there would be nothing to distribute to any other creditors and, absent a carve out arrangement, it is not clear that a trustee would even endeavor to sell assets for the benefit of that one secured party.

Smokecraft scheduled $69,073.70 in cash and cash equivalents, of which $65,000.00 takes the form of a certificate of deposit at TD Bank that is collateral for an irrevocable standby letter of credit acting as a security deposit on the Debtor's restaurant premises lease. The remaining $4,073.70 is a combination of cash and depository account balances. In the event of a liquidation, there would be no sensible contention to discount the depository account balances and cash-on-hand, as such are innately liquid assets.[3]

The Debtor also entered bankruptcy with $26,511.65 in food and beverage. It is suggested these assets would be discounted approximately 80% in the event of a liquidation for two reasons: (i) the liquidation of alcoholic beverages is pragmatically almost impossible, on a small scale such as this, because of licensure and regulatory issues; and (ii) the liquidation of perishable food is a notoriously perilous undertaking because of the expediency with which the goods rot. So, for liquidation purposes, the Debtor believes food and beverages on hand should be valued at $5,302.33.

Smokecraft additionally scheduled $33,871.50 in kitchen equipment. After Capital Bank challenged this valuation, the Debtor engaged a reputable third party to perform an appraisal of the subject assets. Through this appraisal process, the Debtor has learned that the liquidation value of the kitchen equipment (including other personal property throughout Smokecraft's premises) is actually only $29,435.00, with the schedules herein having overstated the value of these assets by slightly more than $4,000.00.

The Debtor holds litigation rights against a law firm that withdrew from representing Smokecraft on the eve of an arbitration. Valuing these rights has proven enormously difficult, insofar as litigation rights are innately finicky assets, a trial-within-a-trial would have to be conducted to show what outcome may have occurred had the law firm not withdrawn its representation, collectability analysis of the arbitration counterparty would factor into assessing damages, and then a separate collectability analysis of the law firm would have to be undertaken

---

[2] A portion of the Debtor's pre-petition depository account balances may actually have been unencumbered, insofar as Capital Bank did not obtain an account control agreement in furtherance of its UCC lien. This is a *de minimis* sum of money in the context of this case and, for myriad reasons, the Debtor has thus far elected to not dispute the security interest of Capital Bank in these funds.

[3] As the United States Trustee has properly observed, in the event of a Chapter 7 liquidation, the Debtor's cash on hand as of the conversion date would become available to creditors. It is difficult to project this number with great accuracy given the constant ebb and flow of accounts as receivables are collected and payables are retired. However, for liquidation purposes, even if the number were assumed to be $15,000.00 greater than what was present on the petition date, such would not alter the analysis herein, with creditors faring better in Chapter 11 than in Chapter 7.

to assess what, if any, damages could be recovered on the claim. There is likely *some* value here, though the law firm also holds a claim against Smokecraft for unpaid legal fees and that debt, in turn, could serve as the basis for a setoff defense. As such, and solely for purposes of this liquidation analysis, the Debtor is valuing this asset at $0.00. As noted below in this Plan, however, the Debtor is prepared to assign these litigation rights at auction, should any party in interest so wish.

Finally, the Debtor's intangible assets merit attention herein. Smokecraft's lease is at a rate that is believed to be above-market and, as such, would not be likely to fetch value if assigned to a third party. Similarly, while the Debtor has historically assigned value to intangible assets and goodwill for tax and amortization purposes, Smokecraft does not believe its recipe book would be likely to fetch a non-*de minimis* sum of money if sold. Equally, the Debtor does not believe its name has any value on the open market. There is a recognition that Smokecraft furnishes a topnotch product with an esteemed pitmaster but, just as with a law firm or medical practice, it is not believed any intangible value would pass with the entity unless the pitmaster did, too, agree to tender his services to a successful purchaser. And, as noted *passim*, the Debtor's pitmaster is also the largest derivative equity holder; there is no reason to believe he would be inclined to volunteer his services to a Chapter 7 purchaser.

Collectively, these figures put the liquidation value of the Debtor's estate at $103,811.03, as noted on **Exhibit A**. In the event of a Chapter 7 liquidation, if a trustee were permitted to sell *all* of these assets, the trustee would be entitled to a commission of $8,440.55. 11 U.S.C. § 326(a). It is reasonably surmised a trustee would also incur at least $10,000.00 in legal fees as part of an effort to liquidate the estate. This would result in a net distribution, to creditors, of $85,370.48.[4] This Plan proposes to pay creditors $~~13~~165,319.53~~7,041.10~~, a sum well in excess of that figure.

