DocuSign Envelope ID: A41FECF1-BA6A-45DD-96FA-33C98F654CEC

| Fill in this information to identify the case: |
| --- |

| Debtor 1 | Smokecraft Clarendon, LLC |
| --- | --- |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | District of Maryland |
| Case number | 24-13609 |

## Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Capital Bank, National Association
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  Capital Bank, N.A., and Capital Bank

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Catherine Keller Hopkin<br>Name | Capital Bank   Attn:  Nonnie Rash<br>Name |
| 185 Admiral Cochrane Drive, Suite 130<br>Number       Street | 2275 Research Blvd., Ste 600<br>Number       Street |
| Annapolis          MD          21401<br>City          State          ZIP Code | Rockville          MD          20850<br>City          State          ZIP Code |
| Contact phone (443) 569-0788 | Contact phone 301-468-8848 x1239 |
| Contact email chopkin@yvslaw.com | Contact email rrash@capitalbankmd.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____    Filed on ___ / ___ / _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No
☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  4   5   1   9

**7. How much is the claim?**     $_____917,126.61 . **Does this amount include interest or other charges?**

☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Loaned

**9. Is all or part of the claim secured?**

☐ No
☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe:      All of the Debtor's assets

**Basis for perfection:**      See Attached Rider

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**      $____917,126.61
**Amount of the claim that is secured:**      $____515,268.11
**Amount of the claim that is unsecured:**  $____401,858.50  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $____917,126.61

**Annual Interest Rate** (when case was filed) 7.50 %
☑ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410                              **Proof of Claim**                                page 2

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  07/02/2024<br>　　　　　　　　　　MM / DD / YYYY<br><br>*DocuSigned by:*<br>*Krystal Broussard*<br>419C83EFB8134ED...<br>Signature<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name　　Krystal 　　　　　　　　　　　　　Broussard<br>　　　　　First name 　　　Middle name 　　　Last name<br><br>Title　　Senior Vice President<br><br>Company　Capital Bank<br>　　　　　Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address　2275 Research Blvd., Ste 600<br>　　　　　Number 　　Street<br>　　　　　Rockville 　　　　　　　MD 　　20850<br>　　　　　City 　　　　　　　　State 　ZIP Code<br><br>Contact phone　703-434-3783 　　　　Email  kbroussard@capitalbankmd.com |

## Rider to Proof of Claim for Capital Bank, National Association

Claimant, Capital Bank, National Association (the "Claimant" or "Capital Bank") has a claim against Smokecraft Clarendon, LLC ("Smokecraft" or the "Debtor"). The Claim is based on various agreements to fund the Debtor's renovation and construction on existing improvements in Smokecraft's leased space in Arlington County, VA. This Rider and the attached documents support the Claimant's Claim.

Debtor is indebted to Claimant in the amount of $917,126.61, which amount is comprised of $911,880.18 in principal and $5,246.43 in interest.

Debtor is indebted to Claimant pursuant to the following funding agreements:

    a. Construction Loan Agreement (the "Loan"), dated as of January 31, 2020, by and among Capital Bank, the Debtor, and the Debtor's majority owner Smokecraft Holdings, LLC ("Holdings");

    b. Security Agreement, dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings;

    c. Credit Agreement, dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings, and Andrew C. Darneille (as guarantor);

    d. Copyright Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

    e. Patent Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

    f. Trademark Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

    g. Assignment of Contracts, dated as of January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

    h. Subordination of Lien Agreement, dated as of July _, 2019, by and between, KBSIII 3003 Washington, LLC, the Debtor's landlord, the Debtor, and Capital Bank;

    i. U.S. Small Business Administration ("SBA") Authorization issued in connection with the Loan, having an SBA Loan No. of 36035970-10 and an approval date of March 15, 2019, as amended from time to time;

    j. SBA Note, dated January 31, 2020, executed by Smokecraft Clarendon, LLC and Smokecraft Holdings, LLC as borrowers; and

    k. SBA Unconditional Guarantee, dated January 31, 2020, executed by Andrew C. Darneille as guarantor.

    l. Virginia UCC Financing Statement, dated January 31, 2020, filed by Annalise Humm.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>**Annalise Humm** | Office of the Clerk<br>Virginia State Corporation Commission<br><br>Filing Number: 202001310319956<br>Filing Date and Time: 01/31/2020 09:39 AM<br>Total Number of Pages: 1<br>(Document filed electronically) |
| B. E-MAIL CONTACT AT FILER (optional)<br>**ahumm@r-plaw.com** | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address)<br><br>**Annalise Humm**<br>**6031 University Boulevard**<br>**Suite 300**<br>**Ellicott City, MD 21043 USA** | |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |
|---|
| **Smokecraft Clarendon, LLC** |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3003 Washington Boulevard, Suite 101** | **Arlington** | **VA** | **22201** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |
|---|
| **Smokecraft Holdings, LLC** |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3003 Washington Boulevard, Suite 101** | **Arlington** | **VA** | **22201** | **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| **Capital Bank, National Association** |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1776 Eye Street NW** | **Washington** | **DC** | **20006** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of Debtors (collectively, "Collateral"), including, without limitation, all of Debtors' Equipment, Fixtures, Inventory, Accounts, Investment Property, Chattel Paper, Instruments, Documents, and General Intangibles, wherever located, whether now owned or hereafter acquired or arising together with all products and proceeds thereof (both cash and noncash). This Financing Statement is intended to cover all of Debtors' assets and the mention or inclusion of specific categories or items of property shall not limit the security interest of Secured Party. All or a portion of the indebtedness secured hereby is purchase money for all or a portion of the Collateral.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



U.S. Small Business Administration

NOTE    *5985*

---

**IMPORTANT NOTICE**

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

| SBA Loan # | ██████████ |
|---|---|
| SBA Loan Name | Smokecraft Modern Barbecue |
| Date | January 31, 2020 |
| Loan Amount | $1,200,000.00 |
| Interest Rate | 7.50% per annum |
| Borrower | SMOKECRAFT CLARENDON, LLC and SMOKECRAFT HOLDINGS, LLC |
| Operating Company | N/A |
| Lender | Capital Bank, National Association |

1.  PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

One Million Two Hundred Thousand and No/100 ------------------------------------------------------------------- Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2.  DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3.    PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate is 7.50% per year.  The interest rate may only be changed in accordance with SOP 50 10.

Borrower must pay a total of 6 payments of interest only on the disbursed principal balance beginning one month from the month this Note is dated and every month thereafter; payments must be made on the 1st calendar day in the months they are due.

Borrower must pay principal and interest payments of $14,313.46 every month, beginning seven months from the month this Note is dated; payments must be made on the 1st calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply remaining balance to reduce principal.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years and 6 months from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4.  DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.  Fails to do anything required by this Note and other Loan Documents;

B.  Defaults on any other loan with Lender;

C.  Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.  Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E.  Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F.  Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.  Fails to pay any taxes when due;

H.  Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.  Has a receiver or liquidator appointed for any part of their business or property;

J.  Makes an assignment for the benefit of creditors;

K.  Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.  Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M.  Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.


5.  LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.  Require immediate payment of all amounts owing under this Note;

B.  Collect all amounts owing from any Borrower or Guarantor;

C.  File suit and obtain judgment;

D.  Take possession of any Collateral; or

E.  Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.


6.  LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.  Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C.  Release anyone obligated to pay this Note;

D.  Compromise, release, renew, extend or substitute any of the Collateral; and

E.  Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.   WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.   SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.   GENERAL PROVISIONS:

A.   All individuals and entities signing this Note are jointly and severally liable.

B.   Borrower waives all suretyship defenses.

C.   Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.   Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.   Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.   If any part of this Note is unenforceable, all other parts remain in effect.

G.   To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10.  STATE-SPECIFIC PROVISIONS:

CONFESSION OF JUDGMENT. Each Borrower authorizes any attorney designated by Lender or any clerk of any court of record to appear for such Borrower and confess judgment against such Borrower in favor of Lender for the full amount due on this Note (including principal, accrued interest, charges and fees), plus court costs, plus attorneys' fees equal to 15% of the amount due under this Note, all without prior notice or opportunity of either Borrower for prior hearing, without stay of execution or right of appeal, and expressly waiving the benefit of all exemption laws and any irregularity or error in entering any such judgment.  For purposes of confessing judgment in the Commonwealth of Virginia, each Borrower hereby appoints and designates Brian C. Rosenberg, Bryan J. Pelino, Christopher Mullings, Christopher Johnson and any other officer, employee or agent of Capital Bank, National Association, each of whom may act as such Borrower's duly constituted attorney-in-fact, to confess judgment against such Borrower pursuant to the provisions of this Note and of Section 8.01-432 of the Code of Virginia of 1950, as amended, which judgment shall be confessed in the Circuit Court of Arlington County, Virginia. Upon Lender's request, each Borrower: (i) shall name such additional or alternative persons designated by Lender as such Borrower's duly constituted attorney or attorneys-in-fact to confess judgment against such Borrower in accordance with the terms of this Note; and (ii) shall agree to the designation of any additional circuit courts in the Commonwealth of Virginia in which judgment may be confessed against such Borrower. No single exercise of the power to confess judgment granted in this paragraph shall exhaust the power, regardless of whether such exercise is ruled invalid, void or voidable by any court, nor shall this Note, Lender's right to attorneys' fees in the amount described herein or any other obligation hereunder or under any other Loan Document merge into any such judgment.  The power to confess judgment granted in this paragraph may be exercised from time to time as often as the holder of this Note may elect.  Each Borrower acknowledges that the actual amount of attorneys' fees incurred by Lender would be impossible to calculate at the time judgment by confession is entered, as all such fees would not yet have been incurred.  Accordingly, each Borrower agrees that attorneys' fees equal to 15% of the amount due is reasonable given the circumstances.

If this Note is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Borrower shall pay all of Lender's reasonable costs, fees and expenses, including reasonable attorneys' fees actually incurred by Lender and actual expenses incurred, resulting from such referral.  Each Borrower intends that the provisions of this Section shall not be merged into any judgment under this Note, but shall survive every such judgment so that Borrower shall pay all costs, fees and disbursements, including reasonable attorneys' fees, incurred by Lender in connection with this Note, whether incurred before or after judgment, and including without limitation any reasonable attorneys' fees and expenses incurred by Lender in collecting on any such judgment.

DEFAULT INTEREST.  Upon the occurrence of a default, but at all times subject to the restrictions and requirements of SOP 50 10 and all other applicable laws, Lender, in Lender's sole discretion and without notice or demand, may raise the rate of interest accruing on the principal balance outstanding under this Note by the lesser of (i) 5% above the rate otherwise applicable, or (ii) such amount as is permitted under SOP 50 10 or otherwise under applicable law, independent of whether the holder elects to accelerate the principal balance outstanding under this Note.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note.

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

| WITNESS/ATTEST: | BORROWER: |
|---|---|
| | SMOKECRAFT CLARENDON, LLC |
| | A Virginia Limited Liability Company |
| _____ | By: _____ (SEAL) |
| PATRICK ESINDU | Andrew C. Darneille |
| | Manager |
| | |
| | SMOKECRAFT HOLDINGS, LLC |
| | A Virginia Limited Liability Company |
| _____ | By: _____ (SEAL) |
| PATRICK ESINDU | Andrew C. Darneille |
| | Sole Member and Manager |

## CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT ("Agreement") is made as of January 31, 2020 by and among **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company ("Clarendon"), **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company ("Holdings"), and **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender"). Clarendon and Holdings are collectively called "Borrowers."

### Recitals

Clarendon is the tenant under a certain lease for existing improvements located in Arlington County, Virginia and intends to perform certain renovations to those existing improvements. Borrowers have applied to Lender for a commercial loan in the maximum principal amount of $1,200,000, the proceeds of which will be used by Borrowers to finance, in part, the renovation and construction of the aforementioned improvements. Lender has agreed to make the loan upon and subject to the terms, conditions, and provisions of this Agreement.

### Agreements

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Borrowers and Lender agree as follows:

## 1.    DEFINITIONS AND GENERAL RULES OF CONSTRUCTION

1.1.    _Definitions_. In this Agreement, all defined terms shall be capitalized and shall have the meanings given on Exhibit A attached hereto and made a part of this Agreement. Capitalized terms used in this Agreement and not otherwise defined in this Agreement have such meanings ascribed to them in the Credit Agreement; provided, however, that should any such term cease to be defined under the Credit Agreement or should the Credit Agreement cease to exist, such term shall have such meaning as ascribed to it by Lender in its sole and absolute discretion.

1.2.    _Accounting Terms_. All accounting terms not specifically defined herein have the meanings assigned to them as determined by generally accepted accounting principles consistently applied and maintained throughout the periods indicated ("GAAP") as used by the Financial Accounting Standards Board and/or the American Institute of Certified Public Accountants or such successor or other organization as determined by Lender, unless otherwise specifically elected by Lender.

1.3.    _UCC Terms_. Unless specifically defined otherwise in this Agreement, all terms used in this Agreement that are defined in the UCC shall have the meanings ascribed to them therein; provided, however, that should any such term cease to be defined under the UCC or should the UCC cease to exist, such term shall have such meaning as ascribed to it by Lender in its sole and absolute discretion.

1.4.    _Tense; Gender; Section Headings_. In this Agreement, the singular includes the plural and _vice versa_. Each reference to any gender also applies to any other gender. The section headings are for convenience only and are not part of this Agreement.

## 2.    TERMS OF LOAN

2.1.    _Agreement to Lend_. Subject to and in accordance with the terms, conditions and provisions of this Agreement and the other Loan Documents, Lender agrees to advance, as Loan Proceeds, such principal amounts as are requested by Borrowers, provided that the principal amount advanced to Borrowers shall not exceed $1,200,000, as determined by Lender in Lender's sole discretion.

2.2.    _Terms of Repayment_. The Loan shall be evidenced by and repaid with interest in accordance with the terms of the Note, which are incorporated herein by reference.

2.3.    _Purpose_. The Loan Proceeds shall be used solely to finance the Project Costs.

2.4.    _Loan Account_. Lender may establish and maintain one or more accounts on the books of Lender evidencing the Liabilities, to which account or accounts: (a) each advance made by Lender shall be debited as of the date made; (b) each payment made by Borrowers shall be credited as of the date payment is received by Lender; (c) all interest that accrues on the Loan shall be debited as it accrues; and (d) all other fees, charges, interest, and expenses chargeable by Lender to Borrowers under this Agreement or any other Loan Document shall be debited as of the date such charges, interest, and expenses are incurred. All credit entries to such accounts are conditional and shall be readjusted as of the date made if final payment is not received by Lender. The entries made by Lender to such accounts in accordance with this Section 2.4 shall constitute _prima facie_ evidence of the existence and amounts of the Liabilities, absent manifest error.

2.5.    _Direct Debit_. Upon request by Lender, all payments due under the Note and the Loan shall be made by direct debit from one or more accounts maintained by Borrowers (or either of them) with Lender. Borrowers shall be responsible for ensuring that adequate funds to satisfy each payment due under the Note and the Loan are deposited in such accounts prior to the scheduled payment dates. Lender is hereby irrevocably authorized to debit all accounts maintained by either Borrower with Lender for all amounts due and payable under the Note and the Loan. Borrowers shall execute and deliver to Lender (and shall cause all other Persons to execute and deliver to Lender) all other documents and instruments reasonably required by Lender in connection with Borrowers' agreement to make payments by direct debit.

## 3.    PROJECT COSTS; BORROWERS' EQUITY CONTRIBUTION

3.1.    _Project Costs; Use of Loan Proceeds_. Borrowers have submitted the Budget to Lender and agree that each Project Cost, as shown on the Budget, shall not exceed the amount shown for such Project Cost on the Budget. The Loan Proceeds shall be used in accordance with the Budget. Advances from the contingency category (as shown on the Budget) may be made or withheld in Lender's sole discretion. Funds may not be reallocated within the Budget without Lender's prior approval; provided, however, that Lender shall not unreasonably withhold, condition or delay approval of the reallocation of funds from one category for which there are, or are reasonably expected to be, cost savings to another category for which there are, or are reasonably expected, to be cost overruns. Notwithstanding the foregoing, cost savings in any one category may be reallocated to the contingency line item without the necessity of Lender's consent.

3.2.    _Borrowers' Equity Contribution_. Prior to the date of this Agreement, Borrowers have invested, or have made arrangements satisfactory to Lender to invest, the excess of the total funds needed to achieve Completion of the Project, purchase all furnishings, fixtures and equipment necessary for the operation of the Premises over the principal amount of the Loan. All Project Costs in excess of the Loan Proceeds available therefor shall be paid by Borrowers from its separate funds, shall constitute Borrowers' equity investment in the Premises and the Project and shall be made before Lender advances any Loan Proceeds. If Lender reasonably determines at any time that the sum of remaining Project Costs exceeds the amount of unadvanced Loan Proceeds, Borrowers shall invest the amount of the deficit in the Project before the next advance of Loan Proceeds. Any funds, whether deposited by Borrowers with Lender or invested or to be invested directly by Borrowers in the Project, shall be deposited or invested, as the case may be, in full prior to any advance of any unadvanced Loan Proceeds.

3.3.    _Additional Funds_. Loan Proceeds and any amounts deposited by Borrowers with Lender for application to Project Costs shall be advanced by Lender from time to time to pay for Project Costs pursuant to the terms and conditions of this Agreement. Lender is not obligated to advance funds for the payment of any Project Cost in excess of the amount shown for such Project Cost in the Budget. Similarly, Lender is not obligated to advance funds for payments under any construction contract or any subcontract in excess of the amount budgeted for any one category of such contract or subcontract as shown on the trade cost breakdown previously submitted to Lender by Borrowers. Whenever Lender, in its sole discretion, estimates that funds budgeted for any Project Cost or funds allocated to any one category under any construction contract or subcontract as shown on the trade cost breakdown submitted

to Lender are insufficient to pay such Project Cost or category, respectively, Lender, in its sole discretion, may demand that Borrowers deposit the amount of such deficiency with Lender, and Borrowers immediately thereupon shall deposit such amount with Lender. Lender, in its sole discretion, may refuse to make any further advances of Loan Proceeds or funds deposited by Borrowers with Lender until Lender has received such amount.

3.4.   *Interest*.  Lender shall pay no interest to Borrowers on any portion of the Loan Proceeds not yet advanced to or for the account of Borrowers or on any sums deposited by Borrowers with Lender to cover costs of completing the Project as provided in this Agreement.  Except as otherwise provided in this Agreement, interest shall accrue on all advanced and outstanding Loan Proceeds at the rate or rates provided in the Note.

