*EXECUTION COPY*

**DEED OF RETAIL LEASE**

**By and Between**

**KBSIII 3003 WASHINGTON, LLC**
**("Landlord")**

**and**

**SMOKECRAFT CLARENDON LLC**
**("Tenant")**

\*    \*    \*    \*    \*    \*    \*

**3003 Washington Boulevard**
**Arlington, Virginia  22201**

Capital Bank's Exhibit-R-01

*EXECUTION COPY*

## DEED OF RETAIL LEASE

**THIS DEED OF RETAIL LEASE** (this "Lease") is made as of the _____ day of May, 2019 (the "Effective Date"), by and between **KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant"), who agree as follows:

1.      **BASIC LEASE TERMS.**

The following terms shall have the following meanings in this Lease:

|   |   |   |
|---|---|---|
| a. | **Premises:** | Approximately 3,460 rentable square feet of space located on the first (1st) floor of the Building (described in Section 1.b., below), as outlined on the floor plan attached hereto as <u>Exhibit A</u>, as well as approximately 250 square feet of basement storage space as shown in the floor plan attached hereto as <u>Exhibit A-1</u> (the "Basement Storage Space," provided however the square footage of the basement storage space shall not be used for the calculation of any Rent, Additional Rent, or other charges set forth in this Lease. |
| b. | **Building:** | 3003 Washington Boulevard, Arlington, Virginia 22201 (the "Building"), containing approximately 210,804 rentable square feet of space. |
| c. | **Commencement Date:** | The First Delivery Date, as defined in and subject to adjustment pursuant to Section 3 of this Lease. |
| d. | **Rent Commencement Date:** | The date which is three hundred (300) days following the Effective Date. |
| e. | **Lease Expiration Date:** | The last day of the tenth (10th) Lease Year (as defined in Section 3.b. below). |
| f. | **Term:** | Subject to Section 3.d., the period commencing on the Commencement Date and ending on the Lease Expiration Date, unless earlier terminated or extended in accordance with the terms of this Lease. |
| g. | **Initial Annual Base Rent*:** | $40.00 per rentable square foot $138,400.00 per annum $11,533.33 per month<br><br>*subject to escalation as provided for in this Lease |

| | | |
|---|---|---|
| h. | **Tenant's Pro Rata Share (Operating Expenses):** | 1.64%* |
| i. | **Tenant's Pro Rata Share (Real Estate Taxes):** | 1.64%* |

*subject to adjustments provided for in this Lease

j.      **Address for Notices:**

**To Landlord:**

KBSIII 3003 Washington, LLC
c/o KBS
3003 Washington Boulevard,
Suite #950
Arlington, VA 22201
Attention:  Senior Vice President

**With a copy to:**

Holland & Knight LLP
800 17th Street N.W.
Suite 1100
Washington, DC 20006
Attention:  Christopher L. Camarra, Esquire

**To Tenant:**

At the Premises

**With a copy of all Default notices to:**

The Morris Law Firm LLC
4845 Rugby Avenue, Suite 302
Bethesda, Maryland 20814
Attention: Sean T. Morris, Esquire

k.      **Landlord's Address for Payment of Rent:**

KBSIII 3003 Washington LLC
PO Box 983031
Boston, MA  02298-3030

| | | |
|---|---|---|
| l. | **Security Deposit:** | $65,000.00 |

m.    **Effective Date:**    The first date on which this Lease has been executed and delivered by each party hereto, which date shall be the date of this Lease and set forth in the preamble hereof.

n.    **Permitted Use:**    The Premises shall be used and occupied solely for the operation of a first-class modern barbecue restaurant and bar, which use shall expressly include late night operations, all in substantial conformity with the provisions set forth in Section 6 of this Lease and the menu attached hereto as <u>Exhibit F</u> (the "Menu"), and for no other use. No other use shall be permitted without Landlord's prior written consent.

o.    **Percentage Rent:**    Percentage Rent Factor: Six percent (6%).

Breakpoint of Sales: Determined by dividing (i) the applicable Base Rent payable for each Lease Year or portion thereof by (ii) the Percentage Rent Factor.

p.    **Trade Name:**    Smokecraft Modern Barbecue

q.    **Guarantor:**    Andrew Darneille, an individual

## 2.    PREMISES.

a.    **Premises.**    In consideration of Tenant's agreement to pay Annual Base Rent (hereinafter defined), Percentage Rent (hereinafter defined) and Additional Rent (hereinafter defined) and subject to the covenants and conditions hereinafter set forth, Landlord hereby leases the Premises to Tenant and Tenant hereby hires and leases the Premises from Landlord, upon the terms and conditions set forth herein.  The lease of the Premises to Tenant includes the non-exclusive right, together with other tenants of the Building and members of the public, to use the common public areas of the Building and the land on which the Building is situated (the "Land"), but includes no other rights not expressly set forth herein.

b.    **Improvements.**

(i)    Landlord shall deliver the Premises to Tenant, and Tenant shall accept the Premises, in its "AS-IS" condition as of the Commencement Date without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements or, to provide any allowance for same, except as otherwise expressly provided for in the Work Agreement attached hereto as <u>Exhibit B</u> (the "Work Agreement"). Tenant acknowledges that Landlord has not made any representation or warranty with respect to the condition of the Premises or the Building or with respect to the suitability or fitness of either for the Permitted Use or for any other purpose.

(ii)     Tenant, at Tenant's sole cost and expense, shall construct in the Premises the Tenant Improvements (as defined in the Work Agreement) in accordance with the terms and conditions of the Work Agreement.

**3.     TERM AND COMMENCEMENT OF TERM.**

a.     **Term**.  This Lease shall be in full force and effect as of the Effective Date.  The term of this Lease (the "Term") shall commence on the Commencement Date and shall expire on the Lease Expiration Date, unless earlier terminated or extended in accordance with the terms of this Lease. Notwithstanding anything to the contrary contained herein, if, for any reason, Landlord is unable to deliver possession of the Premises on the Commencement Date set forth in Section 1 of this Lease, Landlord shall not be liable for any damage caused thereby, nor shall this Lease be void or voidable, but, rather, the Term shall commence upon, and the Commencement Date shall be, the date that possession of the Premises is so tendered to Tenant.  Notwithstanding the foregoing, if Landlord is unable to deliver Premises to Tenant within two hundred seventy (270) days following the First Delivery Date (the "Outside Delivery Date"), Tenant shall have the right to terminate this Lease by delivering written notice to Landlord no later than five (5) business days after the Outside Delivery Date.  If Tenant exercises its right to terminate this Lease, as set forth herein, it shall be entitled to receive from Landlord the return of any Security Deposit or pre-paid Rent and the parties shall thereafter have no further obligations hereunder except for those which expressly survive the expiration or earlier termination of this Lease.

b.     **Lease Year**.  As used in this Lease, the term "Lease Year" means (A) the twelve (12)-month period commencing on the Rent Commencement Date, except that if the Rent Commencement Date does not occur on the first day of a calendar month, the first Lease Year shall commence on the Rent Commencement Date and terminate on the last day of the twelfth (12th) full calendar month following the Rent Commencement Date, and (B) each successive period of twelve (12) calendar months thereafter during the Term.

c.     **Declaration**.  Reference is made to the form of Declaration of Commencement Date (the "Declaration") attached hereto as <u>Exhibit C</u>.  At any time following the Commencement Date, Landlord may, at Landlord's option, complete the Declaration and deliver same to Tenant for execution to confirm, among other things, the Commencement Date, the Rent Commencement Date, the Lease Expiration Date and the Term.  Tenant shall execute and return the Declaration to Landlord within five (5) days following Tenant's receipt of same.  Failure to execute the Declaration shall not affect the commencement or expiration of the Term.

d.     **Financing Contingency**.  Landlord and Tenant acknowledge and agree that this Lease, and the rights and obligations of Landlord and Tenant hereunder, are contingent on Tenant securing a commitment for financing for the business Tenant intends to operate in the Premises (the "Tenant Financing Commitment").  Tenant shall use commercially reasonable efforts to secure the Tenant Financing Commitment as promptly as possible following the Effective Date.  Tenant shall notify Landlord in writing promptly upon Tenant's receipt of the Tenant Financing Commitment and such writing shall expressly waive any and all rights to terminate this Lease pursuant to this Section 3.d. (the "Contingency Waiver Notice").  In the event that Tenant does not deliver the Contingency Waiver Notice on or before the date which is forty-five (45) days following the Effective Date (the "Financing Contingency Deadline"), then either Landlord or Tenant shall have the option to terminate this Lease effective immediately upon written notice to the other delivered at any time prior to the delivery of the Contingency Waiver Notice, and the parties shall thereafter have no further rights or obligations hereunder, except for those which expressly survive the expiration or earlier termination of this Lease. In the event of any termination of this Lease pursuant to this Section 3.d., Tenant shall be entitled to receive from Landlord the return of any Security Deposit or pre-paid Rent.  In the event Tenant does deliver a Contingency Waiver Notice on or before the Financing Contingency Deadline, then neither party shall have the right to terminate this Lease pursuant to this Section 3.4.d. and Landlord shall deliver the Premises to Tenant in accordance with the terms of this Lease no later than the date (the "First Delivery Date") which is forty-five (45)

days following Landlord's receipt of the Contingency Waiver Notice.  For the avoidance of any doubt, nothing in this Section 3.d shall affect the Rent Commencement Date so long as this Lease is not otherwise terminated pursuant to this Section 3.d.

**4.    RENT.**

Tenant covenants and agrees to pay as Rent (hereinafter defined) for the Premises the following amounts set forth in this Section 4 and as otherwise provided in this Lease.  "Additional Rent" shall mean all costs, expenses, charges and other payments to be made by (or on behalf of) Tenant to Landlord (or to a third party if required under this Lease), other than Annual Base Rent and Percentage Rent, whether or not the same be designated as such. "Rent" or "rent" shall mean all Annual Base Rent, Percentage Rent and Additional Rent due hereunder.

a.    **Annual Base Rent.**

(i)    Commencing on the Rent Commencement Date, and thereafter during the Term, Tenant shall pay annual base rent in the amounts set forth immediately below (the "Annual Base Rent"), which amounts shall be payable in equal monthly installments (the "Monthly Base Rent") as set forth immediately below:

| Lease Year | Annual Base Rent Per Square Foot | Annual Base Rent* | Monthly Base Rent |
|---|---|---|---|
| 1 | $40.00 | $138,400.00 | $11,533.33 |
| 2 | $41.00 | $141,860.00 | $11,821.67 |
| 3 | $42.03 | $145,406.50 | $12,117.21 |
| 4 | $43.08 | $149,041.66 | $12,420.14 |
| 5 | $44.15 | $152,767.70 | $12,730.64 |
| 6 | $45.26 | $156,586.90 | $13,048.91 |
| 7 | $46.39 | $160,501.57 | $13,375.13 |
| 8 | $47.55 | $164,514.11 | $13,709.51 |
| 9 | $48.74 | $168,626.96 | $14,052.25 |
| 10 | $49.95 | $172,842.64 | $14,403.55 |
| 11** | $51.20 | $177,163.70 | $14,763.64 |
| 12** | $52.48 | $181,592.79 | $15,132.73 |
| 13** | $53.80 | $186,132.61 | $15,511.05 |
| 14** | $55.14 | $190,785.93 | $15,898.83 |
| 15** | $56.52 | $195,555.58 | $16,296.30 |

*Calculated on an annualized basis

**Applicable only in the event Tenant elects to exercise its Extension Option with respect to the first Extension Period pursuant to Section 31 below.

(ii)    All installments of Monthly Base Rent shall be payable in advance, on the Rent Commencement Date and the first day of each calendar month thereafter during the Term; provided, however, that the first installment of Monthly Base Rent and Tenant's Pass-Through Costs (as hereinafter defined) shall be due and payable upon Tenant's execution of this Lease.  If the Rent Commencement Date shall be a day other than the first day of a calendar month, (1) the Annual Base Rent for the first Lease Year shall be an

amount equal to the sum of (x) the amount of Monthly Base Rent for the partial month in which the Rent Commencement Date occurs, plus (y) the amount of the Annual Base Rent set forth in Section 1, above, and (2) Monthly Base Rent for such partial month shall be the prorated amount of the Monthly Base Rent payable hereunder during the first Lease Year, which proration shall be based upon the actual number of days of such partial month.  The prorated Monthly Base Rent for such partial month shall be payable on the first day of the calendar month after the month in which the Rent Commencement Date occurs

b.    **Tenant's Pass-Through Costs.**

(i)    As used in this Lease:

1.    **"Operating Expenses"** shall mean any and all expenses, costs and disbursements of every kind and nature incurred by Landlord in connection with the ownership, management, operation, maintenance, servicing and repair of the Building and appurtenances thereto, including, without limitation, the common areas thereof, and the Land, including, but not limited to, employees' wages, salaries, welfare and pension benefits and other fringe benefits; payroll taxes; telephone service; painting of common areas of the Building; exterminating service; detection and security services; concierge services; sewer rents and charges; premiums for fire and casualty, liability, rent, workmen's compensation, sprinkler, water damage and other insurance; repairs and maintenance; building supplies; uniforms and dry cleaning; snow removal; the cost of obtaining and providing electricity, water and other public utilities to all areas of the Building; trash removal; janitorial and cleaning supplies; and janitorial and cleaning services; window cleaning; service contracts for the maintenance of elevators, boilers, HVAC and other mechanical, plumbing and electrical equipment; fees for all licenses and permits required for the ownership and operation of the Building; business license fees and taxes, including those based on Landlord's rental income from the Building; the rental value of the management office maintained in the Building; all costs of operating, maintaining and replacing equipment in the health and fitness facility, if any, located in the Building; sales, use and personal property taxes payable in connection with tangible personal property and services purchased for the management, operation, maintenance, repair, cleaning, safety and administration of the Building; legal fees; accounting fees relating to the determination of Operating Expenses and the tenants' share thereof and the preparation of statements required by tenant's leases; management fees, whether or not paid to any person having an interest in or under common ownership with Landlord; purchase and installation of indoor plants in the common areas; and landscaping maintenance and the purchase and replacement of landscaping services, plants and shrubbery.  If Landlord makes an expenditure for a capital improvement to the Building (or any portion thereof) by, for example, installing energy conservation or labor-saving devices to reduce Operating Expenses, or to comply with any Legal Requirements (hereinafter defined) pertaining to the Building, and if, under generally accepted accounting principles, such expenditure is not a current expense, then the cost thereof (a "Permitted Capital Expenditure") shall be amortized over a period equal to the useful life of such improvement, determined in accordance with generally accepted accounting principles, and the amortized costs allocated to each calendar year during the Term, together with an imputed interest amount calculated on the unamortized portion thereof using an interest rate of ten percent (10%) per annum, shall be treated as an Operating Expense.  In the event that any costs with respect to the operation and management of more than one building are allocated among the Building and any other building owned by Landlord or an affiliate of Landlord, the costs so allocated to the Building shall be included in the calculation of Operating Expenses, as reasonably determined by Landlord.

Notwithstanding the foregoing to the contrary, Operating Expenses shall not include the following:

i.        Leasing commissions payable by Landlord;

ii.        Cost of repairs or other work occasioned by fire, windstorm or other casualty to the extent reimbursed by insurance proceeds;

iii.        Costs incurred due to renovating, decorating, redecorating or otherwise improving (as opposed to making repairs to) space for the exclusive benefit of another tenant in the Building;

iv.        Payments of principal, interest, ground rent or any other financing or refinancing costs on any mortgages, deeds of trust or ground leases encumbering Landlord's interest in the Building;

v.        Salaries, wages, or other compensation or benefits paid to employees of Landlord who are not assigned full-time to the operation, management, maintenance, or repair of the Building; provided, however, (i) Operating Expenses shall include Landlord's reasonable allocation of wages, salaries, or other compensation or benefits paid to any employee to the extent such employee is assigned or devotes services on a part-time basis to the operation, management, maintenance, or repair of the Building, and (ii) any salaries, wages or other compensation paid to officers or executives of Landlord or any employees of Landlord above the level of property manager or engineer shall not be included in Operating Expenses;

vi.        Costs of marketing and advertising space available for lease in the Building;

vii.        Costs incurred for any items to the extent Landlord is reimbursed by a manufacturer's, materialman's, vendor's or contractor's warranty, except for reimbursement of Operating Expenses paid by other tenants of the Building;

viii.        Costs incurred in connection with the sale or change of ownership of the Building;

ix.        Fines, interest or penalties, incurred due to the late payments of Real Estate Taxes, utility bills and other costs incurred as a result of Landlord's failure to make such payments when due (except to the extent caused by a default of Tenant hereunder); provided, however, fines, interest or penalties incurred by Landlord in connection with Landlord's good faith appeal or contest of any Real Estate Taxes, utility bills or other costs shall be included in Operating Expenses;

x.        Costs incurred by Landlord which are associated with the operation of the business of the legal entity which constitutes Landlord as the same is separate and apart from the cost of the operation of the Building, recognizing that accounting costs incurred in connection with the determination of Operating Expenses shall be included as an Operating Expense;

xi.    All amounts which would otherwise be included in Operating Expenses which are paid to any affiliate or subsidiary of Landlord, or any representative, employee or agent of same, to the extent the costs of such services exceed the competitive rates for similar services of comparable quality rendered by persons or entities of similar skill, competence and experience;

xii.    Fees paid exclusively for the management of the Building to the extent such fees exceed the greater of (a) competitive rates for similar management services of comparable quality rendered by persons or entities of similar skill, competence and experience; or (b) 3% of gross revenues of the Building;

xiii.    Costs or expenses of utilities directly metered to tenants of the Building and payable separately by such tenants; and

xiv.    Attorneys' fees and costs incurred by Landlord in connection with negotiations or disputes with tenants and prospective tenants of the Building; and

xv.    Cost of capital improvements other than Permitted Capital Expenditures (and except for the replacement of parts or components purchased and installed in the ordinary course which, under generally accepted accounting principles consistently applied, are expense items and not capital expenditures).

2.    **"Real Estate Taxes"** shall mean all taxes, assessments and charges levied upon or with respect to the Land (or any portion thereof), the Building, and any improvements adjacent thereto, including, without limitation, vault rents, if any, franchise taxes, the Transportation Tax (Va. Code § 58.1-3221.3B), any tax, fee or excise on (i) rents, (ii) the square footage of the Premises (including, without limitation, the Business, Professional and Occupational License Tax ("BPOL Tax") administered by Arlington County), (iii) the act of entering into this Lease, or (iv) the occupancy of Tenant, or any tax, fee or excise on account of the rent hereunder or the business of renting space now or hereafter levied or assessed against Landlord by the United States of America or the state, county, city or town in which the Building are located, or any political subdivision, public corporation, district or other political or public entity. Real Estate Taxes shall also include any other tax to the extent that such tax is imposed in lieu of or in addition to such Real Estate Taxes. Reasonable legal fees, costs and disbursements incurred by Landlord in connection with any proceedings for appeal or reduction of any Real Estate Taxes shall also be considered Real Estate Taxes for the year in question. In the event that Real Estate Taxes for the Land and the Building are not separately assessed, Landlord shall allocate to the Land and the Building the portion of the total Real Estate Tax assessment that fairly represents the relative values of all properties that have been assessed together.

3.    **"Tenant's Pro Rata Share (Operating Expenses),"** as of the date hereof, shall be as provided in Section 1, representing the ratio that the rentable area of the Premises bears to the total rentable area of the Building. If either the rentable area of the Premises or the total rentable area of the Building shall be increased or decreased, as reasonably determined by Landlord, Tenant's Pro Rata Share (Operating Expenses) shall be adjusted accordingly, provided that in no instance shall the total rentable area of the Building, for purpose of calculating Tenant's Pro Rata Share, decrease by more than Ten Percent (10%) during the Term as a result of any re-measurement not caused by physical changes to the Building.

4.    **"Tenant's Pro Rata Share (Real Estate Taxes)**," as of the date hereof, shall be as provided in Section 1, representing the ratio that the rentable area of the Premises bears to the total rentable area of the Building.  If either the rentable area of the Premises or the total rentable area of the Building shall be increased or decreased, as reasonably determined by Landlord, Tenant's Pro Rata Share (Real Estate Taxes) shall be adjusted accordingly, provided that in no instance shall the total rentable area of the Building, for purpose of calculating Tenant's Pro Rata Share, decrease by more than Ten Percent (10%) during the Term as a result of any re-measurement not caused by physical changes to the Building.

(ii)    Beginning on the Rent Commencement Date, and thereafter throughout the Term, Tenant shall pay to Landlord, as Additional Rent, an amount ("Tenant's Pass-Through Costs") which is equal to the sum of: (1) the product of (A) the amount of Operating Expenses for each calendar year, multiplied by (B) Tenant's Pro Rata Share (Operating Expenses); and (2) the product of (A) the amount of Real Estate Taxes for each calendar year, multiplied by (B) Tenant's Pro Rata Share (Real Estate Taxes).  Tenant's Pass-Through Costs for any partial calendar year during the Term shall be determined by multiplying the amount of Tenant's Pass-Through Costs for the full calendar year by a fraction, the numerator of which is the number of days during such calendar year falling within the Term and the denominator of which is three hundred sixty-five (365).

(iii)    If at any time during any calendar year during the Term, less than ninety-five percent (95%) of the total rentable area in the Building is occupied by tenants, the amount of Operating Expenses for any such calendar year during the Term shall be deemed to be the amount of Operating Expenses as reasonably estimated by Landlord that would have been incurred if the percentage of occupancy of the Building during any such calendar year during the Term was ninety-five percent (95%).

(iv)    Beginning on the Rent Commencement Date, and continuing on the first day of each calendar month during the Term thereafter until further adjustment pursuant to this Section 4.b., Tenant shall pay to Landlord one-twelfth (1/12) of the amount of Landlord's estimated Tenant's Pass-Through Costs for the calendar year.  On or before the Rent Commencement Date and thereafter during the month of December of each calendar year (or as soon thereafter as is reasonably practicable), Landlord shall use reasonable efforts to furnish to Tenant a statement of Landlord's estimate of Tenant's Pass-Through Costs for the calendar year.  Such statement shall show the amount of Tenant's Pass-Through Costs payable by Tenant for such calendar year pursuant to this Section 4.b. on the basis of Landlord's estimate.  Within one hundred and twenty (120) days after the expiration of each calendar year during the Term (or as soon thereafter as is reasonably practicable), Landlord shall furnish to Tenant a statement (the "Expense Statement") showing the actual Operating Expenses for such calendar year. The Expense Statement shall be conclusive and binding on Tenant.  In case of an underpayment, Tenant shall, within thirty (30) days after the receipt of the Expense Statement, pay to Landlord an amount equal to such underpayment.  In case of an overpayment, Landlord shall credit the next monthly rental payment by Tenant with an amount equal to such overpayment.  Additionally, if this Lease shall have expired, Landlord shall apply such excess against any sums due from Tenant to Landlord and shall refund any remainder to Tenant within one hundred twenty (120) days after the expiration of the Term, or as soon thereafter as possible.

(v)    Subject to the terms and conditions of this 4.b.(v), Tenant shall be entitled to cause a Qualified Auditor (hereinafter defined) to conduct an audit (the "Audit") of Landlord's books and records relating to Landlord's determination of Operating Expenses evidenced by an Expense Statement by providing Landlord, within ninety (90) days following receipt of such Expense Statement, with a written notice of Tenant's exercise of such audit right (the "Audit Notice").  As used herein, the term "Qualified Auditor" means a national (or regionally recognized), independent certified public accounting firm reasonably acceptable to Landlord. In no event may the Qualified Auditor be compensated on a "contingency" or

"success fee" basis. If Tenant elects to conduct an Audit, Tenant and the Qualified Auditor shall execute and deliver to Landlord a confidentiality and nondisclosure agreement on Landlord's standard form, and Tenant shall provide Landlord not less than thirty (30) days' notice of the date on which the Qualified Auditor desires to examine Landlord's books and records; provided, however, that such date (the "Audit Date") shall be between thirty (30) and sixty (60) days after Tenant delivers to Landlord the Audit Notice. Any examination of Landlord's books and records shall occur during regular business hours at Landlord's management office or, at Landlord's election, another location reasonably acceptable to Landlord and Tenant. All costs and expenses of any Audit shall be paid by Tenant. Any Audit shall be limited to a determination of whether Landlord calculated the Expense Statement in accordance with the terms and conditions of this Lease and shall be completed by Tenant (and a copy of the results thereof delivered to Landlord) no later than thirty (30) days following the Audit Date. Notwithstanding anything contained herein to the contrary, (1) Tenant shall be entitled to conduct an Audit pursuant to this Section 4.b.(v) only in strict accordance with the foregoing procedures and not more often than once with respect to each Expense Statement and each such Audit shall relate only to the most recent calendar year covered by the Expense Statement, (2) Tenant shall not be entitled to exercise the forgoing audit right with respect to any Expense Statement if an Event of Default has occurred and remains uncured; and (3) Tenant shall pay all Additional Rent as and when due regardless of, but without prejudice to, Tenant's audit rights pursuant to this Section 4.b.(v). If Landlord disputes the results of any Audit, Landlord shall have the right, exercisable within thirty (30) days following Tenant's delivery to Landlord of the results of Tenant's Audit, to appoint a neutral Qualified Auditor ("Neutral CPA") reasonably acceptable to both Landlord and Tenant to review the results of Tenant's Audit and the determination of the Neutral CPA shall be binding upon both parties. The costs and expenses of the Neutral CPA shall be paid by Tenant; provided, however, if such Neutral CPA shall determine that Landlord has overstated the total Operating Expenses for the Building by more than five percent (5%) for the applicable calendar year, Landlord shall be responsible for the costs and expenses of the Neutral CPA (not to exceed $2,500 in each instance).

(vi)    Landlord shall have the right to commingle Tenant's Pass-Through Costs with other funds collected by Landlord; provided, however, that all monies received from Tenant as Tenant's Pass-Through Costs shall be received by Landlord to pay Operating Expenses and Real Estate Taxes.

(vii)    Tenant's obligation to pay Tenant's Pass-Through Costs with respect to any period during the Term hereof and with respect to any holdover period of occupancy following the expiration of the Term pursuant to the provisions of this Section 4.b. shall survive the expiration or other termination of this Lease.

c.    **Percentage Rent.**

(i)    In addition to the Annual Base Rent and all Additional Rent and as part of the total Rent to be paid, Tenant agrees to pay to Landlord, as Rent, for each Lease Year (or portion thereof falling within the Term) occurring from and after the first (1st) day of the fourth (4th) Lease Year, as "Percentage Rent", an amount equal to the Percentage Rent Factor multiplied by the Gross Sales (as hereinafter defined) of Tenant for such Lease Year that are in excess of Tenant's Breakpoint of Sales. In the event any Lease Year shall consist of a period of less than twelve (12) full calendar months, the Percentage Rent for such Lease Year set forth above shall be reduced by multiplying such Breakpoint of Sales by a fraction, the numerator of which shall be the number of calendar days in such Lease Year, and the denominator of which shall be three hundred sixty-five (365). Percentage Rent shall be computed separately with respect to each Lease Year and there shall be no carry backs or carry forwards with respect to any Lease Year. Percentage Rent shall be paid on a quarterly basis (such payments, the "Quarterly Percentage Rent") as set forth in Section 4.c.(ii) below.

(ii)    Percentage Rent shall be determined and paid, without any prior demand therefor, as follows:

1.    No later than twenty (20) days after the close of each calendar quarter during the Term (including, without limitation, the fifteenth (15th) day of the quarter following the end of the Term, as to which Tenant's obligation shall survive the Lease Expiration Date (or any earlier termination pursuant to any provision of this Lease or by law)), Tenant shall deliver to Landlord a true, correct and complete statement in the form from time to time provided by Landlord, certified as such by an authorized officer or agent of Tenant, showing (a) the Gross Sales made (x) in the immediately preceding calendar quarter, and (y) for the entire elapsed portion of the Lease Year, including the immediately preceding quarter, and including a detailed itemization of any permissible exclusions therefrom as set forth herein, (b) all payments of Quarterly Percentage Rent theretofore made by Tenant in respect of such Lease Year, and (c) a calculation of the Quarterly Percentage Rent then due.  Simultaneously with the rendition of each such statement (the "Quarterly Statement"), Tenant shall pay to Landlord the Quarterly Percentage Rent then due, which shall equal the amount calculated in accordance with Section 4.c.(i) above.

2.    No later than sixty (60) days after the close of each Lease Year during the Term, and within sixty (60) days after expiration of the Term (as to which Tenant's obligation shall survive the Lease Expiration Date or any earlier termination pursuant to any provision of this Lease or by law), Tenant shall deliver to Landlord a true, correct and complete statement (each such statement, an "Annual Gross Sales Statement") of Gross Sales setting forth for the preceding Lease Year (a) Gross Sales for such Lease Year, (b) the aggregate amount paid by Tenant in respect of Percentage Rent for such Lease Year, and (c) the amount by which the aggregate amount paid by Tenant in respect of Percentage Rent in respect of such Lease Year exceeds or is less than, as the case may be, the amount of Percentage Rent that was payable for such Lease Year, calculated based upon the Gross Sales for such Lease Year set forth on such Annual Gross Sales Statement.  The Annual Gross Sales Statement shall be certified by an independent certified public accountant and an officer of Tenant to be in accordance with the requirements of this Section 4.c and with generally accepted accounting principles.  If the aggregate amount paid by Tenant in respect of Percentage Rent in respect of such Lease Year shall be less than the Percentage Rent payable for such Lease Year, then simultaneously with the rendition of such Annual Gross Sales Statement, Tenant shall pay to Landlord the amount of such deficiency.  If the aggregate amount paid by Tenant in respect of Percentage Rent in respect of such Lease Year shall be greater than the Percentage Rent payable for such Lease Year, then, so long as no Event of Default shall then exist, Landlord shall credit the amount of such overpayment against the monthly installments of Rent (other than Annual Base Rent) next due and payable by Tenant.  The acceptance by Landlord of payments of Percentage Rent or reports of Gross Sales shall be without prejudice to Landlord and shall in no event constitute a waiver of Landlord's right to claim a deficiency or to audit Tenant's books and records as provided herein.

(iii)    As used in this Lease, the term "Gross Sales" shall mean the aggregate of all receipts, revenues and income, however characterized, resulting or derived directly or indirectly from the operation of all or part of the Premises for the Permitted Use or otherwise by Tenant or any subtenant, licensee or concessionaire.  Gross Sales shall include, without limitation, (a) revenues from the sale of any food, beverages, goods, wares or merchandise sold or produced at the Premises, whether at wholesale or retail, or for cash, credit, trade-in or otherwise, (b) the proceeds of business interruption insurance received in lieu of any of the foregoing, (c) the gross amount of deposits not refunded, and (d) sales and services,

including, without limitation, coat checking services, (1) where the orders therefor originate in, at or from the Premises, or arise out of the use of the Premises, in any case, whether delivery or performance is made from the Premises or from some other place, (2) made or performed by Internet, computer or telecommunications, mail, telephone, telecopy, or telegraph orders, (3) made or performed by means of mechanical or other vending devices at the Premises, or (4) which Tenant or any subtenant, licensee, concessionaire or other person in the normal and customary course of its business would credit or attribute to its operations in any part of the Premises.  A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (x) the transaction is initially reflected in the books or records of Tenant, or any sublessee, assignee or concessionaire of Tenant, (y) Tenant or such other entity receives all or any portion of the sales price (except in event of receipt of deposits for special rooms or events, in which case only the deposit shall be recognized at time of receipt of the remainder upon receipt by Tenant), or (z) the applicable goods or services are delivered to the customer, whichever first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit, or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time.  Notwithstanding the foregoing, The following items shall be excluded from Gross Sales:  (i) any exchange of merchandise between stores of Tenant when such exchange is made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale made on, in or from the Premises; (ii) returns to shippers or manufacturers; (iii) cash or credit refunds to customers on transactions otherwise included in Gross Sales; (iv) all sums and credits received in settlement of claims for loss or damage to merchandise (except for insurance or other claims to the extent attributable to loss of business); (v) sales of fixtures, machinery and equipment, which are not stock-in-trade, after use thereof in the conduct of Tenant's business; (vi) amounts separately collected from customers and paid by Tenant to any government for any sales or excise tax;  (vii) the amount of discounted sales to employees, not to exceed three percent (3%) of Tenant's annual Gross Sales; (viii) the amount of any delivery fee charges paid by Tenant to unaffiliated third parties to the extent that neither Tenant nor any affiliate of Tenant share in such charges or fees; (ix) the amount of any charges or premiums paid by Tenant to any unaffiliated third party that is in the nature of a service charge for payments made to Tenant via mobile phone or web application to the extent that neither Tenant nor any affiliate of Tenant share in such charges or fees; (x) the amount of any charges or premiums paid by Tenant to any credit card company that is in the nature of a service charge for payments made to Tenant via credit card to the extent that neither Tenant or any affiliate of Tenant share in such charges or fees; and (xi) promotional discounts, coupons. loyalty rewards, and complimentary meals provided no consideration has been or will be paid to Tenant or Tenant's affiliate(s).  No franchise, capital stock tax, tax based upon assets or net worth, value-added tax, or gross receipts tax, and no income or similar tax based on income or profits shall be deducted from Gross Sales.

(iv)     Tenant agrees to prepare, keep and maintain at the Premises (or at any executive offices maintained by Tenant within the Washington, D.C. metropolitan area) for a period of not less than three (3) years following the end of each Lease Year (including following the expiration of the Term, as to which Tenant's obligations hereunder shall survive the Lease Expiration Date or any other termination pursuant to any provision of this Lease or by law), originals of complete and accurate books of account and records, in form and substance satisfactory to Landlord, of all sales and other transactions by Tenant from which Tenant's Gross Sales at, upon or from the Premises can be determined.  Tenant agrees to record all sales, at the time each sale is made, whether for cash or credit, in a cash register or on a substantially equivalent electronic point of sale system.  Tenant's obligations under this Section 4.c. shall survive for a period of three (3) years following the Lease Expiration Date.  The books and records, or their substantially equivalent electronic or digital records, to be kept by Tenant shall include, without limitation, (i) cash register tapes, including tapes from temporary registers if such system is in place; (ii) detailed records of any exclusions or deductions from Gross Sales; (iii) sales tax records and (iv)

such other records, if any, which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of Tenant's sales. If requested by Landlord, Tenant shall submit to Landlord photocopies of the federal, state or local sales tax or similar tax returns filed by Tenant promptly after filing the same with the appropriate governmental authority.

(v)     Landlord (and its representatives) shall have the right, from time to time, to examine and/or cause a complete audit (and to make copies) of any one or more or all statements of Gross Sales and Tenant's books of account and records of Gross Sales and Tenant's procedures for keeping the same and Tenant shall promptly produce such books and records upon Landlord's demand. Tenant shall promptly pay any additional Percentage Rent due Landlord as determined pursuant to any such audit, plus the reasonable third party, out of pocket costs incurred by Landlord for the audit, not to exceed Two Thousand Five Hundred Dollars ($2,500.00) in any one instance.

(vi)    If Tenant fails to deliver any Quarterly Statement as and when due pursuant to the terms of this Lease, Tenant shall pay on demand a late fee of One Hundred and 00/100 Dollars ($100.00) per late statement, as Additional Rent.  Furthermore, if Tenant fails to deliver any Quarterly Statement as and when due pursuant to the terms of this Lease and such failure continues for a period of fifteen (15) days following Landlord's written notice to Tenant of such failure, then such failure shall be an immediate Event of Default and, without limiting any other remedies of Landlord for such Event of Default, (i) Gross Sales for the calendar month for which Tenant fails to deliver a complete Quarterly Statement (prepared as set forth herein) shall be deemed to be one hundred twenty (120%) of the highest reported monthly Gross Sales during the immediately preceding 12-full calendar month period and (ii) the Quarterly Percentage Rent due and payable for such calendar month shall be determined by Landlord on such basis and paid by Tenant to Landlord within five (5) days following Landlord's demand.

d.     **Payment of Rent**.  All Rent shall be paid in lawful money of the United States of America, without deduction, diminution, set-off, counterclaim or prior notice or demand, at Landlord's Address for Payment of Rent (as provided in Section 1 of this Lease) or at such other place as Landlord may hereafter designate in writing.  All such payments shall be made by good checks, or substantially similar electronic payment reasonably approved by Landlord, payable to Landlord or such other person, firm or corporation as Landlord may hereafter designate in writing.  No payment by Tenant or receipt and acceptance by Landlord of a lesser amount than the Monthly Base Rent, Percentage Rent or Additional Rent shall be deemed to be other than partial payment of the full amount then due and payable; nor shall any endorsement or statement on any check or any letter accompanying any check, payment of Rent or other payment, be deemed an accord and satisfaction; and Landlord may accept, but is not obligated to accept, such partial payment without prejudice to Landlord's right to recover the balance due and payable or to pursue any other remedy provided in this Lease or by law.  If Landlord shall at any time or times accept Rent after it becomes due and payable, such acceptance shall not excuse a subsequent delay or constitute a waiver of Landlord's rights hereunder.  Any Rent owed by Tenant to Landlord, including, without limitation, Annual Base Rent, Percentage Rent, Additional Rent, Tenant's Pass-Through Costs and Late Charges (hereinafter defined), which is not paid within five (5) days after the date such payment is due shall bear interest from the due date at a rate (the "Default Rate") equal to the lesser of (i) the prime rate on corporate loans quoted in the Wall Street Journal plus four percent (4%), or (ii) the highest interest rate permitted by law.  In addition, if any amount of Rent required to be paid by Tenant to Landlord under the terms of this Lease is not paid within five (5) days after the date such payment is due, then in addition to paying the amount of Rent then due, Tenant shall pay to Landlord a late charge (the "Late Charge") equal to five percent (5%) of the amount of Rent then required to be paid.  Payment of such Late Charge will not excuse the untimely payment of Rent.  In the event Tenant makes any payment of Rent by check and said check is returned by the bank unpaid, Tenant shall pay to Landlord any and all charges assessed by the bank or payable by Landlord in connection therewith, plus the sum of One Hundred Dollars ($100.00), in addition to the Rent payment and any other charges provided for herein (including

the Late Charge and interest at the Default Rate). Any interest, Late Charge and other amounts charged hereunder shall constitute Additional Rent.

