IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| Smokecraft Clarendon, LLC | * | Case No: 24-13609 (Chapter 11) |
| Debtor | * | |

* * * * * * * * * * * *

**CAPITAL BANK NATIONAL ASSOCIATION'S OPPOSITION TO DEBTOR'S MOTION TO VALUE SECURED CLAIM OF CAPITAL BANK**

Capital Bank, National Association ("Capital Bank"), by counsel, files this Opposition (the "Opposition") to Debtor's Motion to Value Secured Claim of Capital Bank, National Association (the "Motion to Value"). In support of this Opposition, Capital Bank states as follows:

## I. INTRODUCTION

The Court should deny the Debtor's Motion to Value because (i) it undervalues the fair market value of the Debtor's property that secures Capital Bank's loan; and (ii) it omits any valuation for certain assets, including all fixtures. The Debtor has accepted[1] Capital Bank's determination that it held a lien against $17,630.00 in cash collateral as of the Petition Date. However, the Debtor requests that this Court determine that the total value of Capital Bank's secured claim should be increased by only an additional $75,365.00 for the value of the Debtor's personal property, for a total secured claim of $92,995.00. Capital Bank disputes the Debtor's valuation of the personal property and asserts that the personal property should be properly valued in the amount of at least $158,420.00, as determined by Capital Bank's appraiser. In addition to the personal property valuation, Capital Bank's collateral includes at least $17,630.00 in cash collateral and an additional $5,302.33[2] for the Debtor's food and beverage inventory for a total secured claim of at least $181,352.33, which amount does not account for items that may remain

[1] The Debtor accepts this amount for purposes of the Motion to Value.

[2] While the fair market value is the appropriate value in this context, Capital Bank concedes that this liquidation value stated in the Debtor's Second Amended Plan would likely be similar to the fair market value of food and beverage inventory and, in any event, would not be a large enough discrepancy to incur legal fees to dispute.

missing from the premises and thus from the appraisals and valuation of Capital Bank's allowed secured claim.

## II. BACKGROUND

1. On April 29, 2024 (the "Petition Date"), the Debtor commenced this Chapter 11 proceeding under Subchapter V of Title 11 of the United States Code.

2. As further described hereinafter, Capital Bank is a first-priority secured creditor of the Debtor with a blanket lien on all of Debtor's assets.

3. In January 2020, Capital Bank, the Debtor, and the Debtor's majority owner Smokecraft Holdings, LLC ("Holdings") entered into various agreements to fund the Debtor's renovation and construction on existing improvements in its leased space in Arlington County, VA. Particularly, Capital Bank, the Debtor, and Holdings (as applicable with respect to each agreement) entered into the following (collectively, and together with all other related documents executed in connection therewith, the "Funding Agreements"):

a. Construction Loan Agreement (the "Loan"), dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings;

b. Security Agreement, dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings;

c. Credit Agreement, dated as of January 31, 2020, by and among Capital Bank, the Debtor, and Holdings, and Andrew C. Darneille (as guarantor);

d. Copyright Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

e. Patent Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

f. Trademark Security Agreement, dated January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

g. Assignment of Contracts, dated as of January 31, 2020, by the Debtor and Holdings in favor of Capital Bank;

h. Subordination of Lien Agreement, dated as of July 2019, by and between, KBSIII 3003 Washington, LLC, the Debtor's landlord, the Debtor, and Capital Bank [date not completed in original];

i. U.S. Small Business Administration ("SBA") Authorization issued in connection with the Loan, having an SBA Loan No. of 36035970-10 and an approval date of March 15, 2019, as amended from time to time;

j. SBA Note, dated January 31, 2020, executed by Smokecraft Clarendon, LLC and Smokecraft Holdings, LLC as borrowers; and

k. SBA Unconditional Guarantee, dated January 31, 2020, executed by Andrew C. Darneille as guarantor.

4. The Funding Agreements granted Capital Bank a lien on all assets of the Debtor (the "Collateral") to secure the obligations created by the Funding Agreements and owed by the Debtor. Debtor does not contest that it executed each of the Funding Agreements and that they are enforceable, and the Court has granted orders authorizing the use of Capital Bank's cash collateral.

5. Capital Bank's blanket lien is perfected and as evidenced by, among other things, a UCC-1 financing statement filed on January 31, 2020, with the Virginia State Corporation Commission at File No.: 202001310319956.

