**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

In re                                                                    Case No. 24-13609-MCR

Smokecraft Clarendon, LLC                                 Chapter 11

      Debtor.

_____/

**REPLY TO CAPITAL BANK NATIONAL ASSOCIATION'S OPPOSITION
TO DEBTOR'S MOTION TO VALUE SECURED CLAIM OF CAPITAL BANK**

Comes now Smokecraft Clarendon, LLC ("Smokecraft" or the "Debtor"), by and through undersigned counsel, in reply to Capital Bank National Association's Opposition to Debtor's Motion to Value Secured Claim of Capital Bank (the "Opposition," as found at DE #106, with the underlying motion to value being known as the "Motion to Value," as found at DE #103) and states as follows:

**I.**    **Introduction**

The Motion to Value seeks to ascertain the amount of the secured claim of Capital Bank National Association ("Capital Bank"), with transparent aspirations of then using that fixed sum to structure an amended plan of reorganization ripe for confirmation—whether consensually or through cramdown. The Opposition, in turn, takes issue with (i) the appraised value of the majority of the Debtor's personal property; (ii) the Debtor's contention that fixtures are properly excluded from the bank's collateral and thus have no value for present purposes; and (iii) the alleged omission of various items of personal property from the schedules in this case and the appraisal obtained by the Debtor. The latter two contentions of Capital Bank are errant, with the fixture-centric issue being one largely governed by well-settled law, and the "missing" item allegations being empirically rooted in an errant reading of various records. The former contention,

1

fortunately, is one that is now moot, with the parties having reached a stipulation as to the valuation of all assets subject to the lien of Capital Bank *except* for (i) any fixtures, to the extent they are, indeed, assets subject to such lien; and (ii) any "missing" property. *See* Stipulation of Smokecraft Clarendon, LLC and Capital Bank National Association Regarding Motion to Value (the "Stipulation"), DE #118.

As discussed in greater detail *infra*, Capital Bank's lien cannot—and does not—include any fixtures for two reasons. First, as a matter of law, such fixtures are not assets of Smokecraft and, as such, do not form a part of the Debtor's bankruptcy estate. And, second, even if, *arguendo*, the fixtures were somehow an asset of Smokecraft, Capital Bank fully relinquished any claim to such a lien through a triparty pre-petition contract to which both the bank and Smokecraft are parties.

As to the "missing" items, the bank's argument—which, rather notably, is premised upon at least the suggestion of nonfeasance (if not outright malfeasance) on the part of the Debtor—is largely pegged to "Exhibit 3" to the Opposition. *See* Exhibits to Opposition, DE #106-1 at pp. 159-162 ("Exhibit 3"). Unfortunately, it appears that in a rush to tarnish the Debtor, Capital Bank has comprised this exhibit through a series of fundamental errors, at least some of which have invited an exponential increase of putative item values. By way of anecdote only, in connection with a series of "smallwares," Capital Bank took the aggregate price for a full collection of items and then multiplied that price per each item. So instead of one set of 24 storage container lids, costing an aggregate of $51.84, Capital Bank has surmised that *each* storage container lid costs $51.84, for an aggregate valuation of $1,244.16. And such is merely one example of the numerous times this mistake appears to have been made, with the cumulative overstatement of the bank's putative cost of Debtor assets amounting to roughly $85,000.00.

Similarly, the "missing" items also appear to be inclusive of services rendered that never constituted assets in the first place. Capital Bank includes in Exhibit 3 approximately $21,004.26 of installation costs, parts and services. By way of anecdote only, the exhibit contains a "condensing unit," at a value of $3,376.00, that is actually part of the separately-appraised walk-in cooler (which is included in the bank's appraisal).

There are, too, double-counted items—lots of them. Exhibit 3 appears to rest on more than $125,000.00 in assets being "missing" when, in fact, those assets are plainly included on schedules and in the parties' respective appraisals.

As extrapolated upon *infra*, with the exception of *de minimis* small items (in the nature of utensils and cutlery) that have a natural tendency to "walk away" from restaurants in customers' pockets and bags, and dishes, glasses and other items that may have broken or worn out due to normal wear and tear, there are no "missing" items. And, more importantly, the Debtor has no assets—subject to the lien of Capital Back—other than those subsumed within the Stipulation. The fixtures are, as a matter of fact and law alike, not subject to the lien. And the "missing" items are not, in fact, actually missing.

