COPYRIGHT SECURITY AGREEMENT

This COPYRIGHT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Copyright Security Agreement for recording with the U.S. Copyright Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1. <u>Terms</u>. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. <u>Grant of Security</u>. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral (as defined in the Security Agreement) of Grantors (collectively, "Copyright Collateral"): (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished; (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on <u>Schedule A</u> attached hereto: (i) rights and privileges arising under applicable law with respect to Grantors' use of such copyrights, (ii) renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3. <u>Security for Liabilities</u>. The grant of a security interest in the Copyrights and exclusive Copyright Licenses by Grantors under this Copyright Security Agreement is made to secure the payment or performance, as the case may be, in full of the Liabilities.

SECTION 4. <u>Recordation</u>. Each Grantor authorizes and requests that the Register of Copyrights record this Copyright Security Agreement.

SECTION 5. <u>Execution in Counterparts</u>. This Copyright Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same agreement. Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Copyright Security Agreement shall be effective as delivery of an original executed counterpart of this Copyright Security Agreement.

SECTION 6. <u>Security Agreement</u>. This Copyright Security Agreement has been entered into in conjunction with the provisions of the Security Agreement. Each Grantor does hereby acknowledges and

confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein. In the event that any provision of this Copyright Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7. Governing Law. EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS COPYRIGHT SECURITY AGREEMENT, THIS COPYRIGHT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8. SBA Provisions. The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a. When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b. Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument. Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note. The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Copyright Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**GRANTORS:**

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
Andrew C. Darneille
Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
Andrew C. Darneille
Sole Member and Manager

**Acknowledgments**

STATE OF _Maryland_ , CITY/COUNTY OF _Rockville_ _Montgomery_ , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

_9/9/22_

```
ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022
```

STATE OF _Maryland_ , CITY/COUNTY OF _Rockville_ _Montgomery_ , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

_9/9/22_

```
ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022
```

SCHEDULE A

**UNITED STATES COPYRIGHTS**

| COPYRIGHT | OWNER/HOLDER | COPYRIGHT NO. | APP./REG. DATE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**CREDIT AGREEMENT**

THIS CREDIT AGREEMENT is made as of January 31, 2020 by and among **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company ("Clarendon"), **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company ("Holdings"), and **ANDREW C. DARNEILLE** ("Guarantor"), and **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender"). Clarendon and Holdings are collectively called "Borrowers." Borrowers and Guarantor are collectively called "Debtors."

**Recitals**

Debtors have requested that Lender make a commercial term loan to Borrowers in the maximum principal amount of $1,200,000, and Lender has agreed to do so in accordance with the terms of this Agreement.

**Agreements**

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtors and Lender agree as follows:

**1.     DEFINITIONS AND GENERAL RULES OF CONSTRUCTION**

1.1.     *Definitions*.  In this Agreement, all defined terms are capitalized and have the meaning given on Exhibit A attached hereto and made a part hereof.

1.2.     *Accounting Terms*.  All accounting terms not specifically defined herein shall have the meanings assigned to them as determined by generally accepted accounting principles as used by the Financial Accounting Standards Board, and/or the American Institute of Certified Public Accountants or such successor or other organization as determined by Lender consistently applied and maintained throughout the periods indicated, unless otherwise specifically elected by Lender.

1.3.     *UCC Terms*.  Unless specifically defined otherwise in this Agreement, all terms used in this Agreement that are defined in the UCC shall have the meanings ascribed to them therein; provided, however, that should any such term cease to be defined under the UCC or should the UCC cease to exist, such term shall have such meaning as ascribed to it by Lender in its sole and absolute discretion.

1.4.     *Tense; Gender; Section Headings*.  In this Agreement, the singular includes the plural and *vice versa*.  Each reference to any gender also applies to any other gender.  The Section headings are for convenience only and are not part of this Agreement.

**2.     TERMS OF LOAN**

2.1.     *Agreement to Lend*.  Lender agrees, at the request of either Borrower, and subject to and in accordance with the terms, conditions, and provisions of this Agreement and the other Loan Documents, to advance as Loan Proceeds a maximum principal amount not to exceed $1,200,000.  LENDER SHALL NOT BE RESPONSIBLE OR LIABLE TO ANY PERSON OTHER THAN BORROWERS FOR THE ADVANCE OF ANY LOAN PROCEEDS, OR ANY PART THEREOF, AND NO OTHER PERSON, INCLUDING, WITHOUT LIMITATION, GUARANTOR, ANY OTHER IDENTIFIED PARTY OR ANY CONTRACTOR, SUBCONTRACTOR, MATERIALMAN, SUPPLIER, MANUFACTURER, LANDLORD, RETAILER OR WHOLESALER SHALL HAVE ANY RIGHT OR CLAIM AGAINST LENDER UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.

2.2.     *Terms of Repayment*.  The Loan shall be evidenced by and repaid with interest in accordance with the terms of the Note, which are incorporated herein by reference, provided that in any month in which a payment is due under the Note for which no day numerically corresponds to such payment date, such monthly payment shall be made on the last day of such month unless otherwise elected by Lender or the SBA.

1

2.3.    *Purpose*.  Unless otherwise elected by Lender, the Loan Proceeds shall be used solely in accordance with the SBA Authorization.

2.4.    *Direct Debit*.  At Lender's option, subject to Applicable Law, all payments due under the Note and the Loan shall be made by direct debit from one or more accounts maintained by Borrowers (or either of them) with Lender.  Debtors shall be solely responsible for ensuring that adequate funds to satisfy each payment due under the Note and the Loan are deposited in such accounts prior to the scheduled payment dates.  Lender is hereby irrevocably authorized to debit all accounts maintained by Debtors, or any of them, with Lender for all amounts due and payable under the Note and the Loan.  Debtors shall execute and deliver to Lender all other documents and instruments required by Lender in connection with such Debtor's agreement to make payments by direct debit.

2.5.    *SBA Guaranty Fee*.  Borrowers shall have paid to Lender on or before the date hereof a nonrefundable and unconditional SBA guarantee fee of $31,500 and any related SBA packaging fee, which fees shall be the absolute property of Lender upon payment.  The guarantee fee and the packaging fee shall not be considered to be a payment of any of Lender's costs and expenses incurred in connection with the Loan, and shall be paid independent of the amount of Loan Proceeds ultimately advanced, even if that amount is less than the stated maximum principal amount of the Loan.

2.6.    *Priority of Liens*.  Lender has or may in the future have multiple Liens on and in the Collateral and Lender, in its sole and absolute discretion and without notice to or the consent of any Debtor or any other Obligor, may at any time and from time to time change the order of priority of those Liens.  Lender shall evidence such order of priorities by making appropriate entries to Lender's internal records.  Lender may, but shall have no obligation to, file one or more amendments to any financing statement publicizing the Liens granted by this Agreement setting forth such order of priorities.

2.7.    *Security*.  The Note, the Loan and the Liabilities are secured by, among other things, the Security Agreement and the Grants of Security Interests.

3.    **REPRESENTATIONS AND WARRANTIES**

3.1.    *Representations and Warranties*.  Debtors, and each Person acting on behalf of any Debtor in executing this Agreement, represents and warrants to Lender as follows:

a.    Organization and Authority.  Each Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of the Commonwealth of Virginia.  Each Debtor is duly qualified to transact business as in all jurisdictions in which qualification is required each such Debtor is required to do so.  Each Debtor has the power and authority to consummate the transactions contemplated hereby, and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and the other Loan Documents executed and delivered by it.

b.    Validity of Loan Documents.  The Loan, the execution, delivery and performance by Debtors and all other Obligors of the Loan Documents, and the use, directly or indirectly of all or any portion of the Loan Proceeds in accordance with this Agreement: (i) are within the legal powers of Debtors and such Obligors; (ii) have received all necessary governmental approval; (iii) will not violate or result in a violation of any provision of any applicable federal, state or local law, statute, rule or regulation, or any order of any court or other Governmental Authority having jurisdiction, or any authorized official, board, department, instrumentality, or agency thereof; and (iv) will not result in a breach of or constitute a default under any mortgage, deed of trust, security agreement, lease, loan or credit agreement, or any other agreement or instrument to which any Debtor or any other Obligor is a party or by which any of them or any of their properties is bound, or result in the creation or imposition of any Lien of any nature whatsoever upon any Debtor's or any other Obligor's property or assets, except as contemplated by the provisions of the Loan Documents. BORROWERS ARE OBTAINING THE LOAN SOLELY FOR BUSINESS AND COMMERCIAL PURPOSES, AND LOAN PROCEEDS ARE NOT INTENDED TO BE USED, AND WILL NOT BE USED, FOR FAMILY, HOUSEHOLD, AGRICULTURAL OR PERSONAL PURPOSES. This Agreement, the Note, the Guarantee and the other

2

Loan Documents constitute the legal, valid and binding obligations of Debtors and all other Obligors, enforceable against Debtors and all other Obligors in accordance with their respective terms.

      c.     <u>No Litigation</u>.  There are no actions, suits, or proceedings pending or threatened against any Debtor, any other Obligor or all or any part of the Collateral or any other property of any Debtor or any other Obligor at law or in equity or before or by any Governmental Authority.  Neither any Debtor nor any other Obligor is in default with respect to any order, writ, injunction, decree, or demand of any court or any Governmental Authority.

      d.     <u>Taxes</u>.  Debtors have filed all required federal, state, county and municipal income tax returns and all Taxes have been paid and discharged prior to the date when any interest or penalty would accrue for the nonpayment thereof.  No claims against any Debtor have been assessed or are unpaid with respect to any Taxes.

      e.     <u>Environmental Compliance</u>.  Debtors, each Debtor Premises, the Collateral and all of each Debtor's other properties, whether owned or leased, are in compliance with all environmental laws, regulations and restrictions.

      f.     <u>Equipment and Fixtures Certification</u>.  Each Debtor hereby certifies to Lender that the equipment, fixtures, furniture, and machinery set forth on <u>Exhibit B</u> attached hereto is all of the equipment, fixtures, furniture and machinery owned by Borrowers, wherever located. Any item of equipment, fixtures, furniture, or machinery with a value of over $5,000 described on <u>Exhibit B</u> also includes the make, model and serial number, if applicable.  If no such equipment, fixtures, furniture or machinery is listed on the attached <u>Exhibit B</u>, Debtors represent and warrant that no equipment, fixtures, furniture or machinery is owned by Borrowers.

      g.     <u>Licenses and Permits</u>.  Each Debtor has all licenses, permits, approvals and authorizations required to be held or obtained by such Debtor as of the date of this Agreement in order to lawfully and properly operate each Debtor's businesses.  All such licenses, permits, approvals and authorizations are in good standing and without undue restrictions, necessary for it to conduct lawfully its business and affairs on the date hereof.  Each Debtor hereby certifies that the licenses, permits, approvals and authorizations necessary for Debtors to lawfully operate their businesses as of the date of this Agreement, including, without limitation, any required professional licenses, business licenses, sale tax licenses, liquor licenses and use and occupancy permits, are set forth on <u>Exhibit C</u> attached hereto.  If no such documentation is attached, Debtors represent and warrant that no such documentation is required for Debtors to lawfully operate their respective businesses or engage in any such Debtor's profession as of the date of this Agreement.

      h.     <u>Financial Statements</u>.  The financial statements of Debtors and such other Obligors delivered to Lender prior to the date of this Agreement are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently applied or such other method of preparation acceptable to Lender and fairly present the financial condition of each Debtor and each other Obligor as of the respective dates thereof.  No material adverse change has occurred in the financial condition of any Debtor or any other Obligor since the respective dates such financial statements.

      i.     <u>Information</u>.  All information contained in any financial statement, application, schedule, report, certificate, opinion, or any other document given by any Debtor or by any other Person in connection with the Loan or with any of the Loan Documents is in all respects true and accurate, and no Debtor or any other Person has omitted to state any material fact or any fact necessary to make such information not misleading.

      j.     <u>ERISA</u>.  Any Plan established and maintained by any Debtor or any Commonly Controlled Entity is a qualifying plan under the applicable requirements of ERISA, and there is no current matter which would adversely affect the qualified tax exempt status of any Plan.  Neither any Debtor nor any Commonly Controlled Entity has engaged in or is engaging in any Prohibited Transaction or has incurred any Accumulated Funding Deficiency in connection with any such Plan, whether or not waived,

3

and no Reportable Event has occurred with respect to any Plan subject to the minimum funding requirements of Section 412 of the Code. No Multiemployer Plan has "terminated," as that term is defined in ERISA, and neither any Debtor nor any Commonly Controlled Entity has "withdrawn" or "partially withdrawn" from any Multiemployer Plan. No Multiemployer Plan is in "reorganization," as that term is defined in ERISA, nor has notice been received from the administrator of any Multiemployer Plan that any such Plan will be placed in "reorganization."

k.      Margin Stock. Neither any Debtor nor any other Obligor is in the business of purchasing or selling margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System, as amended). No portion of the Loan Proceeds will be used to acquire or carry any margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System, as amended).

l.      Subsidiaries. As of the date of this Agreement, no Debtor has any Subsidiaries except that Clarendon is a Subsidiary of Holdings.

m.      SBA Authorization. The SBA Authorization is in full force and effect. No Debtor is in default under the SBA Authorization or under any other document or agreement executed in connection with the SBA Authorization.

n.      Small Business Lending Funds Certification. No Identified Party has been convicted of, or pleaded *nolo contendre* to, a sex offense against a minor (as such terms are defined in Section 111 of the *Sex Offender Registration and Notification Act* (42 U.S.C. 16911)).

o.      USA Patriot Act. No Identified Party is identified in any Blocked Persons List.

3.2.    *Continuing Nature of Representations and Warranties*. Each Debtor hereby represents, warrants, covenants and agrees that the representations and warranties made by Debtors in Section 3.1 and in the other Loan Documents shall remain true and accurate in all respects throughout the term of the Loan. Debtors shall immediately notify Lender in writing if any of the representations and warranties of Debtors set forth in Section 3.1 of this Agreement or in any of the other Loan Documents this Agreement should become untrue, incorrect, incomplete or inaccurate in any respect. Each request for an advance of Loan Proceeds shall constitute a reaffirmation of all representations and warranties made by Debtors in Section 3.1.

## 4.    AFFIRMATIVE COVENANTS

4.1.    *Payment and Performance*. Debtors shall pay the Liabilities as and when due and payable and shall perform, comply with, and observe all of the terms and conditions of the Loan Documents.

4.2.    *Costs of Transaction*. Debtors shall pay all costs and expenses incident to the making of the Loan and perfection of Lender's Liens under the Loan Documents, including but not limited to reasonable attorneys' fees, costs of appraisals and environmental site assessments, recordation costs and taxes incident to filing of any deed of trust, assignment, financing statements and continuation statements in respect thereof, title insurance premiums, and the fees of any title company.

4.3.    *Use of Loan Proceeds*. Debtors shall use the Loan Proceeds only for the purposes described in Section 2.3 of this Agreement. Each Debtor certifies, acknowledges and promises that: (a) the Loan Proceeds will be used in solely in accordance with Section 2.3 of this Agreement and the SBA Authorization, unless otherwise approved by Lender in writing; (b) each Debtor is and shall remain jointly and severally liable for the Loan, the Liabilities and all other indebtedness of Debtors related to the Loan and the Liabilities; (c) the making of the Loan and the Loan assistance constitute sufficient consideration for the foregoing certifications, acknowledgements and promises as well as the Liabilities and all other agreements, promises, representations, warranties, covenants, liabilities, indemnities, and indebtedness agreed to, created under or arising from the Loan or the Loan Documents; and (d) each Debtor waives any defense relating to failure of consideration.

4.4.    *Subordination*.

4

a.    Payment Subordination.  All of each Borrower's indebtedness to its officers, directors, direct or indirect owners of any interest in either of them, to any Subsidiary and to any of either of their affiliates shall be subordinated to repayment of the Loan and the Liabilities.  Each Debtor subordinates the payment of any and all present and future indebtedness, liabilities, obligations and agreements of any nature whatsoever of each other Identified Party to such Debtor, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation all principal, interest, expense payments, liquidation costs, and reasonable attorneys' fees and expenses owed or incurred in connection with any of the foregoing indebtedness, to the payment of the Liabilities and to payment of all other indebtedness, liabilities, obligations and agreements of any Debtor or any other Identified Party to Lender.  So long as all or any part of the Loan or the Liabilities remains unpaid, no Debtor shall, without the prior written consent of Lender, ask, demand, sue for, set off, accept, or receive any payment of all or any part of such indebtedness, liabilities and obligations of any other Identified Party to such Debtor.  No Debtor shall subordinate, assign, or transfer to any other Person all or any part of such indebtedness, liabilities and obligations of any other Identified Party to such Debtor, without the prior written consent of Lender.

b.    Lien Subordination.  No Debtor shall take any Lien in or on or obtain any other right in any property of any other Identified Party or take any action that would violate the terms or conditions of the Loan Documents without the prior written consent of Lender.  Except as may be separately and specifically elected by Lender in writing, all right, title and interest of any Debtor, if any, in or to any tangible or intangible property of any other Identified Party granted to or otherwise vested in any Debtor by any other Identified Party by or arising from any of document, agreement or otherwise shall be and hereby are made subordinate, junior and inferior and postponed in priority, operation and effect to the Loan Documents and all right, title and interest of Lender, irrespective of the dates of execution, delivery, recording or vesting of any of them.  Upon request by Lender, each Identified Party shall execute and deliver to Lender such subordination, standby and intercreditor agreements as required by Lender from time to time.

c.    Security.  To secure the performance by Debtors of the provisions of this Agreement and the payment of the Liabilities, each Debtor assigns, pledges and grants to Lender a Lien in and on all indebtedness, liabilities, and obligations of any nature whatsoever of each other Identified Party to such Debtor and all products and proceeds thereof.  Upon the request of Lender, Debtors shall, or shall cause each Identified Party to, endorse, assign, and deliver to Lender in a manner acceptable to Lender all notes, instruments, and agreements evidencing, securing, guaranteeing, or made in connection with such indebtedness, liabilities, and obligations.  If any Debtor fails to make any such endorsement, assignment, or delivery, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

4.5.    _Reporting Requirements_.  Debtors shall submit to Lender:  (a) within 120 days after the end of each calendar year, (1) annual financial statements for Borrowers (including balance sheet, income statement, statement of contingent liabilities and cash flow analysis), and (2) annual personal financial statement of Guarantor; (b) within 30 days after the end of each calendar quarter, quarterly financial statements of Borrowers (including balance sheet, income statement, statement of contingent liabilities and cash flow analysis); and (c) within 30 days after filing, copies of all federal and state income tax returns for each Debtor including K-1 statements and all other schedules and addenda thereto.  All financial statements, tax returns, reports and other information submitted to Lender or the SBA or otherwise required by this Section shall be in form and substance acceptable to Lender and the SBA and shall be prepared by an independent certified public accountant unless otherwise permitted by Lender in writing.  The costs of submitting all such financial statements, tax returns and other reports and information and otherwise complying with the terms and conditions of this Section shall be paid solely by Debtors.  Except as otherwise specifically stated in this Section 4.5, all financial statements, reports, returns, filings, data and other submissions required under this section shall be in form and substance acceptable to Lender.

4.6.   *Books, Records, and Inspections*.  Debtors: (a) at all times shall maintain accurate and complete books and records pertaining to the operation, business, and financial condition of Debtors and pertaining to the Collateral and any contracts and collections relating to the Collateral, all in a manner satisfactory to Lender and the SBA; (b) at all reasonable times and without hindrance or delay, shall permit Lender, the SBA, or any Person designated by Lender or the SBA to enter any place of business of any Debtor or any other premises where any books, records, and other data concerning any Debtor or the Collateral may be kept and to examine, audit, inspect, and make extracts from and photocopies of any such books, records, and other data; (c) at all reasonable times and without hindrance or delay, shall permit Lender, the SBA, or any Person designated by Lender or the SBA to inspect and appraise any of either Borrower's assets; (d) shall allow all government authorities to furnish reports of examinations, or any records pertaining to Debtors, upon request by Lender or the SBA; (e) shall furnish to Lender promptly upon request and in the form and content specified by Lender lists of purchasers of inventory (other than consumers purchasing goods in the ordinary course of such Debtor's business on a retail basis), aging of accounts, aggregate cost or wholesale market value of inventory, schedules of equipment, and other data concerning the Collateral as Lender may from time to time specify; and (f) shall mark its books and records in a manner satisfactory to Lender so that Lender's rights in and to the Collateral will be shown.

4.7.   *Notice of Default and Litigation*.  Debtors shall notify Lender promptly of the occurrence of any Default or Event of Default.  Debtors shall notify Lender promptly of any litigation instituted or threatened against any Debtor or any other Obligor and of the entry of any judgment or Lien against any of any Debtor's or any other Obligor's assets or properties, and of any prospective condemnation, change of zoning, or other action affecting any of any Debtor's or any other Obligor's properties.

4.8.   *Preservation of Properties*.  Debtors at all times: (a) shall maintain its properties, whether owned or leased, in good operating condition, and from time to time shall make all repairs, renewals, replacements, additions, and improvements thereto needed to maintain such properties in good operating condition; (b) shall comply with the provisions of all leases to which any Debtor is a party or under which any Debtor occupies property so as to prevent any loss or forfeiture thereof or thereunder; and (c) shall comply with all laws, rules, regulations, and orders applicable to any Debtor's properties or any part thereof.

4.9.   *Taxes*.  Debtors shall pay and discharge all Taxes prior to the date when any interest or penalty would accrue for the nonpayment thereof.

4.10.   *Maintain Existence*.  Borrowers at all times shall maintain in full force and effect their legal existence, rights, privileges, and franchises and shall qualify and remain qualified in all jurisdictions where qualification is required.

4.11.   *Payment of Indebtedness to Others*.  Debtors shall pay when and as due all indebtedness due to third Persons.

