## SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made as of January 31, 2020, by and among **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company and **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Debtors"), and **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

### Recitals

Debtors have requested that Lender extend to Debtors a commercial loan in the principal amount of $1,200,000, and Lender has agreed to do so in accordance with the terms of this Agreement.

### Agreements

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtors and Lender agree as follows:

**1.    DEFINITIONS AND GENERAL RULES OF CONSTRUCTION**

1.1.    *Definitions*. In this Agreement, all defined terms are capitalized and have the meaning given on Exhibit A attached hereto and made a part hereof. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Credit Agreement; provided, however, that should any such term cease to be defined under the Credit Agreement or should the Credit Agreement cease to exist, each such term shall have such meaning as ascribed to it by Lender in its sole and absolute discretion.

1.2.    *Accounting Terms*. All accounting terms not specifically defined herein shall have the meanings assigned to them as determined by generally accepted accounting principles ("GAAP") as used by the Financial Accounting Standards Board, the American Institute of Certified Public Accountants or such other organization as selected by Lender consistently applied and maintained throughout the periods indicated, unless otherwise specifically elected by Lender.

1.3.    *UCC Terms*. All terms used in this Agreement that are defined in the UCC shall have the meanings ascribed to them therein, unless specifically defined otherwise in this Agreement; provided, however, that should any such term cease to be defined under the UCC or should the UCC cease to exist, each such term shall have such meaning as ascribed to it by Lender in its sole and absolute discretion.

1.4.    *Tense; Gender; Section Headings*. In this Agreement, the singular includes the plural and *vice versa*. Each reference to any gender also applies to any other gender. The Section headings are for convenience only and are not part of this Agreement.

**2.    TERMS OF LOAN**

2.1.    *Agreement to Lend*. Lender agrees, subject to and in accordance with the terms, conditions and provisions of the SBA Authorization, this Agreement, the Credit Agreement and the other Loan Documents to make the Loan to Debtors.

2.2.    *Terms of Repayment*. The Loan shall be evidenced by and repaid with interest in accordance with the terms of the Note, which are incorporated herein by reference.

2.3.    *Purpose*. Unless otherwise elected by Lender, the Loan Proceeds shall be used solely in accordance with the SBA Authorization.

**3.    SECURITY**

3.1.    *Grant of Security Interest*. To secure the payment of the Liabilities and the payment and performance of all of each Debtor's other obligations under the Loan Documents, each Debtor hereby grants, pledges and assigns to Lender a security interest in the Collateral together with all of such

Debtor's right, title and interest therein and thereunder. Without limiting the generality of the foregoing or any other grant, pledge, lien or security interest benefiting or otherwise in favor of Lender, each Debtor hereby further authorizes Lender to file a Grant of Security Interest substantially in the form of <u>Exhibit C</u>, <u>Exhibit D</u> and/or <u>Exhibit E</u> (each a "Grant of Security Interest"), as applicable, covering the relevant IP Collateral consisting of U.S. registered Patents (and U.S. Patents for which applications are pending), U.S. registered Trademarks (and U.S. Trademarks for which registration applications are pending) and U.S. registered Copyrights (and U.S. Copyrights for which registration applications are pending) with the United States Patent and Trademark Office or United States Copyright Office (or any successor office), as applicable, and such other documents as may be necessary for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest of Lender in such IP Collateral granted by Debtors hereunder (without the signature of either Debtor after the occurrence of an Event of Default) and naming Debtors (or either of them), as debtor, and Lender, as secured party.

3.2.     *Future Advances.*   The security interest granted by this Agreement secures future advances.

3.3.     *Perfection of Security Interest.*   Each Debtor authorizes Lender to file financing statements, financing statement addenda, continuation statements and financing statement amendments in such form and in such filing offices as Lender may require to perfect or to preserve, maintain or continue the perfection of the security interest in the Collateral and its priority. Each Debtor further agrees to execute and deliver to Lender, or to cooperate with Lender in obtaining from any third party, upon Lender's request, any control agreement, acknowledgment of bailment, or other document Lender may request in order to perfect or to preserve, maintain, or continue the perfection of Lender's security interest in the Collateral and its priority. Debtors shall pay the costs of filing any assignment, financing statement, financing statement addendum, continuation statement or termination statement as well as any recordation or transfer tax required by law to be paid in connection with the filing or recording of any such document. A carbon, photographic, or other reproduction of this Agreement is sufficient as a financing statement. Neither Debtor shall file any amendments, correction statements or termination statements concerning the Collateral without the prior written consent of Lender.

3.4.     *Grant of License for IP Collateral; Transfer of IP Collateral; Etc.*   Without limiting the provisions of Section 3.1 above or any other rights of Lender, solely for the purpose of enabling Lender to exercise rights and remedies under this Agreement and the other Loan Documents, each Debtor hereby grants to Lender, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to either Debtor) to use, license or sublicense any of the IP Collateral now owned or hereafter acquired by either Debtor, and wherever the same may be located, and including in such license access to all media in either Debtor's possession and control in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, in each case, to the extent permitted by any applicable third party Licenses and other agreements. The use of such license by Lender may only be exercised, at the option of Lender, after the occurrence of an Event of Default or an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default. Further, each Debtor agrees to take, at its expense, all steps, including, without limitation, in the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other governmental authority located in the United States to (i) maintain the validity and enforceability of any registered IP Collateral and maintain such IP Collateral in full force and effect, and (ii) pursue the registration and maintenance of each Patent, Trademark, or Copyright registration, issuance or application, now or hereafter included in such IP Collateral of Debtors, including, without limitation, the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the *U.S. Trademark Act*, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings. In the event that any item of the IP Collateral owned by either Debtor is being infringed or misappropriated by a third party, Debtors shall take such actions, at its sole expense, to protect or enforce such IP Collateral, including, without limitation, suing for infringement or misappropriation and for an injunction against such infringement or misappropriation. Debtors shall use proper statutory notice as commercially practical in connection with its use of each material item of its IP Collateral, to the extent required under applicable law. Neither

2

Debtor shall do or permit any act or omit to do any act whereby any of its material IP Collateral may lapse, be terminated or become invalid or unenforceable or dedicated to the public domain. Debtors shall take all steps to preserve and protect each item of its IP Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality, as Debtors determine is appropriate in the exercise of their reasonable business judgment. Each Debtor agrees that, should it obtain an ownership or other interest in any IP Collateral after the date of this Agreement ("After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become part of the IP Collateral subject to the terms and conditions of this Agreement with respect thereto. Once every year, but in no event later than the early to occur of (i) 30 days after the end of the preceding calendar year or (ii) 5 days after the making any such application or registration, Debtors shall deliver to Lender applications for U.S. registration and U.S. registrations of U.S. Patents, Trademarks and Copyrights not previously disclosed to Lender. In each case, Debtors shall cooperate as necessary to enable Lender to make any recordations with the U.S. Copyright Office or the U.S. Patent and Trademark Office, as appropriate, with respect to such applications for U.S. registration and U.S. registrations. With respect to any IP Collateral, on demand, Lender shall have the right to cause the security interest granted herein to become an assignment, transfer and conveyance of any of or all such IP Collateral, Lender being free to sell, transfer, offer for sale, otherwise dispose of such IP Collateral, or license or sublicense, whether general, special or otherwise, and whether on an exclusive or nonexclusive basis, any such IP Collateral throughout the world on such terms and conditions and in such manner as Lender shall determine; provided, however, that such terms shall include all terms and restrictions that are customarily required to ensure the continuing validity and effectiveness of the IP Collateral at issue, such as, without limitation, notice, quality control and inurement provisions with regard to Trademarks, patent designation provisions with regard to Patents, and copyright notices and restrictions or decompilation and reverse engineering of copyrighted software, and confidentiality protections for trade secrets.

3.5.    *Requests of Other Secured Parties; Power of Attorney*. Each Debtor authorizes Lender to request other secured parties of such Debtor to provide such accountings, confirmations of collateral and confirmations of statements of account concerning such Debtor as Lender may require. Each Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of endorsing such Debtor's name on any such requests to be delivered to other secured parties of such Debtor, which power of attorney is coupled with an interest and irrevocable.

3.6.    *Priority of Liens*. Lender has or may in the future have multiple liens on and security interests in the Collateral and Lender, in its sole and absolute discretion and without notice to or the consent of either Debtor or any Obligor, may at any time and from time to time change the order of priority of those liens and security interests. Lender shall evidence such order of priorities by making appropriate entries to Lender's internal records. Lender may, but shall have no obligation to, file one or more amendments to any financing statement publicizing the security interest granted by this Agreement setting forth such order of priorities.

3.7.    *Subordinated Debt*. All of each Debtor's indebtedness to its officers, directors, direct or indirect owners of any interest in either Debtor, to any Subsidiary and to any of either Debtor's affiliates shall be subordinated to repayment of the Loan.

**4.    REPRESENTATIONS AND WARRANTIES**

4.1.    *Representations and Warranties*. Debtors, and each Person acting on behalf of Debtors (or either of them) in executing this Agreement, represents and warrants to Lender as follows:

a.    Authority. Each Debtor has the power and authority to consummate the transactions contemplated hereby, and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and the other Loan Documents executed and delivered by it.