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. Forward-looking financial projections for the Debtor are attached hereto as **Exhibit B**. These figures show that the Debtor will have projected disposable income (as defined in § 1191(d) of the Bankruptcy Code), remaining after the payment of administrative expenses addressed below, for the period in § 1191(c)(2).

Importantly, the projections attached hereto as **Exhibit B** show earnings before interest, taxes, depreciation, and amortization ("EBITDA") that, when juxtaposed to the Debtor's depository account balances, appear to cause the Debtor's free cash to deplete, *en toto*, on two occasions (November 2024 and April 2025). This is a byproduct of two anomalies: (i) the Debtor accounts on an accrual basis but is making projections herein on a cash basis; and (ii) the Debtor

---

[4] This number is deceptively high. Of the $89,585.15, the sum of $65,000.00 is in the form of a certificate of deposit that, in turn, serves as the collateral for an irrevocable standby letter of credit that acts as the security deposit for the Debtor's lease. In the event of a liquidation, the landlord would have a breach claim that would be satisfied, in part, by this letter of credit (with the bank, in turn, having a secured claim against the certificate of deposit). So while a Chapter 7 liquidation would facilitate the disbursement of the $65,000.00 to TD Bank, the subject debt would not actually cross the threshold from being contingent to being due and owing but for the Chapter 7 conversion itself.

accounts on a temporal horizon that does not precisely coincide with calendar months. Anecdotally, the Debtor's eleventh accounting period in 2024 ends on November 24, with the residue of November being included in the twelfth accounting period. This is significant because the Thanksgiving holiday—historically, one of the Debtor's best sales occasions—falls on November 28. So while it appears there will be a cash shortfall in November, such is actually an illusion owing to the incongruity of calendar months and accounting periods, with the Debtor projecting to sell more-than-enough smoked turkey to pay obligations as they come due.

For the avoidance of doubt, the restaurant business is notoriously difficult, compounded here by rising labor and product costs, and a general decline in consumer "eat-out" spending habits. The projections attached to this Plan are made in good faith and rooted in empirical, historical data points. But these are not guarantees and, even more so than with most businesses, are speculative to a necessary degree. The Debtor is resolved to make best efforts toward a successful reorganization, and believes creditors are uniformly aided—not hampered—through such efforts. But the Debtor is also acutely aware that a further spike in costs, or a failure of sales to rise in accord with inflationary measures, could change ink from black to red and invite a return to this Honorable Court.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.     Summary**

This Plan under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

| The Plan provides for: | 2 classes of secured claims; |
| --- | --- |
| | 1 class of priority, unsecured claims; |
| | 2 classes of non-priority, unsecured claims; and |
| | 1 class of equity holders. |

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.     Classification of Claims and Interests**

**Section 2.01   Class 1**          The secured contingent claim of TD Bank, N.A.

**Section 2.02   Class 2**          The secured portion of the claim of Capital Bank.

**Section 2.03   Class 3**          The priority claims of Andrew Darneille and, should

5

objections thereto not be sustained, The Chefs Warehouse Mid-Atlantic, LLC.[5]

**~~Section 2.04~~** **Class 4** ~~The critical vendor claims of Lyon Bakery, Trimark Adam~~
**Section 2.04** ~~Burch, Buckhead Meat & Seafood, and Sysco~~A convenience class pursuant to the allowances of 11 U.S.C. § 1122(b), comprised of all allowed nonpriority unsecured claims equal to or less than $25,000.00.

**Section 2.05** **Class 5**  All general unsecured claims not subsumed in Class 4.

**Section 2.06** **Class 6**  The Debtor's equity interests.

**Section 2.07** **Class Identification**  A schedule of each class and its constituent creditors is appended hereto as **Exhibit C.** The total size of the claim in each class, before any subsequent objection is filed, and accounting for any dispute noted on schedules where a creditor did not timely a proof of claim,[6] is as follows:

Class 1: $65,000.00

Class 2: $38,811.03

Class 3: $13,669.20

Class 4: $~~60,347.08~~99,948.08

Class 5: $1,076,459.25

The Debtor reasonably anticipates disputing $11,553.81 in Class 3 claims, as discussed further, *infra*, in Section 5.04.

---

[5] The priority claim of Andrew Darneille pertains to pre-petition salary totaling $2,115,39, while Chefs Warehouse's disputed claim relates to foodstuffs purportedly supplied within the ~~last~~ 30 days immediately prior to the instant bankruptcy filing.