**4.     ADVANCE PROCEDURES**

4.1.   *Procedure for Advances Other Than for Interest*.  Subject to compliance by Borrowers with all of the terms, provisions, and conditions of this Agreement and the fulfillment of the conditions to advances set forth in Sections 5.1 and 5.2 of this Agreement, Lender shall advance the Loan Proceeds and other sums deposited by Borrowers with Lender for application to the Project Costs, if any, to Borrowers, or in the sole discretion of Lender, to any general contractor, subcontractor, or materialmen in several advances in accordance with the following procedures:

     a.   Requisition.  At least 5 business days before the date on which Borrowers desire an advance, Borrowers shall submit to Lender requisitions for direct Project Cost and indirect Project Costs other than interest, all in form satisfactory to Lender.  Requisitions for Project Costs shall include a certification by Borrowers, the general contractor, the architect or engineer for the Project and the Inspector of the percentage of Completion of the Project in detailed trade breakdown, the cost of the completed construction and the completed construction's compliance with the plans and specifications for the Project; provided, however, Lender shall not unreasonably require such certifications by the general contractor, architect or engineer for the Project for equipment and furnishings (1) for which Borrowers (or either of them) are invoiced directly and exclusively, (2) which are not incorporated into the Project in a manner to become affixed to any real property or fixtures, (3) which are incorporated in in the Project by Borrowers directly and not by the general contractor or any other contractor or subcontractor, and (4) which are not part of the scope of work provided for under any agreement with the general contractor or any other contractor or subcontractor in connection with the Project.  Requisitions for indirect Project Costs and separately invoiced construction materials and FF&E shall specify in detail the nature and purpose of each expense and shall be accompanied by invoices, receipts and other supporting documentation reasonably acceptable to Lender.

     b.   Calculation of Advance.  Each advance of Loan Proceeds other than the advance of the Retainage shall be in an amount equal to (i) the direct Project Costs incurred to date (as determined by Lender on the basis of its review of Borrowers' requisition and cost breakdown, and the review by, and certification of, the Inspector and the architect or engineer for the Project), plus (ii) the allowable indirect Project Costs related to the Project as described in the Budget, as determined by Lender in its sole discretion, less (iii) the Retainage, less (iv) the amounts previously advanced by Lender, less (v) Borrowers' required equity contribution.

     c.   Advance of Retainage.

          i.   Lender shall advance the Retainage only after: (1) the Project is fully completed and accepted by Borrowers; (2) Lender receives an affidavit by the general contractor for the Project listing the names of all mechanics and materialmen who have supplied labor or material to the Project and, to the extent reasonably required by Lender, final waivers of Liens of the general contractor and all mechanics and materialmen listed in the affidavit, all in form and substance satisfactory to Lender; (3) a certificate of occupancy is issued by the appropriate Governmental Authorities having jurisdiction; (4) Lender receives a certificate of completion of AIA Form G704 combined with a form approved by Lender executed by Borrowers, the general contractor for the Project and architect or engineer for the Project, all in form and substance satisfactory to Lender; (5) to the extent required under the Lease or Applicable

3

Law, Lender receives a copy of Landlord's written approval of the Project and confirmation from Borrowers and Landlord that the term of the Lease has commenced and that each of Borrowers and Landlord have accepted the Premises and the Project; (6) Lender receives final inspection reports and certifications from the Inspector that are reasonably satisfactory to Lender in form and substance; (7); and (8) Lender receives such evidence of such insurance as Lender may require.

        ii.      Notwithstanding anything to the contrary contained in Section 4.1(c)(i) above, upon request by Borrowers, Lender shall release the portion of the Retainage applicable to any specific contract or subcontract (other than the general construction contract) upon completion of such contract or subcontract but prior to the satisfaction of all of the conditions set forth in Section 4.1(c)(i) above. Borrowers shall not request any partial release of the Retainage unless the contractor or subcontractor for whom such a partial release of the Retaining is requested has been paid in full, and Lender may condition any such partial release of the Retainage on the submission of such lien waivers, invoices, receipts and other items as Lender may deem appropriate in its reasonable discretion.

        d.      _Timing and Deposit of Advance_.  Lender shall have 5 business days from receipt of Borrowers' requisition within which to fund each requisition.  Except as otherwise provided in this Agreement, all advances shall be made by depositing funds in a direct deposit account maintained by Borrowers with Lender solely for the Loan.

        e.      _Inspection and Certification_.  At the time each requisition is submitted, the Inspector shall review the completed construction on the Project and shall certify to Lender the cost of completed construction, the percentage of completion, and compliance with the plans and specifications for the Project.  Upon acceptance of the Inspector's report, Lender shall advance the Loan Proceeds in accordance with the Budget.

        f.      _Advance Restrictions_.  The contrary notwithstanding, advances of Loan Proceeds are subject to the following restrictions:

        i.      Borrowers shall not request, and Lender shall have no obligation to make, any advance of Loan Proceeds (A) that would cause the sum of the outstanding principal balance of the Loan plus the amount of any Loan Proceeds that remain available to be advanced to exceed $1,200,000, (B) for any purpose that would cause the Loan Proceeds advance for such purpose plus the amount of Loan Proceeds remaining available to be advanced for such purpose to exceed the amount of Loan Proceeds allocated for such purpose under the SBA Authorization or under the Budget, or (C) for any purpose other than such purposes specifically permitted under the SBA Authorization.

        ii.      Borrowers shall not request, and Lender shall have no obligation to make, any advance of Loan Proceeds after the Completion Date.

        iii.      Lender shall not be required to advance Loan Proceeds more than once each month, and Lender shall limit the total amount advanced for each Project Cost at any time to an amount which, when deducted from the total amount budgeted for such Project Cost, leaves a balance to be advanced which is equal to the cost of completion of that portion of the Project covered by the Project Cost, all as determined by Lender in its sole discretion from time to time; provided, however, that so long as no Default or Event of Default has occurred, Lender shall use commercially reasonable efforts to accommodate requests by Borrower for advances of Loan Proceeds for costs of Borrowers associated with the acquisition of FF&E pursuant to the terms and conditions of this Agreement.

        iv.      No advance shall be made for materials which are not physically incorporated into the Project, or intended to be physically incorporated into the Project, unless such advance is approved by Lender in writing.  Without limiting the generality of the foregoing, Lender shall not be required, or intended to disburse Loan Proceeds for building materials or furnishings that are stored "on or off" the Premises. Further, the use of Loan Proceeds for deposits for furniture, fixtures and equipment ("FF&E") are subject to Lender approval, in Lender's reasonable discretion but subject to the requirements of the SBA Authorization and the Loan Documents.  Lender may require Borrowers to pay all required deposits for FF&E with Borrowers' own funds.  So long as no Default or Event of Default

has occurred, Lender shall reimburse Borrowers for such deposits once such FF&E is delivered to the Premises, subject to the terms and conditions of the SBA Authorization, this Agreement, the other Loan Documents and the Budget provided that such funds remain available within the category of Project Costs therefor.

4.2.    *Procedures for Advances to Pay Interest*.   If and to the extent the Budget provides for the use of Loan Proceeds to pay interest on the Loan, Lender may cause such Loan Proceeds to be advanced and applied to interest as and when due by recording on its books an advance in the amount of the interest payment due and simultaneously recording on its books a receipt of a payment in the amount of the interest payment due.   Lender may cease making advances for the payment of interest upon notice to either Borrower or any other Person (a) upon the occurrence of a Default or an Event of Default, (b) Lender's determination that funds budgeted for any Project Cost or funds allocated to any one category under any construction contract or subcontract as shown on the trade cost breakdown submitted to Lender are insufficient to pay such Project Cost or category, respectively or (c) Lender's determination that the Project is not being prosecuted with diligence and continuity in accordance with the plans and specifications approved by Lender.   No separate interest reserve shall be created by this Agreement or the Budget.

4.3.    *Liability of Lender*.   Lender shall not be responsible or liable to any Person other than Borrowers for the advance of the Loan Proceeds or any funds deposited by Borrowers with Lender or any part thereof, and no third party, including without limitation any Obligor, any contractor, subcontractor, or materialman, shall have any right or claim against Lender under this Agreement because of the administration thereof.

4.4.    *Not Assignable*.   The Loan Proceeds and Lender's commitment to advance funds under this Agreement shall not be assignable by Borrowers nor subject to the process of any court upon legal action by or against either Borrower or by or against anyone claiming under or through either Borrower.

4.5.    *Option of Direct Payment*.   Notwithstanding the other provisions of this Agreement, regardless of whether an Event of Default has occurred, Lender, in its sole discretion, and without liability to either Borrower or any other Person: (a) may make all advances or any advance jointly to Borrowers (or either of them) and any contractor, subcontractor, laborer, materialman, or Person furnishing labor, services, or materials used or to be used on or in connection with the Project (including authorized extras); (b) may make all advances or any advance directly to contractors, subcontractors, laborers, materialmen, or Persons furnishing labor, services, or materials used or to be used in connection with the Project (including authorized extras), or to any combination of them; and (c) may pay all loan fees, Taxes, appraisals, inspection fees, recording charges, legal fees, and any other outstanding amounts due relating to the Loan and to the Project and the full cost of its Completion.   Any such advance or payment shall be deemed to have been made to Borrowers or for their account.   Borrowers shall promptly provide to Lender accurate and fully completed W-9 or W-8 tax forms for itself, the general contractor and any other Person that is to receive Loan Proceeds directly.   At no time shall Lender be required to disburse Loan Proceeds to anyone that has not provided Lender with the W-9 or W-8 forms required by the preceding sentence.

5.    **CONDITIONS TO ADVANCES**

5.1.    *Conditions to Initial Advance*.   On the date of this Agreement, if requested by Borrower but subject to the terms and conditions of this Agreement, Lender shall advance a portion of the Loan Proceeds for a portion of Project Costs and, if approved by Lender, to finance a portion of the closing costs; provided, however, that Lender shall have no obligation to make any advance of the Loan Proceeds unless Lender shall have received all of the following in form and substance satisfactory to Lender in its sole discretion:

    a.    Payment of Fees and Costs.   Evidence that all loan fees, commitment fees, and all other fees and costs incurred by Lender in connection with this Agreement and the making of the Loan, including without limitation Lender's counsel fees, have been paid to Lender.

5

b.    Delivery of Documents.  All of the documents, instruments, and agreements required by Lender in connection with the Loan, including without limitation this Agreement, the Note and all other guaranty agreements, and financing statements.

c.    Delivery of Submissions.  All of the items and materials that Lender, the Landlord or the Inspector may require.  Without limiting the generality of the foregoing, prior to any advance of Loan Proceeds for the construction of any Improvements in connection with the Project, Borrowers shall submit to Lender all such documents and items required by Lender and listed on Exhibit C attached hereto, unless otherwise determined by Lender.  Further, Borrowers shall submit to Lender all documents and other items listed on Exhibit C attached hereto not less than 20 days prior to making or submitting any requisition of any advance of Loan Proceeds and all such items shall be in form and substance acceptable to Lender.

5.2.    _Conditions to All Advances_.  Lender shall have no obligation to make any advance, including the initial advance described in Section 5.1 of this Agreement, until and unless all of the following conditions precedent shall have been and shall continue to be fully satisfied:

a.    Requisition.  Borrowers shall have delivered to Lender a requisition meeting the requirements of Section 4.1 of this Agreement.

b.    No Event of Default.  No Event of Default, or event which upon notice or the lapse of time, or both, would constitute an Event of Default, shall have occurred.  Further, Lender shall not be required to advance any Loan Proceeds if Lender believes, in its sole and absolute discretion, that doing so would violate the SBA Authorization or that the terms of the SBA Authorization have been violated.

c.    Completion.  There shall be sufficient time in the reasonable opinion of the Inspector for the Project to reach Completion by the Completion Date.

d.    Lien Waivers, Etc.  If requested by Lender, Borrowers shall have furnished waivers of Liens and receipts of payment from the general contractor for the Project, the architect and engineer for the Project, and each Major Subcontractor for all work performed to the date of the previous requisition at the time each requisition is submitted and waivers of Liens as to each materialman with respect to all prior advances.

e.    Certifications of Inspector and Architect.  The Inspector and the architect for the Project shall have certified to Lender the cost of completed construction, the percentage of completed construction, and that all construction work which has been completed is in full conformity with the plans and specifications for the Project.  If required by Lender, the architect or engineer for the Project shall have certified to Lender the percentage of completed construction, and that all construction work which has been completed is in all material respects in conformity with the plans and specifications for the Project.

f.    Breakdown of Advances; Receipts.  If requested by Lender, Borrowers shall submit to Lender: (i) a breakdown of what portion of each advance is to be paid to each contractor, materialman or supplier, and (ii) all receipts evidencing the payment of bills and costs for labor and material in connection with the installation or the acquisition and installation of fixtures and equipment.

g.    Application of Prior Advances.  Lender shall have received evidence reasonably satisfactory to Lender that all prior advances have been properly applied to the Project Costs.

h.    Project Costs.  The sum of the funds requisitioned, plus all prior advances by Lender, plus the aggregate of all retainages, if any, and unadvanced funds, shall be sufficient, in the sole opinion of Lender, to achieve Completion of the Project in accordance with the plans and specifications for the Project.

i.    Satisfactory Performance.  Lender shall have received evidence satisfactory to Lender and the Inspector in their sole discretion that construction work performed and materials in place to the

6

date of the requisition are satisfactory both in quantity and quality and that the subsoil is suitable for the continued construction of and such other work on the Project.

       j.      <u>Required Permits</u>.  Lender shall have received copies of all necessary building and other permits prior to commencing the particular work for which they are required.  Further, prior to the advance of any retainage, if any, or at any other time as requested by Lender, Lender shall receive (1) to the extent required to be obtained under Applicable Law or otherwise reasonably required by Lender, a copy of a letter from the fire marshal regarding the Project and otherwise in form and substance acceptable to Lender, (2) a use and occupancy certificate for the Premises satisfactory to Lender, and (3) if required by the SBA or under Applicable Law, a copy of such evidence as is requested by Lender establishing that the Project meets the Seismic Regulations.

       k.      <u>No Default Under the Lease</u>.  There shall be no, and Lender shall not have received notice, of any default by under the Lease.

       l.      <u>Approval by Landlord</u>.  To the extent required under the Lease or Applicable Law, Lender shall have received evidence satisfactory to Lender in its sole discretion that Landlord has approved all construction work performed to date and that all funds to be invested by Landlord in the Project have been invested.

       m.      <u>Advance of Retainage</u>.  If the advance is the advance for the Retainage, then Borrowers shall have satisfied all conditions for the release of the Retainage as set forth in Section 4.1(c) of this Agreement.

       n.      <u>Final Advance</u>.  If the advance is the final advance of Loan Proceeds, Lender shall not be obligated to make such advance until: (1) the Project is fully completed and accepted by Borrowers; (2) Lender receives an affidavit by the general contractor for the Project listing the names of all mechanics and materialmen who have supplied labor or material to the Project and, to the extent reasonably required by Lender, final waivers of Liens of the general contractor and all mechanics and materialmen listed in the affidavit, all in form and substance satisfactory to Lender; (3) a certificate of occupancy is issued by the appropriate Governmental Authorities having jurisdiction; (4) Lender receives a certificate of completion of AIA Form G704 combined with a form approved by Lender executed by Borrowers, the general contractor for the Project and architect or engineer for the Project, all in form and substance satisfactory to Lender; (5) Lender receives a copy of Landlord's written approval of the Project and confirmation from Borrowers and Landlord that the term of the Lease has commenced and that Borrowers and Landlord have accepted the Premises and the Project; (6) Lender receives final inspection reports and certifications from the Inspector that are reasonably satisfactory to Lender in form and substance; and (7) Lender receives such evidence of such insurance as Lender may require.

5.3.      <u>*Conditions for Benefit of Lender*</u>.  All conditions to the making of advances are imposed solely and exclusively for the benefit of Lender, and no Person other than Lender and its agents shall have standing to require satisfaction of such conditions, or be entitled to assume that Lender will or will not make advances in the absence of strict compliance with such conditions.

**6.**      **REPRESENTATIONS AND WARRANTIES**

6.1.      <u>*Representations and Warranties*</u>.  Borrowers, and each Person acting on behalf of either Borrower in executing this Agreement, represents and warrants to Lender as follows:

       a.      <u>Authority</u>.  Each Borrower has the power and authority to consummate the transactions contemplated hereby, and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and the other Loan Documents executed and delivered by it.

       b.      <u>Financial Statements</u>.  The financial statements of Borrowers delivered to Lender prior to the date of this Agreement are true and correct in all material respects and fairly presents the respective financial conditions of Borrowers as of their respective dates, have been prepared in accordance with GAAP and no material adverse change has occurred in the financial condition of either Borrower since

the respective dates thereof. Borrowers shall promptly notify Lender of any material adverse change in the financial condition of either Borrower.

c.    Taxes. Borrowers have timely filed all required federal, state, county and municipal income tax returns and have paid all Taxes which have become due pursuant to such returns or pursuant to any assessments. No claims against either Borrower or any Obligor have been assessed or are unpaid with respect to any Taxes, and neither Borrower nor any Obligor knows of any basis for any additional assessment in respect of any Taxes.

d.    Validity of Loan Documents. The Loan and the execution, delivery and performance by Borrowers of the Loan Documents, the consummation of the transactions contemplated by this Agreement and the use, directly or indirectly, of all or any portion of the Loan Proceeds in accordance with this Agreement: (i) are within the legal powers of each Borrower; (ii) have received all necessary governmental approval; (iii) will not violate or result in a violation of any provision of Applicable Law or any order of any Governmental Authority; and (iv) will not result in a breach of or constitute a default under any mortgage, deed of trust, security agreement, lease, loan or credit agreement, or any other agreement or instrument to which either Borrower or any Obligor is a party or by which any of them or any of their properties is bound or affected, or result in the creation or imposition of any Lien of any nature whatsoever upon any of either Borrower's or any Obligor's property or assets, except as contemplated by the provisions of the Loan Documents. Borrowers are obtaining the Loan solely for business and commercial purposes, and the Loan Proceeds are not intended to be used, and will not be used, for family, household, agricultural or personal purposes. This Agreement, the Note and the other Loan Documents constitute the legal, valid and binding obligations of Borrowers and such Obligors who are a party thereto, enforceable against Borrowers and such Obligors in accordance with their respective terms. To Borrowers' knowledge, neither Borrower nor any Obligor is in default with respect to any order, writ, injunction, decree, or demand of any court or any Governmental Authority.

e.    Litigation. There is not now pending any actions, suits, or proceedings at law or in equity or before any administrative agency or, to the knowledge of Borrowers, threatened: (i) against or affecting either Borrower, the Property or the Project; (ii) involving the validity or enforceability of the any Lien in favor of Lender; or (iii) against either Borrower at law or in equity or before or by any Governmental Authority. To Borrowers' knowledge, neither Borrower is in default with respect to any order, writ, injunction, decree, or demand of any court or any other Governmental Authority.

f.    Environmental Compliance. Borrowers, the Property, the Premises and all of each Borrower's other properties, whether owned or leased, are in compliance with all environmental laws, regulations and restrictions.

g.    Licenses and Permits. Each Borrower and each Obligor has all licenses, permits and authorizations, in good standing and without undue restrictions, necessary for it to conduct lawfully its business and affairs.

h.    Lease. There are no leases or subleases other than the Lease that affect the Premises. The Lease is in full force and effect, and is fully enforceable against the tenants thereunder in accordance with their terms.

i.    Plans and Specifications. The plans and specifications for the Project are satisfactory to Borrowers and have been approved (or will be approved prior to the commencement of any work for which such approval is required), to the extent required by Applicable Law or any effective restrictive covenant, by all Governmental Authorities and the beneficiaries of any such covenant; all construction heretofore performed on the Project has been performed within the Premises in accordance with the plans and specifications for the Project as approved by Lender and in accordance with any restrictive covenants applicable thereto; there are no structural defects in the Project, the Property or the Premises; and no violation of any law or regulation exists with respect to the Project, the Property or the Premises.

   j. <u>Utilities</u>.  All utility services necessary for the Project and the Premises and the operation thereof for its intended purpose are or will be available at the Premises, including water supply, storm, and sanitary sewer facilities, and gas, electric, and telephone facilities.

   k. <u>Access to Property</u>.  All roads, hallways, and access points necessary for the full utilization of the Property and the Premises for its intended purpose have been completed or the necessary rights of way therefor either have been acquired by the appropriate Governmental Authority or have been dedicated to public use and accepted by such Governmental Authority, and all necessary steps have been taken by Borrowers and such Governmental Authority to assure the complete construction and installation thereof.

   l. <u>Zoning and Other Ordinances</u>.  The Project, and the use of the Premises for its intended purposes, will not violate any zoning or other ordinance, regulation or law, restrictive covenant, or agreement of Borrowers (either now in existence or known by Borrowers to be proposed) applicable to the Property, the Premises and the Project or its use, and all requirements for such use have been satisfied.

   m. <u>Required Permits</u>.  All necessary building and other permits have been obtained with respect to the Project or will be obtained prior to commencing the particular work for which they are required.

6.2. *Continuing Nature of Representations and Warranties*.  Each Borrower hereby represents, warrants, covenants and agrees that the representations and warranties made by Borrowers in Section 6.1 of this Agreement shall remain true and accurate in all respects throughout the term of the Loan.  Each requisition shall constitute an affirmation that the representations and warranties of Borrowers set forth in Section 6.1 of this Agreement are true and correct as of the date of the requisition.  Borrowers shall immediately notify Lender in writing if any of the representations and warranties of Borrowers set forth in Section 6.1 of this Agreement become untrue, inaccurate or incorrect in any material respect.

## 7. COVENANTS

7.1. *Commencement of Project*.  Borrowers shall commence the Project within 90 calendar days after the execution of this Agreement.