## 5.    SECURITY DEPOSIT.

a.    Upon Tenant's execution and delivery of this Lease to Landlord, Tenant shall deliver to Landlord a security deposit in the amount set forth in Section 1 hereof (the "Security Deposit") to be held by Landlord during the Term as collateral security (and not prepaid rent), for the payment of Annual Base Rent and Additional Rent and for the faithful performance by Tenant of all other covenants, conditions and agreements of this Lease. Landlord shall not be obligated to hold the Security Deposit in a separate account. Landlord shall not be required to pay any interest on the Security Deposit. If any sum payable by Tenant to Landlord shall be overdue and unpaid, or if Landlord makes any payment(s) on behalf of Tenant, or if Tenant fails to perform any of the terms of this Lease, then Landlord, at its option and without prejudice to any other remedy which Landlord may have, may apply all or part of the Security Deposit to compensate Landlord for the payment of Annual Base Rent or Additional Rent, or any loss or damage sustained by Landlord to the extent permitted by this Lease. Tenant shall restore the Security Deposit to the original sum deposited immediately upon Landlord's demand. Provided that Tenant shall have made all payments and performed all covenants and agreements of this Lease, Landlord shall return the Security Deposit to Tenant (except to the extent of any portion of the Security Deposit which has been applied by Landlord and not restored by Tenant) within sixty (60) days after the expiration of this Lease or the vacation of the Premises by Tenant, whichever is later or as soon thereafter as possible.

b.    Notwithstanding the foregoing, at Tenant's election, the Security Deposit may be in the form of an unconditional and irrevocable letter of credit in the form of Exhibit G attached hereto issued by the Bank (hereinafter defined) (the "Letter of Credit") in the face amount of Sixty-Five Thousand and No/100 Dollars ($65,000.00). As used herein, the term "Bank" means a federally-insured banking institution located in the Washington, D.C. metropolitan area and reasonably acceptable to Landlord, and having total assets of at least Three Billion Dollars ($3,000,000,000.00) and a Standard & Poor's commercial paper rating of at least A-1. Tenant shall pay all costs and expenses of the Letter of Credit, including without limitation, any fees charged by Bank in connection with any replacement or transfer of same. If the Letter of Credit (or any replacement thereof) is issued for an effective period of time less than the remaining Term of this Lease (or any renewal thereof), Tenant shall from time to time, and not later than sixty (60) days prior to the expiration of the Letter of Credit, replace each such expiring Letter of Credit with a new Letter of Credit in the same amount and upon the same terms. The Letter of Credit (and any replacement thereof) may be drawn upon by Landlord under the terms and conditions provided in this Section 5. Failure of Tenant to renew the Letter of Credit at least sixty (60) days prior to its expiration shall constitute an Event of Default under this Lease and shall entitle Landlord, in addition to the other remedies contained in this Lease, to draw upon the Letter of Credit.

c.    Landlord (or the beneficiary under the Letter of Credit, if such beneficiary is not Landlord) shall have the right to draw upon the Letter of Credit in any of the following circumstances (in addition to any other right to draw on the Security Deposit that is set forth in this Section 5): (i) if the total assets of the issuer of the Letter of Credit are at any time less than Three Billion Dollars ($3,000,000,000), or such issuer has a Standard & Poor's commercial paper rating of less than A-1 (provided if at any time the current Standard & Poor's commercial paper rating system is no longer in existence, a comparable rating of a comparable commercial paper rating system from a comparable company shall be selected by Landlord, in its reasonable discretion, for purposes of this Section 5), (ii) if the credit rating of the issuer of the Letter of Credit is downgraded from the credit rating of such issuer at the time of the issuance of the Letter of Credit, the issuer of the Letter of Credit shall enter into any supervisory agreement with any governmental authority, or the issuer of the Letter of Credit shall fail to meet any capital requirements imposed by applicable law, (iii) if Tenant fails to provide Landlord with any renewal or replacement Letter of Credit complying with the terms of this Lease at least sixty (60) days prior to expiration of the then-current Letter of Credit where the issuer of such Letter of Credit has advised Landlord of its intention not to renew

the Letter of Credit, (iv) if Tenant fails to provide Landlord with any renewal or replacement Letter of Credit complying with the terms of this Lease at least sixty (60) days prior to the final expiration date (i.e., the date that, by the terms of the Letter of Credit, the Letter of Credit expires and is either not subject to any automatic renewal or extension or the conditions to such automatic renewal or extension have not then been satisfied) of the then-current Letter of Credit if such Letter of Credit expires prior to the date that is ninety (90) days after the end of the Term, or (v) any voluntary or involuntary proceedings are filed by or against Tenant (or any guarantor of this Lease) under any bankruptcy, insolvency or  similar laws. In the event the Letter of Credit is drawn upon due solely to the circumstances described in the foregoing clauses (i) and  (ii), Landlord shall not draw on the Letter of Credit without first giving Tenant notice and thirty (30) days to obtain a replacement Letter of Credit meeting the requirements of this Section 5.  In the event the Letter of Credit is drawn upon due solely to the circumstances described in the foregoing clauses (i), (ii), (iii), (iv) or (v), the amount drawn shall be held by Landlord as a cash Security Deposit in accordance with the terms of this Section 5, and shall be otherwise retained, expended or disbursed by Landlord for any amounts or sums due under this Lease to which the proceeds of the Letter of Credit could have been applied pursuant to this Lease, and Tenant shall be liable to Landlord for restoration, in cash or Letter of Credit complying with the terms of this Lease, of any amount so expended to the same extent as set forth in this Section 5.

d.      In the event of the sale or transfer of Landlord's interest in the Building, Landlord shall have the right to transfer the Security Deposit to the purchaser or assignee of Landlord's interest in the Building, and upon notification of Tenant of such transfer Tenant shall look only to the new landlord for the return of the Security Deposit, and Landlord shall thereupon be released from all liability to Tenant for the return of the Security Deposit.  Tenant hereby agrees not to look to the mortgagee, as mortgagee, mortgagee in possession, or successor in title to the property, for accountability for the Security Deposit, unless said sums have actually been received by said mortgagee as security for Tenant's performance of this Lease.  In the event of any permitted assignment of Tenant's interest in this Lease, the Security Deposit may, at Landlord's sole option, be held by Landlord as a deposit made by the assignee, and Landlord shall have no further liability to Tenant with respect to the return of the Security Deposit.

## 6.      USE.

a.      Tenant covenants and agrees to open for business to the public in the Premises no later than the Rent Commencement Date and to operate continuously thereafter during the Term for the Minimum Operating Hours (hereinafter defined).  Unless other hours are approved by Landlord in writing, Tenant shall cause the Premises to be open continuously for business, fully fixtured and staffed, at least during the Minimum Operating Hours.  As used herein, the term "Minimum Operating Hours" means fifty (50) hours per week, including lunch service Monday through Friday and dinner service seven (7) days per week. Notwithstanding the foregoing, Tenant may temporarily close for business on Federal Holidays, due to abnormally inclement weather, or for maintenance, in each case in the exercise of its reasonable discretion, so long as continues to be open for business during a minimum of fifty (50) hours per week during any period in which such temporary closure may occur.

b.      Tenant covenants with Landlord to use the Premises solely for the Permitted Use.  Tenant shall not use the Premises or allow the Premises to be used for any purpose other than the Permitted Use.  Tenant, at Tenant's expense, shall comply with all laws, codes, rules, orders, ordinances, directions, regulations, and requirements of federal, state, county, and municipal authorities, now in force or which may hereafter be in force, which shall impose any duty upon Landlord or Tenant with respect to the condition, maintenance, use, occupation, operation or alteration of the Premises, or the conduct of Tenant's business therein, including, without limitation, the Americans with Disabilities Act of 1990, as amended (the "ADA"),   and all regulations promulgated thereunder, all Environmental Laws (hereinafter defined), and all applicable zoning and recycling laws and regulations (all of the foregoing collectively referred to herein as the "Legal Requirements").  Tenant hereby agrees to indemnify and hold harmless Landlord and its agents,

officers, directors and employees from and against any cost, damage, claim, liability and expense (including attorneys' fees) arising out of claims or suits brought by third parties against Landlord, its agents, officers, directors and employees alleging or relating to the failure of the Premises to comply with Legal Requirements, including without limitation, the ADA, except to the extent that such failure is caused by Landlord's negligence or willful misconduct with respect to the common areas of the Building.

c.      Notwithstanding anything to the contrary contained in this Lease, Tenant shall not use or permit the use of space in the Premises for any of the Prohibited Uses set forth on Exhibit E hereto.

d.      Unless otherwise approved by Landlord in writing, Tenant shall conduct business in the Premises only in Tenant's Trade Name as set forth in Section 1 hereof.

e.      Tenant shall furnish and install all trade fixtures which may be necessary or desirable for carrying on Tenant's business, and shall maintain adequate trained personnel for the Permitted Use. Tenant shall operate the Premises, and Tenant's business, in a first-class manner, and Tenant's practices associated with its Permitted Use shall be consistent with the standards and practices generally acceptable in other mixed-use buildings comparable to the Building in terms of age, size and location in Arlington, Virginia leasing submarket ("Comparable Buildings").

f.      In order that the Building can and will maintain a uniform and high quality appearance to those persons outside of the Premises, Tenant shall (i) in areas where lighting is visible from the outside of its Premises, use only lighting which has been previously approved by Landlord in writing, and (ii) in window areas, use only curtains, blinds, shades, screens or other window coverings which have previously been approved by Landlord in writing.  Tenant shall not display in the windows of the Premises or place in a location visible from the windows or glass door of the Premises any items to which Landlord objects.

g.      Tenant shall light the display window and signs for the Premises, if any, during the Minimum Operating Hours.  In order that the Building can and will maintain a uniform and high quality appearance to those persons outside of the Premises, Tenant shall (i) in areas where lighting is visible from the outside of its Premises, use only lighting which has been previously approved by Landlord in writing, and (ii) in window areas, use only curtains, blinds, shades, screens or other window coverings which have previously been approved by Landlord in writing.  Tenant shall not display in the windows of the Premises or place in a location visible from the windows or glass door of the Premises any items to which Landlord objects.

h.      Nothing shall be done or permitted by Tenant which would impair or interfere with the use or enjoyment by any other tenant or any visitor of the Building.  Without limiting the generality of the foregoing, Tenant shall not use or permit the Premises or any part thereof in any manner that constitutes waste, nuisance or unreasonable disturbances to other tenants of the Building or for any disorderly, unlawful or hazardous purpose and will not store or maintain therein any hazardous, toxic or highly combustible items other than usual and customary supplies intended for Tenant's Permitted Use, such as combustible or flammable cooking fuel, and in such event, only in compliance with, and in such amounts as permitted by, all applicable Legal Requirements. Tenant agrees that it will conduct its business in good faith, and will not do any act tending to injure the reputation of the Building (or any part thereof) as determined by Landlord.

i.      Tenant shall not put the Premises to any use, the effect of which use is reasonably likely to cause cancellation of any insurance covering the Premises or the Building, or an increase in the premium rates for such insurance.  In the event that Tenant performs or commits any act, the effect of which is to raise the premium rates for such insurance, Tenant shall pay Landlord the amount of the additional premium, as Additional Rent payable by Tenant upon demand therefor by Landlord.  The Premises shall not be used for any illegal purpose or in violation of any Legal Requirements or the regulations or directives of Landlord's insurance carriers, or in any manner which interferes with the quiet enjoyment of any other tenant of the Building.

j.      Tenant shall not permit odors to emanate from the Premises which are objected to by Landlord and, upon written notice from Landlord, Tenant shall have twenty-four (24) hours to cure such odor.  Tenant's failure to cure such odors within twenty-four (24) hours after receiving written notice thereof from Landlord shall constitute a material breach of this Lease, provided that, if it is not reasonably possible for Tenant to cure such odors within such twenty-four (24) hour period, Tenant shall not be deemed to be in breach of this Lease so long as Tenant shall commence efforts to effect such cure within such twenty-four (24) hour period and thereafter proceed with reasonable diligence to complete such cure within a reasonable period of time, not to exceed five (5) days in any event.  The parties hereby acknowledge that the Tenant Improvements shall include the installation of an exhaust vent to service the Premises and exhaust out the Building smoke, steam, and fumes generated therein (such exhaust vent and any and all related equipment is herein referred to as the "Exhaust Vent").  Tenant, at Tenant's sole cost and expense, shall ensure that the Exhaust Vent is regularly cleaned and maintained in good working order and repair and in compliance with all Legal Requirements at all times.  Prior to operation of the Exhaust Vent, Tenant shall enter into an continuous service contract with a contractor, approved by Landlord, such approval not to be unreasonably withheld, conditioned, or delayed, for the cleaning and routine maintenance of the Exhaust Vent (the "Vent Maintenance Contract").  The Vent Maintenance Contract shall require maintenance of the Exhaust Vent in accordance with the cleaning and maintenance plan approved by Landlord, with such approval not to be unreasonably withheld, conditioned, or delayed; provided, however, Landlord shall have the right to change the frequency or scope of such inspection, cleaning and maintenance plan upon written notice from Landlord if Landlord reasonably determines that such change is necessary or reasonably advisable.  Tenant shall furnish Landlord with a copy of such Vent Maintenance Contract prior to operation of the Exhaust Vent and thereafter shall provide Landlord, on a monthly basis and upon demand by Landlord, with copies of paid invoices evidencing Tenant's payment of all costs and expenses payable by Tenant pursuant to such Vent Maintenance Contract. If Tenant fails to enter the Vent Maintenance Contract as required hereunder, Landlord may engage its own contractor to provide cleaning and maintenance of the Exhaust Vent, and Tenant shall pay all costs and expenses incurred by Landlord in connection with same, plus a fifteen percent (15%) administrative fee, as Additional Rent.  All costs and expenses associated with the operation, maintenance and repair (and, if necessary, replacement) of the Exhaust Vent shall be the sole responsibility of Tenant and Tenant shall indemnify and hold harmless Landlord from any and all such costs and expenses.

k.      Tenant shall, at Tenant's sole cost and expense, cause the Premises to be exterminated from time to time to the satisfaction of Landlord as is necessary to prevent the presence of vermin, rodents or other pests therein and shall employ exterminators which are approved by Landlord, with such approval not be withheld, conditioned, or delayed. Tenant shall enter into an continuous service contract with a contractor, approved by Landlord, such approval to be withheld, conditioned, or delayed, to provide pest extermination services to the Premises in accordance with a schedule reasonably approved by Landlord; provided, however, Landlord shall have the right to change the frequency or scope of such inspection, cleaning and maintenance plan upon written notice from Landlord if Landlord reasonably determines that such change is necessary or reasonably advisable.  Tenant shall furnish Landlord with a copy of such pest extermination contract prior to the date on which Tenant first opens for business to the public in the Premises and thereafter shall provide Landlord, on a monthly basis and upon demand by Landlord, with copies of paid invoices evidencing Tenant's payment of all costs and expenses payable by Tenant pursuant to such contract. If Tenant fails to enter a pest extermination contract as required hereunder, Landlord may engage its own contractor to provide pest extermination services to the Premises, and Tenant shall pay all costs and expenses incurred by Landlord in connection with same, plus a fifteen percent (15%) administrative fee, as Additional Rent.  All costs and expenses associated with the extermination of vermin, rodents and other pests from the Premises shall be the sole responsibility of Tenant, and Tenant shall indemnify and hold harmless Landlord from any and all such costs and expenses.

l.      The parties hereby acknowledge that the Tenant Improvements shall include the installation of one or more grease traps to service the Premises to eliminate the problem of sewer back-up and

health hazards (such grease traps and any and all related equipment herein referred to as the "Grease Traps").  Tenant, at Tenant's sole cost and expense, shall ensure that the Grease Traps are regularly cleaned and maintained in good working order and repair and in compliance with all Legal Requirements at all times.  Prior to operation of the Grease Traps, Tenant shall enter into an continuous service contract with a contractor, approved by Landlord, with such approval not to be unreasonably withheld, conditioned, or delayed, for the cleaning and routine maintenance of the Grease Traps (the "Trap Maintenance Contract").  The Trap Maintenance Contract shall require maintenance of the Grease Traps in accordance with the cleaning and maintenance plan reasonably approved by Landlord; provided, however, Landlord shall have the right to change the frequency or scope of such inspection, cleaning and maintenance plan upon written notice from Landlord if Landlord reasonably determines that such change is necessary or reasonably advisable.  Tenant shall furnish Landlord with a copy of such Trap Maintenance Contract prior to operation of the Grease Traps and thereafter shall provide Landlord, on a monthly basis and upon demand by Landlord, with copies of paid invoices evidencing Tenant's payment of all costs If Tenant fails to enter the Trap Maintenance Contract as required hereunder, Landlord may engage its own contractor to provide cleaning and maintenance of the Grease Traps, and Tenant shall pay all costs and expenses incurred by Landlord in connection with same, plus a fifteen percent (15%) administrative fee, as Additional Rent.  All costs and expenses associated with the acquisition, installation, operation, maintenance and repair (and, if necessary, replacement) of the Grease Traps shall be the sole responsibility of Tenant, and Tenant shall indemnify and hold harmless Landlord from any and all such costs and expenses.

m.      Tenant shall not place nor allow to be placed or accumulated in public or other areas of the Building or the Land outside of the Premises (except in areas reasonably designated by Landlord), any garbage, rubbish or refuse or receptacles for the same.  Tenant shall cause all trash to be removed from the Premises and deposited in designated trash and recycling dumpsters and compactors (located in the vicinity of the loading dock for the Building) and shall access such dumpsters and compacters through the back hallway from the rear entry to the Premises, along a route designated by Landlord from time to time.  In no event shall Tenant be permitted to remove trash through the lobby of the Building.  All garbage and refuse from the Premises shall be stored, handled and transported by Tenant in such manner as will prevent odors and vermin.  Solid waste and wet garbage must be held in kitchen or storage areas and may only be removed from the Premises between the hours approved in advance by Landlord, with such approval not to be unreasonably withheld, conditioned, or delayed.  Under no circumstances shall garbage be left in or outside of the Premises overnight, nor may garbage be stored at or picked up from any curb side adjacent to the Building or stored in service corridors.  In the event of any interruption of regularly scheduled garbage pickups, Tenant shall take all action required to remove Tenant's garbage and refuse from the Building on a daily basis.  Tenant shall be responsible for any spillage or residue of garbage and refuse from the Premises outside the Premises and shall immediately remove such spillage or residue upon its occurrence. The removal of said dirt, rubbish and other refuse matter shall be at the expense of Tenant and Tenant shall employ only such cleaning, garbage and trash removal contractors as may be approved by Landlord.

Landlord's dumpster removal service shall be conducted in a manner that Landlord shall deem appropriate.  Tenant shall comply with any additional rules and regulations required by Landlord in connection with Landlord's provision of any such service. Tenant shall pay, as part of Operating Expenses, all costs and expenses associated with providing dumpster removal/hauling services to the Premises.

Tenant shall provide, at Tenant's sole cost and expense, contractors to clean the Premises and such service shall be provided for each day Tenant is open for business; provided, however, that Tenant may elect instead to perform such cleaning using its own employees so long as such cleaning is performed as and when required.  In the event Landlord determines that Tenant's employees are not properly cleaning the Premises in accordance herewith, Landlord may require Tenant to provide, at Tenant's sole cost and expense, contractors to perform such cleaning and any such contractors shall be subject to the reasonable approval of Landlord.

n.  Tenant agrees to maintain the Premises, and the Tenant Improvements and other Alterations (hereinafter defined) therein, in good order, repair and condition during the Term at Tenant's sole cost and expense.  Except as otherwise expressly provided in this Lease, Landlord shall have no obligation to Tenant to make any repairs in or to the Premises, the Tenant Improvements or any Alterations.  Any and all damage or injury to the Premises (including, but not limited to, the Tenant Improvements), the Building or the Land caused by Tenant, or by any employee, agent, contractor, assignee, subtenant, invitee or customer of Tenant shall be promptly reported to Landlord and repaired by Tenant at Tenant's sole cost; provided, however, that Landlord shall have the option of repairing any such damage, in which case Tenant shall reimburse Landlord for all costs incurred by Landlord in respect thereof, as Additional Rent, within fifteen (15) days after Tenant receives Landlord's notice of such costs.

o.  Tenant shall not place a load upon the floor of the Premises exceeding the designated floor load capacity of the Building.

p.  Tenant shall not use the public areas of the Building and/or the sidewalks adjacent thereto for any purpose other than ingress to or egress from the Premises, nor, without limiting the generality of the foregoing, shall Tenant place or conduct any advertising, marketing, promotion, distribution of samples, or storage of goods, materials or trash in, on, or about such areas.  Tenant shall not store anything in service or exit corridors.

q.  No auction, liquidation, going out of business, fire or bankruptcy sales may be conducted or advertised by sign or otherwise in the Premises.  Tenant shall not display or sell any goods containing portrayals which Landlord determines, in its sole but reasonable discretion, to be lewd, graphically violent or pornographic. Tenant shall not sell or display any paraphernalia used in the preparation or consumption of controlled substances.  Tenant shall not permit the operation of any coin operated or vending machines or pay telephones on the Premises.  Tenant shall not use or permit the use of any portion of the Premises as sleeping quarters, lodging rooms, or for any unlawful purposes.  Tenant shall not install any radio or television or other similar device exterior to the Premises and shall not erect any aerial on the roof or exterior walls of the Building, except as follows:

During the Term of this Lease, and subject to the terms and conditions of this Section 6.q, Tenant shall have the non-exclusive right, at no additional charge, to use a portion of the roof of the Building designated by Landlord for the installation of one (1) satellite dish or antenna not exceeding one (1) meter in diameter and four feet (4') in height, together with the conduit extending from such dish and/or antenna to the Premises (collectively, the "Rooftop Equipment"); provided, however, (i) the installation and operation of the Rooftop Equipment must be permitted under, and conform to all Legal Requirements, (ii) Tenant shall cause the Rooftop Equipment to be fully screened from view and sound in a manner reasonably directed by Landlord, and (iii) Landlord shall have approved in its reasonable discretion all aesthetic, structural, mechanical and electrical details of the Rooftop Equipment, including, without limitation, the proposed method of attaching the Rooftop Equipment to the roof.  Tenant shall be entitled to connect the Rooftop Equipment to the Building's electric power source; provided, however, that: (A) the method of connecting any component of the Rooftop Equipment to the Building's electric power source and the specific location in the Building at which such connection shall be effected, shall be subject to Landlord's prior approval; and (B) such connection shall be undertaken by licensed contractor(s) approved by Landlord (such approval not to be unreasonably withheld, conditioned or delayed).  The cost of connecting the Rooftop Equipment to the Building's electric power source and the cost of all electricity consumed by the Rooftop Equipment shall be paid by Tenant.

Prior to or contemporaneous with requesting Landlord's approval of the installation of the Rooftop Equipment, Tenant shall provide to Landlord:  (i) plans and specifications for the Rooftop Equipment; and (ii) copies of all required governmental and quasi-governmental permits, licensees, special zoning variances, and authorizations for the installation and operation of the

Rooftop Equipment, all of which Tenant shall obtain at its own cost and expense. Landlord may withhold its approval of the installation of the Rooftop Equipment if the installation, operation or removal of the Rooftop Equipment may (A) interfere with and/or materially and adversely affect the structure of the Building or any of the base Building systems, and/or void any warranty or guaranty applicable to the Building; or (B) cause the violation of any Legal Requirement. Landlord may require as a precondition to its approval of the installation of the Rooftop Equipment that Tenant (or, at Landlord's option, Landlord) install a walkway and/or additional structural support, in a manner reasonably determined by Landlord's engineer in its sole discretion, to the portion of the roof on which Tenant desires to install the Rooftop Equipment.

Tenant shall maintain the Rooftop Equipment in good condition and repair throughout the Term of this Lease. Landlord shall have access to the portion of the roof on which the Rooftop Equipment is located in order to inspect the Rooftop Equipment and the roof to determine, *inter alia*, if the Rooftop Equipment is causing damage to the roof or any other part of the Building and/or to repair the roof or remove or relocate the Rooftop Equipment. Landlord, at its sole option and discretion, may require Tenant, at any time prior to the expiration of this Lease, to terminate the operation of the Rooftop Equipment if any such equipment (i) interferes with and/or adversely affects the base Building or any of the base Building systems, (ii) threatens to void any warranty or guaranty applicable to the Building; (iii) generates noise or vibration which disrupts other tenants of the Building, or is interfering with any rooftop equipment being operated on the roof or elsewhere in the Building by any tenant in the Building or other licensee authorized by Landlord; (iv) violates any Legal Requirement, or (v) is not maintained in good condition and repair. Without limiting the other terms and conditions of this Lease but in furtherance thereof, Tenant acknowledges and agrees that Landlord has the right to remove, alter, improve, renovate or rebuild the common areas of the Building at any time during the Term. In connection with Landlord's exercise of the foregoing right, Landlord shall have the right, upon fifteen (15) days prior notice to Tenant, to temporarily suspend Tenant's use of the Rooftop Equipment and/or relocate the Rooftop Equipment. In connection with Landlord's exercise of the foregoing rights, Landlord shall not be liable to Tenant for any expense, injury, loss or damage resulting from Landlord's exercise of any of the foregoing rights, or for damages by reason of interference with the business of Tenant or inconvenience or annoyance to Tenant or the customers or clients of Tenant, all such claims against Landlord for any and all such liability being hereby expressly released by Tenant.

Tenant acknowledges that the rights contained in this Section are non-exclusive, and that Landlord may grant such rights to any other tenant in the Building or any other licensee of Landlord's choice (whether or not such licensee is a tenant of the Building). At the expiration or earlier termination of this Lease, Tenant, at Tenant's sole cost, shall remove the Rooftop Equipment and all cabling and other equipment relating thereto from the Building, and Tenant shall restore the area where the Rooftop Equipment was located to its condition existing prior to such installation. In the event Tenant fails to promptly do so, Tenant hereby authorizes Landlord to remove the Rooftop Equipment and all cabling and other equipment relating thereto and restore the area of the roof and the other portions of the Building affected thereby, and charge Tenant for all costs and expenses incurred in connection therewith. Tenant's obligation to perform and observe this covenant shall survive the expiration or earlier termination of the Term of this Lease. In no event shall Landlord's approval of the installation or operation of Rooftop Equipment constitute any representation or warranty by Landlord that such installation and operation is in compliance with Legal Requirements or any warranty or guaranty applicable to the roof of the Building. Landlord expressly makes no representations or warranties with respect to the suitability or fitness of the roof for the Rooftop Equipment or Legal Requirements associated with the installation or operation of the Rooftop Equipment.

Tenant covenants and agrees that the installation, operation, maintenance and removal of the Rooftop Equipment shall be at Tenant's sole risk, cost and expense, and Landlord assumes no liability or responsibility whatsoever with respect to the installation, operation and removal of the Rooftop Equipment. Tenant shall indemnify and hold Landlord and Landlord Parties harmless from and against any cost, damage, claim, liability or expense (including attorneys' fees) incurred

by or claimed against Landlord and Landlord Parties, directly or indirectly, as a result of or in any way arising from the installation, operation, maintenance or removal of the Rooftop Equipment, including without limitation, any loss or injury resulting from transmissions from the Rooftop Equipment.

r.       The Building is, or may become in the future, certified under certain Green Agency Ratings (as hereinafter defined) or operated pursuant to Landlord's sustainable building practices (as same may be in effect or modified from by Landlord from time to time, the "Sustainable Building Practices").  The Sustainable Building Practices may include, without limitation, whole-building operations and maintenance issues such as, but not limited to: chemical use; indoor air quality; energy efficiency; water efficiency; recycling programs; exterior maintenance programs; and systems upgrades to meet green building energy, water, indoor air quality, and lighting performance standards. Tenant shall not use or operate the Premises in any manner (as determined by Landlord) that will cause the Building, the Premises, or any part thereof not to conform with the Sustainable Building Practices or any certification of the Building (or the Premises) or any part thereof, issued pursuant to any applicable Green Agency Rating.  Any and all Alterations to the Premises must be designed and constructed consistent with the Sustainable Building Practices and certain Green Agency Ratings (as determined by Landlord).  As used herein, the term "Green Agency Ratings" means any one or more of the following ratings, as same may be in effect or amended or supplemented from time to time:  The U.S. EPA's Energy Star® rating and/or Design to Earn Energy Star, the Green Building Initiative's Green GlobesTM for Continual Improvement of Existing Buildings (Green GlobesTM-CIEB), the U.S. Green Building Council's Leadership in Energy and Environmental Design® (LEED) rating system, LEED EBOM (existing buildings operations and maintenance) and any applicable substitute third party or government mandated rating systems.

s.       Tenant shall replace within twenty-four (24) hours, at Tenant's sole cost and expense, any and all plate and other glass damaged or broken from any cause whatsoever in and about the Premises; provided, however, Landlord shall have the option of replacing any such plate glass windows, at Tenant's sole cost and expense.  If it is not reasonably possible for Tenant to complete such replacement within such twenty-four (24) hours, Tenant shall commence efforts to make such replacement within such twenty-four (24) hours and thereafter proceed with due diligence to complete such replacement within a reasonable period of time, not to exceed five (5) days in any event.

t.       At the expiration of the Term or any earlier termination of this Lease, Tenant shall surrender and deliver the Premises, and all keys, locks and other fixtures connected therewith (excepting only Tenant's personal property, including moveable equipment and furniture), to Landlord in good order, repair and condition, as the same shall be at the Commencement Date, except as repaired, rebuilt, restored, altered or added to pursuant to this Lease, and except for ordinary wear and tear and damage due to insured casualty not caused by Tenant or any of its agents, employees, contractors or invitees.

u.       Subject to county approval and full compliance with the requirements of Tenant's food service and liquor licenses, all applicable noise ordinances and other local regulations, and of all the terms of this Lease, including, without limitation, this Section 6.u, Tenant's Permitted Use may include late night DJ entertainment and Live Music (as hereinafter defined) solely during the following hours: Thursday through Sunday (and any evening preceding a federal holiday), 5:30 p.m. to 1:30 a.m. (the "Music Hours").  For the purposes hereof, the defined term "Live Music" shall be deemed to refer solely to a single person equipped with a keyboard, acoustic guitar, harmonica, or similar small non-electric instrument (which person may be accompanied by up to three (3) vocalists who are not playing any instruments) and a microphone, and shall in no event include the playing of any drums, electrical guitars or other similar instruments or a band of any kind (any other reference in this Lease to "live music" shall be deemed to refer to live music as such term is commonly defined).

v.      Tenant shall not permit the emission from the Premises of any noise, sounds or vibrations which are audible or detectable to humans outside of the Premises (any such emission herein referred to as a "Sound Violation").   A Sound Violation shall be a material breach of Tenant's obligations under this Lease.  Following receipt of written notice from Landlord of a Sound Violation, Tenant shall immediately cease any and all activities identified by Landlord as a Sound Violation until Tenant has installed within the Premises such noise and vibration attenuation materials and other sound mitigation insulation in the Premises as necessary to prevent such Sound Violation from re-occurring (collectively, "Sound Mitigation Improvements").  For the avoidance of doubt, any and all Sound Mitigation Improvements shall be deemed Alterations subject to Landlord's prior written approval and the terms and conditions of Section 8 of this Lease.

w.      Tenant shall not place or permit any radio, television, music, loudspeaker or amplifier on the roof or outside the Premises or where the same can be heard from outside the Premises, nor shall Tenant place any antenna, equipment or other projection on the exterior of the Premises (except as otherwise expressly permitted in Section 6.q above with respect to Tenant's satellite), permit any live music to be played from the Premises (except for Live Music played during the Music Hours pursuant to the express terms hereof), or take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Building or unreasonably interfere with their use of the respective premises.  Tenant shall not permit any unlawful or immoral practice to be carried on or committed in the Premises, nor do anything which would tend to injure the reputation of the Building.

x.      In no event shall Tenant be permitted to install, or allow to be installed, in the Premises any dance floor, whether temporary or permanent, or any other area designated at any time solely for the purpose of dancing, whether or not in connection with the Live Music or DJ entertainment permitted hereunder.  Notwithstanding the forgoing, Tenant may rearrange or remove furniture to allow an increase of standing room occupancy at its' sole discretion, and such shall not be considered the installation of a dance floor.  No flashing lights or searchlights which may be experienced outside the Premises shall be permitted.

y.      Without limiting any other obligations of Tenant under this Lease, or the rights or remedies of Landlord under this Lease, if Landlord receives a complaint from other tenants of the Building or any surrounding buildings with respect to noise, vibrations or odors from the Premises, Tenant shall cooperate with Landlord to resolve such complaints by mitigating the noises, vibrations and odors and/or lowering the volume of any music that is played in the Premises to a level that is reasonably satisfactory to Landlord.