6. Capital Bank asserts that pursuant to UCC § 9-204, the relevant Funding Agreements bear appropriate and necessary "after-acquired" and prospective indebtedness language and, thus, the UCC-1 financing statement properly perfected the lien securing the obligations created by the Funding Agreements.

7. Accordingly, Capital Bank holds a first-priority blanket lien on all of the Debtor's assets including, but not limited to, the Debtor's equipment, fixtures, and inventory; intellectual property; accounts; and improvements to its restaurant premises. Debtor disputes that Capital Bank has a lien on all fixtures.

8. On June 24, 2024, Capital Bank and the Debtor filed a Consent Motion for Order (I) Authorizing the Debtor's Interim Use of Cash Collateral Pursuant to 11 U.S.C. Sections 361, 363 and 552; (II) Granting Adequate Protection; and (III) Scheduling Final Hearing Pursuant to 11 U.S.C. Section 363(c)(2) and Fed.R.Bankr.P. 4001 [Dkt. 36] acknowledging that Capital Bank's lien against cash collateral is not less than $17,630.00.

9. On July 8, 2024, Capital Bank filed a proof of claim asserting a total claim of $917,126.61 (the "Claim"), of which $515,268.11 of the claim is secured, and $401,858.50 is unsecured. Since the filing of the Claim, Capital Bank obtained an appraisal of its collateral.

10. On July 31, 2024, AAA Certified Appraisers, LLC (the "Appraiser") issued a report (the "Appraisal") indicating that the appraised value of certain machinery and equipment items owned by the Debtor and located on the Debtor's premises (the "Appraised Collateral"), had a fair market value of $158,420.00 as of July 18, 2024. (See **Exhibit 1**, attached.)

11. The Appraiser categorized the Appraised Collateral into two groups. The first group, known as "Capital Equipment," includes high-value kitchen equipment such as ovens, ice makers, mixer, fryers, and smokers. Each piece of Capital Equipment was individually evaluated by the Appraiser. The second group, termed "Support and Ancillary Items," encompasses a range of supporting items such as shelving, pots, pans, skillets, carts, heat lamps, kitchen utensils, blenders, mixers, microwaves, processors, racks, customer utensils, plates, cups, bowls, bar and restaurant glasses, mugs, caddies, and other miscellaneous restaurant items.

12. The Appraised Collateral is exclusive of inventory; intellectual property; cash; accounts receivable; and other general intangibles, all of which constitute other collateral of Capital bank. It is also exclusive of any items that constitute Capital Bank's collateral that were documented as being purchased by the Debtor with Capital Bank's loan, but not located on the Debtor's premises at the time of the appraisal. Accordingly, the value of the Appraised Collateral does not represent the full value of Capital Bank's allowed secured claim.

13. On October 2, 2024, Motleys Industrial issued a Liquidation Value Appraisal Report (the "Liquidation Appraisal") indicating that the appraised value of certain machinery and equipment items owned by the Debtor, had a value of $49,135.00 as of September 3, 2024.

14. On November 19, 2024, the Debtor filed its First Amended Subchapter V Plan of Reorganization [Dkt. 72].

15. On December 23, 2024, Capital Bank filed its Objection to Debtor's Chapter 11, Subchapter V Plan [Dkt. 84].

16. On January 22, 2025, the Debtor filed its Second Amended Subchapter V Plan of Reorganization [Dkt. 89] (the "Second Amended Plan"). In its Second Amended Plan, it stated, among other things, a liquidation value for the Debtor's food and beverages of $5,302.33.

17. On January 29, 2025, the court held a confirmation hearing to consider the Second Amended Plan and Capital Bank's objection thereto.

18. On February 4, 2025, the Court entered an Order Denying Confirmation with Leave to Amend and Setting Deadlines Regarding Motion to Value [Dkt. 100].

19. On February 14, 2025, the Debtor filed its Motion to Value Secured Claim of Capital Bank, National Association [Dkt. 103]. Attached to the Motion to Value is a Fair Market Value Appraisal, by Motleys Asset Disposition Group, dated February 6, 2025 (the "Debtor's FMV Appraisal"). In the Debtor's FMV Appraisal, the Debtor's appraiser asserts that the fair market value of the Debtor's personal property is $75,365.00.