**II.     The Parties Have Stipulated to the Valuation of Most Assets**

As noted *supra*, Capital Bank and the Debtor have agreed on a valuation of $104,500.00 for all assets subject to the Motion *except* for (i) fixtures (which are specifically identified, by cross-reference, in the Stipulation); and (ii) items set forth on Exhibit 3, which Capital Bank asserts to be "missing." *See* Stipulation, DE #118, *passim*. Smokecraft appreciates the cooperation of Capital Bank in reaching this agreement, and is glad that the Stipulation will serve to greatly limit the scope of a forthcoming hearing on the Motion to Value.

### III. Fixtures are not Assets of the Debtor and are not Subject to the Bank's Lien

In the Opposition, Capital Bank urges that items designated as fixtures should nonetheless be valued and used to support a portion of the bank's lien. This contention, however, is errant as a matter of law and fact alike. The suggestion is legally amiss since, under Virginia law,[1] each of the at-issue items qualify as a fixture and are accordingly not assets of the Debtor's in the first instance. And the suggestion is, too, factually errant insofar as even if fixtures could otherwise be deemed assets of the Debtor, subject to the lien of Capital Bank, the bank has expressly relinquished such lien rights in favor of Smokecraft's landlord.

#### a. Under Virginia Law, Fixtures are not Assets of the Debtor

One of the more peculiar aspects of the Opposition is the citation to *Taco Bell of Am., Inc. v. Commonwealth Transp. Comm'r of Va.*, 710 S.E.2d 478 (Va. 2011), a Supreme Court of Virginia case of relatively recent vintage that discusses the Commonwealth's fixture law. *See* Opposition, DE #106, at ¶ 38. Capital Bank is certainly correct in asserting *Taco Bell* to govern the disposition of the instant dispute. *Taco Bell*, however, does not nearly stand for the proposition suggested by Capital Bank.

As titularly evident, *Taco Bell* is another case involving a Virginia restaurant. There, in the context of a takings dispute, a trial court was tasked with determining whether certain assets constituted (i) personal property; or (ii) fixtures. *Taco Bell*, 710 S.E.2d at 480. There were 42 specific items in dispute, with a witness testifying that none of the assets were physically "attached to the real estate," *id.*, and that all such items could be "relocated and moved without damaging

---

[1] There is no dispute that Virginia law governs the classification of fixtures in a restaurant located in Clarendon.

the building, the structure, or the integrity of the unit, the building itself," *id.* Amongst the 42 items in dispute were "aluminum pans, chairs and frying baskets," as well as a neon sign. *Id.* at 481.

The trial court found all 42 items to not be fixtures. *Id.* at 481. Specifically, the trial court, in connection with a motion *in limine*:

> . . . held that the items in question were "purely personal property" and there was no factual determination to be made by the jury because the undisputed evidence showed that the items could have been removed from the property. The trial court also stated that Taco Bell's decision to leave the items in the restaurant and neither move nor resell them was a "business decision."

*Id.* at 481.

The Supreme Court of Virginia, however, granted certiorari, ultimately reversing and remanding the case. *Id.*, *passim*. Even when some items were clearly not affixed to the premises (such as frying baskets and aluminum pans), the Commonwealth's highest court noted that the record included "testimony that the items were used for the purpose of the restaurant." *Id.* at 482. And, in light of that testimony, it was at least plausible that *all* of the restaurant's personal property constituted "fixtures" within the prism of Virginia law. *Id.*

Here, Smokecraft is not asserting that all of its personal property constitutes fixtures (though *Taco Bell* certainly made such a contention tempting before the Stipulation was reached). Smokecraft is, rather, noting that items physically annexed to the premises, of a use and nature consistent with the operation of a restaurant, ought to be regarded as fixtures. And such is a palpably modest position for the Debtor to assume, in light of *Taco Bell* and the three-prong test that governs the assessment of whether or not an item is a "fixture" under Virginia law:

> (1) annexation of the chattel to the realty, actual or constructive; (2) its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) the intention of the owner of the chattel to make it a permanent addition to the freehold.

5

*In re Alterman*, 127 B.R. 356, 361 (Bankr. E.D. Va. 1991) (citing *Danville Holding Corp. v. Clement*, 16 S.E.2d 345, 349 (Va. 1941)).