4.12.   *Changes in Location*.  Debtors shall advise Lender immediately in writing of (a) any change in the location of either Borrower's chief executive office; (b) the opening of any new place of business; (c) any change in the location of the places where all or any part of any Debtor's books and records are kept; (d) any change in any Debtor's legal name, or the addition of or any change in any name under which any Debtor conducts business; (e) any change in either Borrower's state of formation or Guarantor's state of residence or domicile; (f) any change in any Debtor's federal tax identification number; or (g) any Debtor's receipt of, or any change in, either Borrower's organizational identification number.

4.13.   *Compliance with Laws*.  Debtors at all times shall comply with all Applicable Laws.

4.14.   *Maintenance of Licenses and Permits*.  Debtors shall maintain in good standing and in full force and effect all licenses, permits and authorizations necessary for it to conduct lawfully its business and affairs.  Immediately upon demand by Lender or the SBA or upon renewal of any such license, permit or authorization, Debtors shall deliver to Lender evidence of such renewal and, immediately upon demand by Lender, Debtors shall provide copies of all other licenses, permits and authorizations and shall obtain

6

such other licenses, permits and authorizations for Debtors to lawfully conduct its business and affairs as Lender or the SBA may deem necessary or appropriate.

4.15.    *Further Assurances and Corrective Instruments*.  Debtors, upon request by Lender from time to time, shall execute and deliver, or cause to be executed and delivered, such supplements hereto and such further instruments as may be required by Lender for carrying out the intention of the parties to, or facilitating the performance of, this Agreement.  If any Debtor fails to execute any such document within 10 calendar days after a request by Lender, such Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of executing such document in such Debtor's name, which power of attorney is coupled with an interest and irrevocable.

4.16.    *Estoppel Certificates*.  Debtors, within 10 calendar days after request by Lender from time to time, shall execute, acknowledge and deliver to Lender or any Person designated by Lender a statement in writing, certifying: (a) that this Agreement is unmodified and in full force and effect and the payments required by this Agreement to be paid by Debtors (or any of them) have been paid; (b) the then unpaid principal balance of the Note; and (c) whether to the knowledge of the signer of such certificate any party to any of the Loan Documents is in default in the performance of any covenant, agreement, or condition contained therein and, if so, specifying each such default of which the signer may have knowledge.

4.17.    *Expense Payments*.  If any Debtor shall fail to make any payment or otherwise fail to perform, observe, or comply with any of the conditions, covenants, terms, stipulations, or agreements contained in this Agreement, Lender without notice to or demand upon any Debtor and without waiving or releasing any obligation or any Event of Default may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Debtors, and may enter upon any premises of any Debtor for that purpose and take all such action thereon as Lender may consider necessary or appropriate for such purpose.  All sums so paid or advanced by Lender ("Expense Payments"), together with interest thereon from the date paid, advanced, or incurred until repaid in full at a per annum rate of interest equal at all times to the default rate of interest described in the Note, shall be paid by Debtors to Lender upon demand by Lender.

4.18.    *Deposit Accounts*.  Upon demand by Lender, but subject to Applicable Laws, Debtors shall maintain, and shall cause all other Obligors to maintain, with Lender their primary depository relationships and all operating accounts for Borrowers.  The foregoing notwithstanding, so long as no Default or Event of Default has occurred, Lender shall not unreasonably restrict any Debtor's ability to maintain payroll and secondary operating accounts with banking institutions maintaining branch locations in substantially greater proximity to Debtors.

4.19.    *Field Examinations*.  Lender and the SBA may conduct field examinations of Debtors at such intervals as Lender and the SBA may determine.  All costs of the field examinations shall be paid by Debtors.

4.20.    *SBA Loan*.  Debtors shall perform in a timely manner all obligations, covenants and conditions required of Debtors under the SBA Authorization and all related agreements.  Debtors shall: (a) provide Lender with all certifications, documents or other information Lender is required by the SBA Authorization to obtain from Debtors or any third party; (b) execute any note and any other documents required by Lender; and (c) do everything necessary for Lender to comply with the terms and conditions of the SBA Authorization.  Each Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of executing such documents and to perform such things as are necessary to cause compliance with the SBA Authorization, all in such Debtor's name, which power is coupled with an interest and irrevocable.

4.21.    *Equal Opportunity*.  Debtors shall post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public, and shall comply with the requirements of SBA Form 793, Notice to New SBA Borrowers.

4.22.    *American Made Products*.  To the extent practicable, Debtors shall purchase only American-made equipment and products with the Loan Proceeds.

7

4.23.   *SBA Provisions*.  The Loan was made under nationwide program provided by the SBA which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.      When SBA is the holder of the Note, this document and all documents evidencing or securing the Loan will be construed in accordance with federal law.

b.      Lender and SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. Neither any Debtor nor any other Obligor may claim or assert against SBA any local or state law to deny any obligation of any Debtor or any other Obligor, or defeat any claim of SBA with respect to this Loan.

Any clause in this Agreement or any other Loan Document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

4.24.   *Equity Injection*.  Prior to the advance of any Loan Proceeds subsequent to the date of this Agreement, Debtors shall have invested at least $405,000 (or such other amount as required under the SBA Authorization) from their separate funds for such purposes and in such a manner as provided in Section 2.3 of this Agreement and otherwise under the SBA Authorization.

4.25.   *Non-Debarment*.  Neither any Debtor nor any other Obligor is presently debarred, suspended, proposed for disbarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

4.26.   *No Discrimination*.  Debtors shall comply with the nondiscrimination requirements of 13 CFR parts 112, 113, and 117 of the rules and regulations issued by the SBA.  Among other things, 13 CFR Parts 112, 113 and 117 require that no person shall on the grounds of age, color, handicap, marital status, national origin, race, religion or sex, be excluded from participation in, be denied the benefits of or otherwise be subjected to discrimination under any program or activity for which any Debtor received Federal financial assistance from the SBA, including, without limitation, the Loan.  Each Debtor further agrees to comply with the record keeping requirements of 13 CFR 112.9, 113.5, and 117.9 as set forth in SBA Form 793, "Notice to New SBA Borrowers", to permit effective enforcement of 13 CFR 112, 113 and 117.  Such record keeping requirements have been approved under OMB Number 3245-0076.  Each Debtor further agrees to obtain or require similar Assurance of Compliance for Nondiscrimination from subrecipients, contractors/subcontractors, successors, transferees and assignees so long as such Debtor receives or retains possession of any Federal financial assistance from the SBA, including, without limitation, the Loan.  In the event any Debtor fails to comply with any provision or requirements of 13 CFR Parts 112, 113 and 117, Lender or the SBA may call, cancel, terminate, accelerate repayment or suspend the Loan and Lender's obligation to advance Loan Proceeds hereunder as well as any or all other Federal financial assistance provided by the SBA.

4.27.   *Notice of Non-Eligibility after Default*.  Debtors acknowledge that if any Debtor defaults on any SBA-guaranteed loan and SBA suffers a loss, the names of the Debtors will be referred for listing in the CAIVRS database, which may affect their eligibility for further financial assistance.

4.28.   *Environmental Hazards*.

a.      No Prohibited Activity or Condition.  No Debtor shall cause, permit or exacerbate any Prohibited Activity or Condition with respect to any Debtor Premises, and Debtors shall take all appropriate steps (including but not limited to appropriate lease provisions) to prevent its employees, agents and contractors, and all tenants and other occupants on any Debtor Premises, from causing,

permitting or exacerbating any Prohibited Activities or Conditions. No Debtor shall lease or allow the sublease of all or any portion of any Debtor Premises to any tenant or subtenant that, in the ordinary course of its business, would cause, permit or exacerbate any Prohibited Activity or Condition. No Debtor shall cause or permit any Lien (whether or not such Lien has priority over the Liens in favor of Lender) upon any Debtor Premises imposed pursuant to any Hazardous Materials Laws. Any such Lien shall be considered a Prohibited Activity or Condition.

b.    Compliance with Laws. Debtors shall comply in a timely manner with, and cause all employees, agents and contractors of Debtors and any other Persons present on any Debtor Premises to comply with all Hazardous Materials Laws. Debtors shall cooperate with any governmental inquiry, and shall comply with any governmental order which arises from any alleged Prohibited Activities or Conditions.

c.    Certain Notices. Debtors shall notify Lender promptly of: (i) the occurrence of any Prohibited Activity or Condition on any Debtor Premises; (ii) any Debtor's knowledge of the presence on or under any adjoining property of any Hazardous Materials which can reasonably be expected to have a material adverse effect on any Debtor Premises or the value of any Debtor Premises; (iii) any Debtor's discovery of any occurrence or condition on any Debtor Premises or any adjoining real property that could cause any restrictions on the ownership, occupancy, transferability or use of any Debtor Premises under Hazardous Materials Laws; (iv) any action by any Governmental Authority; and (v) any claim made or threatened by any third party against any Debtor, Lender or any Debtor Premises relating to loss or injury resulting from any Hazardous Materials. Any such notice by Debtors shall not relieve any Debtor of, or result in a waiver of, any obligation of such Debtor under this Section.

d.    Environmental Audits. Debtors shall pay promptly the costs of any environmental audits, studies or investigations (including but not limited to advice of legal counsel) and the removal of any Hazardous Materials from each Debtor Premises required by Lender following a reasonable determination by Lender that there may be Prohibited Activities or Conditions in, on or near any Debtor Premises. Each Debtor authorizes Lender and Lender's employees, agents and contractors to enter onto any Debtor Premises at any time or from time to time for the purpose of conducting such environmental audits, studies and investigations. Any such reasonable costs and expenses incurred by Lender (including but not limited to reasonable fees and expenses of attorneys and consultants, whether incurred in connection with any judicial or administrative process or otherwise) which any Debtor fail to pay promptly shall become immediately due and payable and shall become additional Liabilities secured by this Agreement, and the other Loan Documents.

e.    Indemnification. Debtors shall hold harmless, defend and indemnify Lender and its officers, directors, trustees, employees and agents from and against all proceedings (including but not limited to actions by Governmental Authorities), claims, damages, penalties, costs and expenses (including but not limited to fees and expenses of attorneys and expert witnesses, investigatory fees, and cleanup and remediation expenses, whether or not incurred within the context of the judicial process), arising directly or indirectly from: (a) any breach of any representation, warranty or obligation of any Debtor concerning Prohibited Activities or Conditions or the compliance of any Debtor Premises with Hazardous Materials Laws; or (b) the presence or alleged presence of Hazardous Materials in, on or near any Debtor Premises.

f.    Additional Obligations; Survival. The covenants, agreements, indemnities and undertakings of Debtors contained in this Section: (i) shall be in addition to any and all other obligations and liabilities that Debtors may have to Lender under Applicable Law; and (ii) shall continue and survive notwithstanding the satisfaction, discharge, release, assignment, termination, subordination or cancellation of any Lien in favor of Lender or the payment in full of the Liabilities or the foreclosure of any Lien in favor of Lender or the tender or delivery of a deed in lieu of foreclosure or the release of any portion of any Debtor Premises from any Lien in favor of Lender.

4.29.    *General Indemnity and Corrective Instruments*. Debtors shall indemnify and hold Lender and its representatives, assigns, affiliates, officers, directors, employees or agents harmless against any and all claims, damages, losses, liabilities, and expenses, including attorneys' fees which may be incurred and

9

disbursements and any other fee, costs or charges, that may result from or arise in connection with (a) any failure of any Debtor or any Obligor to pay or perform any of the Liabilities or any other obligations when and as payment or performance is due or that may be incurred by or on behalf of Lender in enforcing any obligation of any Debtor or of any Obligor to pay or perform any of the Liabilities or any other obligations of Debtors to Lender, (b) the execution, delivery, administration or enforcement of this Agreement, the Note or any of the other Loan Documents, , or (c) the execution and delivery or transfer of, or payment or failure to pay under, this Agreement, the Note or any of the other Loan Documents. Nothing in this Section is intended to, or shall be interpreted to, limit the obligations of any Debtor or any Obligor contained in this Agreement, the Note or any of the other Loan Documents. Further, the indemnifications and agreements contained in this Section shall be in addition to and not in replacement of all other agreements, guarantees, indemnities and promises of Debtors under this Agreement, the Note or any of the other Loan Documents and shall survive the avoidance or nullification of this Agreement, the Note or any of the other Loan Documents or any other such agreement, guarantee, indemnity or promise. If any action shall be brought against Lender or such other Person identified above in respect of which indemnity may be sought against any Debtor, at the election of Lender, Debtors shall promptly assume the defense thereof, including the retention of counsel satisfactory to Lender or such Person and the payment of all expenses related thereto. Lender and such Persons identified above shall have the right to employ separate counsel in any such action and to participate in and direct the defense, negotiation and settlement thereof, and the fees and expenses of such counsel shall be at the expense of Debtors. The agreements and indemnifications contained in this Section are continuing obligations and shall (a) be binding upon Debtors and their respective successor and assigns and (b) inure to the benefit of and be enforceable by Lender and its successors and assigns. Each Debtor intends that the provisions of this Section shall not be merged into any judgment obtained by Lender, but shall survive every such judgment so that Debtors shall pay all costs, fees and disbursements, including reasonable attorneys' fees, incurred by Lender in connection with the Loan this Agreement, the Note or any of the other Loan Documents, whether incurred before or after judgment, and including without limitation any reasonable attorneys' fees and expenses incurred by Lender in collecting on any such judgment. Further, Debtors, upon request by Lender from time to time, shall execute and deliver, or cause to be executed and delivered, such supplements hereto, corrective instruments and such further instruments and agreements as may be required by Lender for correcting any inaccuracy, misstatement, mistake, error or failure or otherwise carrying out the intention of the parties to, or facilitating the performance of, this Agreement, any of the other Loan Documents or as otherwise determined by Lender. Absent manifest error all determinations made by Lender with regard any of the foregoing shall be conclusive. If any Debtor fails to execute any such document, instrument, agreement or writing within 10 calendar days after a request by Lender, such Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of executing such document in such Debtor's name, which power of attorney is coupled with an interest and irrevocable. The provisions of this Section shall survive payoff, release, foreclosure, or other disposition of this Agreement, the Collateral or any other security for the Loan. Debtors shall remain liable under this Section regardless of any other provision of this Agreement, the Note or any of the other Loan Documents which may limit any Debtor's liability. Unless otherwise determined by Lender or the SBA, the terms of the Loan are intended to match the terms and conditions required by the SBA Authorization. Debtors further agree that they shall, at all times, comply with the requirements of the SBA Authorization and the SBA rules, regulations and guidelines and shall take such action as is necessary or required by Lender or the SBA in order to cause the Loan and the Loan Documents to so comply

4.30.   *Specific Assignments*. Promptly upon request by Lender, Debtors shall execute and deliver to Lender written assignments, endorsements, and schedules, in form and content satisfactory to Lender, of specific accounts, chattel paper or payment intangibles or groups of accounts, chattel paper or payment intangibles, but the Lien granted to Lender by this Agreement shall not be limited in any way by such assignments. Such accounts, chattel paper and payment intangibles are to secure payment of the Liabilities and payment and performance of Debtors' other obligations under the Loan Documents and are not sold to Lender whether or not any assignment thereof which is separate from this Agreement is in form absolute.

4.31.   *Additional Post-Closing Submissions*. Immediately following request by Lender, Debtors shall deliver to Lender all items required by Lender, the SBA or under the SBA Authorization, which shall be in form and substance acceptable to Lender in its sole discretion. All of each Debtor's licenses, permits,

approvals and authorizations necessary for such Debtor to conduct lawfully its business and affairs shall, at all times, be in good standing and without undue restrictions. Immediately upon receipt thereof, Debtors shall promptly submit to Lender from time to time all previously unsubmitted licenses, permits, approvals and authorizations (and all supplements and replacements thereof) obtained by any Debtor or otherwise required to be held or obtained by any Debtor in order to lawfully and properly operate such Debtor's businesses, including, without limitation, all required professional licenses, business licenses, sale tax licenses, liquor licenses and use and occupancy permits.

4.32.    *Debt Service Coverage Ratio*. Clarendon, at all times, shall maintain a ratio of Cash Flow to Debt Service of not less than 1.20:1.00, tested on an annual basis beginning with the calendar year ending December 31, 2020. Lender's determination of "Cash Flow" and "Debt Service" shall control absent manifest error.

4.33.    *Small Business Lending Funds Certification*. Debtors shall immediately notify Lender if any Identified Party is convicted of, or pleads *nolo contendre* to, a sex offense against a minor (as such terms are defined in Section 111 of the *Sex Offender Registration and Notification Act* (42 U.S.C. 16911)). At no time shall any Identified Party be convicted of, or plead *nolo contendre* to, a sex offense against a minor (as such terms are defined in Section 111 of the *Sex Offender Registration and Notification Act* (42 U.S.C. 16911)).

4.34.    *USA Patriot Act*. Debtors shall immediately notify Lender in writing if any Identified Party is identified in any Blocked Persons List. At no time shall any Identified Party be identified in any Blocked Persons List.

## 5.    NEGATIVE COVENANTS

Without the prior written consent of Lender:

5.1.    *No Change of Name, Merger, Etc*. Neither any Debtor nor any Obligor nor any Commonly Controlled Entity shall change its name, dissolve, merge, or consolidate with any other Person or acquire all or substantially all of the assets of any other Person or acquire, directly or indirectly, any stock or other interest in any Person. Without limiting the generality of the foregoing, neither any Debtor nor any Obligor nor any Commonly Controlled Entity shall acquire or form any Subsidiary, enter into any joint venture agreement, become a partner in any partnership or otherwise acquire any interest of or invest in any other Person. Neither any Debtor nor any Obligor nor any Commonly Controlled Entity or any Obligor shall make or permit to exist any loan, advance, investment (debt or equity), purchase of stock or other interest, or material acquisition of assets, other than accounts receivable that arise in the ordinary course of business.

5.2.    *No Sale or Transfer of Assets*. No Debtor shall not sell, transfer, lease or otherwise dispose of all or substantially all of its assets and no Debtor shall sell, transfer or otherwise dispose of any asset for other than reasonably equivalent value.

5.3.    *No Encumbrance of Assets*. No Debtor shall mortgage, pledge, grant or permit to exist a Lien upon the Collateral or any of its other assets of any kind, now owned or hereafter acquired, except for Liens granted by or otherwise permitted under this Agreement.

5.4.    *Lease Obligations*. No Debtor shall enter into any lease of real or personal property; provided, however, that so long as no Default or Event of Default has occurred, Guarantor may enter into reasonable leases of real property for residential purposes and occupied by Guarantor as Guarantors primary residence.

5.5.    *Transfers of Interests, Change in Control*. No Debtor shall suffer or permit any conveyance, sale, assignment, transfer, Lien, pledge or other encumbrance or alienation of any direct or indirect ownership interest in either Borrower or in any change in control of either Borrower. Without limiting the generality of the foregoing, the management and control over either Borrower shall not be modified, amended or

otherwise changed from the status of such management and control on the date hereof and as disclosed in either Borrower's organizational documents.

5.6.    *No Purchase or Redemption; No Distributions*.  No Debtor shall:  (a) purchase or redeem any interest in either Borrower or any other Obligor which is not a natural person; (b) declare or pay any dividends, distributions or withdraws; (c) set aside any funds for any such redemption, dividend or distribution; or (d) prepay, purchase, or redeem any indebtedness of any Person other than the Loan.

5.7.    *No Additional Indebtedness*.  No Debtor shall incur or permit to exist any indebtedness or liability on account of deposits or advances or for borrowed money or for the deferred purchase price of any property or services, except: (a) the Loan; (b) short term trade debt incurred in the ordinary course of Borrowers' business operations repayable in full not more than 90 days after such debt is incurred; and (c) current accounts payable arising in the ordinary course of business, except that Guarantor may incur ordinary and prudent consumer indebtedness so long as no Default or Event of Default has occurred. Without limiting the generality of the foregoing, neither any Debtor nor any other Obligor nor any Subsidiary shall guarantee, endorse, become contingently liable upon or assume the obligations of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

5.8.    *Loans and Investments*.  Except as provided specifically permitted under the SBA Authorization: (a) no Debtor shall make any advance, loan, investment, purchase of stock or ownership interest, or material acquisition of assets, except that, so long as no Event of Default has occurred, Guarantor may make ordinary and prudent investments for their personal accounts and retirement planning and Borrowers may continue to operate their businesses in the ordinary course; and (b) any direct or indirect interest redemption or purchase of interest in either Borrower shall be subject to the approval of Lender, which approval shall be granted or withheld in Lender's sole and absolute discretion, and funded solely through the use of the proceeds from life insurance policies owned by any Debtor and not otherwise pledged or assigned to Lender as collateral for any indebtedness.

5.9.    *Compensation*.  No Debtor shall increase the amount of salary, bonus, or other compensation paid to its officers, management, executive personnel, and other key employees or family members of any of the foregoing from that amount being paid to such Persons as of the date of this Agreement, except that Debtors may increase the compensation to such personnel above the amount being paid to such Person as of the date of this Agreement so long as (1) no Default or Event of Default has occur or would arise after giving effect to such increase, (2) Debtors and all Obligors, to the extent applicable to them, are and will remain in compliance, on a *pro forma* basis after giving effect to such increase, with the covenants contained in Section 4.32 of this Agreement recomputed as of the last day of the most recently ended period for reporting (or such other period as reasonably determined by Lender), as if such payment had occurred on the first day of each relevant period for testing such compliance, (3) neither any Loan Proceeds nor any proceeds of any other credit extended by Lender or any other Person are used to pay such compensation (all compensation must be paid from funds internally generated by such Debtor from such Debtor's business operations and not from the proceeds of any loan from any Person), and (4) the obligations of Debtors and all Obligors to Lender remain in full force and effect.