3

b.    Name; Location of Places of Business; Other Information Relevant to Perfection.  Each Debtor's correct legal name is as specified on the signature lines of this Agreement, and each legal or trade name of each Debtor for the previous 12 years (if different from such Debtor's current legal name) is as specified on Exhibit B of this Agreement.  Each Debtor's state of formation, federal tax identification number and organizational identification number (if any), and the address of each Debtor's chief executive office and the address of each other place of business of Debtors are as specified on Exhibit B of this Agreement. Except for mobile equipment and motor vehicles, the Collateral and all books and records pertaining to the Collateral are located at such Debtor's chief executive office, as specified on Exhibit B, or at any other place of business which may be specified on Exhibit B.

c.    No Violation; Validity of Loan Documents.  The Loan, the execution, delivery and performance by Debtors and all Obligors of the Loan Documents, and the use, directly or indirectly of all or any portion of the Loan Proceeds in accordance with this Agreement: (i) are within the legal powers of Debtors and Obligors; (ii) have received all necessary governmental approval; (iii) will not violate or result in a violation of any provision of any applicable federal, state or local law, statute, rule or regulation, or any order of any court or other Governmental Authority having jurisdiction, or any authorized official, board, department, instrumentality, or agency thereof; and (iv) will not result in a breach of or constitute a default under any mortgage, deed of trust, security agreement, lease, loan or credit agreement, or any other agreement or instrument to which either Debtor or any Obligor is a party or by which any of them or any of their properties is bound, or result in the creation or imposition of any Lien of any nature whatsoever upon of either Debtor's or any Obligor's property or assets, except as contemplated by the provisions of the Loan Documents.  Debtors are obtaining the Loan solely for business and commercial purposes, and Loan Proceeds are not intended to be used, and will not be used, for family, household, agricultural or personal purposes.  This Agreement, the Note and the other Loan Documents constitute the legal, valid and binding obligations of Debtors and Obligors, enforceable against Debtors and Obligors in accordance with their respective terms.

d.    No Litigation.  There are no actions, suits, or proceedings pending or threatened against either Debtor or any Obligor at law or in equity or before or by any Governmental Authority.  Neither Debtor nor any Obligor is in default with respect to any order, writ, injunction, decree, or demand of any court or any Governmental Authority.

e.    Title to Collateral.  Each Debtor is the owner of its Collateral and has good and marketable title to such Collateral free and clear of all liens, security interests, and other encumbrances except for those in favor of Lender and those previously disclosed in writing to Lender.

f.    Assets and Properties. Each Debtor has good and marketable title to all of its assets and properties, and there is no Lien outstanding against any of either Debtor's assets or properties except those in favor of Lender.

g.    No Violation of Laws.  Neither the consummation of the Loan nor the use, directly or indirectly, of all or any portion of the Loan Proceeds in accordance with this Agreement will violate or result in a violation of any provision of any applicable federal, state or local law, statute, rule or regulation, or any order of any court or other Governmental Authority having jurisdiction, or any authorized official, board, department, instrumentality, or agency thereof.

h.    Environmental Compliance.  Debtors, the Collateral and all of Debtor's properties are in compliance with all environmental laws, regulations and restrictions.

i.    IP Collateral.  Each Debtor represents and warrants that: (a) fully executed Grants of Security Interest in the form attached as Exhibit C, Exhibit D and Exhibit E, as applicable, containing a description of all IP Collateral owned by Debtors as of the date hereof, consisting of federally registered or applied-for Patents, Trademarks and Copyrights, as applicable, have been delivered to Lender for recording by the United States Patent and Trademark Office and the United States Copyright Office, as applicable, pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder; (b) upon the filing of such Grants of Security Interest with the United States Patent and Trademark Office or the United States Copyright Office Lender shall have a perfected first priority

4

security interest in all Collateral in which a security interest may be perfected by the recording of the relevant Grants of Security Interest with the United States Patent and Trademark Office and the United States Copyright Office, as applicable; (c) each Debtor is the exclusive owner of all right, title and interest in and to its portion of the IP Collateral or has the right or license to use the IP Collateral subject only to the terms of the Licenses; (d) the operation of each Debtor's business as currently conducted and the use of the IP Collateral in connection therewith do not conflict with, infringe, misappropriate, misuse or otherwise violate the intellectual property rights of any third party; (e) the IP Collateral owned by Debtors and constituting Patents, Trademarks, and Copyrights issued by or registered in the United States Patent and Trademark Office, the United States Copyrights Office, or any corresponding foreign governmental agency, is subsisting and has not been adjudged invalid or unenforceable in whole or in part and is valid and enforceable; (f) neither Debtor is aware of any uses of any material item of IP Collateral that could be expected to lead to such item becoming invalid or unenforceable; (g) each Debtor has made or performed all filings, recordings and other acts and has paid all required fees and taxes to maintain and protect its interest in each and every item of IP Collateral in full force and effect, and to protect and maintain its interest therein; (h) no claim, action, suit, investigation, litigation or proceeding has been asserted in writing and is pending or, threatened against either Debtor (A) challenging the validity or enforceability of any IP Collateral or either Debtor's ownership of any of the IP Collateral, (B) alleging that either Debtor's use of the IP Collateral or that any services provided by, processes used by, or products manufactured or sold by, either Debtor infringes, misappropriates, dilutes, or otherwise violates any patent, trademark, copyright or any other intellectual property right of any third party, or (C) alleging that the IP Collateral is being licensed or sublicensed in violation or contravention of the terms of any license or other agreement; (i) no person is engaging in any activity that infringes, misappropriates, dilutes, or otherwise violates the material IP Collateral owned by either Debtor; (j) the consummation of the transactions contemplated by this Agreement or any other document or agreement executed or delivered in connection with any of the Liabilities and the payment and performance of all of Debtors' obligations under the Loan Documents will not result in the termination or impairment of any of the IP Collateral; (k) with respect to each License (A) such License is valid and binding and in full force and effect, (B) neither Debtor has received any written notice of termination or cancellation under such License, (C) neither Debtor has received any written notice of a breach or default under such License; and (D) neither Debtor nor any other party to such License is in breach or default thereof, and no event has occurred which, with the passage of time, the giving of notice or both, would constitute such a breach or default or permit termination, modification or acceleration under such License; and (l) (A) none of the trade secrets of either Debtor have been used, divulged, disclosed or appropriated to the detriment of either Debtor for the benefit of any Person other than Debtors; (B) no employee, independent contractor or agent of either Debtor has misappropriated any material trade secrets of any other person in the course of the performance of his or her duties as an employee, independent contractor or agent of either Debtor; and (C) no employee, independent contractor or agent of either Debtor is in default or breach of any material term of any employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of either Debtor's IP Collateral.

   j. <u>Subsidiaries</u>. As of the date of this Agreement, neither Debtor has any Subsidiaries.

   k. <u>SBA Authorization</u>. The SBA Authorization is in full force and effect. Neither Debtor not in default under the SBA Authorization or under any other document or agreement executed in connection with the SBA Authorization.

4.2. *Continuing Nature of Representations and Warranties*. Each Debtor hereby represents, warrants, covenants and agrees that the representations and warranties made by either Debtor in Section 4.1 of this Agreement shall remain true and accurate in all respects throughout the term of the Loan. Debtors shall immediately notify Lender in writing if any of the representations and warranties of either Debtor set forth in Section 4.1 of this Agreement should become untrue, incomplete, inaccurate or incorrect in any respect. Each request for an advance of Loan Proceeds shall constitute a reaffirmation of all representations and warranties made by Debtors in Section 4.1.

## 5.    AFFIRMATIVE COVENANTS.

5.1.    *Payment and Performance*.  Debtors shall pay the Liabilities as and when due and payable and shall perform, comply with, and observe all of the terms and conditions of the Loan Documents.

5.2.    *Costs of Transaction*.  Debtors shall pay all costs and expenses incident to the making and administration of the Loan and the perfection of Lender's security interests under the Loan Documents, including but not limited to reasonable attorneys' fees, costs of appraisals and environmental site assessments, recordation costs and taxes incident to filing of the recordation costs and taxes incident to filing of any deed of trust or mortgage, financing statements and continuation statements in respect thereof, title insurance premiums, and the fees of any title company.

5.3.    *Notice of Collateral Status*.  If either Debtor, for any reason, believes that an event or condition has cause or may adversely the value of any portion of the Collateral, or any of the Lender's rights and remedies relating to such portion of the Collateral, Debtors shall immediately deliver notice of such event or condition to the Lender.

5.4.    *Use of Loan Proceeds*.  Debtors shall use the Loan Proceeds only for the purposes described in Section 2.3 of this Agreement.

5.5.    *Title to Collateral*.  Debtors shall defend each Debtor's title to the Collateral against all Persons and, upon request of Lender, (a) shall furnish such further assurances of title as may be required by Lender, and (b) shall deliver and execute or cause to be delivered and executed, in form and content satisfactory to Lender and the SBA, any financing, continuation, termination, or security interest filing statement, security agreement, control agreement or other document Lender may request in order to perfect, preserve, maintain, or continue the perfection of Lender's security interest in the Collateral and its priority. Debtors shall pay the costs of filing any financing, continuation, termination, or security interest filing statement as well as any recordation or transfer tax required by law to be paid in connection with the filing or recording of any such statement. A carbon, photographic, or other reproduction of this Agreement or a financing statement is sufficient as a financing statement.

5.6.    *Books, Records, and Inspections*.  Each Debtor: (a) at all times shall maintain accurate and complete books and records pertaining to the operation, business, and financial condition of such Debtor and pertaining to the Collateral and any contracts and collections relating to the Collateral, all in a manner satisfactory to Lender and the SBA; (b) at all reasonable times and without hindrance or delay, shall permit Lender, the SBA, or any Person designated by Lender or the SBA to enter any place of business of either Debtor or any other premises where any books, records, and other data concerning either Debtor or the Collateral may be kept and to examine, audit, inspect, and make extracts from and photocopies of any such books, records, and other data; (c) at all reasonable times and without hindrance or delay, shall permit Lender, the SBA, or any Person designated by Lender or the SBA to inspect and appraise any of either Debtor's assets; (d) shall allow all government authorities to furnish reports of examinations, or any records pertaining to either Debtor, upon request by Lender or the SBA; (e) shall furnish to Lender promptly upon request and in the form and content specified by Lender lists of purchasers of inventory, aging of accounts, aggregate cost or wholesale market value of inventory, schedules of equipment, and other data concerning the Collateral as Lender may from time to time specify; and (f) shall mark its books and records in a manner satisfactory to Lender so that Lender's rights in and to the Collateral will be shown.

5.7.    *Notice of Default and Litigation*.  Debtors shall notify Lender promptly of the occurrence of a Default or any Event of Default. Debtors shall notify Lender promptly of any litigation instituted or threatened against either Debtor or any Obligor and of the entry of any judgment or Lien against any of either Debtor's or any Obligor's assets or properties and of any prospective condemnation, change of zoning, or other action affecting the Collateral or any of either Debtor's properties.

5.8.    *Care of Collateral*.  Debtors shall maintain the Collateral in good condition and shall not do or permit anything to be done to the Collateral that may impair its value or that may violate the terms of any insurance covering the Collateral or any part thereof. Lender shall have no duty to preserve any of the

Collateral or to collect or enforce any account, chattel paper or payment intangible or to preserve rights against other parties to the Collateral, and each Debtor hereby releases Lender from all claims for loss or damage caused by Lender's failure to do so.

5.9.    _Preservation of Properties_.  Debtors at all times: (a) shall maintain their properties, whether owned or leased, in good operating condition, and from time to time shall make all repairs, renewals, replacements, additions, and improvements thereto needed to maintain such properties in good operating condition; (b) shall comply with the provisions of all leases to which either Debtor is a party or under which either Debtor occupies property so as to prevent any loss or forfeiture thereof or thereunder; and (c) shall comply with all laws, rules, regulations, and orders applicable to either Debtor's properties or any part thereof.