[6] These metrics are intended to demonstrate the size of each class as of the date of filing of this Plan. As such, if a claim is disputed on the Debtor's schedules, and no proof of claim is timely filed, that claim is reflected as being for $0.00. However, if a proof of claim has been filed, and the Debtor intends to later object to the proof of claim, the amount displayed is the current value of the proof of claim, insofar as the future objection is yet to be filed and adjudicated.

**Article 3.        Treatment of Administrative Expense Claims and Court Costs**

**Section 3.01    Unclassified Claims**        Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes.

**Section 3.02    Administrative Expense Claims**        Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. All professionals. including the Debtor's counsel and the Subchapter V Trustee, will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the Effective Date. Any allowed administrative expense claim will be paid directly by the Debtor within five (5) business days of an order allowing such claim becoming a final order, unless the holder of such claim agrees otherwise. The Debtor's counsel has agreed to be paid any allowed administrative expense claim (over and above that secured by a retainer)[7] on an incremental and deferred basis, with such payments being reflected on the schedule of payments attached hereto as **Exhibit D**. The Debtor is cautiously optimistic that the Subchapter V Trustee will similarly agree and, as such, be paid *pari passu* with the Debtor's counsel. Post-petition, the Subchapter V Trustee shall continue to apply for all fees in accordance with Sections 330 and 331. To the extent monies projected for the payment of administrative expense claims prove greater than the sum owed, surplus monies will be paid to Class 4 claim holders.

**Section 3.03    Priority Tax Claims**        Each holder of a priority tax claim will be paid in full not later than January 12, 2029. It is reasonably believed that no such claims exist in this case.

**Section 3.04    Statutory Fees**        There are no statutory fees due in this case.

**Section 3.05    Prospective Quarterly Fees**        There are no prospective quarterly fees that will be due in this case.

---

[7] A portion of the retainer being held by Debtor's counsel will be used to pay any administrative expense claim of the Subchapter V trustee, as previously noted on the record in this case.

**Article 4.      Treatment of Claims and Interest Under the Plan**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – TD Bank, N.A. | Unimpaired | Class 1 consists of the secured, contingent claim of TD Bank, N.A. ("TD Bank"). TD Bank holds a certificate of deposit, in the face sum of $65,000.00, as collateral for a standby letter of credit that the Debtor is utilizing as a security deposit on its restaurant premises lease. TD Bank will retain its lien on the certificate of deposit and, as such, will have access to those funds should the letter of credit be called at any time, for any reason.<br><br>Pursuant to Section 1126(f) of the Bankruptcy Code, Class 1 is deemed to accept this Plan. |
| Class 2 – Secured Claim of Capital Bank | Impaired | This class consists of the secured portion of the claim of Capital Bank. The Debtor asserts the value of all assets not subject to the Class 1 lien, as of the Petition Date, to be $38,811.03, and, as such, that number to constitute the secured portion of Capital Bank's claim. This claim is reduced by cash collateral payments made by the Debtor during the life of this case, with the Debtor projecting that $10,000.00 in such payments will have been made prior to the Effective Date. This class will be paid every third month, commencing in May 2025 and ending in May 2029, receiving 8% interest on the Claim until satisfied. An amortization schedule, showing the payments to be made toward this class's claim and the accrual of interest therewith, is included on **Exhibit D**. |

| | | |
|---|---|---|
| Class 3 – Priority Claims | Impaired | This class consists of the priority claim of Andrew Darneille and the disputed priority claims of The Chefs Warehouse Mid-Atlantic, LLC. This class will be paid in uneven tri-monthly installments commencing in May 2027 and terminating in August 2028. The timeline of such payments is reflected on **Exhibit D**. Should objections to the priority claims of The Chefs Warehouse Mid-Atlantic, LLC be sustained, the portion of payments that would otherwise go to that creditor will, instead, be paid to Class 4 claim holders. |
| Class 4 – ~~Critical Vendor Claims~~Convenience Class | Impaired | This class consists of ~~the claims of critical vendors without whose services the Debtor will not be able to profitably operate on a forward-looking basis and the payment of whose claims is thusly entitled to differentiated treatment. These are each vendors who furnish an essential good or service to the Debtor, who do not have a local competitor furnishing a comparably-priced service or good of comparable quality, and who have openly indicated to the Debtor that they will cease furnishing such goods and services if not paid in full~~all non-priority general unsecured claims in a sum of $25,000.00 or less. This class will be paid in accord with the schedule set forth on **Exhibit D**. |
| Class 5 – General unsecured creditors | Impaired | |

|  |  |  |
|---|---|---|
|  |  | This class consists of all allowed non-priority unsecured claims, including the unsecured portion of the claim of Capital Bank, except this class excludes those claims provided for in Class 4. This class will not be paid under this Plan and is presumed to reject this Plan. |
| Class 5 – Equity Interests | Unimpaired | The equity interests of the Debtor shall retain their membership in Smokecraft. |