7.2. *Completion of Project*.  Borrowers shall cause the Project to be prosecuted with diligence and continuity in accordance with the plans and specifications approved by Lender and shall cause the Project to reach Completion on or before the Completion Date, free and clear of Liens and claims for Liens for materials supplied or for labor or services. Stored materials shall be incorporated into the Premises within 30 days of storage.  All off site stored materials shall be stored in a secured and bonded warehouse separate from stored materials of others.  Lender is not required to supervise the construction of the Project. Borrowers understand and acknowledge that all inspections and other services rendered by Lender shall be rendered solely for the protection and benefit of Lender.

7.3. *Payment of Equity Contribution*.  Borrowers shall provide any and all funds in excess of the Loan Proceeds necessary to achieve Completion of the Project and purchase all furnishings, fixtures and equipment necessary for the operation of the Premises.  Landlord may provide certain funds to be used to finance the construction of all or a portion of the Project pursuant to a tenant improvement and other allowances available to Clarendon under the Lease.  Prior to any request by Borrowers for any advance of Loan Proceeds, or before Lender is obligated to advance any Loan Proceeds, Borrowers shall invest into the Project all funds in excess of the Loan Proceeds including, without limitation, Borrowers' required equity contribution, all excess funds necessary to achieve Completion of the Project and all such tenant improvement allowance funds or such other funds to be contributed to the Project by Landlord pursuant to the terms and conditions of the Lease or otherwise.  At Lender's request, Borrowers shall furnish to Lender from time to time assurances satisfactory to Lender that any funds which may be necessary to complete any portion of the Project described in the Budget, in excess of the amount of such Project Costs allocated to that portion of the Project in the Budget, have been advanced by Borrowers in accordance with the plans and specifications for the Project and that any funds necessary to achieve Completion of the Project in excess of the total Project Costs have been or will be advanced by Borrowers.

9

7.4.    *No Changes in Project*.  Borrowers shall not permit any material changes in the plans and specifications for the Project or any change orders in any contracts or subcontracts in connection with the Project without the prior written consent of Lender, and the consent of any Governmental Authorities having jurisdiction where such consent of any Governmental Authority is required.

7.5.    *Inspection*.  Borrowers shall permit Lender, Lender's representatives, and the Inspector to enter upon the Property and the Premises, to inspect the Premises and all materials to be used in connection with the Project, and to examine all detailed plans and drawings which are or may be kept at the construction site or elsewhere, and shall cooperate and cause all contractors and subcontractors to cooperate with the Inspector to enable it to perform its functions under this Agreement.

7.6.    *Safeguards as to Application of Funds*.  At any time reasonably requested by Lender, whether or not Borrowers are requesting an advance of Loan Proceeds, Borrowers shall submit to Lender any of the items listed as conditions to advances in Section 4 or Section 5 of this Agreement, all of which shall be in form and substance satisfactory to Lender.

7.7.    *Public Works, Utility and Developer's Agreements*.  Borrowers shall deliver to Lender copies of, and Lender shall have the right to review and approve prior to execution by Borrowers, all public works, utility and developer's agreements required for the Project, including but not limited to agreements with respect to subdivision, the construction of roads, or the installation of water, sanitary sewer, storm water management, gas and electric, telephone, or similar or related utility agreements.  Borrowers shall comply with and perform all of its obligations under such public works, utility and developer's agreements and shall permit no defaults under such public works, utility and developer's agreements.

7.8.    *Evidence of Ownership*.  Borrowers shall promptly deliver to Lender, upon request therefor, any contracts, bills of sale, statements, receipted vouchers, or agreements under which either Borrower claims title to any materials, fixtures, or articles incorporated located in, on or about the Premises are subject to the first priority Lien in favor of Lender.

7.9.    *Correction of any Defects or Departures*.  Borrowers shall commence and proceed promptly and diligently to correct any structural defect in the Improvements, the Project, the Premises or the Property or any material departure from the plans and specifications for the Project not approved by Lender.  The Inspector shall determine in its reasonable discretion whether Borrowers are acting promptly and diligently.  No advance of any portion of the Loan Proceeds shall constitute a waiver of Lender's right to require compliance with this covenant with respect to any such defects or departures from the plans and specifications for the Project.

7.10.    *Approval of Construction Materials, Contractors, Subcontractors and Materialmen*.  All general construction contract, architect's contract, engineer's contract and all other material contracts and agreements to which either Borrower is a party or intends to become a party, and plans and specifications pertaining to the Property or the Project which have not been delivered to Lender prior to the date of this Agreement must receive the approval of Lender prior to execution.  Borrowers shall deliver to Lender the names of all Persons with whom either Borrower intends to contract for the Project or for the furnishing of labor or materials therefor prior to entering into any agreement or contract therewith.  Neither Borrower shall engage or continue to employ any contractor, subcontractor, or materialman who Lender, in its sole discretion, determines is not properly performing or cannot properly perform the work to be done by such contractor or subcontractor.

7.11.    *Books and Records*.  Borrowers shall keep, and shall cause the general contractor, architect, engineer and Major Subcontractors to keep, adequate and accurate records and books of account with respect to the Project and the Premises, and which reflect correctly the results of the operation of the Premises, together with copies of all written contracts, leases and other instruments which affect the Premises.  Borrowers shall permit the Inspector and Lender, and their agents, accountants, and attorneys, to visit and inspect the Premises and the Project and examine such books, records, contracts, leases and other instruments and to discuss the affairs, finances, and accounts pertaining thereto with representatives and agents of Borrowers at such times as may be requested by Lender.

7.12.  _Insurance_.  Borrowers shall maintain in full force and effect, at Borrowers' sole expense, and shall furnish to Lender, policies evidencing such insurance coverage as required pursuant to the terms and provisions of the Security Agreement and the other Loan Documents.

7.13.  _Litigation_.  Borrowers shall promptly notify Lender upon becoming aware of any action or prospective claim or litigation, including Tax deficiencies, which may be asserted against either Borrower, any portion of the Property or the Premises, or any Obligor, and any prospective condemnation, change of zoning, or other action affecting any portion of the Property, the Premises or the Project.

7.14.  _Compliance with Laws and Private Restrictions_.  Borrowers shall comply with all Applicable Laws, including without limitation building restrictions, zoning ordinances, building codes, environmental protection requirements, and other governmental regulations, as well as all declarations, covenants, easements and other restrictions that are applicable to the Property or the Premises.

7.15.  _Payment of Fees and Costs_.  Borrowers shall pay all commitment, loan, letter of credit, and reasonable inspection fees of Lender and all reasonable expenses involved in perfecting the Lien status or priority of the collateral for the Loan and all other reasonable expenses of Lender related to the Loan or the protection and preservation of the Collateral, including without limitation all amounts required to fulfill Borrowers' obligations under the Loan Documents, recording fees and Taxes, Tax, title, and Lien search charges, title insurance charges, architects', engineers', and reasonable attorneys' fees, real property Taxes, and insurance premiums, and shall indemnify Lender against, and hold Lender harmless from, any loss or liability (including reasonable attorneys' fees) resulting from any and all claims, actions, settlements, or liability for acts or failure to act in connection with the Premises or the Project or on account of any claim by any party arising out of the Loan, the Project, Lender's interest in or Lien upon the Premises or the Collateral or the transactions contemplated by this Agreement, including without limitation any claims by brokers.

7.16.  _Payment of Contractors and Materialmen_.  Borrowers shall promptly pay all contractors and materialmen the amounts justly due them and shall receive all advances of Loan Proceeds and hold such advances and the right to receive such advances as trust funds to be applied for the purpose of paying the Project Costs.

7.17.  _Performance Under Other Loan Documents_.  Borrowers shall fulfill all conditions and perform all of the terms and conditions of this Agreement, and the other Loan Documents.

7.18.  _Default by Contractor or Subcontractor_.  If any contractor or subcontractor defaults on its contract and the contractor or subcontractor has no surety, Borrowers, within 5 calendar days after notice from Lender to do so, shall proceed to negotiate or invite bidding, and shall procure, within an additional 15 calendar days, a successor contractor or subcontractor, as applicable, to achieve Completion of the Project.  If required by Lender in its sole discretion as regards the general contractor or any Major Subcontractor, Borrowers shall obtain a performance bond and labor and material payment bond approved by Lender in the full amount of the new contract price.  If the contractor or subcontractor has a surety, but the surety refuses or fails to commence the Project within 15 calendar days after notice from Borrowers or Lender to do so, Borrowers shall negotiate or invite bidding and procure a successor contractor as provided in this Section.

7.19.  _Agreements to Complete_.  Lender shall have the right to require the general contractor or any architect or engineer providing services with respect to the Project to execute and deliver to Lender an agreement in form and substance reasonably acceptable to Lender stating, among other things, that (a) such architect or engineer consents to the unconditional assignment by Borrowers of any contracts, plans, specifications, drawings and other work product of such architect or engineer to Lender, and (b) following notice to such architect or engineer of the occurrence of an Event of Default, such architect or engineer shall furnish its services in accordance with the terms of its contract with Borrowers to or on behalf of Lender or any designee of Lender, as long as Lender advances, or causes to be advanced, funds required

11

to be advanced by Borrowers under the terms of such contract. Any such agreement shall be in form and substance reasonably acceptable to Lender and the general contractor, architect or engineer, as applicable.

7.20.   *Payment and Performance Bonds*.  If required by Lender, Borrowers shall provide Lender with payment and performance bonds for all Major Subcontractors in amount, form and substance satisfactory to Lender.

7.21.   *Notices*.  Borrowers shall forward to Lender copies of all notices given by either Borrower to any contractor, subcontractor, or materialman with respect to the Project, or received by either Borrower from any contractor, subcontractor, or materialman with respect to the Project, promptly upon the giving or receipt of such notice.

7.22.   *Governmental Requirements*.  Borrowers shall promptly deliver to Lender copies of all material notices sent to and received by any Governmental Authority relating to the Property, the Premises or the Project.  Upon request by Lender, Borrowers shall promptly deliver to Lender copies of all project approval requirement letters from any Governmental Authority relating to the Property, the Premises or the Project.

7.23.   *Payment and Performance*.  Borrowers shall pay the Liabilities as and when due and payable and shall perform, comply with, and observe all of the terms and conditions of the Loan Documents.

7.24.   *Costs of Transaction*.  Borrowers shall pay all costs and expenses incident to the making of the Loan and perfection of Lender's Liens under the Loan Documents, including but not limited to attorneys' fees, costs of appraisals and environmental site assessments, recordation costs and Taxes incident to filing of any deed of trust, security agreement, assignment of leases and rents, assignment of contracts, mortgage, financing statements and continuation statements in respect thereof, and any charges in connection with record searches regarding either Borrower or any Obligor or insurance premiums, and the fees of any Obligor.

7.25.   *Use of Loan Proceeds*.  Borrowers shall use the Loan Proceeds only for the purposes described in Section 2.3 of this Agreement.

7.26.   *Preservation of Properties*.  Borrowers at all times: (a) shall maintain their respective properties, whether owned or leased, in good operating condition, and from time to time shall make all repairs, renewals, replacements, additions, and improvements thereto needed to maintain such properties in good operating condition; (b) shall comply with the provisions of all leases to which either Borrower is a party or under which either Borrower occupies property so as to prevent any loss or forfeiture thereof or thereunder; and (c) shall comply with all laws Applicable Laws.

7.27.   *Expense Payments*.  If Borrowers shall fail to make any payment or otherwise fail to perform, observe, or comply with any of the conditions, covenants, terms, stipulations, or agreements contained in this Agreement, Lender without notice to or demand upon Borrowers and without waiving or releasing any obligation or any Default or Event of Default may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Borrowers, and may enter upon any premises of Borrowers for that purpose and take all such action thereon as Lender may consider necessary or appropriate for such purpose.  All sums so paid or advanced by Lender together with interest thereon from the date paid, advanced, or incurred until repaid in full at the highest rate of interest described in the Note, shall be paid by Borrowers to Lender upon demand by Lender.

7.28.   *Seismic Regulations and other SBA Provisions*.  To the extent required by the SBA or under Applicable Law: (a) the Project and all other construction contemplated hereunder, shall comply with the Seismic Regulations; and (b) Borrowers shall submit to Lender and the SBA evidence satisfactory to Lender and the SBA from a licensed architect or engineer that the Project and all other construction contemplated hereunder will conform with the Seismic Regulations; provided, however, at the election of Lender or the SBA, Borrowers may also submit a letter from a state or local government agency stating that an occupancy permit is required and that the local building codes upon which the permit is based include the standards established under the Seismic Regulations or such other the Seismic standards as

determined by Lender or the SBA.  Lender may charge Borrowers a one-time fee not to exceed 2% of the portion of the Loan designated for the construction, which fee shall not exceed the actual cost of such extra services.

7.29.    *Additional Post-Closing Submissions*.  Immediately following request by Lender, Borrowers shall deliver to Lender all items reasonably required by Lender, which shall be in form and substance acceptable to Lender in its sole discretion.

7.30.    *SBA Specific Requirements*.  To the extent required by Lender, prior to the commencement of the Project, Borrowers shall provide to Lender: (a) evidenced acceptable to Lender that Borrowers' contractor has furnished a 100% performance bond and labor and materials bond from a corporate surety approve by the *United States Treasury Department* using an AIA form or such other comparable coverage acceptable to Lender; (b) evidence that Borrowers' contractor carries the appropriate liability, worker's compensation and builder's risk insurance; (c) a copy of the final plans and specifications for the Project; and (d) a copy of Borrowers' contract with Borrowers' contractor for such specified price as determined by Lender, which contact shall include, among other things, an agreement that Borrowers will not order or permit any material changes in the approved plans and specifications without Lender's prior written consent and the contractor's surety providing the such bonds as are required by Lender.

7.31.    *Further Assurances and Corrective Instruments*.  Borrowers, upon request by Lender from time to time, shall execute and deliver, or cause to be executed and delivered, such supplements to this Agreement, corrective instruments, and such further instruments and as may be required by Lender for carrying out the intention of the parties to, or facilitating the performance of, this Agreement, any of the other Loan Documents or as otherwise determined by Lender.  Absent manifest error all determinations made by Lender with regard any of the foregoing shall be conclusive.  If either Borrower fails to execute any such document within 10 calendar days after written request by Lender, such Borrower hereby appoints Lender or any officer of Lender as such Borrower's attorney in fact for purposes of executing such document in such Borrower's name, which power of attorney is coupled with an interest and irrevocable.

## 8.    DEFAULT AND REMEDIES

8.1.    *Events of Default*.  The occurrence of any of the following events shall constitute an Event of Default under this Agreement and under the other Loan Documents:

      a.    Failure to Pay.  Borrowers fail to pay when due any of the Liabilities.

      b.    Failure to Perform.  Borrowers fail to observe or perform any covenant or agreement contained in this Agreement.

      c.    Default Under Other Loan Documents.  An Event of Default (as defined therein) occurs under any of the other Loan Documents, which default remains uncured beyond the expiration of any applicable cure period.  Reference is made to the other Loan Documents for specific cure periods, if any, for specific types of defaults.

      d.    Failure of Representation or Warranty.  Any representation or warranty made by Borrowers in this Agreement proves to have been incorrect in any material respect.

      e.    Failure to Complete.  Borrowers fail to achieve completion of the Project by the Completion Date.

      f.    Failure to Construct.  The Project is not carried on with reasonable dispatch or at any time is discontinued for a period of 15 business days for reasons other than moratoria, war, act of God, fire, flood, epidemic, quarantine restriction, riots, strike, lockout, or labor dispute.

g.      Failure to Satisfy Conditions to Advances.  Borrowers are unable to satisfy any condition to the advance of Loan Proceeds for a period in excess of 30 calendar days from the date the requisition therefor is received by Lender.

h.      Mechanic's Lien.  A Lien for the performance of work or the supply of materials is created against the Property, the Premises or any of the Collateral and remains unsatisfied or unbonded at the time of any request for an advance or for a period of 30 calendar days after the date of the creation thereof.

i.      Encumbrance.  Any survey or title insurance endorsement required by Lender during the period of construction shows any matter not approved by Lender and such matter is not removed within 30 calendar days after notice from Lender to either Borrower.

j.      Failure to Comply with Governmental Requirements.  Borrowers fail to comply with any requirement of any Governmental Authority having jurisdiction within 10 calendar days after either Borrower receives written notice of such requirement or within such greater or lesser time as may be specified in any such notice from such Governmental Authority with jurisdiction over the Project revokes or refuses to issue a required permit or approval or issues a stop work order, or any proceeding is commenced or action taken to enforce any remedy for a violation of any requirement of a Governmental Authority or any restrictive covenant affecting the Property, the Premises, the Collateral or any part thereof.

k.      Default by Contractor or Subcontractor.  The general contractor or any Major Subcontractor materially defaults under its contract or subcontract, which default Lender, in its sole discretion, deems material and substantial, and either Borrower fails to exercise any resulting right or remedy to which they may be entitled thereunder within 30 calendar days after notice from Lender to either Borrower.

l.      Impairment of Collateral.  There is any condition or situation which, in the discretion of Lender, constitutes a danger to or impairment of the security for repayment of the Loan.

m.      Cross Default.  A material default occurs with respect to any obligation owed by either Borrower or any Obligor to Lender or to any other Person, which default remains uncured beyond the expiration of any applicable cure period.

n.      Failure of Perfection.  Any Lien or security interest granted by the Loan Documents or otherwise in connection with the Loan is unperfected due to any action or omission by either Borrower in violation of this Agreement.

8.2.    *Remedies of Lender*.  Upon the occurrence of any Event of Default, in addition to all other rights and remedies available to Lender under the Loan Documents and Applicable Law, Lender shall have the following rights and remedies:

a.      Acceleration.  Lender may declare the Note and all other Liabilities to be immediately due and payable without presentment, demand, protest, or notice of any kind, and Lender's obligation to make advances under the Note, this Agreement or any of the other Loan Documents shall automatically terminate without notice or further action by Lender.  The tender and acceptance of partial payments alone shall not rescind or affect in any way any acceleration of maturity.

b.      No Further Advances.  Lender may refuse to make any further advance of Loan Proceeds and may apply all funds of Borrowers then held by Lender in any capacity to the payment of the principal of and interest on the Note and all other Liabilities which may be or become due and payable under any of the Loan Documents

c.      Restriction on Advances.  Lender may restrict advances of Loan Proceeds to such amounts and for such purposes as Lender deems appropriate under the circumstances then prevailing.