7.      **ASSIGNMENT AND SUBLETTING.**

a.      Tenant shall not, without the prior written consent of Landlord, which consent may be granted or withheld by Landlord in its sole and absolute discretion (except in cases of a bona fide sale of Tenant's business or substantially all of its assets, in which case such consent shall not be unreasonably withheld, conditioned, or delayed), in each instance:  (i) assign or otherwise transfer this Lease or any of Tenant's rights hereunder, (ii) sublet the Premises or any part thereof, or permit the use of the Premises or any part thereof by any persons other than Tenant or its employees, agent and invitees, or (iii) permit the assignment or other transfer of this Lease or any of Tenant's rights hereunder by operation of law.  In addition, the following conditions must be satisfied at the time Tenant requests Landlord's consent to an assignment or sublease:

(i)      no Event of Default (hereinafter defined) exists and no event has occurred and remains uncured which, with notice and/or the passage of time, would constitute an Event of Default if not cured within the time, including any applicable grace period, specified herein;

(ii)     Landlord receives at least thirty (30) days prior written notice of Tenant's intention to assign this Lease or sublet any portion of the Premises;

(iii)    the proposed use or occupant of the Premises will not violate any agreement affecting the Premises or the Building;

(iv)    Tenant submits to Landlord at least thirty (30) days prior to the proposed date of subletting or assignment whatever information Landlord reasonably requests in order to permit Landlord to make a judgment on the proposed subletting or assignment, including, without limitation, the name, business experience, financial history, net worth and business references of the proposed assignee or subtenant (and each of its principals), an in-depth description of the transaction, and the consideration delivered to Tenant for the assignment or sublease;

(v)    the proposed assignee or subtenant is not a tenant of the Building or a prospective tenant who, within the six (6) months prior to Tenant's request, has talked to Landlord or its brokers or agents about the possibility of leasing space in the Building;

(vi)    Tenant has not requested approval of a sublease within the prior twelve (12) months and Tenant has not previously sublet any portion of the Premises; and

(vii)    Tenant has paid to Landlord an administrative fee in the amount of One Thousand Dollars ($1,000.00) which shall be retained by Landlord whether or not such consent is granted.

b.    All proposed subleases and assignments shall be on a form of sublease or assignment, whichever is applicable, approved by Landlord; and shall, inter alia, (i) include an assumption by the assignee or subtenant, from and after the effective date of such assignment or sublease, of the performance and observance of the covenants and conditions to be performed and observed on the part of Tenant as contained in this Lease, (ii) specify that this Lease or sublease shall not be further assigned nor the Premises further sublet, and (iii) specify that the term of such sublease shall not extend beyond the date which is one (1) day prior to the expiration of this Lease.  The consent by Landlord to any assignment, transfer or subletting to any person or entity shall not be construed as a waiver or release of Tenant from any provision of this Lease, unless expressly agreed to in writing by Landlord (it being understood that Tenant shall remain primarily liable as a principal and not as a guarantor or surety), nor shall the collection or acceptance of rent from any such assignee, transferee, subtenant or occupant constitute a waiver or release of Tenant from any such provision.  No consent by Landlord to any such assignment, transfer or subletting in any one instance shall constitute a waiver of the necessity for such consent in a subsequent instance.  Upon Landlord's request and as a condition to Landlord's consent to any assignment or sublease, Tenant and each assignee or subtenant, as applicable, shall execute Landlord's then-current consent form, which, among other things, shall reaffirm the foregoing provisions of this Section 7.b.  In addition to the administrative fee set forth above, Tenant shall reimburse Landlord upon demand, as Additional Rent, an amount equal to any and all third-party legal and/or accounting fees and expenses or other costs and expenses incurred by Landlord in connection with a request by Tenant to undertake any assignment of this Lease or subletting of all or any portion of the Premises, not to exceed Two Thousand Five Hundred Dollars ($2,500.00) in each instance (provided that the subtenant does not seek recognition protections from Landlord), whether or not Landlord consents to such assignment or subletting.

c.    In the event that Tenant assigns this Lease or sublets all or any portion of the Premises, Tenant shall pay to Landlord, as Additional Rent, an amount equal to fifty percent (50%) of the difference, if any, between (i) all sums paid to Tenant or its agent by or on behalf of such assignee or subtenant under the assignment or sublease after deducting Tenant's reasonable, actual expenses of obtaining such assignment or subleasing, including, but not limited to, brokerage commissions, tenant improvement or other allowances or concessions granted and actually paid out by Tenant, advertising and marketing costs incurred, and legal fees (with all such expenses amortized on a straight-line basis over the term of the proposed sublease or over the term of the assignment), and (ii) the Annual Base Rent, Percentage Rent and Additional Rent paid by Tenant under this Lease and attributable to the portion of the Premises assigned or sublet.  Nothing

herein shall be construed as to require Tenant to pay any amounts to Landlord that Tenant receives pursuant to a bona fide sale of its business, or substantially all of the assets thereof.

d.        For purposes of this Section 7, a transfer, conveyance, grant or pledge, directly or indirectly, in one or more transactions, of an interest in Tenant (whether stock, partnership interest or other form of ownership or control, or the issuance of new interests) by which an aggregate of more than forty-nine percent (49%) of the beneficial interest in Tenant shall be vested in a party or parties who are not holders of such interest(s) as of the Effective Date) shall be deemed an assignment of this Lease; provided, however, that this limitation shall not apply to any corporation, all of the outstanding voting stock of which is listed on a national securities exchange as defined in the Securities Exchange Act of 1934.  Furthermore, the merger or consolidation of Tenant into or with any other entity, the sale of all or substantially all of Tenant's assets, or the dissolution of Tenant shall each be deemed to be an assignment within the meaning of this Section 7.

e.        Any assignment or subletting not in conformance with the terms of this Lease shall be void ab initio and shall, subject to the provisions of Section 16, constitute a default under this Lease.

f.        Upon receipt of the notice referred to in Section 7.a(ii) above, Landlord may, at its option, in lieu of approving or rejecting the proposed assignment or subletting, exercise all or any of the following rights by written notice to Tenant of Landlord's intent to do so within fifteen (15) business days of Landlord's receipt of Tenant's notice:

(i)        with respect to a proposed assignment of this Lease, the right to terminate this Lease on the effective date of the proposed assignment as though it were the Lease Expiration Date;

(ii)        with respect to a proposed sublease of the entire Premises, the right to terminate this Lease on the effective date of the proposed sublease as though it were the Lease Expiration Date;

(iii)        with respect to a proposed sublease of less than the entire Premises, the right to terminate this Lease as to the portion of the Premises affected by such sublease on the effective date of the proposed sublease, as though it were the Lease Expiration Date, in which case Tenant shall execute and deliver to Landlord an appropriate modification of this Lease, in form satisfactory to Landlord in all respects, within ten (10) days of Landlord's notice of partial termination, which modification of this Lease shall provide that the number of rentable square feet of the Premises shall be decreased by, and the Monthly Base Rent, Percentage Rent and Additional Rent payable by Tenant hereunder shall be adjusted in proportion to, the number of rentable square feet of the Premises affected by such termination, as determined by Landlord; or

(iv)        with respect to a proposed sublease for less than the balance of the Term, the right to sublet the portion of the Premises from Tenant upon the same terms and conditions (including those pertaining to Annual Base Rent, Percentage Rent and Additional Rent) set forth in this Lease for the term of the proposed sublease.

If Landlord exercises any of its options under this Section 7.f., Landlord may then lease (or sublease) the Premises or any portion thereof to Tenant's proposed assignee or subtenant, as the case may be, without any liability whatsoever to Tenant.  Notwithstanding the foregoing, Landlord shall not be entitled to exercise any of its options under this Section 7.f. where Tenant's proposed assignment is made in connection with a bona fide sale of Tenant's business or substantially all of its assets, in which instance Landlord's sole option shall be to exercise its right to consent to or reject the proposed assignment, as set forth in Section 7.a. above.

g.        Upon any assignment of this Lease (except in cases of a bona fide sale of Tenant's business or substantially all of its assets) or sublease of any portion of the Premises, any and all option rights, rights of first refusal, rights of first negotiation, and expansion rights shall terminate, it being

understood that any and all such rights are personal to Tenant named herein (and not to any assignee or subtenant) and are not appurtenant to the Premises or this Lease. Further, Tenant shall not have the right to exercise any such rights unless Tenant (and not any assignee or subtenant of Tenant) shall be in occupancy of all of the Premises at the time of the exercise of any such right.

h.    Notwithstanding any consent by Landlord to an assignment or subletting, Tenant shall remain primarily liable for the performance of all covenants and obligations contained in this Lease. Each assignee approved by Landlord shall also automatically become liable for all of the obligations of Tenant under this Lease. Each subtenant approved by Landlord shall automatically become liable for the obligations of Tenant under this Lease relating to the sublet space (other than the payment of Rent or the posting of the Security Deposit). Landlord shall be permitted to enforce the provisions of this Lease directly against Tenant and/or against any assignee or sublessee without proceeding in any way against any other person. Collection or acceptance of Annual Base Rent, Percentage Rent or Additional Rent from any such assignee, subtenant or occupant shall not constitute a waiver or release of Tenant from the terms of any covenant or obligation contained in this Lease, nor shall such collection or acceptance in any way be construed to relieve Tenant from obtaining the prior written consent of Landlord to such assignment or subletting or any subsequent assignment or subletting.

## 8.    IMPROVEMENTS AND FIXTURES.

a.    Except as otherwise expressly provided in the Work Agreement with respect to the Tenant Improvements, Tenant shall neither make nor allow any alterations, decorations, replacements, changes, additions or improvements (collectively referred to as "Alterations") to the Premises or any part thereof that will or may affect the mechanical, electrical, plumbing, HVAC or other systems or the exterior or structure of the Building, without the prior written consent of Landlord, which may be withheld by Landlord in its sole discretion. Tenant shall not make or allow any other kind of Alterations to the Premises or any part thereof without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Tenant may, without Landlord's consent, make minor, interior, non-structural Alterations that (i) do not require issuance of a permit, (ii) do not affect common plumbing, electrical, HVAC or other mechanical systems and are not visible from the exterior of the Premises, and (iii) cost less than $25,000.00, in the aggregate, in any Lease Year (such Alterations, "Cosmetic Alterations"); provided, however, that with respect to any such Cosmetic Alteration, Tenant shall notify Landlord in writing at least ten (10) business days prior to the commencement thereof, which notice shall include all plans and specifications for such work, if applicable. All Alterations, structural or otherwise, must conform to (i) such minimum base Building standards as are established from time to time by Landlord, and (ii) such construction rules and regulations as are established from time to time by Landlord. All Alterations must be performed in a good and workmanlike manner, must comply with all Legal Requirements, shall not require any changes to or modifications of any of the mechanical, electrical, plumbing, HVAC or other systems or the exterior or structure of the Building, and shall otherwise be constructed in strict accordance with the terms and conditions of this Section 8. If any Alterations made by or on behalf of Tenant requires Landlord to make any alterations or improvements to any part of the Building in order to comply with Legal Requirements, Tenant shall pay all costs and expenses incurred by Landlord in connection with such alterations or improvements. Prior to undertaking any Alterations in the Premises, Tenant shall furnish to Landlord duplicate policies or certificates evidencing compliance by Tenant's contractors and subcontractors with the insurance requirements of Section 12 of this Lease.

b.    It is understood and agreed by Landlord and Tenant that any Alterations undertaken in the Premises shall be constructed at Tenant's sole expense. The costs of Alterations shall include, without limitation, the cost of all architectural work, engineering studies, materials, supplies, plans, permits and insurance. No consent by Landlord to any Alterations shall be deemed to be an agreement or consent by Landlord to subject Landlord's interest in the Premises, the Building or

the Land to any mechanic's or materialman's liens which may be filed in respect to such Alterations made by or on behalf of Tenant.  If Landlord gives its consent as specified in Section 8.a. above, Landlord may impose as a condition to such consent such requirements as Landlord may deem necessary or desirable, in its sole discretion exercised in good faith, including, without limitation, the right to approve the plans and specifications for any work, the supervision of the work by Landlord or its agents or by Landlord's architect or contractor, the payment to Landlord or its agents, architect or contractor of a construction supervision fee in connection therewith (not to exceed one percent (1%) of the cost of the Alterations), and the right to impose requirements as to the manner in which or the time or times at which work may be performed.  Landlord shall also have the right to approve the contractor or contractors who shall perform any Alterations or repairs in, to or about the Premises, with such approval not to be unreasonably withheld, conditioned, or delayed, and to post notices of non-responsibility and similar notices, as appropriate.  In addition, immediately after completion of any Alterations, Tenant shall assign to Landlord any and all warranties applicable to such Alterations and shall provide Landlord with as-built plans of the Premises depicting such Alterations.

c.      Tenant shall keep the Premises free from any liens arising out of any work performed on, or materials furnished to, the Premises, or arising from any other obligation incurred by Tenant.  If any mechanic's or materialmen's lien is filed against the Premises, the Building and/or the Land for work claimed to have been done for or materials claimed to have been furnished to Tenant, such lien shall be discharged by Tenant within ten (10) days thereafter, at Tenant's sole cost and expense, by the payment thereof or by filing any bond required by law.  If Tenant shall fail to timely discharge any such mechanic's or materialman's lien, Landlord may, at its option, discharge the same and treat the cost thereof as Additional Rent payable with the installment of rent next becoming due; it being expressly covenanted and agreed that such discharge by Landlord shall not be deemed to waive or release the default of Tenant in not discharging the same.  Tenant shall indemnify and hold harmless Landlord, the Premises and the Building from and against any and all expenses, liens, claims, actions or damages to person or property in connection with any such lien or the performance of such work or the furnishing of such materials.  Tenant shall be obligated to, and Landlord reserves the right to, post and maintain on the Premises at any time such notices as shall in the reasonable judgment of Landlord be necessary to protect Landlord against liability for all such liens or actions.

d.      Any Alterations of any kind to the Premises or any part thereof, except Tenant Lines (as hereinafter defined) and Tenant's furniture and moveable equipment or trade fixtures, shall at once become part of the realty and belong to Landlord and shall be surrendered with the Premises, as a part thereof, at the end of the Term hereof; provided, however, that Landlord may, by written notice to Tenant given at the time Landlord approves such Alteration(s) (or, with respect to Cosmetic Alterations, within ten (10) business days after Tenant delivers notice thereof to Landlord as required by Section 8.a above), require Tenant to remove any Alterations (including, without limitation, all Tenant Lines) and to repair any damage to the Premises caused by such removal, all at Tenant's sole expense.  Any articles of personal property, including business and trade fixtures, not attached to or built into the Premises, which were installed or placed in the Premises by Tenant at its sole expense, shall be and remain the property of Tenant and may be removed by Tenant at any time during the Term as long as Tenant is not in default hereunder and provided that Tenant repairs any damage to the Premises or the Building caused by such removal.

e.      All voice, data, video, audio, and other low-voltage control transport system cabling and/or cable bundles installed in the Building by Tenant (or by Landlord in connection with this Lease and for the benefit of Tenant) (collectively, "Tenant Lines") shall be (i) plenum rated and/or have a composition makeup suited for its environmental use in accordance with NFPA 70/National Electrical Code, (ii) labeled every 3 meters with Tenant's name and origination and destination points, (iii) installed in accordance with all EIA/TIA standards and the National Electrical Code, and (iv) installed and routed in accordance with a routing plan showing "as built" or "as installed" configurations of cable pathways, outlet identification numbers, locations of all wall, ceiling and floor penetrations, riser cable routing and conduit routing if applicable, and such other information

as Landlord may request. The routing plan shall be available to Landlord and its agents at the Building upon request. Upon Landlord's written request and at Tenant's sole cost and expense, Tenant shall cause all Tenant Lines (or such Tenant Lines as Landlord shall request) to be removed at the expiration of the Term or earlier termination of this Lease; provided, however, Landlord, at Landlord's option, shall have the right to cause such Tenant Lines to be removed at the expiration of the Term, or earlier termination of this Lease, and in such event, Tenant shall reimburse Landlord (within ten (10) days following Landlord's demand) for all costs and expenses incurred by Landlord in connection therewith.

**9.     UTILITIES AND SERVICES.**

a.     Tenant shall be solely responsible for and shall promptly pay any and all charges for electricity, water and sewer, and any other utility used, consumed or supplied to the Premises. Tenant shall cause the Premises to be separately metered for electricity and shall contact the appropriate public electric utility company to establish an account in Tenant's name for electrical service to the Premises. Landlord shall cause the Premises to be submetered for water and sewer services at its sole cost and expense. In the event Tenant does not pay such utility charges when due, Landlord shall have the right, but not the obligation, to pay said charges, and Tenant shall reimburse Landlord therefor as Additional Rent. Tenant, at Tenant's expense, shall maintain and repair in good condition (including replacement as necessary) any utility meters in the Premises and related equipment. Landlord shall have no liability to Tenant or any other person for any loss, damage, expense, or inconvenience which Tenant may sustain or incur by reason of any failure, interruption, curtailment, cessation, inadequacy or defect in the character, quantity or supply of the utilities to the Premises or, the failure of any heating, ventilating or air conditioning equipment. No interruption or malfunction of any such services shall constitute an actual or constructive eviction or disturbance of Tenant's use and possession of the Premises or the Building or constitute a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of Tenant's obligations hereunder (including the obligation to pay Rent) or grant Tenant any right of setoff or claim against Landlord or constitute a constructive or other eviction of Tenant. Notwithstanding the provisions of this Section 9.a to the contrary, if (i) the electricity, water or HVAC services to be provided to the Premises pursuant to this Section 9.a are interrupted as a result of the negligence or willful misconduct of Landlord for a period of more than five (5) consecutive business days, and (ii) such interruption renders more than ten percent (10%) of the rentable area of the Premises untenantable and Tenant actually ceases to use such portion of the Premises, then Tenant shall be entitled to a pro rata abatement of the Monthly Base Rent and Additional Rent (based on the portion of the Premises rendered untenantable) for the period beginning on the sixth (6th) consecutive business day that the foregoing conditions exist and continuing until the earlier of (a) the restoration of such services to such portion of the Premises, or (b) Tenant's occupancy and use of such portion of the Premises. Tenant shall, at Tenant's sole cost and expense, clean the Premises and such service shall be provided for each day Tenant is open for business. Any company and employees thereof hired by, or under the direction of, Tenant shall be subject to the reasonable approval of Landlord. All cleaning services so performed by Tenant's contractors must comply with Landlord's requirements.

b.     The Premises is equipped with an independent heating, ventilation and air-conditioning system ("HVAC System"). Landlord makes no representations or warranties, express or implied, regarding the condition of the HVAC System; provided, however, that if the HVAC System is not in good working order upon delivery of the Premises by Landlord to Tenant, Tenant shall notify Landlord in writing within five (5) business days after delivery and, following receipt of such written notice, Landlord will undertake appropriate repairs of the HVAC System at its sole cost and expense. Tenant shall maintain and repair the HVAC System in a first-class, clean and safe condition at all times during the Term. All maintenance and repairs to the HVAC System shall be performed by licensed contractors approved in writing by Landlord. Tenant shall provide Landlord with a duplicate of the continuous service or maintenance contract with respect to the HVAC system. For purposes of operating the HVAC System, Landlord will provide Tenant with access to

the base Building condenser water system ("Building Condenser"); provided, however, Landlord shall have the right, exercisable from time to time without any liability to Tenant, to suspend Tenant's access to the Building Condenser as may be necessary for Landlord to perform maintenance or repair work on the Building Condenser or other areas of the Building. Tenant shall reimburse Landlord upon demand for any and all charges associated with the operation of the Building Condenser to the extent reasonably allocated by Landlord to the operation of the HVAC System.

c.  Tenant will not, without the prior written consent of Landlord, use any apparatus or device in the Premises other than equipment customarily and routinely used for the Permitted Use. Whenever heat generating machines or equipment are used in the Premises which materially and adversely affect the temperature otherwise maintained by the air conditioning system, Landlord reserves the right to install supplementary air conditioning units in the Premises and the cost thereof, including the cost of installation, operation and maintenance thereof, shall be paid by Tenant to Landlord upon demand.

d.  Tenant shall not install equipment of any kind or nature whatsoever, nor engage in any practice or use, which will or may necessitate any changes, replacements or additions to, or in the use of, the water system, heating system, plumbing system, air conditioning system, electrical system, floor load capacities, or other mechanical or structural system of the Premises or the Building, without first obtaining the prior written consent of Landlord.

## 10.    RIGHTS OF LANDLORD.

a.  Landlord reserves the following rights: (i) to change the name or street address of the Building with thirty (30) days prior notice to Tenant; (ii) to approve the design, location, number, size and color of all signs or lettering on the Premises or visible from the exterior of the Premises; (iii) to have pass keys and/or access cards to the Premises and key codes or cards for the telephone access system installed by Tenant; (iv) to grant to anyone the exclusive right to conduct any particular business or undertaking in areas of the Building other than the Premises; (v) to enter the Premises (1) at any reasonable time for inspection upon reasonable prior notice to Tenant (which notice may be oral), (2) at any time, without prior notice, in the event of any emergency, (3) to supply any service to be provided by Landlord hereunder, (4) to submit the Premises to prospective purchasers or tenants, (5) to post notices of non-responsibility, (6) to affix and display "For Rent" signs, or (7) to make repairs, alterations, additions or improvements to the Premises or the Building; and (vi) to approve the design, location, number, size and color of all signs located on the exterior of the Building. Landlord shall use commercially reasonable efforts to exercise all rights provided for herein in a manner which does not unreasonably interfere with the use of the Premises for the Permitted Use.

b.  Without limiting the generality of the provisions of Section 10.a., above, at any time during the Term of this Lease, Landlord shall have the right to remove, alter, improve, renovate or rebuild the common areas of the Building (including, but not limited to, the lobby, hallways and corridors thereof), and to install, repair, replace, alter, improve or rebuild in the Premises, other tenants' premises and/or the common areas of the Building (including the lobby, hallways and corridors thereof), any mechanical, electrical, water, sprinkler, plumbing, heating, air conditioning and ventilating systems, at any time during the Term of this Lease. In connection with making any such installations, repairs, replacements, alterations, additions and improvements under the terms of this Section 10, Landlord shall have the right to access through the Premises as well as the right to take into and upon and through the Premises or any other part of the Building, all materials that may be required to make any such repairs, replacements, alterations, additions or improvements, as well as the right in the course of such work to close entrances, doors, corridors, elevators or other facilities located in the Building or temporarily to cease the operations of any services or facilities therein or to take portion(s) of the Premises reasonably necessary in connection with such work, without being deemed or held guilty of an eviction of Tenant. Landlord shall have the right to install, use and maintain pipes and conduits in and through the Premises,

including, without limitation, telephone and computer installations, provided that Landlord shall use commercially reasonable efforts to ensure that such installations do not materially and unreasonably alter the visible appearance or layout of the Premises, nor materially and unreasonably interfere with the use of the Premises for the Permitted Use.

c.  Landlord shall not be liable to Tenant for any expense, injury, loss or damage resulting from Landlord's exercise of any rights under this Section 10, all claims against Landlord for any and all such liability being hereby expressly released by Tenant.  Landlord shall not be liable to Tenant for damages by reason of interference with the business of Tenant or inconvenience or annoyance to Tenant or the customers or clients of Tenant. The Rent reserved herein shall not abate while Landlord's rights under this Section 10 are exercised, and Tenant shall not be entitled to any set-off or counterclaims for damages of any kind against Landlord by reason thereof, all such claims being hereby expressly released by Tenant.

d.  Landlord shall have the right to use any and all means which Landlord may reasonably deem proper to open all of the doors in, upon and about the Premises, excluding Tenant's vaults and safes, in any emergency in order to obtain entry to the Premises, and shall otherwise undertake commercially reasonable efforts to avoid entry of Tenant's walk-in coolers, liquor storage area, and private office where financial or personnel records may be stored without prior notice to Tenant.  Any entry to the Premises obtained by Landlord by any of said means shall not be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction of Tenant from the Premises or any portion thereof.

e.  Landlord agrees to use reasonable efforts not to interfere unreasonably with the operation of Tenant's business in the Premises and to minimize disruption resulting from the access granted to Landlord under this Section 10.

## 11.    LIABILITY.

a.  Landlord and its trustees, officers, directors, members, agents and employees, Landlord's mortgagees and Landlord's representatives (collectively, the "Landlord Parties") assume no liability or responsibility whatsoever with respect to the conduct or operation of the business to be conducted in the Premises and shall have no liability for (i) any claim of loss of business or interruption of operations (or any claim related thereto), or (ii) any accident to or injury to any person or persons or property in or about the Premises which are caused by the conduct and operation of said business or by virtue of equipment or property of Tenant in said Premises. Landlord and the Landlord Parties shall not be liable to Tenant, its employees, agents, business invitees, licensees, customers, clients, family members or guests (collectively, the "Tenant Parties") for any damage, compensation or claim arising out of or related to managing the Premises or the Building, repairing any portion of the Premises or the Building, the interruption in the use of the Premises, accident or damage resulting from the use or operation (by Landlord or any Landlord Parties) or failure of elevators, or heating, cooling, electrical or plumbing equipment or apparatus, or the termination of this Lease by reason of the destruction of the Premises, or from any fire, robbery, theft, mysterious disappearance and/or any other casualty, or from any leakage in any part of portion of the Premises or the Building, or from water, rain or snow that may leak into or flow from any part of the Premises or the Building, or from any other cause whatsoever.  Subject to Section 11.c below, the foregoing shall not be deemed to relieve Landlord from liability for claims or loss or damage to the extent resulting from the gross negligence or willful misconduct of Landlord Parties in the performance of Landlord's obligations hereunder. In no event shall Landlord or any Landlord Parties be liable for punitive or consequential damages, nor shall Landlord or any Landlord Parties be liable with respect to utilities furnished to the Premises, or the lack of any utilities.  Any goods, property or personal effects, stored or placed by Tenant or any Tenant Parties in or about the Premises or in the Building, shall be at the sole risk of Tenant, and Landlord and the Landlord Parties shall not in any manner be held responsible therefor.  The agents and employees of Landlord are prohibited from receiving any packages or other articles delivered to the Building for Tenant, and if any such agent or employee receives any

such package or articles, such agent or employee shall be the agent of Tenant for such purposes and not of Landlord.

b.    Tenant hereby agrees to indemnify and hold Landlord and the Landlord Parties harmless from and against any cost, damage, claim, liability or expense (including, without limitation, attorneys' fees) incurred by or claimed against Landlord and the Landlord Parties, directly or indirectly, as a result of or in any way arising from: (i) the use and occupancy of the Premises by Tenant or any Tenant Parties or in any other manner which relates to the business of Tenant, including, but not limited to, any cost, damage, claim, liability or expense arising from any violation of any zoning, health, environmental or other law, ordinance, order, rule or regulation of any governmental body or agency; (ii) the negligence or willful misconduct of Tenant or any Tenant Parties; (iii) any default, breach or violation of this Lease by Tenant; or (iv) except to the extent caused by the gross negligence or intentional misconduct of Landlord, injury or death to individuals or damage to property sustained in or about the Premises.   The liabilities accrued by Tenant to Landlord pursuant to this Section 11.b. or any other indemnity contained in this Lease shall survive the transactions contemplated herein or any expiration or termination of this Lease.

c.    Notwithstanding any other provision of this Lease to the contrary, Landlord and Tenant agree that in the event that the Building, the Premises or the contents thereof are damaged or destroyed by fire or other casualty, each party hereto waives its rights, if any, against the other party with respect to such damage or destruction to the extent such damage or destruction is covered under the property insurance policy(ies) of the party waiving such rights (or would have been covered had the party waiving such rights carried the property insurance required hereunder to be carried by such party); provided however, if any fire or other casualty caused by Tenant shall have damaged or destroyed any part of the Building or the contents thereof, Tenant shall be responsible for any deductible amount under Landlord's property insurance policy(ies).  All policies of fire and/or extended coverage or other insurance covering the Premises or the contents thereof obtained by Landlord or Tenant shall contain a clause or endorsement providing in substance that (i) such insurance shall not be prejudiced if the insureds thereunder have waived in whole or in part the right of recovery from any person or persons prior to the date and time of loss or damage, if any, and (ii) the insurer waives any rights of subrogation against Landlord (in the case of Tenant's insurance policy) or Tenant (in the case of Landlord's insurance policy), as the case may be.

12.    **INSURANCE.**

a.    **Tenant's Insurance**.  Tenant, at Tenant's sole cost and expense, agrees to keep in full force and effect at all times during the Term of this Lease:

(i)    Commercial general liability insurance which insures against claims for bodily injury, personal injury, advertising injury, and property damage based upon, involving, or arising out of the use, occupancy, or maintenance of the Premises and the Building.  Such insurance shall afford, at a minimum, the following limits:

| | |
|---|---|
| Each Occurrence | $ 1,000,000 |
| General Aggregate | 2,000,000 |
| Products/Completed Operations Aggregate | 1,000,000 |
| Personal and Advertising Injury Liability | 1,000,000 |
| Fire Damage Legal Liability | 100,000 |
| Medical Payments | 5,000 |

Any general aggregate limit shall apply on a per location basis. Tenant's commercial general liability insurance shall name Landlord and any Landlord Parties designated by Landlord as additional insureds. This coverage shall be written on the most current ISO CGL form, shall include blanket contractual,

premises-operations and products-completed operations and shall contain an exception to any pollution exclusion which insures damage or injury arising out of heat, smoke or fumes from a hostile fire. Such insurance shall be written on an occurrence basis and contain a standard separation of insureds provision.

(ii)      Business automobile liability insurance covering owned, hired and non-owned vehicles with limits of $1,000,000 combined single limit per occurrence.

(iii)     Workers' compensation insurance in accordance with the laws of the state in which the Premises are located with employer's liability insurance in an amount not less than $1,000,000.

(iv)     If Tenant at any time sells, serves or otherwise allows liquor to be consumed in or about the Premises, then Tenant must also carry Liquor Liability insurance coverage in an amount not less than $1,000,000 per occurrence and in the aggregate, naming Landlord as an additional insured on a primary and non-contributory basis.

(v)      Umbrella/excess liability insurance, on an occurrence basis, that applies excess of the required commercial general liability, liquor liability, business automobile liability, and employer's liability policies with the following minimum limits:

|                   |             |
|-------------------|-------------|
| Each Occurrence   | $3,000,000  |
| Annual Aggregate  | $3,000,000  |

These limits shall be in addition to and not including those stated for the underlying commercial general liability, business automobile liability, and employers liability insurance required herein. Such excess liability policies shall name Landlord and any Landlord Parties designated by Landlord as additional insureds.

(vi)     All risk property insurance including theft, sprinkler leakage and boiler and machinery coverage on all of Tenant's trade fixtures, furniture, inventory and other personal property owned by Tenant and located in or about the Premises or the Building, and on any Alterations, all for the full replacement cost thereof. Tenant shall use the proceeds from such insurance for the replacement of trade fixtures, furniture, inventory and other personal property and for the restoration of any Alterations. Landlord shall be named as loss payee with respect to any Alterations.

(vii)    Business income and extra expense insurance with limits not less than one hundred percent (100%) of all charges payable by Tenant under this Lease for a period of twelve (12) months.

b.      **Tenant's Insurer Rating; Certification of Insurance**. All policies required to be carried by Tenant hereunder shall be issued by and binding upon an insurance company licensed to do business in the state in which the Building is located with a rating of at least "A - X" or better as set forth in the most current issue of Best's Insurance Reports, unless otherwise approved by Landlord. Tenant shall not do or permit anything to be done that would invalidate the insurance policies required herein.  Liability insurance maintained by Tenant shall be primary coverage without right of contribution by any similar insurance that may be maintained by Landlord. Certificates of insurance, acceptable to Landlord, evidencing the existence and amount of each insurance policy required hereunder shall be delivered to Landlord prior to delivery or possession of the Premises and ten (10) days following each renewal date. Certificates of insurance shall name Landlord and any Landlord Parties designated by Landlord as additional insureds on liability policies and Landlord is named as loss payee on the property insurance as stated in Section 12.a.(v) above. Further, the certificates of insurance must include an endorsement for each policy whereby the insurer agrees not to cancel, non-renew, or materially alter the policy without at least thirty (30) days' prior written notice to Landlord.

(i)     In the event that Tenant fails to provide evidence of insurance required to be provided by Tenant in this Lease, prior to the Commencement Date and thereafter during the Term, within ten (10) days following Landlord's request thereof, and thirty (30) days prior to the expiration of any such coverage, Landlord shall be authorized (but not required) to procure such coverage in the amount stated with all costs thereof to be chargeable to Tenant and payable upon written invoice thereof.

(ii)    The limits of insurance required by this Lease, or as carried by Tenant, shall not limit the liability of Tenant or relieve Tenant of any obligation thereunder, except to the extent provided for under Section 11.c, above.  Any deductibles selected by Tenant shall be the sole responsibility of Tenant.

(iii)   Tenant insurance requirements stipulated in Section 12.a., above, are based upon current industry standards.  Landlord reserves the right to require additional coverage or to increase limits as industry standards change.

c.      **Contractors' Insurance**.  Should Tenant engage the services of any contractor to perform work in the Premises, Tenant shall ensure that such contractor carries commercial general liability, business automobile liability, umbrella/excess liability, worker's compensation and employers liability coverages in substantially the same amounts as are required of Tenant under this Lease. Contractor shall name Landlord and any Landlord Parties designated by Landlord as additional insureds on the liability policies required hereunder.  All policies required to be carried by any contractor shall be issued by and binding upon an insurance company licensed to do business in the state in which the Building is located with a rating of at least "A - X" or better as set forth in the most current issue of Best's Insurance Reports, unless otherwise approved by Landlord. Certificates of insurance, acceptable to Landlord, evidencing the existence and amount of each insurance policy required hereunder shall be delivered to Landlord prior to the commencement of any work in the Premises.  Further, the certificates must include an endorsement for each policy whereby the insurer agrees not to cancel, non-renew, or materially alter the policy without at least thirty (30) days' prior written notice to Landlord.  The above requirements shall apply equally to any subcontractor engaged by Tenant's contractor.

## 13.     FIRE OR CASUALTY.

a.      If the Premises or any part thereof shall be damaged by fire or any other cause, Tenant shall give prompt notice thereof to Landlord.  If, in the reasonable judgment of Landlord's architect, restoration of the Premises is feasible within a period of twelve (12) months from the date of the damage, and provided such damage was not caused by Tenant, its agents, servants or invitees, Landlord shall restore the Premises to the condition existing as of the Commencement Date, provided that adequate insurance proceeds are made available to Landlord.  Tenant agrees to make all proceeds of Tenant's insurance policies available to Landlord in accordance with Tenant's insurance obligations set forth in Section 12, above, except to the extent such insurance proceeds are for the replacement of Tenant's furniture, fixtures, equipment, or other personal property located in the Premises which are not the property of, or required to be maintained and/or restored by, Landlord.  In addition, Tenant shall repair and restore, at Tenant's sole expense, all Alterations, furniture, fixtures and other property of Tenant located in the Premises prior to such casualty.  If, as a result of such casualty, the Premises are rendered untenantable, in whole or in part, and Tenant ceases to occupy the whole or such part of the Premises during the restoration of such portion of the Premises, the Monthly Base Rent, Percentage Rent and Additional Rent hereunder shall be abated to the extent and for the period that the Premises (or portion thereof) are rendered untenantable; provided, however, that if such damage or destruction shall result from the act or omission of Tenant, its employees, agents or invitees, Tenant shall not be entitled to any abatement of Monthly Base Rent, percentage Rent or Additional Rent.

b.      If restoration is not feasible, in the reasonable judgment of Landlord's architect, within the aforesaid twelve (12) month period, Landlord shall so notify Tenant, and Landlord and Tenant

shall each have the right to terminate this Lease by giving written notice thereof to the other party within sixty (60) days after notice of such determination is given by Landlord to Tenant, in which event this Lease and the tenancy hereunder shall terminate as of the date of such damage or destruction and the Monthly Base Rent, Percentage Rent and Additional Rent will be apportioned as of the date of such damage or destruction.  If neither party exercises its right of termination, the Premises shall be restored as provided above.

c.      In case the Building is so severely damaged by fire or other casualty (although the Premises may not be affected) that Landlord shall decide in its sole discretion not to rebuild or reconstruct the Building, then this Lease and the tenancy hereunder shall terminate on the date specified by Landlord in a notice given no later than sixty (60) days after the date of such casualty.


## 14.     EMINENT DOMAIN.

a.      If all or a substantial part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain (a "Taking"), then Landlord or Tenant shall have the right to terminate this Lease upon written notice to the other within thirty (30) days after notice of such Taking, in which event this Lease shall terminate, and the Annual Base Rent shall be apportioned, as of the date of such Taking.  If a Taking of any part of the Building (exclusive of the Premises) shall occur and, in Landlord's reasonable judgment, such Taking would materially interfere with or impair Landlord's operation of the Building, then Landlord shall have the right to terminate this Lease upon written notice to Tenant within thirty (30) days after the date of such Taking, in which event this Lease shall terminate and Annual Base Rent shall be apportioned as of the date of termination.  If a Taking of less than all of the Premises shall occur, and this Lease is not terminated as provided above, the Annual Base Rent payable hereunder during the unexpired Term shall be reduced based on the portion of the Premises taken.  If a Taking of any part of the Building (exclusive of the Premises) shall occur, and this Lease is not terminated by Landlord as provided above, the Annual Base Rent payable hereunder during the unexpired Term shall be not reduced.

b.      In the event of any Taking, all sums awarded or agreed upon between Landlord and the condemning authority for the Taking, whether as damages or as compensation, will be the property of Landlord.  Tenant shall have no right to participate in any Taking proceedings and shall make no claim for damages or other compensation in such proceedings and hereby assigns to Landlord any and all rights of Tenant in and to any such compensation.