## III. ARGUMENT

20. Capital Bank asserts that the Motion to Value should be denied because it undervalues the fair market value of the Debtor's property based on review of Capital Bank's appraiser's appraisal and omits any valuation for certain assets, including all fixtures.

21. Section 506(a)(1) of the Bankruptcy Code provides that:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest [. . .] is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property [. . .]. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

22. Federal Rule of Bankruptcy Procedure ("FRBP") 3012(a) permits a court to determine the amount of a secured claim under section 506(a) after notice and a hearing.

23. While the Debtor and Capital Bank dispute the value of the Debtor's personal property, two asset values – for cash collateral and inventory - remain undisputed. First, Capital Bank agrees that the value of its cash collateral as of the Petition Date was $17,630.00 and acknowledges that it has been receiving cash collateral payments to apply against this amount.

Second, Capital Bank notes that while not referenced in the Motion to Value, the Debtor's Second Amended Plan stated a liquidation value for the Debtor's food and beverage inventory of $5,302.33 as of the Petition Date. These two values must be added to what this Court ultimately determines is the appropriate value of the other personal property securing Capital Bank's indebtedness.

24. After calculation of Capital Bank's secured claim using the aforementioned values, the remaining value for this Court to determine is the value of the personal property that the Debtor uses in connection with its restaurant business.

25. Pursuant to section 506(a) of the Bankruptcy Code and FRBP 3012(a), Capital Bank requests that this Court deny the Motion to Value and determine that the amount of Capital Bank's personal property is at least $158,420.00 for a total secured claim of at least $181,352.33 based on the following.

**A. The Debtor's FMV Appraisal Undervalues the Fair Market Value of the Debtor's Property Based on Capital Bank's Appraisal.**

26. The Debtor's FMV Appraisal is incorrect because it improperly undervalues certain of the Debtor's assets and arrives at an artificially low valuation for the Debtor's personal property.

27. Capital Bank's appraiser has determined that the fair market value of the Debtor's personal property is $158,420.00.

28. In contrast, the Debtor's appraiser arrived at a value of $75,365.00 for the Debtor's personal property. The Debtor's appraiser's value does not take into account fixtures or certain other assets, which will be discussed in Section B below, but also undervalues assets that the appraiser did appraise.

29. While each appraiser grouped some items in different ways to arrive at values, certain discrepancies are immediately apparent. For instance, while Capital Bank's appraiser determined that the fair market value of two Southern Pride Smokers (Model MLR-850) was $34,000.00, the Debtor's FMV Appraisal arrived at a staggeringly lower valuation for the same

item. Denoted on the Debtor's FMV Appraisal as Southern Pride MLR-850 Dual Smoker, the Debtor's appraisal appraised this item for only $2,600.00.

30. Also noteworthy, is that while Capital Bank's appraiser appraised "Turbo Air Refrig. Beer Coolers (3)" with model number TBB-4SG-N at $10,275.00, the Debtor's FMV Appraisal appraised the same three items at $5,850.00.

31. Additionally, while the Debtor's FMV Appraisal appraised a Florida Seating set with patio chair, table and nesting base at $7,300.00[3], Capital Bank's appraiser valued the same set at $10,200.00. Similarly, the Debtor's FMV Appraisal valued an Alto-Shaam Model No. 500-2DN Warming Drawer at $1,500.00 while Capital Bank's appraiser appraised the same item at $2,250.00.

32. Beyond the aforementioned items, the two appraisals are replete with discrepancies regarding item values.

33. As value is a question of fact, Capital Bank intends to rely on its appraiser and present evidence at an evidentiary hearing to support its valuations. Capital Bank believes its appraiser will be found credible and requests that this Court determine that Capital Bank's appraisal contains the most accurate appraisal values for the personal property that is collateral for Capital Bank's secured claim.

**B. The Debtor's FMV Appraisal Does Not Include Values for Certain Assets, Including for Any Fixtures.**

34. While the two appraisals value certain of the same items differently, a second issue is that the Debtor's FMV Appraisal has failed to value certain items at all, namely what the Debtor has determined are fixtures. The Debtor asserts that items it has designated as fixtures should not be included in valuing the Debtor's personal property. Capital Bank asserts that the items in question are not fixtures, but notes that even if this Court determines they are, fixtures are indeed part of Capital Bank's collateral.