Critically, "[a]lthough it is ostensibly a three-part or three-step test, in essence the test applied by most courts, including the Supreme Court of Virginia, is whether the party annexing the chattel to the realty intended to permanently improve such realty." *In re Shelton*, 35 B.R. 505, 509 (Bankr. E.D. Va. 1983). And, "[i]n the law relating to fixtures, actual annexation includes every movement by which a chattel is joined or united to the property; constructive annexation is the union of such things as have been holden parcel of the realty, but which are not actually annexed, fixed, or fastened to the property." *Id.* (quoting Black's Law Dictionary, 81 (5th ed. 1979)).

Here, the items exempted from the Stipulation, as being within the scope of what Capital Bank urges to not be fixtures, are (i) an exhaust hood system, consisting of three hoods, an electronic control panel and fireproof stainless steel backsplash, with an integrated Ansul fire suppression system; (ii) a walk-in beer cooler and beer distribution system;[2] (iii) a pre-existing walk-in food cooler owned by the landlord;[3] and (iv) a cheese melter/salamander broiler. *See* Stipulation, DE #118, at ¶ 1 (cross-referencing Exhibit 1 to Opposition, DE #106-1, at p. 31, Item #s 15, 17-19 & 22).

Evidence adduced at a hearing on the Motion to Value will demonstrate, unsurprisingly, that the custom-designed and installed three-exhaust hoods and Ansel fire suppression system is

---

[2] Capital Bank erroneously refers to this "cooler" as a "freezer." This cooler is built into the premises, and is an integral part of the draft beer distribution system.

[3] This walk-in food cooler was installed by the prior tenant, was onsite and made available to Smokecraft when it took over the premises in 2019, and—like the other fixtures at issue—is the property of the landlord.

6

built into—and annexed to—the premises' exhaust system *and* is consistent with and essential to the use of the subject space as a restaurant. The same will be true of the (i) custom designed, built onsite, walk-in draft beer cooler and tap system, (ii) the pre-existing walk-in cooler, and (iii) the heavy duty, gas, infrared salamander broiler. And, pursuant to *Taco Bell*, *Danville Holding Corp.*, and their progeny, the evidence will well support that these items are fixtures that do not constitute assets of Smokecraft.

Nor should this contention prove controversial. *Taco Bell* highlights that pans and frying baskets may actually be considered fixtures if contained within a restaurant and used in furtherance of the restaurant's food service business. Assuredly, if a frying basket and a pan are to be regarded as fixtures, surely a walk-in freezer is to be regarded as a fixture.

### b. Even if Fixtures Were Assets of the Debtor, the Bank has Waived any Lien Interest

While *Taco Bell* makes apparent that the at-issue fixtures are not assets of the Debtor and, as such, not a part of the Debtor's estate herein, 11 U.S.C. § 541, the facts of this case also make clear that the fixtures are not subject to the bank's lien. Under the Debtor's lease (which was contemporaneously reviewed by Capital Bank), and as Capital Bank concedes, fixtures clearly become an asset of the landlord. *See* Opposition, DE #106, at ¶ 19, ("Section 8(d) of the Lease provides that Debtor's fixtures become property of the Landlord. . ."). And, to whatever extent doubt may nonetheless remain, the July 2019 Subordination of Lien Agreement between the Debtor, the landlord, and Capital Bank makes clear that the bank does not hold a lien on any fixtures.[4]

---

[4] It bears notation that even if the bank did hold a lien on fixtures, such lien would be on assets of the landlord, not assets of the Debtor's estate, per *Taco Bell*. Accordingly, analysis of the subordination agreement is somewhat superfluous except to the extent such evidences the intent of the parties, which is the third *Danville Holding Corp.* factor.

Starting with the subordination agreement (the "Subordination Agreement," a copy of which is attached hereto as Exhibit A), the document expressly provides, *inter alia*:

> Notwithstanding anything herein to the contrary, in no event shall the following be deemed part of the Collateral: (a) property attached to or built into the Premises so as to become a fixture under applicable law or a part of the Premises, (b) any Tenant Improvements or Alterations, and (c) any personal property owned by Landlord and located in the Premises.

Subordination Agreement, attached hereto as Exhibit A, at § 2. And, as noted above, the Subordination Agreement is executed by each of the landlord, the Debtor, *and* Capital Bank. *Id.* at p. 5 (with there being three consecutive pages bearing the same number, each containing a separate party's signature).