5.10.    *Registration of Intellectual Property*.  No Debtor shall register any Trademarks, Copyrights or Patents without Lender's prior written consent.  Further, and in addition to all other grants, pledges and assignments, each Debtor hereby grants, pledges and assigns to Lender the IP Collateral and a security interest therein together with all of such Debtor's right, title and interest therein and thereunder.  Without limiting the generality of the foregoing or any other grant, pledge, lien or security interest benefiting or otherwise in favor of Lender, each Debtor hereby further authorizes Lender to file a Grant of Security Interest covering the relevant IP Collateral, and such other documents as may be necessary for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest of Lender in such IP Collateral granted by Debtors hereunder (without the signature of either Debtor after the occurrence of an Event of Default) and naming Debtors (or any of them), as debtor, and Lender, as secured party.

12

5.11.    _ERISA Compliance_. Debtors shall not: (a) restate or amend any Plan established and maintained by any Debtor or any Commonly Controlled Entity in a manner designed to disqualify such Plan under the applicable requirements of the Code; (b) permit management of any Debtor or any Commonly Controlled Entity to affect adversely the qualified tax exempt status of any Plan of any Debtor or any Commonly Controlled Entity; (c) engage in or permit any Commonly Controlled Entity to engage in a Prohibited Transaction; (d) incur or permit any Commonly Controlled Entity to incur any Accumulated Funding Deficiency, whether or not waived, in connection with any Plan; (e) take or permit any Commonly Controlled Entity to take any action or fail to take any action which causes a termination of any Plan in a manner which could result in the imposition of a Lien on the property of any Debtor or any Commonly Controlled Entity pursuant to Section 4068 of ERISA; (f) fail to notify Lender that notice has been received of a termination of any Multiemployer Plan to which any Debtor or any Commonly Controlled Entity has an obligation to contribute; (g) incur or permit any Commonly Controlled Entity to incur a complete or partial withdrawal from any Multiemployer Plan to which any Debtor or any Commonly Controlled Entity has an obligation to contribute; or (h) fail to notify Lender that notice has been received from the administrator of any Multiemployer Plan to which any Debtor or any Commonly Controlled Entity has an obligation to contribute that any such plan will be placed in "reorganization," as that term is defined in ERISA.

## 6.    DEFAULT AND REMEDIES

6.1.    _Events of Default_.  The occurrence of any of the following events shall constitute an Event of Default under this Agreement and under the other Loan Documents:

a.    Failure to Pay.  Any Debtor fails to pay when due any of the Liabilities.

b.    Failure of Representation or Warranty.  Any representation or warranty made by any Debtor in this Agreement proves to have been incorrect or misleading in any material respect.

c.    Breach of Affirmative Covenant.  Any Debtor fails to perform or observe any of the affirmative covenants set forth in Section 4 of this Agreement.

d.    Violation of Negative Covenant.  Any Debtor violates any of the negative covenants set forth in Section 5 of this Agreement.

e.    Default Under Other Loan Documents.  An event of default (as defined therein) occurs under any of the other Loan Documents, which default remains uncured beyond the expiration of any applicable cure period.  Reference is made to the other Loan Documents for specific cure periods, if any, for specific types of defaults.

f.    Transfers of Property or Interests.  The sale, transfer or encumbrance of (i) all or any part of the Collateral or any interest therein (except for the normal and prudent retail sale by Borrower of inventory in the ordinary course of Borrower's business operations), (ii) all or substantially all of the property or other assets of any Debtor or any other Obligor, (iii) any assets of any Debtor or any other Obligor for other than reasonably equivalent value, or (iv) any direct or indirect interest in either Borrower or any other Obligor that is other than a natural Person or any change in control of any Debtor or any other Obligor.

g.    Judgment.  A final judgment for the payment of money is rendered against any Debtor or any other Obligor and remains unpaid, unstayed on appeal, undischarged, unbonded, or undismissed for a period of 20 calendar days after the date of entry.

h.    Voluntary Bankruptcy, Etc. Any Debtor, any member of either Borrower, or any other Obligor: (i) voluntarily is adjudicated as bankrupt or insolvent, (ii) seeks or consents to the appointment of a receiver or trustee for itself or for all or any part of its property, (iii) files a petition seeking relief under the bankruptcy or similar laws of the United States or any state or any other competent jurisdiction, (iv) makes a general assignment for the benefit of creditors, or (v) admits in writing its inability to pay its debts as they mature.

i.      Involuntary Bankruptcy, Etc. A court of competent jurisdiction enters an order, judgment or decree appointing, without the consent of such Debtor, such interest holder of or in any Debtor that is other than a natural Person or such Obligor, a receiver or trustee for any Debtor, any such interest holder or other Obligor for all or any part of its property or approving a petition filed against it, her or him seeking relief under the bankruptcy or other similar laws of the United States or any state or other competent jurisdiction, and such order, judgment or decree shall remain in force undischarged or unstayed for a period of 30 calendar days.

j.      Material Adverse Change. Lender determines in good faith that a material adverse change has occurred in the financial condition of any Debtor, any other Obligor or any Subsidiary.

k.      Insecurity of Lender. Lender in good faith deems itself to be insecure.

l.      Impairment of Security. Any event shall occur which Lender in good faith deems to impair any of the security for the Loan.

m.      Extraordinary Acts. A sale, dissolution, merger, consolidation, liquidation or reorganization of either Borrower, any other Obligor or any Subsidiary or any partner, shareholder or member of either Borrower, any other Obligor or any Subsidiary which is a corporation, limited liability company, trust, estate, partnership or other legal entity.

n.      Failure of Perfection. Any Lien granted by this Agreement or any of the other Loan Documents is unperfected due to any action or omission by any Debtor in violation of this Agreement.

o.      SBA Authorization. A failure to perform or observe any covenant or agreement described in the SBA Authorization.

p.      Cross Default. A default occurs with respect to any obligation owed by any Debtor or any other Obligor to Lender or any other Person, and such default remains uncured beyond the expiration of any applicable cure period.

q.      Death or Disability. The death of Guarantor or any other Obligor that is a natural person; or if Guarantor or any other Obligor that is a natural person should become a "Disabled Person" as defined by the Estates and Trusts Article of the Annotated Code of Maryland or has otherwise been judged by a court to require a guardian for Guarantor or such other Obligor's property resulting from an inability to manage his or her property or affairs or to provide for his or her daily needs sufficiently to protect his or her health or safety.

6.2.    *Remedies of Lender.* Upon the occurrence of any Event of Default, in addition to all other rights and remedies available to Lender under the Loan Documents and Applicable Law, Lender shall have the following rights and remedies:

a.      Acceleration. Lender may declare the Note and all other Liabilities to be immediately due and payable, without further notice, presentment or demand (each of which is hereby waived by each Debtor), whereupon the same shall become immediately due and payable. Acceleration of maturity, once declared by Lender, may be rescinded at the option of Lender by written acknowledgment to that effect by Lender. The tender and acceptance of partial payments alone shall not rescind or affect in any way any acceleration of maturity.

b.      SBA Authorization. Lender may take all steps and advance all funds deemed necessary or desirable by Lender to keep the SBA Authorization in full force and effect and to cause compliance with all of the terms and provisions of the SBA Authorization.

c.      Set-Off. Lender may set off any amounts in any account or represented by any certificate with Lender in the name of any Debtor or in which any Debtor has an interest. As additional security for the Note, the Guarantee and the Loan, each Debtor hereby pledges and grants to Lender a Lien on and in,

14

and authorizes Lender to offset such obligations of Debtors or any other Obligor to Lender against, all property of any Debtor now or at any time hereafter in the possession of, in transit to, under the control of, or on deposit with Lender, in any capacity whatsoever, including without limitation, any balance of any deposit account and any credits with Lender.

      d.    <u>Other Remedies</u>.  Lender may pursue such other remedies, including actions for specific performance and damages, or any remedies provided for in the Loan Documents or permitted by law, which Lender may deem appropriate, it being specifically understood and agreed that any remedies may be exercised in the alternative or cumulatively in the sole discretion of Lender.  None of the rights and remedies conferred upon or reserved to Lender under this Agreement are intended to be exclusive of any other rights, and each and every right shall be cumulative and concurrent, and may be enforced separately, successively or together, and may be exercised from time to time as often as may be deemed necessary by Lender.

      e.    <u>Liquidation Costs</u>.  Debtors shall reimburse and pay to Lender upon demand all Liquidation Costs, including without limitation attorneys' fees and expenses, advanced, incurred by, or on behalf of Lender in collecting and enforcing the Liabilities and the Loan Documents.  All Liquidation Costs shall bear interest payable by any Debtor to Lender upon demand from the date advanced or incurred until paid in full at a per annum rate of interest equal to the default rate of interest described in the Note.

      f.    <u>No Waiver, Etc</u>.  No failure or delay by Lender to insist upon the strict performance of any term, condition, covenant, or agreement of this Agreement or of any of the other Loan Documents, or to exercise any right, power, or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant, or agreement of any such breach, or preclude Lender from exercising any such right, power, or remedy at any later time or times.  By accepting payment after the due date of any amount payable under this Agreement, the Note, the Guarantee or any of the other Loan Documents, Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement, the Note, the Guarantee or any of the other Loan Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount.  The powers and rights granted under this Section 6.2 and such other powers and rights as may be granted to Lender under any of the other Loan Documents may be exercised from time to time as often as Lender may elect.

## 7.    MISCELLANEOUS

7.1.   <u>Notices</u>.  All notices, demands, requests and other communications required under this Agreement shall be in writing and shall be deemed to have been properly given if sent by hand delivery, Federal Express (or similar overnight courier service), or by United States certified mail (return receipt requested), postage prepaid, addressed to the party for whom it is intended at its address hereinafter set forth:

      If to Lender:      Capital Bank, National Association
      1776 Eye Street, NW
      Washington, DC 20006
      Attention: Chris Mullings, Senior Vice President

      With copies to:

      Bryan J. Pelino
      Rosenberg Pelino LLC
      6031 University Boulevard, Suite 300
      Ellicott City, Maryland 21043

      If to Debtors:      Smokecraft Clarendon, LLC
      Smokecraft Holdings, LLC
      Andrew C. Darneille

15

3003 Washington Boulevard, Suite 101
Arlington, Virginia 22201
Attention: Andrew C. Darneille

With copies to:

The Morris Law Firm
4845 Rugby Avenue, Suite 302
Bethesda, Maryland 20814
Attention: Sean Morris

Notice shall be deemed given as of the date of hand delivery, as of the date specified for delivery if by overnight courier service or as of 2 days after the date of mailing, as the case may be. Upon proper notice provided in compliance with this Section, either party may notify the other party of a changed recipient and/or changed address to be used for future notices without requiring any amendment to this Agreement.

7.2.    *Liability of Lender*.  Lender, by the acceptance and performance of this Agreement, does not assume any liability, and each Debtor hereby releases Lender and Lender's agents, employees and attorneys from any such liability, and no claim shall be made by any Debtor upon Lender or such employees or agents for or on account of any matter or thing in excess of the balance of the Loan Proceeds not yet advanced by Lender.  NEITHER GUARANTOR, NOR ANY OTHER OBLIGOR NOR ANY OTHER PERSON IS A THIRD-PARTY BENEFICIARY OF THE LOAN AND, OTHER THAN LENDER, ONLY BORROWERS MAY ENFORCE ANY RIGHTS OR ACTIONS IN CONNECTION WITH THE LOAN OR UNDER THE LOAN DOCUMENTS.

7.3.    *Survival of Agreements*.  All agreements, covenants, representations, and warranties of Debtors made in this Agreement shall survive the making of the advances under this Agreement, the SBA Authorization or any of the other Loan Documents.  The SBA Authorization shall continue to be in effect and shall survive the execution of this Agreement and the other Loan Documents.  If any term of the SBA Authorization conflicts with the terms of this Agreement, the terms of the SBA Authorization shall control unless otherwise elected by Lender.

7.4.    *Successors*.  This Agreement shall be binding upon and inure to the benefit of each Debtor, its heirs, personal representatives, successors, and those assigns approved in writing by Lender, and upon and to Lender, its successors and assigns.

7.5.    *Applicable Law*.  This Agreement is made, executed, and delivered in the Commonwealth of Virginia, and except as otherwise provided under Section 4.23 of this Agreement or as otherwise provided under SBA regulations, the law of the Commonwealth of Virginia (but excluding Virginia principles of conflicts of laws) shall govern its interpretation, performance, and enforcement.

7.6.    *Assignment Not Effective*.  Any attempted assignment or transfer of any Debtor's rights under this Agreement without the prior written consent of Lender shall be void.

7.7.    *Obligations of Debtors*.  Debtors' obligations and representations under this Agreement shall be in addition to all obligations, covenants, and representations made by or on behalf of Debtors in all other documents delivered in connection with the Loan and the transactions contemplated hereby.

7.8.    *No Oral Modification*.  Neither this Agreement nor any term, condition, representation, warranty, covenant, or agreement set forth in this Agreement may be changed, waived, discharged, or terminated orally but only by an instrument in writing by the party against whom such change, waiver, discharge, or termination is sought. All calculations made pursuant to this Agreement, the Note or any of the other Loan Documents or any certificate or report submitted to Lender shall be made by Lender in its sole and absolute discretion and, absent manifest error, shall be conclusive.

7.9.    *Integration*.  This Agreement and the other Loan Documents constitute the entire agreement between Lender and Debtors regarding the Loan, and shall completely and fully supersede all other prior

16

agreements, both written and oral, between Debtors and Lender regarding their respective rights, obligations, and responsibilities relating to the Loan. Debtors recognize that this Agreement, the Note, the Guarantee, and the other Loan Documents may contain additional or similar representations, warranties, covenant, requirements and agreements applicable to Debtors and others. All such additional or similar provisions shall be in addition to and not in replacement of the others and Debtors shall comply with each and every provision of the Loan Documents applicable to it.

7.10.    *Severability*. If any provision or part of any provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

7.11.    *Change in Law*. If Lender reasonably determines that any Change in Law has the effect of (a) imposing, modifying or requiring the application of any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets or deposits with or for the account of, or credit extended or participated in or by, such Lender, or (b) reducing the rate of return on Lender's capital as a consequence of this Agreement, the Note, the other Loan Documents or the Loan below that which Lender would have achieved but for such Change In Law (taking into consideration such Lender's policies with respect to capital adequacy), then Debtors agree to pay to Lender such additional amounts as will compensate Lender for any such increased costs or reductions suffered by such Lender within 30 days after receipt of a certificate from Lender setting forth the amounts necessary to compensate Lender for any such increased costs or reductions and the calculations therefor.

7.12.    *Publicity*. Lender shall have the right, at its expense, to issue press releases and otherwise to publicize or advertise Lender's involvement in providing the Loan; provided, however, that Lender's right to display any signage on or about the Premises shall be subject to the restrictions for display of signage applicable to Clarendon under the Lease.

7.13.    *Counterparts*. This Agreement may be signed in one or more counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument.

7.14.    *Time*. Time is of the essence of all of Debtors' obligations under this Agreement.

**8.    CONSENTS AND WAIVERS**

8.1.    *Participations; Release of Information*. The Loan, the Liabilities, this Agreement and the other Loan Documents may be placed, assigned, serviced or participated out (either in whole or in part) by Lender, its successors and assigns. Each Debtor grants Lender its unlimited and unconditional consent to the disclosure and dissemination of financial records, including without limitation loan application and account information, statements of deposit and share accounts, negotiable instruments, individual, corporate, limited liability company and partnership financial statements, credit references and histories, property appraisals, surveys, pro forma assumptions, profit and loss statements, resumes, accounting reports, balance sheets, and other financial information provided to Lender by or on behalf of any Debtor, for such purposes as Lender, in its sole and absolute discretion, from time to time deems necessary or proper. Each Debtor further releases, acquits and forever discharges Lender and its agents from all liability, claims, actions, or causes of action under any Applicable Law for disclosure of confidential financial records made in accordance with this Section.

8.2.    *Benefit of Lender*. This Agreement is entitled to the benefits of, and is subject to the Note, the Guarantee, and the other Loan Documents the respective terms of which are incorporated herein by reference. Nothing herein contained and no act done or omitted by the Lender pursuant to the powers and rights granted it herein shall be deemed to be a waiver by the Lender of its rights and remedies under any of the other Loan Documents, but this Agreement is made and accepted without prejudice to any of the rights and remedies possessed by the Lender under the terms thereof. The right of the Lender to collect the indebtedness and to realize on any other security securing the Loan may be exercised by the Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder. Further, nothing

contained in this Agreement shall, or shall be construed to, deny, adversely affect, terminate or extinguish any rights of the Lender under the other Loan Documents, at law or in equity even if such terms may conflict. The rights of the Lender granted, and the indemnities and agreements made by Debtors, under this Agreement are in addition to and not in replacement of such other rights of the Lender and indemnities and agreements of Debtors. Further, Debtors waive (a) the benefits of any statutory provision limiting the right of Lender to recover a deficiency judgment, or to otherwise proceed against any Person or entity obligated for payment of the Loan or the Liabilities, after any foreclosure sale of any part of the Collateral and (b) any right to require Lender to institute suit against any Debtor and such other rights or relief provided to Borrowers, guarantors, indemnitors or sureties under Applicable Law or otherwise.

8.3.    *Co-Debtors*. From time to time, Lender may, at Lender's option, without giving notice to or obtaining the consent of any other Debtor or any other Person, without liability on Lender's part and notwithstanding any Debtor's or any other Person's breach of any covenant or agreement in this Agreement: (a) extend the time for payment of the Loan with respect to any Debtor or any other Person; (b) reduce the payments required from any Debtor or any other Person on the Loan; (c) release any Debtor or any other Person from any of its obligations with respect to the Loan; (d) modify the terms and time of payment of Loan with respect to any Debtor or any other Person; (e) take or release any security given by any Debtor or any other Person; (f) join in any extension or subordination agreement with respect to any Debtor or any other Person; and (g) waive or fail to exercise any right, power or remedy granted by law or herein or in any other instrument given at any time to evidence or secure the payment of the Loan. Any action taken by Lender pursuant to the terms of this Section shall not affect the obligation of any Debtor or any other Person to pay the Loan or to observe the covenants of any Debtor or any other Person contained in this Agreement or any of the other Loan Documents.

8.4.    *Consent to Jurisdiction*. Each Debtor consents to the exclusive jurisdiction of any and all state and federal courts in the Commonwealth of Virginia with jurisdiction over such Debtor and such Debtor's assets. Each Debtor agrees that such assets shall be used first to satisfy all claims of creditors organized or domiciled in the United States of America, and that no assets of any Debtor in the United States of America shall be considered part of any foreign bankruptcy estate. Each Debtor agrees that any controversy arising under or in relation to the Note, the Guarantee, this Agreement or any of the other Loan Documents shall be litigated exclusively in the Commonwealth of Virginia. The state and federal courts and authorities with jurisdiction in the Commonwealth of Virginia shall have exclusive jurisdiction over all controversies which may arise under or in relation to the Note, the Guarantee and any security for the debt evidenced by the Note, including without limitation those controversies relating to the execution, interpretation, breach, enforcement or compliance with the Note, the Guarantee, this Agreement or any other issue arising under, related to, or in connection with any of the Loan Documents. Each Debtor irrevocably consents to service, jurisdiction, and venue of such courts for any litigation arising from the Note, the Guarantee this Agreement or any other Loan Document, and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

8.5.    *Waiver of Homestead Exemption; Surety Waiver*. Each Debtor waives and renounces, for itself, himself or herself and his or her family, any and all homestead or exemption rights any of them may have under or by virtue of the Constitution or laws of any State or of the United States or the District of Columbia with respect to the liability and obligation arising under in connection with the Loan. Each Debtor hereby transfers, conveys, and assigns to Lender a sufficient amount of any homestead or exemption that may be allowed to such Debtor, including any such homestead or exemption that may be set apart in bankruptcy, to pay the obligations created under the Loan in full, with all costs of collection. Each Debtor hereby directs any party having possession of such homestead or exemption, including a trustee in bankruptcy, to deliver to Lender a sufficient amount of property or money set apart as exempt to pay such Debtor's obligations arising under the Loan. Each Debtor waives all rights such Debtor may have under Sections 49-25 and 49-26 of the Code of Virginia of 1950, as amended.

8.6.    *JURY TRIAL WAIVER*. DEBTORS AND LENDER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH ANY DEBTOR AND LENDER MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO

18

SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.   THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY EACH DEBTOR, AND EACH DEBTOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.   EACH DEBTOR FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**[SIGNATURES APPEAR ON NEXT PAGE]**

IN WITNESS WHEREOF, Debtors and Lender have caused this Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

                                                **BORROWERS:**

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
      Andrew C. Darneille
      Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
      Andrew C. Darneille
      Sole Member and Manager

**GUARANTOR:**

PATRICK EJINDU

_____ (SEAL)
ANDREW C. DARNEILLE

**LENDER:**

CAPITAL BANK, NATIONAL ASSOCIATION

_____

By: _____ (SEAL)
      Name: _____
      Title: _____

[ACKNOWLEDGMENTS FOLLOW]

*[Signature Page to Credit Agreement]*

20

**Acknowledgments**

_Rockville_ OF _Montgomery_ CITY/COUNTY OF _Maryland_, TO WIT:

I HEREBY CERTIFY that on this _____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

NOTARY PUBLIC

My Commission Expires:

_9 9 22_

> ERICA WANG
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> My Commission Expires 9-9-2022

_Rockville_ OF _Montgomery_, CITY/COUNTY OF _Maryland_, TO WIT:

I HEREBY CERTIFY that on this _____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

NOTARY PUBLIC

My Commission Expires:

_9 9 22_

(SEAL)

> ERICA WANG
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> My Commission Expires 9-9-2022

_Rockville_ OF _Montgomery_, CITY/COUNTY OF _Maryland_, TO WIT:

I HEREBY CERTIFY that on this _____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared ANDREW C. DARNEILLE, acknowledged that he, being authorized so to do, executed the foregoing document individually for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

NOTARY PUBLIC                                    (SEAL)

My Commission Expires:

_9 9 22_

> ERICA WANG
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> My Commission Expires 9-9-2022

3

_____ OF _____, CITY/COUNTY OF _____, TO WIT:

     I HEREBY CERTIFY that on this _____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared _____, and acknowledged himself/herself to be a _____ of CAPITAL BANK, NATIONAL ASSOCIATION, and acknowledged that s/he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

     IN WITNESS MY Hand and Notarial Seal.