5.10.    _Insurance_.

    a.    Special Form Coverage, Etc.  Each Debtor shall keep such of the Collateral as specified by Lender insured against such casualties and risks and in such amounts as may from time to time be required by Lender, without reduction for depreciation or co-insurance. Neither Debtor shall take out any separate or additional insurance which is contributing in the event of loss unless it is properly endorsed and otherwise satisfactory to Lender in all respects.

    b.    Business Income Insurance.  Debtors shall maintain business income insurance at all times in such amounts as are required by Lender.

    c.    Claims and Proceeds.  In the event of loss, Debtors shall give immediate written notice to the insurance carrier and to Lender. Each Debtor hereby authorizes and empowers Lender as attorney-in-fact for such Debtor to make proof of loss, to adjust and compromise any claim under the insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds; provided, however, that nothing contained in this Section shall require Lender to incur any expense or take any action. Each Debtor further authorizes Lender, at Lender's option: (i) to hold the balance of such proceeds to be used to reimburse such Debtor for the cost of repair or replacement of the Collateral, upon such terms as Lender may determine in its sole discretion; or (ii) to apply the balance of such proceeds to the payment of the Liabilities, whether or not then due, in the same manner and order as the proceeds of sale or other disposition of the Collateral are to be applied pursuant to Section 7.2 of this Agreement.

    d.    General Insurance Requirements.  All insurance policies required pursuant to this Section shall: (i) be endorsed to name Lender as loss payee, with losses payable solely to Lender, without contribution, as its interests may appear; (ii) provide that this Section shall not be invalidated by a waiver of the right of subrogation by any insured, that the insurance carrier shall have no right of subrogation, and that the policies may not be canceled, terminated or changed without 30 calendar days prior written notice to Lender; and (iii) be fully paid for; (iv) be on forms and contain provisions and expiration dates which are approved by Lender; (v) be issued by insurance companies which (A) are licensed to do business in the state where the insured Collateral is located, (B) have a Best's Key Rating of at least A-, (C) have a Best's Key Rating Class of at least IX, and (D) otherwise are reasonably satisfactory to Lender in all respects. Debtors shall deliver all original policies to Lender together with the endorsements thereto required hereunder, or acceptable certificates evidencing the existence of such policies. Not less than 10 calendar days prior to the expiration dates of each policy required pursuant to this Section, Debtors shall deliver to Lender a renewal policy or policies, or an acceptable certificate evidencing the existence of such renewal policy or policies, accompanied by evidence satisfactory to Lender that the premium for such policy or policies has been paid for at least a 1-year period.

5.11.    _Liability and Worker's Compensation Insurance_.  Debtors shall maintain commercial general liability insurance (for both personal injuries and property damage) in such amounts as Lender requires from time to time. Each liability policy: (a) shall be endorsed to name Lender as additional insured; (b) shall provide that it may not be canceled or modified without 30 calendar days advance notice to Lender; (c) shall be fully paid for; (d) shall be on a form and contain provisions and expiration dates which are

approved by Lender; (e) shall be issued by an insurance company which (i) is licensed to do business in the state in which Debtors are located, (ii) has a Best's Key Rating of at least A-, (iii) has a Best's Key Rating Class of at least IX, and (iv) otherwise is reasonably satisfactory to Lender in all respects. Debtors shall deliver a certified copy of each liability policy to Lender together with endorsements thereto required hereunder, or an acceptable certificate evidencing the existence of each such policy. Debtors also shall maintain worker's compensation insurance in such amounts as are required by Applicable Law. Not less than 10 calendar days prior to the expiration dates of each policy required pursuant to this Section, Debtors shall deliver to Lender a renewal policy or policies, or an acceptable certificate evidencing the existence of such renewal policy or policies, accompanied by evidence satisfactory to Lender that the premium for such policy or policies has been paid for at least a 1-year period.

5.12.   *Taxes*. Debtors shall pay and discharge all Taxes prior to the date when any interest or penalty would accrue for the nonpayment thereof.

5.13.   *Maintain Existence*. Debtors at all times shall maintain in full force and effect their company existence, rights, privileges, and franchises and shall qualify and remain qualified in all jurisdictions where qualification is required.

5.14.   *Payment of Indebtedness to Others*. Debtors shall pay when and as due all indebtedness due to third Persons.

5.15.   *Changes in Location*. Debtors shall advise Lender immediately in writing of (a) any change in the location of either Debtor's chief executive office; (b) the opening of any new place of business; (c) any change in the location of the places where all or any part of the Collateral or the books and records concerning all or any part of the Collateral are kept; (d) any change in either Debtor's legal name, or the addition of or any change in any name under which either Debtor conducts business; (e) any change in either Debtor's state of formation; (f) any change in either Debtor's federal tax identification number; or (g) either Debtor's receipt of, or any change in, either Debtor's organizational identification number.

5.16.   *Compliance with Laws*. Debtors at all times shall comply with all Applicable Law.

5.17.   *Maintenance of Licenses and Permits*. Debtors shall maintain in good standing and in full force and effect all licenses, permits and authorizations necessary for it to conduct lawfully their businesses and affairs. Immediately upon demand by Lender or the SBA, Debtors shall provide copies of all such licenses, permits and authorizations and shall obtain such other licenses, permits and authorizations for Debtors to lawfully conduct their respective businesses and affairs as Lender or the SBA may deem appropriate.

5.18.   *Environmental Matters*. Debtors shall notify Lender immediately if either Debtor becomes aware of: (a) the presence of any Hazardous Substance in, on or near any property owned or leased by either Debtor; (b) the commencement or threat of any environmental investigation or clean-up proceeding by any Person in connection with any property owned or leased by either Debtor; and (c) any citation, notification, complaint, or violation which either Debtor receives from any Person which relates or pertains to the making, storing, handling, treating, disposing, generating, transporting or release of any Hazardous Substance. Debtors shall comply fully with and assist any environmental investigation or clean-up proceeding, and shall execute and complete promptly any remedial action necessary to ensure that no environmental liens or encumbrances are levied against or exist with respect to any property owned or leased by either Debtor. Promptly upon the written request of Lender from time to time, Debtors shall submit to Lender an environmental site assessment or report, in form and substance satisfactory to Lender, with respect to such property of either Debtor as is specified by Lender. Debtors shall indemnify and hold harmless Lender from all loss, liability, damage, cost, and expense, including but not limited to reasonable legal fees, fines, or other penalties or payments, for failure of any property of either Debtor on which Lender has a Lien to comply in all respects with all environmental laws and requirements. The provisions of this Section shall survive payoff, release, foreclosure, or other disposition of this Agreement, the Collateral or any other security for the Loan. Debtors shall remain liable under this Section regardless of any other provision of this Agreement which may limit Debtors' liability.

5.19.   *Specific Assignments*.  Promptly upon request by Lender, Debtors shall execute and deliver to Lender written assignments, endorsements, or schedules, in form and content satisfactory to Lender, of specific accounts, chattel paper or payment intangibles or groups of accounts, chattel paper or payment intangibles, but the security interest granted to Lender by this Agreement shall not be limited in any way by such assignments.  Such accounts, chattel paper and payment intangibles are to secure payment of the Liabilities and payment and performance of Debtors' other obligations under the Loan Documents and are not sold to Lender whether or not any assignment thereof which is separate from this Agreement is in form absolute.

5.20.   *Delivery of Chattel Paper*.  Promptly upon request by Lender, Debtors shall deliver and endorse to Lender all chattel paper and all other documents held by either Debtor in connection therewith.

5.21.   *Government Contracts*.  If any account, chattel paper or payment intangible arises out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof or any state or local governmental or quasi-Governmental Authority or any department, agency, or instrumentality thereof, Debtors immediately shall notify Lender thereof in writing and execute any instruments or take any steps required by Lender in order that all moneys due or to become due under such contract or contracts shall be assigned to Lender and notice thereof given under the *Federal Assignment of Claims Act of 1940*, as amended, or any other applicable federal or state statute or common law.  The contrary notwithstanding, neither Debtor shall make any assignment of any such contract, account, chattel paper or payment intangible to any Person other than Lender.

5.22.   *Accounts, Inventory, Chattel Paper and Payment Intangibles*.  Neither Debtor shall make any material change to the terms of any sale or lease of inventory or of any account, chattel paper or payment intangible without the prior written permission of Lender.  Upon demand by Lender, Debtors shall make available in form acceptable to Lender shipping documents and delivery receipts evidencing the shipment of goods which gave rise to the sale or lease of inventory or of an account, chattel paper or payment intangible, completion certificates, or other proof of the satisfactory performance of services which gave rise to an account or chattel paper, copies of the invoices arising out of the sale or lease of inventory or for an account, and Debtors' copy of any written contract or order from which the sale or lease of inventory, an account, chattel paper or a payment intangible arose.  When requested, Debtors shall advise Lender regularly whenever an account debtor returns or refuses to retain any goods, the sale or lease of which gave rise to an account or chattel paper, and of any delay in delivery or performance, or claims made, in regard to any sale or lease of inventory, account, or chattel paper, and will comply with any instructions which Lender may give regarding the sale or other disposition of such returns.  The contrary notwithstanding, neither Debtor shall make any assignment of any such contract, account, chattel paper or payment intangible to any Person other than Lender.

5.23.   *Collateral Account*.  Debtors, both prior to and after the occurrence of an Event of Default, shall deposit or cause to be deposited to a bank account designated by Lender and from which Lender alone has power of access and withdrawal ("Collateral Account"), all Items of Payment.  Debtors shall deposit the Items of Payment for credit to the Collateral Account within 2 business days of the receipt thereof, and in precisely the form received, except for the endorsement of Debtors where necessary to permit the collection of the Items of Payment, which endorsement Debtors hereby agrees to make.  Pending such deposit, Debtors shall not commingle any of the Items of Payment with any of their other funds or property, but shall hold them separate and apart.  In the event that any Item of Payment is deposited into an account maintained by either Debtor with Lender other than the Collateral Account, Lender may cause such funds to be withdrawn from such other account and deposited in the Collateral Account on a daily basis or at such other time as Lender may elect.  On the day that monthly payments are due under the Note, and at any other time determined by Lender, Lender may apply the whole or any part of the collected funds credited to the Collateral Account against the Loan, and credit the balance of any such collected funds to a banking account of either Debtor with Lender, the order and method of such application or credit to be in the sole discretion of Lender.