**Article 5.    Allowance and Disallowance of Claims**

**Section 5.01   Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Anticipated Disputed Claims**. The Debtor will file objections to any disputed claims (except those deemed disputed on the Debtor's schedules where no proof of claim was thereafter filed) within six (6) calendar months of the Effective Date, *except* any objection to the claim of any governmental tax creditor may be filed at any time within ninety (90) days of the date on which such claim is filed. The Debtor reasonably anticipates disputing those claims marked as such on Exhibit C.

**Article 6.    Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption.** The Debtor assumes the executory contracts and unexpired leases listed on Lines 2.1-2.5 and 2.7-2.20 of Schedule G. For the avoidance of ambiguity, these constitute all executory contracts and unexpired leases *except* for the executory contract with Crystal Commercial Cleaning Services, LLC, which that company unilaterally refused to further honor upon notice of the bankruptcy filing.

**Section 6.02   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof, expressly rejecting the executory contract with Crystal Commercial Cleaning Services, LLC.

**Article 7.   Means for Implementation of the Plan**

The Debtor will continue to operate its eponymous restaurant, so as to generate the revenues necessary to implement this Plan. The margins are thin, but Smokecraft believes the projected payments to be feasible in nature and is committed to performing under this Plan so as to realize the proverbial "fresh start" promised by the bankruptcy process.

In light of the seasonal and variable nature of the Debtor's income, payments will be in periodically-varied sums, as projected on **Exhibit D**.

The Debtor does not reasonably anticipate pursuing the professional liability claim disclosed on line 74 of Schedule A/B. However, should any party in interest express interest in acquiring that claim (with an expression of interest being manifested by filing a line on the docket in this case, prior to the date of a confirmation hearing on this Plan), the Debtor will then facilitate an auction of the litigation rights, with a starting bid of $10,000.00[8] and with the auction to be carried out on the front steps of the courthouse within ten (10) business days of the Effective Date. Should such an auction occur, the Debtor will give notice of the details of such auction (date, time, bidding procedures) by filing a line on the docket of this case. The proceeds of any such auction will be used (i) first, to retire attorneys' fees incurred in connection with conducting the auction; and (ii) second, to retire administrative expense claims more promptly so that scheduled administrative expense claim payments may be subsequently applied to Class 5 general unsecured creditors once administrative expense claim obligations are fully retired.

At core, and unsurprisingly, this Plan will be funded through the ongoing operations of the Debtor's restaurant.

**Article 8.   General Provisions**

**Section 8.01   Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02   Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated. The Debtor will file a notice of the effective date, on the docket of this case, within seven days of the effective date.

---

[8] The opening bid is intended to reflect the additional attorneys' fees the Debtor is likely to incur should counsel need to facilitate the occurrence of an auction, as well as the general administrative burden the Debtor will occasion through the potential need to thereafter participate in litigation.

**Section 8.03   Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04   Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05   Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code), as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06   Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07   Prepayment.** The Debtor may prepay any—or all—of the obligations hereunder, at any time. Should the Debtor prepay part—or all—of the Class 2 claim at any time, the Class 2 claim shall be reamortized accordingly, with the Class 2 claim then being regarded as paid in full when the Debtor makes such payment(s) as cause the Class 2 claim to be fully retired in accord with the accrual of interest at the rate provided for herein.

**Section 8.08   Captions.** The headings contained in this Plan are for convenience of reference only, and do not affect the meaning or interpretation of this Plan.

**Section 8.09   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of Maryland govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.10   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder.  Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono*

services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.11   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of Maryland shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.12   Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 8.13   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by the Subchapter V trustee, counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court.

**Section 8.14   Progress Reports:** As required under Local Rule 3022-1(d), the Debtor will file, and serve upon the U.S. Trustee, a progress report six (6) months after the entry of the confirmation order and every six (6) months thereafter, each report detailing the progress made towards full administration of the Plan, to include distributions made to-date and any other substantial activities that would impede full administration.

**Article 9.   Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

   (a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

   (b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in the 60th month succeeding the Effective Date.

**Section 9.02** **Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Section 9.03** **Notice of Substantial Consummation.** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

*[Signature on Following Page]*
Respectfully Submitted,

<u>/s/ Maurice B. VerStandig</u>
Maurice B. VerStandig, Esq.
THE BELMONT FIRM
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
mac@dcbankruptcy.com
*Counsel for the Debtor*