14

      d.     <u>Protection of Collateral and the Premises</u>. Lender may take such steps as Lender deems appropriate to protect the Collateral and the Premises from depredation or injury including employment of watchmen or other protective services, all at the expense of Borrowers.

      e.     <u>Completion of Project</u>. Lender may enter upon the Property and the Premises for the purpose of causing the continuation or completion of the construction and equipping of the Project and causing Borrowers' obligations under this Agreement and the other Loan Documents to be fulfilled, and for such purposes each Borrower hereby appoints Lender as its lawful attorney-in-fact, with full power of delegation and substitution, to act for such purpose in such Borrower's name, including, but not limited to, the power to continue work on the Project and to avail itself and procure performance of all contracts theretofore made by such Borrower, to modify such contracts or to enter into new contracts with the same or other contractors, architects, suppliers, or agents, to make such corrections or changes in the plans and specifications for the Project as may in the sole judgment of Lender be necessary or desirable for the continuation of the work, to pay, settle, or compromise any bills, claims, or Liens incurred in connection with the construction and equipping of the Project and the Premises, to prosecute or defend any action or proceeding in connection therewith, to execute such applications and certificates as may be required by any Governmental Authority or any agreement by such Borrower, to enter into and perform contracts for the all or any portion of the Project, and to perform any other act and to execute and deliver all documents and instruments that may be appropriate for such purposes, and to use the funds then remaining to be advanced under this Agreement or which may have otherwise been allocated or made available therefor to pay the cost thereof, it being specifically agreed that this power of attorney is a power coupled with an interest which cannot be revoked.

      f.     <u>Lender's Advance of Funds</u>. Any advance of funds by Lender for the purposes described in this Section 8.2 shall be deemed an advance pursuant to this Agreement, shall constitute a portion of the Liabilities, and shall be secured by the Loan Documents and the Collateral, and if it shall be necessary for Lender to advance amounts in excess of the amount remaining to be advanced under this Agreement or otherwise available to Lender in order to accomplish such purposes, Borrowers shall reimburse Lender for the amount of such excess together with interest at the highest rate provided in the Note, and authorizes Lender to apply funds received from the sale or rental of any portions of the Premises to the repayment of such excess before the same are applied for any other purpose.

      g.     <u>No Obligation of Lender to Complete</u>. Any action taken by Lender under this Agreement may, in Lender's sole discretion, be thereafter terminated or changed, and neither this Agreement nor any action taken under this Agreement shall be construed as imposing any obligation upon Lender to act or continue to act on Borrowers' behalf or otherwise to achieve Completion of the Project or fulfill any obligation of Borrowers in connection with the Project, the Property or the Collateral.

      h.     <u>SBA Authorization</u>. Lender may take all steps and advance all funds deemed necessary or desirable by Lender to keep the SBA Authorization in full force and effect and to cause compliance with all of the terms and provisions of the SBA Authorization.

      i.     <u>Set-Off</u>. Lender may set off any amounts in any account or represented by any certificate with Lender in the name of either Borrower or in which either Borrower has an interest.

      j.     <u>Other</u>. Lender may pursue such other remedies, including actions for specific performance and damages, or any remedies provided for in the Loan Documents or permitted by law, which Lender may deem appropriate, it being specifically understood and agreed that any remedies may be exercised in the alternative or cumulatively in the sole discretion of Lender. None of the rights and remedies conferred upon or reserved to Lender under this Agreement are intended to be exclusive of any other rights, and each and every right shall be cumulative and concurrent, and may be enforced separately, successively or together, and may be exercised from time to time as often as may be deemed necessary by Lender. THE PROVISIONS OF THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS ARE NOT INTENDED IN ANY WAY TO PROHIBIT, HINDER, IMPEDE DIMINISH OR ADVERSELY AFFECT THE RIGHTS OF LENDER TO DEMAND REPAYMENT IN FULL OF THE IN CONNECTION THEREWITH OR ANY OTHER CREDIT EXTENDED BY LENDER TO EITHER BORROWER OR ANY OBLIGOR.

k.    No Waiver, Etc. No failure or delay by Lender to insist upon the strict performance of any term, condition, covenant, or agreement of this Agreement or of any of the other Loan Documents, or to exercise any right, power, or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant, or agreement or of any such breach, or preclude Lender from exercising any such right, power, or remedy at any later time or times. By accepting payment after the due date of any amount payable under this Agreement, the Note or any of the other Loan Documents, Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement, the Note, or any of the other Loan Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount.

## 9.    MISCELLANEOUS

9.1.    *Notices*.    All notices, demands, requests and other communications required under this Agreement shall be given in the manner prescribed in the Credit Agreement for the giving of notices under the Credit Agreement.

9.2.    *No Waiver*.    No failure or delay by Lender to (a) exercise any right, power, privilege, or discretion under this Agreement or (b) insist upon the strict performance of any term, condition, covenant, or agreement of this Agreement or of any of the other Loan Documents, or to exercise any right, power, or remedy consequent upon a breach thereof, shall constitute or operate as a waiver thereof; nor shall any single or partial exercise of any right, power, privilege, or discretion under this Agreement preclude any other or further exercise thereof; nor shall any waiver thereof be effective unless in writing and signed by the party waiving the same. Further, by accepting payment after the due date of any amount payable under this Agreement, the Note or any of the other Loan Documents, Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement, the Note or any of the other Loan Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount. The powers and rights granted under this Agreement and such other powers and rights as may be granted to Lender under any of the other Loan Documents may be exercised from time to time as often as Lender may elect.

9.3.    *Liability of Lender*.    Lender, by the acceptance and performance of this Agreement, does not assume any liability, and each Borrower hereby releases Lender and any of its individual agents or employees from any such liability, and no claim shall be made by either Borrower upon Lender or such employees or agents for or on account of any matter or thing in excess of the balance of the Loan Proceeds not yet advanced.

9.4.    *Survival of Agreements*.    All agreements, covenants, representations, and warranties of Borrowers made in this Agreement shall survive the making of the advances of Loan Proceeds under this Agreement.

9.5.    *Successors*.    This Agreement shall be binding upon and inure to the benefit of Borrowers, their respective successors, and those assigns approved in writing by Lender, and upon and to Lender, its successors and assigns.

9.6.    *Applicable Law*.    This Agreement is made, executed, and delivered in the Commonwealth of Virginia, and, except as provided in Section 9.16 below, Commonwealth of Virginia law (but excluding Commonwealth of Virginia principles of conflicts of laws) shall govern its interpretation, performance, and enforcement.

9.7.    *Publicity*.    Lender shall have the right, at its expense, to post prominently on the Property or about the Premises, a sign advertising the fact that Lender is providing construction financing, and to issue press releases and otherwise to publicize or advertise the fact that Lender is providing construction financing; provided, however, that Lender's right to display any signage on or about the Premises shall be subject to the restrictions for display of signage applicable to Clarendon under the Lease.

9.8.    *Change in Law*.    If Lender reasonably determines that any Change in Law has the effect of (a) imposing, modifying or requiring the application of any reserve, special deposit, compulsory loan,

16

insurance charge or similar requirement against assets or deposits with or for the account of, or credit extended or participated in or by, Lender, or (b) reducing the rate of return on Lender's capital as a consequence of this Agreement or the Loan below that which Lender would have achieved but for such Change In Law (taking into consideration Lender's policies with respect to capital adequacy), then Borrowers agree to pay to Lender such additional amounts as will compensate Lender for any such increased costs or reductions suffered by Lender within 30 days after receipt of a certificate from Lender setting forth the amounts necessary to compensate Lender for any such increased costs or reductions and the calculations therefor.

9.9.    *Assignment not Effective*.  Any attempted assignment or transfer of either Borrower's rights under this Agreement without the prior written consent of Lender shall be void.

9.10.    *Obligations of Borrowers*.  Borrowers' obligations and representations under this Agreement shall be in addition to all obligations, covenants, and representations made by or on behalf of Borrowers in all other documents delivered in connection with the Loan and the transactions contemplated hereby.

9.11.    *No Oral Modification; Determinations*.  Neither this Agreement nor any term, condition, representation, warranty, covenant, or agreement set forth in this Agreement may be changed, waived, discharged, or terminated orally but only by an instrument in writing by the party against whom such change, waiver, discharge, or termination is sought.  All calculations made pursuant to this Agreement or any of the other Loan Documents or any certificate or report submitted to Lender shall be made by Lender in its sole and absolute discretion and, absent manifest error, shall be conclusive.

9.12.    *Severability*.  If any provision or part of any provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.  Each Borrower recognizes that this Agreement, the Note and the other Loan Documents may contain additional or similar representations, warranties, covenant, requirements and agreements applicable to Borrowers and others.  All such additional or similar provisions shall be in addition to and not in replacement of the others and each Borrower shall comply with each and every provision of the Loan Documents applicable to it.

9.13.    *Integration*.  This Agreement and the Loan Documents constitute the entire agreement between Lender and Borrowers regarding the Loan, and shall completely and fully supersede all other prior agreements, both written and oral, between Borrowers and Lender regarding their respective rights, obligations and responsibilities relating to the Loan.

9.14.    *Counterparts*.  This Agreement may be signed in one or more counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument.

9.15.    *Time*.  Time is of the essence in all of provisions of this Agreement.

9.16.    *SBA Provisions*.  The Loan was made under an SBA nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

        a.       When SBA is the holder of the Note, this document and all documents evidencing or securing the Loan will be construed in accordance with federal law.

        b.       Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  Neither Borrower nor any Obligor may claim or assert against SBA any local or state law to deny any obligation either Borrower or any Obligor, or defeat any claim of SBA with respect to the Loan.

Any clause in this Agreement requiring arbitration is not enforceable when SBA is the holder of the Note.

17

## 10.    CONSENTS AND WAIVERS

10.1.    *No Warranty*.  Neither the approval by Lender of the plans and specifications for the Project nor any subsequent inspections or approvals of the Property, the Collateral, the Premises or the Project during construction shall constitute a warranty or representation by Lender or any of its agents, representatives, or designees to anyone as to the technical sufficiency or adequacy or safety of the Property, the Collateral, the Premises or the Project or any of their respective component parts, including, without limitation, their respective fixtures, equipment, or furnishings, nor shall such approvals or inspections constitute such a warranty or representation as to the subsoil conditions of the Property or any other physical condition or feature pertaining to all or any portion of the Property, the Premises, the Collateral or the Project.  All acts, including any failure to act, relating to the Property, the Collateral, the Premises or the Project by any agent, representative, or designee of Lender are performed solely for the benefit of Lender to assure repayment of the Loan and are not for either Borrower's benefit or the benefit of any other Person, including, without limitation, purchasers, tenants, or other occupants. Borrowers shall indemnify Lender and shall hold Lender harmless against any loss or expense (including attorneys' fees) resulting from any and all claims, actions, settlements, or liability for acts or failure to act in connection with the Property, the Collateral, the Premises or the Project.

10.2.    *Consent to Jurisdiction*.  Each Borrower consents to the exclusive jurisdiction of any and all state and federal courts in the Commonwealth of Virginia with jurisdiction over such Borrower and such Borrower's assets.  Each Borrower agrees that such assets shall be used first to satisfy all claims of creditors organized or domiciled in the United States of America, and that no assets of either Borrower in the United States of America shall be considered part of any foreign bankruptcy estate.  Each Borrower agrees that any controversy arising under or in relation to the Note, this Agreement or any of the other Loan Documents shall be litigated exclusively in the Commonwealth of Virginia.  The state and federal courts and authorities with jurisdiction in the Commonwealth of Virginia shall have exclusive jurisdiction over all controversies which may arise under or in relation to the Note and any security for the debt evidenced by the Note, including without limitation those controversies relating to the execution, interpretation, breach, enforcement or compliance with the Note, this Agreement or any other issue arising under, related to, or in connection with any of the Loan Documents.  Each Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any litigation arising from the Note, this Agreement or any other Loan Document, and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

10.3.    *Participation/Release of Information*.  Lender may sell or assign the Loan or participation interests or other interests in the Loan.  Each Borrower hereby grants Lender its unlimited and unconditional consent to the disclosure and dissemination of financial records, including without limitation loan application and account information, statements of deposit and share accounts, negotiable instruments, individual, corporate and partnership financial statements, credit references and histories, property appraisals, surveys, *pro forma* assumptions, profit and loss statements, resumes, accounting reports, balance sheets, and other financial information provided to Lender by or on behalf of either Borrower, for such purposes.  Each Borrower further releases, acquits and forever discharges Lender and its agents from all liability, claims, actions, or causes of action for disclosure of confidential financial records under any Applicable Law if made in accordance with the provisions of this Section.

10.4.    *SBA Authorization*.  The SBA Authorization shall continue to be in effect and shall survive the execution of this Agreement and the other Loan Documents.  If any term of the SBA Authorization conflicts with the terms of this Agreement, the terms of the SBA Authorization shall control.

10.5.    *Benefit of Lender*.  This Agreement is entitled to the benefits of, and is subject to the Note and the other Loan Documents the respective terms of which are incorporated herein by reference.  Nothing herein contained and no act done or omitted by Lender pursuant to the powers and rights granted it herein shall be deemed to be a waiver by Lender of its rights and remedies under any of the other Loan Documents, but this Agreement is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof.  The right of Lender to collect the Indebtedness and to realize on any other security securing the Loan may be exercised by Lender either prior to,

18

simultaneously with, or subsequent to any action taken by it hereunder. Further, nothing contained in this Agreement shall, or shall be construed to, deny, adversely affect, terminate or extinguish any rights of Lender under the other Loan Documents, at law or in equity even if such terms may conflict. The rights of Lender granted, and the indemnities and agreements made by Borrowers under this Agreement are in addition to and not in replacement of such other rights of Lender and indemnities and agreements of Borrowers.

10.6.   *ADDITIONAL RIGHTS OF LENDER*.   FROM TIME TO TIME, LENDER MAY, AT LENDER'S OPTION, WITHOUT GIVING NOTICE TO OR OBTAINING THE CONSENT OF EITHER BORROWER OR ANY OTHER PERSON, WITHOUT LIABILITY ON LENDER'S PART AND NOTWITHSTANDING EITHER BORROWER'S OR ANY OTHER PERSON'S BREACH OF ANY COVENANT OR AGREEMENT IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT: (A) EXTEND THE TIME FOR PAYMENT OF ANY PORTION OF THE LOAN OR THE LIABILITIES WITH RESPECT TO EITHER BORROWER OR ANY OTHER PERSON; (B) REDUCE THE PAYMENTS REQUIRED FROM EITHER BORROWER OR ANY OTHER PERSON IN CONNECTION WITH ANY PORTION OF THE LOAN OR THE LIABILITIES; (C) RELEASE EITHER BORROWER OR ANY OTHER PERSON FROM ANY OF ITS OBLIGATIONS WITH RESPECT TO ANY PORTION OF LOAN OR THE LIABILITIES; (D) SUBJECT TO SECTION 9.16 ABOVE, MODIFY THE TERMS AND TIME OF PAYMENT OF ANY PORTION OF THE LOAN OR THE LIABILITIES WITH RESPECT TO EITHER BORROWER OR ANY OTHER PERSON; (E) TAKE OR RELEASE ANY SECURITY GIVEN BY EITHER BORROWER OR ANY OTHER PERSON; (F) JOIN IN ANY EXTENSION OR SUBORDINATION AGREEMENT WITH RESPECT TO EITHER BORROWER OR ANY OTHER PERSON; AND (G) WAIVE OR FAIL TO EXERCISE ANY RIGHT, POWER OR REMEDY GRANTED BY LAW OR HEREIN OR IN ANY OTHER INSTRUMENT GIVEN AT ANY TIME TO EVIDENCE OR SECURE THE PAYMENT OF ANY PORTION OF THE LOAN OR THE LIABILITIES.   ANY ACTION TAKEN BY LENDER PURSUANT TO THE TERMS OF THIS SECTION SHALL NOT AFFECT THE OBLIGATION OF EITHER BORROWER OR ANY OTHER PERSON TO PAY ANY PORTION OF THE LOAN OR THE LIABILITIES OR TO OBSERVE THE COVENANTS OF EITHER BORROWER OR ANY OTHER PERSON CONTAINED IN THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.

10.7.   *WAIVER OF JURY TRIAL*.   BORROWERS AND LENDER JOINTLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH EITHER BORROWER AND LENDER MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.   THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY EACH BORROWER, AND EACH BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. EACH BORROWER FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**[SIGNATURE PAGES FOLLOW]**



IN WITNESS WHEREOF, Borrowers and Lender hereto have caused this Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                          **BORROWERS**:

                                         SMOKECRAFT CLARENDON, LLC
                                         A Virginia Limited Liability Company

PATRICK EJINDU                           By: _____ (SEAL)
                                             Andrew C. Darneille
                                             Manager

                                         SMOKECRAFT HOLDINGS, LLC
                                         A Virginia Limited Liability Company

PATRICK EJINDU                           By: _____ (SEAL)
                                             Andrew C. Darneille
                                             Sole Member and Manager

**Acknowledgments**

Rockville ____ OF Muntgumery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

                                         ERICA WANG
                                         NOTARY PUBLIC
                                         MONTGOMERY COUNTY
                                         MARYLAND
                                         My Commission Expires 9-9-2022

Rockville ____ OF Montgumery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

                                         ERICA WANG
                                         NOTARY PUBLIC
                                         MONTGOMERY COUNTY
                                         MARYLAND
                                         My Commission Expires 9-9-2022

**[LENDER'S SIGNATURE PAGE FOLLOWS]**

*[Borrower's Signature Page to Construction Loan Agreement]*

IN WITNESS WHEREOF, Borrowers and Lender hereto have caused this Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                                    **LENDER**:

                                                   CAPITAL BANK, NATIONAL ASSOCIATION

_____    By: _____(SEAL)
                                          Name:_____
                                          Title:_____

### Acknowledgment

_____ OF _____, CITY/COUNTY OF _____, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared _____, and acknowledged herself/himself to be a _____ of CAPITAL BANK, NATIONAL ASSOCIATION, and acknowledged that s/he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

                                          _____(SEAL)
                                          NOTARY PUBLIC

My Commission Expires:

_____

*[Lender's Signature Page to Construction Loan Agreement]*

## EXHIBIT A

*Agreement* means this Construction Loan Agreement, as it may be amended, restated, extended, or consolidated from time to time.

*Applicable Law* means all laws, statutes, treaty, codes, ordinances, regulations, rules, rulings, orders, judgments, decrees, injunctions, arbitral decisions, regulations, authorizations, determinations, directives and any other requirements and/or provisions (including building codes and zoning regulations and ordinances) of all Governmental Authorities, whether now or hereafter in force, which may be or become applicable to either Borrower or Lender, the relationship of lender and borrower, the Collateral, any of the Loan Documents, or any part of any of them (whether or not the same may be valid), and all requirements, obligations and conditions of all instruments of record applicable to the Collateral on the date hereof.

*Borrowers* means, collectively, Clarendon and Holdings.

*Budget* means the capital budget for the Project submitted by Borrowers to Lender in the form of Exhibit B attached hereto and made a part of the Agreement, as modified or amended with Lender's approval from time to time.

*Change In Law* means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the *Dodd-Frank Wall Street Reform and Consumer Protection Act* and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by Lender for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

*Clarendon* means Smokecraft Clarendon, LLC, a Virginia limited liability company.

*Code* means the *Internal Revenue Code of 1986*, as amended, and the income tax regulations now or hereafter issued thereunder.

*Collateral* means, collectively, all of each Borrower's assets, wherever located, whether now owned or hereafter acquired and all other security for the Loan, the Note or any guaranty of any or all of each Borrower's obligations to Lender.

*Completion* means the completion of the Project in accordance with the plans and specifications therefor to such an extent that the Premises is ready to be occupied used for its intended purpose.

*Completion Date* means the 6-month anniversary of the date of this Agreement.

*Controlling Interest* means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

*Credit Agreement* means the Credit Agreement of even date herewith among Borrowers, Lender and others as it may be amended, restated, spread, consolidated or increased from time to time.

*Default* means an event or the occurrence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default.

*Event of Default* means any of the events described in Section 8.1 of this Agreement.

FF&E has the meaning ascribed to it in Section 4.1(f) of this Agreement.

GAAP has the meaning ascribed to it in Section 1.2 of this Agreement.

Governmental Action means any claim, citation or notice of any pending or threatened suits, proceedings, orders, or governmental inquiries or opinions involving, either Borrower, Landlord, the Property, the Premises or the Project that allege the violation of any Hazardous Materials Law.

Governmental Authority means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, official, instrumentality, regulatory body, court, central bank, quasi-governmental agency or group or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government and all officials, boards, departments, agencies and instrumentalities thereof.

Holdings means Smokecraft Holdings, LLC, a Virginia limited liability company.

Identified Party means each Borrower, each Obligor, each Subsidiary or affiliate of either Borrower or any Obligor and each Principal of any of the foregoing.

Improvements means, collectively, (a) the existing improvements in the Premises and (b) the all improvements constructed as part of the Project and related fixtures and appurtenances, landscaping, paving and site work.

Inspector means the outside inspector hired by Lender to assist Lender and Lender's personnel in reviewing the Project, the plans and specifications for the Premises and the Project and other construction materials, and in making the general periodic inspections of the Premises as construction of the Project progresses or specific inspections prior to advances.

Landlord means KBSIII 3003 Washington, LLC, a Delaware limited liability company, its successors and assigns.

Lease means the Deed of Retail Lease dated May 22, 2019 between Clarendon, as tenant, and Landlord, as landlord.

Lender means Capital Bank, National Association.

Liabilities means: the obligation of Borrowers to pay: (a) the unpaid principal amount of the Note, plus all accrued and unpaid interest thereon; and (b) all other charges, interest, and expenses chargeable by Lender to Borrowers under the Note, this Agreement and the other Loan Documents.

Lien means any mortgage, deed of trust, pledge, security interest, assignment, encumbrance, lien, or charge of any kind, including without limitation any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the *Uniform Commercial Code* of any jurisdiction.

Loan means the construction loan made by Lender to Borrowers pursuant to this Agreement in the maximum principal amount of $1,200,000.

Loan Documents means, collectively, this Agreement, the Credit Agreement, the Note, and all other documents which either Borrower, any Obligor or any third party or parties has executed and delivered, or may hereafter execute and deliver, in connection with the Loan, as such documents may be amended, restated, replaced, extended, spread, consolidated or increased from time to time.