## 15.     SUBORDINATION AND ESTOPPEL CERTIFICATES.

a.      This Lease shall be subject and subordinate at all times to all ground or underlying leases which now exist or may hereafter be executed affecting the Building or any part thereof or the Land, and to the lien of any mortgages or deeds of trust in any amount or amounts whatsoever now or hereafter placed on or against the Building or any part thereof or the Land, or on or against Landlord's interest or estate therein or on or against any ground or underlying lease without the necessity of having further instruments on the part of Tenant to effect such subordination.  Upon request of Landlord, Tenant will execute any written instrument necessary to further confirm the subordination of Tenant's rights hereunder to any such underlying leases or liens.  If, at any time, or from time to time during the Term, any mortgagee shall request that this Lease have priority over the lien of such mortgage, and if Landlord consents thereto, this Lease shall have priority over the lien of such mortgage and all renewals, modifications, replacements, consolidations and extensions thereof and all advances made thereunder and interest thereon, and Tenant shall, within ten (10) days after receipt of a request therefor from Landlord, execute, acknowledge and deliver any and all documents and instruments confirming the priority of this Lease.  In any event, however, if this Lease shall have priority over the lien of a first mortgage, this Lease shall not become subject or subordinate to the lien of any subordinate mortgage, and Tenant shall not execute any subordination documents or instruments for any subordinate mortgagee, without the written consent of the first mortgagee.

b.      In the event of (i) a transfer of Landlord's interest in the Building, (ii) the termination of any ground or underlying lease of the Building, or the Land, or both, or (iii) the purchase or other acquisition of the Building, or Landlord's interest therein in a foreclosure sale or by deed in lieu of foreclosure under any mortgage or deed of trust, or pursuant to a power of sale contained in any mortgage or deed of trust, then Tenant shall, at the request of Landlord or Landlord's successor in interest, attorn to and recognize the transferee or purchaser of Landlord's interest or the interest of the lessor under the terminated ground or underlying lease, as the case may be, as "Landlord" under this Lease for the balance then remaining of the Term, and thereafter this Lease shall continue as a direct lease between such person or entity, as "Landlord," and Tenant, as "Tenant," except that such lessor, transferee or purchaser shall not be liable for any act or omission of Landlord before such lease termination or before such person's succession to title, nor be subject to any offset, defense or counterclaim accruing before such lease termination or before such person's succession to title, or be bound by any payment of Monthly Base Rent, Percentage Rent or Additional Rent before such lease termination or before such person's succession to title for more than one month in advance.

c.      Tenant agrees, at any time, and from time to time, upon not fewer than five (5) days prior notice by Landlord, to execute, acknowledge and deliver to Landlord, a statement in writing certifying that (i) this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), (ii) the Term of this Lease has commenced and the full rental is now accruing hereunder, (iii) Tenant has accepted possession of the Premises and is presently occupying the same, (iv) all improvements required by the terms of this Lease to be made by Landlord have been completed and all tenant improvement allowances have been paid in full, (v) there are no offsets, counterclaims, abatements or defenses against or with respect to the payment of any rent or other charges due under this Lease, (vi) no rent under this Lease has been paid more than thirty (30) days in advance of its due date, (vii) to the best of the knowledge of Tenant, Landlord is not in default in the performance of any covenant, agreement, provision or condition contained in this Lease or, if so, specifying each such default of which Tenant may have knowledge, (viii) the address for notices to be sent to Tenant is as stated in Section 1.j above, (ix) the only security deposit, if any, tendered by Tenant is as set forth in this Lease, and such security deposit, if any, has been paid to Landlord, and (x) providing any other information reasonably requested by Landlord or any mortgagee or ground lessor of the Building and/or the Land, it being intended that any such statement delivered pursuant hereto may be relied upon by any prospective purchaser or lessee of the Building or any part thereof, any mortgagee or prospective mortgagee thereof, any prospective assignee of any mortgage thereof, any ground lessor or prospective ground lessor of the Land and/or the Building, or any prospective assignee of any such ground lease. Tenant also agrees to execute and deliver from time to time such estoppel certificates as an institutional lender may reasonably require with respect to this Lease.

**16.     DEFAULT AND REMEDIES.**

a.      An "Event of Default" shall be deemed to have been committed by Tenant upon the occurrence of any one or more of the following events: (i) the failure to pay when due any installment of Monthly Base Rent, Percentage Rent or Tenant's Pass-Through Costs (provided, however, with respect solely to the first (1st) such failure in any twelve (12) consecutive month period, no Event of Default shall be deemed to have occurred unless Tenant shall have failed to make such payment in full within five (5) days after written notice from Landlord that the same is due and owing); (ii) the failure to pay when due any Additional Rent or any other payment required by the terms and provisions hereof (other than Monthly Base Rent, Percentage Rent or Tenant's Pass-Through Costs), which failure continues for ten (10) days after notice from Landlord; (iii) the conveyance, assignment, mortgage or sublet of this Lease, the Premises or any part thereof, or Tenant's interest therein, or attempt any of the foregoing, without the prior written consent of Landlord (except to the extent otherwise expressly permitted pursuant to this Lease); (iv) the abandonment of the Premises for a period of thirty (30) consecutive calendar days; (v) an Event of Bankruptcy (hereinafter defined), (vi) the failure to maintain the insurance coverage required by Section 12,

above, which failure continues for five (5) days after notice from Landlord, or (vii) the violation or failure to perform any of the other terms, conditions, covenants, or agreements herein made by Tenant and which violation or failure continues for thirty (30) calendar days after notice, provided that if the failure is not of a nature that it can reasonably be cured within such thirty (30) days, Tenant shall not be deemed in default it commences to cure such failure within such thirty (30) days and proceeds with due diligence to, and does, cure such failure within a reasonable time thereafter (not to exceed an additional thirty (30) days).   Notwithstanding the foregoing cure periods, in the event that Tenant commits a Sound Violation or breaches any other single covenant set forth in this Lease, including without limitation, any breach of the covenants of Tenant with respect to noise and late night operations as provided in Section 6 above on more than two (2) occasions in any twelve (12) consecutive month period, or on more than three (3) occasions in any twenty-four (24) consecutive month period, then any subsequent breach of such covenant (including without limitation, a Sound Violation) during the Term of this Lease shall be deemed to be an immediate Event of Default.  Upon an Event of Default, at Landlord's option, this Lease shall terminate, without prejudice, however, to the right of Landlord to recover from Tenant all rent and any other sums accrued, and without release of Tenant from any indemnification obligations to Landlord under this Lease which arose or accrued, up to the later of (1) the date of termination of this Lease or (2) the date Landlord recovers possession of the Premises.   The foregoing is not intended to, and shall not, limit Landlord in the exercise of any other remedy for such immediate Event of Default.

b.      In the event of any Event of Default by Tenant as defined in Section 16.a., Landlord may at any time thereafter, without notice and demand and without limiting Landlord in the exercise of any other right or remedy which Landlord may have by reason of such default or breach, do any of the following:

(i)      Terminate this Lease by giving written notice of such termination to Tenant, whereupon this Lease shall automatically cease and terminate and Tenant shall be immediately obligated to quit the Premises.  Any other notice to quit or notice of Landlord's intention to re-enter the Premises is hereby expressly waived.  If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, subject, however, to the right of Landlord to recover from Tenant all rent and any other sums accrued up to the time of termination or recovery of possession by Landlord, whichever is later.

(ii)     With or without the termination of this Lease, proceed to recover possession of the Premises under and by virtue of the provisions of the laws of the jurisdiction in which the Building is located, or by such other proceedings, including re-entry and possession, as may be applicable.  If this Lease is terminated or Landlord recovers possession of the Premises before the expiration of the Term by reason of Tenant's default as hereinabove provided, or if Tenant shall abandon or vacate the Premises before the Lease Expiration Date without having paid the full rental for the remainder of such Term, Landlord shall have the option to take reasonable steps to re-let the Premises for such rent and upon such terms as are not unreasonable under the circumstances and, if the full rental reserved under this Lease (and any of the costs, expenses or damages indicated below) shall not be realized by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, (a) deficiency in rent during any period of vacancy or otherwise, (b) the costs of removing and storing the property of Tenant or of any other occupant, (c) all reasonable expenses incurred by Landlord in enforcing Landlord's remedies, including, without limitation, reasonable attorneys' fees and Late Charges as provided herein, and (d) advertising, brokerage fees and expenses of placing the Premises in first class rentable condition.  Landlord, in putting the Premises in good order or preparing the same for re-rental may, at Landlord's option, make such alterations, repairs, or replacements in the Premises as Landlord, in its sole judgment, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs, or replacements shall not operate or be construed to release Tenant from liability hereunder as aforesaid.

(iii)   Any damage or loss of rent sustained by Landlord may be recovered by Landlord, at Landlord's option, at the time of termination of this Lease, the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive re-lettings, or, at Landlord's option, in a single proceeding deferred until the expiration of the Term (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the date of expiration of said Term) or in a single proceeding prior to either the time of re-letting or the expiration of the Term.  If Landlord elects to repossess the Premises without terminating this Lease, then Tenant shall be liable for and shall pay to Landlord all Rent and other indebtedness accrued to the date of such repossession, plus Rent required to be paid by Tenant to Landlord during the remainder of the Term until the Lease Expiration Date (as the same may have been extended pursuant to the terms hereof), diminished by any net sums thereafter received by Landlord through reletting the Premises during such period (after deducting expenses incurred by Landlord as provided in Section 16.b.(ii), above).  In no event shall Tenant be entitled to any excess of any Rent obtained by reletting over and above the Rent herein reserved.  Actions to collect amounts due from Tenant as provided in this Section 16.b.(iii) may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Term.  Upon termination of this Lease or repossession of the Premises following a default hereunder, Landlord shall have no obligation to re-let, or attempt to re-let, the Premises or any portion thereof or to collect rental after reletting, and in the event of re-letting, Landlord may re-let the whole or any portion of the Premises for any period, to any tenant, and for any use and purpose on such terms and at such rentals as Landlord in its exclusive judgment may determine.

c.   Notwithstanding the foregoing, if Landlord terminates this Lease pursuant to Section 16.b.(i), above, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, as and for liquidated and agreed final damages for Tenant's default, an amount equal to the difference between (i) all Monthly Base Rent, Percentage, Additional Rent and other sums which would be payable under this Lease from the date of such demand (or, if it is earlier, the date to which Tenant shall have satisfied in full its obligations under Section 16.b.(ii), above) for what would be the then-unexpired Term in the absence of such termination, and (ii) the fair market rental value of the Premises over the same period (net of all expenses and all vacancy periods reasonably projected by Landlord to be incurred in connection with the reletting of the Premises), with such differential discounted at the rate of five percent (5%) per annum.  Nothing herein shall be construed to affect or prejudice Landlord's right to prove, and claim in full, unpaid Rent or any other amounts accrued prior to termination of this Lease.

d.   Notwithstanding anything herein to the contrary, upon the occurrence of an Event of Default hereunder, Landlord, with or without terminating this Lease, may immediately reenter and take possession of the Premises and evict Tenant therefrom, without legal process of any kind, using such force as may be necessary, without being liable for or guilty of trespass, forcible entry or any other tort.  Landlord's right to exercise such "self-help" remedy shall be in addition to, and not in limitation of, Landlord's other rights and remedies hereunder for a breach by Tenant of its obligations under this Lease.

e.   Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future laws in the event Tenant is evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise.  In addition, Tenant hereby expressly waives any and all rights to bring any action whatsoever against any tenant taking possession after Tenant has been dispossessed or evicted hereunder, or to make any such tenant or party to any action brought by Tenant against Landlord.

f.   Landlord and Tenant shall and each does hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease or its termination, the relationship of

Landlord and Tenant, Tenant's use or occupancy of the Premises or any claim of injury or damage and any emergency statutory or any other statutory remedy.  In the event Landlord commences any summary proceeding for nonpayment of Rent or Additional Rent, or commences any other action or proceeding against Tenant in connection with this Lease, Tenant will interpose no counterclaim of whatever nature or description in any such proceeding.

g.      Nothing contained herein shall prevent the enforcement of any claim Landlord may have against Tenant for anticipatory breach of the unexpired Term.  In the event of a breach or anticipatory breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if reentry, summary proceedings and other remedies were not provided for herein.

h.      In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting Tenant a lien upon the property of Landlord or upon Rent due Landlord), but prior to any such action Tenant will give Landlord notice specifying such default with particularity, and Landlord shall have thirty (30) days after receipt of such notice in which to cure any such default; provided, however, that if such default cannot, by its nature, be cured within such period, Landlord shall not be deemed in default if Landlord shall within such period commence to cure such default and shall diligently prosecute the same to completion.  Tenant further agrees, in the event of any act or omission by Landlord which would give Tenant the right, either immediately or after the lapse of a period of time, to terminate this Lease, or to claim a partial or total eviction, Tenant will not exercise any such right (i) until it has sent written notice of such act or omission to any mortgagee as may be specified in a notice previously sent to Tenant in accordance with the provisions of Section 23 hereof, and (ii) unless a mortgagee shall have failed within thirty (30) days after receipt of such notice to cure such default or, if such default is not reasonably susceptible of cure within such thirty (30) days, such mortgagee shall not have commenced the cure of such default within thirty (30) days of receipt of such notice and thereafter diligently pursued such action; provided, however, in no event shall any mortgagee have any obligation to cure (or any liability or obligation for not curing) any breach or default by Landlord.  Unless and until Landlord (and, if applicable, Landlord's mortgagee) fails so to cure any default after notice, Tenant shall have no remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; all such obligations will be binding upon Landlord only during the period of its ownership of the Building and not thereafter; and no default or alleged default by Landlord shall relieve or delay performance by Tenant of its obligations to continue to pay Annual Base Rent, Percentage Rent and Additional Rent hereunder as and when the same shall be due.

## 17.    BANKRUPTCY.

a.      For purposes of this Lease, the following shall be deemed "Events of Bankruptcy":  (i) a receiver or custodian is appointed for any or all of Tenant's property or assets, or if there is instituted a foreclosure action on any of Tenant's property; (ii) Tenant files a voluntary petition under 11 U.S.C. Article 101, et seq., as amended (the "Bankruptcy Code"), or under the insolvency laws of any jurisdiction (the "Insolvency Laws"); (iii) there is filed an involuntary petition against Tenant as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is not dismissed within thirty (30) days of filing; (iv) Tenant makes or consents to an assignment of its assets, in whole or in part, for the benefit of creditors, or a common law composition of creditors; or (v) Tenant generally is not paying its debts as its debts become due.

b.      Upon the occurrence of an Event of Bankruptcy, Landlord, at its option and sole discretion, may terminate this Lease by written notice to Tenant (subject, however, to applicable provisions of the Bankruptcy Code or Insolvency Laws during the pendency of any action thereunder).  If this Lease is terminated under this Section 17, Tenant shall immediately surrender and vacate the Premises, waives all statutory or other notice to quit, and agrees that Landlord shall have all rights and remedies against Tenant provided in Section 16 in case of an Event of Default by Tenant.

c.    If Tenant becomes the subject debtor in a case pending under the Bankruptcy Code (the "Bankruptcy Case"), Landlord's right to terminate this Lease under this Section 17 shall be subject to the applicable rights (if any) of the debtor-in-possession or the debtor's trustee in bankruptcy (collectively, the "Trustee") to assume or assign this Lease as then provided for in the Bankruptcy Code, however, the Trustee must give to Landlord, and Landlord must receive, proper written notice of the Trustee's assumption or rejection of this Lease, within sixty (60) days (or such other applicable period as is provided pursuant to the Bankruptcy Code, it being agreed that sixty (60) days is a reasonable period of time for election of an assumption or rejection of this Lease) after the commencement of the Bankruptcy Case; it being agreed that failure of the Trustee to give notice of such assumption hereof within said period shall conclusively and irrevocably constitute the Trustee's rejection of this Lease and waiver of any right of the Trustee to assume or assign this Lease.  The Trustee shall not have the right to assume or assign this Lease unless said Trustee (i) promptly and fully cures all defaults under this Lease, (ii) promptly and fully compensates Landlord and any third party (including other tenants) for all monetary damages incurred as a result of such default, and (iii) provides to Landlord "adequate assurance of future performance."   Landlord and Tenant (which term may include the debtor or any permitted assignee of debtor) hereby agree in advance that "adequate assurance of performance," as used in this Section 17.c, shall mean that all of the following minimum criteria must be met:  (1) the source of Monthly Base Rent, Percentage Rent, Additional Rent, and other consideration due under this Lease, and the financial condition and operating performance of Tenant, and its guarantor, if any, shall be similar to the financial condition and operating performance of Tenant as of the Commencement Date; (2) Trustee or Tenant must pay to Landlord all Monthly Base Rent, Percentage Rent and Additional Rent payable by Tenant hereunder in advance; (3) Trustee or Tenant must agree (by writing delivered to Landlord) that the Premises shall be used only for the permitted use as stated in this Lease, and that any assumption or assignment of this Lease is subject to all of the provisions thereof and will not violate or affect the rights or agreements of any other tenants or occupants in the Building or of Landlord (including any mortgage or other financing agreement for the Building; (4) Trustee or Tenant must pay to Landlord at the time the next Monthly Base Rent is due under this Lease, in addition to such installment of Monthly Base Rent, an amount equal to the installments of Monthly Base Rent, Percentage Rent and Additional Rent due under this Lease for the next six (6) months of this Lease, said amount to be held by Landlord in escrow until either Trustee or Tenant defaults in its payment of Monthly Base Rent, Percentage Rent and Additional Rent or other obligations under this Lease (whereupon Landlord shall have the right to draw on such escrowed funds) or until the expiration of this Lease (whereupon the funds shall be returned to Trustee or Tenant except to the extent the funds have been drawn and not replaced); and (5) Trustee or Tenant must agree to pay to Landlord at any time Landlord is authorized to and does draw on the escrow account the amount necessary to restore such escrow account to the original level required by clause (4), above.  The criteria stated above are not intended to be exhaustive or all-inclusive and Landlord may determine that the circumstances of Tenant or of this Lease require other or further assurances of future performance.  In the event Tenant is unable to (a) cure its defaults, (b) reimburse Landlord for its monetary damages, (c) pay the Monthly Base Rent, Percentage Rent and Additional Rent due under this Lease on time, or (d) meet the criteria and obligations imposed by (1) through (5), above, Tenant hereby agrees in advance that it shall be deemed to have failed to meet its burden to provide adequate assurance of future performance, and this Lease may thereafter be terminated by Landlord in accordance with Section 17.b., above.

## 18.    PAYMENT OF TENANT'S OBLIGATIONS BY LANDLORD AND UNPAID RENT.

All covenants and agreements to be performed by Tenant under any of the terms of this Lease shall be performed by Tenant at Tenant's sole cost and expense.  If Tenant shall fail to pay any sum of money, other than Rent, required to be paid by it hereunder or shall fail to perform any other act on its part to be performed hereunder, and such failure shall continue beyond any applicable grace period set forth in this Lease, Landlord may, without waiving or releasing Tenant from any of its obligations hereunder, make any such payment or perform any such other required act on Tenant's part. All sums so paid by Landlord, and all necessary incidental costs, together with interest thereon at the Default Rate from the date of such

payment by Landlord, shall be payable by Tenant to Landlord as Additional Rent hereunder, on demand, and Tenant covenants and agrees to pay any such sums. Landlord shall have (in addition to any other right or remedy of Landlord hereunder or at law) the same rights and remedies in the event of the nonpayment thereof by Tenant as in the case of default by Tenant in the payment of Additional Rent.

## 19.    VOLUNTARY SURRENDER.

The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, shall not work a merger, and shall, at the sole option of Landlord, terminate all or any existing subleases or subtenancies, or may, at the sole option of Landlord, operate as an assignment to Landlord of any or all such subleases or subtenancies; provided, however, that if Landlord elects to treat such termination as an assignment of any such sublease, Landlord shall have no obligation or liability to the subtenant thereunder for any claim, damage or injury which accrued prior to the date of surrender or mutual cancellation hereunder.

## 20.    ABANDONMENT OF PERSONAL PROPERTY.

Upon the expiration of the Term or earlier termination of this Lease, Tenant shall immediately remove Tenant's goods and effects and those of any other persons claiming through or under Tenant, or subtenancies assigned to it, and quit and deliver the Premises to Landlord peaceably and quietly. Goods and effects not removed by Tenant prior to the expiration of the Term (or within forty-eight (48) hours after any earlier termination of this Lease) shall be considered abandoned. Landlord may dispose of any such abandoned property as Landlord deems expedient (including, without limitation, public or private sale and/or storage in a public warehouse or elsewhere at the sole cost and expense of Tenant), and Landlord shall not be liable for trespass, conversion, negligence or in any other way liable in connection with the disposal of such property. Tenant shall promptly upon demand reimburse Landlord for any costs and expenses incurred by Landlord in connection with the disposal of abandoned property, including, but not limited to, reasonable attorneys' fees.

## 21.    HOLD-OVER.

Tenant agrees that it will not occupy or retain or allow occupancy or retention by any subtenant of possession of the Premises at any time after the expiration of the Term or other termination of this Lease, without the prior written consent of Landlord. In the event that Tenant shall hold over after the expiration of the Term or other termination of this Lease without Landlord's prior written consent, Tenant shall be deemed a tenant at sufferance and Landlord shall have the right to regain possession of the Premises by any legal process in force at such time. It will be conclusively presumed that the value to Tenant of remaining in possession of the Premises after the expiration of the Term or termination of this Lease, and the loss or damage that Landlord will suffer as a result thereof, far exceed the Annual Base Rent, Percentage Rent and Additional Rent that would have been payable had the Term continued during the holdover period. For each month or part of a month that Tenant occupies the Premises after the date of expiration of the Term or other termination of this Lease, Tenant shall pay to Landlord an amount equal to the sum of (i) one hundred fifty percent (150%) of the monthly installments of Annual Base Rent being paid immediately prior to the expiration of the Term or earlier termination of this Lease, plus (ii) Tenant's Pass-Through Costs, Percentage Rent and any other Additional Rent paid on an installment basis, plus (iii) any other Additional Rent or charges, including attorneys' fees, costs, and expenses incurred by Landlord in regaining possession of the Premises and/or to recover the foregoing amounts. Such liquidated damages for the first calendar month (or part thereof) during the holdover period shall be due and payable on the day immediately following the expiration of the Term or earlier termination of this Lease, and for each calendar month thereafter during the holdover period, such liquidated damages shall be due and payable on the first day of such calendar month. If the holdover period ends on a date other than the last day of a calendar month, such liquidated damages for the entire calendar month in which the holdover period ends shall be deemed earned by Landlord as of the first day of such month, and Tenant shall not be entitled to a refund or reduction of Rent for any such partial month. In addition, the security deposit provided to Landlord pursuant to the terms of this Lease shall be forfeited. Holdover occupancy

by Tenant shall be subject to all of the terms, covenants, and conditions of this Lease. Tenant acknowledges and agrees that Landlord intends to lease the Premises (in whole, in part or as a part of a larger portion of the Building) to another tenant immediately after the expiration of the Term or earlier termination of this Lease and that any holdover by Tenant in the Premises may result in material damages to Landlord (including, without limitation, any damages to Landlord in connection with its reletting of the Premises and/or other portions of the Building).  Tenant agrees to indemnify, hold harmless and defend Landlord for all damages (including, but not limited to, consequential damages), losses, expenses and costs (including, without limitation, attorneys' fees and court costs) that Landlord may suffer as a result of Landlord's failure to deliver the Premises to another tenant due to Tenant's holdover use and occupancy of the Premises.

## 22.    RESERVED.

## 23.    NOTICES.

All notices or other communications hereunder shall be in writing and shall be deemed duly given if delivered by hand, or by a nationally recognized delivery service providing a receipt evidencing such delivery, or by certified or registered mail return receipt requested, first-class, postage prepaid, to the notice addresses for Landlord and Tenant set forth in Section 1 of this Lease, unless notice of a change of address is given in writing pursuant to this Section 23.  Notice shall be deemed to have been given upon receipt or at the time delivery is refused.  In the event that Section 1 provides (or Tenant otherwise designates in writing in accordance with this Section 23) that more than one (1) person or address receive notices on Tenant's behalf hereunder, Landlord shall use commercially reasonable efforts to send such notices to all requested parties; provided, however, it shall not be a condition to the effectiveness of any notice that more than one (1) person or address receive such notices.

## 24.    BROKERS.

Landlord and Tenant recognize Neighborhood Retail Group, LLC and Papadopoulos Properties (collectively, the "Brokers") as the sole brokers with respect to this Lease and Landlord agrees to be responsible for the payment of any leasing commission owed to the Brokers in accordance with the terms of separate commission agreement(s) entered into between Landlord and the Brokers. Tenant represents and warrants to Landlord that, except for the Brokers, no other broker has been employed or engaged in carrying on any negotiations relating to this Lease and Tenant shall indemnify and hold harmless Landlord from any claim for a brokerage or other commission  and any other claims, fees and expenses arising from or out of any breach of the foregoing representation and warranty.  Landlord represents and warrants to Tenant that, except for the Brokers, no broker has been employed or engaged in carrying on any negotiations relating to this Lease, and Landlord shall indemnify and hold harmless Tenant from any claim for a brokerage commission and any other claims, fees and expenses arising from or out of any breach of the foregoing representation and warranty.

## 25.    ENVIRONMENTAL CONCERNS.

a.    Tenant, its agents, employees, contractors or invitees shall not (i) cause or permit any Hazardous Materials (hereinafter defined) to be brought upon, stored, used or disposed on, in or about the Premises and/or the Building, or (ii) knowingly permit the release, discharge, spill or emission of any Hazardous Material in or from the Premises.

b.    Tenant hereby agrees that it is and shall be fully responsible for all costs, expenses, damages or liabilities (including, but not limited to, those incurred by Landlord and/or its mortgagee) which may occur from the use, storage, disposal, release, spill, discharge or emissions of Hazardous Materials by Tenant whether or not the same may be permitted by this Lease.  Tenant shall defend, indemnify and hold harmless Landlord, its mortgagee and its agents from and against any claims, demands, administrative orders, judicial orders, penalties, fines, liabilities, settlements, damages, costs or expenses (including, without limitation, reasonable attorney and consultant

fees, court costs and litigation expenses) of whatever kind or nature, known or unknown, contingent or otherwise, arising out of or in any way related to the use, storage, disposal, release, discharge, spill or emission of any Hazardous Material, or the violation of any Environmental Laws (hereinafter defined), by Tenant, its agents, employees, contractors or invitees.  The provisions of this Section 25 shall be in addition to any other obligations and liabilities Tenant may have to Landlord at law or in equity and shall survive the transactions contemplated herein or any termination of this Lease.

c.    As used in this Lease, the term "Hazardous Materials" shall include, without limitation:

(i)    those substances included within the definitions of "hazardous substances", "hazardous materials," toxic substances," or "solid waste" in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. §9601 *et seq.*) ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), the Resource Conservation and Recovery Act of 1976 ("RCRA"), and the Hazardous Materials Transportation Act, and in the regulations promulgated pursuant to said laws, all as amended;

(ii)    those substances listed in the United States Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); and

(iii)    any material, waste or substance which is (A) petroleum, (B) asbestos, (C) polychlorinated biphenyl, (D) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. §1251 *et seq*. (33 U.S.C. §1321) or pursuant to 33 U.S.C. §1317; (E) flammables or explosives; or (F) radioactive materials.

d.    As used herein, the term "Environmental Laws" means any federal, state or local law, ordinance, rule, regulation, requirement, guideline, code, resolution, order or decree (including consent decrees and administrative orders) which (i) regulates the use, generation, handling, storage, treatment, transportation, decontamination, clean-up, removal, encapsulation, enclosure, abatement or disposal of Hazardous Materials, or (ii) imposes liability or standards of conduct concerning Hazardous Materials.

## 26.    LANDLORD'S LIEN.

To secure the payment of all Rent and Additional Rent due and to become due hereunder and to assure the faithful performance of all of the other covenants of this Lease required to be performed by Tenant, Tenant hereby grants to Landlord an express contractual lien on and security interest in all property, chattels or merchandise which may be placed in the Premises and also upon all proceeds of any insurance which may accrue to Tenant by reason of damage to or destruction of any such property, chattels or merchandise.  All exemption laws are hereby waived by Tenant.  Such contractual lien and security interest are (i) granted in addition to Landlord's statutory and common law liens and shall be cumulative thereto, and (ii) may be foreclosed with or without court proceedings, by public or private sale, upon not fewer than three (3) days prior notice.  Landlord shall have the right to become purchaser upon being the highest bidder at such sale.  Landlord shall have the right to file or record a Uniform Commercial Code financing statement(s) relating to the aforesaid security interest.

Upon Tenant's written request, Landlord agrees to provide a subordination of lien agreement pursuant to which Landlord will subordinate its lien rights in the personal property of Tenant located within the Premises to the lien of any bona-fide third-party institutional lender (a "Tenant Lender") providing financing to Tenant in relation to the Tenant Improvements or the operation of Tenant's business in the Premises.  The subordination of lien agreement shall include, without limitation: (i) a covenant that the Tenant Lender notify Landlord prior to entering the Premises and/or exercising any rights under the subordination of lien agreement; (ii) a covenant requiring the Tenant Lender and Tenant, jointly and

severally, to reimburse Landlord for and indemnify, defend and hold harmless Landlord and all Landlord Parties from and against any and all cost, damage, claim, liability or expense (including, without limitation, reasonable attorney's fees) incurred by Landlord or any Landlord Parties, directly or indirectly, as a result of or in any way arising from Tenant Lender's exercise of its rights under the subordination of lien agreement, including, without limitation, any entry upon the Premises by such Tenant Lender; and (iii) require the Tenant Lender to remove all personal property of Tenant subject to such lien and described in such subordination of lien agreement within fifteen (15) days following such Tenant Lender's first entry upon the Premises (and in all events, prior to any termination of this Lease).  It shall be a condition to Landlord's delivery of any subordination of lien agreement that (a) Tenant deliver to Landlord, simultaneously with Tenant's request for such subordination of lien agreement, a copy of the financing agreement with the Tenant Lender, a list of all personal property of Tenant subject to the lien of such Tenant Lender and any other information Landlord may reasonably request regarding such Tenant Lender and/or the financing provided by such Tenant Lender, and (b) Tenant reimburse Landlord, within ten (10) days following Landlord's written demand, for all costs and expenses (including without limitation, attorney's fees) incurred by Landlord in connection with Tenant's request for a subordination of lien agreement, including, without limitation, all legal costs and expenses incurred in connection with the preparation, review and/or negotiation of the subordination of lien agreement.

## 27.    RULES AND REGULATIONS.

Tenant shall at all times comply with the rules and regulations set forth in Exhibit D attached hereto and with any reasonable additions thereto and modifications thereof adopted from time to time by Landlord and of which Landlord has provided notice to Tenant.  Each such rule or regulation shall be deemed to be a covenant of this Lease to be performed and observed by Tenant; provided, however to the extent any additional rules and regulations or modifications thereof conflict with the terms of this Lease, the terms of this Lease shall control.

## 28.    QUIET ENJOYMENT.

Landlord covenants that, if Tenant is not in default hereunder beyond the expiration of any applicable cure period, Tenant shall at all times during the Term peaceably and quietly have, hold and enjoy the Premises without disturbance from Landlord, subject to the terms of this Lease and to the rights of the parties presently or hereinafter secured by any deed of trust or mortgage against the Building.

## 29.    USA PATRIOT ACT AND ANTI-TERRORISM LAWS.

a.    Tenant represents and warrants to, and covenants with, Landlord that neither Tenant nor any of its respective constituent owners or affiliates currently are, or shall be at any time during the Term hereof, in violation of any laws relating to terrorism or money laundering (collectively, the "Anti-Terrorism Laws"), including without limitation Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order") and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "USA Patriot Act").

b.    Tenant covenants with Landlord that neither Tenant nor any of its respective constituent owners or affiliates is or shall be during the Term hereof a "Prohibited Person," which is defined as follows:  (i) a person or entity that is listed in the Annex to, or is otherwise subject to, the provisions of the Executive Order; (ii) a person or entity owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity with whom Landlord is prohibited from dealing with or otherwise engaging in any transaction by any Anti-Terrorism Law, including without limitation the Executive Order and the USA Patriot Act; (iv) a person or entity who commits, threatens or conspires to commit or support "terrorism" as defined in Section 3(d) of the Executive

Order; (v) a person or entity that is named as a "specially designated national and blocked person" on the then-most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf, or at any replacement website or other replacement official publication of such list; and (vi) a person or entity who is affiliated with a person or entity listed in items (i) through (v), above.

c.      At any time and from time-to-time during the Term, Tenant shall deliver to Landlord, within ten (10) days after receipt of a written request therefor, a written certification or such other evidence reasonably acceptable to Landlord evidencing and confirming Tenant's compliance with this Section 29.

**30.      MISCELLANEOUS PROVISIONS.**

a.      Time is of the essence with respect to all of Tenant's obligations under this Lease.

b.      The waiver by Landlord or Tenant of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition of any prior or subsequent breach of the same or any other term, covenant or condition herein contained.  The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any prior breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such prior breach at the time of acceptance of such rent.

c.      In the event of any action or proceeding brought by either party against the other under this Lease, the prevailing party shall be entitled to recover from the other party the fees of its attorneys in such action or proceeding in such amount as the court may judge to be reasonable for such attorneys' fees.

d.      Except as expressly otherwise provided in this Lease, all of the provisions of this Lease shall bind and inure to the benefit of the parties hereto and to their heirs, successors, representatives, executors, administrators, transferees and assigns.  The term "Landlord," as used herein, shall mean only the owner of the Building and the Land or of a lease of the Building and the Land, at the time in question, so that in the event of any transfer or transfers of title to the Building and the Land, or of Landlord's interest in a lease of the Building and the Land, the transferor shall be and hereby is relieved and freed of all obligations of Landlord under this Lease accruing before such transfer, and it shall be deemed, without further agreement, that such transferee has assumed and agreed to perform and observe all obligations of Landlord herein during the period it is the holder of Landlord's interest under this Lease.

e.      At Landlord's request, Tenant will execute a memorandum of this Lease in recordable form setting forth such provisions hereof as Landlord deems desirable.  Further, at Landlord's request, Tenant shall acknowledge before a notary public its execution of this Lease, so that this Lease shall be in form for recording.  The cost of recording this Lease or memorandum thereof shall be borne by Tenant.

f.      Notwithstanding any provision to the contrary herein, Tenant shall look solely to the estate and property of Landlord in and to the Land and the Building in the event of any claim against Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises, and Tenant agrees that the liability of Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises shall be limited to such estate and property of Landlord in and to the Land and the Building.  No other properties or assets of Landlord (i.e., other than the estate and property of Landlord in and to the Building) and no property or assets of any member, partner, shareholder, officer or director of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) or for the satisfaction of any other

remedy of Tenant arising out of or in connection with this Lease, the relationship of Landlord and Tenant or Tenant's use of the Premises.

g.       Landlord and Landlord's agents have made no representations or promises with respect to the Building, the Land or the Premises except as herein expressly set forth.

h.       Landlord shall be excused from performing an obligation or undertaking provided for in this Lease so long as such performance is prevented or delayed, retarded or hindered by an Act of God, fire, earthquake, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure or a general shortage of labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, a taking by eminent domain, requisition, laws, orders of government, or of civil, military or naval authorities, inability to obtain, or delays in obtaining, permits or other governmental approvals, or any other cause whether similar or dissimilar to the foregoing, not within the reasonable control of Landlord (collectively, "Force Majeure").

i.       Tenant hereby elects domicile at the Premises for the purpose of service of all notices, writs of summons or other legal documents or process in any suit, action or proceeding which Landlord or any mortgagee may undertake under this Lease.

j.       Landlord shall not be liable to Tenant for any damage caused by other tenants or persons in the Building or caused by operations of others in the construction of any private, public or quasi-public work.

k.       If in this Lease it is provided that Landlord's consent or approval as to any matter will not be unreasonably withheld or delayed, and it is established by a court or body having final jurisdiction thereover that Landlord has been unreasonable, the sole effect of such finding shall be that Landlord shall be deemed to have given its consent or approval, but Landlord shall not be liable to Tenant in any respect for money damages or expenses incurred by Tenant by reason of Landlord having withheld its consent. Nothing contained in this paragraph shall be deemed to limit Landlord's right to give or withhold consent unless such limitation is expressly contained in the paragraph to which such consent pertains.

l.       If any governmental entity or authority hereafter imposes a tax or assessment upon or against any of the rent or other charges payable by Tenant to Landlord hereunder (whether such tax takes the form of a lease tax, sales tax or other tax), Tenant shall be responsible for the timely payment thereof. Unless Landlord and Tenant otherwise agree in writing with respect to the payment thereof, Tenant shall pay the applicable tax to Landlord in monthly installments on the date upon which Tenant pays to Landlord the installments of Monthly Base Rent due under this Lease.

m.       This Lease and the Exhibits hereto constitute the entire agreement between the parties, and supersedes any prior agreements or understandings between them. The provisions of this Lease may not be modified in any way except by written agreement signed by both parties.

n.       This Lease shall be subject to and construed in accordance with the laws of the Commonwealth of Virginia without regard to its conflicts of laws principles.

o.       Tenant (and any guarantor of this Lease) will provide Landlord, within ten (10) days after Landlord delivers to Tenant (or such guarantor) written request therefor, with a copy of its most recent financial statements, consisting of a Balance Sheet and Earnings Statement, prepared in accordance with generally accepted accounting principles. Such financial statements must be either certified by a certified public accountant or sworn to as to their accuracy by Tenant's (or the guarantor's, as applicable) chief financial officer. The financial statements provided must be as of a date not more than twelve (12) months prior to the date of request.

p.       It is generally understood that mold spores are present essentially everywhere and that mold can grow in most any moist location. Emphasis is properly placed on prevention of moisture and on

good housekeeping and ventilation practices.   Tenant acknowledges the necessity of housekeeping, ventilation, and moisture control (especially in kitchens, janitor's closets, bathrooms, break rooms and around outside walls) for mold prevention.  Tenant represents that it has first inspected the aforementioned Premises and certifies that it has not observed mold, mildew or moisture within the Premises.   Tenant agrees to immediately notify Landlord if it observes mold/mildew and/or moisture conditions (from any source, including leaks), and allow Landlord to evaluate and make recommendations and/or take appropriate corrective action. Tenant releases Landlord from any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the Premises. In addition, execution of this Lease constitutes acknowledgement by Tenant that control of moisture and mold prevention are integral to its obligations under this Lease.

q.      The submission of this Lease to Tenant, does not constitute an offer to lease the Premises.  This Lease shall have no force and effect until it is executed and delivered by Tenant to Landlord and executed by Landlord;  provided, however, that, upon execution of this Lease by Tenant and delivery to Landlord, such execution and delivery by Tenant shall, in consideration of the time and expense incurred by Landlord in preparing this Lease and reviewing Tenant's credit, constitute an offer by Tenant to lease the Premises upon the terms and conditions set forth herein.

r.      This Lease may be executed in two (2) or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Lease.