---

[3] In fact, the Debtor's FMV Appraisal actually included three additional items – a No Rock No Rock Terrace Self Stabilizing Table Base 28" Height, a No Rock Terrace Self Stabilizing Table Base 42" Height, and exterior fencing - also in its total for this set while Capital Bank's appraisal did not.

35. The Debtor's FMV Appraisal identified the following items as leasehold items or fixtures and values each at $0.00: Vulcan 36" Salamander Broiler, Gas; Norlake Walkin Cooler; Beer Line System - 18 Lines; Norlake Walkin Freezer; and Exhaust/Hoods (3) Ansul System. The Debtor argues that these items that it has identified as fixtures are not assets of the Debtor under Virginia law, as applicable here.

36. In support of its position, the Debtor relies on the test stated in *In re Alterman*, 127 B.R. 356, 361 (Bankr. E.D. Va. 1991) (*citing Danville Holding Corp. v. Clement*, 16 S.E.2d 345, 349 (Va. 1941)). This test states that under Virginia law, the three-prong test used to determine whether chattel is a fixture is as follows:

> (1) annexation of the chattel to the realty, actual or constructive; (2) its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) the intention of the owner of the chattel to make it a permanent addition to the freehold.

*Id.*

37. The Debtor argues that the items identified by its appraiser as leasehold items are fixtures because (1) each such item is physically annexed to the realty leased by the Debtor, (2) the items have been adapted to the use of the restaurant space, and (3) the intent of the parties for the items to be fixtures should be ascertained from the Subordination Agreement.

38. Regarding the first prong, case law states that "whether an item can be removed from the realty is not the test for establishing whether or not it is a fixture." *Taco Bell of Am., Inc. v. Commonwealth Transp. Comm'r of Va.*, 282 Va. 127, 132, 710 S.E.2d 478, 481 (2011) (describing the test in *Danville Holding Corp.*, 178 Va. at 232, 16 S.E.2d at 349). Applying this standard, whether certain items can be removed from the realty or are annexed thereto is not the standalone consideration in determining whether an item is a fixture. And, indeed, in this case, certain of the items identified as leasehold items, such as exhaust hoods for example, can be removed from the premises without damaging it. The Debtor offers no evidence as to why the named fixtures cannot be removed. Without this evidence, the Debtor cannot simply call items fixtures and be permitted to exclude them from valuation of Capital Bank's claim, particularly

where Capital Bank has produced its UCC-1 financing statement, loan documents, and in particular the security agreement confirming that fixtures constitute Capital Bank's collateral.

39. To the contrary, the Debtor's lease of the restaurant premises confirms that both the Debtor and the Landlord contemplated that the Debtor not only could remove these fixtures, but that it would be required to do so at the Landlord's request. Section 8(d) of the Lease provides that Debtor's fixtures become property of the Landlord, but that Landlord can require the Debtor to remove any fixtures and/or Tenant Lines and repair damage at the Debtor's expense. Notably, this section specifically permits the Debtor to remove any fixtures so long as the Debtor repairs any damage caused by the removal. The term "Tenant Lines" is defined as cabling and similar voice, data, audio and other transport system cabling and bundles, and the Debtor is required to remove any such Tenant Lines at the end of the lease term – thus they cannot be fixtures because the lease itself obligates Debtor to remove them. Lease, §8(e), attached as **Exhibit 2.**

40. Landlord has not claimed a secured interest in any fixtures (or ownership thereof) as far as Capital Bank can ascertain.

41. Regarding the second prong, while the premises is currently used as a restaurant, there are other uses to which the same property could be put wherein the leasehold items would remain useful. For example, a community soup kitchen in the space would similarly use many of the leasehold items as would another restaurant or a bar, or a private club could also operate in the space and utilize much of the fixtures; likewise, a food laboratory or test kitchen could also utilize the fixtures at issue. As such, these items are not specific to this restaurant such that they could not be used in the same or similar ways in other establishments.

42. Finally, and more noteworthy, the intent of the parties has been borne out by the Security Agreement, not by the Subordination Agreement. The parties entered into the Subordination Agreement in July 2019[4] approximately six (6) months prior to the date they entered into the Security Agreement. The Subordination Agreement, by its terms, is an

[4] The parties failed to finalize the date of the agreement but it indicates it is as of July 2019.

agreement that dictates the respective relationships between the landlord and a lender regarding fixtures and other items. The later-signed Security Agreement between the parties in this case is the applicable agreement to review to determine their intent and respective rights as to any items identified as fixtures.