Yet even if one were to go further, examining the lease (the "Lease," as appended to the Opposition as Exhibit 2), such only confirms that fixtures are an asset of the landlord—not the Debtor. While Capital Bank takes great care to argue that the landlord *may* require removal of fixtures, *see* Opposition, DE #106, at ¶ 39, such is both immaterial and enormously misleading.

The immateriality is self-evident: unless and until a request is made to remove fixtures, such items will remain fixtures. There is no evidence of the landlord having made any such request as of present, nor could one reasonably be made insofar as Smokecraft is still actively operating a restaurant.

The misleading part of the argument, however, is more troubling in nature. The bank asserts, *inter alia*, "Section 8(d) of the Lease provides that Debtor's fixtures become property of the Landlord, but that Landlord can require the Debtor to remove any fixtures and/or Tenant Lines and repair damage at the Debtor's expense." Opposition, DE #106, at ¶ 39. Yet this is exceedingly deceptive. The at-issue portion of the lease provides, *inter alia*:

> Any Alterations of any kind to the Premises or any part thereof, except Tenant Lines (as hereinafter defined) and Tenant's furniture and moveable equipment or trade fixtures, shall at once become part of the realty and belong to Landlord and shall

8

> be surrendered with the Premises, as a part thereof, at the end of the Term hereof; provided, however, that Landlord may, **by written notice to Tenant given at the time Landlord approves such Alteration(s)** (or, with respect to Cosmetic Alterations, within ten (10) business days after Tenant delivers notice thereof to Landlord as required by Section 8.a above), require Tenant to remove any Alterations (including, without limitation, all Tenant Lines) and to repair any damage to the Premises caused by such removal, all at Tenant's sole expense.

Exhibit 2 to Opposition, DE #106-1, at p. 60, § 8(d) (emphasis added). Similarly, the following provision of the lease provides that "tenant lines" are to be removed by the Debtor "[u]pon Landlord's written request," and only upon such a written request. *Id.* at § 8(e).

Key to the foregoing language is that while, yes, the landlord may require fixtures to be removed by Smokecraft, the landlord would have been required to make such demand at the time the landlord approved the Debtor's build-out plans (*i.e.*, several years ago). This is not, as Capital Bank suggests, a clause that permits the landlord to weigh options upon the conclusion of the lease or even during the life of the lease; this is a provision that allows the landlord to designate items for removal, upon lease termination, at the time the landlord approves the installation of those items in the first instance. And such is rather sensible: the lease creates a prism where a tenant is on notice of the steps and expenses correlative to installing (and, if demanded, de-installing) items at the time such installation is approved. This is not a paradigm where a landlord gets to undertake a final walk through and point to items it wishes to see removed; this is a paradigm where a landlord, during the construction phase of a lease, is permitted to approve plans on the express condition that certain items be stripped from the premises upon the conclusion of the lease. The landlord did not invoke this right in connection with the build-out of the Debtor's premises. And there will thusly be no removal of fixtures that accompanies termination of the lease, whenever such may occur.

9

**IV.     There is No Missing Property**

    **a. The Bank Fundamentally Misconstrues the Asset Composition of the Debtor**

The Opposition insists items to be "missing," and that the "total amount of missing items is just over $250,000.00 with respect to purchase value, and the items are detailed in attached Exhibit 3." Opposition, DE #106, at ¶ 45. This is, no doubt, a relatively scandalous allegation, with the brief at least implying that either (i) the Debtor is concealing assets; or (ii) the Debtor sold off assets pre-petition and did not disclose such on the Statement of Financial Affairs or otherwise. Yet, upon careful inspection of Exhibit 3, there are no missing items—there are only (i) a series of computation errors (some of an exponential quality); (ii) twice-counted items that have been appraised by both parties; (iii) a core misapprehensions as to what actually constitutes an "item" as opposed to a "service" or a part used to install an item; and (iv) "missing" items that are plainly present on the bank's own appraisal of on-site assets.

    **i. Data Entry/Mathematical Errors**

There are approximately 160 line items on Exhibit 3. At least half of these line items contain errors of either data entry or math, inviting an overstatement of value of roughly $85,000.00. It is not that assets are subject to disputed valuations; it is, rather, that Capital Bank's funds were never extended—much less utilized—to acquire items at the indicated costs.