_____(SEAL)

     NOTARY PUBLIC

My Commission Expires:

_____



4

**EXHIBIT A**
Definitions

Accumulated Funding Deficiency means an "accumulated funding deficiency" as defined in Section 302 of ERISA or Section 412(a) of the Code.

Agreement means this Credit Agreement, including all schedules and exhibits hereto, as it may be amended, restated, extended, consolidated or increased from time to time.

Applicable Law means all laws, statutes, treaty, codes, ordinances, regulations, rules, rulings, orders, judgments, decrees, injunctions, arbitral decisions, regulations, authorizations, determinations, directives and any other requirements and/or provisions (including building codes and zoning regulations and ordinances) of all Governmental Authorities, whether now or hereafter in force, which may be or become applicable to any Debtor or Lender, the relationship of lender and , any part of the Collateral, any Debtor Premises, any of the Loan Documents, or any part of any of them (whether or not the same may be valid), and all requirements, obligations and conditions of all instruments of record applicable to any part of the Collateral on the date hereof.

Blocked Persons List means any list of known or suspected terrorists published by any United States government agency, including, without limitation, (i) the annex to Executive Order 13224 issued on September 23, 2001 by the President of the United States and (ii) the Specially Designated Nationals List published by the United States Office of Foreign Assets Control.

Borrowers means, collectively, Clarendon and Holdings.

Cash Flow means, for any period, (a) net income, (b) minus income or plus loss from discontinued operations, extraordinary items, and non-recurring items, (c) plus depreciation, depletion, amortization and other non-cash charges, (d) plus interest expense on all obligations, and (e) minus dividends, distributions and withdrawals, in each case as determined by Lender in its sole and absolute discretion.

Change In Law means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the *Dodd-Frank Wall Street Reform and Consumer Protection Act* and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and (y) all requests, rules, guidelines or directives promulgated by Lender for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Applicable Law, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

Clarendon means Smokecraft Clarendon, LLC, a Virginia limited liability company.

Code means the *Internal Revenue Code of 1986*, as amended, and the income tax regulations now or hereafter issued thereunder.

Collateral means, collectively, all of each Borrower's tangible and intangible personal property wherever located, whether now owned or hereafter acquired together with all cash and noncash products and proceeds thereof and all other collateral or security for the Loan or the Liabilities.

Commonly Controlled Entity means any subsidiary or any other trade or business (whether or not incorporated) which is under "common control" (as defined in the Code) with any Debtor or any of its subsidiaries.

Copyrights has the meaning ascribed to it in the Security Agreement.

Construction Loan Agreement means the Construction Loan Agreement of even date herewith among Borrowers and Lender, as it may be amended, restated or increased from time to time.

Controlling Interest means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

Debtor Premises means, collectively, each property owned, leased or otherwise occupied by any Debtor or any Obligor or where all or any part of the Collateral may be located.

Debtors means, collectively, Borrowers and Guarantor.

Debt Service means, for any period, regularly scheduled payments of principal and interest due on the Loan and all other long-term indebtedness of during such period.

Default means an event or the occurrence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default.

ERISA means the *Employee Retirement Income Security Act of 1974*, as amended.

Event of Default means any of those events described in Section 6.1 of this Agreement.

Expense Payment has the meaning ascribed to it in Section 4.17 of this Agreement.

Grant of Security Interest has the meaning ascribed to it in the Security Agreement.

Governmental Authority means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, official, instrumentality, regulatory body, court, central bank, quasi-governmental agency or group or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government and all officials, boards, departments, agencies and instrumentalities thereof.

Guarantee means the Unconditional Guarantee (SBA Form 148) of even date herewith by Guarantor for the benefit of Lender, as any of them may be amended, restated, spread, increased or otherwise modified from time to time.

Guarantor means Andrew C. Darneille.

Hazardous Materials means petroleum and petroleum products, flammable explosives, radioactive materials (excluding radioactive materials in smoke detectors), polychlorinated biphenyls, lead, asbestos in any form that is or could become friable, hazardous waste, toxic or hazardous substances or other related materials whether in the form of a chemical, element, compound, solution, mixture or otherwise, including but not limited to those materials defined as "hazardous substances," "extremely hazardous substances," "hazardous chemicals," "hazardous materials," "toxic substances," "solid waste," "toxic chemicals," "air pollutants," "toxic pollutants," "hazardous wastes," "extremely hazardous wastes," or "restricted hazardous waste" by Hazardous Materials Law or regulated by Hazardous Materials Law in any manner whatsoever.

Hazardous Materials Law means all federal, state and local laws, ordinances and regulations and standards, rules, policies and other binding governmental requirements and any court judgments applicable to any Debtor or any Debtor Premises relating to industrial hygiene or to environmental or unsafe conditions or to human health, including but not limited to those relating to the generation, manufacture, storage, transportation, disposal, release, emission or discharge of Hazardous Materials, those in connection with the construction, fuel supply, power generation and transmission, waste disposal

or any other operations or processes relating to any Debtor Premises, and those relating to the atmosphere, soil, surface and ground water, wetlands, stream sediments and vegetation on, under, in or about any Debtor Premises; provided, however, that "Hazardous Materials" shall not include: (i) supplies for cleaning and maintenance and other related substances stored and/or used in compliance with all applicable Hazardous Materials Laws, (ii) standard office supplies in commercially reasonable amounts required for use in the ordinary course of business, provided such items are incidental to the use of any Debtor Premises and are stored and/or used in compliance with all applicable Hazardous Materials Laws, or (iii) such materials customarily used in construction of improvements similar to the Premises provided the same are installed, stored and/or used in compliance with all applicable Hazardous Materials Laws.

Holdings means Smokecraft Holdings, LLC, a Virginia limited liability company.

Identified Party means each Debtor, each Obligor, each affiliate of any Debtor or any other Obligor and each Principal of any of the foregoing.

IP Collateral has the meaning ascribed to it in the Security Agreement.

Lender means Capital Bank, National Association.

Liabilities means the obligations of Debtors to pay (a) the unpaid principal amount of the Note, plus all accrued and unpaid interest thereon, (b) to pay all amounts owed under the Guarantee, (c) all unpaid Expense Payments, (d) all unpaid Liquidation Costs, and (e) all other charges, interest, and expenses chargeable by Lender to any Debtor under this Agreement and the other Loan Documents.

Lien means any mortgage, deed of trust, pledge, security interest, assignment, encumbrance, lien, or charge of any kind, including without limitation any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the *Uniform Commercial Code* of any jurisdiction.

Liquidation Costs means all expenses, charges, costs, and fees (including without limitation attorneys' fees and expenses) of any nature whatsoever paid or incurred by or on behalf of Lender in connection with: (a) the collection or enforcement of any of the Liabilities; and (b) the collection or enforcement of any of the Loan Documents.

Loan means the commercial loan in the maximum principal amount of $1,200,000 made by Lender to Borrower pursuant to the terms and conditions of the SBA Authorization, this Agreement and the other Loan Documents.

Loan Documents means collectively the Construction Loan Agreement, the Note, the Guarantee, this Agreement, and all other instruments, documents, and agreements now or hereafter evidencing, securing, guaranteeing, indemnifying, or given by any Debtor or any other Person in connection with the Loan or any of the other Liabilities, as such documents may be amended, restated, extended, spread, consolidated or increased from time to time.

Loan Proceeds means the funds advanced, or available to be advanced, by Lender as proceeds of the Loan.

Multiemployer Plan means a multiemployer plan, as defined in ERISA, to which any Debtor or any Commonly Controlled Entity, as appropriate, has or had an obligation to contribute.

Note means the Note (SBA Form 147) of even date herewith in the principal amount of $1,200,000 made by Borrowers to the order of Lender, as it may be amended, restated, extended, consolidated or increased from time to time.

Obligor means any Person other than Borrowers who may at any time now or hereafter be primarily or secondarily liable for any or all of the Liabilities or who has granted any security for any of

3

the Liabilities, including without limitation, Guarantor or any other maker, endorser, surety, or guarantor of all or a portion of the Liabilities or any Person, other than Lender, who is now or hereafter a party to any of the Loan Documents.

Patents has the meaning ascribed to it in the Security Agreement.

Person means an individual, an estate, a trust, a corporation, a partnership, a limited liability company, a government or governmental agency or instrumentality and any other legal entity.

Plan means any pension, profit sharing, savings, stock bonus, or other deferred compensation plan which is subject to the requirements of ERISA, together with any related trusts.

Premises shall have the meaning ascribed to it in the Construction Loan Agreement.

Principal means if a sole proprietorship, the proprietor; if a partnership, each managing partner and each partner who is a natural person and holds an ownership interest in the partnership; and if a corporation, limited liability company, association or a development company, each director, each of the five most highly compensated executives or officers of the entity, and each natural person who is a direct or indirect holder any of the interest, ownership stock or stock equivalent of the entity.

Prohibited Activities or Conditions means: (a) the presence, use, generation, manufacture, production, processing, installation, release, discharge, storage (including aboveground and underground storage tanks for petroleum or petroleum products), treatment, handling or disposal of any Hazardous Materials (excluding the safe and lawful use and storage of quantities of Hazardous Materials customarily used in the operation and maintenance of properties similar to such Debtor Premises or in the ordinary course of any Debtor's business) on or under any Debtor Premises, or in any way affecting any Debtor Premises or its value, or which may form the basis for any present or future demand, claim or liability relating to contamination, exposure, cleanup or other remediation any Debtor Premises; (b) the transportation to, from or across any Debtor Premises of any Hazardous Material (excluding the safe and lawful use and storage of quantities of Hazardous Materials customarily used in the operation and maintenance of properties similar to any Debtor Premises or for normal household purposes); or (c) any occurrence or condition on any Debtor Premises that is or may be in violation of Hazardous Material Law.

Prohibited Transaction means a "prohibited transaction" as defined in Section 406 of ERISA or Section 4975 of the Code.

Reportable Event means a "reportable event" as defined by Title IV of ERISA.

SBA means the *United States Small Business Administration*.

SBA Authorization means the SBA Authorization issued in connection with the Loan, having an SBA Loan No. of ▮▮▮▮▮▮ dated March 15, 2019, as amended from time to time.

Subordinated Debt means loans from interest holders to either Borrower that are subordinated to repayment of the Liabilities upon terms satisfactory to Lender in all respects.

Subsidiary means any corporation, partnership, limited liability company, association, or other business entity (a) in which a Controlling Interest is directly or indirectly owned or controlled by any Debtor or any other Obligor, or (b) a majority (by number of votes) of the outstanding shares or interest of any class or classes of which shall at the time be directly or indirectly owned or controlled by any Debtor or any other Obligor, if the holders of the shares or interest of such class or classes (i) are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors (or Persons performing similar functions) of the issuer thereof, even though the right to vote has been suspended by the happening of such a contingency, or (ii) are at the time entitled, as such holders, to elect a majority of the directors or

4

managers (or Persons performing similar functions) of the issuer thereof, whether or not the right to vote exists by reason of the happening of a contingency.

Taxes means all taxes and assessments, whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character (including all penalties or interest thereon), which at any time may be assessed, levied, confirmed, or imposed on any Debtor or any of any Debtors' properties or assets or income or any part thereof or in respect of any of any Debtor's franchises, businesses, income or profits, and all claims for sums which by law have or might become a lien or charge upon any of any Debtor's properties or assets or any part thereof.

Trademarks has the meaning ascribed to it in the Security Agreement.

UCC means the *Uniform Commercial Code* as in effect from time to time in the Commonwealth of Virginia; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection or the priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the *Uniform Commercial Code* as in effect in a jurisdiction other than the Commonwealth of Virginia, "UCC" means the *Uniform Commercial Code* as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority or availability of such remedy, as the case may be, as determined by Lender.

5

**EXHIBIT B**

(Equipment List)

## EXHIBIT B - EQUIPMENT LIST

### SMOKECRAFT CLARENDON LLC EQUIPMENT LIST

| MAKE | MODEL | SERIAL NUMBER |
|------|-------|---------------|
| Southern Pride | MLR-850 | R8500090 |
| Southern Pride | MLR-850 | R8500091 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

### SMOKECRAFT HOLDINGS LLC EQUIPMENT LIST

| MAKE | MODEL | SERIAL NUMBER |
|------|-------|---------------|
| 270 Smokers | "KC" (Kansas City) | N/A |
| 270 Smokers | "KC" (Kansas City) | N/A |
| 270 Smokers | Memphis | N/A |
| Diamond Cargo | 7x14 Single Axel Diamond | 53NBE1410K1070778 |
| Westinghouse | iGen4500DF | N/A |
| Kenmore | 17512 | N/A |
| Danby | DAR170A2WDD | N/A |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**EXHIBIT C**

(Licenses, Permits and Approvals)

Case 24-13609    Claim 7 Part 3    Filed 07/08/24    Page 115 of 174

## EXHIBIT C - SMOKECRAFT CLARENDON LLC LICENSES, PERMITS & APPROVALS

| TYPE | ISSUING AUTHORITY | NAME | STATUS | NUMBER | DATE OF APPROVAL | DATE OF EXPIRATION |
|------|-------------------|------|--------|--------|------------------|--------------------|
| Permit | Arlington County | Building Permit | Issued | B1902192 | 11/19/2019 | 5/17/2020 |
| Permit | Arlington County | HVAC Permit | Applied | | | |
| Permit | Arlington County | Plumbing | Applied | | | |
| Permit | Arlington County | Electrical | Applied | | | |
| Permit | Arlington County | Fire | Applied | | | |
| Permit | Arlington County | Sprinkler | Applied | | | |
| Permit | Arlington County | Certificate of Occupancy | | | | |
| Permit | Arlington County | Health | | | | |
| License | Arlington County | Business License | | | | |
| License | Commonwealth of Virginia | Liquor License | | | | |
| License | Commonwealth of Virginia | Sales Tax License | | | | |
| Permit | Arlington County | Patio Permit | | | | |
| Permit | Arlington County | Signage Permit | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

COPYRIGHT SECURITY AGREEMENT

This COPYRIGHT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Copyright Security Agreement for recording with the U.S. Copyright Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2.  Grant of Security.  As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral (as defined in the Security Agreement) of Grantors (collectively, "Copyright Collateral"): (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished; (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on Schedule A attached hereto: (i) rights and privileges arising under applicable law with respect to Grantors' use of such copyrights, (ii) renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3.  Security for Liabilities.  The grant of a security interest in the Copyrights and exclusive Copyright Licenses by Grantors under this Copyright Security Agreement is made to secure the payment or performance, as the case may be, in full of the Liabilities.

SECTION 4.  Recordation.  Each Grantor authorizes and requests that the Register of Copyrights record this Copyright Security Agreement.

SECTION 5.  Execution in Counterparts.  This Copyright Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same agreement.  Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Copyright Security Agreement shall be effective as delivery of an original executed counterpart of this Copyright Security Agreement.

SECTION 6.  Security Agreement.  This Copyright Security Agreement has been entered into in conjunction with the provisions of the Security Agreement. Each Grantor does hereby acknowledges and

IN WITNESS WHEREOF, Grantors and Lender have caused this Copyright Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                                    **GRANTORS:**

                                                   SMOKECRAFT CLARENDON, LLC
                                                   A Virginia Limited Liability Company

_____          By: _____ (SEAL)
PATRICK EJINDU                         Andrew C. Darneille
                                       Manager

                                                   SMOKECRAFT HOLDINGS, LLC
                                                   A Virginia Limited Liability Company

_____          By: _____ (SEAL)
PATRICK EJINDU                         Andrew C. Darneille
                                       Sole Member and Manager

**Acknowledgments**

STATE OF _Maryland_, CITY/COUNTY OF _Montgomery_ Rockville, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal. _____
                                       NOTARY PUBLIC                    (SEAL)

My Commission Expires:                             ERICA WANG
                                                   NOTARY PUBLIC
_9/9/22_                                           MONTGOMERY COUNTY
                                                   MARYLAND
                                   Rockville       My Commission Expires 9-9-2022

STATE OF _Maryland_, CITY/COUNTY OF _Montgomery_, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal. _____
                                       NOTARY PUBLIC                   (SEAL)

My Commission Expires:
_9/9/22_                                           ERICA WANG
                                                   NOTARY PUBLIC
                                                   MONTGOMERY COUNTY
                                                   MARYLAND
                                                   My Commission Expires 9-9-2022

PATENT SECURITY AGREEMENT

This PATENT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2.  Grant of Security.  As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, for the benefit of Lender, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Patent Collateral"): (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on Schedule A attached hereto; (b) all (i) rights and privileges arising under applicable law with respect to Grantors' use of any patents, (ii) reissues, divisions, continuations, extensions and continuations-in-part thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world, and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3.  Security for Liabilities.  The grant of a security interest in the Patent by Grantors under this Patent Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4.  Recordation.  Each Grantor authorizes and requests that the Commissioner for Patents record this Patent Security Agreement.

SECTION 5.  Execution in Counterparts.  This Patent Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument. Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Patent Security Agreement shall be effective as delivery of an original executed counterpart of this Patent Security Agreement.

IN WITNESS WHEREOF, Grantors and Lender have caused this Patent Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                          **GRANTORS**:

                                         SMOKECRAFT CLARENDON, LLC
                                         A Virginia Limited Liability Company

                                         By: _____ (SEAL)
PATRICK E JINAN                              Andrew C. Darneille
                                             Manager

                                         SMOKECRAFT HOLDINGS, LLC
                                         A Virginia Limited Liability Company

                                         By: _____ (SEAL)
PATRICK E JINAN                              Andrew C. Darneille
                                             Sole Member and Manager

                        **Acknowledgments**

STATE OF Maryland , CITY/COUNTY OF ~~Rockville~~ montgomery , TO WIT:

   I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

   IN WITNESS MY Hand and Notarial Seal.

                                         _____ (SEAL)
                                         NOTARY PUBLIC

My Commission Expires:
9/9/22                                   ┌─────────────────────────────┐
                                         │   ERICA WANG                │
                          Rockville      │   NOTARY PUBLIC             │
STATE OF Maryland , CITY/COUNTY OF Montgomery , TO WIT: │ MONTGOMERY COUNTY │
                                         │   MARYLAND                  │
                                         │ My Commission Expires 9-9-2022 │
                                         └─────────────────────────────┘

   I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

   IN WITNESS MY Hand and Notarial Seal.

                                         _____ (SEAL)
                                         NOTARY PUBLIC

My Commission Expires:
9/9/22                                   ┌─────────────────────────────┐
                                         │   ERICA WANG                │
                                         │   NOTARY PUBLIC             │
                                         │ MONTGOMERY COUNTY           │
                                         │   MARYLAND                  │
                                         │ My Commission Expires 9-9-2022 │
                                         └─────────────────────────────┘



TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1. _Terms_. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. _Grant of Security_. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in, all of each Grantor's right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Trademark Collateral"): (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names or other source or business identifiers or designs of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations thereof, and all registration applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, including, without limitation, those listed on _Schedule A_ attached hereto; (b) all rights and privileges arising under applicable law with respect to Grantors' use of any trademarks; (c) all extensions and renewals thereof; (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof; (e) all rights corresponding thereto throughout the world; (f) all rights to sue for past, present and future infringements or dilutions thereof; and (g) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing; provided that, in no event shall any security interest be granted in any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance by the United States Patent and Trademark Office of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law (it being understood that after such period such intent-to-use application shall be automatically subject to the security interest granted herein).

SECTION 3. _Security for Liabilities_. The grant of a security interest in the Trademarks by Grantors under this Trademark Security Agreement is made to secure the payment and performance in full of the Liabilities.

IN WITNESS WHEREOF, Grantors and Lender have caused this Trademark Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                          **GRANTORS**:

                                         SMOKECRAFT CLARENDON, LLC
                                         A Virginia Limited Liability Company

_____                  By: _____ (SEAL)
PATRICK EJINWU                               Andrew C. Darneille
                                             Manager

                                         SMOKECRAFT HOLDINGS, LLC
                                         A Virginia Limited Liability Company

_____                  By: _____ (SEAL)
PATRICK EJINWU                               Andrew C. Darneille
                                             Sole Member and Manager

**Acknowledgments**

STATE OF Maryland , CITY/COUNTY OF Rockville
montgomery , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

                                         _____ (SEAL)
                                         NOTARY PUBLIC

My Commission Expires:                   ┌─────────────────────────────┐
                                         │ ERICA WANG                  │
9/9/22                                   │ NOTARY PUBLIC               │
                                         │ MONTGOMERY COUNTY           │
                                         │ MARYLAND                    │
                                         │ My Commission Expires 9-9-2022 │
                                         └─────────────────────────────┘

STATE OF Maryland , CITY/COUNTY OF Montgomery, TO WIT:
                                         Rockville

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

                                         _____ (SEAL)
                                         NOTARY PUBLIC

My Commission Expires:                   ┌─────────────────────────────┐
                                         │ ERICA WANG                  │
9/9/22                                   │ NOTARY PUBLIC               │
                                         │ MONTGOMERY COUNTY           │
                                         │ MARYLAND                    │
                                         │ My Commission Expires 9-9-2022 │
                                         └─────────────────────────────┘

## ASSIGNMENT OF CONTRACTS

THIS ASSIGNMENT OF CONTRACTS ("Assignment") is made as of January 31, 2020 by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company and **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Borrowers"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

### Recitals

In accordance with the Construction Loan Agreement of even date herewith among Borrowers and Lender, as amended from time to time ("Loan Agreement"), Lender has agreed to provide to Borrowers a loan in the maximum principal amount of $1,200,000 ("Loan"). The Loan is evidenced by the Note (SBA form 147) of even date herewith made by Borrowers to the order of Lender in the principal amount of $1,200,000, as amended from time to time ("Note"). The Loan is secured in part by the Security Agreement of even date herewith by Borrowers to and for the benefit of Lender, as amended from time to time ("Security Agreement"), granting to Lender a lien on and security interest in all of Borrowers' assets, wherever located whether now owned or hereafter acquired together with all cash and noncash products and proceeds thereof (collectively, "Property"). Capitalized terms used in this Assignment and not otherwise defined in this Assignment shall have the meaning ascribed to them in the Loan Agreement.