5.24.   *Lender's Collection Rights*.  If all or any part of the Collateral at any time consists of inventory, accounts, chattel paper or payment intangibles, Lender may at any time and from time to time both prior

to and after the occurrence of an Event of Default, and each Debtor hereby irrevocably appoints Lender as its attorney in fact (which appointment is coupled with an interest), with power of substitution, in the name of Lender or in the name of such Debtor or otherwise, for the use and benefit of Lender, but at the cost and expense of Debtors and without notice to Debtors, to: (a) notify the account debtors obligated on any of the Collateral to make payments thereon directly to Lender, and to take control of the cash and non-cash proceeds of any such Collateral; (b) charge to any banking account of either Debtor with Lender any Item of Payment credited to the Collateral Account which is dishonored by the drawee or maker thereof; (c) compromise, extend, or renew any of the Collateral or deal with the same as it may deem advisable; (d) release, make exchanges or substitutions for, or surrender all or any part of the Collateral; (e) remove from either Debtor's place of business all books, records, ledger sheets, correspondence, invoices, and documents relating to or evidencing any of the Collateral or, without cost or expense to Lender, make such use of either Debtor's places of business as may be reasonably necessary to administer, control, and collect the Collateral; (f) repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any account debtor; (g) demand, collect, receipt for, and give renewals, extensions, discharges, and releases of any of the Collateral; (h) institute and prosecute legal and equitable proceedings to enforce collection of, or realize upon, any of the Collateral; (i) settle, renew, extend, compromise, compound, exchange, or adjust claims with respect to any of the Collateral or any legal proceedings brought with respect thereto; (j) endorse the name of either Debtor upon any Items of Payment relating to the Collateral or upon any proof of claim in bankruptcy against an account debtor; (k) receive and open all mail addressed to either Debtor and, if an Event of Default exists, notify postal authorities to change the address for the delivery of mail to Debtors to such address as Lender may designate; and (l) exercise all other rights of Debtors against its account debtors.

5.25.    *Further Assurances and Corrective Instruments*.  Debtors, upon request by Lender from time to time, shall execute and deliver, or cause to be executed and delivered, such supplements hereto and such further instruments as may be required by Lender for carrying out the intention of the parties to, or facilitating the performance of, this Agreement.  If either Debtor fails to execute any such document within 10 calendar days after a request by Lender, each Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of executing such document in such Debtor's name, which power of attorney is coupled with an interest and irrevocable.

5.26.    *Estoppel Certificates*.  Debtors, within 10 calendar days after request by Lender from time to time, shall execute, acknowledge and deliver to Lender or any Person designated by Lender a statement in writing, certifying: (a) that this Agreement is unmodified and in full force and effect and the payments required by this Agreement to be paid by Debtors have been paid; (b) the then unpaid principal balance of the Note; and (c) whether to the knowledge of the signer of such certificate any party to any of the Loan Documents is in default in the performance of any covenant, agreement, or condition contained therein and, if so, specifying each such default of which the signer may have knowledge.

5.27.    *Expense Payments*.  If Debtors shall fail to make any payment or otherwise fail to perform, observe, or comply with any of the conditions, covenants, terms, stipulations, or agreements contained in this Agreement, Lender without notice to or demand upon either Debtor and without waiving or releasing any obligation or any Event of Default may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Debtors, and may enter upon any premises of Debtors for that purpose and take all such action thereon as Lender may consider necessary or appropriate for such purpose.  All sums so paid or advanced by Lender ("Expense Payments"), together with interest thereon from the date paid, advanced, or incurred until repaid in full at a *per annum* rate of interest equal at all times to the default rate of interest described in the Note, shall be paid by Debtors to Lender upon demand by Lender.

5.28.    *Evidence of Ownership*.  Debtors shall promptly deliver to Lender, on demand, any contracts, bills of sale, statements, receipted vouchers, or agreements under which either Debtor claims title to any materials, fixtures, or articles incorporated in the property subject to the Lease or subjected to the security interest granted in this Agreement.

5.29.    *SBA Loan*.  Debtors shall perform in a timely manner all obligations, covenants and conditions required of Debtors under the SBA Authorization and all related agreements.  Debtors shall: (a) provide

Lender with all certifications, documents or other information Lender is required by the SBA Authorization to obtain from either Debtor or any third party; (b) execute any note and any other documents required by Lender; and (c) do everything necessary for Lender to comply with the terms and conditions of the SBA Authorization. Each Debtor hereby appoints Lender or any officer of Lender as such Debtor's attorney in fact for purposes of executing such documents and to perform such things as are necessary to cause compliance with the SBA Authorization, all in such Debtor's name, which power is coupled with an interest and irrevocable.

5.30.    _Field Examinations_.  Lender and the SBA may conduct field examinations of Debtors at such intervals as Lender or the SBA may determine.  All costs of the field examinations shall be paid by Debtors.

5.31.    _Equal Opportunity_.  Debtors shall post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public, and shall comply with the requirements of SBA Form 793, Notice to New SBA Debtors.

5.32.    _American Made Products_.  To the extent practicable, Debtors shall purchase only American-made equipment and products with the Loan Proceeds.

5.33.    _SBA Provisions_.  The Loan secured by this lien was made under a _United States Small Business Administration_ (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

        a.    When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

        b.    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

5.34.    _Vehicle Titles and Manufacturers' Statements of Origin_.  Promptly upon request by Lender, Debtors shall: (a) deliver to Lender all vehicle titles, manufacturers' statements of origin, and such other certificates of title and/or ownership applicable to any of either Debtor's assets; and (b) execute and deliver to Lender and cause to be filed with the appropriate filing office for perfecting a lien on and security interest in such assets of either Debtor having any such title, manufacturer's statement of origin or other certificate of title or ownership and shall cause Lender to be properly listed as lienholder and secured party thereon and shall take all such other actions to perfect Lender's security interest therein. Debtors shall pay the costs of filing any assignment, financing statement, security interest filing, lien instruments, lien certificates, financing statement addendum, continuation statement, release, termination statement or other filing required by Lender as well as any taxes or other fees required by Applicable Law to be paid in connection with the filing or recording of any such document.  Further, Debtors shall be solely responsible for all costs incurred by Lender in connection with the foregoing, including, without limitation, attorneys' fees, postage costs, lien search fees, release fees and filing fees.

## 6.    NEGATIVE COVENANTS

Without the prior written consent of Lender:

6.1.    *No Change of Name, Merger, Etc.*  Neither Debtor shall change its name, dissolve, merge, or consolidate with any other Person or acquire all or substantially all of the assets in any Person.  Without limiting the generality of the foregoing, neither Debtor shall acquire or form any Subsidiary, enter into any joint venture agreement, become a partner in any partnership or become a member in any limited liability company.  Neither Debtor shall make or permit to exist any loan, advance, investment (debt or equity), purchase of stock or other interest, or material acquisition of assets, other than accounts receivable that arise in the ordinary course of business.

6.2.    *No Change in Ownership.*  Neither Debtor shall cause or permit any conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance or alienation of any direct or indirect ownership interest in either Debtor.  Neither Debtor shall suffer or permit any change in the management of either Debtor or control over the day-to-day business operations of either Debtor.

6.3.    *No Sale or Transfer of Assets.*  Neither Debtor shall sell, transfer, lease or otherwise dispose of all or any part of the Collateral, or any material part of its other assets, except that Debtors, in the ordinary course of its business, and in the absence of a Default or an Event of Default or a contrary direction by Lender, may collect its accounts, chattel paper and payment intangibles and may sell its inventory in the ordinary course of its business.

6.4.    *No Encumbrance of Assets.*  Neither Debtor shall mortgage, pledge, grant or permit to exist a Lien upon any of the Collateral or any of its other assets of any kind, now owned or hereafter acquired, except for Liens granted by or otherwise expressly permitted under this Agreement.

6.5.    *No Purchase or Redemption; No Distributions.*  Neither Debtor shall: (a) purchase or redeem any interest in either Debtor; (b) make or declare or pay any dividends, distributions or withdraws; (c) set aside any funds for any such redemption, dividend, distribution or withdraw; or (d) prepay, purchase, or redeem any indebtedness of either Debtor other than the Loan except trade debt incurred in the ordinary course of either Debtor's business.

6.6.    *No Additional Indebtedness.*  Neither Debtor shall incur or permit to exist any indebtedness or liability on account of deposits or advances or for borrowed money or for the deferred purchase price of any property or services, except: (a) the Loan; (b) current debt incurred in the ordinary course of business; (c) the Subordinated Debt; and (d) debt secured by a Lien in favor of Lender.  Without limiting the generality of the foregoing, neither Debtor nor any Obligor shall guarantee, endorse, become contingently liable upon or assume the obligations of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

6.7.    *Loans; Distributions and Investments.*  Neither Debtor shall make any advance, loan, investment, purchase of stock or other interest, purchase of any customer lists of other accounting practices, or material acquisition of assets.  Further, any direct or indirect interest redemption or purchase of interest in either Debtor shall be subject to the approval of Lender, which approval shall be granted or withheld in Lender's sole and absolute discretion, and funded solely through the use of the proceeds from life insurance policies owned by either Debtor and not otherwise pledged or assigned to Lender as collateral for any indebtedness.

## 7.    DEFAULT AND REMEDIES

7.1.    *Events of Default.*  The occurrence of any of the following events shall constitute an Event of Default under this Agreement and under the other Loan Documents:

    a.    Failure to Pay.  Either Debtor fails to pay when due any of the Liabilities.

b.    <u>Failure of Representation or Warranty</u>.  Any representation or warranty made by either Debtor in this Agreement proves to have been incorrect or misleading in any material respect.

c.    <u>Breach of Affirmative Covenant</u>.  Either Debtor fails to perform or observe any of the affirmative covenants set forth in Section 5 of this Agreement.

d.    <u>Violation of Negative Covenant</u>.  Either Debtor violates any of the negative covenants set forth in Section 6 of this Agreement.

e.    <u>Default Under Other Loan Documents</u>.  An event of default (as defined therein) occurs under any of the other Loan Documents, which default remains uncured beyond the expiration of any applicable cure period.  Reference is made to the other Loan Documents for specific cure periods, if any, for specific types of defaults.

f.    <u>Insecurity of Lender</u>.  Lender in good faith deems itself to be insecure.

g.    <u>Impairment of Collateral</u>.  Any event shall occur which Lender in good faith deems to impair any of the Collateral or any other security for the Loan.

h.    <u>Failure of Perfection</u>.  Any security interest granted by this Agreement is unperfected due to any action or omission by either Debtor in violation of this Agreement.

i.    <u>Transfers of Collateral or Interests</u>.  The sale, transfer or encumbrance of (i) all or any part of the Collateral or any interest therein, except as expressly permitted by this Agreement, (ii) all, substantially all or material part of the property or other assets of either Debtor or any Obligor, (iii) any assets of either Debtor or any Obligor for other than reasonably equivalent value in the ordinary course of either Debtor's business, or (iv) any beneficial interest in either Debtor, any Obligor or any Subsidiary.

j.    <u>SBA Authorization</u>. A failure to perform or observe any covenant or agreement described in the SBA Authorization.

k.    <u>Cross-Default</u>.  A default occurs with respect to any obligation owed by either Debtor or any other Obligor to Lender or any other Person, and such default remains uncured beyond the expiration of any applicable cure period.