Loan Proceeds means the funds advanced, or available to be advanced, by Lender from time to time as proceeds of the Loan.

2

Major Subcontractor means any contractor, subcontractor or materialman or supplier providing labor or materials for the Project whose subcontract exceeds $10,000.

Note means the Note (SBA Form 147) of even date herewith in the principal amount of $1,200,000, made by Borrowers to the order of Lender, as it may be amended, restated, extended, consolidated or increased from time to time.

Obligor means any Person other than Borrowers who may at any time now or hereafter be primarily or secondarily liable for any or all of the Liabilities or who has granted any security for any of the Liabilities, including without limitation any other maker, endorser, surety, or guarantor of all or a portion of the Liabilities or any Person, other than Lender, who is now or hereafter a party to any of the Loan Documents.

Person means an individual, an estate, a trust, a partnership, a limited liability company, a corporation, a government or a government agency or instrumentality or any other legal entity.

Premises means the real property and improvements located in Arlington County, Virginia and known as 3003 Washington Boulevard, Suite 101, Arlington, Virginia 22201 and also known as 1051 North Highland Street, Suite 101, Arlington, Virginia 22201.

Principal means if a sole proprietorship, the proprietor; if a partnership, each managing partner and each partner who is a natural person and holds an interest in the partnership; and if a corporation, limited liability company, association or a development company, each director, each of the five most highly compensated executives or officers of the entity, and each natural person who is a direct or indirect holder of interest, ownership stock or stock equivalent of the entity.

Project means the renovation of the Premises in order to make such improvements usable as a restaurant, pursuant to the plans and specifications for the Project and other items identified in the Budget.

Project Costs means, collectively, all direct and indirect hard and soft construction costs described in the Budget. Each category of costs described on the Budget shall constitute a Project Cost.

Property means the real property and improvements in Arlington County, Virginia known as 3003 Washington Boulevard, Suite 101, Arlington, Virginia 22201 and also known as 1051 North Highland Street, Suite 101, Arlington, Virginia 22201, which includes, but is not limited to, the Premises.

Retainage means an amount equal to 5% of direct construction costs; provided that, if a greater amount is required to be retained under any contract or agreement, then, with respect to such contract or agreement, Lender shall retain such greater amount as is specified.

SBA means the United States Small Business Administration.

SBA Authorization means the SBA Authorization issued in connection with the Loan, having an SBA Loan No. of ▮▮▮▮▮▮▮ and an approval date of March 15, 2019, as amended from time to time.

Seismic Regulations means the National Earthquake Hazards Reduction Program Recommended Provisions for the Development of Seismic Regulations for New Buildings ("NEHRP") or, if elected by Lender or the SBA, the following codes which have been identified by the SBA as substantially equivalent to NEHRP: (1) Uniform Building Code of the International Congress of Building Officials (ICBO), as amended, (2) Supplement to the Building Officials and Code Administrators (BOCA) National Building Code, as amended, (3) Southern Building Code Congress (SBCC) Standard Building code as amended.

Subsidiary means any corporation, partnership, limited liability company, association, or other business entity (a) in which a Controlling Interest is directly or indirectly owned or controlled by either Borrower or any Obligor, or (b) a majority (by number of votes) of the outstanding shares or interest of any class or classes of which shall at the time be directly or indirectly owned or controlled by either

3

Borrower or any Obligor, if the holders of the shares or interest of such class or classes (i) are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors (or Persons performing similar functions) of the issuer thereof, even though the right to vote has been suspended by the happening of such a contingency, or (ii) are at the time entitled, as such holders, to elect a majority of the directors or managers (or Persons performing similar functions) of the issuer thereof, whether or not the right to vote exists by reason of the happening of a contingency.

Taxes means all taxes and assessments, whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character (including all penalties or interest thereon), which at any time may be assessed, levied, confirmed, or imposed on either Borrower or any of either Borrower's properties or assets or income or any part thereof or in respect of any of either Borrower's franchises, businesses, income or profits, and all claims for sums which by law have or might become a Lien or charge upon any of either Borrower's properties or assets or any part thereof.

UCC means the *Uniform Commercial Code* as in effect from time to time in the Commonwealth of Virginia; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection or the priority of a security interest in any collateral or the availability of any remedy hereunder is governed by the *Uniform Commercial Code* as in effect in a jurisdiction other than Commonwealth of Virginia, "UCC" means the *Uniform Commercial Code* as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority or availability of such remedy, as the case may be, as determined by Lender.

4

**EXHIBIT B**

(Budget)

**EXHIBIT B – Smokecraft Clarendon LLC Project Budget**

| STARTUP EXPENSES | TOTALS |
|---|---|
| Project Development Expenses | $98,500.00 |
| Pre-Construction Expenses | $144,160.00 |
| Construction Expense | $784,385.00 |
| Capital Equipment List | $300,565.00 |
| Location and Admin Expenses | $76,640.00 |
| Opening Inventory | $38,500.00 |
| Advertising and Promotional Expenses | $22,000.00 |
| Hourly Staff Pre-Opening Training Expense | $35,250.00 |
| Contingency Fund | $50,000.00 |
| Working Capital | $55,000.00 |
| Total | $1,605,000.00 |

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made as of January 31, 2020, by and among **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company and **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Debtors"), and **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

### Recitals

Debtors have requested that Lender extend to Debtors a commercial loan in the principal amount of $1,200,000, and Lender has agreed to do so in accordance with the terms of this Agreement.

### Agreements

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtors and Lender agree as follows:

## 1.    DEFINITIONS AND GENERAL RULES OF CONSTRUCTION

1.1.    *Definitions*.  In this Agreement, all defined terms are capitalized and have the meaning given on Exhibit A attached hereto and made a part hereof.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Credit Agreement; provided, however, that should any such term cease to be defined under the Credit Agreement or should the Credit Agreement cease to exist, each such term shall have such meaning as ascribed to it by Lender in its sole and absolute discretion.

1.2.    *Accounting Terms*.  All accounting terms not specifically defined herein shall have the meanings assigned to them as determined by generally accepted accounting principles ("GAAP") as used by the Financial Accounting Standards Board, the American Institute of Certified Public Accountants or such other organization as selected by Lender consistently applied and maintained throughout the periods indicated, unless otherwise specifically elected by Lender.

1.3.    *UCC Terms*.  All terms used in this Agreement that are defined in the UCC shall have the meanings ascribed to them therein, unless specifically defined otherwise in this Agreement; provided, however, that should any such term cease to be defined under the UCC or should the UCC cease to exist, each such term shall have such meaning as ascribed to it by Lender in its sole and absolute discretion.

1.4.    *Tense; Gender; Section Headings*.  In this Agreement, the singular includes the plural and *vice versa*.  Each reference to any gender also applies to any other gender.  The Section headings are for convenience only and are not part of this Agreement.

## 2.    TERMS OF LOAN

2.1.    *Agreement to Lend*.  Lender agrees, subject to and in accordance with the terms, conditions and provisions of the SBA Authorization, this Agreement, the Credit Agreement and the other Loan Documents to make the Loan to Debtors.

2.2.    *Terms of Repayment*.  The Loan shall be evidenced by and repaid with interest in accordance with the terms of the Note, which are incorporated herein by reference.

2.3.    *Purpose*.  Unless otherwise elected by Lender, the Loan Proceeds shall be used solely in accordance with the SBA Authorization.

## 3.    SECURITY

3.1.    *Grant of Security Interest*.  To secure the payment of the Liabilities and the payment and performance of all of each Debtor's other obligations under the Loan Documents, each Debtor hereby grants, pledges and assigns to Lender a security interest in the Collateral together with all of such

Debtor's right, title and interest therein and thereunder. Without limiting the generality of the foregoing or any other grant, pledge, lien or security interest benefiting or otherwise in favor of Lender, each Debtor hereby further authorizes Lender to file a Grant of Security Interest substantially in the form of <u>Exhibit C</u>, <u>Exhibit D</u> and/or <u>Exhibit E</u> (each a "Grant of Security Interest"), as applicable, covering the relevant IP Collateral consisting of U.S. registered Patents (and U.S. Patents for which applications are pending), U.S. registered Trademarks (and U.S. Trademarks for which registration applications are pending) and U.S. registered Copyrights (and U.S. Copyrights for which registration applications are pending) with the United States Patent and Trademark Office or United States Copyright Office (or any successor office), as applicable, and such other documents as may be necessary for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest of Lender in such IP Collateral granted by Debtors hereunder (without the signature of either Debtor after the occurrence of an Event of Default) and naming Debtors (or either of them), as debtor, and Lender, as secured party.

3.2.    *Future Advances*.  The security interest granted by this Agreement secures future advances.

3.3.    *Perfection of Security Interest*.  Each Debtor authorizes Lender to file financing statements, financing statement addenda, continuation statements and financing statement amendments in such form and in such filing offices as Lender may require to perfect or to preserve, maintain or continue the perfection of the security interest in the Collateral and its priority. Each Debtor further agrees to execute and deliver to Lender, or to cooperate with Lender in obtaining from any third party, upon Lender's request, any control agreement, acknowledgment of bailment, or other document Lender may request in order to perfect or to preserve, maintain, or continue the perfection of Lender's security interest in the Collateral and its priority. Debtors shall pay the costs of filing any assignment, financing statement, financing statement addendum, continuation statement or termination statement as well as any recordation or transfer tax required by law to be paid in connection with the filing or recording of any such document. A carbon, photographic, or other reproduction of this Agreement is sufficient as a financing statement. Neither Debtor shall file any amendments, correction statements or termination statements concerning the Collateral without the prior written consent of Lender.

3.4.    *Grant of License for IP Collateral; Transfer of IP Collateral; Etc*.  Without limiting the provisions of Section 3.1 above or any other rights of Lender, solely for the purpose of enabling Lender to exercise rights and remedies under this Agreement and the other Loan Documents, each Debtor hereby grants to Lender, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to either Debtor) to use, license or sublicense any of the IP Collateral now owned or hereafter acquired by either Debtor, and wherever the same may be located, and including in such license access to all media in either Debtor's possession and control in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, in each case, to the extent permitted by any applicable third party Licenses and other agreements. The use of such license by Lender may only be exercised, at the option of Lender, after the occurrence of an Event of Default or an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default. Further, each Debtor agrees to take, at its expense, all steps, including, without limitation, in the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other governmental authority located in the United States to (i) maintain the validity and enforceability of any registered IP Collateral and maintain such IP Collateral in full force and effect, and (ii) pursue the registration and maintenance of each Patent, Trademark, or Copyright registration, issuance or application, now or hereafter included in such IP Collateral of Debtors, including, without limitation, the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the *U.S. Trademark Act*, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings. In the event that any item of the IP Collateral owned by either Debtor is being infringed or misappropriated by a third party, Debtors shall take such actions, at its sole expense, to protect or enforce such IP Collateral, including, without limitation, suing for infringement or misappropriation and for an injunction against such infringement or misappropriation. Debtors shall use proper statutory notice as commercially practical in connection with its use of each material item of its IP Collateral, to the extent required under applicable law. Neither

2

Debtor shall do or permit any act or omit to do any act whereby any of its material IP Collateral may lapse, be terminated or become invalid or unenforceable or dedicated to the public domain. Debtors shall take all steps to preserve and protect each item of its IP Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality, as Debtors determine is appropriate in the exercise of their reasonable business judgment. Each Debtor agrees that, should it obtain an ownership or other interest in any IP Collateral after the date of this Agreement ("After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become part of the IP Collateral subject to the terms and conditions of this Agreement with respect thereto. Once every year, but in no event later than the early to occur of (i) 30 days after the end of the preceding calendar year or (ii) 5 days after the making any such application or registration, Debtors shall deliver to Lender applications for U.S. registration and U.S. registrations of U.S. Patents, Trademarks and Copyrights not previously disclosed to Lender. In each case, Debtors shall cooperate as necessary to enable Lender to make any recordations with the U.S. Copyright Office or the U.S. Patent and Trademark Office, as appropriate, with respect to such applications for U.S. registration and U.S. registrations. With respect to any IP Collateral, on demand, Lender shall have the right to cause the security interest granted herein to become an assignment, transfer and conveyance of any of or all such IP Collateral, Lender being free to sell, transfer, offer for sale, otherwise dispose of such IP Collateral, or license or sublicense, whether general, special or otherwise, and whether on an exclusive or nonexclusive basis, any such IP Collateral throughout the world on such terms and conditions and in such manner as Lender shall determine; provided, however, that such terms shall include all terms and restrictions that are customarily required to ensure the continuing validity and effectiveness of the IP Collateral at issue, such as, without limitation, notice, quality control and inurement provisions with regard to Trademarks, patent designation provisions with regard to Patents, and copyright notices and restrictions or decompilation and reverse engineering of copyrighted software, and confidentiality protections for trade secrets.

3.5.    *Requests of Other Secured Parties; Power of Attorney*. Each Debtor authorizes Lender to request other secured parties of such Debtor to provide such accountings, confirmations of collateral and confirmations of statements of account concerning such Debtor as Lender may require. Each Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of endorsing such Debtor's name on any such requests to be delivered to other secured parties of such Debtor, which power of attorney is coupled with an interest and irrevocable.

3.6.    *Priority of Liens*. Lender has or may in the future have multiple liens on and security interests in the Collateral and Lender, in its sole and absolute discretion and without notice to or the consent of either Debtor or any Obligor, may at any time and from time to time change the order of priority of those liens and security interests. Lender shall evidence such order of priorities by making appropriate entries to Lender's internal records. Lender may, but shall have no obligation to, file one or more amendments to any financing statement publicizing the security interest granted by this Agreement setting forth such order of priorities.

3.7.    *Subordinated Debt*. All of each Debtor's indebtedness to its officers, directors, direct or indirect owners of any interest in either Debtor, to any Subsidiary and to any of either Debtor's affiliates shall be subordinated to repayment of the Loan.

4.    **REPRESENTATIONS AND WARRANTIES**

4.1.    *Representations and Warranties*. Debtors, and each Person acting on behalf of Debtors (or either of them) in executing this Agreement, represents and warrants to Lender as follows:

a.    Authority. Each Debtor has the power and authority to consummate the transactions contemplated hereby, and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and the other Loan Documents executed and delivered by it.

3

b.    Name; Location of Places of Business; Other Information Relevant to Perfection. Each Debtor's correct legal name is as specified on the signature lines of this Agreement, and each legal or trade name of each Debtor for the previous 12 years (if different from such Debtor's current legal name) is as specified on Exhibit B of this Agreement. Each Debtor's state of formation, federal tax identification number and organizational identification number (if any), and the address of each Debtor's chief executive office and the address of each other place of business of Debtors are as specified on Exhibit B of this Agreement. Except for mobile equipment and motor vehicles, the Collateral and all books and records pertaining to the Collateral are located at such Debtor's chief executive office, as specified on Exhibit B, or at any other place of business which may be specified on Exhibit B.

c.    No Violation; Validity of Loan Documents. The Loan, the execution, delivery and performance by Debtors and all Obligors of the Loan Documents, and the use, directly or indirectly of all or any portion of the Loan Proceeds in accordance with this Agreement: (i) are within the legal powers of Debtors and Obligors; (ii) have received all necessary governmental approval; (iii) will not violate or result in a violation of any provision of any applicable federal, state or local law, statute, rule or regulation, or any order of any court or other Governmental Authority having jurisdiction, or any authorized official, board, department, instrumentality, or agency thereof; and (iv) will not result in a breach of or constitute a default under any mortgage, deed of trust, security agreement, lease, loan or credit agreement, or any other agreement or instrument to which either Debtor or any Obligor is a party or by which any of them or any of their properties is bound, or result in the creation or imposition of any Lien of any nature whatsoever upon of either Debtor's or any Obligor's property or assets, except as contemplated by the provisions of the Loan Documents. Debtors are obtaining the Loan solely for business and commercial purposes, and Loan Proceeds are not intended to be used, and will not be used, for family, household, agricultural or personal purposes. This Agreement, the Note and the other Loan Documents constitute the legal, valid and binding obligations of Debtors and Obligors, enforceable against Debtors and Obligors in accordance with their respective terms.

d.    No Litigation. There are no actions, suits, or proceedings pending or threatened against either Debtor or any Obligor at law or in equity or before or by any Governmental Authority. Neither Debtor nor any Obligor is in default with respect to any order, writ, injunction, decree, or demand of any court or any Governmental Authority.

e.    Title to Collateral. Each Debtor is the owner of its Collateral and has good and marketable title to such Collateral free and clear of all liens, security interests, and other encumbrances except for those in favor of Lender and those previously disclosed in writing to Lender.

f.    Assets and Properties. Each Debtor has good and marketable title to all of its assets and properties, and there is no Lien outstanding against any of either Debtor's assets or properties except those in favor of Lender.

g.    No Violation of Laws. Neither the consummation of the Loan nor the use, directly or indirectly, of all or any portion of the Loan Proceeds in accordance with this Agreement will violate or result in a violation of any provision of any applicable federal, state or local law, statute, rule or regulation, or any order of any court or other Governmental Authority having jurisdiction, or any authorized official, board, department, instrumentality, or agency thereof.

h.    Environmental Compliance. Debtors, the Collateral and all of Debtor's properties are in compliance with all environmental laws, regulations and restrictions.

i.    IP Collateral. Each Debtor represents and warrants that: (a) fully executed Grants of Security Interest in the form attached as Exhibit C, Exhibit D and Exhibit E, as applicable, containing a description of all IP Collateral owned by Debtors as of the date hereof, consisting of federally registered or applied-for Patents, Trademarks and Copyrights, as applicable, have been delivered to Lender for recording by the United States Patent and Trademark Office and the United States Copyright Office, as applicable, pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder; (b) upon the filing of such Grants of Security Interest with the United States Patent and Trademark Office or the United States Copyright Office Lender shall have a perfected first priority

4

security interest in all Collateral in which a security interest may be perfected by the recording of the relevant Grants of Security Interest with the United States Patent and Trademark Office and the United States Copyright Office, as applicable; (c) each Debtor is the exclusive owner of all right, title and interest in and to its portion of the IP Collateral or has the right or license to use the IP Collateral subject only to the terms of the Licenses; (d) the operation of each Debtor's business as currently conducted and the use of the IP Collateral in connection therewith do not conflict with, infringe, misappropriate, misuse or otherwise violate the intellectual property rights of any third party; (e) the IP Collateral owned by Debtors and constituting Patents, Trademarks, and Copyrights issued by or registered in the United States Patent and Trademark Office, the United States Copyrights Office, or any corresponding foreign governmental agency, is subsisting and has not been adjudged invalid or unenforceable in whole or in part and is valid and enforceable; (f) neither Debtor is aware of any uses of any material item of IP Collateral that could be expected to lead to such item becoming invalid or unenforceable; (g) each Debtor has made or performed all filings, recordings and other acts and has paid all required fees and taxes to maintain and protect its interest in each and every item of IP Collateral in full force and effect, and to protect and maintain its interest therein; (h) no claim, action, suit, investigation, litigation or proceeding has been asserted in writing and is pending or, threatened against either Debtor (A) challenging the validity or enforceability of any IP Collateral or either Debtor's ownership of any of the IP Collateral, (B) alleging that either Debtor's use of the IP Collateral or that any services provided by, processes used by, or products manufactured or sold by, either Debtor infringes, misappropriates, dilutes, or otherwise violates any patent, trademark, copyright or any other intellectual property right of any third party, or (C) alleging that the IP Collateral is being licensed or sublicensed in violation or contravention of the terms of any license or other agreement; (i) no person is engaging in any activity that infringes, misappropriates, dilutes, or otherwise violates the material IP Collateral owned by either Debtor; (j) the consummation of the transactions contemplated by this Agreement or any other document or agreement executed or delivered in connection with any of the Liabilities and the payment and performance of all of Debtors' obligations under the Loan Documents will not result in the termination or impairment of any of the IP Collateral; (k) with respect to each License (A) such License is valid and binding and in full force and effect, (B) neither Debtor has received any written notice of termination or cancellation under such License, (C) neither Debtor has received any written notice of a breach or default under such License; and (D) neither Debtor nor any other party to such License is in breach or default thereof, and no event has occurred which, with the passage of time, the giving of notice or both, would constitute such a breach or default or permit termination, modification or acceleration under such License; and (l) (A) none of the trade secrets of either Debtor have been used, divulged, disclosed or appropriated to the detriment of either Debtor for the benefit of any Person other than Debtors; (B) no employee, independent contractor or agent of either Debtor has misappropriated any material trade secrets of any other person in the course of the performance of his or her duties as an employee, independent contractor or agent of either Debtor; and (C) no employee, independent contractor or agent of either Debtor is in default or breach of any material term of any employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of either Debtor's IP Collateral.

       j.      <u>Subsidiaries</u>. As of the date of this Agreement, neither Debtor has any Subsidiaries.

       k.     <u>SBA Authorization</u>. The SBA Authorization is in full force and effect. Neither Debtor not in default under the SBA Authorization or under any other document or agreement executed in connection with the SBA Authorization.