## 31.    OPTION TO EXTEND TERM

a.      Subject to the terms and conditions of this Section 31, Tenant shall have and is hereby granted the option to extend the Term (the "Extension Option") for two (2) period(s) of five (5) years each (each, an "Extension Period").   Tenant may only exercise the Extension Option by delivering to Landlord written notice of Tenant's irrevocable election to exercise the Extension Option (the "Extension Notice") to Landlord, not more than fifteen (15), nor less than twelve (12), calendar months prior to the Lease Expiration Date (with respect to the first Extension Period) or the expiration of the first Extension Period (with respect to the second Extension Period), as the case may be, time being of the essence.  Tenant may not exercise the Extension Option if (i) any Event of Default has occurred and remains uncured at the time Tenant delivers the applicable Extension Notice or at the commencement of the applicable Extension Period, or (ii) the Tenant originally named in this Lease has assigned its interest in this Lease or sublet all or any portion of the Premises (except for an assignment or sublease to which Landlord has expressly consented in accordance with Section 7 above).

b.      All terms and conditions of this Lease, including, without limitation, all provisions governing the payment of Annual Base Rent, Percentage Rent and Additional Rent, and annual increases in Annual Base Rent, shall remain in full force and effect during the Extension Periods, except as follows: (i) the Annual Base Rent (on a per rentable square foot basis) payable during the first Extension Period shall be as set forth in Section 4.a above, and the Annual Base Rent (on a per rentable square foot basis) payable during the second Extension Period shall equal the greater of (1) one hundred two and one-half percent (102.5%) of the Annual Base Rent in effect for the last Lease Year of the first Extension Period and (2) the Fair Market Rental Rate (hereinafter defined) for the Premises at the time of the commencement of the second Extension Period; and (ii) Landlord shall provide Tenant with a "market" tenant improvement allowance and other "market" tenant concessions that are typically provided to tenants in connection with the renewal of leases of comparable space in Comparable Buildings for renewal periods comparable to the applicable Extension Period.  As used in this Lease, the term "Fair Market Rental Rate" shall mean the fair market rental rate that would be agreed upon between a landlord and a tenant entering into a lease renewal for a comparable term for retail space comparable to the Premises as to location, build-out, configuration and size, in a Comparable Building, assuming the following:  (x) the landlord and tenant are informed and well-advised and each is acting in what it considers its own best interests; (y) the landlord will provide the tenant with a "market" improvement allowance and

other tenant concessions being provided in connection with similar lease renewals of comparable space in Comparable Buildings with a comparable build-out for renewal terms comparable to the applicable Extension Period; and (z) the tenant will continue to pay its proportionate share of Operating Expenses and Real Estate Taxes as set forth in this Lease.

c.    Landlord and Tenant shall negotiate in good faith to determine the Fair Market Rental Rate for the second Extension Period, for a period of thirty (30) days after the date on which Landlord receives Tenant's written notice of Tenant's irrevocable election to exercise the Extension Option for such Extension Period as provided for under this Section 31.  In the event Landlord and Tenant are unable to agree upon the Fair Market Rental Rate within said thirty (30)-day period, the Fair Market Rental Rate for the Premises shall be determined by a board of three (3) licensed real estate brokers, one of whom shall be named by Landlord, one of whom shall be named by Tenant, and the two so appointed shall select a third.  Each real estate broker so selected shall be licensed in the Commonwealth of Virginia as a real estate broker specializing in the field of retail leasing in the Arlington, Virginia leasing submarket, having no fewer than ten (10) years' experience in such field, and recognized as ethical and reputable within the field  (a "Qualified Broker").  Landlord and Tenant agree to make their appointments promptly within ten (10) days after the expiration of the thirty (30)-day period, or sooner if mutually agreed upon.  The two (2) Qualified Brokers selected by Landlord and Tenant shall promptly select a third Qualified Broker within ten (10) days after they both have been appointed, and each Qualified Broker, within fifteen (15) days after the third Qualified Broker is selected, shall submit his or her determination of the Fair Market Rental Rate.  The Fair Market Rental Rate shall be the mean of the two closest rental rate determinations.  Landlord and Tenant shall each pay the fee of the Qualified Broker selected by it, and they shall equally share the payment of the fee of the third Qualified Broker.

d.    Should the Term of this Lease be extended hereunder, Tenant shall, if required by Landlord, execute an amendment modifying this Lease within ten (10) business days after Landlord presents same to Tenant, which agreement shall set forth the Annual Base Rent for each year of, and the other economic terms and provisions in effect during, the applicable Extension Period. Should Tenant fail to execute the amendment (which amendment accurately sets forth the economic terms and provisions in effect during the applicable Extension Period) within ten (10) business days after presentation of same by Landlord, time being of the essence, Tenant's right to extend the Term of this Lease shall, at Landlord's sole option, terminate, and Landlord shall be permitted to lease such space to any other person or entity upon whatever terms and conditions are acceptable to Landlord in its sole discretion.

e.    If Tenant fails to timely exercise its Extension Option (or is deemed to have waived such Extension Option) with respect to the first Extension Period, Tenant's Extension Option with respect to the second Extension Period shall be deemed to have been irrevocably waived and shall thereafter be null and void and of no further force or effect.

## 32.    PATIO AREA.

Subject to Legal Requirements and the following terms and conditions of this Section 32, Tenant is hereby granted a license to use the patio area adjacent to the Premises, and marked on the floor plan attached hereto as Exhibit A (hereinafter "Patio Area").  Tenant may use the Patio Area for the placement of tables and chairs serving as an outdoor seating area for customers of the business operated in the Premises for the consumption of food and beverages purchased by such customers in the Premises, and shall not use the Patio Area for any other purpose. Tenant shall not use or permit the Patio Area or any part thereof to be used in any manner that violates Legal Requirements, constitutes waste or nuisance, causes unreasonable disturbances to other tenants of the Building, or for any disorderly, unlawful or hazardous purpose. Tenant shall not be permitted to operate loudspeakers or any other audio devices in the Patio Area.  Tenant shall not utilize any area outside the Premises for tables and chairs other than the Patio Area.  Tenant's use of the Patio Area shall be subject to the terms and conditions of this Lease, and shall be in compliance with all Legal Requirements.  The design, quality and number of tables and chairs, and the design, quality and method of installation for any other improvements located within the Patio Area, as well as the hours of operation of the Patio Area, shall be approved in advance in writing by

Landlord, which approval shall not be unreasonably withheld. Tenant, at Tenant's sole cost and expense, shall maintain the Patio Area in an attractive and clean condition at all times and in accordance with the general character of the Building.  Without limiting the foregoing, Tenant shall, at Tenant's sole cost and expense, keep the Patio Area free of trash and debris caused by its customers, which trash and debris shall not be placed in any public trash receptacles in the common areas of the Building.   Tenant shall insure and maintain the Patio Area in the same quality, scope and manner as Tenant is required to insure and maintain the Premises.  Tenant shall be solely and strictly liable for any loss or damage resulting or arising from or in connection with the use of the Patio Area by Tenant or any Tenant Parties and shall indemnify and hold harmless Landlord from any and all liability that may arise from the use of the Patio Area by Tenant or any Tenant Parties. Tenant acknowledges and agrees that Landlord shall have access to the Patio Area at all times and as needed in order to maintain and repair the Building and may from time to time close the Patio Area in connection therewith. Notwithstanding anything to the contrary set forth herein, if at any time Tenant is in violation of the terms of this Lease regarding the use of the Patio Area or Tenant's use of the Patio Area is otherwise in violation of any Legal Requirements, Landlord shall have the right, upon written notice to Tenant and in addition to any other remedies provided in this Lease or at law, to revoke the foregoing license to use the Patio Area.  Tenant, at Tenant's expense, shall immediately remove all of Tenant's tables and chairs and any other improvements located or installed by Tenant in the Patio Area immediately upon Landlord's revocation of Tenant's license to use the Patio Area.

**33.    GUARANTY.**

Simultaneously with the execution and delivery of this Lease by Tenant, Tenant shall cause the a guaranty of lease (the "Guaranty") in the form attached hereto and made a part hereof as <u>Exhibit H</u>, to be executed by Guarantor and delivered to and for the benefit of Landlord.  The effectiveness of this Lease shall be conditioned upon Guarantor's execution and delivery of the Guaranty no rights of Tenant, or obligations of Landlord, shall be effective until the Guaranty is executed and delivered to Landlord as required herein.

**34.    RIGHT OF FIRST OFFER**.

a.    Subject to (i) any expansion rights, renewal rights, rights of first offer or refusal or other rights possessed by any tenant in the Building with respect to the ROFO Space (hereinafter defined) or any portion thereof existing as of the Effective Date, (ii) any renewal rights granted by Landlord after the Effective Date to any tenant of all or any portion of the ROFO Space, and (iii) the right of any tenant of the ROFO Space (or any portion thereof) to negotiate an extension of the term of its lease of such space or a new lease demising such space, Tenant shall have the following rights set forth in this Section 34 with respect to the ROFO Space.  As used herein, the term "ROFO Space" shall mean certain premises adjacent to the Premises on the first (1st) floor of the Building and consisting of approximately 1,306 rentable square feet of space, as more specifically depicted on <u>Exhibit I</u> attached hereto.

b.    In the event that the ROFO Space becomes or is reasonably anticipated by Landlord to become vacant during the Term, then, except as provided below, Landlord shall notify Tenant in writing (the "Availability Notice") of the availability of the ROFO Space, and set forth in such Availability Notice: (i) the Annual Base Rent and Percentage Rent to be paid by Tenant with respect to the ROFO Space, which Annual Base Rent and Percentage Rent shall be comparable to the base rental and percentage rental rates then being offered to tenants entering into leases of comparable space as to location, configuration, build-out and size, and with comparable lease concessions, in a Comparable Building (the "Fair Market ROFO Rental Rate"); (ii) the other terms and conditions pursuant to which Landlord would lease the ROFO Space to Tenant; and (iii) the date on which Landlord anticipates that the ROFO Space will be available for delivery to Tenant (the "Availability Date"). The term of the demise of the ROFO Space to Tenant shall commence on the date on which Landlord delivers such space to Tenant (the "Delivery Date") and end on the last day of the Term.

c.    Notwithstanding anything to the contrary contained herein, in no event shall Landlord have any obligation to deliver an Availability Notice to Tenant, and Tenant shall have no right to lease the ROFO Space, if (A) any Event of Default then exists under this Lease or more than two (2) Events of Default shall have occurred in the 12-month period preceding the date on which Landlord would otherwise deliver an

Availability Notice, (B) Tenant has assigned its interest in this Lease or sublet all or any portion of the Premises, or (C) Landlord determines that there will be less than sixty (60) full calendar months remaining in the Term as of the Availability Date.

       d.      Tenant shall have five (5) business days after Tenant's receipt of the Availability Notice, time being of the essence, to notify Landlord, in writing, of Tenant's election to lease all (but not less than all) of the ROFO Space (the "Tenant Election Notice") on the terms and conditions of this Section 34.

       e.      In the event that Tenant timely delivers a Tenant Election Notice to Landlord, but fails to notify Landlord of Tenant's disagreement with the Fair Market ROFO Rental Rate set forth in the Availability Notice, the Fair Market ROFO Rental Rate set forth in the Availability Notice delivered by Landlord shall be deemed to be the Fair Market ROFO Rental Rate for purposes of this Section 34. In the event Tenant disagrees with Landlord's determination of the Fair Market ROFO Rental Rate set forth in the Availability Notice, Tenant shall so notify Landlord simultaneously with Tenant's delivery to Landlord of the Tenant Election Notice, time being of the essence, and Tenant shall set forth in the Tenant Election Notice: (i) Tenant's calculation of the Fair Market ROFO Rental Rate based on good faith opinion of a Qualified Broker selected by Tenant ("Tenant's Broker"), (ii) comparable lease data confirming the calculation of the Fair Market ROFO Rental Rate determined by Tenant's Broker, and (iii) the name and contact information for Tenant's Broker and the Qualified Broker proposed by Tenant's Broker to serve as the Third ROFO Broker. Provided that Tenant timely notifies Landlord that Tenant does not agree with the Fair Market ROFO Rental Rate set forth in the Availability Notice, Landlord and Tenant shall negotiate in good faith to determine the Fair Market ROFO Rental Rate for a period of ten (10) business days after the date on which Landlord receives the Tenant Election Notice. In the event Landlord and Tenant are unable to agree upon the Fair Market ROFO Rental Rate within said ten (10)-business day period, the Fair Market ROFO Rental Rate shall be determined by a board of three (3) licensed real estate brokers comprised of (a) Tenant's Broker, (b) one Qualified Broker selected by Landlord ("Landlord's Broker"), and (c) one Qualified Broker selected by Tenant's Broker and Landlord's Broker (the "Third ROFO Broker"). If Landlord does not accept the Third ROFO Broker proposed by Tenant's Broker, then Landlord's Broker and Tenant's Broker shall select a different Qualified Broker to serve as Third ROFO Broker within ten (10) days thereafter, and all three (3) Qualified Brokers shall, within five (5) business days after the Third ROFO Broker is selected, submit his or her determination of the Fair Market ROFO Rental Rate. The Third ROFO Broker shall determine which determination of Fair Market ROFO Rental Rate made by Landlord's Broker or Tenant's Broker is closest to the determination of Fair Market ROFO Rental Rate made by the Third ROFO Broker (the "Closest ROFO Determination"). The Fair Market ROFO Rental Rate hereunder shall be the mean of the Closest ROFO Determination and the determination of Fair Market ROFO Rental Rate made by the Third ROFO Broker. Landlord and Tenant shall each pay the fee of the Qualified Broker selected by it, and they shall equally share the payment of the fee of the Third ROFO Broker.

       f.      In the event that Tenant timely delivers a Tenant Election Notice to Landlord, once Fair Market ROFO Rental Rate has been determined in accordance with this Section 34, Landlord and Tenant shall execute and deliver an amendment to this Lease (the "ROFO Amendment") incorporating the ROFO Space, which ROFO Amendment shall set forth, among other things: (i) the amount of Annual Base Rent, Percentage Rent and Additional Rent attributable to the Available ROFO Space; and (ii) the adjustment to Tenant's Pro Rata Share (Operating Expenses) and Tenant's Pro Rata Share (Real Estate Taxes) resulting from the demise of the ROFO Space hereunder. In the event that Tenant does not execute the ROFO Amendment (which amendment accurately sets forth the terms and conditions relating to the demise of the ROFO Space to Tenant, as set forth in this Section 34) within ten (10) days after receipt thereof from Landlord, time being of the essence, then Tenant's right of first offer to lease the ROFO Space shall be null and void and of no further force or effect and Landlord may lease the ROFO Space to any person or entity of its choice on whatever terms and conditions Landlord elects in its sole discretion.

       g.      In the event Landlord and Tenant execute the ROFO Amendment, and Landlord is unable to deliver possession of the ROFO Space to Tenant on the Availability Date for any reason whatsoever, including without limitation the failure of an existing tenant to vacate such space, Landlord shall not be liable or responsible for any claims, damages or liabilities in connection therewith or by reason thereof. In

such event, Landlord shall use reasonable efforts to make the ROFO Space available to Tenant as soon as reasonably practicable after the Availability Date.

**[The rest of this page intentionally left blank. Signatures appear on the following page.]**

**IN WITNESS WHEREOF,** duly authorized representatives of Landlord and Tenant have executed this Deed of Retail Lease under seal on the day and year first above written.

**KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company

By:    KBS Capital Advisors, LLC, a Delaware limited liability company, its authorized agent

        By:    _____

                Stephen J. Close
                Senior Vice President

**TENANT:**

**SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company

By:    _____
        Name:
        Title:

### LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT A: | Floor Plan of Premises |
| EXHIBIT A-1: | Basement Storage Space |
| EXHIBIT B: | Work Agreement |
| EXHIBIT C: | Declaration of Commencement Date |
| EXHIBIT D: | Rules and Regulations |
| EXHIBIT E: | Prohibited Uses |
| EXHIBIT F: | Menu |
| EXHIBIT G: | Form of Letter of Credit |
| EXHIBIT H: | Form of Guaranty |
| EXHIBIT I: | ROFO Space |

**EXHIBIT A**

**FLOOR PLAN OF PREMISES**



**EXHIBIT A-1**

**BASEMENT STORAGE SPACE**



Smokecraft Storage
Garage B-2 Level
Approximately 250 SF

**EXHIBIT B**

**WORK AGREEMENT**

Capitalized terms not otherwise defined in this Work Agreement shall have the meanings set forth in the Lease.  In the event of any conflict between the terms hereof and the terms of the Lease, the terms hereof shall prevail for the purposes of design and construction of the Tenant Improvements.

A.    **TENANT IMPROVEMENTS.**  Tenant, at its sole cost and expense, shall furnish and install in the Premises in accordance with the terms of this Work Agreement, the improvements (the "Tenant Improvements") set forth in the Tenant Plans (hereinafter defined), which Tenant Plans are subject to Landlord's approval, in accordance with the terms and conditions of this Work Agreement.

B.    **PLANS AND SPECIFICATIONS**

1.    **Space Planner.**  Tenant has retained the services of ~~EVI~~GrizForm Design Architects (the "Space Planner"), to design the Tenant Improvements in the Premises and prepare the space plan attached hereto as <u>Schedule B-1</u> (the "Space Plan"), which Space Plan has been approved by Landlord and Tenant, and the Contract Documents (hereinafter defined).  The Space Planner shall meet with the Landlord and/or Landlord's building manager from time to time to obtain information about the Building and to insure that the improvements envisioned in the Contract Documents do not interfere with and/or adversely affect the Building or any systems therein.  In addition to the Space Plan, the Space Planner shall prepare all additional space plans, working drawings, and plans and specifications described in this Work Agreement, in conformity with the base Building plans and systems, and the Space Planner shall coordinate its plans and specifications with the Engineers (hereinafter defined) and Landlord.

2.    **Engineers.**  Tenant shall retain the services of mechanical, electrical, plumbing and structural engineers approved by Landlord (the "Engineers"), which approval shall not be unreasonably withheld, conditioned or delayed, to: (i) design the type, number and location of all mechanical systems in the Premises, including, without limitation, the heating, ventilating and air conditioning system therein, fire alarm system and to prepare all of the mechanical plans; (ii) assist Tenant and the Space Planner in connection with the electrical design of the Premises, including the location and capacity of light fixtures, electrical receptacles and other electrical elements, and to prepare all of the electrical plans; (iii) assist Tenant and the Space Planner in connection with plumbing-related issues involved in designing the Premises and to prepare all of the plumbing plans; and (iv) assist Tenant and the Space Planner in connection with the structural elements of the Space Planner's design of the Premises, and to prepare all of the structural plans.

3.    **Time Schedule.**

a.    Within ninety (90) days after the Effective Date, Tenant shall furnish to Landlord for its review and approval, all architectural plans, working drawings and specifications (the "Contract Documents") necessary and sufficient (i) for the construction of the Tenant Improvements; and (ii) to enable Tenant to obtain a building permit for the construction of the Tenant Improvements by the Contractor (hereinafter defined).  The Contract Documents shall contain the information and otherwise comply with the requirements therefore described in <u>Schedule B-2</u> attached hereto and shall set forth the location of any core drilling by Tenant (the approval of same shall be subject to Landlord's approval in its sole discretion).  Landlord shall advise Tenant of Landlord's approval or disapproval of the Contract Documents, or any of them, within ten (10) business days after Tenant submits the Contract Documents to Landlord.  Tenant shall promptly revise the Contract Documents to meet Landlord's objections, if any, and resubmit the Contract Documents to Landlord for its review and approval within five (5) business days of Tenant's receipt of Landlord's objections, if any.  Landlord shall advise Tenant of Landlord's approval or disapproval of the revised Contract Documents within five (5) business days after Tenant submits same.

b.    The Space Plan and the Contract Documents are referred to collectively herein as the "Tenant Plans."  Notwithstanding anything to the contrary contained in this Work Agreement,

Landlord shall have the right to disapprove, in its sole discretion, any portion of the Tenant Plans that Landlord believes will or may affect the exterior or structure of the Building or will or may adversely affect the mechanical, electrical, plumbing, life safety, HVAC or other base Building systems. Notwithstanding anything herein to the contrary, approval by Landlord of the Tenant Plans shall not constitute an assurance by Landlord that the Tenant Plans (i) satisfy Legal Requirements, (ii) are sufficient to enable Tenant to obtain a building permit for the undertaking of the Tenant Improvements in the Premises, or (iii) will not interfere with, and/or otherwise adversely affect, the base Building or base Building systems.

          c.      The Tenant Improvements shall be of first-class quality, commensurate with the level of improvements for a first-class retail tenant in a Comparable Building. The Tenant Plans shall be prepared in accordance with a Data Cadd or convertible DXF format for working drawings (using 1/8" reproducible drawings) in conformity with the base Building plans and Building systems and with information furnished by and in coordination with Landlord and Engineers. Tenant Plans shall comply with all Legal Requirements, shall not contain any improvements which interfere with or require any changes to or modifications of the Building's HVAC, mechanical, electrical, plumbing, life safety or other systems or to other Building operations or functions, and, unless Tenant agrees in writing to pay all such excess costs or charges, shall not increase maintenance, insurance or utility charges for operating the Building in excess of the standard requirements for Comparable Buildings. In no event shall Landlord's approval of the Tenant Plans constitute a representation or warranty from Landlord that the Tenant Plans comply with all Legal Requirements.

          4.      **Base Building Work**. If Tenant requests work to be done in the Premises or for the benefit of the Premises that necessitates revisions or changes in the design or construction of the base Building or affect Building systems (a "Building Change"), any such Building Changes shall be subject to the prior written approval of Landlord, which approval may be granted or withheld in Landlord's sole discretion. Tenant shall be responsible for all costs and delays resulting from Building Changes, including, without limitation, architectural and engineering charges, and any special permits or fees attributed thereto.

          5.      **Changes to Tenant Plans.**    No changes shall be made to the Tenant Plans without the prior written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed; provided, however, that Landlord shall have the right to disapprove, in its sole discretion, any such change that Landlord believes will affect the exterior or structure of the Building or will adversely affect the mechanical, electrical, plumbing, life safety, HVAC or other base Building systems. Landlord shall not be responsible for delay in occupancy by Tenant because of any changes to the Tenant Plans after approval by Landlord, or because of delay caused by or attributable to any deviation by the Tenant Plans from applicable Legal Requirements. In the event that Tenant requests any changes to the Tenant Plans after Landlord has approved same, or if it is determined that the Tenant Plans do not conform to the plans for the base Building, deviate from applicable Legal Requirements or contain improvements which will or may interfere with and/or affect the base Building or any of the base Building systems, or in the event of any change orders, Tenant shall be responsible for all costs and expenses and all delay resulting therefrom, including, without limitation, costs or expenses relating to (i) any additional architectural or engineering services and related design expenses, (ii) any changes to materials in process of fabrication, (iii) cancellation or modification of supply or fabricating contracts, (iv) removal or alteration of work or plans completed or in process, or (v) delay claims made by any subcontractor.

C.      **COST OF TENANT IMPROVEMENTS**

          All costs of design and construction of the Tenant Improvements, including without limitation the costs of all space planning, architectural and engineering work related thereto (including, without limitation, all fees of the Space Planner and Engineers), all governmental and quasi-governmental approvals and permits required therefor, any costs incurred by Landlord because of Building Changes, all construction costs, contractors' overhead and profit, insurance, and other requirements (collectively, "Construction Costs"), shall be paid by Tenant.

D.      **CONSTRUCTION**

1.      **General Contractor.** Tenant shall retain the services of a general contractor approved by Landlord ("Contractor") for the construction of the Tenant Improvements. The Contractor shall be a licensed, insured and bonded general contractor with significant experience in construction of retail space in Comparable Buildings.

2.      **Construction By The Contractor.**

a.      In undertaking the Tenant Improvements, Tenant and the Contractor shall strictly comply with the following conditions:

(i)      No work involving or affecting the Building's structure or the plumbing, mechanical, electrical or life/safety systems of the Building shall be undertaken without (1) the prior written approval of Landlord in its sole discretion, whether pursuant to its approval of Tenant Plans or otherwise, (2) the supervision of Landlord's building engineer, the actual cost of which shall be borne by Tenant if more than five (5) hours of such engineer's time is spent in connection with the Tenant Improvements during any calendar week, and (3) compliance by Tenant and the Contractor with all of the terms and provisions of this Work Agreement, including, without limitation, the insurance requirements set forth below;

(ii)      All Tenant Improvement work shall be performed in strict conformity with (1) the final approved Tenant Plans, (2) all applicable codes and regulations of governmental authorities having jurisdiction over the Building and the Premises, (3) valid building permits and other authorizations from appropriate governmental agencies, when required (which shall be obtained by Tenant, at Tenant's expense), and (4) Landlord's construction policies, rules and regulations attached hereto as <u>Schedule B-3</u>, as the same may be reasonably modified by Landlord from time to time ("Construction Rules").  Any work not acceptable to the appropriate governmental agencies or not reasonably satisfactory to Landlord shall be promptly replaced at Tenant's sole expense.  Notwithstanding any failure by Landlord to object to any such work, Landlord shall have no responsibility therefor; and

(iii)      Tenant shall ensure that Contractor and each subcontractor obtains and maintains commercial general liability, business automobile liability, umbrella/excess liability, worker's compensation and employers liability coverages in accordance with Section 12 of the Lease.

b.      All Tenant Improvements to be performed and completed in a good and workmanlike manner and in accordance with good industry practice. Without limiting the foregoing, (i) any staining and varnishing of doors, casements, cabinets or other installations shall be performed at a location other than the Building, and (ii) any structural work, such as coring, drilling, sanding and chipping, and all oil base painting and cabinet/wood finishing shall be performed after normal business hours. The Premises and the surrounding areas (including maintaining emergency ingress and egress) shall be maintained in a clean, safe and orderly condition at all times during the construction of the Tenant Improvements. Storage of construction materials, tools, equipment and debris shall be confined within the Premises and all unused construction materials, equipment, shipping containers, packaging, debris and flammable waste shall be promptly removed from the Building.  Rubbish, trash or other debris from construction of the Tenant Improvements shall be removed from the Building, at Tenant's sole cost and expense, and in no event shall such rubbish or trash be deposited in Landlord's trash containers or elsewhere in the Building.

c.      All material used in the performance of the Tenant Improvements and in the fixturing of the Premises shall be new and of good quality.  All construction deliveries in the performance of the Tenant Improvements and in the fixturing of the Premises shall be scheduled twenty-four (24) hours in advance with Landlord.

d.      Elevators in the Building shall not be used by Tenant and/or Contractor without Landlord's prior consent, which shall not be unreasonably withheld, conditioned, or delayed.

E.      **PERMITS AND LICENSES**.

1.      Tenant shall be solely responsible for procuring, at its sole cost and expense, all permits and licenses necessary to undertake the Tenant Improvements and, upon completion of the Tenant Improvements, to occupy the Premises. Tenant shall file with the appropriate office of the Arlington County, Virginia (the "Permit Office") the Tenant Plans and any and all other application materials or information required by Arlington County, Virginia for the issuance of the required permits (the "Permit Application") on or before the date which is three (3) business days following Landlord's approval of the Tenant Plans.  Tenant shall respond to any objections to the Tenant Plans and/or other requests and/or inquiries from the Permit Office regarding the Permit Application (including, without limitation, revising and resubmitting the Tenant Plans) within five (5) business days of Tenant's receipt of any such objections, requests or inquiries.  Tenant shall deliver to Landlord copies all correspondence with the Permit Office within two (2) business days following Tenant's receipt or submittal of such correspondence, including without limitation, copies of the Permit Application, any objections, requests or inquiries received by Tenant from the Permit Office, and any revisions to the Tenant Plans to address such objections, requests or inquires.

2.      In the event that Tenant has not obtained the required permits for the construction of the Tenant Improvements in accordance with the Tenant's Plans (and provided Landlord with written notice thereof) on or prior to the date which is one hundred eighty (180) days after the Commencement Date, for any reason or no reason, Landlord shall have the right, but not the obligation, to terminate the Lease by sending a written termination notice to Tenant at any time prior to the date Tenant obtains such permits.  Upon such a termination, the Lease shall automatically terminate on the date specified in Landlord's termination notice and Landlord and Tenant shall each be released from any and all obligations or liabilities under the Lease accruing after such termination date, except any obligations and liabilities which expressly survive any termination of the Lease. At Landlord's request, Tenant shall promptly execute and return to Landlord a termination agreement prepared by Landlord and reasonably satisfactory to Tenant documenting the termination of the Lease pursuant to this Paragraph E, which obligation shall survive any termination of the Lease pursuant to this Paragraph E.

F.      **INSPECTION**.  Landlord shall have the right, but not the obligation, to enter the Premises at all times during Tenant's prosecution of construction of the Tenant Improvements to inspect the Tenant Improvements.

G.      **REMOVAL OF TENANT IMPROVEMENTS**.  All items of the Tenant Improvements (including fixtures, but excluding Tenant's non-fixture personal property) shall become the property of Landlord upon expiration or earlier termination of the Lease and shall remain in the Premises at all times during the Term of the Lease.  Notwithstanding the foregoing, Tenant shall remove any items of the Tenant Improvements which are designated in writing by Landlord to be removed at the time that Landlord approves the Tenant Plans. Tenant shall repair and restore any damage to the Premises and/or Building caused by the removal of any items of the Tenant Improvements.

H.      **CONSTRUCTION WARRANTIES**.  Tenant shall timely and fully enforce all construction warranties and guaranties that Tenant obtains in connection with the Tenant Improvements.

I.      **INDEMNIFICATION**.  Except to the extent caused by the gross negligence or willful misconduct of Landlord, Tenant shall indemnify Landlord and hold it harmless from and against all claims, injury, damage or loss (including, without limitation, attorneys' fees) sustained by Landlord as a result of the construction of the Tenant Improvements in the Premises.

J.      **TENANT'S AGENT**.  Tenant hereby designates Infinity Building Services, whose address is 4901 Tesla Drive, Suite C, Bowie, MD 20715, and whose telephone number is 410-255-9040, to act as Tenant's agent for purposes of authorizing and executing any and all documents, work-letters or other writings and changes thereto needed in connection with this Work Agreement, including any and all changes, additions or deletions to the Tenant Plans and Landlord shall have the right to rely on any documents executed by such authorized party.

K.      **DEFAULT**.   Any failure of Tenant to comply with the requirements of this Work Agreement shall, subject to applicable cure periods, if any, constitute a default by Tenant under the Lease and Landlord shall have and may pursue all remedies available to Landlord under the Lease, at law, or in equity.

**LIST OF SCHEDULES**

**Schedule B-1    Space Plan**
**Schedule B-2    Requirements for Contract Documents**
**Schedule B-3    Construction Rules and Regulations**

**SCHEDULE B-1**

**SPACE PLAN**



**SCHEDULE B-2**

**REQUIREMENTS FOR CONTRACT DOCUMENTS**

Final architectural detail and working drawings, finish schedules and related plans (which may be submitted electronically by Tenant or the Space Planner) including, without limitation, the following information and/or meeting the following conditions:

a.    materials, colors and designs of wallcoverings, floor coverings and window coverings and finishes;

b.    paintings and decorative treatment required to complete all construction;

c.    complete, finished, detailed mechanical, electrical, plumbing and structural plans and specifications for the Tenant Improvements, including but not limited to the fire and life safety systems and all work necessary to connect any special or non-standard facilities to the Building's base mechanical systems, indicating, among other things:

    1.    indicate light switches in offices, conference rooms and all other rooms in the Premises;

    2.    indicate the layouts for specially installed equipment, including computer and duplicating equipment, the size and capacity of mechanical and electrical services required and heat rejection of the equipment;

    3.    indicate the dimensioned location of: (A) electrical receptacles (one hundred twenty (120) volts), including receptacles for wall clocks, and telephone outlets and their respective locations (wall or floor), (B) electrical receptacles for use in the operation of Tenant's business equipment which requires two hundred eight (208) volts or separate electrical circuits, (C) electronic calculating and CRT systems, etc., and (D) special audio-visual requirements;

    4.    indicate proposed layout of sprinkler and other life safety and fire protection equipment, including any special equipment and raised flooring;

    5.    identify areas, if any, requiring twenty-four (24) hour air conditioning;

    6.    indicate those partitions that are to extend from floor to underside of structural slab above or require special acoustical treatment;

    7.    identify the location of rooms for, and layout of, telephone equipment other than building core telephone closet;

    8.    identify the locations and types of plumbing required for toilets (other than core facilities), sinks, drinking fountains, etc.;

    9.    indicate the swing of each door;

    10.    indicate a schedule for doors and frames, complete with hardware, if applicable; and

    11.    indicate any special file systems to be installed.

d.    all final drawings and blueprints must be drawn to a scale of not less than one-eighth (l/8) inch to one (l) foot.

Notwithstanding anything to the contrary set forth herein, in the Work Agreement or in the Lease, Tenant shall not, without Landlord's prior written consent (which may be granted or withheld in Landlord's sole discretion), request any work which would: (1) require changes to structural components of the Building or the exterior design of the Building; (2) require any material modification to the Building's mechanical installations or installations outside the Premises; (3) not comply with all Legal Requirements; (4) be incompatible with the building plans filed with the appropriate governmental agency from which a building permit is obtained for the construction of the Tenant Improvements or with the occupancy of the Building as a first-class office building; or (5) materially delay the completion of the Premises or any part thereof. Tenant shall not oppose or delay changes required by any governmental agency affecting the construction of the Building and/or the Tenant Improvements in the Premises.

**SCHEDULE B-3**

**CONSTRUCTION RULES AND REGULATIONS**

1.      Tenant and/or the Contractor will supply Landlord with a copy of all permits prior to the start of any work.

2.      Tenant and/or the Contractor will post applicable permits on a wall of the construction site while work is being performed.

3.      Public area corridor, and carpet, is to be protected by plastic runners or a series of walk-off mats from the elevator to the suite under reconstruction.

4.      Walk-off mats are to be provided at entrance doors.

5.      The Contractor and all subcontractors will remove their trash and debris daily, or as often as necessary to maintain cleanliness in the Building.  Building trash containers are not to be used for construction debris.  Landlord reserves the right to bill Tenant for any cost incurred to clean up debris left by the Contractor or any subcontractor.  Further, the Building staff is instructed to hold the driver's license of any employee of the Contractor or any subcontractor while using the freight elevator to ensure that all debris is removed from the elevator.

6.      No utilities (electricity, water, gas, plumbing) or services to the tenants are to be cut off or interrupted without first having requested, in writing, and secured, in writing, the permission of Landlord.

7.      No electrical services are to be put on the emergency circuit, without specific written approval from Landlord.

8.      When utility meters are installed, the Contractor must provide the property manager with a copy of the operating instructions for that particular meter.

9.      Landlord will be notified of all work schedules of all workmen on the job and will be notified, in writing, of names of those who may be working in the Building after "normal" business hours.

10.     Passenger elevators shall not be used for moving building materials and shall not be used for construction personnel except in the event of an emergency.  The designated freight elevator is the only elevator to be used for moving materials and construction personnel.  This elevator may be used only when it is completely protected as determined by Landlord's building engineer.

11.     Contractors or personnel will use loading dock area for all deliveries and will not use loading dock for vehicle parking.

12.     Contractors will be responsible for daily removal of waste foods, milk and soft drink containers, etc. to trash room and will not use any Building trash receptacles but trash receptacles supplied by them.

13.     No building materials are to enter the Building by way of main lobby, and no materials are to be stored in any lobbies at any time.

14.     Construction personnel are not to eat in the lobby or in front of building nor are they to congregate in the lobby or in front of the Building.

15.     Landlord is to be contacted by Tenant when work is completed for inspection.  All damage to the Building will be determined at that time.

16.     All key access, fire alarm work, or interruption of security hours must be arranged with Landlord's building engineer.

17.     There will be no radios allowed on job site.

18.     All workers are required to wear a shirt, shoes, and full length trousers.

19.     Protection of hallway carpets, wall coverings, and elevators from damage with masonite board, carpet, cardboard, or pads is required.

20.     Public spaces — corridors, elevators, bathrooms, lobby, etc. — must be cleaned immediately after use.  Construction debris or materials found in public areas will be removed at Tenant's cost.

21.     There will be no smoking, eating, or open food containers in the elevators, carpeted areas or public lobbies.

22.     There will be no yelling or boisterous activities.

23.     All construction materials or debris must be stored within the project confines or in an approved lock-up.

24.     There will be no alcohol or controlled substances allowed or tolerated.

25.     Contractor and Tenant shall be responsible for all loss of their materials and tools and shall hold Landlord harmless for such loss and from any damages or claims resulting from the work.