43. The Security Agreement, dated January 31, 2020, by Smokecraft Clarendon, LLC, Smokecraft Holdings, LLC and Capital Bank, National Association states that it was entered into "[t]o secure the payment of the Liabilities and the payment and performance of all of each Debtor's other obligations under the Loan Documents, each Debtor hereby grants, pledges and assigns to Lender a security interest in the Collateral [. . .]." Security Agreement, Section 3.1. "Collateral" is then defined in Exhibit A to the Security Agreement to include "(f) All of each Debtor's equipment, motor vehicles, and fixtures, both now owned and hereafter acquired [. . .]." Security Agreement, Exhibit A, Collateral. The parties' intent is evidenced by the Security Agreement they entered into including fixtures as part of Capital Bank's collateral.

44. Capital Bank asserts that the fixtures, valued by its appraiser at substantially more than $0.00, should be included in the valuation of the Debtor's personal property for purposes of valuing Capital Bank's secured claim.

45. In addition, Capital Bank asserts that certain assets have continued to be omitted from the appraisals given that they are not located at the Debtor's premises. These assets are missing equipment/tangible property that Capital Bank has knowledge were purchased but not scheduled, not located on Debtor's premises currently, and not included in Debtor's appraisal (nor in Capital Bank's, as they were not available for inspection by Capital Bank's appraiser. The total amount of missing items is just over $250,000.00 with respect to purchase value, and the items are detailed in attached **Exhibit 3**. The underlying invoices from which the summary spreadsheet was compiled are available by contacting the undersigned and have been provided previously to the Debtor. Capital Bank acknowledges that it appears that two items on the Debtor's FMV Appraisal may include some of the items previously identified by Capital Bank as missing, but that given the differing descriptions of items, Capital Bank cannot be certain at this

time. The Debtor values those two items (a warming drawer valued at $700 and a food warmer valued at $90) at approximately $800 total and thus would not meaningfully decrease the $250,000 of missing items that Debtor has not yet accounted for in this case.

46. Therefore, to determine the accurate value of Capital Bank's secured claim, this Court should: (i) adopt Capital Bank's appraisal with respect to the fair market value of the Debtor's personal property; (ii) add the value of Debtor's cash and inventory as of the Petition Date; (iii) determine that assets designated by the Debtor as fixtures are Capital Bank's collateral; and (iv) require the Debtor to account for items it purchased but no longer possess at its premises so that the current fair market value can be calculated and added.

## III. CONCLUSION

For the foregoing reasons, Capital Bank respectfully requests that the Court deny the Debtor's Motion to Value and instead value Capital Bank's secured claim in the amount of at least $181,352.33 plus an additional amount for items yet to be located and appraised, and grant such other and further relief as the Court deems just and appropriate.

*/s/ Catherine K. Hopkin*

Catherine Keller Hopkin, 28257
Corinne D. Adams, 18768
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland 21401
(443) 569-0788
chopkin@yvslaw.com; cadams@yvslaw.com
Counsel for Capital Bank N.A.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of February 2025, notice of filing Capital Bank's Opposition to Debtor's Motion to Value Secured Claim of Capital Bank, National Association (the "Opposition") was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list.

*/s/ Catherine Keller Hopkin*
Catherine Keller Hopkin

**The following parties received CM/ECF notice of the filing:**

Catherine Keller Hopkin, Esquire
(chopkin@yvslaw.com)
Counsel for Capital Bank N.A.
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland 21401

Corinne Donohue Adams, Esquire
(cadams@yvslaw.com)
Counsel for Capital Bank N.A.
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland 21401

Lynn A. Kohen, Esquire
(lynn.a.kohen@usdoj.gov)
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland 20770

L. Jeanette Rice, Esquire
(jeanette.rice@usdoj.gov)
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland 20770

Angela L. Shortall, Subchapter V Trustee
(ashortall@3cubed-as.com)
111 South Calvert Street, Suite 1400
Baltimore, Maryland 21202

U.S. Trustee – Greenbelt
(ustpregion04.gb.ecf@usdoj.gov)
6305 Ivy Lane, Suite 600
Greenbelt, Maryland 20770

Maurice Belmont VerStandig, Esquire
(mac@mbvesq.com)
Counsel for Debtor
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854