The first example of this comes in the context of items purchased from TriMark. In creating Exhibit 3, it appears Capital Bank mis-entered TriMark's *extended* line item prices, rather than TriMark's *individual unit* prices, as to most (but conspicuously not all) items based on TriMark's invoices and quotes.[5] Capital Bank then erroneously multiplied TriMark's already-extended line

---

[5] Oddly, it appears Capital Bank did compute several items properly, showing some cognizance of the proper method for entering data from various vendor quotes. But, for reasons the Debtor does not feign to understand, Capital Bank simply did not do so in connection with most items.

10

item prices by the respective specified unit quantities, in effect exponentially increasing the total cost. The result is an aggregate $74,046.00 overstatement of TriMark's quoted prices, mostly involving TriMark's modest $8,119.62 "Smallwares" quote. *Compare* Exhibit 3, DE #106-1 at pp. 159-162 *and* TriMark quote, attached hereto as Exhibit B.

For example, line 155 of Exhibit 3 relates to TriMark's "Smallwares" quote for square plastic food storage container lids:[6]

| LID, FOR 2-4 QT, SQUARE CONTAINER, TRANSLUCENT | $ | 51.84 | 24 | $ | 1,244.16 |
|---|---|---|---|---|---|

Reading this, as included in the Opposition, it appears Smokecraft purchased 24 lids, at a cost of $51.84 each (which is a staggering sum for a lid), and accordingly paid TriMark $1,244.16 for the subject lids. Yet a review of the correlative TriMark quote reveals that the Debtor did not pay $51.84 per lid; the Debtor, rather, paid $2.16 per lid, for an aggregate price of $51.84:

| Line # | Product | Quantity | Unit | Price | Extended |
|---|---|---|---|---|---|
| 90 | 73350<br>ABC BOWL, MIXING, 13QT, S/S, 16"<br>MBR-13 / MXB-1300Q<br>Packed: EACH<br>Catalog Page 262 | 2 | EACH | 6.57 | 13.14 |
| 91 | 74977<br>CONTAINER, STORAGE, 4QT, CLEAR, SQUARE<br>926414 / 4SFSCWTRI135<br>Packed: EACH<br>Catalog Page 264 | 24 | EACH | 5.59 | 134.16 |
| 92 | 74001<br>LID, FOR 2-4 QT, SQUARE CONTAINER, TRANSLUCENT<br>SFC2SCPP190<br>Packed: EACH<br>Catalog Page 264 | 24 | EACH | 2.16 | 51.84 |

*See* TriMark quote, attached hereto as Exhibit B, at p. 11, ln. 92.

---

[6] As with various subsequently copied/pasted items, this has been enlarged for readability and is not a precise reproduction of Exhibit 3, though all text and numbers have remained identical to the original.

The "extended" price of $51.84 for lids was arrived upon by multiplying the quantity of lids (24) by the cost per lid ($2.16). Capital Bank, however, took this "extended" price and re-multiplied it by the quantity of lids, thereby increasing the cost by 2,400%.

Worse, the foregoing example is merely anecdotal. It appears Capital Bank repeated this error in connection with most—if not all—of the items set forth on the TriMark quote attached hereto as Exhibit B. Twenty-four storage containers, quoted at $5.59 a piece for a total of $134.16, suddenly became 24 storage containers valued at $134.16 a piece, for a grand total of $3,219.84. *Compare* Exhibit 3, DE #106-1 at pp. 159-162 *and* TriMark quote, attached hereto as Exhibit B. The same goes for mixing bowls Capital Bank asserts to cost $38.24 a piece (when they really only cost $4.78 a piece), and so on and so forth. *Id.*

This cumulative overstatement is staggering. Capital Bank is suggesting a quarter million dollars of assets to be missing, and at least $70,000.00 of that sum is premised upon item costs being exponentially squared.

These are not the only mathematical errors, however. It equally appears Capital Bank inserted a quantity of "11," instead of "1," for "factory service" correlative to a separate TriMark invoice. *Compare* Exhibit 3, DE #106-1 at pp. 159-162 *and* TriMark invoice, attached hereto as Exhibit C. Exhibit 3 shows:

| FACTORY SERVICE | $ | 584.40 | 11 | $ | 6,428.40 |

Exhibit 3, DE #106-1, at p. 161.