As a condition precedent to making the Loan, Lender has required Borrowers to execute and deliver this Assignment to Lender.

### Agreements

NOW, THEREFORE, in order to secure: (i) the prompt payment of all past, present, and future indebtedness, liabilities, and obligations of Borrowers to Lender of any nature whatsoever in connection with the Loan, and (ii) the performance by Borrowers of all of the terms, conditions, and provisions of this Assignment, the Loan Agreement, the Note and the Security Agreement, and of any other note, security agreement, pledge agreement, reimbursement agreement, guaranty agreement, mortgage, deed of trust, loan agreement, hypothecation agreement, subordination agreement, indemnity agreement, letter of credit application, assignment, or any other document previously, simultaneously, or hereafter executed and delivered by Borrowers or any other person, singly or jointly with another person or persons, evidencing, securing, guarantying, or in connection with the Loan (collectively, "Loan Documents"), Borrowers hereby pledges, assigns, and grants to Lender a security interest in, and assigns to Lender all of each Borrower's right, title and interest in and to the following property (collectively, "Collateral"):

a.      All now existing or hereafter created contracts for the sale of all or a portion of the Property, or all or any portion of any improvements now or hereafter constructed on or in the Premises or constituting any part of the Project (collectively, "Contracts").

b.      All monies in the nature of earnest money deposits made pursuant to the Contracts (collectively, "Deposits"), and all monies payable to either Borrower under the Contracts.

c.      All construction, architectural, engineering and similar contracts, plans, specifications, drawings, renderings, profiles, studies, shop drawings, reports, plats, surveys and the like, and all building permits, certificates of occupancy and the like, relating to the Premises or the Project or any part thereof (collectively, "Project Documents").

d.      All agreements now existing or hereafter entered into in connection with the use, operation, and sale of the Premise or the Project or any part thereof.

e.      All cash and non-cash proceeds of all of the foregoing.

Until the occurrence of an event of default under the Loan Documents, Borrowers shall have a license to collect and retain all Deposits and all proceeds of the Contracts and to act under the Project Documents. Such license shall terminate automatically upon the occurrence of an Event of Default under the Loan Documents. Lender shall have no liability with respect to the performance of any of either Borrower's obligations under the Contracts or the Project Documents, including but not limited to the payment of any amounts due or owing to any Person thereunder.

1

Upon the occurrence of an Event of Default (as defined therein) under any of the Loan Documents Lender may: (a) exercise and enforce in the name of Borrowers (or either of them), Lender or otherwise any rights, powers, and remedies of Borrowers (or either of them) under the Contracts, Project Documents and other Collateral, including without limitation the right to collect sale proceeds from any purchaser; (b) apply any Deposits and other moneys payable to Borrowers (or either of them) under the Contracts to the payment of Borrowers' obligations under the Note, the Loan Agreement or any of the other Loan Documents in such amounts and in such order as the Lender in the exercise of its sole discretion shall determine; and (c) have all rights and remedies of a secured party under the UCC.

Each Borrower hereby covenants and agrees to execute and deliver on request of Lender any and all such further instruments, authorizations, or directions as may from time to time be requested by Lender in order to effectuate the purpose and intent of this Assignment. This Assignment does not include the delegation of any of either Borrower's duties, responsibilities, or obligations under the Contracts, Project Documents or other Collateral, and Borrowers specifically agrees to indemnify and forever hold Lender harmless from any claim or liability on account thereof.

**SBA PROVISIONS.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

(a)    When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

(b)    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument. Lender shall not enforce the terms of any cross-collateralization provision or rights related thereto with regard to the collateral for the Loan at any time that the SBA is the holder of the Note. All capitalized terms used in this Section entitled "SBA PROVISIONS" and not otherwise defined in this Assignment shall have such meaning as determined by Lender or the SBA; provided, however, in the absence of such determination (a) all such terms shall have the meaning ascribed to them in the Loan Agreement and (b) the term "Guarantor" shall have the meaning ascribed to the term "Obligor" under the Loan Agreement.

[SIGNATURE APPEARS ON NEXT PAGE]

2

IN WITNESS WHEREOF, Borrowers have executed this Assignment under seal as of the day and year first above written.

WITNESS:

Signature of Witness

PATRICK EJINDU
Printed Name of Witness

Signature of Witness

PATRICK EJINDU
Printed Name of Witness

**SMOKECRAFT CLARENDON, LLC**
A Virginia limited liability company

By: _____ (SEAL)
Andrew C. Darneille
Manager

**SMOKECRAFT HOLDINGS, LLC**
A Virginia limited liability company

By: _____ (SEAL)
Andrew C. Darneille
Sole Member and Manager

**Acknowledgments**

Rockville OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this _____ day of January 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

Rockville OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this _____ day of D January 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

9/9/22

[Signature Page to Assignment of Contracts]

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

3

## SUBORDINATION OF LIEN AGREEMENT

**THIS SUBORDINATION OF LIEN AGREEMENT** (this "Agreement") is entered into this __ day of July, 2019, by and between KBSIII 3003 WASHINGTON, LLC, a Delaware limited liability company ("Landlord"), and SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company ("Tenant"), and CAPITAL BANK, N.A. ("Lender").

## RECITALS

A.      Landlord is the owner of the Building having a street address of 3003 Washington Boulevard, Arlington, Virginia 22201 (also known as 1051 North Highland Street, Arlington, Virginia 22201)  (the "Building").

B.      Landlord currently leases a portion of the Building, containing approximately 3,460 rentable square feet of space (the "Premises"), to Tenant pursuant to that certain Deed of Lease dated May 22, 2019 (the "Lease").

C.      Lender is currently extending, or is about to extend, credit ("Loan") to the Tenant secured by a security interest in certain property of the Tenant to be located in the Premises (the "Collateral").

D.      Tenant and Lender have asked Landlord to subordinate its statutory and contractual lien rights in and to the Collateral to Lender, and Landlord has agreed thereto, subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration and of the mutual agreements hereinafter set forth, it is hereby mutually agreed as follows:

1.      The foregoing recitals are hereby incorporated in this Agreement and made a part hereof by this reference. Capitalized terms used but not defined in this Agreement shall have the meanings ascribed thereto in the Lease.

2.      Subject to the terms and conditions set forth in this Agreement, Landlord hereby subordinates its lien rights in and to the Collateral to Lender's lien on the Collateral pursuant to its security interest in the Collateral. Notwithstanding anything herein to the contrary, in no event shall the following be deemed part of the Collateral: (a) property attached to or built into the Premises so as to become a fixture under applicable law or a part of the Premises, (b) any Tenant Improvements or Alterations, and (c) any personal property owned by Landlord and located in the Premises.

3.      Promptly after the declaration of a default which remains uncured by Tenant under the credit and/or security agreement securing the Collateral and subject to the terms and conditions of this Agreement, Lender shall promptly notify Landlord in writing if Lender intends to enter upon the Premises to remove the Collateral. Should Lender desire to enter upon the Premises and remove the Collateral located therein, it shall notify Landlord in writing and arrange for a mutually-agreeable date and time for such entry by Lender or its agent and a representative of Landlord shall be present to supervise the removal of the Collateral. Lender may not enter the Premises for purposes of the removal of the Collateral without the prior written approval of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, and any entry by Lender upon the Premises shall be on such date(s) and time(s) as selected by Landlord in Landlord's reasonable discretion. Lender shall remove such of the Collateral as desired by Lender from and vacate the Premises within thirty (30) calendar days after the date upon which Lender first enters upon the Premises, time being of the essence, and any Collateral thereafter remaining in the Premises shall be deemed to have been abandoned by Lender, whereupon Landlord may remove and dispose of the Collateral in such manner as Landlord sees fit in its discretion, without any obligation or liability whatsoever to Lender, including without limitation, the obligation to apply the proceeds of any sale of the Collateral to the reduction of any amount then owing to Lender by Tenant. The contrary notwithstanding, Lender shall have no obligation to remove any or all of the Collateral from the Premises.

4.      Lender and Tenant shall be jointly and severally liable to Landlord for any damages to the Building, including without limitation the Premises or any improvements thereto, caused by Lender in connection with any removal of the Collateral and shall promptly reimburse Landlord for any and all reasonable costs and expenses actually incurred by Landlord in connection with repairing any such damage.

5.      To the extent not paid or prepaid by Tenant, Lender shall pay Landlord a reasonable sum for the use and occupancy of the Premises (which sum shall be based on the applicable rent set forth in the Lease) from the date on which Lender first enters the Premises to remove the Collateral until the date Lender has removed the Collateral from the Premises and vacates the Building.

6.      Prior to entering the Premises, and as a condition to Landlord's approval of any entry into the Premises by same, Lender's contractors, if any, shall provide Landlord with a certificate(s) of insurance evidencing liability insurance and property insurance providing coverage for such contractor's entry upon the Premises (for the avoidance of any doubt, Lender shall not itself be

1

required to provide certificates of insurance prior to entry by Lender or its employees into the Premises). Such insurance shall name Landlord as an additional insured and shall be in the amounts and subject to the same terms and conditions of the Lease regarding the insurance to be carried by Tenant. Landlord and its agents, officers, directors and employees (collectively, "Landlord Parties") assume no liability or responsibility whatsoever with respect to the Collateral and shall not be liable to Lender for any damages or claims arising out of or related to the Collateral or Lender's removal of same from the Premises or the actions or inactions of any person other than Landlord or a Landlord Party. Lender and Tenant, jointly and severally, agree to reimburse Landlord for and indemnify, defend and hold harmless Landlord and Landlord Parties from and against any and all cost, damage, claim, liability or expense (including without limitation, reasonable attorney's fees) incurred by Landlord or any Landlord Parties, directly or indirectly, as a result of or in any way arising from Lender's exercise of its rights under this Agreement, including without limitation, any entry upon the Premises by Lender.

7.    Notwithstanding anything to the contrary contained herein, in the event that Landlord notifies Lender in writing (a "Landlord Termination Notice") that Landlord is terminating the Lease as a result of a default by Tenant thereunder, Lender shall have five (5) business days from Lender's receipt of the Landlord Termination Notice to notify Landlord in writing of Lender's desire to enter the Premises to remove the Collateral in accordance with the terms and conditions of this Agreement. The foregoing notice to Landlord shall include the date on which Lender desires to enter the Premises to remove the Collateral, which date shall be no later than thirty (30) calendar days after Lender's receipt of the Landlord Termination Notice, unless otherwise approved in writing by Landlord. If Lender fails to timely notify Landlord of its desire to remove the Collateral or, following any such notice, fails to remove the Collateral within the time limits set forth herein, Lender shall be deemed to have abandoned the Collateral and forfeited all of its rights under this Agreement, whereupon Landlord may remove and dispose of the Collateral in such manner as Landlord sees fit in its discretion, without any obligation or liability whatsoever to Lender, including without limitation, the obligation to apply the proceeds of any sale of the Collateral to the reduction of any amount then owing to Lender by Tenant. The contrary notwithstanding, Landlord shall notify Lender in writing of any default by Tenant under the provisions of the Lease, and following receipt of such notice, Lender shall have the right (but is not obligated) to cure such default within the applicable notice and cure period, if any, allotted to Tenant under the Lease. Notwithstanding the foregoing to the contrary, with respect to any monetary default by Tenant with respect to which Tenant is entitled to a five (5) day notice and cure period in accordance with item (i) in Section 16.a of the Lease, Lender shall have the right to cure such default within ten (10) days after receiving written notice thereof, which notice may be given by Landlord simultaneously with the delivery of written notice of the same to Tenant.

8.    Tenant shall reimburse Landlord, within ten (10) days following Landlord's written demand, for all reasonable costs and expenses incurred by Landlord in connection with Tenant's request for this Agreement and the subordination of lien contemplated hereby, including without limitation, all reasonable legal costs and expenses incurred in connection with the preparation, review and/or negotiation of this Agreement.

9.    Tenant represents, warrants, and covenants to Landlord and Lender that (a) the Lease described in the recitals of this Agreement is in full force and effect and has not been modified, altered, or amended; and (b) there are no defaults by Landlord under the Lease and there is no defense, claim, or right of set-off whatsoever existing for the benefit of Tenant as of the date hereof to the obligations evidenced by the Lease.

10.    SBA Provisions. The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a.    When SBA is the holder of the Note, this document and all documents evidencing or securing the Loan will be construed in accordance with federal law solely with respect to any dispute between Lender and Tenant.

b.    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. Neither Tenant nor any Guarantor may claim or assert against SBA any local or state law to deny any obligation of Tenant, or defeat any claim of SBA with respect to the Loan.

c.    As security for the Loan and the performance of all of Tenant's obligations to Lender arising from the Loan, including without limitation the payment of all fees, charges, assessments, costs, and expenses provided for in the documents and agreements evidencing securing or otherwise executed in connection with the Loan, and the performance of all the terms and conditions of the SBA Authorization issued in connection the Loan (collectively, "Obligations"), Tenant hereby grants, transfers and assigns to Lender all of its right, title and interest in and to the Lease and the Premises. Lender may, by written notice to Landlord given no later than fifteen (15) days following notice of a default by Tenant, assign all of its rights under this Agreement and the Lease to a Qualified Replacement Tenant (as hereinafter defined) after a default under any of the Obligations, and shall have the right and power at its option after such default to sell, assign and transfer the entire lessees' interest in the Lease to any Qualified Replacement Tenant reasonably acceptable to Landlord, and, subject to the terms and conditions set forth in Section 7.c of the Lease, Lender shall retain all of the proceeds of such sale, assignment or transfer to be applied to the repayment of the Obligations, and Tenant hereby irrevocably appoints

Lender, or any officer of Lender, as Tenant's true and lawful attorney in fact, with full power of substitution, for the purpose of implementing the foregoing. Such a further assignment, sale or other transfer by Lender shall divest Tenant of all of its right, title, and interest in the Lease and transfer the same to the Qualified Replacement Tenant as the new tenant, which shall have and be vested, absolutely, with all of the right, title and interest of Tenant in and to the Lease. The foregoing notwithstanding, so long as Tenant has not defaulted in connection with the Obligations, Tenant shall have the right to enjoy all of the rights, title and benefits of the Lease. Nothing herein contained shall be construed to alter or modify the obligations of Tenant to Landlord pursuant to the terms of the Lease and, notwithstanding anything herein to the contrary, Landlord shall continue to deal directly with Tenant regarding administration and enforcement of the Lease and shall not have any obligation to provide notices or to otherwise engage Lender in connection therewith except with respect to the notice and cure rights of Lender which are expressly set forth in this Agreement. For the purposes hereof, a "Qualified Replacement Tenant" shall mean a replacement tenant selected by Lender and reasonably approved by Landlord, which replacement tenant intends to and does operate in the Premises a food and beverage operation substantially similar to the operation of Tenant which complies with the Permitted Use (as defined in the Lease). Any such Qualified Replacement Tenant shall be open and operating in the Premises no later than two (2) months following Lender's delivery of notice to Landlord that it has elected to have such Qualified Replacement Tenant assume Tenant's interest in the Lease in accordance with this paragraph. In the event any Qualified Replacement Tenant fails to open for business in the Premises, in accordance with the Permitted Use and the terms and conditions hereof, within the aforementioned two (2) month period, then the assignment or sublease to the Qualified Replacement Tenant shall be null and void and Landlord shall, notwithstanding anything in this Agreement to the contrary, have the right to immediately terminate the Lease and re-enter the Premises without any further obligation to Lender or such Qualified Replacement Tenant. Landlord hereby consents to the foregoing.

d.       Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

SBA PROVISIONS (APPLICABLE ONLY TO LENDER AND TENANT). The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

(a)       When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

(b)       Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

11.       Any and all notices or demands required or permitted under this Agreement shall be in writing and served (i) personally, (ii) by certified mail, return receipt requested, or (iii) by guaranteed overnight courier, at the addresses set forth below:

**If to Landlord:**

KBSIII 3003 Washington, LLC
c/o KBS
3003 Washington Blvd., Suite 950
Arlington, VA 22201
Attention: Stephen J. Close

**If to Lender:**

Capital Bank, National Association
1776 Eye Street, NW
Washington, DC 20006
Attention: Chris Mullings, Senior Vice President

With copies to:

Bryan J. Pelino
Rosenberg Pelino LLC
6031 University Boulevard, Suite 300
Ellicott City, Maryland 21043

**If to Tenant:**

Smokecraft Clarendon, LLC
7104 Loch Lomond Drive
Bethesda, Maryland 20817
Attention: Andrew Darneille

12.     This Agreement may be executed in two (2) or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Agreement.

13.     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

14.     If any provision of this Agreement shall be held or deemed to be invalid, inoperative or unenforceable, this Agreement shall be reformed and construed as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted.

15.     This Agreement shall be binding upon the successors and assigns of Landlord and Lender and shall inure to the benefit of each parties' respective successors and assigns.

**IN WITNESS WHEREOF,** the parties hereto have executed this Subordination of Lien Agreement under seal as of the day and year first hereinabove written.

**[SIGNATURES FOLLOW]**

4

**LENDER:**

Capital Bank, National Association

By: _____
      Name: CHRIS MULLINGS
      Title: SENIOR VICE PRESIDENT

**TENANT:**

Smokecraft Clarendon, LLC
a Virginia limited liability company

By: _____
      Andrew Darneille
      Member

**LANDLORD:**

KBSIII 3003 Washington, LLC
a Delaware limited liability company

By:   KBS Capital Advisors, LLC,
      a Delaware limited liability company, its authorized agent

      By: _____
            Stephen J. Close
            Senior Vice President

5

**LENDER:**

Capital Bank, National Association

By: _____

      Name: _____
      Title: _____

**TENANT:**

Smokecraft Clarendon, LLC
a Virginia limited liability company

By: _____
      Andrew Darneille
      Member

**LANDLORD:**

KBSIII 3003 Washington, LLC
a Delaware limited liability company

By:    KBS Capital Advisors, LLC,
        a Delaware limited liability company, its authorized agent

        By:  _____
              Stephen J. Close
              Senior Vice President

5

**LENDER:**

Capital Bank, National Association

By: _____
       Name: _____
       Title: _____

**TENANT:**

Smokecraft Clarendon, LLC
a Virginia limited liability company

By: _____
       Andrew Darneille
       Member

**LANDLORD:**

KBSIII 3003 Washington, LLC
a Delaware limited liability company

By:    KBS Capital Advisors, LLC,
       a Delaware limited liability company, its authorized agent

       By: _____
           Stephen J. Close
           Senior Vice President



U.S. Small Business Administration

# AUTHORIZATION
## (SBA 7(A) GUARANTEED LOAN)

| SBA Loan # | ▮▮▮▮▮▮▮ |
|---|---|
| SBA Loan Name | Smokecraft Modern Barbecue |
| Approval Date | March 15, 2019 |

Lender:

Capital Bank, National Association
One Church St, Ste 100
Rockville, MD 20850

U. S. Small Business Administration (SBA):

7a Loan Guaranty Processing Center (Hazard)
262 Black Gold Boulevard
Hazard, KY 41701

SBA approves, under Section 7(a) of the Small Business Act as amended, Lender's application, received February 26, 2019, for SBA to guaranty 75% of a loan ("Loan") in the amount of $1,200,000.00 to assist:

Borrower:

1.  Smokecraft Clarendon, LLC dba
    Smokecraft Modern Barbecue
    3003 Washington Blvd, Suite 101
    Arlington, VA 22201

All requirements in the Authorization which refer to Borrower also apply to any Co-Borrower.

A.  **THE GUARANTY FEE IS $31,500.00.**

    Lender must pay the guaranty fee within 90 days of the approval date of this Authorization. Failure to timely pay the guaranty fee will result in cancellation of the SBA guarantee. The 90-day deadline may not be extended. Lenders are required to make their payments electronically. Payment can be made at www.pay.gov or by ACH if they have previously enrolled with the SBA. No part of the guaranty fee is refundable if Lender has made any disbursement. Lender may collect this fee from Borrower after initial disbursement of Loan, except when an escrow closing is used, Lender may not collect the fee until all Loan funds have been disbursed to the Borrower from the escrow account. Borrower may use Loan proceeds to reimburse Lender for the guaranty fee.

    For loans of $150,000 or less, Lender may retain 25% of any required guaranty fee but must remit the remainder to SBA.

B.  **ON-GOING GUARANTY FEE** (Lender's Annual Service Fee):

    1.  Lender agrees to pay SBA an on-going guaranty fee equal to 0.550 of one percent per year of the guaranteed portion of the outstanding balance.

    2.  Lender may not charge or otherwise pass through this fee to Borrower.

C.  **IT IS LENDER'S SOLE RESPONSIBILITY TO:**

1.  Close the Loan in accordance with the terms and conditions of this Authorization.

2.  Obtain valid and enforceable Loan documents, including obtaining the signature or written consent of any obligor's spouse if such consent or signature is necessary to bind the marital community or create a valid lien on marital property.

3.  Retain all Loan closing documents.  Lender must submit these documents, along with other required documents, to SBA for review if Lender requests SBA to honor its guarantee on the Loan, or at any time SBA requests the documents for review.

D.  **REQUIRED FORMS**

NOTE:  LENDER MAY USE ITS OWN NOTE AND GUARANTEE AGREEMENTS IN LIEU OF THE SBA NOTE AND GUARANTEE AGREEMENTS.  IF LENDER USES ITS OWN NOTE AND/OR GUARANTEE FORMS, LENDER MUST ENSURE THE DOCUMENTS COMPLY WITH THE REQUIREMENTS SET FORTH IN SOP 50 10.