7.2.    <u>*Remedies of Lender*</u>.  Upon the occurrence of any Event of Default, in addition to all other rights and remedies available to Lender under the Loan Documents and Applicable Law, Lender shall have the following rights and remedies:

a.    <u>Acceleration</u>.  Lender may declare the Note and all other Liabilities to be immediately due and payable.

b.    <u>Protection of Collateral</u>.  Lender may take such steps as Lender deems appropriate to protect all or any portion of the Collateral or any other property owned or leased by either Debtor from depredation or injury including employment of watchmen or other protective services, all at the expense of Debtors.

c.    <u>Sale of Collateral</u>.  Lender shall have all of the rights and remedies of a secured party under the UCC and other Applicable Laws.  Upon demand by Lender, Debtors shall assemble the Collateral and make it available to Lender at a place designated by Lender which is mutually convenient to both parties.  Lender or its agents may enter upon Debtors' respective premises to take possession of the Collateral, to remove it, to render it unusable, or to sell or otherwise dispose of it, all without judicial process or proceedings.  Lender shall have no obligation to clean up or otherwise to prepare the Collateral for sale.  Any written notice of the sale, disposition, or other intended action by Lender with respect to the Collateral which is required by Applicable Laws and is sent by certified mail, postage prepaid, to Debtors at the address of such Debtor's chief executive office specified below, or such other address of such Debtor which may from time to time be shown on Lender's records, at least 10 calendar days prior to

13

such sale, disposition, or other action, shall constitute reasonable notice to Debtors. Lender, without adversely affecting the commercial reasonableness of any sale of the Collateral, (a) may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, and (b) may refuse to give or may disclaim any warranties of title or the like. Any proceeds of sale or other disposition of the Collateral shall be applied by Lender to the payment of Liquidation Costs and Expense Payments, and any balance of such proceeds will be applied by Lender to the payment of the remaining Liabilities, whether or not then due, in such order and manner of application as Lender may from time to time in its sole discretion determine. If the sale or other disposition of the Collateral fails to satisfy fully the Liabilities, Debtors shall remain liable to Lender for any deficiency. If Lender sells any of the Collateral on credit, Debtors shall be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of the purchaser. If the purchaser defaults in making payments to Lender, then Lender may resell the Collateral and apply the proceeds of such resale to the Liabilities in accordance with this paragraph.

d.      SBA Authorization. Lender may take all steps and advance all funds deemed necessary or desirable by Lender to keep the SBA Authorization in full force and effect and to cause compliance with all of the terms and provisions of the SBA Authorization.

e.      Set-Off. Lender may set-off any amounts in any account or represented by any certificate with Lender in the name of either Debtor or in which either Debtor has an interest. As additional security for the Note and the Loan, each Debtor hereby pledges and grants to Lender a lien on and security interest in, and authorizes Lender to offset such obligations of each Debtor and each Obligor to Lender against, all property of each Debtor now or at any time hereafter in the possession of, in transit to, under the control of, or on deposit with Lender, in any capacity whatsoever, including without limitation, any balance of any deposit account and any credits with Lender.

f.      Other Remedies. Lender may pursue such other remedies, including actions for specific performance and damages, or any remedies provided for in the Loan Documents or permitted by law, which Lender may deem appropriate, it being specifically understood and agreed that any remedies may be exercised in the alternative or cumulatively in the sole discretion of Lender.

g.      Liquidation Costs. Debtors shall reimburse and pay to Lender upon demand all Liquidation Costs, including without limitation attorneys' fees and expenses, advanced, incurred by, or on behalf of Lender in collecting and enforcing the Liabilities and the Loan Documents. All Liquidation Costs shall bear interest payable by Debtors to Lender upon demand from the date advanced or incurred until paid in full at a per annum rate of interest equal the default rate of interest described in the Note.

h.      No Waiver, Etc. No failure or delay by Lender to insist upon the strict performance of any term, condition, covenant, or agreement of this Agreement or of any of the other Loan Documents, or to exercise any right, power, or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant, or agreement or of any such breach, or preclude Lender from exercising any such right, power, or remedy at any later time or times. By accepting payment after the due date of any amount payable under this Agreement or under the Note or under any of the other Loan Documents, Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement, the Note or any of the other Loan Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount.

8.    **MISCELLANEOUS**

8.1.    *Notices.*  All notices, demands, requests and other communications required under this Agreement shall be in writing and shall be deemed to have been properly given if sent by hand delivery, Federal Express (or similar overnight courier service), or by United States certified mail (return receipt requested), postage prepaid, addressed to the party for whom it is intended at its address hereinafter set forth:

If to Lender:          Capital Bank, National Association
                       1776 Eye Street, NW

14

Washington, DC 20006
Attention: Chris Mullings, Senior Vice President

With copies to:

Bryan J. Pelino
Rosenberg Pelino LLC
6031 University Boulevard, Suite 300
Ellicott City, Maryland 21043

If to Debtors:   Smokecraft Clarendon, LLC
Smokecraft Holdings, LLC
3003 Washington Boulevard, Suite 101
Arlington, Virginia 22201
Attention: Andrew C. Darneille

Notice shall be deemed given as of the date of hand delivery, as of the date specified for delivery if by overnight courier service or as of 2 calendar days after the date of mailing, as the case may be.

8.2.   *Liability of Lender*.   Lender, by the acceptance and performance of this Agreement, does not assume any liability, and each Debtor hereby releases Lender and Lender's agents, employees and attorneys from any such liability, and no claim shall be made by either Debtor upon Lender or such employees or agents for or on account of any matter or thing in excess of the balance of the Loan Proceeds not yet advanced.

8.3.   *Survival*.   All agreements, covenants, representations, and warranties of Debtors made in this Agreement shall survive the making of the advances under this Agreement or any other Loan Document. The SBA Authorization shall continue to be in effect and shall survive the execution of this Agreement and the other Loan Documents.   If any term of the SBA Authorization conflicts with the terms of this Agreement, the terms of the SBA Authorization shall control.

8.4.   *Successors*.   This Agreement shall be binding upon and inure to the benefit of Debtors, their successors, and those assigns approved in writing by Lender, and upon and to Lender, its successors and assigns.

8.5.   *Applicable Law*.   This Agreement is made, executed, and delivered in the Commonwealth of Virginia.   Except as otherwise provided under Section 5.33 of this Agreement or as otherwise provided under SBA regulations, the law of the Commonwealth of Virginia (but excluding Virginia principles of conflicts of laws) shall govern its interpretation, performance, and enforcement.

8.6.   *Assignment not Effective*.   Any attempted assignment or transfer of either Debtor's rights under this Agreement without the prior written consent of Lender shall be void.

8.7.   *Obligations of Debtors*.   Debtors' obligations and representations under this Agreement are joint and several and are be in addition to all obligations, covenants, and representations made by or on behalf of Debtors in all other documents delivered in connection with the Loan and the transactions contemplated hereby.

8.8.   *No Oral Modification*.   Neither this Agreement nor any term, condition, representation, warranty, covenant, or agreement set forth in this Agreement may be changed, waived, discharged, or terminated orally but only by an instrument in writing by the party against whom such change, waiver, discharge, or termination is sought.

8.9.   *Integration*.   This Agreement and the Loan Documents constitute the entire agreement between Lender and Debtors regarding the Loan, and shall completely and fully supersede all other prior agreements, both written and oral, between Debtors and Lender regarding their respective rights, obligations, and responsibilities relating to the Loan.

15

8.10.    *Severability.*  If any provision or part of any provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

8.11.    *Time.*  Time is of the essence of all of Debtors' obligations under this Agreement.

## 9.    CONSENTS AND WAIVERS

9.1.    *Participations; Release of Information.*  The Loan, the Liabilities, this Agreement and the other Loan Documents may be placed, assigned, serviced or participated out (either in whole or in part) by Lender, its successors and assigns.  Each Debtor grants Lender its unlimited and unconditional consent to the disclosure and dissemination of financial records, including without limitation loan application and account information, statements of deposit and share accounts, negotiable instruments, individual, corporate and partnership financial statements, credit references and histories, property appraisals, surveys, pro forma assumptions, profit and loss statements, resumes, accounting reports, balance sheets, and other financial information provided to Lender by or on behalf of such Debtor, for such purposes as Lender, in its sole discretion, from time to time deems necessary or proper.  Each Debtor further releases, acquits and forever discharges Lender and its agents from all liability, claims, actions, or causes of action for disclosure of confidential financial records under any applicable federal or state statute or common law.

9.2.    *Consent to Jurisdiction.*  Each Debtor consents to the exclusive jurisdiction of any and all state and federal courts in the Commonwealth of Virginia with jurisdiction over such Debtor and such Debtor's assets as selected by Lender.  Each Debtor agrees that such assets shall be used first to satisfy all claims of creditors organized or domiciled in the United States of America, and that no assets of either Debtor in the United States of America shall be considered part of any foreign bankruptcy estate. Each Debtor agrees that any controversy arising under or in relation to the Note, this Agreement or any of the other Loan Documents shall be litigated exclusively in the Commonwealth of Virginia.  The state and federal courts and authorities with jurisdiction in the Commonwealth of Virginia shall have exclusive jurisdiction over all controversies which may arise under or in relation to the Note and any security for the debt evidenced by the Note, including without limitation those controversies relating to the execution, interpretation, breach, enforcement or compliance with the Note, this Agreement or any other issue arising under, related to, or in connection with any of the Loan Documents.  Each Debtor irrevocably consents to service, jurisdiction, and venue of such courts for any litigation arising from the Note, this Agreement or any other Loan Document, and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

9.3.    *JURY TRIAL WAIVER.*  EACH DEBTOR AND LENDER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH EITHER DEBTOR OR LENDER MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.  THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY EITHER DEBTOR, AND EACH DEBTOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  EACH DEBTOR FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

[SIGNATURES APPEAR ON NEXT PAGE]

IN WITNESS WHEREOF, Debtors and Lender have caused this Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**DEBTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
    Andrew C. Darneille
    Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

PATRICK EJINDU

By: _____ (SEAL)
    Andrew C. Darneille
    Sole Member and Manager

**LENDER**:

CAPITAL BANK, NATIONAL ASSOCIATION

Ramona Rash

By: _____ (SEAL)
    Name: _____
    Title: _____

[ACKNOWLEDGMENTS APPEAR ON NEXT PAGE]

*[Signature Page to Security Agreement]*

17

**Acknowledgments**

_Rockville_ OF _Montgomery_, CITY/COUNTY OF _maryland_, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____
NOTARY PUBLIC

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

My Commission Expires:
_9/9/22_

_Rockville_ OF _Montgomery_ CITY/COUNTY OF _Maryland_, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____
NOTARY PUBLIC

ERICA WANG (SEAL)
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

My Commission Expires:
_9/9/22_

_Rockville_ OF _Montgomery Co._ CITY/COUNTY OF _Maryland_, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared _Kathleen Conrad_, and acknowledged himself/herself to be a _EVP_ _____ of CAPITAL BANK, NATIONAL ASSOCIATION, and acknowledged that s/he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____(SEAL)
NOTARY PUBLIC

STEPHANIE A LANG
NOTARY PUBLIC
MY COMMISSION EXPIRES
APR. 3, 2026
MONTGOMERY COUNTY, MD

My Commission Expires:
_4/3/26_

**EXHIBIT A**
(Definitions)

After-Acquired Intellectual Property shall have the meaning ascribed to it in Section 3.4 of this Agreement.