4.2.    *Continuing Nature of Representations and Warranties*. Each Debtor hereby represents, warrants, covenants and agrees that the representations and warranties made by either Debtor in Section 4.1 of this Agreement shall remain true and accurate in all respects throughout the term of the Loan. Debtors shall immediately notify Lender in writing if any of the representations and warranties of either Debtor set forth in Section 4.1 of this Agreement should become untrue, incomplete, inaccurate or incorrect in any respect. Each request for an advance of Loan Proceeds shall constitute a reaffirmation of all representations and warranties made by Debtors in Section 4.1.

5

5.    **AFFIRMATIVE COVENANTS**.

5.1.    _Payment and Performance_.  Debtors shall pay the Liabilities as and when due and payable and shall perform, comply with, and observe all of the terms and conditions of the Loan Documents.

5.2.    _Costs of Transaction_.  Debtors shall pay all costs and expenses incident to the making and administration of the Loan and the perfection of Lender's security interests under the Loan Documents, including but not limited to reasonable attorneys' fees, costs of appraisals and environmental site assessments, recordation costs and taxes incident to filing of the recordation costs and taxes incident to filing of any deed of trust or mortgage, financing statements and continuation statements in respect thereof, title insurance premiums, and the fees of any title company.

5.3.    _Notice of Collateral Status_.  If either Debtor, for any reason, believes that an event or condition has cause or may adversely the value of any portion of the Collateral, or any of the Lender's rights and remedies relating to such portion of the Collateral, Debtors shall immediately deliver notice of such event or condition to the Lender.

5.4.    _Use of Loan Proceeds_.  Debtors shall use the Loan Proceeds only for the purposes described in Section 2.3 of this Agreement.

5.5.    _Title to Collateral_.  Debtors shall defend each Debtor's title to the Collateral against all Persons and, upon request of Lender, (a) shall furnish such further assurances of title as may be required by Lender, and (b) shall deliver and execute or cause to be delivered and executed, in form and content satisfactory to Lender and the SBA, any financing, continuation, termination, or security interest filing statement, security agreement, control agreement or other document Lender may request in order to perfect, preserve, maintain, or continue the perfection of Lender's security interest in the Collateral and its priority.  Debtors shall pay the costs of filing any financing, continuation, termination, or security interest filing statement as well as any recordation or transfer tax required by law to be paid in connection with the filing or recording of any such statement.  A carbon, photographic, or other reproduction of this Agreement or a financing statement is sufficient as a financing statement.

5.6.    _Books, Records, and Inspections_.  Each Debtor: (a) at all times shall maintain accurate and complete books and records pertaining to the operation, business, and financial condition of such Debtor and pertaining to the Collateral and any contracts and collections relating to the Collateral, all in a manner satisfactory to Lender and the SBA; (b) at all reasonable times and without hindrance or delay, shall permit Lender, the SBA, or any Person designated by Lender or the SBA to enter any place of business of either Debtor or any other premises where any books, records, and other data concerning either Debtor or the Collateral may be kept and to examine, audit, inspect, and make extracts from and photocopies of any such books, records, and other data; (c) at all reasonable times and without hindrance or delay, shall permit Lender, the SBA, or any Person designated by Lender or the SBA to inspect and appraise any of either Debtor's assets; (d) shall allow all government authorities to furnish reports of examinations, or any records pertaining to either Debtor, upon request by Lender or the SBA; (e) shall furnish to Lender promptly upon request and in the form and content specified by Lender lists of purchasers of inventory, aging of accounts, aggregate cost or wholesale market value of inventory, schedules of equipment, and other data concerning the Collateral as Lender may from time to time specify; and (f) shall mark its books and records in a manner satisfactory to Lender so that Lender's rights in and to the Collateral will be shown.

5.7.    _Notice of Default and Litigation_.  Debtors shall notify Lender promptly of the occurrence of a Default or any Event of Default.  Debtors shall notify Lender promptly of any litigation instituted or threatened against either Debtor or any Obligor and of the entry of any judgment or Lien against any of either Debtor's or any Obligor's assets or properties and of any prospective condemnation, change of zoning, or other action affecting the Collateral or any of either Debtor's properties.

5.8.    _Care of Collateral_.  Debtors shall maintain the Collateral in good condition and shall not do or permit anything to be done to the Collateral that may impair its value or that may violate the terms of any insurance covering the Collateral or any part thereof.  Lender shall have no duty to preserve any of the

6

Collateral or to collect or enforce any account, chattel paper or payment intangible or to preserve rights against other parties to the Collateral, and each Debtor hereby releases Lender from all claims for loss or damage caused by Lender's failure to do so.

5.9.    _Preservation of Properties_.    Debtors at all times: (a) shall maintain their properties, whether owned or leased, in good operating condition, and from time to time shall make all repairs, renewals, replacements, additions, and improvements thereto needed to maintain such properties in good operating condition; (b) shall comply with the provisions of all leases to which either Debtor is a party or under which either Debtor occupies property so as to prevent any loss or forfeiture thereof or thereunder; and (c) shall comply with all laws, rules, regulations, and orders applicable to either Debtor's properties or any part thereof.

5.10.    _Insurance_.

a.    Special Form Coverage, Etc.    Each Debtor shall keep such of the Collateral as specified by Lender insured against such casualties and risks and in such amounts as may from time to time be required by Lender, without reduction for depreciation or co-insurance.    Neither Debtor shall take out any separate or additional insurance which is contributing in the event of loss unless it is properly endorsed and otherwise satisfactory to Lender in all respects.

b.    Business Income Insurance.    Debtors shall maintain business income insurance at all times in such amounts as are required by Lender.

c.    Claims and Proceeds.    In the event of loss, Debtors shall give immediate written notice to the insurance carrier and to Lender.    Each Debtor hereby authorizes and empowers Lender as attorney-in-fact for such Debtor to make proof of loss, to adjust and compromise any claim under the insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds; provided, however, that nothing contained in this Section shall require Lender to incur any expense or take any action.    Each Debtor further authorizes Lender, at Lender's option: (i) to hold the balance of such proceeds to be used to reimburse such Debtor for the cost of repair or replacement of the Collateral, upon such terms as Lender may determine in its sole discretion; or (ii) to apply the balance of such proceeds to the payment of the Liabilities, whether or not then due, in the same manner and order as the proceeds of sale or other disposition of the Collateral are to be applied pursuant to Section 7.2 of this Agreement.

d.    General Insurance Requirements.    All insurance policies required pursuant to this Section shall: (i) be endorsed to name Lender as loss payee, with losses payable solely to Lender, without contribution, as its interests may appear; (ii) provide that they shall not be invalidated by a waiver of the right of subrogation by any insured, that the insurance carrier shall have no right of subrogation, and that the policies may not be canceled, terminated or changed without 30 calendar days prior written notice to Lender; and (iii) be fully paid for; (iv) be on forms and contain provisions and expiration dates which are approved by Lender; (v) be issued by insurance companies which (A) are licensed to do business in the state where the insured Collateral is located, (B) have a Best's Key Rating of at least A-, (C) have a Best's Key Rating Class of at least IX, and (D) otherwise are reasonably satisfactory to Lender in all respects. Debtors shall deliver all original policies to Lender together with the endorsements thereto required hereunder, or acceptable certificates evidencing the existence of such policies.    Not less than 10 calendar days prior to the expiration dates of each policy required pursuant to this Section, Debtors shall deliver to Lender a renewal policy or policies, or an acceptable certificate evidencing the existence of such renewal policy or policies, accompanied by evidence satisfactory to Lender that the premium for such policy or policies has been paid for at least a 1-year period.

5.11.    _Liability and Worker's Compensation Insurance_.    Debtors shall maintain commercial general liability insurance (for both personal injuries and property damage) in such amounts as Lender requires from time to time.    Each liability policy: (a) shall be endorsed to name Lender as additional insured; (b) shall provide that it may not be canceled or modified without 30 calendar days advance notice to Lender; (c) shall be fully paid for; (d) shall be on a form and contain provisions and expiration dates which are

7

approved by Lender; (e) shall be issued by an insurance company which (i) is licensed to do business in the state in which Debtors are located, (ii) has a Best's Key Rating of at least A-, (iii) has a Best's Key Rating Class of at least IX, and (iv) otherwise is reasonably satisfactory to Lender in all respects. Debtors shall deliver a certified copy of each liability policy to Lender together with endorsements thereto required hereunder, or an acceptable certificate evidencing the existence of each such policy. Debtors also shall maintain worker's compensation insurance in such amounts as are required by Applicable Law. Not less than 10 calendar days prior to the expiration dates of each policy required pursuant to this Section, Debtors shall deliver to Lender a renewal policy or policies, or an acceptable certificate evidencing the existence of such renewal policy or policies, accompanied by evidence satisfactory to Lender that the premium for such policy or policies has been paid for at least a 1-year period.

5.12.    *Taxes*.  Debtors shall pay and discharge all Taxes prior to the date when any interest or penalty would accrue for the nonpayment thereof.

5.13.    *Maintain Existence*.  Debtors at all times shall maintain in full force and effect their company existence, rights, privileges, and franchises and shall qualify and remain qualified in all jurisdictions where qualification is required.

5.14.    *Payment of Indebtedness to Others*.  Debtors shall pay when and as due all indebtedness due to third Persons.

5.15.    *Changes in Location*.  Debtors shall advise Lender immediately in writing of (a) any change in the location of either Debtor's chief executive office; (b) the opening of any new place of business; (c) any change in the location of the places where all or any part of the Collateral or the books and records concerning all or any part of the Collateral are kept; (d) any change in either Debtor's legal name, or the addition of or any change in any name under which either Debtor conducts business; (e) any change in either Debtor's state of formation; (f) any change in either Debtor's federal tax identification number; or (g) either Debtor's receipt of, or any change in, either Debtor's organizational identification number.

5.16.    *Compliance with Laws*.  Debtors at all times shall comply with all Applicable Law.

5.17.    *Maintenance of Licenses and Permits*.  Debtors shall maintain in good standing and in full force and effect all licenses, permits and authorizations necessary for it to conduct lawfully their businesses and affairs.  Immediately upon demand by Lender or the SBA, Debtors shall provide copies of all such licenses, permits and authorizations and shall obtain such other licenses, permits and authorizations for Debtors to lawfully conduct their respective businesses and affairs as Lender or the SBA may deem appropriate.

5.18.    *Environmental Matters*.  Debtors shall notify Lender immediately if either Debtor becomes aware of:  (a) the presence of any Hazardous Substance in, on or near any property owned or leased by either Debtor; (b) the commencement or threat of any environmental investigation or clean-up proceeding by any Person in connection with any property owned or leased by either Debtor; and (c) any citation, notification, complaint, or violation which either Debtor receives from any Person which relates or pertains to the making, storing, handling, treating, disposing, generating, transporting or release of any Hazardous Substance.  Debtors shall comply fully with and assist any environmental investigation or clean-up proceeding, and shall execute and complete promptly any remedial action necessary to ensure that no environmental liens or encumbrances are levied against or exist with respect to any property owned or leased by either Debtor.  Promptly upon the written request of Lender from time to time, Debtors shall submit to Lender an environmental site assessment or report, in form and substance satisfactory to Lender, with respect to such property of either Debtor as is specified by Lender.  Debtors shall indemnify and hold harmless Lender from all loss, liability, damage, cost, and expense, including but not limited to reasonable legal fees, fines, or other penalties or payments, for failure of any property of either Debtor on which Lender has a Lien to comply in all respects with all environmental laws and requirements.  The provisions of this Section shall survive payoff, release, foreclosure, or other disposition of this Agreement, the Collateral or any other security for the Loan.  Debtors shall remain liable under this Section regardless of any other provision of this Agreement which may limit Debtors' liability.

8

5.19.   *Specific Assignments*.  Promptly upon request by Lender, Debtors shall execute and deliver to Lender written assignments, endorsements, or schedules, in form and content satisfactory to Lender, of specific accounts, chattel paper or payment intangibles or groups of accounts, chattel paper or payment intangibles, but the security interest granted to Lender by this Agreement shall not be limited in any way by such assignments.  Such accounts, chattel paper and payment intangibles are to secure payment of the Liabilities and payment and performance of Debtors' other obligations under the Loan Documents and are not sold to Lender whether or not any assignment thereof which is separate from this Agreement is in form absolute.

5.20.   *Delivery of Chattel Paper*.  Promptly upon request by Lender, Debtors shall deliver and endorse to Lender all chattel paper and all other documents held by either Debtor in connection therewith.

5.21.   *Government Contracts*.  If any account, chattel paper or payment intangible arises out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof or any state or local governmental or quasi-Governmental Authority or any department, agency, or instrumentality thereof, Debtors immediately shall notify Lender thereof in writing and execute any instruments or take any steps required by Lender in order that all moneys due or to become due under such contract or contracts shall be assigned to Lender and notice thereof given under the *Federal Assignment of Claims Act of 1940*, as amended, or any other applicable federal or state statute or common law.  The contrary notwithstanding, neither Debtor shall make any assignment of any such contract, account, chattel paper or payment intangible to any Person other than Lender.

5.22.   *Accounts, Inventory, Chattel Paper and Payment Intangibles*.  Neither Debtor shall make any material change to the terms of any sale or lease of inventory or of any account, chattel paper or payment intangible without the prior written permission of Lender.  Upon demand by Lender, Debtors shall make available in form acceptable to Lender shipping documents and delivery receipts evidencing the shipment of goods which gave rise to the sale or lease of inventory or of an account, chattel paper or payment intangible, completion certificates, or other proof of the satisfactory performance of services which gave rise to an account or chattel paper, copies of the invoices arising out of the sale or lease of inventory or for an account, and Debtors' copy of any written contract or order from which the sale or lease of inventory, an account, chattel paper or a payment intangible arose.  When requested, Debtors shall advise Lender regularly whenever an account debtor returns or refuses to retain any goods, the sale or lease of which gave rise to an account or chattel paper, and of any delay in delivery or performance, or claims made, in regard to any sale or lease of inventory, account, or chattel paper, and will comply with any instructions which Lender may give regarding the sale or other disposition of such returns.  The contrary notwithstanding, neither Debtor shall make any assignment of any such contract, account, chattel paper or payment intangible to any Person other than Lender.

5.23.   *Collateral Account*.  Debtors, both prior to and after the occurrence of an Event of Default, shall deposit or cause to be deposited to a bank account designated by Lender and from which Lender alone has power of access and withdrawal ("Collateral Account"), all Items of Payment.  Debtors shall deposit the Items of Payment for credit to the Collateral Account within 2 business days of the receipt thereof, and in precisely the form received, except for the endorsement of Debtors where necessary to permit the collection of the Items of Payment, which endorsement Debtors hereby agrees to make.  Pending such deposit, Debtors shall not commingle any of the Items of Payment with any of their other funds or property, but shall hold them separate and apart.  In the event that any Item of Payment is deposited into an account maintained by either Debtor with Lender other than the Collateral Account, Lender may cause such funds to be withdrawn from such other account and deposited in the Collateral Account on a daily basis or at such other time as Lender may elect.  On the day that monthly payments are due under the Note, and at any other time determined by Lender, Lender may apply the whole or any part of the collected funds credited to the Collateral Account against the Loan, and credit the balance of any such collected funds to a banking account of either Debtor with Lender, the order and method of such application or credit to be in the sole discretion of Lender.

5.24.   *Lender's Collection Rights*.  If all or any part of the Collateral at any time consists of inventory, accounts, chattel paper or payment intangibles, Lender may at any time and from time to time both prior

9

to and after the occurrence of an Event of Default, and each Debtor hereby irrevocably appoints Lender as its attorney in fact (which appointment is coupled with an interest), with power of substitution, in the name of Lender or in the name of such Debtor or otherwise, for the use and benefit of Lender, but at the cost and expense of Debtors and without notice to Debtors, to: (a) notify the account debtors obligated on any of the Collateral to make payments thereon directly to Lender, and to take control of the cash and non-cash proceeds of any such Collateral; (b) charge to any banking account of either Debtor with Lender any Item of Payment credited to the Collateral Account which is dishonored by the drawee or maker thereof; (c) compromise, extend, or renew any of the Collateral or deal with the same as it may deem advisable; (d) release, make exchanges or substitutions for, or surrender all or any part of the Collateral; (e) remove from either Debtor's place of business all books, records, ledger sheets, correspondence, invoices, and documents relating to or evidencing any of the Collateral or, without cost or expense to Lender, make such use of either Debtor's places of business as may be reasonably necessary to administer, control, and collect the Collateral; (f) repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any account debtor; (g) demand, collect, receipt for, and give renewals, extensions, discharges, and releases of any of the Collateral; (h) institute and prosecute legal and equitable proceedings to enforce collection of, or realize upon, any of the Collateral; (i) settle, renew, extend, compromise, compound, exchange, or adjust claims with respect to any of the Collateral or any legal proceedings brought with respect thereto; (j) endorse the name of either Debtor upon any Items of Payment relating to the Collateral or upon any proof of claim in bankruptcy against an account debtor; (k) receive and open all mail addressed to either Debtor and, if an Event of Default exists, notify postal authorities to change the address for the delivery of mail to Debtors to such address as Lender may designate; and (l) exercise all other rights of Debtors against its account debtors.

5.25.    *Further Assurances and Corrective Instruments*.  Debtors, upon request by Lender from time to time, shall execute and deliver, or cause to be executed and delivered, such supplements hereto and such further instruments as may be required by Lender for carrying out the intention of the parties to, or facilitating the performance of, this Agreement.  If either Debtor fails to execute any such document within 10 calendar days after a request by Lender, each Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of executing such document in such Debtor's name, which power of attorney is coupled with an interest and irrevocable.

5.26.    *Estoppel Certificates*.  Debtors, within 10 calendar days after request by Lender from time to time, shall execute, acknowledge and deliver to Lender or any Person designated by Lender a statement in writing, certifying: (a) that this Agreement is unmodified and in full force and effect and the payments required by this Agreement to be paid by Debtors have been paid; (b) the then unpaid principal balance of the Note; and (c) whether to the knowledge of the signer of such certificate any party to any of the Loan Documents is in default in the performance of any covenant, agreement, or condition contained therein and, if so, specifying each such default of which the signer may have knowledge.

5.27.    *Expense Payments*.  If Debtors shall fail to make any payment or otherwise fail to perform, observe, or comply with any of the conditions, covenants, terms, stipulations, or agreements contained in this Agreement, Lender without notice to or demand upon either Debtor and without waiving or releasing any obligation or any Event of Default may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Debtors, and may enter upon any premises of Debtors for that purpose and take all such action thereon as Lender may consider necessary or appropriate for such purpose.  All sums so paid or advanced by Lender ("Expense Payments"), together with interest thereon from the date paid, advanced, or incurred until repaid in full at a *per annum* rate of interest equal at all times to the default rate of interest described in the Note, shall be paid by Debtors to Lender upon demand by Lender.

5.28.    *Evidence of Ownership*.  Debtors shall promptly deliver to Lender, on demand, any contracts, bills of sale, statements, receipted vouchers, or agreements under which either Debtor claims title to any materials, fixtures, or articles incorporated in the property subject to the Lease or subjected to the security interest granted in this Agreement.

5.29.    *SBA Loan*.  Debtors shall perform in a timely manner all obligations, covenants and conditions required of Debtors under the SBA Authorization and all related agreements.  Debtors shall: (a) provide

Lender with all certifications, documents or other information Lender is required by the SBA Authorization to obtain from either Debtor or any third party; (b) execute any note and any other documents required by Lender; and (c) do everything necessary for Lender to comply with the terms and conditions of the SBA Authorization. Each Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of executing such documents and to perform such things as are necessary to cause compliance with the SBA Authorization, all in such Debtor's name, which power is coupled with an interest and irrevocable.