**EXHIBIT C**

**DECLARATION OF COMMENCEMENT DATE**

This Declaration of Commencement Date (this "Declaration") is made as of _____, 20__, by **KBSIII 3003 WASHINGTON, LLC** ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant"), who agree as follows:

1.      Landlord and Tenant entered into a Deed of Retail Lease dated May __, 2019 (the "Lease"), in which Landlord leased to Tenant, and Tenant leased from Landlord, certain premises described therein (the "Premises") in the building located at 3003 Washington Boulevard, Arlington, Virginia 22201 (the "Building"). All capitalized terms which are used but not otherwise defined herein are as defined in the Lease.

2.      Pursuant to the Lease, Landlord and Tenant agreed to and do hereby confirm the following matters as of the Commencement Date of the Term:

        a.      the Commencement Date is _____;

        b.      the Rent Commencement Date is: _____;

        c.      the Lease Expiration Date is _____;

        d.      the number of rentable square feet of the Premises is _____;

        e.      Tenant's Pro Rata Share (Operating Expenses) is _____%; and

        f.      Tenant's Pro Rata Share (Real Estate Taxes) is _____%.

3.      Tenant confirms that:

        a.      it has accepted possession of the Premises as provided in the Lease;

        b.      Landlord is not required to perform any work or furnish any improvements to the Premises under the Lease;

        c.      Landlord has fulfilled all of its obligations under the Lease as of the date hereof;

        d.      the Lease is in full force and effect and has not been modified, altered, or amended, except as follows: _____; and

        e.      there are no set-offs or credits against Rent, and no Security Deposit or prepaid Rent has been paid except as provided by the Lease.

4.      The provisions of this Declaration shall inure to the benefit of, or bind, as the case may require, the parties and their respective successors and assigns, and to all mortgagees of the Building, subject to the restrictions on assignment and subleasing contained in the Lease, and are hereby attached to and made a part of the Lease.

**LANDLORD:**

**KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company

By:    KBS Capital Advisors, LLC, a Delaware limited liability company, its authorized agent

By:    _____
Name: Stephen J. Close
Title: Senior Vice President

**TENANT:**

**SMOKECRAFT CLARENDON LLC**,
a Virginia limited liability company

By:    _____
Name:
Title:

**EXHIBIT D**

**RULES & REGULATIONS**

The following rules and regulations have been formulated for the safety and well-being of all tenants of the Building. Strict adherence to these rules and regulations is necessary to guarantee that every tenant will enjoy a safe and undisturbed occupancy of its premises. Any violation of these rules and regulations by Tenant shall constitute a default by Tenant under the Lease and, following any applicable notice and/or cure period expressly set forth in the Lease, shall constitute an Event of Default. Landlord's consent to any variation of these rules and regulations may be given or withheld in Landlord's sole discretion.

The following rules shall be applicable to all tenants of the Building:

1.      Tenant shall not obstruct or encumber or use for any purpose other than ingress and egress to and from the Premises any sidewalk, entrance, passage, court, elevator, vestibule, stairway, corridor, hall or other part of the Building not exclusively occupied by Tenant without Landlord's consent. No bottles, parcels or other articles shall be placed, kept or displayed on window ledges, in windows or in corridors, stairways or other public parts of the Building. Tenant shall not place any showcase, mat or other article outside the Premises without Landlord's consent.

2.      Landlord shall have the right to control and operate the public portions of the Building and the facilities furnished for common use of the tenants, in such manner as Landlord deems best for the benefit of the tenants generally. Tenant shall not permit the visit to the Premises of persons in such numbers or under such conditions as to interfere with the use and enjoyment of the common area entrances, corridors, elevators and other public portions or facilities of the Building by other tenants. Tenant shall reasonably coordinate in advance with Landlord's property management department all deliveries to the Building so that arrangements can be made to minimize such interference. Tenant shall not permit its employees and invitees to congregate in the common area elevator lobbies or common area corridors and lobbies of the Building. Canvassing, soliciting and peddling in the Building (other than in the Premises) are prohibited, and Tenant shall cooperate to prevent the same.

3.      Tenant shall not attach, hang or use in connection with any exterior window or door of the Premises any drape, blind, shade or screen, without Landlord's prior written consent. All awnings, drapes projections, curtains, blinds, shades, screens and other fixtures shall be of a quality, type, design and color, and shall be attached in a manner, approved in writing by Landlord. Any Tenant-supplied window treatments (that are approved by Landlord) shall be installed behind Landlord's standard window treatments so that Landlord's standard window treatments will be what is visible to persons outside the Building. Drapes (whether installed by Landlord or Tenant) which are visible from the exterior of the Building shall be cleaned by Tenant at least once a year, without notice from Landlord, at Tenant's own expense.

4.      Tenant shall not use the water fountains, water and wash closets, and plumbing and other fixtures for any purpose other than those for which they were constructed, and Tenant shall not place any debris, rubbish, rag or other substance therein (including, without limitation, coffee grounds). All damages from misuse of fixtures shall be borne by the tenant causing same.

5.      Tenant shall not construct, maintain, use or operate within the Premises any electrical device, wiring or apparatus in connection with a loudspeaker system or other sound system, in connection with any excessively bright, changing, flashing, flickering or moving light or lighting device, or in connection with any similar device or system, without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed, provided, however, an internal paging system shall be acceptable. Tenant shall not construct, maintain, use or operate any such device or system outside of its Premises or within such Premises so that the same can be heard or seen from outside the Premises. No flashing, neon or search lights shall be used

which can be seen outside the Premises, unless otherwise approved by Landlord in its sole discretion.

6.    Tenant shall not bring any bicycle, vehicle, animal, bird or pet of any kind into the Building, other than the parking garage, except seeing-eye or hearing-ear dogs for handicapped persons visiting the Premises.

7.    Tenant shall not place on any floor a load exceeding the floor load per square foot which such floor was designed to carry. Landlord shall have the right to prescribe the weight, position and manner of installation of safes and other heavy equipment and fixtures. Subject to the terms of the Lease to the contrary, Landlord shall have the right to repair, at Tenant's expense, any damage to the Premises or the Building caused by Tenant's moving property into or out of the Premises or due to the same being in or upon the Premises or to require Tenant to do the same. Tenant shall not receive into the Building or carry in the elevators any safes, freight, furniture, equipment or bulky item except as approved by Landlord, and any such furniture, equipment and bulky item shall be delivered only through the designated delivery entrance of the Building and the designated freight elevator at designated times. Tenant shall remove promptly from any sidewalk adjacent to the Building any furniture, furnishing, equipment or other material there delivered or deposited for Tenant.

8.    All electrically operated equipment or machinery shall be subject to Landlord's reasonable approval. Tenant shall not install any equipment of any type or nature that will or may necessitate any changes, replacements or additions to, or changes in the use of, the water system, heating system, plumbing system, air-conditioning system or electrical system of the Premises or the Building, without obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. If any machine or equipment of Tenant causes noise or vibration that may be transmitted to such a degree as to be objectionable to Landlord or any tenant in the Building, then Landlord shall have the right to install, at Tenant's expense, vibration eliminators or other devices sufficient to reduce such noise and vibration to a level satisfactory to Landlord or to require Tenant to do the same.

9.    Landlord reserves the right to exclude from any portion of the Building outside the Premises at all times any person who does not properly identify himself to the Building management or attendant on duty. Landlord shall have the right to exclude any undesirable or disorderly persons from any portion of the Building at any time. Landlord may require all persons admitted to or leaving the office portion and common areas of the Building to show satisfactory identification and to sign a register.

10.    Tenant shall not permit or encourage any loitering in or about the Premises and shall not use or permit the use of the Premises for lodging, dwelling or sleeping.

11.    Tenant shall not request Landlord's employees to perform any work or do anything outside of such employees' regular duties without Landlord's prior written consent. Tenant's special requirements will be attended to only upon application to Landlord, and any such special requirements shall be billed to Tenant in accordance with the schedule of charges maintained. by Landlord from time to time or as is agreed upon in writing in advance by Landlord and Tenant. Tenant shall not employ any of Landlord's employees for any purpose whatsoever without Landlord's prior written consent.

12.    There shall not be used in any space, or in the public halls of the Building, either by any tenant or by jobbers or others in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards. Tenant shall be responsible for any loss or damage resulting from any deliveries made by or for Tenant.

13.    Tenant shall not install or permit the installation of any wiring for any purpose on the exterior of the Premises (other than as expressly provided in the Lease).

14.    Tenant acknowledges that it is Landlord's intention that the Building be operated in a manner which is consistent with the highest standards of cleanliness, decency and morals in the community which it serves. Toward that end, Tenant shall not sell, distribute, display or offer for sale any item which, in Landlord's judgment, is inconsistent with the quality of operation of the Building or may tend to impose or detract from the moral character or image of the Building. Tenant shall not use the Premises for any illegal purpose.

15.    Unless otherwise expressly provided in the Lease, Tenant shall not use, occupy or permit any portion of the Premises to be used or occupied for the storage, manufacture, or sale of liquor, except as otherwise expressly provided in the Lease.

16.    Tenant shall not remove, alter or replace the ceiling light diffusers, ceiling tiles or air diffusers in any portion of the Premises without the prior written consent of Landlord.

17.    Tenant shall not in any manner deface any part of the Premises or the Building. Except to the extent permitted in accordance with the Lease, no stringing of wires, boring or cutting shall be permitted except with Landlord's prior written consent. Any floor covering installed by Tenant shall have an under layer of felt rubber, or similar sound deadening substance, which shall not be affixed to the floor by cement or any other non-soluble adhesive materials.

18.    Should Tenant's use and occupancy of the Premises require the installation of supplemental cooling, and should the Building contain a closed loop, Tenant agrees that its supplemental cooling requirements will be serviced by tapping into the Building's closed loop. Tenant shall be responsible for the cost of connecting into the loop and agrees to pay to Landlord as additional rent the monthly tap fee in accordance with Landlord's then-current rate schedule. Should the Building not contain a closed loop, Tenant agrees to be responsible for fees associated with placing equipment on the roof of the Building.

19.    Tenant shall not bring or keep, or permit to be brought or kept, in the Building any weapon (or, any flammable, combustible or explosive fluid, chemical or substance, except for cooking materials that are used in compliance with all Legal Requirements including, without limitation, Environmental Laws.

20.    Tenant shall comply with all workplace smoking Legal Requirements. There shall be no smoking in or about the Building.

21.    Landlord may, upon request of Tenant, waive Tenant's compliance with any of the rules, provided that (a) no waiver shall be effective unless signed by Landlord, (b) no waiver shall relieve Tenant from the obligation to comply with such rule in the future unless otherwise agreed in writing by Landlord, (c) no waiver granted to any tenant shall relieve any other tenant from the obligation of complying with these rules and regulations, and (d) no waiver shall relieve Tenant from any liability for any loss or damage resulting from Tenant's failure to comply with any rule.

The following rules and regulations shall be applicable to all tenants of retail space in the Building:

1.    Neither Tenant, nor any agent, employee, contractor or invitee of Tenant, shall go upon the roof of the Building without Landlord's prior written consent in each instance, which consent may be granted or withheld in Landlord's sole and absolute discretion.

2.    No sign, placard, picture, name, advertisement or notice visible from the exterior of the Premises shall be inscribed, painted affixed or otherwise displayed by any tenant on any part of the Building without the prior written consent of Landlord. All approved signs or lettering on doors shall be printed, painted, affixed or inscribed at the expense of Tenant by a person approved by Landlord. Material visible from outside the Building will not be permitted without Landlord's consent.

3.    Tenant shall not use any advertising media which may be heard outside of the Premises and shall not place or permit the placement of any radio or television antenna, loudspeaker, sound

amplifier, phonograph, searchlight, flashing light or other device of any nature on the roof or outside of the boundaries of the Premises (except for Tenant's approved identification sign or signs) or at any place where the same may be seen outside of the Premises, without Landlord's consent.

4.      All loading and unloading of merchandise, supplies, materials, garbage and refuse which requires use of common area loading docks or movement through the common area entrances shall be conducted at such times and in such manner as Landlord may reasonably require. In its use of the loading areas, Tenant shall not obstruct or permit the obstruction of said loading areas and at no time shall park or allow its officers, agents or employees to park vehicles therein except for loading and unloading. Tenant assumes all risks of and shall be liable for all damage to articles moved or to the Building and injury to persons resulting from such activity.

5.      Tenant shall see that the doors of the Premises are closed and locked and that all water faucets, water apparatus and utilities are shut off before Tenant or its employees leave the Premises, so as to prevent waste or damage, and for any default or carelessness in this regard Tenant shall make good all injuries sustained by Landlord or any other tenants or occupants of the Building.

6.      Tenant shall not use any portion of the common areas for any purpose when the Premises are not open for business or Tenant is not conducting work in preparation therefor, and then only for such uses expressly stated in the Lease. Tenant shall not use any portion of the sidewalk adjoining the Premises for the sale of goods (unless expressly approved by Landlord), and shall not conduct a "going out of business" sale, or advertise that it sells products or services at "discount," "cut-price," or "cut-rate" prices.

7.      The common areas may not be used to solicit business or distribute, or cause to be distributed in any portion of the Building any handbills, promotional materials or other advertising, and Tenant shall not conduct or permit any other activities in the Building that might constitute a nuisance. No vehicle shall be parked as a "billboard" vehicle in the common areas and no person shall wear or display "billboard" advertising in or around the common areas.

8.      Landlord shall not be responsible for lost or stolen personal property, money or jewelry from any premises or public areas or common areas, regardless of whether such loss occurs when the area is locked against entry or not.

9.      The Premises shall not be used for any use that is disreputable or may draw protests.

10.     Landlord reserves the right to make such other and reasonable rules and regulations as in its judgment may from time to time be needed for the safety, care and cleanliness of the Building, and for the preservation of good order therein, so long as they do not materially modify the terms of the Lease.

**EXHIBIT E**

**PROHIBITED USES**

The Premises may be used only for such retail uses as are not prohibited by Laws and are consistent with retail uses in Comparable Buildings in the Clarendon submarket of Arlington, Virginia; provided, however, that except as expressly noted below, in no event shall the Premises be used for any of the following purposes without the express, prior written approval of Landlord, to be granted or withheld in Landlord's sole discretion:

1. Any business or use which (1) is a public or private nuisance in accordance with Virginia common law, (2) emits noise and sounds detectable inside the Building and outside the Premises which are reasonably objectionable to other tenants of the Building, (3) creates unusual fire, explosive or other hazards, (4) has flashing lights or signs, strobe lights, search lights or loudspeakers detectable outside the Premises, or (5) has phonographs, radios or video screens outside the Premises;

2. Auditorium or other similar place of general assembly;

3. Funeral parlor;

4. Industrial or manufacturing use;

5. Dance hall, nightclub or discotheque or any use which involves the temporary or permanent use of a dance floor or other designated dancing area;

6. Package goods store, liquor store, cocktail lounge or bar (except that the following shall be permitted uses: sit-down restaurants, including those with bars, having an alcoholic beverage permit as contemplated by the Permitted Use, premium wine stores and upscale wine bars, upscale vodka bars or similar upscale establishments that are consistent with retail uses in Comparable Buildings, such as, for example, Zola Wine in Washington, DC);

7. Pool hall, other than an upscale establishment that includes pool tables as part of an upscale wine bar or similar establishment permitted under (6) above and otherwise consistent with retail uses in Comparable Buildings, such as, for example, Buffalo Billiards;

8. Adult bookstore or adult video store (defined as stores, a material portion of the inventory of which is not available for rental or sale to children under the age of fifteen (15) because it expressly deals with or depicts human sexuality);

9. Massage parlor, "strip" or similar club or establishment providing adult entertainment, including adult dance clubs;

10. So-called "head shop" or store which sells drug paraphernalia;

11. Off-track betting parlor, pawn shop, auction house or check-cashing establishment;

12. Dry cleaners (except as a "drop off site for off-site cleaning);

13. Tattoo parlor, sun tanning parlor or commercial hot tub facility;

14. Video game arcade (excluding stores that sell children's games or children's toys) or joke shop (defined as a gag gift, magic shop or similar shop);

15. Cinema;

16. Liquidator/flea market type of operation;

17. Day laborer employment agency;

18. Soup kitchens or free food distribution centers;

19. Bus station or other transportation depot (however such restriction shall not be deemed to prohibit any shuttle bus service provided by Landlord in accordance with the Lease or any shuttle bus service provided by Tenant for the benefit of its employees and agents);

20. "Hi-fi" electronics, stereo, television or similar stores, provided however, that (i) such stores may be permitted with soundproofing satisfactory to Landlord in its reasonable discretion, and (ii) high-end electronics stores such as Apple, Sony, Bose, and Bang & Olufson shall be permitted;

21. Political campaign headquarters;

22. Sale of firearms;

23. Fast Food Restaurants.

As used herein, the term "Fast Food Restaurant" shall mean any type of restaurant, or food service establishment that may be recognized within the restaurant industry as "Quick Service Restaurant" or "Fast Food Restaurant" that may also be known to operate within the restaurant industry with walk-up, drive-in, drive-thru or drive up service and which serves as a substantial part of its business the following products: hamburgers or any other type of beef products served in sandwich form; or ground meat or meat substitute, or a combination of ground meat and meat substitute, any of which are served in sandwich form; tacos, burritos, tamales, enchiladas, fajitas or nachos.  In addition, notwithstanding anything to the contrary set forth herein, the following restaurants are deemed to be Fast Food Restaurants and are Prohibited Uses: McDonald's, Burger King, Burger Chef, Wendy's, Taco Bell, KFC, Arby's, Chick-Fil-A, Lil Caesar's, Roy Rogers, Subway, and Hardee's.

In addition to the foregoing prohibited uses, no portion of the Premises shall be used for a (i) "hot yoga" program, including, without limitation, the Bikram and Vinyasa types of hot yoga, (ii) fitness concept that utilizes a ballet barre as part of such fitness program, (iii) membership-based fitness facility, or (iv) hair salon or business which dedicates more than two hundred fifty (250) square feet of floor space exclusively to hair cutting/styling services.

**EXHIBIT F**

**MENU**

## Sample Food Menu Items

To ensure we have the capability to produce the highest quality barbecue, we will be installing two (2) Southern Pride MLR-850 commercial smokers, which will give us the capacity to produce over 2,000 pounds of meat at a time.  This capacity will allow us to produce fresh food daily, holding many items hot into service.  We will be utilizing a variety of woods, such as oak, hickory, cherry, apple, and mesquite, to give our food a variety of smoked flavors.  To complement our food, we will be producing four house-made barbecue sauces, representing different styles and flavors from around the country, which will be available on each table for guests to add to their food as they wish.

As we continue to develop our concept, we are evaluating menu items for flavor, ease of execution, ingredient availability, and profitability.  Our goal is to have a final everyday menu that fits on the front side of an 11"x17" sheet, with brunch additions to be on the back.  We recognize that we have to keep our menu consolidated in order to maintain excellent food and labor costs, and plan to cross utilize many products to limit waste.  The full menu will be re-evaluated and updated bi-annually to account for seasonal product availability, consumer trends, and food costs.  To test new ideas, we will offer daily specials, on occasion, as well. Here are some items that we currently expect to be on our final menu:

### Appetizers

**Best Damn Chili in the DMV $6.95**

brisket / rib meat / cheddar / crema / jalapenos / chips / onions / sunrise bell peppers

**All American Nachos $10.95**

homemade tri-color tortilla chips / queso / cheddar cheese / pico de gallo / jalapenos / crema / guacamole / chipotle fire sauce

Add Chili or Pork +$2 / Add Burnt Ends or Chicken +$3



**Burnt Ends – *While They Last!* $11.95**

twice smoked brisket ends / fried onions / texas toast

**Smokey Whole "V" Pit Wings $9.95**

marinated in hot sauce and Budweiser / slow-smoked / ranch

**Bacon Wrapped Smoked Jalapeno Poppers $9.95**

jalapenos / cream cheese mix / candied bacon / bbq ranch

**Fried Okra $8.95**

okra spears / wild horse sauce

**Big Bend Egg Rolls $9.95**

brisket / corn chow chow / poblano chilis / chipotle fire sauce

**Meaty Mac $9.95**

mac & cheese / choice of chili, pork, or chicken / cheddar cheese / sweet bbq sauce



## Salads

**The Wedge $10.95**

iceberg lettuce / tomato / red onion / blue cheese crumbles / candied bacon / blue cheese dressing

**Pacific Pear Salad $11.95**

smoked pears / arugula / goat cheese / candied walnuts / raspberry vinaigrette

**Firebird Chicken Salad $14.95**

chili rubbed chicken breast / avocado / pico de gallo / corn chow chow / black beans / sunrise bell peppers / cheddar cheese / fried onions / bbq ranch / sweet and tangy sauce



**The Smokeshack $15.95**

pulled pork / pulled chicken / brisket / tomato / cheddar cheese / corn chow chow / cucumbers / bbq vinaigrette

**Grilled Caesar $9.95**

grilled romaine hearts / seasoned croutons / parmesan cheese / caesar dressing

Add Chili Rubbed Chicken Breast $6 / Add Smoked Salmon $8

## Sandwiches- *Served with one heapin' helpin'*

**Our Iconic Pulled Pork Sandwich $12.95**

injected / dry rubbed / 12-hour smoked / cole slaw

**The Alamo Chicken Sandwich $14.95**

chili rubbed chicken breast / pepper jack cheese / candied bacon / avocado / red onions / romaine / tomato / wild horse sauce

**Tri-Tip Dip Sandwich $15.95**

smoked tri-tip / jicama horseradish slaw / sweet bbq jous

**Heavenly Hot Dog $13.95**

half pound, foot long beef dog / pulled pork / mac & cheese / cole slaw / sweet mustard sauce

**Cascades Wrap $14.95**

smoked lamb shank / mint yogurt slaw / pita

**Chopped Brisket Sandwich $14.95**

14-hour smoked / sweet bbq sauce / caramelized onions / cole slaw

**Smoked Schroom Stack $13.95**



smoked portobello mushrooms / fire roasted red peppers & tomatoes, feta / chimichurri / tobacco onions

**The Smokey Mess $15.95**

smoked sausage / sliced brisket / grilled onions / grilled jalapenos / queso / sweet & tangy sauce

**Black Crack Rueben $14.95**

smoked pastrami / jicama cabbage slaw / fire roasted 1000 island dressing

**BBQ Slider Trio $12.95**

sliced brisket / pulled pork / smoked sausage

**The Smokehouse Club $13.95**

smoked turkey / smoked ham / candied bacon / cheddar / swiss / avocado / romaine / tomato / sweet mustard sauce / garlic mayo

**The Que-Bano $14.95**

smoked ham / pulled pork / swiss cheese / pickles / sweet mustard sauce



**Hand Crafted Burger $12.95**

half pound beef / lettuce / tomato / onion / pickle

burger add-ons for $1

cheddar / pepper jack / swiss / queso / candied bacon / jalapenos / cole slaw / chimichurri

burger add-ons for $2

smoked ham / sliced brisket / sausage / mac & cheese / chili / avocado / fried egg

## Entrees- *Served with One Heapin' Helpin'*

**St. Louis Ribs**

dry rubbed / 6-hour smoked

Half Rack $17.95 / Full Rack $24.95

**Dinosaur Beef Short Rib $27.95**

herb dry rubbed / 6-hour smoked

**Smoked Lamb Shank $19.95**

mint brined / herb rubbed / 6-hour smoked

**BBQ Half Chicken $16.95**

brined / dry rubbed / smoked / pineapple-
bourbon sauce



**Smoked Duck $18.95**

brined / dry rubbed / 4-hour smoked

**Competition Style Chicken Thighs $15.95**

brined / dry rubbed / smoked in butter

**Slow Smoked Brisket Platter $18.95**

dry rubbed / 14-hour smoked

**Maple Bourbon Salmon $21.95**

hot smoked / maple-bourbon glaze / candied
pecans



**Smokecraft Combo**

pulled pork / chicken thigh / sliced brisket / ¼ chicken / sausage / st. louis ribs / turkey / ham

Choose 2 $18.95 / Choose 3 $23.95

**\*Whole Lotta' Que\* $59.95**

a sample of our meats / 4 heapin' helpin's / feeds 3-4 people

## Heapin' Helpin's $4.95/Each

| | | | |
|---|---|---|---|
| **Collard Greens** | **Seasoned Fries** | **Maker's Sweet Mashed** | **Mac & Cheese** |
| **Veggie Skewers** | **Cole Slaw** | **Campfire Baked Beans** | **Potato Salad** |

## Desserts

**Fried Apple Pie $6.95**

vanilla bean ice cream / cinnamon sugar / candied bacon crumbles / bourbon - caramel

**Bacon Bourbon Brownie $7.95**

bourbon - caramel / chocolate sauce / candied bacon crumbles / vanilla bean ice cream

**Bourbon - Caramel Banana Pudding $6.95**

banana pudding / brown sugar nilla wafers / bananas / whipped cream

**Tennessee Honey Bourbon Pecan Pie $7.95**

jack daniels tennessee honey bourbon / vanilla bean ice cream / chocolate sauce / honey



**Chocolate Homestyle Bread Pudding $6.95**

vanilla bean ice cream / bourbon - caramel / whipped cream

## Brunch – *to be served Saturdays and Sundays from 10am-3pm*

**The Ranch Hand Breakfast $14.95**

3 eggs / potato hash / 2 slices texas toast / grilled tomato slices / choice of candied bacon, smoked sausage, or smoked ham

**Smoked Salmon Benedict $19.95**

smoked salmon fillets / poached eggs / english muffin / chipotle hollandaise sauce / seasonal fruit

**Brisket Hash $15.95**

slow smoked brisket / potato hash / poached eggs / texas toast / sweet & tangy sauce



**Stuffed French Toast $12.95**

crispy battered toast / berries / cream cheese / caramelized nilla wafers / smoked bacon / bourbon maple syrup

**Biscuits and Gravy $13.95**

homemade biscuits / smoked sausage gravy / 2 eggs / candied bacon

**Three Little Piggie Benedict $14.95**

poached eggs / pulled pork / smoked ham / candied bacon / chipotle hollandaise / scallions / texas toast / potato hash

## Sample Beverage Menu Items

### Handcrafted Cocktails

We will have a rotating cocktail menu that will highlight brand name liquors mixed with seasonal ingredients, prepared using various techniques, to create exciting, approachable, and flavorful cocktails. Here are some of the cocktails that we plan to include in our seasonal rotation:

**Maker's Mash** - Maker's Mark Bourbon, blackberries, blueberries, raspberries, lemon, simple syrup, Sierra Mist

**Kentucky Porch Rocker** - Jim Beam Bourbon, grilled peaches, peach schnapps, sweet tea

**Grilled Pineapple Mojito** - Bacardi Pineapple Fusion Rum, mint, grilled pineapple, simple syrup, club soda

**Alamo Cooler** - Milagro Silver Tequila, watermelon, blueberries, simple syrup, Sierra Mist

**Sunset Summer Sipper** - Deep Eddy's Sweet Tea Vodka, raspberries, simple syrup, lemon sour

**Watermelon Cucumber Collins** - Hendrick's Gin, watermelon, cucumber, simple syrup, lemon sour

**Sweet Shine** - Belle Isle Grapefruit Moonshine, strawberries, lemonade

**The Smoking Pig** - George Dickel No. 8 Bourbon, maple syrup, liquid smoke, candied bacon

**Red & Smokey** - Del Maguey Vida Mescal, hibiscus, lime, lemon sour, chili salt rim

### Craft Beers

We expect to have 15 seasonally rotating American craft beers on draft, representing a wide variety of styles. We plan to serve our beers by the pint, on flight tasting boards, and in take home Growlers to accompany our takeout. Here are some beers which we hope to be able to serve on draft:



**Coney Island Mermaid Pilsner**, Brooklyn, New York (abv 5.2%) - Mermaid Pilsner is a light-bodied, crisp drinking, nicely hopped lager. A heavy-handed addition of rye malt adds a mild spiciness, which is balanced by a light, fruity, floral hop aroma.

**Cisco Whale's Tale Pale Ale,** Nantucket, Massachusetts (abv 5.6%) - In the sea of ales, this English-style Pale is refreshingly unique. This medium-bodied malty brew has bisquity overtones, a caramelly sweetness and just a hint of citrus and floral hops in the finish that will give you a whole new perspective on pale ales.

**Blue Point Toasted Lager,** Patchogue, New York (abv 5.5%) - Copper in color, this brew is made from six different malts including: English Page, Crystal, Munich, Carapils, Wheat and Belgian Caravienna. Toasted Lager displays a balanced flavor of malt and hops which makes it easy drinking.

**Port City Monumental IPA,** Alexandria, Virginia (abv 6.3%) - This local beer exhibits floral aromas and flavors of citrus and pine resin, balanced by toasty, caramel malt character. Neither astringent nor sugary sweet, this brew provides a great example of a complex and perfectly balanced East Coast style IPA.

**New Belgium Fat Tire,** Asheville, North Carolina (abv 5.2%) - With aromas of biscuity and caramel malts, this Amber Ale has the perfect balance of tasty malt, gentle sweetness, and a flash of fresh hop bitterness.

**Kona Big Wave,** Kailua Kona, Hawaii (abv 4.4%) - Big Wave is a light golden ale with a subtle fruitiness and delicate hop aroma. A smooth, easy drinking refreshing ale. The lightly roasted honey malt contributes to the golden hue of this beer and also gives a slight sweetness that is balanced out by a special blend of hops.

**Devil's Backbone Gold Leaf Lager,** Lexington, Virginia (abv 4.5%) - Gold Leaf Lager harkens back to the days when refreshing beers were made 100% from malted barley. It is pale gold, light to medium bodied with subtle fresh bready notes, and a clean crisp finish.

**Atlas Rowdy Rye,** Washington, D.C. (abv 5.0%) - Made with three varieties of hops and a generous amount of specialty malts, Rowdy offers a complex flavor and aroma that is both aggressive and fun. The addition of malted rye to the grain bill lends a peppery and distinct character to the beer complementing the bitter, floral hop notes.

**Great Lakes Christmas Ale** (seasonal), Cleveland, Ohio (abv 7.5%) – Don't open 'til Christmas? Whoever coined that phrase obviously hasn't tasted Christmas Ale's fresh honey, cinnamon, and ginger flavors. Great Lakes most anticipated seasonal beer has a Yuletide's worth of holiday spices and sweet honey to keep you a-wassailing all season long.



**Samuel Adam's Fresh as Helles** (seasonal), Boston, Massachusetts (abv 5.6%) - The soft citrus of orange blossom adds a bright accent to the slightly sweet honey malt notes in this Helles-style lager, leading to a round, smooth finish.

## EXHIBIT G

## FORM OF LETTER OF CREDIT

IRREVOCABLE LETTER OF CREDIT NO. ___

_____, 200_

[*Beneficiary Name and Address*]

Gentlemen:

We hereby establish in favor of _____, a _____ ("Beneficiary"), for the account of _____, our Irrevocable Letter of Credit in the amount of _____ AND NO/100 DOLLARS ($_____.00), effective immediately and expiring with our close of business on the _____ day of _____, 200_. It is a condition of this Letter of Credit that it will be automatically extended for additional consecutive periods of one year each from the present or future expiration date unless you receive from us no later than sixty (60) days prior to such date, in writing by registered mail at the above address, that we elect not to renew this Letter of Credit for such additional period.

Funds under this Letter of Credit are available to you against your sight draft drawn on us, marked thereon "Drawn under Irrevocable Letter of Credit No. _____" and presented to us at our office at _____ **[NOTE: TO BE LOCATED IN WASHINGTON, DC AREA]**, accompanied by your statement addressed to us in the form attached hereto and incorporated herein as Attachment A.

We will accept such statement as binding and correct without having to investigate or having to be responsible for the accuracy, truthfulness, or validity thereof or any part thereof and notwithstanding the claim of any person to the contrary.

Partial draws are permitted under this Letter of Credit.

This Letter of Credit is transferable one or more times, but in each instance to a single transferee. Each transfer shall be evidenced by our endorsement on the reverse of the original of this Letter of Credit and we shall deliver the original of this Letter of Credit so endorsed to the transferee. All banking charges associated with this Letter of Credit shall be paid by Applicant, including without limitation, any fees and expenses charged by us for a transfer of this Letter of Credit.

All drafts drawn under and in compliance with the terms of this Letter of Credit will be immediately honored if drawn and presented for payment at our counters at _____**[NOTE: TO BE LOCATED IN WASHINGTON, DC AREA]**, on or before the expiration date, as such date may be extended pursuant to the terms hereof.

Unless otherwise stated, this Letter of Credit is issued subject to the International Standby Practices 1998 (ISP98).

Very truly yours,

**"ATTACHMENT A"**

Attached to and made a part of Irrevocable Letter of Credit No. _____ (the "Letter of Credit") dated ___, 200___, issued by _____, to _____, a _____ ("Beneficiary"), for the account of _____.

The undersigned, a duly authorized officer of Beneficiary under the Letter of Credit, certifies and represents that the Beneficiary is drawing on this Letter of Credit in accordance with the provisions of the Lease Agreement dated _____, 200_, by and between the Beneficiary and _____.

The undersigned has executed this statement as of the ___ day of _____, 200_.

_____,

a _____

By: _____

Name: _____

Title: _____

**EXHIBIT H**

**FORM OF GUARANTY**

THIS GUARANTY OF LEASE (this "Guaranty") is made as of the _____ day of May, 2019 by ANDREW DARNEILLE, an individual ("Guarantor"), for the benefit of KBSIII 3003 WASHINGTON, LLC, a Delaware limited liability company ("Landlord") and its successors and assigns.

**RECITALS**

A.    Landlord, as landlord, and SMOKECRAFT CLARENDON LLC, a Virginia limited liability company ("Tenant"), as tenant, desire to enter into that certain Deed of Lease dated as of even date herewith (the "Lease"), pursuant to which Tenant shall lease from Landlord approximately 3460 rentable square feet of space (the "Premises") in the building located at 3003 Washington Boulevard, Suite 101, Arlington, Virginia.

B.    Guarantor has a direct and/or indirect financial interest in Tenant and because of such financial interest in Tenant, Guarantor will be significantly benefited by the benefits and advantages which will result from the Lease.

C.    The terms and conditions contained in the Lease were agreed to by Landlord solely because Guarantor has agreed to guarantee the performance of the obligations of Tenant and its respective successors and assigns under the Lease, and such guarantee was and is a material inducement to Landlord's consent to, and execution and delivery of, the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Landlord to execute the Lease, Guarantor agrees as follows:

1.    **DEFINITIONS; RECITALS.**  As used herein, (i) the term "Lease" means the Lease, as it may be modified, supplemented, expanded, extended or renewed from time to time, and (ii) the term "Obligations" means all obligations of Tenant under the Lease, including, but not limited to, Tenant's obligation to pay all Rent due and owing under the Lease.  Any capitalized terms not defined in this Guaranty shall have the meanings ascribed thereto in the Lease.  The recitals set forth above are by this reference incorporated herein and Guarantor represents and warrants to Landlord that said recitals are true and complete.

2.    **WARRANTIES AND REPRESENTATIONS.**   Guarantor warrants and represents to Landlord as follows: (i) Guarantor owns a majority interest in Tenant and will benefit from the Lease; (ii) Guarantor is duly authorized to execute and deliver this Guaranty, which is enforceable in accordance with its terms; and (iii) the making and performance of this Guaranty by Guarantor will not result in any breach of any term, condition or provision of, or constitute a default under, any contract, agreement or other instrument to which Guarantor is a party or by which Guarantor may be bound, or result in a breach of any regulation, order, writ, injunction or decree of any court or any commission, board or other administrative agency entered in any proceeding to which Guarantor is a party or by which Guarantor may be bound.