Yet the actual invoice shows that "factory service" has a correlative quantity of "1," not "11," with a total cost of $584.40:

| 50 | 1 ea | **FACTORY SERVICE** <br> Captive-Aire Model No. CUSTOM <br> Factory Services <br> Service Design Verification for CASLink. x1 <br> Service Design Verification for Demand Control Ventilation x1 <br> Service Design Verification for Hood x3 <br> Service Design Verification Mileage Charge: (42) x 2 = 84 total miles x1 | $584.40 | $584.40 |
|---|---|---|---|---|
| | | | **ITEM TOTAL:** | **$584.40** |

TriMark invoice, attached hereto as Exhibit C, at p. 6, ln. 50. The resulting overstatement is $5,844.00. And, as discussed in greater detail *infra*, this mathematical error—while seemingly inadvertent—also overlooks a much simpler and broader issue: a "service" is, rather assuredly, not an item of personal property over which Capital Bank holds a lien.

Similarly, Capital Bank appears to have misapprehended the price of a salamander broiler (an item that, to be sure, is a fixture in any event). Exhibit 3 lists the broiler as having a value of $3,234.16. *See* Exhibit 3, DE #106-1, at p. 160. Yet the subject broiler actually cost $2,714.04, with an additional $520.12 in parts being included as part of the installation process. *See* TriMark Quote, attached hereto as Exhibit D, at pp. 7-8, ln. 59. Self-evidently, the "[w]all mount brackets," "[s]tainless steel bottom panel," and second "[s]tainless steel bottom panel" are part and parcel of this item—not separate items. *Id.* And this item is assuredly not "missing," either, with the salamander being clearly included as line item number 22 on Capital Bank's appraisal. *See* Exhibits to Opposition, DE #106-1 at p. 31, ln. 22.[7]

The same goes for a "Blue Hose Gas Connector Kit," which shows up four times on Exhibit 3 with a cumulative value of $4,743.22. *See* Exhibit 3, DE #106-1, at p. 160. Suffice it to posit the "connector kit," to the extent such is inclusive of tangible assets, has become part of the items to

---

[7] Exhibit 3, unlike the bank's appraisal (Exhibit 1), does not include line numbers. Where pragmatic, the Debtor has endeavored to count the lines and cite a correlative line number. In some instances, however, it is more prudent to simply cite by page number, which this brief alternatively does on several occasions.

which those kit components are connected. These are not "missing items;" these are items melded into appraised items.

It equally appears Capital Bank has twice counted an "Art & Accessories Allowance," with the item appearing on both the sixth and eighteenth lines of Exhibit 3. *See* Exhibit 3, DE #106-1, at p. 160, ll. 6, 8. Each such item is listed at $5,000.00. *Id.* Worsening matters, this line item is not only duplicated but, too, correlates to an item that was cancelled by the Debtor and thusly never paid for with Capital Bank's loaned funds (or any other funds). *Compare* GrizForm Invoice 2019-886, attached hereto as Exhibit E, at p. 2 (listing the $5,000.00 "Art and Accessories Allowance") *with* GrizForm Invoice 2019-890, attached hereto as Exhibit F, at p. 2 (omitting the same allowance and showing a reduction in total cost of more than $5,000.00).

Cumulatively, the errors set forth in this Section IV(a)(i) total approximately $85,000.00. And, in the context of the Opposition that claims some $250,000.00 of property to be "missing," that is an astonishing sum to be readily attributable to computation errors.

### ii.  **Twice-Counted Items that Were Appraised**

In addition to the foregoing errors, Capital Bank appears to have erroneously entered and duplicated numerous furniture items, resulting in a significant overstatement of the bank's asserted "purchase costs."  Specifically, while purportedly basing Exhibit 3 strictly on "invoices," Capital Bank erroneously entered data into the first seven lines of Exhibit 3 based upon "specifications." *See* Exhibit 3, DE #106-1, at p. 160. Capital Bank then reentered six of the same identical items from the correlative invoices issued by GrizForm, resulting in duplicate entries for the same items. Indeed, in at least two instances, Capital Bank erroneously entered the same item three separate times.

Specifically, the first and eleventh lines of Exhibit 3 are for the same dining banquette. *Id.* So, too, are the second and twelfth lines for the same upholstery. *Id.* And, similarly, the third and thirteenth lines are also for the same upholstery (being different than the foregoing upholstery). *Id.* The fourth and fifty-second lines are for the same bar table bases. *Id.* at pp. 160-161. There is also the aforementioned duplication of the $5,000.00 art allowance (that was cancelled in any event). *Id.* So, too, are pick-up order shelves duplicated (with a separately listed, also duplicative, item having not ever actually been purchased, as the Debtor opted in favor of a different option—also included on Exhibit 3—from a separate vendor). *Id.*

Together, these duplications add approximately $15,000.00 to the alleged purchase costs. A summary of these duplications is attached hereto as Exhibit G.