1.  Lender may use its own forms except as otherwise instructed in this Authorization. Lender must use the following SBA forms for the Loan:
      SBA Form 147, Note or Lender's own Note that complies with SOP 50 10
      SBA Form 1050, Settlement Sheet
      SBA Form 159, Compensation Agreement, for each required agent
      SBA Form 722, Equal Opportunity Poster
      Guarantee:  SBA Form 148 or Lender equivalent
      SBA Form 601, Agreement of Compliance

2.  Lender may use computer-generated versions of mandatory SBA Forms, as long as the text is identical.

3.  Lender must submit a copy of each completed SBA Form 159 by email to the SBA fiscal and transfer agent after initial disbursement and in conjunction with Lender's 1502 Report for the month.  Lender must maintain each original SBA Form 159 in its file.

E.  **CONTINGENCIES**—SBA issues this Authorization in reliance on representations in the Loan application, including supporting documents.  The guarantee is contingent upon Lender:

1.  Having and complying with a valid SBA Loan Guarantee Agreement (SBA Form 750, SBA Form 750B for short-term loans, or 750CA for Community Advantage (CA) loans, if applicable) and any required supplemental guarantee agreements, between Lender and SBA;

2.  Having paid the full guaranty fee in the time and manner required by this Authorization and SBA Loan Program Requirements;

3.  Complying with the current SOP 50 10 and all applicable appendices;

4.  Completing disbursement no later than 48 months from the approval date of this Authorization. (The loan must be fully disbursed within 48 months from the date of this Authorization. Any undisbursed balance remaining after 48 months will be automatically cancelled by SBA.);

5.  Having no evidence since the date of the Loan application, or since any preceding disbursement, of any unremedied adverse change in the financial condition, organization, management, operation, or assets of Borrower or Operating Company which would warrant withholding or not making any further disbursement; and,

6.  Satisfying all of the conditions in this Authorization.

F.  **NOTE TERMS**:

1.  **Maturity**:  This Note will mature in 10 years and 6 months from date of Note.

2.  **Repayment Terms:**

If Lender uses its own Note, Lender must comply with the repayment terms set forth below and must ensure the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand.  The Note must include the following language:

*"When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations.  Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability.  As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."*

If Lender uses SBA Note, Form 147, Lender must insert into Note, to be executed by Borrower, the following terms, without modification.  Lender must complete all blank terms on the Note at time of closing.

The interest rate on this Note will fluctuate.  The initial interest rate is 8.00% per year.  This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.50%.  The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay a total of 6 payments of interest only on the disbursed principal balance beginning one month from the month this Note is dated and every month thereafter; payments must be made on the _____ calendar day in the months they are due.

Borrower must pay principal and interest payments of $14,559.31 every month, beginning seven months from the month this Note is dated; payments must be made on the _____ calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted monthly (the "change period") beginning _____ (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs.  Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.50% above the Prime Rate.  Lender will adjust the interest rate on the first calendar day of each change period.  The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

---

SBA Loan Number: ███████                                                 Page 3
SBA Loan Name:  Smokecraft Modern Barbecue                    (7a Wizard 2018)

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a.   Give Lender written notice;

b.   Pay all accrued interest; and

c.   If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years and 6 months from date of Note.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

3.   Lender must include valid confession of judgment clauses in the Note for borrower(s) resident in Virginia.

G.   **USE OF PROCEEDS**

1.   $589,152.00 to make leasehold improvements to the building located at 3003 Washington Blvd. Suite 101 Arlington VA 22201. Construction financing guaranteed by SBA.

2.   $140,048.00 to purchase equipment.

3.   $38,500.00 to purchase inventory.

4.   $215,352.00 for working capital.

5.   $101,948.00 for soft cost contingencies and closing cost.

6.   $115,000.00 for Furniture and Fixtures.

All amounts listed above are approximate.  Lender may not disburse Loan proceeds solely to pay the guaranty fee.  Lender may disburse to Borrower, as working capital only, funds not spent for the listed purposes as long as those funds do not exceed 20% of the specific purpose authorized or $50,000.00, whichever is less.  An Eligible Passive Company may not receive working capital funds or funds to be used for the purchase of other assets, including intangible assets, for the Operating Company's use.

The loan must be made for a sound business purpose and must benefit the small business, and one 7(a) loan may not be split into two 7(a) loans merely to benefit the Lender. 13 CFR 120.120 and 120.130(f).

Lender must document that Borrower used the loan proceeds for the purposes stated in this Authorization.  Except under SBA Express, Export Express, and 7(a) Small Loans, Lender and Borrower must complete and sign SBA Form 1050 at the time of first disbursement.  Lender must document the first and all subsequent disbursements by attaching required documentation to the original SBA Form 1050 and must maintain the documentation in the Loan file, following the procedures described in SOP 50 10.

H.  **COLLATERAL CONDITIONS**

Lender must obtain a lien on 100% of the interests in the following collateral and properly perfect all lien positions.

The following language must appear in Lender's Guarantee when Lender uses its own Guarantee.

*"When SBA is the holder, the Note and this Guarantee will be interpreted and enforced under federal law, including SBA regulations.  Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability.  As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt federal law."*

1. **First Perfected Security Interest, subject to no other liens,** in the following personal property (including any proceeds and products), whether now owned or later acquired, wherever located:
   Equipment; Fixtures; Inventory; Accounts; Instruments; Chattel Paper; General Intangibles;

   a. Lender must obtain a written agreement from all Lessors (including sublessors) agreeing to: (1) Subordinate to Lender Lessor's interest, if any, in this property; (2) Provide Lender written notice of default and reasonable opportunity to cure the default; and (3) Allow Lender the right to take possession and dispose of or remove the collateral.

   b. Lender must obtain a list of all equipment and fixtures that are collateral for the Loan.  For items with a unit value of $5,000 or more, the list must include a description and serial number, if applicable.

   c. Lender must obtain an appropriate Uniform Commercial Code lien search evidencing all required lien positions. If UCC search is not available, another type of lien search may be substituted.

2.  **Collateral assignment of Lessee's Interest in the Lease** between KBSlll 3003 Washington, LLC, Lessor, and Smokecraft Clarendon LLC, Lessee, for the premises located at 3003 Washinton Blvd, Suite 101 Arlington VA 22201, including right of reassignment, Lessor's consent to the assignment and agreement to subordinate its interest in any property which is collateral for the Loan.  Remaining term of lease, including options to renew exercisable solely by the Borrower, must cover term of Loan.  Lease must require Lessor to provide Lender/SBA 60-day written notice of intent to terminate the lease for Borrower's default and an opportunity to cure.

3.  **Guarantee on SBA Form 148** or equivalent lender's form, by Andrew Darneille, resident in Maryland.

The following language must appear in all security instruments including Mortgages, Deeds of Trust, and Security Agreements:

*"The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:*

a)  *When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.*

b)  *Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax, or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.*

c)  *Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument."*

**Maryland Mandatory Provision**—Lender must include valid confession of judgment clauses in guarantees signed by Maryland residents.

I.  **ADDITIONAL CONDITIONS**

1.  **Insurance Requirements**

Prior to disbursement, Lender must require Borrower to obtain the following insurance coverage and maintain this coverage for the life of Loan:

a.  **Flood Insurance.**  Based on the Standard Flood Hazard Determination (FEMA Form 086-0-32):

(1)  If any portion of a building that is collateral for the Loan is located in a special flood hazard area, Lender must require Borrower to obtain flood insurance for the building under the NFIP.

(2)  If any equipment, fixtures, or inventory that is collateral for the loan ("Personal Property Collateral") is in a building any portion of which is located in a special flood

hazard area and that building is collateral for the Loan, Lender must require Borrower to also obtain flood insurance for the Personal Property Collateral under the NFIP.

(3)    If any Personal Property Collateral is in a building any portion of which is located in a special flood hazard area and that building is not collateral for the Loan, Lender must require Borrower to obtain available flood insurance for the Personal Property Collateral.  Lender may waive this requirement when the building is not collateral for the Loan if it uses prudent lending standards and includes in the Loan file a written justification that fully explains why flood insurance is not economically feasible or, if flood insurance is not available, the steps taken to determine that it is not available.

Insurance coverage must be at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001 et seq.), whichever is less.  ("Maximum limit of coverage available" is the lesser of the maximum limit available under the NFIP for the type of structure or the insurable value of the structure.)  Insurance coverage must contain a MORTGAGEE CLAUSE/LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of Lender.  This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender and SBA.  (Borrower will be ineligible for any future SBA disaster assistance or business loan assistance if Borrower does not maintain any required flood insurance for the entire term of the Loan.)

b.    **Personal Property Hazard Insurance** coverage (including required additional coverage, such as wind, hail, earthquake, etc., if the business is located in a state that requires additional coverage) on all equipment, fixtures or inventory that is collateral for the Loan, in the amount of full replacement costs.  If full replacement cost insurance is not available, coverage must be for maximum insurable value.  Insurance coverage must contain a LENDER'S LOSS PAYABLE CLAUSE in favor of Lender.  This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender.  The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

c.    **Life Insurance**, satisfactory to Lender:

(1)    on the life of Andrew Darneille in the amount of $1,200,000.00.

Lender must obtain a collateral assignment of each policy with Lender as assignee and Lender must also obtain acknowledgement of the assignment by the Home Office of the Insurer.  Lender must ensure that Borrower pays the premium on the policy.

2.    **Borrower, Guarantor and Operating Company Documents**

a.    Prior to closing, Lender must obtain from Borrower, Guarantor and Operating Company a current copy of each of the following as appropriate:

(1)    **Corporate Documents**—Articles or Certificate of Incorporation (with amendments), any By-laws, Certificate of Good Standing (or equivalent), Corporate Borrowing Resolution, and, if a foreign corporation, current authority to do business within this state.

(2)    **Limited Liability Company (LLC) Documents**—Articles of Organization (with amendments), Fact Statement or Certificate of Existence, Operating Agreement, Borrowing Resolution, and evidence of registration with the appropriate authority.

(3)    **General Partnership Documents**—Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable.

(4) **Limited Partnership Documents**—Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable, Certificate of Limited Partnership, and evidence of registration with the appropriate authority.

(5) **Limited Liability Partnership (LLP) Documents**—Partnership Agreement, Certificate as to Partners, Certificate of Partnership or Good Standing (or equivalent) as applicable, and evidence of registration with the appropriate authority.

(6) **Trustee Certification**—A Certificate from the trustee warranting that:
 (a) The trust will not be revoked or substantially amended for the term of the Loan without the consent of Lender/SBA;
 (b) The trustee has authority to act;
 (c) The trust has the authority to borrow funds, guarantee loans, and pledge trust assets;
 (d) If the trust is an Eligible Passive Company, the trustee has authority to lease the property to the Operating Company;
 (e) There is nothing in the trust agreement that would prevent Lender from realizing on any security interest in trust assets;
 (f) The trust agreement has specific language confirming the above; and
 (g) The trustee has provided and will continue to provide Lender/SBA with a true and complete list of all trustors and donors.

(7) **Trade Name—**Documentation that Borrower has complied with state requirements for registration of Borrower's or Operating Company's trade name (or fictitious name), if one is used.

b. Prior to closing, Lender must obtain from Borrower and Operating Company:

(1) **Ownership—**Evidence that ownership and management have not changed without Lender's approval since the application was submitted.

3. **Operating Information**

Prior to any disbursement of Loan proceeds, Lender must obtain:

a. **Verification of Financial Information**—Lender must submit IRS Form 4506-T to the Internal Revenue Service to obtain federal income tax information on Borrower, or the Operating Company if the Borrower is an EPC, for the last 3 years (unless Borrower or Operating Company is a start-up business). If the business has been operating for less than 3 years, Lender must obtain the information for all years in operation. This requirement does not include tax information for the most recent fiscal year if the fiscal year-end is within 6 months of the date SBA received the application. If the applicant has filed an extension for the most recent fiscal year, Lender must obtain a copy of the extension along with evidence of payment of estimated taxes. Lender must compare the tax data received from the IRS with the financial data or tax returns submitted with the Loan application, and relied upon in approving the Loan. Borrower must resolve any significant differences to the satisfaction of Lender and SBA. Failure to resolve differences may result in cancellation of the Loan.

If the Loan involves a change of ownership, Lender must verify financial information provided by the seller of the business in the same manner as above.

If the IRS responds and the transcript reflects "Record not Found" for any tax year, Lender must follow the procedures detailed in SOP 50 10 to determine what steps must be taken to satisfy the SBA tax verification requirement.

If Lender is processing a loan under its delegated authority and does not receive a response from the IRS or copy of the tax transcript within 10 business days of submitting the IRS Form 4506-T, then Lender may close and disburse the loan provided that Lender sends a second request following precisely the procedures detailed in SOP 50 10 and Lender performs the verification and resolves any significant differences discovered, even if the Loan is fully disbursed.

b. **Authority to Conduct Business**—Evidence that Borrower and Operating Company have an Employer Identification Number and all insurance, licenses, permits and other approvals necessary to lawfully operate the business, including, but not limited to, the ability to operate at the business location.

c. **Flood Hazard Determination**—A completed Standard Flood Hazard Determination (FEMA Form 086-0-32).

d. **Lease**—Current lease(s) on all business premises where collateral is located with term, including options, at least as long as the term of the Loan.

4. **Injection**

Lender must obtain evidence that prior to disbursement:

a. **Cash Injection—**At least $220,000.00 cash has been injected into the project. This cash is for working capital, SBA fee, soft cost, contingencies, closing cost. The source of the cash is personal resources.

5. **Construction Provisions**

a. **Building Standards—**In the construction of a new building or an addition to an existing building, the construction must conform with the "National Earthquake Hazards Reduction Program Recommended Provisions for the Development of Seismic Regulations for New Buildings" (NEHRP), or a building code that SBA has identified as having substantially equivalent provisions. Lender must obtain from Borrower evidence of compliance with these requirements. Examples of evidence include a certificate issued by a licensed building architect, construction engineer or similar professional, or a letter from a state or local government agency stating that an occupancy permit is required and that the local building codes upon which the permit is based include the Seismic standards.

b. Lender may charge Borrower a one-time fee not to exceed 2% of the portion of the Loan designated for construction. The actual fee must not exceed the cost of the extra service.

c. Prior to closing, if an "as completed" appraisal was obtained prior to construction and the SBA guaranteed loan was not used to cover the construction period, Lender must obtain a statement from the appraiser, general contractor, project architect, or construction management firm after construction is completed that the building was built with only minor deviations (if any) from the plans and specifications upon which the original estimate of value was based. If the Lender cannot obtain such a statement, then the lender may not close the loan without SBA's prior written permission.

If the SBA guaranteed loan was used to cover the construction period, after construction is completed, Lender must notify the appropriate SBA CLSC of any deviation(s) and work with the SBA CLSC to determine an appropriate course of action, including securing additional collateral. Lender's notification to SBA must comply with SOP 50 10.

---

If the appraiser is unable to issue a statement that the building was built with only minor deviations (if any) from the plans and specifications upon which the original estimate of value was based, but is able to provide a new appraisal demonstrating that the market value meets or exceeds the original estimate of value, then no additional action by Lender is necessary.

d.   Prior to the commencement of any construction, Lender must obtain from Borrower:

(1)   **Bonds**—Evidence that the licensed contractor has furnished a l00% performance bond and labor and materials payment bond. Only a corporate surety approved by the Treasury Department using an American Institute of Architect's form or comparable coverage may issue these bonds.  Only Borrower may be named as obligee on the bonds.

(2)   **Insurance**—Evidence that licensed contractor carries appropriate Builder's Risk and Worker's Compensation Insurance.

(3)   **Injection**—Evidence that Borrower has injected the required funds into the project prior to disbursement of the Loan, if Borrower is injecting funds into the construction project.

(4)   **Plans and Specifications**—A copy of the final plans and specifications for Lender review.

(5)   **Construction Contract**—One (1) copy of a Construction Contract with an acceptable licensed contractor at a specified price not to exceed $589,152.00.  The contract must include an agreement that Borrower will not order or permit any material changes in the approved plans and specifications without prior written consent of Lender and the surety providing the required bonds.

e.   **Lender must**:

(1)   **Cost Overruns**—Obtain evidence of Borrower's ability to pay cost overruns or additional construction financing expenses prior to approving any contract modification. Lender and SBA are not obligated to increase the loan to cover cost overruns.

(2)   **Inspection**—Make interim and final inspections to determine that construction conforms to the plans and specifications.

(3)   **Codes and Permits**—Obtain evidence that the building, when completed, will comply with all state and local building and zoning codes, and applicable licensing and permit requirements.

(4)   **Compliance Form**—Obtain SBA Form 601, Applicant's Agreement of Compliance.

(5)   **Lien Waivers**—Obtain lien waivers or releases from all materialmen, contractors, and subcontractors involved in the construction.

(6)   **Construction Safeguards**—Take all normal other construction loan safeguards appropriate for the Loan.

6.   **Certifications and Agreements**

a.   Prior to disbursement, Lender must require Borrower and Operating Company to certify that:

(1)   **Receipt of Authorization**—Borrower and Operating Company have received a copy of this Authorization from Lender, and acknowledge that:

(a)   The Authorization is <u>not</u> a commitment by Lender to make a loan to Borrower;

(b)   The Authorization is between Lender and SBA and creates no third party rights or benefits to Borrower;

    (c)   The Note will require Borrower to give Lender prior notice of intent to prepay.

    (d)   If Borrower defaults on Loan, SBA may be required to pay Lender under the SBA guaranty.  SBA may then seek recovery of these funds from Borrower. Under SBA regulations, 13 CFR Part 101, Borrower may not claim or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Borrower's obligation to repay to SBA any funds advanced by Lender to Borrower.

    (e)   Payments by SBA to Lender under SBA's guarantee will not apply to the Loan account of Borrower, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.

    (f)   If the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, the names of the small business and the guarantors of the SBA-guaranteed loan will be referred for listing in the Credit Alert Verification Reporting System (CAIVRS) database, which may affect their eligibility for further financial assistance.

(2)   There has been no adverse change in Borrower's (and Operating Company's) financial condition, organization, operations, or fixed assets since the date the Loan application was signed.

(3)   **Child Support**—No principal who owns at least 50% of the ownership or voting interest of the company is delinquent more than 60 days under the terms of any (a) administrative order, (b) court order, or (c) repayment agreement requiring payment of child support.

(4)   **Current Taxes**—Borrower and Operating Company are current (or will be current with any loan proceeds specified for eligible tax payments) on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes.

(5)   **Environmental**—For any real estate pledged as collateral for the Loan or where the Borrower or Operating Company (if applicable) is conducting business operations (collectively "the Property"):

    (a)   At the time Borrower and Operating Company submitted the Loan application, Borrower was in compliance with all local, state, and federal environmental laws and regulations pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum product, or any other pollutant regulated by state or federal law as hazardous to the environment (Contaminant), and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

    (b)   Borrower and Operating Company will continue to comply with these laws and regulations;

    (c)   Borrower and Operating Company, and all of its principals,  have no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property, including groundwater under such Property, other than what was disclosed in connection with the Environmental Investigation of the Property;

    (d)   Until full repayment of the Loan, Borrower and Operating Company will promptly notify Lender and SBA if it knows or suspects that there has been, or may have been, a release of a Contaminant in, at, or under the Property, including groundwater, or if Borrower or Operating Company or such Property are subject to any investigation or enforcement action by any federal, state, or local environmental agency (Agency) pertaining to any Contaminant on, at, or under such Property, including groundwater;

(e) As to any Property owned by Borrower or Operating Company, Borrower and Operating Company indemnifies, and agrees to defend and hold harmless, Lender and SBA, and any assigns or successors in interest which take title to the Property, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at, or under the Property, including groundwater, regardless of whether such Contaminant resulted from Borrower's or Operating Company's operations.  (Lender or SBA may require Borrower and Operating Company to execute a separate indemnification agreement).

b. Prior to disbursement, Lender must require Borrower and Operating Company to certify that they will:

(1) **Reimbursable Expenses**—Reimburse Lender for expenses incurred in the making and administration of the Loan.

(2) **Books, Records, and Reports**—
   (a) Keep proper books of account in a manner satisfactory to Lender;
   (b) Furnish year-end statements to Lender within 120 days of fiscal year end;
   (c) Furnish additional financial statements or reports whenever Lender requests them;
   (d) Allow Lender or SBA, at Borrower's or Operating Company's expense, to:
      [1] Inspect and audit books, records and papers relating to Borrower's and Operating Company's financial or business condition;
      [2] Inspect and appraise any of Borrower's and Operating Company's assets; and
      [3] Allow all government authorities to furnish reports of examinations, or any records pertaining to Borrower and Operating Company, upon request by Lender or SBA.

(3) **Equal Opportunity**—Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public.

(4) **American-made Products**—To the extent practicable, purchase only American-made equipment and products with the proceeds of the Loan.

(5) **Taxes**—Pay all federal, state, and local taxes, including income, payroll, real estate and sales taxes of the business when they come due.

(6) **Leasing** – During the life of the loan, the real estate pledged as Collateral for the Loan or where the Borrower or Operating Company conducts its business operations will not be leased to or occupied by any business that Borrower or Operating Company knows is engaged in any activity that is illegal under federal, state or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under federal, state, or local law.

c.  Lender must require Borrower and Operating Company to certify that they will not, without Lender's prior written consent:

(1)  **Distributions**—Make any distribution of company assets that will adversely affect the financial condition of Borrower and/or Operating Company.

(2)  **Ownership Changes—**Change the ownership structure or interests in the business during the term of the Loan.

(3)  **Transfer of Assets—**Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Borrower's property or assets, except in the ordinary course of business.


ADMINISTRATOR
SMALL BUSINESS ADMINISTRATION


_Hensley_ for

March 15, 2019

By: Donna J. Williams, Senior Loan Specialist                    Date


In consideration of SBA's guarantee of the Loan to be made by Lender to Borrower, Lender accepts the above conditions.