Agreement means this Security Agreement, including all schedules and exhibits hereto, as it may be amended, restated, extended, consolidated or increased from time to time.

Applicable Law means all laws, statutes, treaty, codes, ordinances, regulations, rules, rulings, orders, judgments, decrees, injunctions, arbitral decisions, regulations, authorizations, determinations, directives and any other requirements and/or provisions (including building codes and zoning regulations and ordinances) of all Governmental Authorities, whether now or hereafter in force, which may be or become applicable to either Debtor or Lender, the relationship of lender and borrower, the Collateral, any of the Loan Documents, or any part of any of them (whether or not the same may be valid), and all requirements, obligations and conditions of all instruments of record applicable to the Collateral on the date hereof.

Code means the *Internal Revenue Code of 1986*, as amended, and the income tax regulations now or hereafter issued thereunder.

Collateral means all of each Debtor's assets wherever located, whether now owned or hereafter acquired, together with all products and proceeds thereof (both cash and non-cash), including without limitation, all of the following property of Debtors:

(a)     All of each Debtor's inventory both now owned and hereafter acquired, wherever located, and as the same may now and hereafter from time to time be constituted.

(b)     All of each Debtor's (i) accounts (including without limitation all health-care-insurance receivables) and (ii) notes, notes receivable, drafts, acceptances, and other instruments and documents, both now owned and hereafter acquired, together with all returned, rejected, or repossessed goods, the sale or lease of which shall have given or shall give rise to an account, instrument or document.

(c)     All of each Debtor's general intangibles (including, without limitation, all payment intangibles, things in action, contractual rights, goodwill, literary rights, trade names, domain names, rights to performance, Intellectual Property and software), both now owned and hereafter acquired.

(d)     All of each Debtor's rights, title, charges, abilities, licenses and interest in, to and under the any franchise or similar agreement.

(e)     All of each Debtor's chattel paper (including both electronic chattel paper and tangible chattel paper) both now owned and hereafter existing, acquired, or created, together with (i) all moneys due and to become due thereunder, (ii) all returned, rejected, or repossessed goods, the sale or lease of which shall have given or shall give rise to chattel paper, and (iii) all property and goods both now owned and hereafter acquired by either Debtor which are sold, leased, secured, are the subject of, or otherwise covered by, either Debtor's chattel paper, and all rights incident to such property and goods.

(f)     All of each Debtor's equipment, motor vehicles, and fixtures, both now owned and hereafter acquired, together with (i) all additions, parts, fittings, accessories, special tools, attachments, and accessions now and hereafter affixed thereto or used in connection therewith, and (ii) all replacements thereof and substitutions therefor.  All such fixtures are or will be attached to Debtors' chief executive offices or any other place of business of either Debtor as described in Exhibit B attached hereto.

(g)     All of each Debtor's as-extracted collateral.

(h)     All of each Debtor's commodity accounts, commodity contracts, financial assets, securities (whether certificated or uncertificated), securities entitlements, securities accounts and other investment property, both now owned and hereafter acquired.

(i)     All of each Debtor's deposit accounts, both now owned and hereafter acquired.

(j)     All of each Debtor's letter-of-credit rights, both now owned and hereafter acquired.

(k)     All cash and non-cash proceeds (including insurance proceeds) and products of any of the foregoing.

Collateral Account has the meaning ascribed to it in Section 5.23 of the Agreement.

Commonly Controlled Entity means any subsidiary or any other trade or business (whether or not incorporated) which is under "common control" (as defined in the Code) with either Debtor or any of its subsidiaries.

Controlling Interest means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

Copyright License means any written agreement granting any right to any third party under any Copyright owned by either Debtor or that either Debtor otherwise has the right to license, or granting any right to either Debtor under any Copyright owned by any third party.

Copyrights means all of the following now owned or hereafter acquired by or assigned to either Debtor: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished and (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including, without limitation, those listed on Schedule A to the applicable Grant of Security Interest and all: (i) rights and privileges arising under applicable law with respect to either Debtor's use of such copyrights, (ii) renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

Credit Agreement means the Credit Agreement of even date herewith by and among Debtors, Lender and others, as it may be amended, restated, extended, spread, consolidated or increased from time to time.

Debtors means, collectively, Smokecraft Clarendon, LLC, a Virginia limited liability company and Smokecraft Holdings, LLC, a Virginia limited liability company.

Event of Default means any of those events described in Section 7.1 of this Agreement.

Expense Payment has the meaning ascribed to it in Section 5.27 of this Agreement.

GAAP shall have the meaning ascribed to it in Section 1.2 of this Agreement.

Governmental Authority means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, official, instrumentality, regulatory body, court, central bank, quasi-governmental agency or group or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government and all officials, boards, departments, agencies and instrumentalities thereof.

Grant of Security Interest shall have the meaning ascribed to it in Section 3.1 of this Agreement.

Hazardous Substance means: (a) any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the *Comprehensive Environmental Response, Compensation and Liability Act of 1980*, as amended, 42 U.S.C.A. § 9601(14), as a "hazardous substance," (ii) the *Clean Water Act*, 33 U.S.C.A. § 1321(b)(2)(A), as a "hazardous substance," (iii) the *Clean Water Act*, 33 U.S.C.A. §§ 1317(a) and 1362(13), as a "toxic pollutant," (iv) Table 1 of Committee Print Numbered 95-30 of the Committee on Public Works And Transportation of the United States House of Representatives as a "toxic pollutant," (v) the *Clean Air Act*, 42 U.S.C.A. § 7412(a)(1), as a "hazardous air pollutant," (vi) *Toxic Substances Control Act*, 15 U.S.C.A. § 2606(f), as an "imminently hazardous chemical substance or mixture," (vii) the *Resource, Conservation and Recovery Act*, 42 U.S.C.A. §§ 6903(5) and 6921, as a "hazardous waste," or (viii) any other law as presenting an imminent and substantial danger to the public health or welfare or to the environment, or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation; (b) petroleum, crude oil, gasoline, natural gas, liquefied natural gas, synthetic fuel, or other petroleum, oil, or gas based product; (c) any nuclear, radioactive, or atomic substance, mixture, waste, compound, material, element, product, or matter; or (d) any other substance, mixture, waste, compound, material, element, product or matter that presents an imminent and substantial danger to the public health or welfare or to the environment upon its spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, or dumping.

Identified Party means each Debtor, each Obligor, each affiliate of either Debtor or any Obligor and each Principal of any of the foregoing.

Intellectual Property means all of each Debtor's right, title, and interest in Patents, Copyrights, Licenses, and Trademarks, whether now owned or held, or hereafter acquired by either Debtor.

IP Collateral means the Collateral consisting of Intellectual Property.

Items of Payment means all checks, drafts, cash, and other remittances in payment or on account of payment for or of inventory, accounts, or chattel paper or payment intangibles, and the cash proceeds of any returned goods, the sale or lease of which gave rise to an account or chattel paper.

Lease means any lease agreement for real property to which either Debtor is a party or by which either Debtor may be bound.

Lender means Capital Bank, National Association.

Liabilities means: the obligations of Debtors to pay: (a) the unpaid principal amount of the Note, plus all accrued and unpaid interest thereon; (b) all unpaid Expense Payments; (c) all unpaid Liquidation Costs; and (d) all other charges, interest, and expenses chargeable by Lender to either Debtor under the Note, this Agreement and the other Loan Documents.

License means any Patent License, Trademark License, Copyright License or other written agreement granting rights under Intellectual Property to which either Debtor is a party.

Lien means any mortgage, deed of trust, pledge, security interest, assignment, encumbrance, lien, or charge of any kind, including without limitation any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the UCC or the *Uniform Commercial Code* of any other jurisdiction.

Liquidation Costs means all expenses, charges, costs, and fees (including without limitation attorneys' fees and expenses) of any nature whatsoever paid or incurred by or on behalf of Lender in connection with:  (a) the collection or enforcement of any of the Liabilities; and (b) the collection or enforcement of any of the Loan Documents.

Loan means the loan in the principal amount of $1,200,000 made by Lender to Debtors pursuant to the terms and conditions of this Agreement and the SBA Authorization.

Loan Documents means, collectively, this Agreement, the Credit Agreement, the Note, and all other instruments, documents, and agreements now or hereafter evidencing, securing, guaranteeing, indemnifying, or given by either Debtor, any Obligor or any third party in connection with the Loan or any of the other Liabilities, as such documents may be amended, restated, extended, spread, consolidated or increased from time to time.

Loan Proceeds means the funds advanced by Lender as proceeds of the Loan.

Note means the SBA Form 147 Note of even date herewith in the principal amount of $1,200,000 made by Debtors to the order of Lender, as it may be amended, restated, extended, consolidated or increased from time to time.

Obligor means any Person other than Debtors who may at any time now or hereafter be primarily or secondarily liable for any or all of the Liabilities or who has granted any security for any of the Liabilities, including, without limitation, each guarantor and any other maker, endorser, surety, or guarantor of all or a portion of the Liabilities or any Person, other than Lender, who is now or hereafter a party to any of the Loan Documents.