5.30.    *Field Examinations*.  Lender and the SBA may conduct field examinations of Debtors at such intervals as Lender or the SBA may determine.  All costs of the field examinations shall be paid by Debtors.

5.31.    *Equal Opportunity*.  Debtors shall post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public, and shall comply with the requirements of SBA Form 793, Notice to New SBA Debtors.

5.32.    *American Made Products*.  To the extent practicable, Debtors shall purchase only American-made equipment and products with the Loan Proceeds.

5.33.    *SBA Provisions*.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.    When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

5.34.    *Vehicle Titles and Manufacturers' Statements of Origin*.  Promptly upon request by Lender, Debtors shall: (a) deliver to Lender all vehicle titles, manufacturers' statements of origin, and such other certificates of title and/or ownership applicable to any of either Debtor's assets; and (b) execute and deliver to Lender and cause to be filed with the appropriate filing office for perfecting a lien on and security interest in such assets of either Debtor having any such title, manufacturer's statement of origin or other certificate of title or ownership and shall cause Lender to be properly listed as lienholder and secured party thereon and shall take all such other actions to perfect Lender's security interest therein. Debtors shall pay the costs of filing any assignment, financing statement, security interest filing, lien instruments, lien certificates, financing statement addendum, continuation statement, release, termination statement or other filing required by Lender as well as any taxes or other fees required by Applicable Law to be paid in connection with the filing or recording of any such document.  Further, Debtors shall be solely responsible for all costs incurred by Lender in connection with the foregoing, including, without limitation, attorneys' fees, postage costs, lien search fees, release fees and filing fees.

## 6.    NEGATIVE COVENANTS

Without the prior written consent of Lender:

6.1.    _No Change of Name, Merger, Etc_. Neither Debtor shall change its name, dissolve, merge, or consolidate with any other Person or acquire all or substantially all of the assets in any Person. Without limiting the generality of the foregoing, neither Debtor shall acquire or form any Subsidiary, enter into any joint venture agreement, become a partner in any partnership or become a member in any limited liability company. Neither Debtor shall make or permit to exist any loan, advance, investment (debt or equity), purchase of stock or other interest, or material acquisition of assets, other than accounts receivable that arise in the ordinary course of business.

6.2.    _No Change in Ownership_. Neither Debtor shall cause or permit any conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance or alienation of any direct or indirect ownership interest in either Debtor. Neither Debtor shall suffer or permit any change in the management of either Debtor or control over the day-to-day business operations of either Debtor.

6.3.    _No Sale or Transfer of Assets_. Neither Debtor shall sell, transfer, lease or otherwise dispose of all or any part of the Collateral, or any material part of its other assets, except that Debtors, in the ordinary course of its business, and in the absence of a Default or an Event of Default or a contrary direction by Lender, may collect its accounts, chattel paper and payment intangibles and may sell its inventory in the ordinary course of its business.

6.4.    _No Encumbrance of Assets_. Neither Debtor shall mortgage, pledge, grant or permit to exist a Lien upon any of the Collateral or any of its other assets of any kind, now owned or hereafter acquired, except for Liens granted by or otherwise expressly permitted under this Agreement.

6.5.    _No Purchase or Redemption; No Distributions_. Neither Debtor shall: (a) purchase or redeem any interest in either Debtor; (b) make or declare or pay any dividends, distributions or withdraws; (c) set aside any funds for any such redemption, dividend, distribution or withdraw; or (d) prepay, purchase, or redeem any indebtedness of either Debtor other than the Loan except trade debt incurred in the ordinary course of either Debtor's business.

6.6.    _No Additional Indebtedness_. Neither Debtor shall incur or permit to exist any indebtedness or liability on account of deposits or advances or for borrowed money or for the deferred purchase price of any property or services, except: (a) the Loan; (b) current debt incurred in the ordinary course of business; (c) the Subordinated Debt; and (d) debt secured by a Lien in favor of Lender. Without limiting the generality of the foregoing, neither Debtor nor any Obligor shall guarantee, endorse, become contingently liable upon or assume the obligations of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

6.7.    _Loans; Distributions and Investments_. Neither Debtor shall make any advance, loan, investment, purchase of stock or other interest, purchase of any customer lists of other accounting practices, or material acquisition of assets. Further, any direct or indirect interest redemption or purchase of interest in either Debtor shall be subject to the approval of Lender, which approval shall be granted or withheld in Lender's sole and absolute discretion, and funded solely through the use of the proceeds from life insurance policies owned by either Debtor and not otherwise pledged or assigned to Lender as collateral for any indebtedness.

## 7.    DEFAULT AND REMEDIES

7.1.    _Events of Default_. The occurrence of any of the following events shall constitute an Event of Default under this Agreement and under the other Loan Documents:

a.    Failure to Pay. Either Debtor fails to pay when due any of the Liabilities.

12

b.      Failure of Representation or Warranty.  Any representation or warranty made by either Debtor in this Agreement proves to have been incorrect or misleading in any material respect.

c.      Breach of Affirmative Covenant.  Either Debtor fails to perform or observe any of the affirmative covenants set forth in Section 5 of this Agreement.

d.      Violation of Negative Covenant.  Either Debtor violates any of the negative covenants set forth in Section 6 of this Agreement.

e.      Default Under Other Loan Documents.  An event of default (as defined therein) occurs under any of the other Loan Documents, which default remains uncured beyond the expiration of any applicable cure period.  Reference is made to the other Loan Documents for specific cure periods, if any, for specific types of defaults.

f.      Insecurity of Lender.  Lender in good faith deems itself to be insecure.

g.      Impairment of Collateral.  Any event shall occur which Lender in good faith deems to impair any of the Collateral or any other security for the Loan.

h.      Failure of Perfection.  Any security interest granted by this Agreement is unperfected due to any action or omission by either Debtor in violation of this Agreement.

i.      Transfers of Collateral or Interests.  The sale, transfer or encumbrance of (i) all or any part of the Collateral or any interest therein, except as expressly permitted by this Agreement, (ii) all, substantially all or material part of the property or other assets of either Debtor or any Obligor, (iii) any assets of either Debtor or any Obligor for other than reasonably equivalent value in the ordinary course of either Debtor's business, or (iv) any beneficial interest in either Debtor, any Obligor or any Subsidiary.

j.      SBA Authorization.  A failure to perform or observe any covenant or agreement described in the SBA Authorization.

k.      Cross-Default.  A default occurs with respect to any obligation owed by either Debtor or any other Obligor to Lender or any other Person, and such default remains uncured beyond the expiration of any applicable cure period.

7.2.    *Remedies of Lender*.  Upon the occurrence of any Event of Default, in addition to all other rights and remedies available to Lender under the Loan Documents and Applicable Law, Lender shall have the following rights and remedies:

a.      Acceleration.  Lender may declare the Note and all other Liabilities to be immediately due and payable.

b.      Protection of Collateral.  Lender may take such steps as Lender deems appropriate to protect all or any portion of the Collateral or any other property owned or leased by either Debtor from depredation or injury including employment of watchmen or other protective services, all at the expense of Debtors.

c.      Sale of Collateral.  Lender shall have all of the rights and remedies of a secured party under the UCC and other Applicable Laws.  Upon demand by Lender, Debtors shall assemble the Collateral and make it available to Lender at a place designated by Lender which is mutually convenient to both parties.  Lender or its agents may enter upon Debtors' respective premises to take possession of the Collateral, to remove it, to render it unusable, or to sell or otherwise dispose of it, all without judicial process or proceedings.  Lender shall have no obligation to clean up or otherwise to prepare the Collateral for sale.  Any written notice of the sale, disposition, or other intended action by Lender with respect to the Collateral which is required by Applicable Laws and is sent by certified mail, postage prepaid, to Debtors at the address of such Debtor's chief executive office specified below, or such other address of such Debtor which may from time to time be shown on Lender's records, at least 10 calendar days prior to

13

such sale, disposition, or other action, shall constitute reasonable notice to Debtors. Lender, without adversely affecting the commercial reasonableness of any sale of the Collateral, (a) may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, and (b) may refuse to give or may disclaim any warranties of title or the like. Any proceeds of sale or other disposition of the Collateral shall be applied by Lender to the payment of Liquidation Costs and Expense Payments, and any balance of such proceeds will be applied by Lender to the payment of the remaining Liabilities, whether or not then due, in such order and manner of application as Lender may from time to time in its sole discretion determine. If the sale or other disposition of the Collateral fails to satisfy fully the Liabilities, Debtors shall remain liable to Lender for any deficiency. If Lender sells any of the Collateral on credit, Debtors shall be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of the purchaser. If the purchaser defaults in making payments to Lender, then Lender may resell the Collateral and apply the proceeds of such resale to the Liabilities in accordance with this paragraph.

       d.     SBA Authorization. Lender may take all steps and advance all funds deemed necessary or desirable by Lender to keep the SBA Authorization in full force and effect and to cause compliance with all of the terms and provisions of the SBA Authorization.

       e.     Set-Off. Lender may set-off any amounts in any account or represented by any certificate with Lender in the name of either Debtor or in which either Debtor has an interest. As additional security for the Note and the Loan, each Debtor hereby pledges and grants to Lender a lien on and security interest in, and authorizes Lender to offset such obligations of each Debtor and each Obligor to Lender against, all property of each Debtor now or at any time hereafter in the possession of, in transit to, under the control of, or on deposit with Lender, in any capacity whatsoever, including without limitation, any balance of any deposit account and any credits with Lender.

       f.     Other Remedies. Lender may pursue such other remedies, including actions for specific performance and damages, or any remedies provided for in the Loan Documents or permitted by law, which Lender may deem appropriate, it being specifically understood and agreed that any remedies may be exercised in the alternative or cumulatively in the sole discretion of Lender.

       g.     Liquidation Costs. Debtors shall reimburse and pay to Lender upon demand all Liquidation Costs, including without limitation attorneys' fees and expenses, advanced, incurred by, or on behalf of Lender in collecting and enforcing the Liabilities and the Loan Documents. All Liquidation Costs shall bear interest payable by Debtors to Lender upon demand from the date advanced or incurred until paid in full at a per annum rate of interest equal the default rate of interest described in the Note.

       h.     No Waiver, Etc. No failure or delay by Lender to insist upon the strict performance of any term, condition, covenant, or agreement of this Agreement or of any of the other Loan Documents, or to exercise any right, power, or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant, or agreement or of any such breach, or preclude Lender from exercising any such right, power, or remedy at any later time or times. By accepting payment after the due date of any amount payable under this Agreement or under the Note or under any of the other Loan Documents, Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement, the Note or any of the other Loan Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount.

## 8.    MISCELLANEOUS

8.1.    *Notices*. All notices, demands, requests and other communications required under this Agreement shall be in writing and shall be deemed to have been properly given if sent by hand delivery, Federal Express (or similar overnight courier service), or by United States certified mail (return receipt requested), postage prepaid, addressed to the party for whom it is intended at its address hereinafter set forth:

      If to Lender:          Capital Bank, National Association
                         1776 Eye Street, NW

Washington, DC 20006
Attention: Chris Mullings, Senior Vice President

With copies to:

Bryan J. Pelino
Rosenberg Pelino LLC
6031 University Boulevard, Suite 300
Ellicott City, Maryland 21043

If to Debtors:    Smokecraft Clarendon, LLC
Smokecraft Holdings, LLC
3003 Washington Boulevard, Suite 101
Arlington, Virginia 22201
Attention: Andrew C. Darneille

Notice shall be deemed given as of the date of hand delivery, as of the date specified for delivery if by overnight courier service or as of 2 calendar days after the date of mailing, as the case may be.

8.2.    *Liability of Lender*.  Lender, by the acceptance and performance of this Agreement, does not assume any liability, and each Debtor hereby releases Lender and Lender's agents, employees and attorneys from any such liability, and no claim shall be made by either Debtor upon Lender or such employees or agents for or on account of any matter or thing in excess of the balance of the Loan Proceeds not yet advanced.

8.3.    *Survival*.  All agreements, covenants, representations, and warranties of Debtors made in this Agreement shall survive the making of the advances under this Agreement or any other Loan Document. The SBA Authorization shall continue to be in effect and shall survive the execution of this Agreement and the other Loan Documents.  If any term of the SBA Authorization conflicts with the terms of this Agreement, the terms of the SBA Authorization shall control.

8.4.    *Successors*.  This Agreement shall be binding upon and inure to the benefit of Debtors, their successors, and those assigns approved in writing by Lender, and upon and to Lender, its successors and assigns.

8.5.    *Applicable Law*.  This Agreement is made, executed, and delivered in the Commonwealth of Virginia.  Except as otherwise provided under Section 5.33 of this Agreement or as otherwise provided under SBA regulations, the law of the Commonwealth of Virginia (but excluding Virginia principles of conflicts of laws) shall govern its interpretation, performance, and enforcement.

8.6.    *Assignment not Effective*.  Any attempted assignment or transfer of either Debtor's rights under this Agreement without the prior written consent of Lender shall be void.

8.7.    *Obligations of Debtors*.  Debtors' obligations and representations under this Agreement are joint and several and are in addition to all obligations, covenants, and representations made by or on behalf of Debtors in all other documents delivered in connection with the Loan and the transactions contemplated hereby.

8.8.    *No Oral Modification*.  Neither this Agreement nor any term, condition, representation, warranty, covenant, or agreement set forth in this Agreement may be changed, waived, discharged, or terminated orally but only by an instrument in writing by the party against whom such change, waiver, discharge, or termination is sought.

8.9.    *Integration*.  This Agreement and the Loan Documents constitute the entire agreement between Lender and Debtors regarding the Loan, and shall completely and fully supersede all other prior agreements, both written and oral, between Debtors and Lender regarding their respective rights, obligations, and responsibilities relating to the Loan.

8.10.    *Severability*.  If any provision or part of any provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

8.11.    *Time*.  Time is of the essence of all of Debtors' obligations under this Agreement.

## 9.    CONSENTS AND WAIVERS

9.1.    *Participations; Release of Information*.  The Loan, the Liabilities, this Agreement and the other Loan Documents may be placed, assigned, serviced or participated out (either in whole or in part) by Lender, its successors and assigns.  Each Debtor grants Lender its unlimited and unconditional consent to the disclosure and dissemination of financial records, including without limitation loan application and account information, statements of deposit and share accounts, negotiable instruments, individual, corporate and partnership financial statements, credit references and histories, property appraisals, surveys, pro forma assumptions, profit and loss statements, resumes, accounting reports, balance sheets, and other financial information provided to Lender by or on behalf of such Debtor, for such purposes as Lender, in its sole discretion, from time to time deems necessary or proper.  Each Debtor further releases, acquits and forever discharges Lender and its agents from all liability, claims, actions, or causes of action for disclosure of confidential financial records under any applicable federal or state statute or common law.

9.2.    *Consent to Jurisdiction*.  Each Debtor consents to the exclusive jurisdiction of any and all state and federal courts in the Commonwealth of Virginia with jurisdiction over such Debtor and such Debtor's assets as selected by Lender.  Each Debtor agrees that such assets shall be used first to satisfy all claims of creditors organized or domiciled in the United States of America, and that no assets of either Debtor in the United States of America shall be considered part of any foreign bankruptcy estate.  Each Debtor agrees that any controversy arising under or in relation to the Note, this Agreement or any of the other Loan Documents shall be litigated exclusively in the Commonwealth of Virginia.  The state and federal courts and authorities with jurisdiction in the Commonwealth of Virginia shall have exclusive jurisdiction over all controversies which may arise under or in relation to the Note and any security for the debt evidenced by the Note, including without limitation those controversies relating to the execution, interpretation, breach, enforcement or compliance with the Note, this Agreement or any other issue arising under, related to, or in connection with any of the Loan Documents.  Each Debtor irrevocably consents to service, jurisdiction, and venue of such courts for any litigation arising from the Note, this Agreement or any other Loan Document, and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

9.3.    *JURY TRIAL WAIVER*.  EACH DEBTOR AND LENDER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH EITHER DEBTOR OR LENDER MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.    THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY EITHER DEBTOR, AND EACH DEBTOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  EACH DEBTOR FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

[SIGNATURES APPEAR ON NEXT PAGE]

IN WITNESS WHEREOF, Debtors and Lender have caused this Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                    **DEBTORS:**

                                   SMOKECRAFT CLARENDON, LLC
                                   A Virginia Limited Liability Company

_____             By: _____ (SEAL)
PATRICK EJINDU                          Andrew C. Darneille
                                        Manager

                                   SMOKECRAFT HOLDINGS, LLC
                                   A Virginia Limited Liability Company

_____             By: _____ (SEAL)
PATRICK EJINDU                          Andrew C. Darneille
                                        Sole Member and Manager

                                   **LENDER:**

                                   CAPITAL BANK, NATIONAL ASSOCIATION

_____             By: _____ (SEAL)
                                        Name: _____
                                        Title: _____


[ACKNOWLEDGMENTS APPEAR ON NEXT PAGE]


*[Signature Page to Security Agreement]*


17

**Acknowledgments**

*Rockville* OF *Montgomery*, CITY/COUNTY OF *maryland*, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

NOTARY PUBLIC

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

My Commission Expires:

9 9 22

*Rockville* OF *Montgomery*, CITY/COUNTY OF *maryland*, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

NOTARY PUBLIC

ERICA WANG (SEAL)
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

My Commission Expires:

9 9 22

_____ OF _____, CITY/COUNTY OF _____, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared _____, and acknowledged himself/herself to be a _____ of CAPITAL BANK, NATIONAL ASSOCIATION, and acknowledged that s/he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

_____

18

**EXHIBIT A**
(Definitions)

        <u>After-Acquired Intellectual Property</u> shall have the meaning ascribed to it in Section 3.4 of this Agreement.

        <u>Agreement</u> means this Security Agreement, including all schedules and exhibits hereto, as it may be amended, restated, extended, consolidated or increased from time to time.

        <u>Applicable Law</u> means all laws, statutes, treaty, codes, ordinances, regulations, rules, rulings, orders, judgments, decrees, injunctions, arbitral decisions, regulations, authorizations, determinations, directives and any other requirements and/or provisions (including building codes and zoning regulations and ordinances) of all Governmental Authorities, whether now or hereafter in force, which may be or become applicable to either Debtor or Lender, the relationship of lender and borrower, the Collateral, any of the Loan Documents, or any part of any of them (whether or not the same may be valid), and all requirements, obligations and conditions of all instruments of record applicable to the Collateral on the date hereof.

        <u>Code</u> means the *Internal Revenue Code of 1986*, as amended, and the income tax regulations now or hereafter issued thereunder.

        <u>Collateral</u> means all of each Debtor's assets wherever located, whether now owned or hereafter acquired, together with all products and proceeds thereof (both cash and non-cash), including without limitation, all of the following property of Debtors:

        (a)    All of each Debtor's inventory both now owned and hereafter acquired, wherever located, and as the same may now and hereafter from time to time be constituted.

        (b)    All of each Debtor's (i) accounts (including without limitation all health-care-insurance receivables) and (ii) notes, notes receivable, drafts, acceptances, and other instruments and documents, both now owned and hereafter acquired, together with all returned, rejected, or repossessed goods, the sale or lease of which shall have given or shall give rise to an account, instrument or document.

        (c)    All of each Debtor's general intangibles (including, without limitation, all payment intangibles, things in action, contractual rights, goodwill, literary rights, trade names, domain names, rights to performance, Intellectual Property and software), both now owned and hereafter acquired.

        (d)    All of each Debtor's rights, title, charges, abilities, licenses and interest in, to and under the any franchise or similar agreement.

        (e)    All of each Debtor's chattel paper (including both electronic chattel paper and tangible chattel paper) both now owned and hereafter existing, acquired, or created, together with (i) all moneys due and to become due thereunder, (ii) all returned, rejected, or repossessed goods, the sale or lease of which shall have given or shall give rise to chattel paper, and (iii) all property and goods both now owned and hereafter acquired by either Debtor which are sold, leased, secured, are the subject of, or otherwise covered by, either Debtor's chattel paper, and all rights incident to such property and goods.