3.    **GUARANTY OF PAYMENT AND PERFORMANCE.**   Guarantor hereby irrevocably and unconditionally guarantees the punctual payment, performance and fulfillment of all of the Obligations and hereby agrees to fully defend, indemnify and hold Landlord harmless from and against any cost, claim, liability, damage or expense (including, but not limited to, reasonable attorneys' fees) which Landlord incurs in the event Tenant does not pay, perform and/or fulfill all of the Obligations as and when such Obligations are to be paid, performed or fulfilled under the Lease.  This Guaranty is a guaranty of payment and not of collection.  Notwithstanding the foregoing provisions of this Section 3 to the contrary, the maximum aggregate liability of Guarantor under this Guaranty shall be limited to the sum of (a) an amount

equal to the aggregate sum of all Monthly Base Rent and Tenant's Pass-Through Costs payable by Tenant under the Lease for the most recent twelve (12) month trailing period (the "Applicable Amount"), plus (b) any and all costs and expenses payable by Guarantor pursuant to Sections 7 and 8 of this Guaranty; provided, however, so long as no Event of Default by Tenant has occurred (or shall thereafter occur) under the Lease, then on the first day of the sixth (6th) Lease Year (the "Reduction Date"), the Applicable Amount shall be reduced to, and shall thereafter be for the remainder of the Term, an amount equal to the aggregate sum of all Monthly Base Rent and Tenant's Pass-Through Costs payable by Tenant under the Lease for the most recent six (6) month trailing period.  In the event that the Reduction Requirements are not satisfied as of the Reduction Date, or if any Event of Default by Tenant shall thereafter occur, the Applicable Amount shall not be reduced on such Reduction Date, but rather the Applicable Amount shall remain at the amount immediately preceding such Reduction Date (or, with respect to an Event of Default occurring after such Reduction Date, the Applicable Amount shall be increased to the amount set forth in (a) above.  Landlord and Guarantor acknowledge and agree that this Guaranty shall apply only with respect to the Obligations accruing during or with respect to the initial Term and that, in the event Tenant exercises its Extension Option, this Guaranty shall not apply to any Obligations accruing with respect to the Extension Period so long as Tenant shall have fully and timely complied with all Obligations pertaining to the initial Term.

4.      **WAIVER.**  Guarantor waives and renounces any and all homestead exemption rights against the Obligations and also waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty.

5.      **GUARANTY IS DIRECT.**  This Guaranty is direct and immediate and may be enforced without prior resort by Landlord to any right of dispossession or other remedies it may have under the Lease or against Tenant or any other person or against any security or collateral and without the necessity of any suit or proceedings by Landlord of any nature whatsoever against Tenant.  Guarantor's obligations under this Guaranty are independent of the obligations of Tenant, and a separate action or actions may be brought and prosecuted against Guarantor, whether or not action is brought against Tenant or any other guarantor or party or whether or not Tenant or any other guarantor or party is joined in such action or actions.

6.      **GUARANTY IS ABSOLUTE.**  This Guaranty is absolute and is not conditioned in any way upon the genuineness, validity, regularity or enforceability of the Lease or the Obligations.

7.      **PAYMENT OF EXPENSES.**  All costs and expenses of any nature, including, without limitation, reasonable attorneys' fees, which Landlord incurs in connection with or incidental to the enforcement of the performance of any of Guarantor's obligations under this Guaranty shall immediately be payable by Guarantor to Landlord.

8.      **LATE PAYMENTS.**  If Guarantor fails to pay any amount payable under this Guaranty when such amount is due, interest on such amount shall accrue at the Default Rate set forth in the Lease.

9.      **LANDLORD'S RIGHTS.**  Without notice to or further assent by Guarantor, Landlord, in its sole and absolute discretion, may at any time or times it so determines, and upon such terms and conditions as it so determines, (i) extend or modify the time, manner, place or terms of payment or performance of, or otherwise modify, amend, renew, supplement, change or waive the terms and conditions of, any of the Obligations or the Lease, (ii) in the event that any security or collateral at any time secures any of the Obligations, release any of such security or collateral without obtaining other security or collateral in substitution therefor, (iii) in the event of any default in the payment, performance or fulfillment of the Obligations, sell, assign, transfer and deliver any of such security or collateral at public or private sale, at any time or place selected by Landlord, at such prices and upon such terms and conditions, including on credit and/or for future delivery, as it may deem proper, without demand, advertisement or notice of sale to Guarantor, which are hereby waived, and, if such security or collateral is disposed of at private sale, Landlord shall be relieved of any liability or claim for inadequacy of price, and at any sale Landlord may itself purchase the property so sold, free from any right of redemption or subrogation of

Guarantor, which is hereby waived and released, and (iv) settle or compromise any of the Obligations with or discharge Tenant and/or any other persons who may at any time be liable thereon, whether or not they are in bankruptcy, receivership, composition, dissolution, liquidation, arrangement, reorganization or adjustment. Guarantor acknowledges that Guarantor shall remain bound on this Guaranty notwithstanding any act, omission, forbearance, delay, extension, modification, amendment, renewal, supplement, change or waiver by Landlord of any nature whatsoever, whether pursuant to the provisions of this Section or otherwise, relating to any of the Obligations or any security or collateral. Guarantor further acknowledges that none of the Obligations shall be excluded from the coverage of this Guaranty by virtue of being affected by any such act, omission, forbearance, delay, extension, modification, amendment, renewal, supplement, change or waiver.

10.  **WAIVER OF SUBROGATION.**  Notwithstanding any other provision of this Guaranty to the contrary, Guarantor hereby waives any claim or other rights which Guarantor may now have or hereafter acquire against Tenant, any other guarantor of the Lease or any other party of all or any of the Obligations, that arise from the existence or performance of Guarantor's obligations under this Guaranty or the Lease (all such claims and rights are referred to as "Guarantor's Conditional Rights"), including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, or indemnification, any right to participate in any claim or remedy of Landlord against Tenant or any collateral which Landlord now has or hereafter acquires, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, by any payment made hereunder or otherwise, including, without limitation, the right to take or receive from Tenant, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim or other rights. If, notwithstanding the foregoing provisions, any amount shall be paid to Guarantor on account of any such Guarantor's Conditional Rights and either (i) such amount is paid to Guarantor at any time when the Obligations shall not have been paid or performed in full, or (ii) regardless of when such amount is paid to Guarantor, any payment made by Tenant to Landlord is at any time determined to be a preferential payment, then such amount paid to Guarantor shall be held in trust for the benefit of Landlord and shall forthwith be paid to Landlord to be credited and applied to the Obligations, whether matured or unmatured, in such order as Landlord, in its sole and absolute discretion, shall determine.

11.  **SUBORDINATION OF TENANT'S INDEBTEDNESS.**  Any indebtedness of Tenant now or hereafter owed to or held by Guarantor is hereby subordinated to the Obligations of Tenant to Landlord. Such indebtedness of Tenant to Guarantor shall, if Landlord so requests, be collected, enforced and received by Guarantor as trustee for Landlord and be paid over to Landlord on account of the Obligations of Tenant to Landlord, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

12.  **SURVIVAL OF OBLIGATIONS.**  For the purposes of this Guaranty, the Obligations shall survive the termination of the Lease in accordance with its terms or by reason of a default by Tenant, whether or not the Obligations actually survive such termination, and Guarantor shall remain bound to perform its obligations under this Guaranty notwithstanding such termination.

13.  **NO RIGHT OF SETOFF.**  Guarantor shall not set up or claim any defense, counterclaim, setoff or other objection of any kind to any demand or claim, or to any action or proceeding, at law, in equity or otherwise, made or brought at any time hereunder by Landlord.

14.  **VALIDITY OF GUARANTY.**  The validity of this Guaranty, and Guarantor's obligations hereunder, shall not be impaired, changed, released or limited in any manner whatsoever by reason of (i) the assertion or failure to assert by Landlord against Tenant of any of the rights or remedies of Landlord pursuant to the Lease or by law, (ii) any impairment, change, release or limitation of the Obligations of the Lease or any remedy for the enforcement thereof, (iii) the making of any assignment by Tenant, with or without notice to Landlord, of its interest under the Lease (whether or not such assignment is permitted under the Lease and whether or not it is approved by Landlord), (iv) the sale or other transfer by Guarantor of any stock of Tenant or any change in the ownership or control of such stock of Tenant, or (v) any impairment, change, release or limitation of Tenant's Obligations under the Lease or otherwise by (A) the release or discharge of Tenant in any creditors' proceedings, receivership, bankruptcy, insolvency, composition, dissolution, liquidation, reorganization, arrangement or adjustment or other proceedings, (B)

any impairment, limitation or modification of the liability of Tenant or the estate of Tenant in receivership, bankruptcy, insolvency, composition, dissolution, liquidation, reorganization, arrangement or adjustment, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the Bankruptcy Code or any other present or future statute or from the decision of any court or other tribunal, or (C) the rejection or disaffirmance of the Lease or any Obligations thereunder in any such proceedings.

15.    **NOTICES**.   All notices and other communications permitted or required by the provisions of this Guaranty shall be in writing and shall be delivered by (a) the United States Postal Service, designated as registered or certified mail, return receipt requested, bearing adequate postage and addressed as hereinafter provided, (b) hand delivery, or (c) nationally-recognized commercial delivery service (such as FedEx) which provides receipt of delivery. All notices and other communications shall be deemed to be served on the earlier of the date on which such notices and other communications are actually received or the date on which such delivery was refused.  Rejection or refusal to accept or inability to deliver because of change of address of which no notice was given as provided herein shall be deemed to be receipt of the notice or other communication sent.  By giving to the other party hereto at least ten (10) days' notice thereof, any party hereto shall have the right from time to time to change its address for purposes of this Guaranty to any other address.  Each notice or other communication to Guarantor or Landlord shall be addressed, until such notice of change of address, as follows:

|  |  |
|---|---|
| **To Landlord:** | KBSIII 3003 Washington, LLC<br>c/o KBS<br>3003 Washington Boulevard,<br>Suite #950<br>Arlington, VA 22201<br>Attention:  Senior Vice President |
| **With a copy to:** | Holland & Knight LLP<br>800 17th Street N.W.<br>Suite 1100<br>Washington, DC 20006<br>Attention:  Christopher L. Camarra, Esquire |
| **To Guarantor:** | At the Premises |

16.    **REAFFIRMATION**.  Guarantor agrees that it will, at any time and from time to time, within fifteen (15) days following written request by Landlord, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modification).  Guarantor agrees that such certificate may be relied on by anyone holding or proposing to acquire any interest in the Premises or the project of which the Premises is a part from or through Landlord or by the holder of any mortgage or prospective holder of any mortgage or of any interest therein.

17.    **CHANGES ONLY IN WRITING.**  This Guaranty cannot be changed or terminated orally and may be changed or terminated only by instrument signed by Landlord and Guarantor.

18.    **SEVERABILITY.**  If any provision of this Guaranty or its application to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Guaranty, or the applicability of such provision to other persons or circumstances, shall not be affected thereby.  Each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law and shall be deemed to be separate from such invalid or unenforceable provisions and shall continue in full force and effect.

19.      **NO LIMITATION OF LANDLORD'S RIGHTS.**  All of Landlord's rights and remedies under the Lease or under this Guaranty are distinct, separate and cumulative, and no such right and remedy therein mentioned is to be in exclusion of or a waiver of any of the others.  In addition, none of the provisions of this Guaranty shall be construed to limit any other provisions or any rights which Landlord may have at law, in equity, or otherwise.  None of the waivers by Guarantor made in this Guaranty shall be construed to preclude or limit any others.

20.      **REVIEW OF DOCUMENTS BY GUARANTOR.**  Guarantor represents that, with the assistance of independent legal counsel of its choice, it has read and reviewed the Lease and any other documents given in connection with the Lease as it or it's counsel deem necessary or desirable to read.

21.      **WAIVER OF RIGHTS UNDER VIRGINIA CODE**.  Guarantor waives all rights accorded Guarantor under Sections 49-25 and 49-26 of the Virginia Code.

22.      **WAIVER OF JURY TRIAL**.  GUARANTOR HEREBY KNOWINGLY, WILLINGLY AND VOLUNTARILY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING AT LAW, IN EQUITY OR OTHERWISE, BROUGHT ON, UNDER OR BY VIRTUE OF THIS GUARANTY.

23.      **CONSENT TO JURISDICTION.**

(a)      Guarantor hereby: (i) irrevocably consents and submits to the jurisdiction of any federal or state court sitting in the jurisdiction in which the Premises is located, in respect to any action or proceeding brought therein by Landlord against Guarantor concerning any matters arising out of or in any way relating to this Guaranty or the Lease; (ii) expressly waives any rights of Guarantor pursuant to the law of any other jurisdiction by virtue of which exclusive jurisdiction of its courts might be claimed; (iii) irrevocably waives personal service of any summons and complaint, and consents to the service upon Guarantor of process in any such action or proceeding by the mailing of such process by first class, registered or certified mail, postage prepaid, to Guarantor at the address set forth in Section 15 of this Guaranty; (iv) irrevocably waives all objections as to venue and any and all rights Guarantor may have to seek a change of venue with respect to any such action or proceeding (provided the venue remains within the jurisdiction of any federal or state court sitting in the jurisdiction in which the Premises is located); (v) agrees that the laws of the jurisdiction where the Premises is located shall govern in any such action or proceeding and waives any defense to any action or proceeding granted or allowed by the laws of any other country or jurisdiction; and (vi) agrees that any final judgment rendered against Guarantor in any such action or proceeding shall be conclusive and may be enforced in the jurisdiction in which the Premises is located or any other jurisdiction by suit on the judgment or in any other manner provided by law, and expressly consents to the affirmation of the validity of any such judgment by the courts of the jurisdiction in which the Premises is located or any other jurisdiction so as to permit execution thereon. Guarantor further agrees that any action or proceeding by Guarantor against Landlord with respect to any matters arising out of or in any way relating to the Lease shall be brought only in the jurisdiction in which the Premises is located.

(b)      Guarantor shall from time to time execute, acknowledge, deliver and file all further instruments reasonably necessary under the laws of any jurisdiction to make effective (i) the consent of Guarantor to jurisdiction of the state and federal courts sitting in the jurisdiction where the Premises is located, and (ii) the other provisions of this Guaranty.

(c)      Without limiting any other provision of this Section 23, Guarantor agrees and consents that venue and jurisdiction shall be proper in the Circuit Court for Arlington County, Virginia, or in the United States District Court for the Eastern District of Virginia.

24.      **HEADINGS.**  The headings contained in this Guaranty are included for convenience of reference only and are not intended to modify the terms hereof.

25.    **SUCCESSORS AND ASSIGNS.**  The provisions of this Guaranty shall be binding upon Guarantor and its heirs, legal representatives, successors and assigns, and shall inure to the benefit of Landlord and its heirs, legal representatives, successors and assigns.

26.    **APPLICABLE LAW.**  This Guaranty shall be governed, and construed in accordance with, the laws of the Commonwealth of Virginia, without regard to its conflicts of laws principles.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty of Lease under seal as of the date first above written.

**GUARANTOR**:

WITNESSES:

_____          _____ [seal]
Name:                                                            Name: ANDREW DARNEILLE

_____
Name:

## ACKNOWLEDGMENT

_____          )
                                                                )          ss:
_____          )

On this _____ day of _____, before me, the undersigned officer, personally appeared _____, who acknowledged himself to be person who executed the foregoing Guaranty of Lease for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____ [SEAL]
Notary Public

My commission expires: _____

**EXHIBIT I**

**ROFO SPACE**



1,306 RSF

Smokecraft0137

Document comparison by Workshare 9.5 on Wednesday, May 15, 2019 2:07:11 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://HKDMS/Active/62735864/10 |
| Description | #62735864v10<Active> - Lease - KBS - 3003 Washington - Smokekraft |
| Document 2 ID | interwovenSite://HKDMS/Active/62735864/11 |
| Description | #62735864v11<Active> - Lease - KBS - 3003 Washington - Smokekraft |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 18 |
| Deletions | 17 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 35 |

Smokecraft0138

## FIRST AMENDMENT TO DEED OF RETAIL LEASE

**THIS FIRST AMENDMENT TO DEED OF RETAIL LEASE** (this "Amendment") is made as of March 31, 2020 (the "Effective Date"), by and between **KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant").

### RECITALS

A.      Landlord and Tenant are parties to that certain Deed of Retail Lease dated as of May 22, 2019 (the "Original Lease"), pursuant to which Tenant leases from Landlord certain premises ("Premises") located on the first floor of the building having a street address of 3003 Washington Boulevard, Arlington, Virginia (the "Building"), as more particularly described in the Original Lease.

B.      The Rent Commencement Date determined in accordance with the Original Lease is March 17, 2019 (the "Original Rent Commencement Date").

C.      Due to recent events and circumstances related to the Coronavirus Disease COVID-19 Pandemic ("COVID-19"), Tenant has requested a deferral of the Original Rent Commencement Date until June 1, 2020.

D.      Due to COVID-19, Landlord and Tenant have agreed to amend the Original Lease to, among things, delay the Original Rent Commencement Date, subject to and in accordance with the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      **Incorporation of Recitals; Definitions.**  The foregoing recitals are hereby incorporated in this Amendment and made a part hereof by this reference. All capitalized terms used in this Amendment shall have the meanings ascribed thereto in the Original Lease, unless otherwise defined herein.  As used herein and in the Original Lease, the term "Lease" means the Original Lease, as amended by this Amendment.

2.      **Commencement Date.**  Section 1.c of the Original Lease (captioned "Commencement Date") is hereby amended by deleting the words "The First Delivery Date, as defined in and subject to adjustment pursuant to Section 3 of this Lease" and, in lieu thereof, inserting the words "January 20, 2020".

3.      **Rent Commencement Date.**

A.      Section 1.d of the Original Lease (captioned "Rent Commencement Date") is hereby amended by deleting the words "The date which is three hundred (300) days following the Effective Date" and, in lieu thereof, inserting the words "June 1, 2020".

B.      The parties acknowledge and agree (A) that the first installment of Monthly Base Rent and Tenant's Pass-Through Costs in the amount of $15,992.33 (the "Prepaid Rent") was delivered by Tenant to Landlord together with Tenant's execution and delivery of the Original Lease, (B) prior to the execution and delivery of this Amendment, a portion of the Prepaid Rent in the amount of $8,079.44 (the "March Payment") was applied to the Rent otherwise due and payable following the Original Rent Commencement for the month of March 2020, and (C)  Landlord shall credit the March Payment, together with the remaining balance of the Prepaid Rent, to the installment of Rent due and payable by Tenant for June 2020.

Smokecraft0139

4.      **Estoppel.**

A.      Tenant hereby certifies to Landlord that (i) Tenant received the Tenant Financing Commitment and Tenant delivered the Financing Contingency Waiver Notice pursuant to letter to Landlord dated December 6, 2019, and therefore, Tenant has no right to terminate the Lease pursuant to Section 3.d of the Original Lease; (ii) Landlord delivered the Premises to Tenant and therefore, Tenant has no right to terminate the Lease pursuant to Section 3.a of the Original Lease; and (iii) Tenant filed the Permit Application and has obtained from the Permit Office all permits and licenses necessary to undertake the Tenant Improvements in accordance with the Tenant Plans.

B.      Tenant represents and warrants to Landlord that (a) the Original Lease is in full force and effect and, except as set forth in this Amendment, has not been modified, altered, or amended; (b) Landlord has fulfilled all of its obligations under the Lease to be performed as of the date hereof and there are no defaults by Landlord under the Lease; and (c) Tenant has no causes of action, defenses, setoffs, claims or demands whatsoever, in law or in equity, against Landlord as of the Effective Date, based upon or by reason of any matter, cause or thing whatsoever, including, without limitation, COVID-19, or any matter or circumstance arising out of the Lease, and that Tenant has waived and relinquished, and is forever estopped to assert, any such causes of action, defenses, setoffs, claims or demands.

5.      **Broker.**  Tenant represents and warrants to Landlord that Tenant has not engaged any broker or agent in connection with this Amendment.  Tenant shall and does hereby indemnify, hold harmless and defend Landlord from and against any and all claims, loss, damage, cost or expense (including without limitation attorneys' fees and all court costs) arising out of any breach of the foregoing representation and warranty or any purported or actual dealings by Tenant and any broker or agent.

6.      **Successors; Governing Law.**  This Amendment shall be (a) binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, and (b) governed by and construed in accordance with the laws of the Commonwealth of Virginia.

7.      **Ratification; Entire Agreement.**  Except as expressly amended by this Amendment, all terms, conditions and provisions of the Original Lease are hereby ratified and confirmed and shall continue in full force and effect. This Amendment contains and embodies the entire agreement of the parties hereto with respect to the subject matter hereof.  This Amendment may not be modified or changed in whole or in part in any manner other than by an instrument in writing duly signed by the parties hereto.  In the event of any inconsistencies between the provisions of the Original Lease and this Amendment, the provisions of this Amendment shall control.

8.      **No Offer**.  The submission of this Amendment to Tenant does not constitute an offer to amend the Original Lease.  This Amendment shall have no force and effect until it is executed and delivered by Tenant to Landlord and executed by Landlord.

9.      **Counterpart Copies.**  This Amendment may be executed in two (2) or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Amendment.

[The rest of this page intentionally left blank. Signatures appear on the following page.]

**IN WITNESS WHEREOF,** the parties hereto have executed this First Amendment to Deed of Retail Lease under seal as of the day and year first hereinabove written.

<u>LANDLORD</u>:

**KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company

By:     KBS Capital Advisors, LLC, a Delaware limited liability company, its authorized agent

     By: _____

     Name: _____

     Title: _____

<u>TENANT</u>:

**SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company

By: _____

Name: Andrew Darneille

Title: Managing Member

[Signatures continue on the following page.]

3

Smokecraft0141

**JOINDER**

The undersigned individual, **ANDREW DARNEILLE**, hereby reaffirms his obligations under that certain Guaranty of Lease made as of May 22, 2019 (the "Guaranty") and ratifies and confirms that the Guaranty continues in full force and effect in accordance with its terms and that, as used in the Guaranty, the term "Lease" shall mean the Original Lease, as amended by this Amendment, and any further amendments or modifications thereof. Guarantor acknowledges and agrees that there is no defense, claim, or right of set-off whatsoever existing as of the date hereof to the obligations evidenced by the Lease or the Guaranty, and that Guarantor has waived and relinquished, and is forever estopped to assert, any such defense, claim or set-off. This reaffirmation is not intended to be, and shall not cause or result in a novation with respect to the Guaranty.  The acceptance of this reaffirmation by Landlord in this instance shall not in any way imply that this reaffirmation is a condition to the continuance of Guarantor's obligations under the Guaranty or that any similar agreement is required for further amendments or modifications to Lease.

Andrew Darneille

Smokecraft0142

## THIRD AMENDMENT TO DEED OF RETAIL LEASE

**THIS THIRD AMENDMENT TO DEED OF RETAIL LEASE** (this "Amendment") is made as of July 13, 2020 (the "Effective Date"), by and between **KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant").

## RECITALS

A.     Landlord and Tenant are parties to that certain Deed of Retail Lease dated as of May 22, 2019, as amended by that certain First Amendment to Deed of Retail Lease dated March 31, 2020, and by that certain Second Amendment to Deed of Retail Lease dated May 21, 2020 (collectively, the "Original Lease"), pursuant to which Tenant leases from Landlord certain premises ("Premises") located on the first floor of the building having a street address of 3003 Washington Boulevard, Arlington, Virginia (the "Building"), as more particularly described in the Original Lease.

B.     Landlord and Tenant desire to amend the Original Lease in accordance with the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.     **Incorporation of Recitals; Definitions.**  The foregoing recitals are hereby incorporated in this Amendment and made a part hereof by this reference. All capitalized terms used in this Amendment shall have the meanings ascribed thereto in the Original Lease, unless otherwise defined herein.  As used herein and in the Original Lease, the term "Lease" means the Original Lease, as amended by this Amendment.

2.     **Definition of Lease Year.** The definition of "Lease Year" set forth in Section 3.b of the Original Lease (captioned "Lease Year") is hereby deleted in its entirety and, in lieu thereof, the following is inserted:

> "**Lease Year.** As used in this Lease, the term 'Lease Year' means (A) with respect to the first Lease Year, the period commencing on August 1, 2020 and terminating on July 31, 2021, and (B) each successive period of twelve (12) calendar months thereafter during the Term."

3.     **Lease Expiration Date.**   For the avoidance of doubt, the parties hereby acknowledge and agree that the term "Lease Expiration Date" as used in the Lease means July 31, 2030.

4.     **Estoppel.**   Tenant represents and warrants to Landlord that (a) the Original Lease is in full force and effect and, except as set forth in this Amendment, has not been modified, altered, or amended; (b) Landlord has fulfilled all of its obligations under the Lease to be performed as of the date hereof and there are no defaults by Landlord under the Lease; and (c) Tenant has no causes of action, defenses, setoffs, claims or demands whatsoever, in law or in equity, against Landlord as of the Effective Date, based upon or by reason of any matter, cause or thing whatsoever, including, without limitation, the Coronavirus Diseases COVID-19 Pandemic, or any matter or circumstance arising out of the Lease, and that Tenant has waived and relinquished, and is forever estopped to assert, any such causes of action, defenses, setoffs, claims or demands.

5.     **Affirmation of Guaranty.** Reference is hereby made to that certain Guaranty executed on May 22, 2019 (the "Guaranty") by Andrew Darneille, an individual ("Guarantor") in favor of Landlord in connection with the Original Lease. The term "Lease" as used in the Guaranty means the Original Lease as amended by this Amendment. Guarantor has joined in this Amendment to acknowledge and agree to

the terms and conditions of this Amendment and to ratify and unconditionally and irrevocably reaffirm its guarantee of the complete and timely performance of each obligation of Tenant (and any assignee) under the Lease and any extensions or renewals of and amendments to the Lease in accordance with the terms and conditions of the Guaranty.

   **6.**      **Broker.**  Tenant represents and warrants to Landlord that Tenant has not engaged any broker or agent in connection with this Amendment.  Tenant shall and does hereby indemnify, hold harmless and defend Landlord from and against any and all claims, loss, damage, cost or expense (including without limitation attorneys' fees and all court costs) arising out of any breach of the foregoing representation and warranty or any purported or actual dealings by Tenant and any broker or agent.

   **7.**      **Successors; Governing Law.**  This Amendment shall be (a) binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, and (b) governed by and construed in accordance with the laws of the Commonwealth of Virginia.

   **8.**      **Ratification; Entire Agreement.**  Except as expressly amended by this Amendment, all terms, conditions and provisions of the Original Lease are hereby ratified and confirmed and shall continue in full force and effect. This Amendment contains and embodies the entire agreement of the parties hereto with respect to the subject matter hereof.  This Amendment may not be modified or changed in whole or in part in any manner other than by an instrument in writing duly signed by the parties hereto.  In the event of any inconsistencies between the provisions of the Original Lease and this Amendment, the provisions of this Amendment shall control.

   **9.**      **Confidentiality.** As a material inducement to Landlord's entering into this Amendment, Tenant and Guarantor have agreed to keep the terms and conditions of this Amendment in strict confidence.   In furtherance of the foregoing but not in limitation thereof, Tenant and Guarantor acknowledge that this Amendment includes terms that would not be offered to other tenants in the Building and that disclosure of such terms may cause irreparable harm to Landlord. Tenant shall not disclose, or permit the disclosure of, this Amendment or the content, terms and conditions hereof, to any employee or other person or entity other than Authorized Recipients (hereinafter defined) and then only on a need-to-know basis, and upon Tenant or Guarantor making each such Authorized Recipient aware of the confidentiality restrictions set forth herein and procuring such person's agreement to be bound thereby. All obligations of Tenant and Guarantor  under this Section shall be referred to as the "Confidentiality Obligations". Tenant and Guarantor shall indemnify and hold Landlord harmless from and against any and all costs, expenses (including, without limitation, reasonable attorneys' fees and court costs), damages, or claims arising from a breach of the Confidentiality Obligations by Tenant, Guarantor or by any Authorized Recipients.  The Confidentiality Obligations shall not apply to the extent that disclosure is necessary in connection with the compliance with any court order or other governmental directive expressly requiring Tenant or the Authorized Recipients to disclose the terms of this Amendment. The Confidentiality Obligations shall survive the termination or expiration of the Lease and any other agreements now or hereafter entered into between Landlord and Tenant relating to the Lease. As used herein, the term "Authorized Recipients" means any accountants and/or attorneys hired and engaged on behalf of Tenant in connection with this Amendment.  Tenant and Guarantor represent and warrant to Landlord that Tenant and Guarantor have made the foregoing and any other Authorized Recipients aware of the confidentiality restrictions set forth herein and has procured such person's agreement to be bound thereby.

   **10.**      **No Offer.**  The submission of this Amendment to Tenant does not constitute an offer to amend the Original Lease.  This Amendment shall have no force and effect until it is executed and delivered by Tenant to Landlord and executed by Landlord.

   **11.**      **Counterpart Copies.**  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute but one and the same instrument. Photocopies and electronically scanned or faxed copies of original signature pages, and/or digital or electronic signature pages executed using "DocuSign" or any other method of electronic execution, shall be deemed originals in all respects and binding on the parties. At either party's request,

2

Smokecraft0144

both parties hereto shall execute and deliver to each other originally-executed conforming duplicates of this Amendment.

*[The rest of this page intentionally left blank. Signatures appear on the following page.]*

#75551752_v1

Smokecraft0145

**IN WITNESS WHEREOF,** the parties hereto have executed this Third Amendment to Deed of Retail Lease under seal as of the day and year first hereinabove written.

<u>**LANDLORD:**</u>

**KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company

By:    KBS Capital Advisors LLC, a Delaware limited liability company, its authorized agent

       By:   _____
            Name: Stephen J. Close
            Title: SVP

<u>**TENANT:**</u>

**SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company

By:   _____
     Name: Andrew Darneille
     Title: Managing Member

[Signatures continue on the following page.]

#75551752_v1

Smokecraft0146

### JOINDER

The undersigned individual, **ANDREW DARNEILLE**, hereby reaffirms his obligations under that certain Guaranty made as of May 22, 2019 (the "Guaranty") and ratifies and confirms that the Guaranty continues in full force and effect in accordance with its terms and that, as used in the Guaranty, the term "Lease" shall mean the Original Lease, as amended by this Amendment, and any further amendments or modifications thereof. Guarantor acknowledges and agrees that there is no defense, claim, or right of set-off whatsoever existing as of the date hereof to the obligations evidenced by the Lease or the Guaranty, and that Guarantor has waived and relinquished, and is forever estopped to assert, any such defense, claim or set-off. This reaffirmation is not intended to be, and shall not cause or result in a novation with respect to the Guaranty.  The acceptance of this reaffirmation by Landlord in this instance shall not in any way imply that this reaffirmation is a condition to the continuance of Guarantor's obligations under the Guaranty or that any similar agreement is required for further amendments or modifications to Lease.

_____
Andrew Darneille

5

Smokecraft0147

# FOURTH AMENDMENT TO DEED OF RETAIL LEASE

**THIS FOURTH AMENDMENT TO DEED OF RETAIL LEASE** (this "Amendment") is made as of August _25_, 2020 (the "Effective Date"), by and between **KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant").

## RECITALS

A.      Landlord and Tenant are parties to that certain Deed of Retail Lease dated as of May 22, 2019, as amended by that certain First Amendment to Deed of Retail Lease dated March 31, 2020, by that certain Second Amendment to Deed of Retail Lease dated May 21, 2020, and by that certain Third Amendment to Deed of Retail Lease dated July 13, 2020 (collectively, the "Original Lease"), pursuant to which Tenant leases from Landlord certain premises ("Premises") located on the first floor of the building having a street address of 3003 Washington Boulevard, Arlington, Virginia (the "Building"), as more particularly described in the Original Lease.

B.      The Term of the Original Lease (the "Original Term") expires on July 31, 2030.

C.      Due to recent events and circumstances related to the Coronavirus Disease COVID-19 Pandemic ("COVID-19"), Tenant has requested the Covid Rent Concession (hereinafter defined).

D.      Landlord has agreed to provide Tenant with the Covid Rent Concession subject to the terms and conditions of this Amendment.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      **Incorporation of Recitals; Definitions.** The foregoing recitals are hereby incorporated in this Amendment and made a part hereof by this reference. All capitalized terms used in this Amendment shall have the meanings ascribed thereto in the Original Lease, unless otherwise defined herein. As used herein and in the Original Lease, the term "Lease" means the Original Lease, as amended by this Amendment.

2.      **Rent Abatement.** So long as no Event of Default shall have occurred, Landlord agrees to abate fifty percent (50%) of the Monthly Base Rent otherwise due and payable by Tenant for the period (the "Abatement Period") commencing September 1, 2020 and expiring on September 30, 2020. The aggregate dollar amount of the Monthly Base Rent which is abated pursuant to this paragraph is herein referred to as the "Covid Rent Concession". Landlord and Tenant acknowledge and agree that the Covid Rent Concession equals Five Thousand Seven Hundred Sixty-Six and 67/100 Dollars ($5,766.67). If any Event of Default shall occur following the Effective Date, Tenant's right to the Covid Rent Concession shall immediately terminate, and, upon Landlord's demand, an amount equal to the Covid Rent Concession shall become immediately due and payable by Tenant as Additional Rent. For avoidance of doubt, Tenant shall continue to be obligated to pay to Landlord, Tenant's Pass-Through Costs, Percentage Rent and all other amount due and payable under the Original Lease during the Abatement Period.

3.      **Estoppel.** Tenant represents and warrants to Landlord that (a) the Original Lease is in full force and effect and, except as set forth in this Amendment, has not been modified, altered, or amended; (b) Landlord has fulfilled all of its obligations under the Lease to be performed as of the date hereof and there are no defaults by Landlord under the Lease; and (c) Tenant has no causes of action, defenses, setoffs, claims or demands whatsoever, in law or in equity, against Landlord as of the Effective Date, based upon or by reason of any matter, cause or thing whatsoever, including, without limitation, the

#77901859_v1

Smokecraft0148

Coronavirus Diseases COVID-19 Pandemic, or any matter or circumstance arising out of the Lease, and that Tenant has waived and relinquished, and is forever estopped to assert, any such causes of action, defenses, setoffs, claims or demands.

**4.**     **Affirmation of Guaranty.** Reference is hereby made to that certain Guaranty executed on May 22, 2019 (the "Guaranty") by Andrew Darneille, an individual ("Guarantor") in favor of Landlord in connection with the Original Lease. The term "Lease" as used in the Guaranty means the Original Lease as amended by this Amendment. Guarantor has joined in this Amendment to acknowledge and agree to the terms and conditions of this Amendment and to ratify and unconditionally and irrevocably reaffirm its guarantee of the complete and timely performance of each obligation of Tenant (and any assignee) under the Lease and any extensions or renewals of and amendments to the Lease in accordance with the terms and conditions of the Guaranty.

**5.**     **Broker.** Tenant represents and warrants to Landlord that Tenant has not engaged any broker or agent in connection with this Amendment. Tenant shall and does hereby indemnify, hold harmless and defend Landlord from and against any and all claims, loss, damage, cost or expense (including without limitation attorneys' fees and all court costs) arising out of any breach of the foregoing representation and warranty or any purported or actual dealings by Tenant and any broker or agent.

**6.**     **Successors; Governing Law.** This Amendment shall be (a) binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, and (b) governed by and construed in accordance with the laws of the Commonwealth of Virginia.

**7.**     **Ratification; Entire Agreement.** Except as expressly amended by this Amendment, all terms, conditions and provisions of the Original Lease are hereby ratified and confirmed and shall continue in full force and effect. This Amendment contains and embodies the entire agreement of the parties hereto with respect to the subject matter hereof. This Amendment may not be modified or changed in whole or in part in any manner other than by an instrument in writing duly signed by the parties hereto. In the event of any inconsistencies between the provisions of the Original Lease and this Amendment, the provisions of this Amendment shall control.

**8.**     **Confidentiality.** As a material inducement to Landlord's entering into this Amendment, Tenant and Guarantor have agreed to keep the terms and conditions of this Amendment in strict confidence. In furtherance of the foregoing but not in limitation thereof, Tenant and Guarantor acknowledge that this Amendment includes terms that would not be offered to other tenants in the Building and that disclosure of such terms may cause irreparable harm to Landlord. Tenant shall not disclose, or permit the disclosure of, this Amendment or the content, terms and conditions hereof, to any employee or other person or entity other than Authorized Recipients (hereinafter defined) and then only on a need-to-know basis, and upon Tenant or Guarantor making each such Authorized Recipient aware of the confidentiality restrictions set forth herein and procuring such person's agreement to be bound thereby. All obligations of Tenant and Guarantor under this Section shall be referred to as the "Confidentiality Obligations". Tenant and Guarantor shall indemnify and hold Landlord harmless from and against any and all costs, expenses (including, without limitation, reasonable attorneys' fees and court costs), damages, or claims arising from a breach of the Confidentiality Obligations by Tenant, Guarantor or by any Authorized Recipients. The Confidentiality Obligations shall not apply to the extent that disclosure is necessary in connection with the compliance with any court order or other governmental directive expressly requiring Tenant or the Authorized Recipients to disclose the terms of this Amendment. The Confidentiality Obligations shall survive the termination or expiration of the Lease and any other agreements now or hereafter entered into between Landlord and Tenant relating to the Lease. As used herein, the term "Authorized Recipients" means any accountants and/or attorneys hired and engaged on behalf of Tenant in connection with this Amendment. Tenant and Guarantor represent and warrant to Landlord that Tenant and Guarantor have made the foregoing and any other Authorized Recipients aware of the confidentiality restrictions set forth herein and has procured such person's agreement to be bound thereby.

2

Smokecraft0149

9.  **No Offer**.  The submission of this Amendment to Tenant does not constitute an offer to amend the Original Lease.  This Amendment shall have no force and effect until it is executed and delivered by Tenant to Landlord and executed by Landlord.