### iii. Appraised Items

At least half of the alleged $250,000.00 in "missing" items is attributable to items that are not missing at all. Some of these items are found on Capital Bank's own appraisal. Others are in the nature of *de minimis* items readily visible in the restaurant. And others, yet, are attributable to a $44,339.00 invoice consisting of items the bank's own appraiser witnessed in Smokecraft's premises. There is no question but that the bank's appraiser located these items, since they have been added to the appraisal appended to the Opposition as Exhibit 1.

Shortly after receiving an initial appraisal in this case, Capital Bank's counsel queried the appraiser, *inter alia*:

> I have a question about the appraisal. We had purchase orders for approximately $44,000 worth of televisions, stereos and other electronics that were also listed on the chart I gave you prior to your site visit.
>
> Did you not observe those when you were at the restaurant? I do not see them on the appraisal. I apologize if I am missing something.

*See* E-mail of August 14, 2024, at 4:18 pm, part of string attached hereto as Exhibit H. The appraiser, in turn, replied:

> To be honest with you Cate, I saw cameras, TV's and POS system. I don't recall seeing any DJ equipment. I can add this to the appraisal and reference the invoice. I assume, they obviously are on the hook for this since it was financed. However, wiring, setup, programing, etc., are not items I include in the total. These items are 4 years old, and after deducting the previous installment cost, probably looking at and additional 4-6K on the total.

*Id.* at E-mail of August 16, 2024, at 5:11 am.

Capital Bank's appraisal was then updated to include these items, which appear on the appraisal appended to the Opposition. *See* Exhibits to Opposition, DE #106-1 at p. 32, ln. 24***. Tellingly, after sending the bank's counsel an e-mail saying these items are likely worth "4-6K on the total," the updated appraisal lists them at $10,230.00. *Id.* But, insofar as the Stipulation has now been entered into and docketed, the Debtor appreciates the appraisal line items to be of diminished relevance.

The three asterisks following the line citation above are not a typo. They correlate, rather, to a footnote on the appraisal which reads, *en toto*, "Denotes: Information obtained by Myzentek, LLC. Invoice 40377." *Id.* That invoice is for $44,339.00. *See* Myzentek Invoice, attached hereto as Exhibit I. And that sum appears on Exhibit 3, with a correlative description of "Invoice from Myzentek LLC contains a variety of T.V's, sound systems, other electronic equipment, and instalation[8] related services. Invoice does not list the price for any specific item and instead lists only the total cost of all items." *See* Exhibit 3, DE #106-1, at p. 161.

Stated otherwise, the bank's appraiser saw these items and believed they were worth between $4,000.00 and $6,000.00. The bank then asked the appraiser to add them to the appraisal, which the appraiser did—somehow showing a value of $10,230.00. And yet Capital Bank still lists

---

[8] [sic].

16

these assets, on an inventory of putatively "missing items," and does so citing the original $44,339.00 cost.

The same is true of other assets, too. By way of anecdote, Exhibit 3 shows a "WALK-IN" valued at $10,808.61. *Id.* at p. 161 (emphasis in original). The bank's appraisal is inclusive of both a walk-in cooler and a walk-in "freezer." *See* Exhibits to Opposition, DE #106-1 at p. 31, ll. 18-19. Furniture scattered throughout Exhibit 3 is also found in two cumulative lots on the bank's appraisal. *Id.* at ll. 25-26. And numerous items, including the smallwares discussed in greater detail *supra* (in connection with their exponential counting), are included in a catch-all category on the same appraisal. *Id.* at p. 19 (describing, in some detail, "Support and Ancillary Items," and assigning them a collective value of $6,850.00).