CAPITAL BANK, NATIONAL ASSOCIATION


By: Ramona Rash                                                  Date

| | |
|---|---|
| From: | Chris Johnson |
| To: | 7a Loan Mod |
| Cc: | Chris Mullings; Ramona Rash; Bryan Pelino |
| Subject: | Smokecraft Clarendon, LLC - SBA Loan ▮▮▮▮▮ |
| Date: | Thursday, November 7, 2019 7:39:26 AM |
| Attachments: | image001.png |

▮▮▮▮ :
Smokecraft Clarendon, LLC dba
Smokecraft Modern Barbecue

Please see the below stamp action/modification request for the above-referenced borrower and SBA loan. To date, this loan has not funded ANY loan proceeds. Please let me know if you have any questions or need any further clarification.

**How It Is:**

G. Use of Proceeds:

1.  $589,152.00 to make leasehold improvements to the building located at 3003 Washington Blvd, Ste 101, Arlington, VA 22201. Construction financing guaranteed by SBA.
2.  $140,048.00 to purchase equipment.
3.  $38,500.00 to purchase inventory.
4.  $215,352.00 for working capital.
5.  $101,948.00 for soft cost, contingencies, and closing costs.
6.  $115,000.00 for Furniture and Fixtures.

Total loan:      $1,200,000

**How We'd Like It:**

G. Use of Proceeds:

1.  $684,201.00 to make leasehold improvements to the building located at 3003 Washington Blvd, Ste 101, Arlington, VA 22201. Construction financing guaranteed by SBA.
2.  $175,693.00 to purchase equipment.
3.  $38,500.00 to purchase inventory.
4.  $109,777.00 for working capital.
5.  $76,829.00 for soft cost, contingencies, and closing costs.
6.  $115,000.00 for Furniture and Fixtures.

Total loan:      $1,200,000

**Why:**

During the cost and plan review and borrower's lease negotiations with landlord, the renovation costs increased, as well as, equipment. The borrower will be injecting the difference in cash to keep the total loan amount the same as original submission.

HOW IT IS:

I.        4. Injection:
        Lender must obtain evidence prior to disbursement:
        a.    Cash Injection – At least $220,000 cash has been injected into the project. This cash
              is for working capital, SBA fee, soft cost, contingencies, closing cost. The source of
              the cash is personal resources.


**How We'd Like It:**

I.        4. Injection:
        Lender must obtain evidence prior to disbursement:
        a.    Cash Injection – At least $405,000 cash has been injected into the project. This cash
              is for working capital, SBA fee, soft cost, contingencies, closing cost. The source of
              the cash is personal resources.

-
**Why:**

Total project cost has increased and borrower has added two new owners (non-guarantors –
parents) with minority ownership (less than 8% each) to meet the difference.

Thank you,
Chris

**Christopher Johnson**
SVP, SBA Team Lead | Program Manager
Capital Bank, N.A.
10700 Parkridge Blvd, #108
Reston, VA 20191
Office: 301.468.8848  x2038
Direct: 540.227.8029



**Need to send an attachment over 20MB?** Click here **to email it to me**.

*This message is intended only for the use of the individual or entity to which it is addressed and may
contain information that is PRIVILEGED/CONFIDENTIAL and exempt from disclosure under applicable law. If you
are not the intended recipient, or are not the individual responsible for delivering the message to the intended
recipient, please reply and notify then delete this e-mail from your computer. Any dissemination, distribution or
copying of this communication other than to the intended recipient is strictly prohibited.*

All e-mail sent to or from this address will be received by the Capital Bank corporate e-mail system and is subject
to archiving and review by someone other than the recipient.  For your information security, to send or reply to any
**PRIVILEGED or CONFIDENTIAL** information, please use secure, encrypted e-mail .

Capital Bank is committed to sustainability. Please do not print this e-mail unless necessary.

Send encrypted e-mail

Capital Bank, Member FDIC* | Equal Housing Lender
*Non-depository investment products (NDIP) including repurchase agreements and certain other investment products, are NOT BANK DEPOSITS, ARE NOT FDIC INSURED and MAY LOSE VALUE.

| | |
|---|---|
| **From:** | Chris Johnson |
| **To:** | 7a Loan Mod |
| **Subject:** | FW: [External] - FW: Smokecraft Clarendon, LLC - SBA Loan ▮▮▮▮▮ |
| **Date:** | Tuesday, November 26, 2019 9:11:33 AM |
| **Attachments:** | image003.png |
| | 2019 11 08 SBA Authorization▮▮▮▮▮▮▮df |

CAUTION - The sender of this message is external to the SBA network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@sba.gov.

Good morning,

****NOTE****  Please see amendment to borrowing structure below.  Please let me know if you need anything else to wrap up this modification request.

Changing Smokecraft Holdings from guarantor to co-borrower.

Regards,
Chris

---

**From:** Chris Johnson <CJohnson@capitalbankmd.com>
**Sent:** Tuesday, November 19, 2019 5:46 PM
**To:** 7a Loan Mod <7aloanmod@sba.gov>
**Cc:** Chris Mullings <cmullings@capitalbankmd.com>; Ramona Rash <rrash@capitalbankmd.com>; Bryan Pelino <bpelino@r-plaw.com>
**Subject:** Smokecraft Clarendon, LLC - SBA Loan #▮▮▮▮▮

CAUTION - The sender of this message is external to the SBA network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@sba.gov.

Please see the below stamp action/modification request for the above-referenced borrower and SBA loan.  To date, this loan has not funded ANY loan proceeds.  Please let me know if you have any questions or need any further clarification.
-
**How It Is:**
Borrower:
1.  Smokecraft Clarendon, LLC dba Smokecraft Modern Barbecue

**How We'd Like It:**
Borrower:
1.  Smokecraft Clarendon, LLC dba Smokecraft Modern Barbecue
Co-Borrower:
1.  Smokecraft Holdings, LLC

**Why**:

Upon Lender's review of final Operating Agreement, it was discovered that Smokecraft Holdings, LLC is the majority owner (as parent company – 82%) of Smokecraft Clarendon, LLC. Smokecraft Holdings, LLC is wholly-owned by personal guarantor Andrew Darneille. Smokecraft Holdings (EPC) has NO income/revenue stream and was established for the sole purpose of holding equipment used for BBQ/cooking competitions and the equipment (grill, smoker, trailer) is reflected on the Consolidated Balance Sheet of Smokecraft Holdings/Smokecraft Clarendon. Smokecraft Clarendon will use these assets for their own operations. The assets being purchased with the loan proceeds (to include furniture, fixtures, equipment, and leasehold improvements) will be reflected on the Balance Sheet of Smokecraft Clarendon, LLC (OC). As well, the lease entered into for the subject property to be occupied was negotiated to Smokecraft Clarendon, LLC.

Year-End Balance Sheets for Smokecraft Holdings has been supplied and attached to this email, as well as, Smokecraft Clarendon proforma Balance Sheet. There are no P&L statements as the business had no revenue – entity was formed and will maintain solely for tax purposes. As well, updated Form 1919's have been provided and attached with this email to reflect all true and accurate ownership.

- ∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎

**How It Is**:

G. Use of Proceeds:

1.  $589,152.00 to make leasehold improvements to the building located at 3003 Washington Blvd, Ste 101, Arlington, VA 22201. Construction financing guaranteed by SBA.
2.  $140,048.00 to purchase equipment.
3.  $38,500.00 to purchase inventory.
4.  $215,352.00 for working capital.
5.  $101,948.00 for soft cost, contingencies, and closing costs.
6.  $115,000.00 for Furniture and Fixtures.

Total loan:    $1,200,000

**How We'd Like It**:

G. Use of Proceeds:

1.  $684,201.00 to make leasehold improvements to the building located at 3003 Washington Blvd, Ste 101, Arlington, VA 22201. Construction financing guaranteed by SBA.
2.  $175,693.00 to purchase equipment.
3.  $38,500.00 to purchase inventory.
4.  $109,777.00 for working capital.
5.  $76,829.00 for soft cost, contingencies, and closing costs.
6.  $115,000.00 for Furniture and Fixtures.

Total loan:    $1,200,000

**Why**:

During the cost and plan review and borrower's lease negotiations with landlord, the renovation costs increased, as well as, equipment. The borrower will be injecting the difference in cash to keep the total loan amount the same as original submission.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**How It Is:**
  I.        4. Injection:
            Lender must obtain evidence prior to disbursement:
            a.   Cash Injection – At least $220,000 cash has been injected into the project. This cash
                 is for working capital, SBA fee, soft cost, contingencies, closing cost. The source of
                 the cash is personal resources.

**How We'd Like It:**
  I.        4. Injection:
            Lender must obtain evidence prior to disbursement:
            a.   Cash Injection – At least $405,000 cash has been injected into the project. This cash
                 is for working capital, SBA fee, soft cost, contingencies, closing cost. The source of
                 the cash is personal resources.
  -
**Why:**
Total project cost has increased and borrower has added two new owners (non-guarantors - parents) with minority ownership (less than 10% each and with no day-to-day involvement or decision-making) to meet the difference.

Thank you,
Chris

**Christopher Johnson**
SVP, SBA Team Lead | Program Manager
Capital Bank, N.A.
10700 Parkridge Blvd, #108
Reston, VA 20191
Office:  301.468.8848  x2038
Direct:  540.227.8029



**Need to send an attachment over 20MB? Click here to email it to me**.

*This message is intended only for the use of the individual or entity to which it is addressed* and may contain information that is PRIVILEGED/CONFIDENTIAL and exempt from disclosure under applicable law. If you are not the intended recipient, or are not the individual responsible for delivering the message to the intended

recipient, please reply and notify then delete this e-mail from your computer. Any dissemination, distribution or copying of this communication other than to the intended recipient is strictly prohibited.

All e-mail sent to or from this address will be received by the Capital Bank corporate e-mail system and is subject to archiving and review by someone other than the recipient.  For your information security, to send or reply to any **PRIVILEGED or CONFIDENTIAL** information, please use secure, <u>encrypted e-mail</u> .

Capital Bank is committed to sustainability. Please do not print this e-mail unless necessary.

<u>Send encrypted e-mail</u>

Capital Bank, Member FDIC* | Equal Housing Lender
*Non-depository investment products (NDIP) including repurchase agreements and certain other investment products, are NOT BANK DEPOSITS, ARE NOT FDIC INSURED and MAY LOSE VALUE.

---

***This message is intended only for the use of the individual or entity to which it is addressed*** and may contain information that is PRIVILEGED/CONFIDENTIAL and exempt from disclosure under applicable law. If you are not the intended recipient, or are not the individual responsible for delivering the message to the intended recipient, please reply and notify then delete this e-mail from your computer. Any dissemination, distribution or copying of this communication other than to the intended recipient is strictly prohibited.

All e-mail sent to or from this address will be received by the Capital Bank corporate e-mail system and is subject to archiving and review by someone other than the recipient.  For your information security, to send or reply to any **PRIVILEGED or CONFIDENTIAL** information, please use secure, <u>encrypted e-mail</u> .

Capital Bank is committed to sustainability. Please do not print this e-mail unless necessary.

<u>Send encrypted e-mail</u>

Capital Bank, Member FDIC* | Equal Housing Lender
*Non-depository investment products (NDIP) including repurchase agreements and certain other investment products, are NOT BANK DEPOSITS, ARE NOT FDIC INSURED and MAY LOSE VALUE.



# CAPITAL BANK

**2275 Research Boulevard, Suite 600**
**Rockville, MD 20850**
**301.468.8848**
**www.capitalbankmd.com**

## Amendment to SBA Loan Authorization # ▮▮▮▮▮▮

December 2, 2019

Pursuant to SBA Servicing and Liquidation Actions 7(a) Lender Matrix – version 15, we amend the SBA Loan Authorization originally authorized on 03/15/2019 to Smokecraft Clarendon, LLC dba Smokecraft Modern Barbecue and Smokecraft Holdings, LLC to add the following:

**1.  Page 3, Section F. Note Terms: # 2 Repayment Terms currently reads:**

If Lender uses its own Note, Lender must comply with the repayment terms set forth below and must ensure the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand.

The Note must include the following language:
*"When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."*

If Lender uses SBA Note, Form 147, Lender must insert into Note, to be executed by Borrower, the following terms, without modification. Lender must complete all blank terms on the Note at time of closing.

The interest rate on this Note will fluctuate. The initial interest rate is 8.00% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.50%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay a total of 6 payments of interest only on the disbursed principal balance beginning one month from the month this Note is dated and every month thereafter; payments must be made on the _____ calendar day in the months they are due.

Borrower must pay principal and interest payments of $14,559.31 every month, beginning seven months from the month this Note is dated; payments must be made on the _____ calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted monthly (the "change period") beginning _____ (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.50% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.
Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**
Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years and 6 months from date of Note.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.


**Page 3, Section F. Note Terms: # 2 Repayment Terms is updated to read:**

If Lender uses its own Note, Lender must comply with the repayment terms set forth below and must ensure the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand.

The Note must include the following language:

*"When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."*

If Lender uses SBA Note, Form 147, Lender must insert into Note, to be executed by Borrower, the following terms, without modification.  Lender must complete all blank terms on the Note at time of closing.

The interest rate is 7.50% per year.  The interest rate may only be changed in accordance with SOP 50 10.

Borrower must pay a total of 6 payments of interest only on the disbursed principal balance beginning one month from the month this Note is dated and every month thereafter; payments must be made on the 1st calendar day in the months they are due.

Borrower must pay principal and interest payments of $14,313.46 every month, beginning seven months from the month this Note is dated; payments must be made on the 1st calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

**Loan Prepayment:**
Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.
If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years from date of Note.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

**REASON:**  Prior to closing, the bank approved a new interest rate structure changing the interest rate from variable to fixed for the life of the loan.  The interest rate will be fixed at closing at WSJP + 2.5% for the life of the loan.

# U.S. Small Business Administration

## Loan ██████████, Guaranty Loan

## LOAN PROGRAM

| PRIMARY LOAN PROGRAM | LOAN PROCESSING METHOD | SPECIAL PURPOSE(S) |
|---|---|---|
| 7a Guaranty | 7a General | No Special Purpose |

## A. LENDER INFORMATION

| | | | |
|---|---|---|---|
| **Lender Name** | Capital Bank, National Association | | |
| **Lender Address** | 2275 Research Blvd Ste 600 | **Street Address 2:** | (not entered) |
| **City, State Zip** | ROCKVILLE, MD 20850 - 6238 | **Eligibility check list complete & filed in Loan Folder?** | Y |
| **Partner I.D.** | 27113 | **Location I.D.** | 124055 |
| **Lender's Application Number** | (not entered) | **Lender's Loan Number** | (not entered) |
| **Lender Initial Disbursement Date** | | **Lender Final Disbursement Date** | |
| **Servicing Location I.D.** | 124055 | **Servicing Location Name** | Capital Bank, National Association |
| **SBA Servicing Office** | (0626)Little Rock Commercial Loan Servicing Center | **Cohort Code** | GENERAL BUSINESS |
| **Legislative Indicator** | | **Underwriting Authority** | SBA |
| **Did This Loan Application Involve an "Agent"?** | | (not entered) | |

## B. LOAN SUMMARY

| | |
|---|---|
| **Loan Name:** | Smokecraft Clarendon, LLC |

| Primary Borrower Name: | Smokecraft Clarendon, LLC |
|---|---|
| Legal Entity: | Limited Liability Company(LLC) |
| Loan Status: | In Liquidation Disbursed |
| Loan Status Date: | 05/10/2024 |

## Loan Mailing Address

| Street1: | 3003 Washington Blvd |
|---|---|
| Street2: | Suite 101 |
| City, State Zip: | Arlington, VA 22201 - 2194 |
| Invalid Mailing Address? | No |
| Do you want correspondence in English or Spanish? | English |

| Loan Collateralized? | Approval Amount | Original Approval Amount | Outstanding Balance Amount | Total Undisbursed Amount |
|---|---|---|---|---|
| Yes | $1,200,000.00 | $1,200,000.00 | $911,880.19 | $0.00 |

| Loan Number | Entry Start Date | SBA Received Date | Amount Requested | Current SBA Guaranty Fee |
|---|---|---|---|---|
| ▓▓▓▓▓▓ | 02/26/2019 | 02/26/2019 | 1200000.00 | $31,500.00 |

| Original Loan Term | Original Guaranty Fee | | Original Guaranty % | Loan Last Modified Date |
|---|---|---|---|---|
| 126 | $31,500.00 | | 75.00 | 03/15/2019 |

| Current SBA Guaranty % | Current Loan Term | Payment Amount |
|---|---|---|
| 75.00 % | 126 | $14,313.46 |

| Maturity Date | Maturity Starts Indicator |
|---|---|
| 07/31/2030 | Note Date |

| Note Date | Note Interest Rate | Note Monthly Payment Amount |
|---|---|---|
| 01/31/2020 | | |

## Calendar Basis Code

| Actual/365 |
|---|

## Interest Structure

| Fixed |
|---|

| Phase 1 size | Interest Type | Interest Applies To | Adjusment Period | Effective Date |
|---|---|---|---|---|
| 126 months | Fixed | Full | | |

| Base Rate Source | Base Rate % | Borrower Interest Rate % | Spread Over Prime % |
|---|---|---|---|
| Wall Street Journal Prime Rate | 5.50000 % | 7.50000 % | 2.00000 % |

| Payment Fully Amortizing? | Months Interest Only | Structured with Eligible Passive Company? | Life Insurance Required? | Loan Collateralized? |
|---|---|---|---|---|

| Yes | 6 | No | Yes | Yes |
|-----|---|-----|-----|-----|
| Reconsideration? | Injection Required? | SBA Disaster Control Number | SBA Approved Date | SBA Funded Date |
| No | Yes | | 03/15/2019 | 03/15/2019 |
| Outstanding Balance ASOF Date | | SBA Origination Office | SBA Processing Office | SBA Servicing Office |
| 05/10/2024 | | 0353 | 0626 | 0626 |
| **Payment Schedule** | | | | |
| Jan, Feb, Mar, Apr, May, Jun, Jul, Aug, Sep, Oct, Nov, Dec | | | | |

| **Debenture Pricing** | | | |
|---|---|---|---|
| CDC Processing Fee Paid Separate? | No | | |
| SBA Percentage of Project | | | |
| Net Debenture Amount | | | |
| a. SBA Guaranty Fee | | Third Party Loans | |
| b. Funding Fee | | Third Party Loan % | |
| c. CDC Processing Fee | | Borrower Contribution | |
| d. CDC Closing Costs and Fees | | Borrower Contribution % | 0 % |
| e. Fees And Closing Costs (Sum of (a) through (d)) | | Total Project Requirement $ | 0 |
| Balance to Borrower | | | |
| f. Underwriters' Fee withheld prior to CSA receipt of funds | | Total Project Requirement % | |
| g. Total e-f | 0 | | |

| | Type of Injection | Injection Amount | Term (Years) | Comment/Description |
|---|---|---|---|---|
| 1 | Non-cash Assets | | | |
| 2 | Cash-Borrower | $405,000.00 | 0 | w/c, gty fee, contingencies, soft/closing costs |
| 3 | Cash-Debt | | | |
| 4 | Subordinate Funding | | | |
| 5 | Cash-Gift | | | |
| 6 | Pari Passu Financing | | | |
| 7 | Standby Debt | | | |
| 8 | Other | | | |

## C. REPAYMENT

| Interest Only Payment | | | |
|---|---|---|---|
| Number of Interest Only Payments | Payments Begin Month Number | Paid Every | Payment Day of the Month |
| 6 | | Not Selected Yet | Other: Day |

| P & I Payments | | | | | |
|---|---|---|---|---|---|
| Repayment Option | P & I Payment Amount | Paid every | Payment Schedule | Payments Begin Month Number | Payment Day of the Month |
| | $14,313.46 | Monthly | Jan, Feb, Mar, Apr, May, Jun, Jul, Aug, Sep, Oct, Nov, Dec | | Other: Day |

| Other Loan Options | | | |
|---|---|---|---|
| Escrow Account for Real Estate Taxes and Insurance | Net Earnings Recapture Clause | State Interest Rate Reduction | Late Charge |
| No | No | No | No |

## D. DISBURSEMENT

| Date of First Disbursement? | Next 1502 Report Date | Total Amount Undisbursed | Guaranty Disbursement Indicator | Maturity Date |
|---|---|---|---|---|
| 02/29/2020 | 04/01/2024 | $0.00 | Y | 07/31/2030 |

## E. USE OF PROCEEDS

| No. | Description | Amount | Additional Proceeds Data | Comment |
|---|---|---|---|---|
| A01 | Purchase Land only | | Land (not Location entered) | |
| A02 | Purchase Land and Improvements | | Location (not entered) | |
| A03 | Purchase Improvements only | | Location (not entered) | |
| A04 | Construct a Building | | Location (not entered) | |
| A05 | Add an Addition to an Existing | | Location (not entered) | |

| | | | | |
|---|---|---|---|---|
| | Building | | | |
| A06 | Make Renovations to an Existing Building | | Location  (not entered) | |
| A07 | Pay Off Interim Construction Loan | | Lender  (not entered) | |
| A08 | Pay Off Lender's Interim Loan | | Lender's Interim Loan is used for  (not entered) | |
| A09 | Leasehold Improvements | $684,201.00 | Location   3003 Washington Blvd. Ste 101, Arlington, VA 22201-2194 | |
| A10 | Purchase Equipment | $175,693.00 | | |
| A11 | Purchase Furniture and Fixtures | $115,000.00 | | Furniture and Fixtures |
| A12 | Purchase Inventory | $38,500.00 | | |
| A13 | Pay Trade or Accounts Payable | | | |
| A14 | Pay Notes Payable - not Same Institution Debt | | Payee (not entered) | |
| A15 | Pay Notes Payable - Same Institution Debt | | Payee (not entered) | |
| A16 | Purchase Business - Asset | | Business Name  (not entered) Purchase Agreement Date  (not entered) Intangible Asset Value  (not entered) | |

| | | | | |
|---|---|---|---|---|
| | Purchase | | Intangible Asset Description (not entered) | |
| | | | Includes satisfactory non-compete agreement (not entered) | |
| A17 | Purchase Business - Stock Purchase | | Corporation Names (not entered) | |
| | | | Intangible Asset Value (not entered) | |
| | | | Intangible Asset Description (not entered) | |
| | | | Stockholder (not entered) | |
| | | | Includes satisfactory non-compete agreement (not entered) | |
| A18 | Refinance SBA Loan - Same Institution Debt | | Loan Number (not entered) | |
| A19 | Working Capital | $109,777.00 | | |
| A20 | SBA Guaranty Fee | | | |
| A21 | Other | $76,829.00 | | Pre-Opening Costs and Contingencies |
| A22 | Refinance SBA Loan- not Same Institution Debt | | | |
| | Total | $1,200,000.00 | | |