Patent License means any written agreement granting to any third party any right to import, make, have made, offer for sale, use or sell any invention on which a Patent owned by either Debtor or that either Debtor otherwise has the right to license, is in existence, or granting to either Debtor any such right with respect to any invention on which a Patent owned by any third party, is in existence.

Patents means all of the following now owned or hereafter acquired by either Debtor: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including, without limitation, those listed on Schedule A to the applicable Grant of Security Interest; and (b) all (i) rights and privileges arising under applicable law with respect to either Debtor's use of any patents, (ii) reissues, divisions, continuations, extensions and continuations-in-part thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

Person means an individual, an estate, a trust, a corporation, a partnership, limited liability company, a government or governmental agency or instrumentality and any other legal entity.

Principal means if a sole proprietorship, the proprietor; if a partnership, each managing partner and each partner who is a natural person and holds an ownership interest in the partnership; and if a corporation, limited liability company, association or a development company, each director, each of the five most highly compensated executives or officers of the entity, and each natural person who is a direct or indirect holder of any of the interest, ownership stock or stock equivalent of the entity.

SBA means the United States Small Business Administration.

SBA Authorization means the SBA Authorization issued in connection with the Loan, having an SBA Loan No. of 36035970-10 and an approval date of March 15, 2019, as amended from time to time.

Subordinated Debt means loans from officers, directors, shareholders, or other direct or indirect beneficial owners of either Debtor to such Debtor that are subordinated to repayment of the Liabilities upon terms satisfactory to Lender in all respects and pursuant to this Agreement and/or such other agreement acceptable to Lender in form and substance.

Subsidiary means any corporation, partnership, limited liability company, association, or other business entity (a) in which a Controlling Interest is owned or controlled by such Debtor, or (b) a majority

(by number of votes) of the outstanding shares of any class or classes of which shall at the time be owned or controlled by such Debtor, if the holders of the shares of such class or classes (i) are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors (or Persons performing similar functions) of the issuer thereof, even though the right to vote has been suspended by the happening of such a contingency, or (ii) are at the time entitled, as such holders, to elect a majority of the directors (or Persons performing similar functions) of the issuer thereof, whether or not the right to vote exists by reason of the happening of a contingency.

Taxes means all taxes and assessments, whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character (including all federal, state, local, income, payroll, real estate and sales taxes and all penalties or interest thereon), which at any time may be assessed, levied, confirmed, or imposed on either Debtor or any of either Debtor's properties or assets or income or any part thereof or in respect of any of either Debtor's franchises, businesses, income or profits, and all claims for sums which by law have or might become a lien or charge upon any of either Debtor's properties or assets or any part thereof.

Trademark License means any written agreement granting to any third party any right to use any Trademark owned by either Debtor or that either Debtor otherwise has the right to license, or granting to either Debtor any right to use any Trademark owned by any third party.

Trademarks means all of the following now owned or hereafter acquired by either Debtor: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names or other source or business identifiers or designs of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations thereof, and all registration applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, including, without limitation, those listed on Schedule A to the applicable Grant of Security Interest, (b) all rights and privileges arising under applicable law with respect to either Debtor's use of any trademarks, (c) all extensions and renewals thereof, (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof, (e) all rights corresponding thereto throughout the world and (f) all rights to sue for past, present and future infringements or dilutions thereof.

UCC means the *Uniform Commercial Code* as in effect from time to time in the Commonwealth of Virginia; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection or the priority of a security interest in any collateral or the availability of any remedy hereunder is governed by the *Uniform Commercial Code* as in effect in a jurisdiction other than the Commonwealth of Virginia, "UCC" means the *Uniform Commercial Code* as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority or availability of such remedy, as the case may be, as determined by Lender.

4

## EXHIBIT B

**Debtors' correct legal names:**
- Smokecraft Clarendon, LLC
- Smokecraft Holdings, LLC

Smokecraft Clarendon, LLC
Smokecraft Holdings, LLC

**Other legal names and trade names used by Debtors during the previous 12 years:**
- Smokecraft Clarendon, LLC
- Smokecraft Holdings, LLC

None
Smokecraft Modern Barbeque

**Debtors' jurisdiction of formation:**
- Smokecraft Clarendon, LLC
- Smokecraft Holdings, LLC

Virginia
Virginia

**Debtors' state of formation organizational ID nos.:**
- Smokecraft Clarendon, LLC
- Smokecraft Holdings, LLC

S7543376
S7543392

**Debtors' federal tax identification numbers:**
- Smokecraft Clarendon, LLC
- Smokecraft Holdings, LLC

83-1543479
83-1066983

**Address of Debtors:**

3003 Washington Boulevard, Suite 101
Arlington, Virginia 22201

**Addresses of all other places of business of Debtors:**

NONE

## EXHIBIT C

### [FORM OF] TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31 , 2020 is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors") in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1. <u>Terms</u>. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. <u>Grant of Security</u>. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in, all of each Grantor's right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Trademark Collateral"): (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names or other source or business identifiers or designs of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations thereof, and all registration applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, including, without limitation, those listed on <u>Schedule A</u> attached hereto; (b) all rights and privileges arising under applicable law with respect to Grantors' use of any trademarks; (c) all extensions and renewals thereof; (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof; (e) all rights corresponding thereto throughout the world; (f) all rights to sue for past, present and future infringements or dilutions thereof; and (g) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing; provided that, in no event shall any security interest be granted in any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance by the United States Patent and Trademark Office of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law (it being understood that after such period such intent-to-use application shall be automatically subject to the security interest granted herein).

SECTION 3. Security for Liabilities. The grant of a security interest in the Trademarks by Grantors under this Trademark Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4. Recordation. Each Grantor authorizes and requests that the Commissioner for Trademarks record this Trademark Security Agreement.

SECTION 5. Execution in Counterparts. This Trademark Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument. Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Trademark Security Agreement shall be effective as delivery of an original executed counterpart of this Trademark Security Agreement.

SECTION 6. Security Agreement. This Trademark Security Agreement has been entered into in conjunction with the provisions of the Security Agreement. Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein. In the event that any provision of this Trademark Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7. Governing Law. EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS TRADEMARK SECURITY AGREEMENT, THIS TRADEMARK SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8. SBA Provisions. The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a. When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b. Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument. Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note. The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Trademark Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                          **GRANTORS**:

                                          SMOKECRAFT CLARENDON, LLC
                                          A Virginia Limited Liability Company

_____           By: _____ (SEAL)
PATRICK EJINDU                                 Andrew C. Darneille
                                               Manager

                                          SMOKECRAFT HOLDINGS, LLC
                                          A Virginia Limited Liability Company

_____           By: _____ (SEAL)
PATRICK EJINDU                                 Andrew C. Darneille
                                               Sole Member and Manager

**Acknowledgments**

Rockville ___ OF Montgomery ___, CITY/COUNTY OF Maryland ___, TO WIT:

    I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

    IN WITNESS MY Hand and Notarial Seal.

                                          _____
                                          NOTARY PUBLIC

My Commission Expires:                    ERICA WANG (SEAL)
9/9/22                                    NOTARY PUBLIC
                                          MONTGOMERY COUNTY
                                          MARYLAND
                                          My Commission Expires 9-9-2022

Rockville ___ OF Montgomery ___, CITY/COUNTY OF Maryland ___, TO WIT:

    I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

    IN WITNESS MY Hand and Notarial Seal.

                                          _____(SEAL)
                                          NOTARY PUBLIC

My Commission Expires:                    ERICA WANG
9/9/22                                    NOTARY PUBLIC
                                          MONTGOMERY COUNTY
                                          MARYLAND
                                          My Commission Expires 9-9-2022

<u>SCHEDULE A</u>

**UNITED STATES TRADEMARKS**

| MARK | OWNER/HOLDER | SERIAL/REG. NO. | APP./REG. DATE |
|------|--------------|-----------------|----------------|
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |
|      |              |                 |                |

## EXHIBIT D

### [FORM OF] PATENT SECURITY AGREEMENT

This PATENT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020 is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors") in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1. <u>Terms</u>. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. <u>Grant of Security</u>. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, for the benefit of Lender, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Patent Collateral"): (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on <u>Schedule A</u> attached hereto; (b) all (i) rights and privileges arising under applicable law with respect to Grantors' use of any patents, (ii) reissues, divisions, continuations, extensions and continuations-in-part thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world, and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3. <u>Security for Liabilities</u>. The grant of a security interest in the Patent by Grantors under this Patent Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4. <u>Recordation</u>. Each Grantor authorizes and requests that the Commissioner for Patents record this Patent Security Agreement.

SECTION 5. <u>Execution in Counterparts</u>. This Patent Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument. Delivery by telecopier or by electronic .pdf copy of an

executed counterpart of a signature page to this Patent Security Agreement shall be effective as delivery of an original executed counterpart of this Patent Security Agreement.

SECTION 6. Security Agreement. This Patent Security Agreement has been entered into in conjunction with the provisions of the Security Agreement. Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein. In the event that any provision of this Patent Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7. Governing Law. EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS PATENT SECURITY AGREEMENT, THIS PATENT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8. SBA Provisions. The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a.      When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.      Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument. Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note. The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Patent Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**GRANTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
Andrew C. Darneille
Manager

_____
PATRICK EJINDU

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
Andrew C. Darneille
Sole Member and Manager

_____
PATRICK EJINDU

**Acknowledgments**

Rockville OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____
NOTARY PUBLIC

My Commission Expires:
9/9/22

> ERICA WANG
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> My Commission Expires 9-9-2022

Rockville OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

> ERICA WANG
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> My Commission Expires 9-9-2022

SCHEDULE A

**UNITED STATED PATENTS**

| PATENT | OWNER/HOLDER | PATENT NO. | FILING/ISSUE DATE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## **EXHIBIT E**

### [FORM OF] COPYRIGHT SECURITY AGREEMENT

This COPYRIGHT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020 is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively. "Grantors") in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Copyright Security Agreement for recording with the U.S. Copyright Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1. Terms. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. Grant of Security. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral (as defined in the Security Agreement) of Grantors (collectively, "Copyright Collateral"): (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished; (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on Schedule A attached hereto: (i) rights and privileges arising under applicable law with respect to Grantors' use of such copyrights, (ii) renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3. Security for Liabilities. The grant of a security interest in the Copyrights and exclusive Copyright Licenses by Grantors under this Copyright Security Agreement is made to secure the payment or performance, as the case may be, in full of the Liabilities.

SECTION 4. Recordation. Each Grantor authorizes and requests that the Register of Copyrights record this Copyright Security Agreement.