        (f)    All of each Debtor's equipment, motor vehicles, and fixtures, both now owned and hereafter acquired, together with (i) all additions, parts, fittings, accessories, special tools, attachments, and accessions now and hereafter affixed thereto or used in connection therewith, and (ii) all replacements thereof and substitutions therefor.  All such fixtures are or will be attached to Debtors' chief executive offices or any other place of business of either Debtor as described in <u>Exhibit B</u> attached hereto.

        (g)    All of each Debtor's as-extracted collateral.

        (h)    All of each Debtor's commodity accounts, commodity contracts, financial assets, securities (whether certificated or uncertificated), securities entitlements, securities accounts and other investment property, both now owned and hereafter acquired.

(i)    All of each Debtor's deposit accounts, both now owned and hereafter acquired.

(j)    All of each Debtor's letter-of-credit rights, both now owned and hereafter acquired.

(k)    All cash and non-cash proceeds (including insurance proceeds) and products of any of the foregoing.

Collateral Account has the meaning ascribed to it in Section 5.23 of the Agreement.

Commonly Controlled Entity means any subsidiary or any other trade or business (whether or not incorporated) which is under "common control" (as defined in the Code) with either Debtor or any of its subsidiaries.

Controlling Interest means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

Copyright License means any written agreement granting any right to any third party under any Copyright owned by either Debtor or that either Debtor otherwise has the right to license, or granting any right to either Debtor under any Copyright owned by any third party.

Copyrights means all of the following now owned or hereafter acquired by or assigned to either Debtor: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished and (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including, without limitation, those listed on Schedule A to the applicable Grant of Security Interest and all: (i) rights and privileges arising under applicable law with respect to either Debtor's use of such copyrights, (ii) renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

Credit Agreement means the Credit Agreement of even date herewith by and among Debtors, Lender and others, as it may be amended, restated, extended, spread, consolidated or increased from time to time.

Debtors means, collectively, Smokecraft Clarendon, LLC, a Virginia limited liability company and Smokecraft Holdings, LLC, a Virginia limited liability company.

Event of Default means any of those events described in Section 7.1 of this Agreement.

Expense Payment has the meaning ascribed to it in Section 5.27 of this Agreement.

GAAP shall have the meaning ascribed to it in Section 1.2 of this Agreement.

Governmental Authority means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, official, instrumentality, regulatory body, court, central bank, quasi-governmental agency or group or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government and all officials, boards, departments, agencies and instrumentalities thereof.

Grant of Security Interest shall have the meaning ascribed to it in Section 3.1 of this Agreement.

2

Hazardous Substance means: (a) any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the *Comprehensive Environmental Response, Compensation and Liability Act of 1980*, as amended, 42 U.S.C.A. § 9601(14), as a "hazardous substance," (ii) the *Clean Water Act*, 33 U.S.C.A. § 1321(b)(2)(A), as a "hazardous substance," (iii) the *Clean Water Act*, 33 U.S.C.A. §§ 1317(a) and 1362(13), as a "toxic pollutant," (iv) Table 1 of Committee Print Numbered 95-30 of the Committee on Public Works And Transportation of the United States House of Representatives as a "toxic pollutant," (v) the *Clean Air Act*, 42 U.S.C.A. § 7412(a)(1), as a "hazardous air pollutant," (vi) the *Toxic Substances Control Act*, 15 U.S.C.A. § 2606(f), as an "imminently hazardous chemical substance or mixture," (vii) the *Resource, Conservation and Recovery Act*, 42 U.S.C.A. §§ 6903(5) and 6921, as a "hazardous waste," or (viii) any other law as presenting an imminent and substantial danger to the public health or welfare or to the environment, or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation; (b) petroleum, crude oil, gasoline, natural gas, liquefied natural gas, synthetic fuel, or other petroleum, oil, or gas based product; (c) any nuclear, radioactive, or atomic substance, mixture, waste, compound, material, element, product, or matter; or (d) any other substance, mixture, waste, compound, material, element, product or matter that presents an imminent and substantial danger to the public health or welfare or to the environment upon its spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, or dumping.

Identified Party means each Debtor, each Obligor, each affiliate of either Debtor or any Obligor and each Principal of any of the foregoing.

Intellectual Property means all of each Debtor's right, title, and interest in Patents, Copyrights, Licenses, and Trademarks, whether now owned or held, or hereafter acquired by either Debtor.

IP Collateral means the Collateral consisting of Intellectual Property.

Items of Payment means all checks, drafts, cash, and other remittances in payment or on account of payment for or of inventory, accounts, or chattel paper or payment intangibles, and the cash proceeds of any returned goods, the sale or lease of which gave rise to an account or chattel paper.

Lease means any lease agreement for real property to which either Debtor is a party or by which either Debtor may be bound.

Lender means Capital Bank, National Association.

Liabilities means: the obligations of Debtors to pay: (a) the unpaid principal amount of the Note, plus all accrued and unpaid interest thereon; (b) all unpaid Expense Payments; (c) all unpaid Liquidation Costs; and (d) all other charges, interest, and expenses chargeable by Lender to either Debtor under the Note, this Agreement and the other Loan Documents.

License means any Patent License, Trademark License, Copyright License or other written agreement granting rights under Intellectual Property to which either Debtor is a party.

Lien means any mortgage, deed of trust, pledge, security interest, assignment, encumbrance, lien, or charge of any kind, including without limitation any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the UCC or the *Uniform Commercial Code* of any other jurisdiction.

Liquidation Costs means all expenses, charges, costs, and fees (including without limitation attorneys' fees and expenses) of any nature whatsoever paid or incurred by or on behalf of Lender in connection with: (a) the collection or enforcement of any of the Liabilities; and (b) the collection or enforcement of any of the Loan Documents.

Loan means the loan in the principal amount of $1,200,000 made by Lender to Debtors pursuant to the terms and conditions of this Agreement and the SBA Authorization.

3

Loan Documents means, collectively, this Agreement, the Credit Agreement, the Note, and all other instruments, documents, and agreements now or hereafter evidencing, securing, guaranteeing, indemnifying, or given by either Debtor, any Obligor or any third party in connection with the Loan or any of the other Liabilities, as such documents may be amended, restated, extended, spread, consolidated or increased from time to time.

Loan Proceeds means the funds advanced by Lender as proceeds of the Loan.

Note means the SBA Form 147 Note of even date herewith in the principal amount of $1,200,000 made by Debtors to the order of Lender, as it may be amended, restated, extended, consolidated or increased from time to time.

Obligor means any Person other than Debtors who may at any time now or hereafter be primarily or secondarily liable for any or all of the Liabilities or who has granted any security for any of the Liabilities, including, without limitation, each guarantor and any other maker, endorser, surety, or guarantor of all or a portion of the Liabilities or any Person, other than Lender, who is now or hereafter a party to any of the Loan Documents.

Patent License means any written agreement granting to any third party any right to import, make, have made, offer for sale, use or sell any invention on which a Patent owned by either Debtor or that either Debtor otherwise has the right to license, is in existence, or granting to either Debtor any such right with respect to any invention on which a Patent owned by any third party, is in existence.

Patents means all of the following now owned or hereafter acquired by either Debtor: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including, without limitation, those listed on Schedule A to the applicable Grant of Security Interest; and (b) all (i) rights and privileges arising under applicable law with respect to either Debtor's use of any patents, (ii) reissues, divisions, continuations, extensions and continuations-in-part thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

Person means an individual, an estate, a trust, a corporation, a partnership, limited liability company, a government or governmental agency or instrumentality and any other legal entity.

Principal means if a sole proprietorship, the proprietor; if a partnership, each managing partner and each partner who is a natural person and holds an ownership interest in the partnership; and if a corporation, limited liability company, association or a development company, each director, each of the five most highly compensated executives or officers of the entity, and each natural person who is a direct or indirect holder any of the interest, ownership stock or stock equivalent of the entity.

SBA means the United States Small Business Administration.

SBA Authorization means the SBA Authorization issued in connection with the Loan, having an SBA Loan No. of ▮▮▮▮▮▮ and an approval date of March 15, 2019, as amended from time to time.

Subordinated Debt means loans from officers, directors, shareholders, or other direct or indirect beneficial owners of either Debtor to such Debtor that are subordinated to repayment of the Liabilities upon terms satisfactory to Lender in all respects and pursuant to this Agreement and/or such other agreement acceptable to Lender in form and substance.

Subsidiary means any corporation, partnership, limited liability company, association, or other business entity (a) in which a Controlling Interest is owned or controlled by such Debtor, or (b) a majority

3

(by number of votes) of the outstanding shares of any class or classes of which shall at the time be owned or controlled by such Debtor, if the holders of the shares of such class or classes (i) are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors (or Persons performing similar functions) of the issuer thereof, even though the right to vote has been suspended by the happening of such a contingency, or (ii) are at the time entitled, as such holders, to elect a majority of the directors (or Persons performing similar functions) of the issuer thereof, whether or not the right to vote exists by reason of the happening of a contingency.

Taxes means all taxes and assessments, whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character (including all federal, state, local, income, payroll, real estate and sales taxes and all penalties or interest thereon), which at any time may be assessed, levied, confirmed, or imposed on either Debtor or any of either Debtor's properties or assets or income or any part thereof or in respect of any of either Debtor's franchises, businesses, income or profits, and all claims for sums which by law have or might become a lien or charge upon any of either Debtor's properties or assets or any part thereof.

Trademark License means any written agreement granting to any third party any right to use any Trademark owned by either Debtor or that either Debtor otherwise has the right to license, or granting to either Debtor any right to use any Trademark owned by any third party.

Trademarks means all of the following now owned or hereafter acquired by either Debtor: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names or other source or business identifiers or designs of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations thereof, and all registration applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, including, without limitation, those listed on Schedule A to the applicable Grant of Security Interest, (b) all rights and privileges arising under applicable law with respect to either Debtor's use of any trademarks, (c) all extensions and renewals thereof, (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof, (e) all rights corresponding thereto throughout the world and (f) all rights to sue for past, present and future infringements or dilutions thereof.

UCC means the *Uniform Commercial Code* as in effect from time to time in the Commonwealth of Virginia; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection or the priority of a security interest in any collateral or the availability of any remedy hereunder is governed by the *Uniform Commercial Code* as in effect in a jurisdiction other than the Commonwealth of Virginia, "UCC" means the *Uniform Commercial Code* as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority or availability of such remedy, as the case may be, as determined by Lender.

4

**EXHIBIT B**

**Debtors' correct legal names:**
- Smokecraft Clarendon, LLC                    Smokecraft Clarendon, LLC
- Smokecraft Holdings, LLC                      Smokecraft Holdings, LLC

**Other legal names and trade names used by**
**Debtors during the previous 12 years:**
- Smokecraft Clarendon, LLC                    None
- Smokecraft Holdings, LLC                      Smokecraft Modern Barbeque

**Debtors' jurisdiction of formation:**
- Smokecraft Clarendon, LLC                    Virginia
- Smokecraft Holdings, LLC                      Virginia

**Debtors' state of formation organizational ID nos.:**
- Smokecraft Clarendon, LLC                    S7543376
- Smokecraft Holdings, LLC                      S7543392

**Debtors' federal tax identification numbers:**
- Smokecraft Clarendon, LLC                    83-1543479
- Smokecraft Holdings, LLC                      83-1066983

**Address of Debtors:**                            3003 Washington Boulevard, Suite 101
                                                            Arlington, Virginia 22201

**Addresses of all other places of business**
**of Debtors:**                                        NONE

## EXHIBIT C

### [FORM OF] TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020 is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors") in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2.  Grant of Security.  As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in, all of each Grantor's right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Trademark Collateral"): (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names or other source or business identifiers or designs of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations thereof, and all registration applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, including, without limitation, those listed on Schedule A attached hereto; (b) all rights and privileges arising under applicable law with respect to Grantors' use of any trademarks; (c) all extensions and renewals thereof; (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof; (e) all rights corresponding thereto throughout the world; (f) all rights to sue for past, present and future infringements or dilutions thereof; and (g) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing; provided that, in no event shall any security interest be granted in any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance by the United States Patent and Trademark Office of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law (it being understood that after such period such intent-to-use application shall be automatically subject to the security interest granted herein).

SECTION 3.  Security for Liabilities.  The grant of a security interest in the Trademarks by Grantors under this Trademark Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4.  Recordation.  Each Grantor authorizes and requests that the Commissioner for Trademarks record this Trademark Security Agreement.

SECTION 5.  Execution in Counterparts.  This Trademark Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument.  Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Trademark Security Agreement shall be effective as delivery of an original executed counterpart of this Trademark Security Agreement.

SECTION 6.  Security Agreement.  This Trademark Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein. In the event that any provision of this Trademark Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7.  Governing Law.  EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS TRADEMARK SECURITY AGREEMENT, THIS TRADEMARK SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8.  SBA Provisions.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a.    When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Trademark Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**GRANTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
  Andrew C. Darneille
  Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
  Andrew C. Darneille
  Sole Member and Manager

**Acknowledgments**

Rockville ___ OF Montgumery , CITY/COUNTY OF Maryland , TO WIT:

  I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

  IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

Rockville ___ OF Montgumery , CITY/COUNTY OF Maryland , TO WIT:

  I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

  IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

## SCHEDULE A

### UNITED STATES TRADEMARKS

| MARK | OWNER/HOLDER | SERIAL/REG. NO. | APP./REG. DATE |
|------|--------------|-----------------|----------------|
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |

**EXHIBIT D**

[FORM OF] PATENT SECURITY AGREEMENT

This PATENT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020 is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors") in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1. <u>Terms</u>. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. <u>Grant of Security</u>. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, for the benefit of Lender, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Patent Collateral"): (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on <u>Schedule A</u> attached hereto; (b) all (i) rights and privileges arising under applicable law with respect to Grantors' use of any patents, (ii) reissues, divisions, continuations, extensions and continuations-in-part thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world, and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3. <u>Security for Liabilities</u>. The grant of a security interest in the Patent by Grantors under this Patent Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4. <u>Recordation</u>. Each Grantor authorizes and requests that the Commissioner for Patents record this Patent Security Agreement.

SECTION 5. <u>Execution in Counterparts</u>. This Patent Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument. Delivery by telecopier or by electronic .pdf copy of an

executed counterpart of a signature page to this Patent Security Agreement shall be effective as delivery of an original executed counterpart of this Patent Security Agreement.

SECTION 6.  <u>Security Agreement</u>.  This Patent Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.  In the event that any provision of this Patent Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7.  <u>Governing Law</u>.  EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS PATENT SECURITY AGREEMENT, THIS PATENT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8.  <u>SBA Provisions</u>.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.      When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.      Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Patent Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

GRANTORS:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
     Andrew C. Darneille
     Manager

PATRICK EJINDU

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
     Andrew C. Darneille
     Sole Member and Manager

PATRICK EJINDU

### Acknowledgments

Rockville OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____
NOTARY PUBLIC

My Commission Expires:
9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

Rockville OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

<u>SCHEDULE A</u>

**<u>UNITED STATED PATENTS</u>**

| PATENT | OWNER/HOLDER | PATENT NO. | FILING/ISSUE DATE |
|--------|--------------|------------|-------------------|
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |

**EXHIBIT E**

[FORM OF] COPYRIGHT SECURITY AGREEMENT

This COPYRIGHT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020 is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors") in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Copyright Security Agreement for recording with the U.S. Copyright Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1. Terms. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. Grant of Security. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral (as defined in the Security Agreement) of Grantors (collectively, "Copyright Collateral"): (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished; (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on Schedule A attached hereto: (i) rights and privileges arising under applicable law with respect to Grantors' use of such copyrights, (ii) renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3. Security for Liabilities. The grant of a security interest in the Copyrights and exclusive Copyright Licenses by Grantors under this Copyright Security Agreement is made to secure the payment or performance, as the case may be, in full of the Liabilities.

SECTION 4. Recordation. Each Grantor authorizes and requests that the Register of Copyrights record this Copyright Security Agreement.

SECTION 5. Execution in Counterparts. This Copyright Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same agreement. Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Copyright Security Agreement shall be effective as delivery of an original executed counterpart of this Copyright Security Agreement.

SECTION 6.  Security Agreement.  This Copyright Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledges and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.  In the event that any provision of this Copyright Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7.  Governing Law.  EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS COPYRIGHT SECURITY AGREEMENT, THIS COPYRIGHT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8.  SBA Provisions.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.  When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.  Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Copyright Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**GRANTORS:**

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
Andrew C. Darneille
Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
Andrew C. Darneille
Sole Member and Manager

**Acknowledgments**

Rockville OF montgomery, CITY/COUNTY OF maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

Rockville OF Montgomery, CITY/COUNTY OF maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

SCHEDULE A

**UNITED STATES COPYRIGHTS**

| COPYRIGHT | OWNER/HOLDER | COPYRIGHT NO. | APP./REG. DATE |
|-----------|--------------|---------------|----------------|
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |

TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2.  Grant of Security.  As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in, all of each Grantor's right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Trademark Collateral"): (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names or other source or business identifiers or designs of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations thereof, and all registration applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, including, without limitation, those listed on Schedule A attached hereto; (b) all rights and privileges arising under applicable law with respect to Grantors' use of any trademarks; (c) all extensions and renewals thereof; (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof; (e) all rights corresponding thereto throughout the world; (f) all rights to sue for past, present and future infringements or dilutions thereof; and (g) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing; provided that, in no event shall any security interest be granted in any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance by the United States Patent and Trademark Office of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law (it being understood that after such period such intent-to-use application shall be automatically subject to the security interest granted herein).

SECTION 3.  Security for Liabilities.  The grant of a security interest in the Trademarks by Grantors under this Trademark Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4.  Recordation.  Each Grantor authorizes and requests that the Commissioner for Trademarks record this Trademark Security Agreement.

SECTION 5.  Execution in Counterparts.  This Trademark Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument.  Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Trademark Security Agreement shall be effective as delivery of an original executed counterpart of this Trademark Security Agreement.

SECTION 6.  Security Agreement.  This Trademark Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein. In the event that any provision of this Trademark Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7.  Governing Law.  EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS TRADEMARK SECURITY AGREEMENT, THIS TRADEMARK SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8.  SBA Provisions.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.      When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.      Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Trademark Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

PATRICK EJINDU

PATRICK EJINDU

**GRANTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
Andrew C. Darneille
Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
Andrew C. Darneille
Sole Member and Manager

**Acknowledgments**

STATE OF Maryland , CITY/COUNTY OF Rockville montgomery , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

STATE OF Maryland , CITY/COUNTY OF Rockville Montgomery , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

SCHEDULE A

**UNITED STATES TRADEMARKS**

| MARK | OWNER/HOLDER | SERIAL/REG. NO. | APP./REG. DATE |
|------|-------------|-----------------|----------------|
| SMOKECRAFT | Smokecraft Holdings, LLC | 88242015 | December 26, 2018 |
| SMOKECRAFT | Smokecraft Holdings, LLC | 88075579 | August 13, 2018 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

PATENT SECURITY AGREEMENT

This PATENT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2.  Grant of Security.  As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, for the benefit of Lender, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Patent Collateral"): (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on Schedule A attached hereto; (b) all (i) rights and privileges arising under applicable law with respect to Grantors' use of any patents, (ii) reissues, divisions, continuations, extensions and continuations-in-part thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world, and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3.  Security for Liabilities.  The grant of a security interest in the Patent by Grantors under this Patent Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4.  Recordation.  Each Grantor authorizes and requests that the Commissioner for Patents record this Patent Security Agreement.

SECTION 5.  Execution in Counterparts.  This Patent Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument.  Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Patent Security Agreement shall be effective as delivery of an original executed counterpart of this Patent Security Agreement.

SECTION 6.  Security Agreement.  This Patent Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.  In the event that any provision of this Patent Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7.  Governing Law.  EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS PATENT SECURITY AGREEMENT, THIS PATENT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8.  SBA Provisions.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.      When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.      Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Patent Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**GRANTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
Andrew C. Darneille
Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
Andrew C. Darneille
Sole Member and Manager

**Acknowledgments**

STATE OF Maryland , CITY/COUNTY OF Rockville Montgomery , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

STATE OF Maryland , CITY/COUNTY OF Rockville Montgomery , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

SCHEDULE A

**UNITED STATED PATENTS**

| PATENT | OWNER/HOLDER | PATENT NO. | FILING/ISSUE DATE |
|--------|--------------|------------|-------------------|
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |
|        |              |            |                   |