10.  **Counterpart Copies.**  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute but one and the same instrument. Photocopies and electronically scanned or faxed copies of original signature pages, and/or digital or electronic signature pages executed using "DocuSign" or any other method of electronic execution, shall be deemed originals in all respects and binding on the parties. At either party's request, both parties hereto shall execute and deliver to each other originally-executed conforming duplicates of this Amendment.

*[The rest of this page intentionally left blank. Signatures appear on the following page.]*

Smokecraft0150

**IN WITNESS WHEREOF,** the parties hereto have executed this Fourth Amendment to Deed of Retail Lease under seal as of the day and year first hereinabove written.

**LANDLORD:**

**KBSIII 3003 WASHINGTON, LLC,**
a Delaware limited liability company

By:    KBS Capital Advisors, LLC,
       a Delaware limited liability company,
       its authorized agent

       By:   _____
           Name:  Stephen J. Close
           Title:   SVP

**TENANT:**

**SMOKECRAFT CLARENDON LLC,**
a Virginia limited liability company

By:   _____
     Name:  Andrew Darneille
     Title:   Managing Member

[Signatures continue on the following page.]

Smokecraft0151

## JOINDER

The undersigned individual, **ANDREW DARNEILLE**, hereby reaffirms his obligations under that certain Guaranty made as of May 22, 2019 (the "Guaranty") and ratifies and confirms that the Guaranty continues in full force and effect in accordance with its terms and that, as used in the Guaranty, the term "Lease" shall mean the Original Lease, as amended by this Amendment, and any further amendments or modifications thereof. Guarantor acknowledges and agrees that there is no defense, claim, or right of set-off whatsoever existing as of the date hereof to the obligations evidenced by the Lease or the Guaranty, and that Guarantor has waived and relinquished, and is forever estopped to assert, any such defense, claim or set-off. This reaffirmation is not intended to be, and shall not cause or result in a novation with respect to the Guaranty. The acceptance of this reaffirmation by Landlord in this instance shall not in any way imply that this reaffirmation is a condition to the continuance of Guarantor's obligations under the Guaranty or that any similar agreement is required for further amendments or modifications to Lease.

Andrew Darneille

Smokecraft0152

## FIFTH AMENDMENT TO DEED OF RETAIL LEASE

**THIS FIFTH AMENDMENT TO DEED OF RETAIL LEASE** (this "Amendment") is made as of November ___19___, 2020 (the "Effective Date"), by and between **KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant").

### RECITALS

A.     Landlord and Tenant are parties to that certain Deed of Retail Lease dated as of May 22, 2019, as amended by that certain First Amendment to Deed of Retail Lease dated March 31, 2020, by that certain Second Amendment to Deed of Retail Lease dated May 21, 2020, that certain Third Amendment to Deed of Retail Lease dated July 13, 2020 and that certain Fourth Amendment to Deed of Retail Lease dated August 25, 2020 (collectively, the "Original Lease"), pursuant to which Tenant leases from Landlord certain premises ("Premises") located on the first floor of the building having a street address of 3003 Washington Boulevard, Arlington, Virginia (the "Building"), as more particularly described in the Original Lease.

B.     The Term of the Original Lease (the "Original Term") expires on July 31, 2030.

C.     Due to recent events and circumstances related to the Coronavirus Disease COVID-19 Pandemic ("COVID-19"), Tenant requested, and Landlord granted pursuant to the Fourth Amendment, an abatement (the "Initial Concession") of a portion of the Monthly Base Rent otherwise due and payable by Tenant for the period commencing September 1, 2020 and expiring September 30, 2020.

D.     Due to COVID-19, Tenant has requested, in addition to the Initial Concession, an abatement of a portion of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the Second Abatement Period (hereinafter defined) and Landlord has agreed to abate a portion of the Monthly Base Rent and Additional Rent otherwise payable for the Second Abatement Period, subject to and in accordance with the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.     **Incorporation of Recitals; Definitions.** The foregoing recitals are hereby incorporated in this Amendment and made a part hereof by this reference. All capitalized terms used in this Amendment shall have the meanings ascribed thereto in the Original Lease, unless otherwise defined herein. As used herein and in the Original Lease, the term "Lease" means the Original Lease, as amended by this Amendment.

2.     **Extension of Term.** The Original Term is hereby extended for a period (the "Extension Period") of six (6) full calendar months, commencing on August 1, 2030 and expiring January 31, 2031, unless otherwise earlier terminated in accordance with the terms and conditions of the Lease. From and after the Effective Date, the term "Lease Expiration Date" as used herein and in the Original Lease shall mean 11:59 p.m. on January 31, 2031. As used herein and in the Original Lease, the term "Term" shall mean the Original Term as extended by the Extension Period. Tenant shall lease the Premises for the Extension Period on all the terms and conditions of the Original Lease, as amended by this Amendment; provided, however that Monthly Base Rent payable by Tenant during the Extension Period shall be Fourteen Thousand Seven Hundred Sixty-Three and 64/100 Dollars ($14,763.64).

3.     **"As-is" Condition.** Tenant accepts the Premises for the Extension Period in its "as-is" condition. Tenant acknowledges that neither Landlord nor any broker, agent, or employee of Landlord has made any representations or promises with respect to the Premises or the Building, except as herein expressly set forth, and no rights, privileges, easements or licenses are acquired by Tenant, except as may

#79863569_v2

be expressly set forth herein. Landlord shall have no obligation to perform, or pay for, any work, improvements or alterations in or to the Premises in connection with this Amendment or otherwise.

3. **Rent Abatement**. So long as no Event of Default shall have occurred, Landlord agrees to abate fifty percent (50%) of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the period (the "Second Abatement Period") commencing October 1, 2020 and expiring on March 31, 2021. The aggregate dollar amount of the Monthly Base Rent and Additional Rent which is abated pursuant to this paragraph is herein referred to as the "Additional Covid Rent Concession". Landlord and Tenant acknowledge and agree that the Additional Covid Rent Concession equals Forty-Nine Thousand Twenty-Two and 52/100 Dollars ($49,022.52). If any Event of Default shall occur following the Effective Date, Tenant's right to the Additional Covid Rent Concession shall immediately terminate, and, upon Landlord's demand, an amount equal to the Additional Covid Rent Concession shall become immediately due and payable by Tenant as Additional Rent. For avoidance of doubt, Tenant shall continue to be obligated to pay to Landlord, Percentage Rent under the Original Lease during the Second Abatement Period.

3. **Estoppel.** Tenant represents and warrants to Landlord that (a) the Original Lease is in full force and effect and, except as set forth in this Amendment, has not been modified, altered, or amended; (b) Landlord has fulfilled all of its obligations under the Lease to be performed as of the date hereof and there are no defaults by Landlord under the Lease; and (c) Tenant has no causes of action, defenses, setoffs, claims or demands whatsoever, in law or in equity, against Landlord as of the Effective Date, based upon or by reason of any matter, cause or thing whatsoever, including, without limitation, the Coronavirus Diseases COVID-19 Pandemic, or any matter or circumstance arising out of the Lease, and that Tenant has waived and relinquished, and is forever estopped to assert, any such causes of action, defenses, setoffs, claims or demands.

4. **Affirmation of Guaranty.** Reference is hereby made to that certain Guaranty executed on May 22, 2019 (the "Guaranty") by Andrew Darneille, an individual ("Guarantor") in favor of Landlord in connection with the Original Lease. The term "Lease" as used in the Guaranty means the Original Lease as amended by this Amendment. Guarantor has joined in this Amendment to acknowledge and agree to the terms and conditions of this Amendment and to ratify and unconditionally and irrevocably reaffirm its guarantee of the complete and timely performance of each obligation of Tenant (and any assignee) under the Lease and any extensions or renewals of and amendments to the Lease in accordance with the terms and conditions of the Guaranty.

5. **Broker.** Tenant represents and warrants to Landlord that Tenant has not engaged any broker or agent in connection with this Amendment. Tenant shall and does hereby indemnify, hold harmless and defend Landlord from and against any and all claims, loss, damage, cost or expense (including without limitation attorneys' fees and all court costs) arising out of any breach of the foregoing representation and warranty or any purported or actual dealings by Tenant and any broker or agent.

6. **Successors; Governing Law.** This Amendment shall be (a) binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, and (b) governed by and construed in accordance with the laws of the Commonwealth of Virginia.

7. **Ratification; Entire Agreement.** Except as expressly amended by this Amendment, all terms, conditions and provisions of the Original Lease are hereby ratified and confirmed and shall continue in full force and effect. This Amendment contains and embodies the entire agreement of the parties hereto with respect to the subject matter hereof. This Amendment may not be modified or changed in whole or in part in any manner other than by an instrument in writing duly signed by the parties hereto. In the event of any inconsistencies between the provisions of the Original Lease and this Amendment, the provisions of this Amendment shall control.

8. **Confidentiality.** As a material inducement to Landlord's entering into this Amendment, Tenant and Guarantor have agreed to keep the terms and conditions of this Amendment in strict confidence. In furtherance of the foregoing but not in limitation thereof, Tenant and Guarantor

#79863569_v2

2

acknowledge that this Amendment includes terms that would not be offered to other tenants in the Building and that disclosure of such terms may cause irreparable harm to Landlord. Tenant shall not disclose, or permit the disclosure of, this Amendment or the content, terms and conditions hereof, to any employee or other person or entity other than Authorized Recipients (hereinafter defined) and then only on a need-to-know basis, and upon Tenant or Guarantor making each such Authorized Recipient aware of the confidentiality restrictions set forth herein and procuring such person's agreement to be bound thereby. All obligations of Tenant and Guarantor  under this Section shall be referred to as the "Confidentiality Obligations". Tenant and Guarantor shall indemnify and hold Landlord harmless from and against any and all costs, expenses (including, without limitation, reasonable attorneys' fees and court costs), damages, or claims arising from a breach of the Confidentiality Obligations by Tenant, Guarantor or by any Authorized Recipients.  The Confidentiality Obligations shall not apply to the extent that disclosure is necessary in connection with the compliance with any court order or other governmental directive expressly requiring Tenant or the Authorized Recipients to disclose the terms of this Amendment. The Confidentiality Obligations shall survive the termination or expiration of the Lease and any other agreements now or hereafter entered into between Landlord and Tenant relating to the Lease. As used herein, the term "Authorized Recipients" means any accountants and/or attorneys hired and engaged on behalf of Tenant in connection with this Amendment.  Tenant and Guarantor represent and warrant to Landlord that Tenant and Guarantor have made the foregoing and any other Authorized Recipients aware of the confidentiality restrictions set forth herein and has procured such person's agreement to be bound thereby.

      **9.**    **No Offer.**  The submission of this Amendment to Tenant does not constitute an offer to amend the Original Lease.  This Amendment shall have no force and effect until it is executed and delivered by Tenant to Landlord and executed by Landlord.

      **10.**    **Counterpart Copies.**  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute but one and the same instrument. Photocopies and electronically scanned or faxed copies of original signature pages, and/or digital or electronic signature pages executed using "DocuSign" or any other method of electronic execution, shall be deemed originals in all respects and binding on the parties. At either party's request, both parties hereto shall execute and deliver to each other originally-executed conforming duplicates of this Amendment.

*[The rest of this page intentionally left blank. Signatures appear on the following page.]*

Smokecraft0155

**IN WITNESS WHEREOF,** the parties hereto have executed this Fifth Amendment to Deed of Retail Lease under seal as of the day and year first hereinabove written.

**LANDLORD:**

**KBSIII 3003 WASHINGTON, LLC,**
a Delaware limited liability company

By:    KBS Capital Advisors, LLC,
       a Delaware limited liability company,
       its authorized agent

       By:   _____
            Name:  Stephen J. Close
            Title:   SVP

**TENANT:**

**SMOKECRAFT CLARENDON LLC,**
a Virginia limited liability company

By:   _____
     Name:  Andrew Darneille
     Title:   Managing Member

[Signatures continue on the following page.]

#79863569_v2

Smokecraft0156

## JOINDER

The undersigned individual, **ANDREW DARNEILLE**, hereby reaffirms his obligations under that certain Guaranty made as of May 22, 2019 (the "Guaranty") and ratifies and confirms that the Guaranty continues in full force and effect in accordance with its terms and that, as used in the Guaranty, the term "Lease" shall mean the Original Lease, as amended by this Amendment, and any further amendments or modifications thereof. Guarantor acknowledges and agrees that there is no defense, claim, or right of set-off whatsoever existing as of the date hereof to the obligations evidenced by the Lease or the Guaranty, and that Guarantor has waived and relinquished, and is forever estopped to assert, any such defense, claim or set-off. This reaffirmation is not intended to be, and shall not cause or result in a novation with respect to the Guaranty.  The acceptance of this reaffirmation by Landlord in this instance shall not in any way imply that this reaffirmation is a condition to the continuance of Guarantor's obligations under the Guaranty or that any similar agreement is required for further amendments or modifications to Lease.

Andrew Darneille

**SIXTH AMENDMENT TO DEED OF RETAIL LEASE**

 **THIS SIXTH AMENDMENT TO DEED OF RETAIL LEASE** (this "Amendment") is made as of April ___, 2021 (the "Effective Date"), by and between **KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant").

<u>RECITALS</u>

 A. Landlord and Tenant are parties to that certain Deed of Retail Lease dated as of May 22, 2019 (the "Deed of Lease"), as amended by that certain First Amendment to Deed of Retail Lease dated March 31, 2020 (the "First Amendment"), by that certain Second Amendment to Deed of Retail Lease dated May 21, 2020 (the "Second Amendment"), that certain Third Amendment to Deed of Retail Lease dated July 13, 2020 (the "Third Amendment"), that certain Fourth Amendment to Deed of Retail Lease dated August 25, 2020 (the "Fourth Amendment") and that certain Fifth Amendment to Deed of Retail Lease dated November 19, 2020 (the "Fifth Amendment"; together with the Deed of Lease, First Amendment, Second Amendment, Third Amendment and Fourth Amendment, the "Original Lease"), pursuant to which Tenant leases from Landlord certain premises ("Premises") located on the first floor of the building having a street address of 3003 Washington Boulevard, Arlington, Virginia (the "Building"), as more particularly described in the Original Lease.

 B. The Term of the Original Lease (the "Original Term") expires on January 31, 2031.

 C. Due to recent events and circumstances related to the Coronavirus Disease COVID-19 Pandemic ("COVID-19"), Tenant requested, and Landlord granted (i) pursuant to the Fourth Amendment, an abatement (the "Initial Concession") of a portion of the Monthly Base Rent otherwise due and payable by Tenant for the period commencing September 1, 2020 and expiring September 30, 2020; and (ii) pursuant to the Fifth Amendment, an abatement (the "Second Concession") of a portion of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the period commencing October 1, 2020 and expiring on March 31, 2021.

 D. Due to COVID-19, Tenant has requested, in addition to the Initial Concession and the Second Concession, an abatement of a portion of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the Third Abatement Period (hereinafter defined) and Landlord has agreed to abate a portion of the Monthly Base Rent and Additional Rent otherwise payable for the Third Abatement Period, subject to and in accordance with the terms and conditions set forth in this Amendment.

 **NOW, THEREFORE**, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

 1. <u>**Incorporation of Recitals; Definitions.**</u> The foregoing recitals are hereby incorporated in this Amendment and made a part hereof by this reference. All capitalized terms used in this Amendment shall have the meanings ascribed thereto in the Original Lease, unless otherwise defined herein.  As used herein and in the Original Lease, the term "Lease" means the Original Lease, as amended by this Amendment.

 2. <u>**Second Extension of Term.**</u> The Original Term is hereby extended for a period (the "Second Extension Period") of three (3) full calendar months, commencing on February 1, 2031 and expiring April 30, 2031, unless otherwise earlier terminated in accordance with the terms and conditions of the Lease.  From and after the Effective Date, the term "Lease Expiration Date" as used herein and in the Original Lease shall mean 11:59 p.m. on April 30, 2031.  As used herein and in the Original Lease, the term "Term" shall mean the Original Term as extended by the Second Extension Period. Tenant shall

lease the Premises for the Second Extension Period on all the terms and conditions of the Original Lease, as amended by this Amendment.

      **3.**    **"As-is" Condition.** Tenant accepts the Premises for the Second Extension Period in its "as-is" condition. Tenant acknowledges that neither Landlord nor any broker, agent, or employee of Landlord has made any representations or promises with respect to the Premises or the Building, except as herein expressly set forth, and no rights, privileges, easements or licenses are acquired by Tenant, except as may be expressly set forth herein. Landlord shall have no obligation to perform, or pay for, any work, improvements or alterations in or to the Premises in connection with this Amendment or otherwise.

      **4.**    **Rent Abatement.** So long as no Event of Default shall have occurred, Landlord agrees to abate fifty percent (50%) of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the period (the "Third Abatement Period") commencing April 1, 2021 and expiring on June 30, 2021. The aggregate dollar amount of the Monthly Base Rent and Additional Rent which is abated pursuant to this paragraph is herein referred to as the "Third Covid Rent Concession". Landlord and Tenant acknowledge and agree that the Third Covid Rent Concession equals Twenty-Four Thousand Four Hundred Ninety-Two and 50/100 Dollars ($24,492.50). If any Event of Default shall occur following the Effective Date, Tenant's right to the Third Covid Rent Concession shall immediately terminate, and, upon Landlord's demand, an amount equal to the Third Covid Rent Concession shall become immediately due and payable by Tenant as Additional Rent. For avoidance of doubt, Tenant shall continue to be obligated to pay to Landlord, Percentage Rent under the Original Lease during the Third Abatement Period.

      **5.**    **PPP Loan.** Tenant represents and warrants to Landlord that Tenant has applied, or shall apply immediately following the Effective Date, for a PPP Loan (hereinafter defined). In the event Tenant obtains any proceeds from such PPP Loan, then Tenant shall pay to Landlord from the PPP Loan proceeds an amount equal to the Third Covid Rent Concession within thirty (30) days after the date Tenant has actually received such PPP Loan proceeds prior to applying same against any other expenses relating to Tenant's business operations. A "PPP Loan" means any loan or other economic relief obtained through the Payroll Protection Program (or any similar or substitute program) administered by the U.S. Small Business Administration pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, as expanded under the American Rescue Plan Act.

      **6.**    **Estoppel.** Tenant represents and warrants to Landlord that (a) the Original Lease is in full force and effect and, except as set forth in this Amendment, has not been modified, altered, or amended; (b) Landlord has fulfilled all of its obligations under the Lease to be performed as of the date hereof and there are no defaults by Landlord under the Lease; and (c) Tenant has no causes of action, defenses, setoffs, claims or demands whatsoever, in law or in equity, against Landlord as of the Effective Date, based upon or by reason of any matter, cause or thing whatsoever, including, without limitation, the Coronavirus Diseases COVID-19 Pandemic, or any matter or circumstance arising out of the Lease, and that Tenant has waived and relinquished, and is forever estopped to assert, any such causes of action, defenses, setoffs, claims or demands.

      **7.**    **Affirmation of Guaranty.** Reference is hereby made to that certain Guaranty executed on May 22, 2019 (the "Guaranty") by Andrew Darneille, an individual ("Guarantor") in favor of Landlord in connection with the Original Lease. The term "Lease" as used in the Guaranty means the Original Lease as amended by this Amendment. Guarantor has joined in this Amendment to acknowledge and agree to the terms and conditions of this Amendment and to ratify and unconditionally and irrevocably reaffirm its guarantee of the complete and timely performance of each obligation of Tenant (and any assignee) under the Lease and any extensions or renewals of and amendments to the Lease in accordance with the terms and conditions of the Guaranty.

      **8.**    **Broker.** Tenant represents and warrants to Landlord that Tenant has not engaged any broker or agent in connection with this Amendment. Tenant shall and does hereby indemnify, hold harmless and defend Landlord from and against any and all claims, loss, damage, cost or expense

#83205499_v2

Smokecraft0159

(including without limitation attorneys' fees and all court costs) arising out of any breach of the foregoing representation and warranty or any purported or actual dealings by Tenant and any broker or agent.

**9.      Successors; Governing Law.**  This Amendment shall be (a) binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, and (b) governed by and construed in accordance with the laws of the Commonwealth of Virginia.

**10.      Ratification; Entire Agreement.**  Except as expressly amended by this Amendment, all terms, conditions and provisions of the Original Lease are hereby ratified and confirmed and shall continue in full force and effect. This Amendment contains and embodies the entire agreement of the parties hereto with respect to the subject matter hereof.  This Amendment may not be modified or changed in whole or in part in any manner other than by an instrument in writing duly signed by the parties hereto.  In the event of any inconsistencies between the provisions of the Original Lease and this Amendment, the provisions of this Amendment shall control.

**11.      Confidentiality.** As a material inducement to Landlord's entering into this Amendment, Tenant and Guarantor have agreed to keep the terms and conditions of this Amendment in strict confidence.   In furtherance of the foregoing but not in limitation thereof, Tenant and Guarantor acknowledge that this Amendment includes terms that would not be offered to other tenants in the Building and that disclosure of such terms may cause irreparable harm to Landlord. Tenant shall not disclose, or permit the disclosure of, this Amendment or the content, terms and conditions hereof, to any employee or other person or entity other than Authorized Recipients (hereinafter defined) and then only on a need-to-know basis, and upon Tenant or Guarantor making each such Authorized Recipient aware of the confidentiality restrictions set forth herein and procuring such person's agreement to be bound thereby. All obligations of Tenant and Guarantor   under this Section shall be referred to as the "Confidentiality Obligations". Tenant and Guarantor shall indemnify and hold Landlord harmless from and against any and all costs, expenses (including, without limitation, reasonable attorneys' fees and court costs), damages, or claims arising from a breach of the Confidentiality Obligations by Tenant, Guarantor or by any Authorized Recipients.  The Confidentiality Obligations shall not apply to the extent that disclosure is necessary in connection with the compliance with any court order or other governmental directive expressly requiring Tenant or the Authorized Recipients to disclose the terms of this Amendment. The Confidentiality Obligations shall survive the termination or expiration of the Lease and any other agreements now or hereafter entered into between Landlord and Tenant relating to the Lease. As used herein, the term "Authorized Recipients" means any accountants and/or attorneys hired and engaged on behalf of Tenant in connection with this Amendment.  Tenant and Guarantor represent and warrant to Landlord that Tenant and Guarantor have made the foregoing and any other Authorized Recipients aware of the confidentiality restrictions set forth herein and has procured such person's agreement to be bound thereby.

**12.      No Offer.**  The submission of this Amendment to Tenant does not constitute an offer to amend the Original Lease.  This Amendment shall have no force and effect until it is executed and delivered by Tenant to Landlord and executed by Landlord.

**13.      Counterpart Copies.**  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute but one and the same instrument. Photocopies and electronically scanned or faxed copies of original signature pages, and/or digital or electronic signature pages executed using "DocuSign" or any other method of electronic execution, shall be deemed originals in all respects and binding on the parties. At either party's request, both parties hereto shall execute and deliver to each other originally-executed conforming duplicates of this Amendment.

*[The rest of this page intentionally left blank. Signatures appear on the following page.]*

**IN WITNESS WHEREOF,** the parties hereto have executed this Sixth Amendment to Deed of Retail Lease under seal as of the day and year first hereinabove written.

<u>**LANDLORD**</u>**:**

**KBSIII 3003 WASHINGTON, LLC**,
a Delaware limited liability company

By:     KBS Capital Advisors, LLC,
          a Delaware limited liability company,
          its authorized agent

          By:     _____
                    Name:
                    Title:


<u>**TENANT**</u>**:**

**SMOKECRAFT CLARENDON LLC**,
a Virginia limited liability company


By:     _____
          Name:
          Title:


[Signatures continue on the following page.]

Smokecraft0161

### JOINDER TO SIXTH AMENDMENT TO DEED OF RETAIL LEASE

The undersigned individual, **ANDREW DARNEILLE**, hereby reaffirms his obligations under that certain Guaranty made as of May 22, 2019 (the "Guaranty") and ratifies and confirms that the Guaranty continues in full force and effect in accordance with its terms and that, as used in the Guaranty, the term "Lease" shall mean the Original Lease, as amended by this Amendment, and any further amendments or modifications thereof. Guarantor acknowledges and agrees that there is no defense, claim, or right of set-off whatsoever existing as of the date hereof to the obligations evidenced by the Lease or the Guaranty, and that Guarantor has waived and relinquished, and is forever estopped to assert, any such defense, claim or set-off. This reaffirmation is not intended to be, and shall not cause or result in a novation with respect to the Guaranty. The acceptance of this reaffirmation by Landlord in this instance shall not in any way imply that this reaffirmation is a condition to the continuance of Guarantor's obligations under the Guaranty or that any similar agreement is required for further amendments or modifications to Lease.

_____
Andrew Darneille

## SEVENTH AMENDMENT TO DEED OF RETAIL LEASE

**THIS SEVENTH AMENDMENT TO DEED OF RETAIL LEASE** (this "Amendment") is made as of February 25 , 2022 (the "Effective Date"), by and between **KBSIII 3003 WASHINGTON, LLC**, a Delaware limited liability company ("Landlord"), and **SMOKECRAFT CLARENDON LLC**, a Virginia limited liability company ("Tenant").

## <u>RECITALS</u>

A.      Landlord and Tenant are parties to that certain Deed of Retail Lease dated as of May 22, 2019 (the "Deed of Retail Lease"), as amended by that certain First Amendment to Deed of Retail Lease dated March 31, 2020 (the "First Amendment"), by that certain Second Amendment to Deed of Retail Lease dated May 21, 2020 (the "Second Amendment"), that certain Third Amendment to Deed of Retail Lease dated July 13, 2020 (the "Third Amendment"), that certain Fourth Amendment to Deed of Retail Lease dated August 25, 2020 (the "Fourth Amendment") and that certain Fifth Amendment to Deed of Retail Lease dated November 19, 2020 (the "Fifth Amendment") and that certain Sixth Amendment to Deed of Retail Lease dated April 5, 2021 (the "Sixth Amendment"; together with the Deed of Retail Lease, the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment and Fifth Amendment, the "Original Lease"), pursuant to which Tenant leases from Landlord certain premises ("Premises") located on the first floor of the building having a street address of 3003 Washington Boulevard, Arlington, Virginia (the "Building"), as more particularly described in the Original Lease.

B.      The Term of the Original Lease (the "Original Term") expires on April 30, 2031.

C.      Due to recent events and circumstances related to the Coronavirus Disease COVID-19 Pandemic ("COVID-19"), Tenant requested, and Landlord granted (i) pursuant to the Fourth Amendment, an abatement (the "Initial Concession") of a portion of the Monthly Base Rent otherwise due and payable by Tenant for the period commencing September 1, 2020 and expiring September 30, 2020, (ii) pursuant to the Fifth Amendment, an abatement (the "Second Concession") of a portion of the Monthly Base Rent otherwise due and payable by Tenant for the period commencing October 1, 2020 and expiring March 31, 2021, and (iii) pursuant to the Sixth Amendment, an abatement (the "Third Concession") of a portion of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the period commencing April 1, 2021 and expiring June 30, 2021.

D.      Due to COVID-19, Tenant has requested, in addition to the Initial Concession, the Second Concession, and the Third Concession, an abatement of a portion of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the Fourth Abatement Period (hereinafter defined) and Landlord has agreed to abate a portion of the Monthly Base Rent and Additional Rent otherwise payable for the Fourth Abatement Period, subject to and in accordance with the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      **Incorporation of Recitals; Definitions.**  The foregoing recitals are hereby incorporated in this Amendment and made a part hereof by this reference. All capitalized terms used in this Amendment shall have the meanings ascribed thereto in the Original Lease, unless otherwise defined herein. As used herein and in the Original Lease, the term "Lease" means the Original Lease, as amended by this Amendment.

2.      **Extension of Term.** The Original Term is hereby extended for a period (the "Third Extension Period") of six (6) full calendar months, commencing on May 1, 2031 and expiring October 31, 2031, unless otherwise earlier terminated in accordance with the terms and conditions of the Lease. From and after the Effective Date, the term "Lease Expiration Date" as used herein and in the Original

Smokecraft0163

Lease shall mean 11:59 p.m. on October 31, 2031. As used herein and in the Original Lease, the term "Term" shall mean the Original Term as extended by the Third Extension Period. Tenant shall lease the Premises for the Third Extension Period on all the terms and conditions of the Original Lease, as amended by this Amendment. For avoidance of doubt, the parties acknowledge that Monthly Base Rent payable by Tenant during the Third Extension Period shall be Fourteen Thousand Seven Hundred Sixty-Three and 64/100 Dollars ($14,763.64) (*i.e.*, the same amount of Monthly Base Rent payable by Tenant immediately preceding the Third Extension Period).

3.　　**"As-is" Condition.** Tenant accepts the Premises for the Third Extension Period in its "as-is" condition. Tenant acknowledges that neither Landlord nor any broker, agent, or employee of Landlord has made any representations or promises with respect to the Premises or the Building, except as herein expressly set forth, and no rights, privileges, easements or licenses are acquired by Tenant, except as may be expressly set forth herein. Landlord shall have no obligation to perform, or pay for, any work, improvements or alterations in or to the Premises in connection with this Amendment or otherwise.

4.　　**Rent Abatement.** So long as no Event of Default shall have occurred, Landlord agrees to abate (i) one hundred percent (100%) of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the month of February, 2022, and (ii) fifty percent (50%) of the Monthly Base Rent and Additional Rent otherwise due and payable by Tenant for the period  commencing March 1, 2022 and expiring on June 30, 2022.  The period commencing February 1, 2022 through June 30, 2022 is referred to herein as the "Fourth Abatement Period", and the aggregate dollar amount of the Monthly Base Rent and Additional Rent which is abated during the Fourth Abatement Period is herein referred to as the "Fourth Covid Rent Concession".  Landlord and Tenant acknowledge and agree that the Fourth Covid Rent Concession equals Fifty Thousand Four Hundred Twenty-Nine and 03/100 Dollars ($50,429.03). If any Event of Default shall occur following the Effective Date, Tenant's right to the Fourth Covid Rent Concession shall immediately terminate, and, upon Landlord's demand, an amount equal to the Fourth Covid Rent Concession shall become immediately due and payable by Tenant as Additional Rent. For avoidance of doubt, Tenant shall continue to be obligated to pay to Landlord, Percentage Rent under the Original Lease during the Fourth Abatement Period.

5.　　**Estoppel.**　　Tenant represents and warrants to Landlord that (a) the Original Lease is in full force and effect and, except as set forth in this Amendment, has not been modified, altered, or amended; (b) Landlord has fulfilled all of its obligations under the Lease to be performed as of the date hereof and there are no defaults by Landlord under the Lease; and (c) Tenant has no causes of action, defenses, setoffs, claims or demands whatsoever, in law or in equity, against Landlord as of the Effective Date, based upon or by reason of any matter, cause or thing whatsoever, including, without limitation, the Coronavirus Diseases COVID-19 Pandemic, or any matter or circumstance arising out of the Lease, and that Tenant has waived and relinquished, and is forever estopped to assert, any such causes of action, defenses, setoffs, claims or demands.

6.　　**Affirmation of Guaranty.** Reference is hereby made to that certain Guaranty executed on May 22, 2019 (the "Guaranty") by Andrew Darneille, an individual ("Guarantor") in favor of Landlord in connection with the Original Lease. The term "Lease" as used in the Guaranty means the Original Lease as amended by this Amendment. Guarantor has joined in this Amendment to acknowledge and agree to the terms and conditions of this Amendment and to ratify and unconditionally and irrevocably reaffirm its guarantee of the complete and timely performance of each obligation of Tenant (and any assignee) under the Lease and any extensions or renewals of and amendments to the Lease in accordance with the terms and conditions of the Guaranty.

7.　　**Broker.** Tenant represents and warrants to Landlord that Tenant has not engaged any broker or agent in connection with this Amendment. Tenant shall and does hereby indemnify, hold harmless and defend Landlord from and against any and all claims, loss, damage, cost or expense (including without limitation attorneys' fees and all court costs) arising out of any breach of the foregoing representation and warranty or any purported or actual dealings by Tenant and any broker or agent.

8.    **Successors; Governing Law.**  This Amendment shall be (a) binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, and (b) governed by and construed in accordance with the laws of the Commonwealth of Virginia.

9.    **Ratification; Entire Agreement.**  Except as expressly amended by this Amendment, all terms, conditions and provisions of the Original Lease are hereby ratified and confirmed and shall continue in full force and effect. This Amendment contains and embodies the entire agreement of the parties hereto with respect to the subject matter hereof.  This Amendment may not be modified or changed in whole or in part in any manner other than by an instrument in writing duly signed by the parties hereto.  In the event of any inconsistencies between the provisions of the Original Lease and this Amendment, the provisions of this Amendment shall control.

10.    **Confidentiality.** As a material inducement to Landlord's entering into this Amendment, Tenant and Guarantor have agreed to keep the terms and conditions of this Amendment in strict confidence.  In furtherance of the foregoing but not in limitation thereof, Tenant and Guarantor acknowledge that this Amendment includes terms that would not be offered to other tenants in the Building and that disclosure of such terms may cause irreparable harm to Landlord. Tenant shall not disclose, or permit the disclosure of, this Amendment or the content, terms and conditions hereof, to any employee or other person or entity other than Authorized Recipients (hereinafter defined) and then only on a need-to-know basis, and upon Tenant or Guarantor making each such Authorized Recipient aware of the confidentiality restrictions set forth herein and procuring such person's agreement to be bound thereby. All obligations of Tenant and Guarantor  under this Section shall be referred to as the "Confidentiality Obligations". Tenant and Guarantor shall indemnify and hold Landlord harmless from and against any and all costs, expenses (including, without limitation, reasonable attorneys' fees and court costs), damages, or claims arising from a breach of the Confidentiality Obligations by Tenant, Guarantor or by any Authorized Recipients.  The Confidentiality Obligations shall not apply to the extent that disclosure is necessary in connection with the compliance with any court order or other governmental directive expressly requiring Tenant or the Authorized Recipients to disclose the terms of this Amendment. The Confidentiality Obligations shall survive the termination or expiration of the Lease and any other agreements now or hereafter entered into between Landlord and Tenant relating to the Lease. As used herein, the term "Authorized Recipients" means any accountants and/or attorneys hired and engaged on behalf of Tenant in connection with this Amendment.  Tenant and Guarantor represent and warrant to Landlord that Tenant and Guarantor have made the foregoing and any other Authorized Recipients aware of the confidentiality restrictions set forth herein and has procured such person's agreement to be bound thereby.

11.    **No Offer**.  The submission of this Amendment to Tenant does not constitute an offer to amend the Original Lease.  This Amendment shall have no force and effect until it is executed and delivered by Tenant to Landlord and executed by Landlord.

12.    **Counterpart Copies.**  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute but one and the same instrument. Photocopies and electronically scanned or faxed copies of original signature pages, and/or digital or electronic signature pages executed using "DocuSign" or any other method of electronic execution, shall be deemed originals in all respects and binding on the parties. At either party's request, both parties hereto shall execute and deliver to each other originally-executed conforming duplicates of this Amendment.

*[The rest of this page intentionally left blank. Signatures appear on the following page.]*

#155068668_v2

Smokecraft0165

**IN WITNESS WHEREOF,** the parties hereto have executed this Sixth Amendment to Deed of Retail Lease under seal as of the day and year first hereinabove written.

<u>LANDLORD:</u>

**KBSIII 3003 WASHINGTON, LLC**,
a Delaware limited liability company

By:    KBS Capital Advisors, LLC,
        a Delaware limited liability company,
        its authorized agent

        By:    _____
                Name: Luke Hamagiwa
                Title: Vice President

<u>TENANT:</u>

**SMOKECRAFT CLARENDON LLC**,
a Virginia limited liability company

By:    _____
       Name: Andrew Darneille
       Title: Managing Member

[Signatures continue on the following page.]

Smokecraft0166

## JOINDER

The undersigned individual, **ANDREW DARNEILLE**, hereby reaffirms his obligations under that certain Guaranty made as of May 22, 2019 (the "Guaranty") and ratifies and confirms that the Guaranty continues in full force and effect in accordance with its terms and that, as used in the Guaranty, the term "Lease" shall mean the Original Lease, as amended by this Amendment, and any further amendments or modifications thereof. Guarantor acknowledges and agrees that there is no defense, claim, or right of set-off whatsoever existing as of the date hereof to the obligations evidenced by the Lease or the Guaranty, and that Guarantor has waived and relinquished, and is forever estopped to assert, any such defense, claim or set-off. This reaffirmation is not intended to be, and shall not cause or result in a novation with respect to the Guaranty.  The acceptance of this reaffirmation by Landlord in this instance shall not in any way imply that this reaffirmation is a condition to the continuance of Guarantor's obligations under the Guaranty or that any similar agreement is required for further amendments or modifications to Lease.

Andrew Darneille

#155068668_v2

Smokecraft0167