Other items on Exhibit 3 are, per the express notations of Exhibit 3, already appraised as well. *See* Exhibit 3, DE #106-1, at pp. 160-162. There is an "appraised value" column on the exhibit that, in turn, shows myriad items having been appraised by the bank's expert. *Id.* Yet Capital Bank still includes those items in its running total of the cost of allegedly "missing items." *Id.*

Inclusive of the items from the Myzentek invoice, these clearly-extant items total approximately $128,000.00. When added to the $85,000.00 of data and math errors, and the $15,000.00 of duplications, the total of $250,000.00 in "missing" items suddenly drops to approximately $22,000.00. And, not coincidentally, in reviewing Exhibit 3, there appears to be a collective valuation of a roughly similar sum assigned to a condensing unit that is part of the walk-in beer cooler, plumbing fixtures (including faucets, drains, and water filtration systems), gas connection kits, and items correlation to the installation of the Ansul fire suppression system. *See* Exhibit 3, DE #106-1, at pp. 160-162. These are all fixtures, *see* § III, *supra*, and, in any event, are

17

most certainly not "missing." It would be difficult to appraise the walk-in beer cooler without seeing (knowingly or otherwise) the correlative condensing unit, just as it would be difficult to miss plumbing fixtures or gas connection lines.

### b. Even if Property Were "Missing," Such Would not be an Asset of the Estate

A final observation meritorious of notation: it is genuinely unclear just where Capital Bank has believed the "missing items" to be through the pendency of this case. It would be entirely nonsensical for a restaurant to purchase equipment and then hold the assets in some undisclosed off-site locale, electing to never put the equipment into use. It would be equally illogical for a restaurant to parcel off items of these varieties on a secondary market, nor does logic much support the notion that a walk-in cooler could be discreetly sold.

Yet even if these items had been disposed of pre-petition, they would not have been assets of the Debtor's estate, 11 U.S.C. § 541, and, as such, would not have formed a part of Capital Bank's lien for purposes of assessing the bank's secured claim. It does, of course, turn out that they were never missing at all. But it is equally manifest that these ill-conceived allegations of assets having gone astray—assets supposedly valued at $250,000.00 in the prism of a loan facility that only afforded a $300,000.00 equipment budget, *see* Budget, attached hereto as Exhibit J— have proven enormously problematic.

The majority of the efforts correlative to scribing this brief will never appear on a fee application because undersigned counsel was greatly aided by the Debtor's equity interest holders in juxtaposing Exhibit 3 to various invoices and scrubbing Exhibit 3 for irregularities and inconsistencies. But, absent such a devoted and detailed equity interest, these efforts could well have taken tens of thousands of dollars of time—in a small business case, no less. And there is thusly some need to observe how thoroughly reckless, and indeed dangerous, the bank's

18

allegations have proven. The Debtor was essentially accused of fraud; countless hours of due diligence later, it turns out the bank was relying on nothing more than errant computations, duplicated entries, assets hiding in plain sight, routine fixtures, and an art allowance that was never actually expended.

**V.      Conclusion**

WHEREFORE, Smokecraft respectfully prays this Honorable Court (i) hold fixtures to not constitute a part of Capital Bank's lien; and (ii) find all assets comprising the lien of Capital Bank are subject to the Stipulation.

Respectfully submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. 18071
THE BELMONT FIRM
1050 Connecticut Avenue NW,
Suite 500
Washington, DC 20036
Phone: (301) 444-4600
E-mail: mac@dcbankruptcy.com
*Counsel for the Debtor*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of April, 2025, a copy of the foregoing was served electronically upon filing via the ECF system on all counsel who have entered an appearance herein, including:

- Corinne Donohue Adams    cadams@yvslaw.com, cadams@yvslaw.com;jbeckman@yvslaw.com;pgomez@yvslaw.com;vmichaelides@yvslaw.com;yvslawcmecf@gmail.com;r39990@notify.bestcase.com
- Catherine Keller Hopkin    chopkin@yvslaw.com, pgomez@yvslaw.com;kreese@yvslaw.com;vmichaelides@yvslaw.com;yvslawcmecf@gmail.com;hopkincr39990@notify.bestcase.com
- Lynn A. Kohen    lynn.a.kohen@usdoj.gov
- L. Jeanette Rice    Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- Angela L. Shortall    ashortall@3cubed-as.com, md70@ecfcbis.com
- US Trustee - Greenbelt    USTPRegion04.GB.ECF@USDOJ.GOV

- Maurice Belmont VerStandig    mac@mbvesq.com, lisa@mbvesq.com;mahlon@dcbankruptcy.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email

<u>/s/ Maurice B. VerStandig</u><br>
Maurice B. VerStandig, Esq.