## F. COLLATERAL

| Collateral Description | Owner of Record | Limited Secured Guaranty provided by | |
|---|---|---|---|
| Inventory | Smokecraft Clarendon | | |
| Current Market Value | Collateral Status | Source | Appraisal Code |
| $38,500.00 | Full Value | Internal Valuation | Not Selected Yet |
| Ordered Date | As of Date | Collateral Type | |
| 02/01/2019 | 02/01/2019 | Inventory | |

## Collateral Subtype:

| Personal Property: | |
|---|---|
| Acquired with loan or project proceeds, including all replacements and substitutions | Yes |
| Landlord's Waiver required to protect this interest | No |
| Shared Pari Passu | No |
| Shared Pari Passu, Non-SBA Loan | No |
| Pari Passu Lender Name | |
| Pari Passu Amount | $0.00 |
| The lien is limited to | $0.00 |

## Additional Conditions

| Insurance Requirements | |
|---|---|
| Flood Insurance | No |
| Real Estate Hazard Insurance | No |
| Personal Property Hazard Insurance | No |
| Full Marine Insurance | No |
| Environmental Requirements | |
| Environmental Investigation NOT yet approved by SBA and MUST be approved prior to disbursement. | No |

| Collateral Description | Owner of Record | Limited Secured Guaranty provided by | |
|---|---|---|---|
| Equipment | Unknown | | |
| **Current Market Value** | **Collateral Status** | **Source** | **Appraisal Code** |
| $140,000.00 | | Sales Invoice | Not Selected Yet |
| **Ordered Date** | **As of Date** | **Collateral Type** | |
| | 03/04/2019 | Machinery and Equipment | |

## Collateral Subtype:

| Personal Property: | |
|---|---|
| Landlord's Waiver required to protect this interest | No |
| Shared Pari Passu | No |
| Shared Pari Passu, Non-SBA Loan | No |
| Pari Passu Lender Name | |
| Pari Passu Amount | $0.00 |
| The lien is limited to | $0.00 |

## Additional Conditions

| Insurance Requirements | |
|---|---|
| Flood Insurance | No |

| Real Estate Hazard Insurance | No |
|---|---|
| Personal Property Hazard Insurance | No |
| Full Marine Insurance | No |

| Environmental Requirements | |
|---|---|
| Environmental Investigation NOT yet approved by SBA and MUST be approved prior to disbursement. | No |

| Collateral Description | Owner of Record | Limited Secured Guaranty provided by | |
|---|---|---|---|
| F&F | Unknown | | |

| Current Market Value | Collateral Status | Source | Appraisal Code |
|---|---|---|---|
| $115,000.00 | | Sales Invoice | Not Selected Yet |

| Ordered Date | As of Date | Collateral Type | |
|---|---|---|---|
| | 03/01/2019 | Furniture and Fixtures | |

## Collateral Subtype:

| Personal Property: | |
|---|---|
| Landlord's Waiver required to protect this interest | No |
| Shared Pari Passu | No |
| Shared Pari Passu, Non-SBA Loan | No |
| Pari Passu Lender Name | |
| Pari Passu Amount | $0.00 |
| The lien is limited to | $0.00 |

## Additional Conditions

| Insurance Requirements | |
|---|---|
| Flood Insurance | No |
| Real Estate Hazard Insurance | No |
| Personal Property Hazard Insurance | No |
| Full Marine Insurance | No |

| Environmental Requirements | |
|---|---|
| Environmental Investigation NOT yet approved by SBA and MUST be approved prior to disbursement. | No |

| Collateral Description | Owner of Record | Limited Secured Guaranty provided by | |
|---|---|---|---|
| LHI | Unknown | | |

| Current Market Value | Collateral Status | Source | Appraisal Code |
|---|---|---|---|
| $589,200.00 | | Sales Invoice | Not Selected Yet |

| Ordered Date | As of Date | Collateral Type | |
|---|---|---|---|
| | 03/04/2019 | Real Estate Commercial | |

## Collateral Subtype:

| Lien on Land and Improvements: | |
|---|---|
| **Shared Pari Passu** | No |
| **Shared Pari Passu, Non-SBA Loan** | No |
| **Pari Passu Lender Name** | |
| **Pari Passu Amount** | $0.00 |
| **The lien is limited to** | $0.00 |
| **Type of Instrument** | Mortgage |
| **Including Water Rights** | No |
| **Including Assignment of Rents** | No |
| **Prior lienholder written verification (a) of amount owing on prior obligation (b) that Borrower is current on payments and (c) that Borrower is otherwise in default** | No |
| **Evidence of Title and Priority of Lien** | |
| **Evidence of Title and Priority of Lien based upon** | |
| **Security Survey Questions** | |
| **Write your own** | |

| Additional Conditions | |
|---|---|
| **Insurance Requirements** | |
| Flood Insurance | No |
| Real Estate Hazard Insurance | No |
| Personal Property Hazard Insurance | No |
| Full Marine Insurance | No |
| **Environmental Requirements** | |
| Environmental Investigation NOT yet approved by SBA and MUST be approved prior to disbursement. | No |

## G. LENDER COMMENTS

| (none) |
|---|

## H. PROJECT INFORMATION

| Loan Name | Smokecraft Clarendon, LLC |
|---|---|
| **Project Address** | |
| **Street1** | 3003 Washington Blvd |
| **Street2** | Suite 101 |
| **City name** | Arlington |
| **State** | VA |

| Zip code | 22201 - 2194 |
| --- | --- |
| Project Address is | Urban |
| **Loan Mailing Address** | |
| Street1: | 3003 Washington Blvd |
| Street2: | Suite 101 |
| City, State Zip: | Arlington, VA 22201 - 2194 |
| Invalid Mailing Address? | No |
| **Underwriting Information** | |
| Application Liquid Credit Score | 188 |
| **Nature of Business** | |
| NAICS Code | 722511 |
| NAICS Description | Full-Service Restaurants |
| Small Business Manufacturer | No |
| Business Age | Startup, Loan Funds will Open Business |
| Franchise? | No |
| No. of Current Employees | 1 |
| Number of Jobs Created | 55 |
| Number of Jobs Retained | 1 |
| Date Business Established | 02/01/2018 |
| **Agreements** | |
| Lender Consent Required for Additional Location Acquisition | |
| Lender Consent Required for fixed assets Acquisition | |
| Yearly acquisition amount limited to | |
| Lender Consent Required for Compensation Increase | |
| Amount compensation limited to | |
| Evidence of compliance with Bulk Sales or Transfer provisions of state law | |

## J. BORROWERS

### Borrower 1

| This borrower is a | Business |
| --- | --- |
| Tax ID | 83-1543479 |

| | |
|---|---|
| **Controlling Interest Indicator** | Yes |
| **Controlling Interest Type** | Primary Borrower |
| **DUNS Number** | 040429002 |
| **Business Name** | Smokecraft Clarendon, LLC |
| **(Doing Business As) Trade Name** | Smokecraft Modern Barbecue |
| **Primary Business** | Yes |
| **EPC or Operating Company** | (not entered) |
| **Business Type** | Limited Liability Company(LLC) |
| **Physical Address** | |
| **Street1** | 3003 Washington BLVD |
| **Street2** | Suite 101 |
| **City, State Zip** | Arlington, VA 22201 - 4760 |
| **Mailing Address** | |
| **Street1** | 3003 Washington BLVD |
| **Street2** | Suite 101 |
| **City, State Zip** | Arlington, VA 22201 |
| **Insurance Requirements** | |
| **Liability Insurance** | Yes |
| **Product Liability Insurance** | No |
| **Dram Shop/Host Liquor Liability Insurance** | No |
| **Malpractice Insurance** | No |
| **Workers Comp Insurance** | No |
| **Other Insurance (Ex. State Specific, etc.,)** | No |
| **Name(s) of insurance:** | (not entered) |
| **Other Certification** | |
| **Business--Total payments less than total amount of credit card purchases** | No |
| Furnish Year-End Statements to Lender within 90 days of fiscal year end. | |
| **Bankruptcy/Insolvency** | No |
| **Pending Lawsuit** | No |
| **Prior SBA Loan** | No |
| **Liability Insurance?** | Yes |
| **Product Liability Insurance?** | No |

| Dram Shop/Host Liquor Liability Insurance? | No |
|---|---|
| Malpractice Insurance? | No |
| Workers Compensation Insurance? | No |
| Other Insurance (Ex. State Specific, etc.)? | No |
| Other Insurance Description | |

## J. Borrower 1 PRINCIPALS

| This principal is a | Person |
|---|---|
| Tax ID | ***-**-7336 |
| Controlling Interest Indicator | Yes |
| Controlling Interest Type | Owner of the Concern |
| Name | Andrew C. Darneille |
| Title | (not entered) |
| Date of Birth | ███████ |
| Place of Birth | Washington DC, US |
| Citizenship | U.S. Citizen |
| Alien Registration Number | (not entered) |
| Country of Citizenship | (not entered) |
| Ownership in the Business: | 91% |
| Guarantee Type: | Full Unsecured Guarantee |
| Ethnicity | Not Hispanic or Latino |
| Gender | Male |
| Veteran Status | Non-Veteran |
| Race | White, White |
| Number of Years Professional Experience | (not entered) |
| Involved in Bankruptcy/Insolvency | No |
| Involved in Pending Lawsuit | No |
| Did you obtain an external credit score on this person? | No |
| Score | 772 |
| Date of Score | 01/07/2019 |
| Source of Score | Equifax |
| **Physical Address** | |

| Street1 | ███████████████ |
| Street2 | (not entered) |
| City, State Zip | ███████████████ |
| Mailing Address | |
| Street1 | (not entered) |
| Street2 | (not entered) |
| City, State Zip | (city not entered), (state not entered) (zip not entered) |
| Life Insurance | No |
| Life Insurance Amount | (not entered) |
| Insured Name (if not person listed above) | (not entered) |
| Disability Insurance | No |
| Evidence that Principal does not have a Non-Compete Contract with Competitor | No |
| Primary Phone | N/A |
| Alternative Phone | N/A |
| Primary E-Mail | N/A |
| Alternative E-Mail | N/A |

### Borrower 2

| This borrower is a | Business |
| Tax ID | 83-1066983 |
| Controlling Interest Indicator | No |
| Controlling Interest Type | NOT APPLICABLE |
| DUNS Number | |
| Business Name | Smokecraft Holdings, LLC |
| (Doing Business As) Trade Name | (not entered) |
| Primary Business | No |
| EPC or Operating Company | (not entered) |
| Business Type | Limited Liability Company(LLC) |
| Physical Address | |
| Street1 | 7104 Loch Lomond Drive |
| Street2 | (not entered) |
| City, State Zip | BETHESDA, MD 20817 - 4760 |
| Mailing Address | |

| Street1 | (not entered) |
|---|---|
| Street2 | (not entered) |
| City, State Zip | (city not entered), (state not entered) (zip not entered) |
| Insurance Requirements | |
| Other Certification | |
| Bankruptcy/Insolvency | (not entered) |
| Pending Lawsuit | (not entered) |
| Prior SBA Loan | No |
| Liability Insurance? | (not entered) |
| Product Liability Insurance? | (not entered) |
| Dram Shop/Host Liquor Liability Insurance? | (not entered) |
| Malpractice Insurance? | (not entered) |
| Workers Compensation Insurance? | (not entered) |
| Other Insurance (Ex. State Specific, etc.)? | (not entered) |
| Other Insurance Description | |

## J. Borrower 2 PRINCIPALS

| This principal is a | Person |
|---|---|
| Tax ID | ***-**-7336 |
| Controlling Interest Indicator | Yes |
| Controlling Interest Type | (not entered) |
| Name | Andrew C. Darneille |
| Title | (not entered) |
| Date of Birth | ███████ |
| Place of Birth | Washington DC, US |
| Citizenship | U.S. Citizen |
| Alien Registration Number | (not entered) |
| Country of Citizenship | (not entered) |
| Ownership in the Business: | 100% |
| Guarantee Type: | Full Unsecured Guarantee |
| Ethnicity | Not Hispanic or Latino |
| Gender | Male |
| Veteran Status | Non-Veteran |

| | |
|---|---|
| **Race** | White, White |
| **Number of Years Professional Experience** | (not entered) |
| **Involved in Bankruptcy/Insolvency** | No |
| **Involved in Pending Lawsuit** | No |
| **Did you obtain an external credit score on this person?** | No |
| **Score** | 772 |
| **Date of Score** | 01/07/2019 |
| **Source of Score** | Equifax |
| **Physical Address** | |
| **Street1** | ███████████████████ |
| **Street2** | (not entered) |
| **City, State Zip** | ██████████████ |
| **Mailing Address** | |
| **Street1** | (not entered) |
| **Street2** | (not entered) |
| **City, State Zip** | (city not entered), (state not entered) (zip not entered) |
| **Life Insurance** | Yes |
| **Life Insurance Amount** | $1,200,000.00 |
| **Insured Name (if not person listed above)** | Andrew Darneille |
| **Disability Insurance** | No |
| **Primary Phone** | N/A |
| **Alternative Phone** | N/A |
| **Primary E-Mail** | N/A |
| **Alternative E-Mail** | N/A |

## K. GUARANTORS

(none entered)

## L. ASSOCIATES

(none entered)

## M. THIRD PARTY LENDERS

**End of Print Loan 11444466, Guaranty Loan.**

**IMPORTANT NOTICE**
THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION THAT CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU
MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.



U.S. Small Business Administration

## UNCONDITIONAL GUARANTEE

| SBA Loan # | |
|---|---|
| SBA Loan Name | Smokecraft Modern Barbeque |
| Guarantor | ANDREW C. DARNEILLE |
| Borrower | Smokecraft Clarendon, LLC and Smokecraft Holdings, LLC |
| Lender | Capital Bank, National Association |
| Date | January 31, 2020 |
| Note Amount | $1,200,000.00 |

1.  GUARANTEE:

    Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note.  This Guarantee remains
    in effect until the Note is paid in full.  Guarantor must pay all amounts due under the Note when Lender makes written
    demand upon Guarantor.  Lender is not required to seek payment from any other source before demanding payment from
    Guarantor.

2.  NOTE:

    The "Note" is the promissory note dated _____ January 31, 2020 _____ in the principal amount of
    One Million Two Hundred Thousand and No/100 -------------------------------------------------------------------- Dollars,
    from Borrower to Lender.  It includes any assumption, renewal, substitution, or replacement of the Note, and multiple
    notes under a line of credit.

3.  DEFINITIONS:

    "Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.
    "Loan" means the loan evidenced by the Note.
    "Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or
    anyone who pledges Collateral.
    "SBA" means the Small Business Administration, an Agency of the United States of America.

SBA Form 148 (10/98) Previous editions obsolete.                                                        Page 1/5

4.  LENDER'S GENERAL POWERS:

Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A.  Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B.  Refrain from taking any action on the Note, the Collateral, or any guarantee;

C.  Release any Borrower or any guarantor of the Note;

D.  Compromise or settle with the Borrower or any guarantor of the Note;

E.  Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F.  Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G.  Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H.  Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5.  FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6.  RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

A.  Guarantor waives all rights to:
    1)  Require presentment, protest, or demand upon Borrower;
    2)  Redeem any Collateral before or after Lender disposes of it;
    3)  Have any disposition of Collateral advertised; and
    4)  Require a valuation of Collateral before or after Lender disposes of it.

B.  Guarantor waives any notice of:
    1)  Any default under the Note;
    2)  Presentment, dishonor, protest, or demand;
    3)  Execution of the Note;
    4)  Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
    5)  Any change in the financial condition or business operations of Borrower or any guarantor;
    6)  Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
    7)  The time or place of any sale or other disposition of Collateral.

C.  Guarantor waives defenses based upon any claim that:
    1)  Lender failed to obtain any guarantee;
    2)  Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
    3)  Lender or others improperly valued or inspected the Collateral;
    4)  The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5) Lender impaired the Collateral;

6) Lender did not dispose of any of the Collateral;

7) Lender did not conduct a commercially reasonable sale;

8) Lender did not obtain the fair market value of the Collateral;

9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11) Lender made errors or omissions in Loan Documents or administration of the Loan;

12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor;

13) Lender impaired Guarantor's suretyship rights;

14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15) Borrower has avoided liability on the Note; or

16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

7.   DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

8.   SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

9.   GENERAL PROVISIONS:

A.   ENFORCEMENT EXPENSES. Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.   SBA NOT A CO-GUARANTOR. Guarantor's liability will continue even if SBA pays Lender. SBA is not a co-guarantor with Guarantor. Guarantor has no right of contribution from SBA.

C.   SUBROGATION RIGHTS. Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.   JOINT AND SEVERAL LIABILITY. All individuals and entities signing as Guarantor are jointly and severally liable.

E.   DOCUMENT SIGNING. Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F.   FINANCIAL STATEMENTS. Guarantor must give Lender financial statements as Lender requires.

G.   LENDER'S RIGHTS CUMULATIVE, NOT WAIVED. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H.   ORAL STATEMENTS NOT BINDING. Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I.   SEVERABILITY. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J.   CONSIDERATION. The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

10.  STATE-SPECIFIC PROVISIONS:

CONFESSION OF JUDGMENT.  Guarantor authorizes any attorney designated by Lender or any clerk of any court of record to appear for Guarantor and confess judgment against Guarantor in favor of Lender for the full amount of the obligations described in Section 1 of this Guarantee, plus court costs, plus attorneys' fees equal to 15% of the amount due, all without prior notice or opportunity of Guarantor for prior hearing, without stay of execution or right of appeal, and expressly waiving the benefit of all exemption laws and any irregularity or error in entering any such judgment.  For purposes of confessing judgment in the Commonwealth of Virginia, Guarantor hereby appoints and designates Brian C. Rosenberg, Bryan J. Pelino, Christopher Mullings, Christopher Johnson and any other officer, employee or agent of Capital Bank, National Association, each of whom may act as Guarantor's duly constituted attorney-in-fact, to confess judgment against Guarantor pursuant to the provisions of this Guarantee and of Section 8.01-432 of the Code of Virginia of 1950, as amended, which judgment shall be confessed in the Circuit Court of Arlington County, Virginia. Upon Lender's request, Guarantor: (i) shall name such additional or alternative persons designated by Lender as Guarantor's duly constituted attorney or attorneys-in-fact to confess judgment against Guarantor in accordance with the terms of this Note; and (ii) shall agree to the designation of any additional circuit courts in the Commonwealth of Virginia in which judgment may be confessed against Guarantor. No single exercise of the power to confess judgment granted in this paragraph shall exhaust the power, regardless of whether such exercise is ruled invalid, void or voidable by any court, nor shall this Guarantee, Lender's right to attorneys' fees in the amount described herein or any other obligation hereunder or under any other Loan Document merge into any such judgment.  The power to confess judgment granted in this paragraph may be exercised from time to time as often as Lender may elect. Guarantor acknowledges that the actual amount of attorneys' fees incurred by Lender would be impossible to calculate at the time judgment by confession is entered, as all such fees would not yet have been incurred.  Accordingly, Guarantor agrees that attorneys' fees equal to 15% of the amount due is reasonable given the circumstances.  If this Guarantee is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Guarantor shall pay all of Lender's costs, fees and expenses, including reasonable attorneys' fees, resulting from such referral. The liability of Guarantor for such costs, fees and expenses shall be joint and several with the liability of all other guarantors and obligors of the Loan.  Guarantor waives any rights arising under Sections 49-25 or 49-26 of the Code of Virginia, as the same may be amended from time to time.

Guarantor shall pay to the Lender all costs and expenses (including reasonable attorneys' fees) of the Lender in connection with the Guaranty and the other loan documents and the collection of all sums evidenced by it. Guarantor understands and agrees that upon an event of default, the Lender may incur costs of collection, including attorneys' fees, after the date of any judgment that the Lender may obtain against the Guarantor. Guarantor agrees to pay all of such costs and fees. Guarantor further agrees that the Guarantor's obligation to pay such costs and fees, and the Lender's claim for such costs and fees, which are incurred by the Lender after the date of any judgment obtained by the Lender, shall survive the entry of, and shall not be merged into, any such judgment.

WAIVER OF JURY TRIAL.  Guarantor and Lender jointly waive trial by jury in any action or proceeding to which Guarantor and Lender may be parties, arising out of or in any way pertaining to this Guarantee or any other Loan Document.  It is agreed and understood that this waiver constitutes a waiver of trial by jury of all claims against all parties to such actions or proceedings, including claims against parties who are not parties to this Guarantee.  This waiver is knowingly, willingly and voluntarily made by Guarantor, and Guarantor hereby represents that no representations of fact or opinion have been made by any individual to induce this waiver of trial by jury or to in any way modify or nullify its effect.  Guarantor further represents that he or she has been represented in the signing of this Guarantee and in the making of this waiver by independent legal counsel, selected of his or her own free will, and that he or she has had the opportunity to discuss this waiver with counsel.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

All liabilities of Guarantor under this Guarantee shall be joint and several with the obligations of every other guarantor of Borrower's obligations to Lender.

11.  GUARANTOR ACKNOWLEDGMENT OF TERMS.

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

12.  GUARANTOR NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.



WITNESS/ATTEST

PATRICK EJINBU

GUARANTOR:

_____ (SEAL)
ANDREW C. DARNEILLE

SBA Form 148 (10/98) Previous editions obsolete.

Page 5/5