SECTION 5. Execution in Counterparts. This Copyright Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same agreement. Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Copyright Security Agreement shall be effective as delivery of an original executed counterpart of this Copyright Security Agreement.

SECTION 6. <u>Security Agreement</u>. This Copyright Security Agreement has been entered into in conjunction with the provisions of the Security Agreement. Each Grantor does hereby acknowledges and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein. In the event that any provision of this Copyright Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7. <u>Governing Law</u>. EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS COPYRIGHT SECURITY AGREEMENT, THIS COPYRIGHT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8. <u>SBA Provisions</u>. The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a.    When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument. Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note. The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Copyright Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                          **GRANTORS**:

                                         SMOKECRAFT CLARENDON, LLC
                                         A Virginia Limited Liability Company

_____                  By: _____ (SEAL)
PATRICK EJINDU                               Andrew C. Darneille
                                             Manager

                                         SMOKECRAFT HOLDINGS, LLC
                                         A Virginia Limited Liability Company

_____                  By: _____ (SEAL)
PATRICK EJINDU                               Andrew C. Darneille
                                             Sole Member and Manager

**Acknowledgments**

Rockville __ OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

                                         _____ (SEAL)
                                         NOTARY PUBLIC

My Commission Expires:
9/9/22

                                         ERICA WANG
                                         NOTARY PUBLIC
                                         MONTGOMERY COUNTY
                                         MARYLAND
                                         My Commission Expires 9-9-2022

Rockville __ OF Montgomery, CITY/COUNTY OF Maryland, TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

                                         _____ (SEAL)
                                         NOTARY PUBLIC

My Commission Expires:
9/9/22

                                         ERICA WANG
                                         NOTARY PUBLIC
                                         MONTGOMERY COUNTY
                                         MARYLAND
                                         My Commission Expires 9-9-2022

SCHEDULE A

**UNITED STATES COPYRIGHTS**

| COPYRIGHT | OWNER/HOLDER | COPYRIGHT NO. | APP./REG. DATE |
|-----------|--------------|---------------|----------------|
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |

TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1. Terms. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. Grant of Security. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in, all of each Grantor's right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Trademark Collateral"): (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names or other source or business identifiers or designs of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations thereof, and all registration applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, including, without limitation, those listed on Schedule A attached hereto; (b) all rights and privileges arising under applicable law with respect to Grantors' use of any trademarks; (c) all extensions and renewals thereof; (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof; (e) all rights corresponding thereto throughout the world; (f) all rights to sue for past, present and future infringements or dilutions thereof; and (g) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing; provided that, in no event shall any security interest be granted in any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance by the United States Patent and Trademark Office of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law (it being understood that after such period such intent-to-use application shall be automatically subject to the security interest granted herein).

SECTION 3. Security for Liabilities. The grant of a security interest in the Trademarks by Grantors under this Trademark Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4.  Recordation.  Each Grantor authorizes and requests that the Commissioner for Trademarks record this Trademark Security Agreement.

SECTION 5.  Execution in Counterparts.  This Trademark Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument.  Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Trademark Security Agreement shall be effective as delivery of an original executed counterpart of this Trademark Security Agreement.

SECTION 6.  Security Agreement.  This Trademark Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.  In the event that any provision of this Trademark Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7.  Governing Law.  EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS TRADEMARK SECURITY AGREEMENT, THIS TRADEMARK SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8.  SBA Provisions.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.       When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.       Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Trademark Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**GRANTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
      Andrew C. Darneille
      Manager

PATRICK EJINDU

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
      Andrew C. Darneille
      Sole Member and Manager

PATRICK EJINDU

**Acknowledgments**

STATE OF _Maryland_ , CITY/COUNTY OF _Rockville Montgomery_ , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
_9/9/22_

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

STATE OF _Maryland_ , CITY/COUNTY OF _Rockville Montgomery_ , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
_9/9/22_

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

SCHEDULE A

## UNITED STATES TRADEMARKS

| MARK | OWNER/HOLDER | SERIAL/REG. NO. | APP./REG. DATE |
|---|---|---|---|
| SMOKECRAFT | Smokecraft Holdings, LLC | 88242015 | December 26, 2018 |
| SMOKECRAFT | Smokecraft Holdings, LLC | 88075579 | August 13, 2018 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

PATENT SECURITY AGREEMENT

This PATENT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors agree as follows:

SECTION 1. Terms. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. Grant of Security. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, for the benefit of Lender, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral of Grantors (collectively, "Patent Collateral"): (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on Schedule A attached hereto; (b) all (i) rights and privileges arising under applicable law with respect to Grantors' use of any patents, (ii) reissues, divisions, continuations, extensions and continuations-in-part thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world, and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3. Security for Liabilities. The grant of a security interest in the Patent by Grantors under this Patent Security Agreement is made to secure the payment and performance in full of the Liabilities.

SECTION 4. Recordation. Each Grantor authorizes and requests that the Commissioner for Patents record this Patent Security Agreement.

SECTION 5. Execution in Counterparts. This Patent Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument. Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Patent Security Agreement shall be effective as delivery of an original executed counterpart of this Patent Security Agreement.

SECTION 6.  Security Agreement.  This Patent Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.  In the event that any provision of this Patent Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7.  Governing Law.  EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS PATENT SECURITY AGREEMENT, THIS PATENT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8.  SBA Provisions.  The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a.    When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.  Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note.  The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Grantors and Lender have caused this Patent Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:

**GRANTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
Andrew C. Darneille
Manager

PATRICK EJINDU

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

By: _____ (SEAL)
Andrew C. Darneille
Sole Member and Manager

PATRICK EJINDU

**Acknowledgments**

STATE OF Maryland , CITY/COUNTY OF Rockville Montgomery , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

STATE OF Maryland , CITY/COUNTY OF Rockville Montgomery , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

ERICA WANG
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
My Commission Expires 9-9-2022

SCHEDULE A

**UNITED STATED PATENTS**

| PATENT | OWNER/HOLDER | PATENT NO. | FILING/ISSUE DATE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

COPYRIGHT SECURITY AGREEMENT

This COPYRIGHT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Trademark Security Agreement") dated January 31, 2020, is made by **SMOKECRAFT CLARENDON, LLC**, a Virginia limited liability company, **SMOKECRAFT HOLDINGS, LLC**, a Virginia limited liability company (collectively, "Grantors"), in favor of **CAPITAL BANK, NATIONAL ASSOCIATION** ("Lender").

Grantors have requested that Lender make a loan to Grantors and Lender has agreed to do so in accordance with the terms and conditions of the Security Agreement dated January 31, 2020 among Grantors and Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, "Security Agreement") and certain other documents and agreement executed and delivered in connection therewith.

WHEREAS, under the terms of the Security Agreement, Grantors have granted to Lender a security interest in, among other property, certain intellectual property of Grantors, and has agreed as a condition thereof to execute this Copyright Security Agreement for recording with the U.S. Copyright Office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1. <u>Terms</u>. Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to the in the Security Agreement.

SECTION 2. <u>Grant of Security</u>. As security for the payment and performance in full of the Liabilities and the payment and performance of all of Grantors' obligations under the Loan Documents or otherwise to Lender, each Grantor hereby grants to Lender, its successors and assigns, a security interest in all of Grantors' right, title and interest in, to and under all of the following Collateral (as defined in the Security Agreement) of Grantors (collectively, "Copyright Collateral"): (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished; (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on <u>Schedule A</u> attached hereto: (i) rights and privileges arising under applicable law with respect to Grantors' use of such copyrights, (ii) renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof; and (c) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

SECTION 3. <u>Security for Liabilities</u>. The grant of a security interest in the Copyrights and exclusive Copyright Licenses by Grantors under this Copyright Security Agreement is made to secure the payment or performance, as the case may be, in full of the Liabilities.

SECTION 4. <u>Recordation</u>. Each Grantor authorizes and requests that the Register of Copyrights record this Copyright Security Agreement.

SECTION 5. <u>Execution in Counterparts</u>. This Copyright Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same agreement. Delivery by telecopier or by electronic .pdf copy of an executed counterpart of a signature page to this Copyright Security Agreement shall be effective as delivery of an original executed counterpart of this Copyright Security Agreement.

SECTION 6. <u>Security Agreement</u>. This Copyright Security Agreement has been entered into in conjunction with the provisions of the Security Agreement. Each Grantor does hereby acknowledges and

confirm that the grant of the security interest hereunder to, and the rights and remedies of, Lender with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein. In the event that any provision of this Copyright Security Agreement is deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall control.

SECTION 7. Governing Law. EXCEPT AS OTHERWISE PROVIDED UNDER FEDERAL LAW OR UNDER SECTION 8 OF THIS COPYRIGHT SECURITY AGREEMENT, THIS COPYRIGHT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE LAW OF THE COMMONWEALTH OF VIRGINIA.

SECTION 8. SBA Provisions. The Loan secured by this lien was made under a *United States Small Business Administration* (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a.      When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b.      Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument. Lender shall not enforce any cross-collateralization provision contained in this Agreement or any other Loan Document at any time when the SBA is the holder of the Note. The contrary notwithstanding, the covenants and provisions contained in the Loan Documents shall be subject to the restrictions and requirements of SOP 50 10 and such other laws, rules and regulations during such times as they are applicable to the Loan.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Grantors and Lender have caused this Copyright Security Agreement to be executed under seal as of the date first above written.

WITNESS/ATTEST:                          **GRANTORS**:

SMOKECRAFT CLARENDON, LLC
A Virginia Limited Liability Company

_____        By: _____ (SEAL)
PATRICK  EJINDU                        Andrew C. Darneille
                                      Manager

SMOKECRAFT HOLDINGS, LLC
A Virginia Limited Liability Company

_____        By: _____ (SEAL)
PATRICK  EJINDU                        Andrew C. Darneille
                                      Sole Member and Manager

**Acknowledgments**

STATE OF Maryland , CITY/COUNTY OF Montgomery Rockville , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Manager of SMOKECRAFT CLARENDON, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

> ERICA WANG
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> My Commission Expires 9-9-2022

STATE OF Maryland , CITY/COUNTY OF Montgomery Rockville , TO WIT:

I HEREBY CERTIFY that on this ____ day of January, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Andrew C. Darneille, and acknowledged himself to be the Sole Member and Manager of SMOKECRAFT HOLDINGS, LLC, a Virginia limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
9/9/22

> ERICA WANG
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> My Commission Expires 9-9-2022

SCHEDULE A

**UNITED STATES COPYRIGHTS**

| COPYRIGHT | OWNER/HOLDER | COPYRIGHT NO. | APP./REG. DATE |
|-----------|--------------|---------------|----------------|
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |
|           |              |               |                |